# EXHIBIT 1

Case: 23-50489     Document: 6     Page: 2     Date Filed: 06/30/2023

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

CAREER COLLEGES
& SCHOOLS OF TEXAS,

        Plaintiff,

v.

UNITED STATES DEPARTMENT OF
EDUCATION; MIGUEL CARDONA,
in his official capacity as the Secretary
of Education,

        Defendants.

CASE NO.: 4:23-cv-206-P

**DECLARATION OF
JEFF ARTHUR**

I, Jeff Arthur, do hereby declare and state as follows:

## BACKGROUND

1.     I make this declaration in support of Career Colleges & Schools of Texas's ("CCST") Motion for Preliminary Injunction. This declaration is based on my personal knowledge, and I could and would competently testify to its contents if called to do so.

2.     I am the Vice President of Regulatory Affairs and Chief Information Officer for ECPI University, which is headquartered in Virginia Beach, VA. I joined ECPI University in April 1993, and have worked in career education and the proprietary sector for almost 40 years.

3.     As Vice President of Regulatory Affairs and Chief Information Officer, I am responsible for, among other things, overseeing our schools' compliance with Title IV and other regulations.

Case: 23-50489     Document: 6     Page: 3     Date Filed: 06/30/2023

4.     Founded in 1966, ECPI University was initially formed as an institution focused entirely on accelerated education in computer science and computer programming. ECPI University has since expanded to the bachelor's and master's degree levels with educational offerings that include nursing, advanced clinical and health sciences, electronics engineering, and business. Today, ECPI University is one of the country's most prominent providers of career education and training, with enrollment of over 12,000, operating six colleges and 20 campuses across five states, including the State of Texas.

5.     Over the last 50 years, ECPI University has graduated more than 75,000 students. Its graduates have earned degrees in computer science, electronics engineering technology, health science, nursing, business, criminal justice, and the culinary arts.

### ECPI University—Texas

6.     One of ECPI University's most exciting developments has been its expansion to Texas, beginning with the development of a state of the art campus with facilities in San Antonio, Texas ("ECPI Texas").

7.     ECPI Texas, like all ECPI University campuses, participates in the Direct Loan Program.

8.     ECPI Texas's educational offerings include nursing, computer science, and engineering technologies.

9.     Since its founding, ECPI Texas has been a member of trade association Career Colleges and Schools of Texas (CCST).

### THE FINAL RULE

10.    In my role at ECPI University, I have developed a keen understanding of the issues and implications of the Department of Education (the "Department")'s November 1, 2022 final

Case: 23-50489     Document: 6     Page: 4     Date Filed: 06/30/2023

rule regarding the Department's administration of student loans under the William D. Ford Federal Direct Loan ("Direct Loan"), the Federal Perkins Loan, and the Federal Family Education Loan programs. *See* 87 Fed. Reg. 65,904 (Nov. 1, 2022) (the "Final Rule").

11.     I am especially familiar with the Final Rule's provisions and how they have harmed, continue to harm, and will substantially threaten further harm to ECPI University, their staff, students, alumni, and the communities they serve both before and after the Final Rule takes effect on July 1, 2023.

12.     On account of its participation in the Department of Education's Direct Loan Program, ECPI Texas is subject to the Final Rule's provisions and requirements.

13.     The majority of the students enrolled at ECPI Texas have taken out Direct Loans to support their educational goals.

14.     ECPI University fully supports carefully considered and thoughtful regulations that preserve and equally protect the rights of students and the schools that educate them; however, the Final Rule does not exhibit those qualities and, in fact, has and will substantially threaten the viability of not only ECPI University, but career education schools across the country.

**PREPARATORY EFFORTS AND ONGOING HARM**

15.     As VP of Regulatory Affairs, I oversee ECPI University's regulatory compliance initiatives and resources, including those related to staffing and compliance costs. ECPI University has four staff directly responsible for monitoring regulations and ensuring its schools' compliance with state and federal regulations, and an additional 10-12 who directly monitor all Title IV documentation for compliance.

16.     In anticipation of the Final Rule's July 1, 2023 effective date, ECPI has already undertaken and continues to undertake significant efforts to comply with the Rule's requirements

and to, as best as possible, prepare for the anticipated harms that will result from the overhauled borrower defense to repayment regulations. ECPI has expended significant time and effort preparing and training staff to comply with the new regulations. These preparations include:

a. Training ECPI University staff on the Final Rule's requirements;

b. Reviewing recruitment and advertising materials and training recruiting, admissions, financial aid, and student records staffs. Preparing to train faculty and other staff in connection with the Final Rule's borrower defense regulations, which presume liability against schools;

c. Rewriting our enrollment agreements to remove arbitration and class action waiver provisions;

d. Implementing new record-keeping policies and training to account for the removal of the statute of limitations period on borrower defense claims and the possibility that recoupment proceedings could be instituted for ECPI University graduates whose enrollments ended several years ago;

e. Implementing and dramatically expanding systems that monitor representations made by hundreds of staff both in recruiting processes and to our tens of thousands of students, including verbal and digital communications, including engaging in extensive legal reviews of the monitored content.

f. Ensuring a considered and thorough legal review of proposed communications, documents, and scripts.

17.    ECPI University employs ~60 staff members who are responsible for monitoring and complying with Department of Education regulations. These staff members are being and will need to be further trained regarding Final Rule's provisions and requirements.

Case: 23-50489     Document: 6     Page: 6     Date Filed: 06/30/2023

18.    ECPI employs 95 staff members who are responsible for assisting students in obtaining loans through the Direct Loan Program. These staff members are being and will need to be constantly trained regarding Final Rule's provisions and requirements.

19.    ECPI also employs over 100 staff members who are responsible for new student engagement, advertising of the school's educational programs, and preparing marketing materials. These staff members are being and will need to be constantly trained regarding Final Rule's provisions and requirements.

20.    I expect that the costs and burdens to ECPI Texas and ECPI University, generally, associated with the aforementioned activities will only increase further with incredible urgency if the Final Rule is permitted to go into effect.

### CLOSED SCHOOL DISCHARGE, BORROWER DEFENSE TO REPAYMENT, AND ARBITRATION AND CLASS ACTION WAIVER PROVISIONS

21.    In my role at ECPI University, I am also involved in decisions concerning growth and strategic planning, including decisions about ways in which to meet or respond to changes in employer demand for career education and new programming. These decisions include whether to open campuses in new geographic regions, close or consolidate campuses and facilities, transfer students to improved or upgraded facilities, and expand or modify certain program offerings in accordance with student needs and convenience.

22.    As a result of the Final Rule's closed school discharge provisions, ECPI University has been forced to abandon plans to build new or upgrade existing schools in not only Texas but across the country. The risk is simply too great.

23.    This is because of potential and extensive liability that will result from the Final Rule's overly broad criteria for what constitutes a "closed school" and imposition of complete loan discharges to students who attend or have attended the school.

Case: 23-50489     Document: 6     Page: 7     Date Filed: 06/30/2023

24.     Pursuant to the Final Rule's criteria, a "closed school discharge" could be triggered by consolidating facilities or cutting back certain programs, even if a campus remains open and certainly when ECPI University remains open. Upon the Department's determination that the criteria is met, a school would be presumptively held liable for the entire amount of the resulting loan discharges. Not only is this a significant portion of revenue, but it would also include any loan funds received by the student to pay for their personal expenses, including rent, food, transportation, and computer equipment. This would be a considerable multiple of realized proceeds presenting a serious threat to ECPI University, its staff, and its students.

25.     For example, if ECPI University were to:

a.   consolidate two campuses;

b.   upgrade to an additional facility and later move that facility back to its parent campus;

c.   move a location from one institution to another under the same control for reasons beneficial to the institution and its students (i.e. more favorable accreditation with stronger standards and protections for students); or

d.   relocate due to student demand in some situations,

the Department would determine under the Final Rule's criteria that these scenarios would amount to a closed school, thus resulting in complete loan discharges for all borrowers with a subjective close date and an extensive look back period for those that had attended, regardless of the benefit they received or the purpose of the consolidation or relocation.

26.     The Final Rule's closed school provisions create a significant disincentive for schools to open new campuses or explore new program offerings or facility expansions to improve

the quality of education students receive. This harms both schools and students, not to mention career education generally.

27.    With respect to the new borrower defense to payment regulations, ECPI is deeply concerned that the potential liability that schools face has increased significantly under the Final Rule.

28.    Under the new borrower defense regulations, even inadvertent or otherwise inconsequential misstatements or omissions by school representatives or contractors can result in the school's being liable for the full balance of a borrower's loan.

29.    Further, under the new group claims process, schools could be liable for the discharge amounts for an entire group of students, regardless of whether each student proves that they were harmed by school's alleged conduct. ECPI, like schools across the country, are rightfully concerned that the low barrier to approval and promise of loan discharges will invite tag-along claims. In my estimation, group claims could be so costly for schools that they would force them to reduce educational offerings and substantially threaten the school's financial viability.

30.    Moreover, under the Final Rule's group process, institutions would be effectively prevented from defending against the primary claim before the Department makes the decision to group it with other claims, solely on the basis that the primary claim 'appears credible.' In reaching that primary determination, the Department would have reached its conclusion before the school has the ability to rebut the allegations on which the primary claim is premised.

31.    The above discussed dangers associated with the group process are compounded by the fact that, under the Final Rule, third party legal advocacy organizations may also initiate the group process.

App-43

App.008

Case: 23-50489     Document: 6     Page: 9     Date Filed: 06/30/2023

32.     Putting aside the financial harms, there is significant reputational harm to schools as a result of borrower defense claim approval. The approval of claims will create a false impression that a school's educational offerings are substandard or that the school knowingly engaged in wrongful conduct, when all that might've happened was that a single admissions officer made an inadvertent misstatement to a student. Regardless of the merits, approved borrower defense claims would hurt the school's ability to recruit new students.

33.     Such reputational harm to the school is also likely to harm the school's students and alumni in finding employment, as potential employers will wrongly associate the approval of a borrower defense claim and granting of a loan discharge with lower-quality training.

34.     Given the significantly lower burden that a borrower would need to meet in order to receive a full loan discharge, and the amount of money at stake in providing complete loan forgiveness, there are almost certainly going to be students of ECPI Texas and other ECPI University campuses who will apply for such a discharge, given the possibility of a sure-fire payout with no risk or downside.

35.     Given this strong likelihood, I believe ECPI Texas, and the entire ECPI University, would suffer both reputational and financial harm – if the Final Rule were allowed to go into effect. The harm could not be undone even if the Rule were later vacated.

36.     Additionally, the Final Rule prohibits the inclusion of mandatory arbitration provisions and class action waivers in contracts between institutions and students.

37.     In arbitration, majority of the cost is borne by the school and the proceedings are more streamlined, bringing about quicker resolution for both students and schools. Indeed, for this very reason, ECPI University previously included pre-dispute arbitration, with an opt-out provision, in its contracts with students, as well as a class-action waiver.

App-44

App.009

Case: 23-50489   Document: 6   Page: 10   Date Filed: 06/30/2023

38.     However, once the Final Rule goes into effect, the schools will not be able to renegotiate its agreements with students, and it will irreparably have lost the right to arbitrate disputes and avoid class-action litigation. As a result, in the event of a dispute, students and schools will be forced to engage in protracted litigation that is both costly and inefficient to both parties, and often favors attorneys over students.

39.     Putting aside our belief that prohibitions against arbitration are illegal, the Final Rule's provisions will ultimately harm students and schools, banning a less expensive (for students) and more efficient process for resolving potential disputes.

App-45

App.010

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 4th day of April, 2023.

_____
Jeff Arthur

App-46

App.011

# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

CAREER COLLEGES
& SCHOOLS OF TEXAS,

                    Plaintiff,

v.

UNITED STATES DEPARTMENT OF
EDUCATION; MIGUEL CARDONA,
in his official capacity as the Secretary
of Education,

                    Defendants.

CASE NO.: 4:23-cv-206-P

**DECLARATION OF
SCOTT SHAW**

I, Scott Shaw, do hereby declare and state as follows:

### BACKGROUND

1.      I make this declaration in support of Career Colleges & Schools of Texas's ("CCST") Motion for Preliminary Injunction. This declaration is based on my personal knowledge, and I could and would competently testify to its contents if called to do so.

2.      I am the President and Chief Executive Officer of Lincoln Educational Services Corporation ("Lincoln Tech"), which is headquartered in Parsippany, New Jersey. I have held this position since July 2015. I originally joined Lincoln Tech in 2001 as the Chief Financial Officer.

3.      As President and Chief Executive Officer, I am responsible for, among other things, overseeing our schools' operational activities. In addition, I am familiar with the extensive efforts undertaken by Lincoln Tech to ensure compliance with applicable regulations.

4.      Founded in 1946, Lincoln Tech is now one of the country's largest providers of career education and training, operating 22 campuses in 14 states under four brands: Lincoln College of Technology, Lincoln Technical Institute, Lincoln Culinary Institute, and Euphoria Institute of Beauty Arts and Sciences. Our schools offer programs in health sciences, automotive technology, skilled trades, hospitality services, and business and information technology. Since our Lincoln Tech's founding in 1946, our schools have graduated more than 250,000 students.

5.      Lincoln Tech has long supported carefully crafted rules, regulations, and legislation that protect both students and borrowers alike. However, the newly issued borrower defense regulations stack the decks against schools. They threaten substantial harm to not only Lincoln Tech schools but career education institutions across the country.

**LINCOLN TECH GRAND PRAIRIE**

6.      One of Lincoln Tech's premier schools is the Lincoln Technical Institute in Grand Prairie, Texas ("Lincoln Tech Grand Prairie"). Lincoln Tech Grand Prairie was formed in 1966 as an automotive technical school. The school's program offerings have expanded over the decades and currently include automotive technology, collision repair and refinishing, diesel technology, HVAC service and repair, machining and manufacturing, and welding technology.

7.      Lincoln Tech Grand Prairie is a member of trade association Career Colleges and Schools of Texas (CCST).

8.      Lincoln Tech Grand Prairie participates in the Direct Loan Program and is thus subject to the Department of Education's (the "Department") November 1, 2022 final rule regarding the Department's administration of student loans under the William D. Ford Federal Direct Loan ("Direct Loan"), the Federal Perkins Loan, and the Federal Family Education Loan programs. *See* 87 Fed. Reg. 65,904 (Nov. 1, 2022) (the "Rule").

9.      Lincoln Tech Grande Prairie has two campuses. The main campus is located at 2915 Alouette Drive in Grand Prairie. The second campus is located at 2501 Arkansas Lane in Grand Prairie.

10.     Both campuses of Lincoln Tech Grand Prairie are located in Tarrant County, which I understand to fall within the Fort Worth Division of the Northern District of Texas.

11.     During the 2022 academic year, Lincoln Tech Grand Prairie served proximately 900 students, the vast majority of whom took out Direct Loans to finance their education and meet their obligations.

12.     Over the last 15 years, Lincoln Tech Grand Prairie has enrolled 14,854 students, approximately 31% of whom reside in one of the counties that fall within the Fort Worth Division; and approximately 41% of whom reside within the Northern District of Texas.

13.     According to the Department's Rule, any of these students and alumni who have loan balances would be eligible to file a borrower defense claim based on the Rule's new standard, which lowers the threshold for claim approval and presume liability against schools, regardless of whether the borrower has any proof of harm.

### THE DEPARTMENT'S RULE AND
### HARMS SUFFERED PRIOR TO EFFECTIVE DATE

14.     I have reviewed the Rule. I am familiar with its provisions and how they have harmed and are likely to harm Lincoln Tech schools and their staff, students, alumni, and communities both before and after the Rule takes effect.

15.     Lincoln Tech Grand Prairie participates in the Department of Education's Direct Loan Program and will be subject to the Rule's requirements when they go into effect.

16.     As President and Chief Executive Officer, I am additionally responsible for overseeing Lincoln Tech's strategic planning, including decisions about how to adjust the

App-32

App.015

allocation of the Lincoln Tech's resources in response to changes in student demand. These decisions include whether to open campuses in new markets, whether to close or consolidate facilities, and whether to expand or limit certain program offerings.

17.    The Rule's closed school discharge provisions will have a significant and adverse impact on Lincoln Tech's future decisions regarding growth and expansion. If the Rule should become effective, Lincoln Tech will be forced to reconsider the opening of new campuses and upgrading of existing ones, whether in Texas, or other parts of the country. This is because of the potential liability resulting from "closing a school" – as that term is broadly defined in the new regulations. Under the new Rule, the consolidation of facilities, closing of one campus to open a newer and better one, or the reallocation of funding from one program to invest in others that have greater demand from students, could each constitute a "closed school" under the Rule, which gives the Department wide discretion to determine. In such a case, Lincoln Tech would be held liable for all outstanding loan balances for current and recent students of the "closed school" – even though there was no adverse impact (and more likely a positive impact) on the students' education.

18.    The Rule's closed school provisions create a significant disincentive for schools to explore new program offerings, build new or upgrade existing campuses, or otherwise improve the facilities and services for students.

19.    I am also responsible for, among other things, overseeing Lincoln Tech's financial performance, including its staffing and compliance costs.

20.    As a result of the Rule, Lincoln Tech Grand Prairie and other schools are effectively being forced to expend time and resources that could otherwise be spent on educational programming to instead prepare to comply with new regulations. Such preparatory activities include, but are not limited to: counseling Lincoln Tech's schools and staff on the Rule's

4

requirements; reviewing every marketing and advertising material and training recruitment and admissions staff on account of the regulations' imposition of strict liability against schools; dedicating or allocating staff and resources to handle the anticipated flood of meritless borrower defense claims that will be submitted following the effective date and as a result of the lowered threshold for claim approval; and developing and upgrading recordkeeping systems to maintain student records for perpetuity, on account of the fact that there is no statutory of limitations to borrower defense claims.

21.    I expect that compliance-related costs and burdens to Lincoln Tech schools will increase substantially if the Rule is allowed to go into effect.

## SUBSTANTIAL THREAT OF IMPENDING HARM THAT CANNOT BE UNDONE

22.    I understand that under the Rule's new borrower defense standard, even inadvertent misstatements or omissions by school representatives or contractors could result in an approved borrower defense claim and the school's being liable for the complete loan discharge.

23.    By eliminating the requirement of proof of harm and permitting claims based on unintentional and innocent erroneous statements or omissions to be the basis for an approved borrower defense claim, the Rule has the effect of holding schools like Lincoln Tech Grand Prairie strictly liable for meritless claims based on harmless conduct.

24.    Further, under the Rule's new group claim process, there is the significant risk of tag-a-long claims. As a result, schools like Lincoln Tech could be liable for loan discharge amounts for entire groups of borrowers, regardless of whether each student was actually ever harmed by the school's alleged conduct.

25.    Group claims and the resulting financial harm to schools would be so great as to threaten their closure, or at the very least divert resources away from educational offerings, thus

App-34
App.017

denying current and future generations of career education students the opportunity to better themselves and their communities.

26.     Even if Lincoln Tech Grand Prairie were not forced to close as a result of liability, the reputational harm to the school of a borrower discharge would be substantial. Such a discharge by the Department may create a false impression that the school provides poor service, which would hurt the school's ability to recruit new students.

27.     Such reputational harm to the school is also likely to harm the school's students and alumni in finding employment, as potential employers will wrongly conclude on the basis of the approval of a borrower defense claim and granting of a loan discharge that the students and graduates have received a subpar education – when the opposite is true.

28.     Given the significantly lower burden that a borrower would need to meet for a claim to be approved, and the promise of a financial windfall as a result of a complete loan discharge, there are likely to be many students of Lincoln Tech Grand Prairie and other Lincoln Tech schools that will apply for such a discharge, especially when the Rule does not require borrowers to prove that they were ever harmed by the conduct the allege occurred.

29.     Defending against the inevitable deluge of borrower defense claims will be costly and, given the new standard that presumes liability without due process protections for schools, effectively futile.

30.     If the Rule is permitted to take effect on July 1, schools like Lincoln Tech Grand Prairie will suffer harm that cannot be undone.

App-35
App.018

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 3ʳᵈ day of April, 2023.

_____
SCOTT SHAW

App-36

App.019

# EXHIBIT 3

```
 1                UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF TEXAS
 2                     AUSTIN DIVISION

 3   CAREER COLLEGES &          ) Docket No. A 23-CA-433 RP
     SCHOOLS OF TEXAS           )
 4                              )
     vs.                        ) Austin, Texas
 5                              )
     UNITED STATES DEPARTMENT   )
 6   OF EDUCATION, ET AL        ) May 31, 2023

 7
                     TRANSCRIPT OF MOTION HEARING
 8          BEFORE THE HONORABLE ROBERT L. PITMAN

 9

10   APPEARANCES:

11   For the Plaintiff:        Ms. Allyson B. Baker
                               Mr. Stephen B. Kinnaird
12                             Mr. Michael Murray
                               Paul Hastings, LLP
13                             2050 M Street, N.W.
                               Washington, D.C. 20036
14

15   For the Defendant:        Ms. Christine L. Coogle
                               Mr. Cody T. Knapp
16                             U.S. Department of Justice
                               Civil Division, Federal
17                             Programs Branch
                               1100 L Street, N.W.
18                             Washington, D.C. 20005

19

20   Court Reporter:           Ms. Lily Iva Reznik, CRR, RMR
                               501 West 5th Street, Suite 4153
21                             Austin, Texas 78701
                               (512)391-8792
22

23

24

25   Proceedings reported by computerized stenography,
     transcript produced by computer-aided transcription.
```

*2*

```
 1                    I N D E X

 2                    Direct   Cross    Redirect Recross
      Witnesses:
 3

 4  Mark Dreyfus         5        17       27

 5                                         95      97

 6                                         98

 7  Diane Auer Jones    32        54

 8

 9                    E X H I B I T S

10                                      Offered   Admitted

11  Plaintiff's

12  #1                                     32        32

13

14  Defendant's

15  (None)

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 08:59:57 | 1 | back to me.  Good morning, sir.  Before you take a seat, |
| 09:00:10 | 2 | could you please raise your right hand to be sworn. |
| 09:00:11 | 3 | THE CLERK:  You do solemnly swear or affirm that |
| 09:00:11 | 4 | the testimony which you may give in the case now before |
| 09:00:11 | 5 | the Court shall be the truth, the whole truth, and nothing |
| 09:00:18 | 6 | but the truth? |
| 09:00:18 | 7 | THE WITNESS:  I do. |
| 09:00:18 | 8 | THE COURT:  Thank you.  Please be seated. |
| 09:00:20 | 9 | MARK DREYFUS, called by the Plaintiff, duly sworn. |
| 09:00:20 | 10 | DIRECT EXAMINATION |
| 09:00:23 | 11 | BY MS. BAKER: |
| 09:00:23 | 12 | Q.   Good morning, Mr. Dreyfus. |
| 09:00:27 | 13 | A.   Good morning. |
| 09:00:28 | 14 | Q.   Can you hear me okay?  Can you please state your full |
| 09:00:31 | 15 | name for the record? |
| 09:00:31 | 16 | A.   Mark Dreyfus. |
| 09:00:32 | 17 | Q.   Mr. Dreyfus, what do you currently do? |
| 09:00:35 | 18 | A.   I am President of ECPI University. |
| 09:00:38 | 19 | Q.   And for how long have you been President? |
| 09:00:39 | 20 | A.   I've been President since 1992. |
| 09:00:42 | 21 | Q.   And can you tell the Court, please, what ECPI |
| 09:00:45 | 22 | University is? |
| 09:00:46 | 23 | A.   It is a career college which has about 12,000 |
| 09:00:49 | 24 | students in five states and we primarily work with adults |
| 09:00:57 | 25 | in both healthcare nursing, in particular, as well as |

| | | |
|---|---|---|
| 09:01:00 | 1 | information technology areas. |
| 09:01:02 | 2 | Q.   Mr. Dreyfus, does ECPI have any campuses in the state |
| 09:01:08 | 3 | of Texas? |
| 09:01:08 | 4 | A.   Yes, we do. |
| 09:01:09 | 5 | Q.   How many? |
| 09:01:10 | 6 | A.   One. |
| 09:01:10 | 7 | Q.   And where is that campus located? |
| 09:01:12 | 8 | A.   San Antonio. |
| 09:01:12 | 9 | Q.   And what kinds of programs are offered to students at |
| 09:01:17 | 10 | the San Antonio campus? |
| 09:01:19 | 11 | A.   Nursing, engineering technology, and our cyber |
| 09:01:25 | 12 | security program. |
| 09:01:26 | 13 | Q.   Mr. Dreyfus, you're familiar with the declaration |
| 09:01:31 | 14 | that your colleague, Mr. Arthur, issued in this matter |
| 09:01:35 | 15 | previously? |
| 09:01:36 | 16 | A.   Yes, I am. |
| 09:01:36 | 17 | Q.   And have you had a chance to look at that |
| 09:01:39 | 18 | declaration? |
| 09:01:40 | 19 | A.   I have. |
| 09:01:40 | 20 | Q.   And you adopt it? |
| 09:01:42 | 21 | A.   Yes. |
| 09:01:43 | 22 | Q.   Is ECPI a participant in Title IV Department of |
| 09:01:50 | 23 | Education programs? |
| 09:01:51 | 24 | A.   Yes, we are. |
| 09:01:52 | 25 | Q.   For how long has ECPI been a participant? |

| | | |
|---|---|---|
| 09:01:55 | 1 | A.   Since approximately 1972. |
| 09:01:58 | 2 | Q.   Mr. Dreyfus, can you tell us a bit about ECPI and its |
| 09:02:03 | 3 | history, please? |
| 09:02:03 | 4 | A.   Sure.  The university was founded by my father, who |
| 09:02:09 | 5 | is a holocaust survivor.  He was fortunate enough to be in |
| 09:02:13 | 6 | Switzerland during the war and after the war, he was able |
| 09:02:15 | 7 | to take training as a technician, radio technician, came |
| 09:02:20 | 8 | to this country shortly thereafter and for about 20 years, |
| 09:02:24 | 9 | worked as a technician and then, realized that computers |
| 09:02:28 | 10 | were the future and decided to open up a school to teach |
| 09:02:32 | 11 | people how to program computers and that was in 1966.  And |
| 09:02:38 | 12 | since that time, we've had 75,000 graduates and |
| 09:02:42 | 13 | approximately have about 12,000 students at this time. |
| 09:02:49 | 14 | Q.   Mr. Dreyfus, are you familiar with the borrower |
| 09:02:52 | 15 | defense rule that is currently scheduled to take effect in |
| 09:02:56 | 16 | July, July 1 of this year? |
| 09:02:59 | 17 | A.   Yes, I am. |
| 09:03:00 | 18 | Q.   Mr. Dreyfus, how are you familiar with that rule? |
| 09:03:04 | 19 | A.   I tried to read all 780 pages and I followed the |
| 09:03:12 | 20 | negotiated rulemaking and also followed through the |
| 09:03:15 | 21 | comment period, some of the comments that were made. |
| 09:03:20 | 22 | Q.   And do you have an understanding of whether that rule |
| 09:03:24 | 23 | which is scheduled to take effect on July 1 will impact |
| 09:03:28 | 24 | ECPI? |
| 09:03:30 | 25 | A.   It will have a significant impact. |

8

| | | |
|---|---|---|
| 09:03:32 | 1 | Q.   And when you say significant impact, can you tell the |
| 09:03:34 | 2 | Court, please, what you mean by that? |
| 09:03:36 | 3 | A.   Well, already, we have had to retrain many of our |
| 09:03:41 | 4 | people.  We have about 60 people that are currently |
| 09:03:43 | 5 | working in compliance.  And there are new rules of |
| 09:03:48 | 6 | retaining information as well as the types of |
| 09:03:52 | 7 | communications that go back and forth between students and |
| 09:03:56 | 8 | staff.  And as a result of some of the changes in the way |
| 09:04:01 | 9 | that claims will be brought forward, particularly the |
| 09:04:04 | 10 | lowering of the bar, we have to really maintain more |
| 09:04:08 | 11 | records, more communications, and our people have to be |
| 09:04:12 | 12 | aware of exactly what they are doing and saying to |
| 09:04:17 | 13 | students. |
| 09:04:18 | 14 | Q.   And when you talk about the way that you understand |
| 09:04:21 | 15 | claims will be brought forward under this borrower defense |
| 09:04:25 | 16 | rule scheduled to take effect on July 1, what specifically |
| 09:04:28 | 17 | do you mean, Mr. Dreyfus? |
| 09:04:30 | 18 | A.   So as I understand it, the bar is much lower.  There |
| 09:04:35 | 19 | are group claims that can be made for classes of students, |
| 09:04:41 | 20 | some of whom may not even opt into the class, and these |
| 09:04:44 | 21 | group claims can be brought for a number of reasons, |
| 09:04:49 | 22 | whether it's a misrepresentation or an omission; and in |
| 09:04:55 | 23 | that case, training our people, making sure that they are |
| 09:04:58 | 24 | aware of every communication and knowing that they have to |
| 09:05:01 | 25 | retain this information even for some kind of inadvertent |

| | | |
|---|---|---|
| 09:05:04 | 1 | claim -- or statement, a claim may be brought forward to |
| 09:05:08 | 2 | us and these claims from my opinion are existential |
| 09:05:15 | 3 | because the bar is so much lower and we do have this |
| 09:05:18 | 4 | opportunity of a group claim, it's very detrimental to the |
| 09:05:22 | 5 | institution. |
| 09:05:23 | 6 | Q.   When you say the word "existential," what exactly do |
| 09:05:30 | 7 | you understand that to mean in this context? |
| 09:05:34 | 8 | A.   There are only so many resources you have as an |
| 09:05:36 | 9 | institution, and in our case, we allocate resources to |
| 09:05:41 | 10 | support our students to get the best outcomes that we can. |
| 09:05:45 | 11 | We've already started diverting resources to training our |
| 09:05:48 | 12 | people and preparing for July 1st.  In addition, we've had |
| 09:05:54 | 13 | to abandon a site that we were going to open in Texas, a |
| 09:06:01 | 14 | second site in Texas because the risk is just too high |
| 09:06:05 | 15 | when you only have limited resources and you have to make |
| 09:06:08 | 16 | sure that you're conservative with your resources. |
| 09:06:11 | 17 |         So first of all, we are concerned about the |
| 09:06:14 | 18 | claims that will happen after July 1st, but also, we've |
| 09:06:18 | 19 | had to abandon plans for what we wanted to do in the state |
| 09:06:34 | 20 | of Texas. |
| 09:06:34 | 21 | Q.   So you testified that ECPI had to abandon its plans |
| 09:06:39 | 22 | here in the state of Texas.  Can you give the Court more |
| 09:06:43 | 23 | of an understanding of what specifically you mean by that? |
| 09:06:48 | 24 | A.   We had been in the process of selecting a site in |
| 09:06:51 | 25 | Dallas and when this rule was promulgated, we basically |

| | | |
|---|---|---|
| 09:06:56 | 1 | put a halt to it.  And as we've seen the rule finalized, |
| 09:07:02 | 2 | we realize that the risk is so high that there could be a |
| 09:07:05 | 3 | claim and particular a recoupment of funds that we want to |
| 09:07:10 | 4 | make sure that we are able as an institution to be ready |
| 09:07:15 | 5 | to, you know, pay any recoupment claims that may come |
| 09:07:18 | 6 | against us.  And so, we have to be very conservative.  We |
| 09:07:22 | 7 | have to conserve our funds and we have to allocate |
| 09:07:25 | 8 | resources for that. |
| 09:07:27 | 9 | Q.   Has ECPI abandoned -- well, let me ask you this.  In |
| 09:07:38 | 10 | deciding not to open the campus in Dallas, when was that |
| 09:07:41 | 11 | decision made? |
| 09:07:43 | 12 | A.   Decision was made after this rule started to be, you |
| 09:07:47 | 13 | know, put forth. |
| 09:07:50 | 14 | Q.   Now, you talked about something else.  You said that |
| 09:07:54 | 15 | the nature of claims that ECPI expects on and after July 1 |
| 09:08:02 | 16 | are also another source of concern.  Can you please |
| 09:08:06 | 17 | explain in more detail what you mean by that? |
| 09:08:09 | 18 | A.   Yes.  You know, there are now the ability of states |
| 09:08:16 | 19 | or other consumer groups can bring group claims of |
| 09:08:20 | 20 | students, even students that may have graduated and been |
| 09:08:24 | 21 | successful if they happen to be part of that group, they |
| 09:08:27 | 22 | don't even have to opt in, they can just, you know, be |
| 09:08:31 | 23 | classified as part of a group.  And we're very concerned |
| 09:08:34 | 24 | about that because the bar is so much lower for someone to |
| 09:08:39 | 25 | opt in and, you know, any student that could get their |

09:08:42  1   loans discharged would probably either opt in if they

09:08:47  2   could or they're not -- they don't have to opt in.  They

09:08:50  3   could just be added to the group.

09:08:51  4          Additionally, we have a situation where we have

09:08:56  5   potentially a closed school situation in Richmond,

09:09:01  6   Virginia.  We currently have three locations in Richmond.

09:09:06  7   About two years ago, we opened a brand-new location,

09:09:09  8   brand-new facility, has all the best equipment, has the

09:09:13  9   best faculty there in the -- with the idea that we were

09:09:18  10  going to consolidate three campuses to two.  At this time,

09:09:22  11  we have students that would want to go to the better

09:09:25  12  resourced campus, the newer facility, yet, because of the

09:09:30  13  closed school definition, our third campus that would be

09:09:34  14  closing would be considered a closed school, and at that

09:09:39  15  point, the secretary determines when there was a decline

09:09:43  16  in students and it goes back six months and that then,

09:09:48  17  they assess a student discharge for any students that

09:09:53  18  didn't finish and then, they send the recoupment to the

09:09:56  19  institution.

09:09:57  20         So in essence, what will be best for students

09:10:01  21  where we could consolidate campuses, we can't do.  Even

09:10:05  22  those students want to do that because if that facility

09:10:09  23  closes, that third facility and, you know, migrates into

09:10:13  24  the other two facilities, that is then considered a closed

09:10:17  25  school and we would get a recoupment letter and that is

| | | |
|---|---|---|
| 09:10:20 | 1 | the secretary's decision.  It is a formulaic decision and |
| 09:10:27 | 2 | there's nothing we can do about it. |
| 09:10:28 | 3 | Q.   I want to ask you a bit about a couple of things you |
| 09:10:31 | 4 | just said.  First, I want to ask you some more about your |
| 09:10:36 | 5 | understanding of the claims process on July 1, and then, |
| 09:10:40 | 6 | I'm going to follow up on this closed school dynamic that |
| 09:10:43 | 7 | you're discussing. |
| 09:10:44 | 8 | So you talked about a group claims process.  What |
| 09:10:47 | 9 | is your understanding of whether or how that group claims |
| 09:10:51 | 10 | process could impact ECPI on July 1. |
| 09:10:55 | 11 | A.   If a group claim is presented and it gets adjudicated |
| 09:11:01 | 12 | at the department where there's a full discharge, |
| 09:11:03 | 13 | apparently the new rule, it's a hundred percent discharge. |
| 09:11:07 | 14 | There's no discharge -- partial discharges.  There are |
| 09:11:11 | 15 | individuals that can be part of the group that never opted |
| 09:11:13 | 16 | in and we have then 90 days to respond to that group |
| 09:11:19 | 17 | claim.  The process is very opaque at this point and will |
| 09:11:23 | 18 | continue to be opaque. |
| 09:11:25 | 19 | So as of July 1st, the claims that would be |
| 09:11:28 | 20 | presented to us could be in significant numbers that could |
| 09:11:33 | 21 | jeopardize the institution. |
| 09:11:37 | 22 | Q.   Could the group claims you're talking about cost the |
| 09:11:41 | 23 | institution money? |
| 09:11:43 | 24 | A.   Yes. |
| 09:11:44 | 25 | Q.   How so? |

| | | |
|---|---|---|
| 09:11:45 | 1 | A.    There's a clause for recoupment.  And in addition, |
| 09:11:49 | 2 | not only an institution, I am personally potentially |
| 09:11:53 | 3 | liable because if the institution cannot pay those claims, |
| 09:11:57 | 4 | then the way that this new rule is written that they now |
| 09:12:01 | 5 | hold the executives responsible for those claims. |
| 09:12:07 | 6 | Q.    I want to ask you some more about the schools in |
| 09:12:11 | 7 | Richmond.  What is your understanding of what the closed |
| 09:12:16 | 8 | school designation will mean on July 1? |
| 09:12:23 | 9 | A.    Originally a closed school was a school that didn't |
| 09:12:27 | 10 | exist anymore.  We have now the new definition is a |
| 09:12:31 | 11 | location that doesn't exist anymore.  And a location that |
| 09:12:35 | 12 | we have, since we have three locations in Richmond and |
| 09:12:39 | 13 | want to consolidate because it's a better opportunity for |
| 09:12:41 | 14 | students, it's better for them to go to this new facility, |
| 09:12:47 | 15 | we can't do it.  We have to continue our lease.  We have |
| 09:12:50 | 16 | to keep it open because as the numbers dwindle, there is |
| 09:12:55 | 17 | an arbitrary date that is assigned by the secretary and |
| 09:12:58 | 18 | then, they will go back six months, and for any student |
| 09:13:01 | 19 | that doesn't finish, there is a complete discharge. |
| 09:13:04 | 20 | Now, students that don't finish for a year -- |
| 09:13:07 | 21 | there's many reasons why students sometimes come back a |
| 09:13:09 | 22 | year later or whatever.  But in this particular instance, |
| 09:13:13 | 23 | that third facility will be considered a closed school |
| 09:13:18 | 24 | even though we are still in existence, even though we have |
| 09:13:20 | 25 | a better opportunity for students, even though they would |

| | | |
|---|---|---|
| 09:13:23 | 1 | prefer to be at the new facility, we can't do it and -- |
| 09:13:27 | 2 | because we will get a recoupment letter. |
| 09:13:34 | 3 | Q.   You say that this facility is better for students and |
| 09:13:38 | 4 | that they prefer to be at it.  How do you know that? |
| 09:13:41 | 5 | A.   We already have students migrating there.  I mean, we |
| 09:13:43 | 6 | have students that take a class there and say, I would |
| 09:13:46 | 7 | rather go to this location rather than the old location |
| 09:13:49 | 8 | and that was the original intent.  But since this rule has |
| 09:13:52 | 9 | come out, the liability that we will have at the old |
| 09:13:57 | 10 | location is significant because, as I said, any student |
| 09:14:02 | 11 | that leaves the school, or does not finish at the school, |
| 09:14:06 | 12 | or goes into a different program during that period, that |
| 09:14:10 | 13 | that period that the secretary determines it's a closed |
| 09:14:15 | 14 | school will get a full discharge.  And even if they're 90 |
| 09:14:18 | 15 | percent complete with their program, it's still a hundred |
| 09:14:21 | 16 | percent discharge and then, that discharge letter will be |
| 09:14:23 | 17 | sent to us for recoupment of those funds. |
| 09:14:27 | 18 | Q.   The schools in Richmond, these campuses in Richmond, |
| 09:14:34 | 19 | can you just give us a sense of how close together they |
| 09:14:37 | 20 | are? |
| 09:14:38 | 21 | A.   Each one of them's about 15 miles apart and we've had |
| 09:14:42 | 22 | students go between campuses all the time.  It's not that |
| 09:14:47 | 23 | -- it's not a great distance for students to travel from |
| 09:14:49 | 24 | one to the other, particularly when there's a particular |
| 09:14:52 | 25 | course that they want to take, or it has some kind of |

| | | |
|---|---|---|
| 09:14:55 | 1 | equipment or lab, or some kind of, you know, basically an |
| 09:15:02 | 2 | offering at that facility. |
| 09:15:03 | 3 | Q.   And this new campus or facility that was recently or |
| 09:15:06 | 4 | not that recently perhaps built, when was it built? |
| 09:15:10 | 5 | A.   It was built in 2021. |
| 09:15:15 | 6 | Q.   And you say it's better for students.  Why do you say |
| 09:15:18 | 7 | that? |
| 09:15:18 | 8 | A.   It's a newer facility.  It has, you know, brand-new |
| 09:15:22 | 9 | equipment.  It has -- some of the faculty that we put |
| 09:15:27 | 10 | there are some of our best faculty because it was always |
| 09:15:30 | 11 | anticipated that we would consolidate to that -- to two |
| 09:15:34 | 12 | facilities.  We still have another facility, but for that |
| 09:15:37 | 13 | facility in particular, we built out some new simulation |
| 09:15:41 | 14 | labs.  We built out new labs for our cyber security, for |
| 09:15:44 | 15 | our mechatronics program and, you know, you can't |
| 09:15:47 | 16 | duplicate sometimes these things in three locations.  You |
| 09:15:50 | 17 | have to, you know, put it in one location and that's what |
| 09:15:52 | 18 | we decided to do. |
| 09:15:55 | 19 | Q.   Mr. Dreyfus, come January -- come July 1, what is |
| 09:16:03 | 20 | your expectation that this rule, borrower defense rule |
| 09:16:08 | 21 | will have -- what impact will the borrower defense rule |
| 09:16:14 | 22 | have on ECPI? |
| 09:16:15 | 23 | A.   It will be devastating.  We expect to have claims |
| 09:16:19 | 24 | brought to us because already, I think students have an |
| 09:16:27 | 25 | expectation of discharge of their loans and there's talk |

| | | |
|---|---|---|
| 09:16:32 | 1 | of already of thousands of claims that have been prepared |
| 09:16:37 | 2 | at the department.  We don't know if they're any of ours. |
| 09:16:41 | 3 | We haven't heard any of them.  But we expect July 1 that |
| 09:16:46 | 4 | claims will come in against our institution. |
| 09:16:48 | 5 | Q.   And when the claims come in against the institution |
| 09:16:51 | 6 | on July 1, what do you expect will be the impact of that? |
| 09:16:54 | 7 | A.   We will have to prepare, you know, our defense for it |
| 09:17:00 | 8 | if they're adjudicated against us, which we expect, and we |
| 09:17:03 | 9 | will -- you know, we'll have 90 days to basically defend |
| 09:17:09 | 10 | ourselves, and in the event that we can't do that, then |
| 09:17:12 | 11 | there will be a recoupment proceeding. |
| 09:17:14 | 12 | Q.   What is a recoupment proceeding? |
| 09:17:16 | 13 | A.   As I understand it, we will have the opportunity to |
| 09:17:23 | 14 | go to the department and basically try and explain why |
| 09:17:28 | 15 | they shouldn't recoup funds from us.  Even though they may |
| 09:17:31 | 16 | have discharged the funds to students, we have the |
| 09:17:34 | 17 | opportunity to basically defend ourselves so that we don't |
| 09:17:37 | 18 | get charged for those discharges. |
| 09:17:39 | 19 | Q.   And what recoupment of funds do you anticipate would |
| 09:17:44 | 20 | be at issue here on July 1? |
| 09:17:46 | 21 | A.   A significant amount of money.  I mean, it's a |
| 09:17:49 | 22 | hundred percent for any student where there's a discharge. |
| 09:17:53 | 23 | So even if a student that may have graduated, may have |
| 09:17:56 | 24 | gotten a job, you know, we train people in nursing, we |
| 09:17:59 | 25 | train people in cyber security, our students have great |

| | | |
|---|---|---|
| 09:18:03 | 1 | outcomes.  I mean, that's what we're focused on.  We're |
| 09:18:05 | 2 | focused on outcomes.  And here, you have a situation where |
| 09:18:09 | 3 | you may have students that are part of a claim that want |
| 09:18:13 | 4 | to get a full discharge even though their outcome was |
| 09:18:17 | 5 | exactly what they anticipated when they came to school. |
| 09:18:21 | 6 | Q.   No further questions.  Thank you. |
| 09:18:29 | 7 | CROSS-EXAMINATION |
| 09:18:39 | 8 | BY MR. KNAPP: |
| 09:18:39 | 9 | Q.   Good morning, Mr. Dreyfus. |
| 09:18:41 | 10 | A.   Good morning. |
| 09:18:41 | 11 | Q.   It's nice to meet you this morning. |
| 09:18:44 | 12 |      You're here today on behalf of the San Antonio |
| 09:18:47 | 13 | campus of ECPI. |
| 09:18:48 | 14 | A.   Correct. |
| 09:18:49 | 15 | Q.   Could you explain to me the relationship between San |
| 09:18:54 | 16 | Antonio campus of ECPI and ECPI more broadly? |
| 09:18:58 | 17 | A.   We are regionally accredited by the Southern |
| 09:19:02 | 18 | Association of Colleges & Schools.  As such, we're able to |
| 09:19:05 | 19 | be in the southern region and in 2019, we opened the San |
| 09:19:10 | 20 | Antonio campus as a branch in Texas because of, actually, |
| 09:19:16 | 21 | a request by some employers in Texas that asked us to come |
| 09:19:18 | 22 | here. |
| 09:19:20 | 23 | Q.   How many students are at ECPI campuses nationwide? |
| 09:19:25 | 24 | A.   About 12,000. |
| 09:19:27 | 25 | Q.   And how many are in San Antonio? |

| | | |
|---|---|---|
| 09:19:29 | 1 | A.    About 120. |
| 09:19:32 | 2 | Q.    Has ECPI San Antonio always been a participant in the |
| 09:19:37 | 3 | Title IV student loan programs? |
| 09:19:38 | 4 | A.    Yes. |
| 09:19:39 | 5 | Q.    When did that campus open up? |
| 09:19:41 | 6 | A.    2018. |
| 09:19:48 | 7 | Q.    You adopted the declaration of Mr. Arthur for |
| 09:19:55 | 8 | purposes of your testimony today? |
| 09:19:57 | 9 | A.    Yes.  He would be here except he's in Europe.  So I |
| 09:20:02 | 10 | got the knot. |
| 09:20:05 | 11 | Q.    That's nice of you.  Is it your understanding that |
| 09:20:08 | 12 | when he describes the work of staff in his declaration, |
| 09:20:12 | 13 | he's describing the work of staff nationwide, not just at |
| 09:20:16 | 14 | San Antonio campus? |
| 09:20:17 | 15 | A.    All of our campuses.  Yes. |
| 09:20:20 | 16 | Q.    Are there any legal or compliance officers who are |
| 09:20:23 | 17 | based in San Antonio with the San Antonio campus? |
| 09:20:26 | 18 | A.    We have some compliance people, yes, but they're |
| 09:20:30 | 19 | scattered throughout the entire institution.  Every one of |
| 09:20:32 | 20 | our campuses has somebody that's dealing with compliance. |
| 09:20:37 | 21 | Many campuses, multiple people. |
| 09:20:39 | 22 | Q.    How many do you -- are you aware of how many are in |
| 09:20:43 | 23 | San Antonio? |
| 09:20:44 | 24 | A.    I believe it's two. |
| 09:20:50 | 25 | Q.    Are you familiar with the personnel decisions at the |

| | | |
|---|---|---|
| 09:20:54 | 1 | San Antonio campus? |
| 09:20:55 | 2 | A.    Yes. |
| 09:20:56 | 3 | Q.    Have any new staff members been hired since the |
| 09:20:59 | 4 | promulgation of this latest rule? |
| 09:21:02 | 5 | A.    Not yet. |
| 09:21:04 | 6 | Q.    Are there plans to hire? |
| 09:21:06 | 7 | A.    Yes. |
| 09:21:07 | 8 | Q.    More staff?  When would you expect them to be hired? |
| 09:21:13 | 9 | A.    After July 1st. |
| 09:21:14 | 10 | Q.    Do you have a timeframe in mind for that?  Or... |
| 09:21:16 | 11 | A.    No.  You know, just after July 1st. |
| 09:21:20 | 12 | Q.    Does ECPI currently train its staff on the |
| 09:21:25 | 13 | regulations that govern student loan programs? |
| 09:21:27 | 14 | A.    Yes. |
| 09:21:28 | 15 | Q.    Does ECPI currently train its staff with the -- in |
| 09:21:34 | 16 | the anticipation of facing borrower defense claims? |
| 09:21:38 | 17 | A.    Yes.  When the rule first came out, it was promoted. |
| 09:21:43 | 18 | We started explaining to our staff that this is a |
| 09:21:45 | 19 | possibility that could happen and explained to them that |
| 09:21:49 | 20 | every communication is vital and that they have to |
| 09:21:53 | 21 | basically start retaining more and more of the |
| 09:21:56 | 22 | communications that go back and forth with students.  And, |
| 09:22:00 | 23 | you know, we also explained to our recruiting staff about |
| 09:22:06 | 24 | some of the issues that potentially could come up with |
| 09:22:08 | 25 | some inadvertent conversations.  So we've been training |

| | | |
|---|---|---|
| 09:22:13 | 1 | our people probably for the last three or four months. |
| 09:22:16 | 2 | Q.   Did you do any trainings under the current |
| 09:22:20 | 3 | regulations? |
| 09:22:24 | 4 | A.   Yes. |
| 09:22:24 | 5 | Q.   That are in effect? |
| 09:22:25 | 6 | A.   Yes. |
| 09:22:26 | 7 | Q.   Before? |
| 09:22:26 | 8 | A.   Before, but it's significantly ramped up.  I would |
| 09:22:30 | 9 | say it's a magnitude of, you know, two to three times the |
| 09:22:32 | 10 | amount of time that we are spending educating our staff |
| 09:22:37 | 11 | and training our staff to be prepared for the new |
| 09:22:40 | 12 | regulations because of the potential for, you know, any |
| 09:22:44 | 13 | kind of claims in the future. |
| 09:22:46 | 14 | Q.   As part of the trainings that you did before this |
| 09:22:49 | 15 | rule was promulgated, did you train staff to avoid |
| 09:22:54 | 16 | misrepresentation? |
| 09:22:55 | 17 | A.   Yes.  Yes.  Absolutely. |
| 09:22:59 | 18 | Q.   So could you be specific about the additional |
| 09:23:05 | 19 | misrepresentations that you're training staff on now that |
| 09:23:10 | 20 | were not a part of prior trainings under the current |
| 09:23:13 | 21 | regulations? |
| 09:23:13 | 22 | A.   Well, misrepresentation is something that you always |
| 09:23:18 | 23 | want to avoid.  As I understand the new rule, the evidence |
| 09:23:25 | 24 | that is needed to determine what misrepresentation is is |
| 09:23:30 | 25 | much lower, the bar is much lower.  And more importantly, |

| | | |
|---|---|---|
| 09:23:33 | 1 | it's the group claim that I'm concerned about.  So if |
| 09:23:36 | 2 | there's an inadvertent misrepresentation by one of our |
| 09:23:40 | 3 | staff members, it could potentially be brought against an |
| 09:23:44 | 4 | entire group of claimants that in the past, as I |
| 09:23:50 | 5 | understand -- and I'm not a lawyer, I'm not an expert -- |
| 09:23:55 | 6 | in the past, the individual would have to bring evidence |
| 09:24:00 | 7 | of that misrepresentation and now the bar is much lower |
| 09:24:05 | 8 | for that evidence. |
| 09:24:07 | 9 | Q.   But you would agree with me that under the current |
| 09:24:12 | 10 | regulations, it's not permissible to misrepresent things |
| 09:24:18 | 11 | to students and borrowers? |
| 09:24:19 | 12 | A.   No, it's not permissible. |
| 09:24:25 | 13 | Q.   So would you agree, then, that the substantive |
| 09:24:27 | 14 | standard hasn't changed, meaning the types of |
| 09:24:31 | 15 | misrepresentations that need to be avoided? |
| 09:24:36 | 16 | A.   Yes.  I mean, misrepresentation is misrepresentation. |
| 09:24:41 | 17 | But I think that there has been a change in the definition |
| 09:24:45 | 18 | because in this rule, I don't know how any pages is |
| 09:24:49 | 19 | devoted to misrepresentation.  If the current rule was |
| 09:24:54 | 20 | good enough, why would, you know, there be new regulations |
| 09:24:58 | 21 | about misrepresentation? |
| 09:25:01 | 22 | Q.   Do ECPI staff currently review, you know, |
| 09:25:06 | 23 | advertisements? |
| 09:25:07 | 24 | A.   Yes. |
| 09:25:08 | 25 | Q.   Communications that go off promoting the programs? |

| | | |
|---|---|---|
| 09:25:11 | 1 | A.   Yes. |
| 09:25:12 | 2 | Q.   Do ECPI staff currently keep records about those |
| 09:25:17 | 3 | communications? |
| 09:25:18 | 4 | A.   Yes. |
| 09:25:22 | 5 | Q.   Do ECPI staff currently keep records in preparation |
| 09:25:25 | 6 | to respond to borrower defense claims under the currently |
| 09:25:29 | 7 | effective regulations? |
| 09:25:30 | 8 | A.   Yes. |
| 09:25:30 | 9 | Q.   And do those records involve communications to |
| 09:25:34 | 10 | borrowers? |
| 09:25:35 | 11 | A.   Yes.   The difference is under the -- after July 1st, |
| 09:25:41 | 12 | the claim could come 20 years from now even after a |
| 09:25:46 | 13 | borrower has been out working for a long time.  So the |
| 09:25:49 | 14 | types of communications and given that now you have text |
| 09:25:53 | 15 | messaging, you have voice messaging, you have all kinds of |
| 09:25:57 | 16 | ways to communicate with students, the totality of what we |
| 09:25:59 | 17 | have to maintain and any type of communication so that we |
| 09:26:05 | 18 | can provide a defense in the event of a discharge claim, I |
| 09:26:10 | 19 | mean now, the burden has shifted dramatically to us to |
| 09:26:15 | 20 | basically defend ourselves, and we only have 90 days to do |
| 09:26:19 | 21 | that in the event of a claim, as I understand it.  So the |
| 09:26:23 | 22 | volume of what we have to maintain, the types of |
| 09:26:26 | 23 | communications that we have to maintain because we want to |
| 09:26:29 | 24 | maintain them to protect us going forward. |
| 09:26:34 | 25 | But, of course, misrepresentation is |

| | | |
|---|---|---|
| 09:26:36 | 1 | misrepresentation. |
| 09:26:38 | 2 | Q.   Mr. Dreyfus, you reviewed the full rule before your |
| 09:26:44 | 3 | testimony today, correct? |
| 09:26:45 | 4 | A.   Yes. |
| 09:26:46 | 5 | Q.   And I know it's long.  Are you aware that the |
| 09:26:50 | 6 | department states in the rule that it will not pursue |
| 09:26:54 | 7 | recoupment based on the new borrower defense standards |
| 09:26:57 | 8 | except for loans that are disbursed after the effective |
| 09:26:59 | 9 | date, meaning after July 1st? |
| 09:27:01 | 10 | A.   Yes. |
| 09:27:04 | 11 | Q.   So would you agree that when Mr. Arthur's declaration |
| 09:27:08 | 12 | states, quote, recoupment proceedings could be instituted |
| 09:27:11 | 13 | for ECPI university graduates whose enrollment ended |
| 09:27:15 | 14 | several years ago, that that's a -- that that statement is |
| 09:27:18 | 15 | mistaken? |
| 09:27:20 | 16 | A.   I guess so.  Yeah. |
| 09:27:23 | 17 | Q.   During your tenure with ECPI, has any branch or |
| 09:27:31 | 18 | campus ever closed? |
| 09:27:33 | 19 | A.   Yes. |
| 09:27:35 | 20 | Q.   And in those circumstances, were students who wanted |
| 09:27:41 | 21 | to continue with their program unable to access |
| 09:27:45 | 22 | educational opportunities at the remaining branches? |
| 09:27:48 | 23 | A.   Every student was, you know, taken care of. |
| 09:27:54 | 24 | Q.   Has any closed ECPI institution ever been subject to |
| 09:27:57 | 25 | recoupment before? |

| | | |
|---|---|---|
| 09:27:58 | 1 | A.    No. |
| 09:28:02 | 2 | Q.    Whenever Mr. Arthur describes upgrades to programs, |
| 09:28:14 | 3 | could you explain a little bit about what an upgrade looks |
| 09:28:17 | 4 | like? |
| 09:28:17 | 5 | A.    Sure.  Let's take cyber security.  You may build a |
| 09:28:23 | 6 | new lab to that program, you may add a specialty of the |
| 09:28:26 | 7 | program, for example, now you may have artificial |
| 09:28:29 | 8 | intelligence to cyber security, which means you have to |
| 09:28:32 | 9 | get new software, you have to have different staff, you'd |
| 09:28:35 | 10 | have to make sure that, you know, our facilities are |
| 09:28:38 | 11 | prepared for that.  Same thing in nursing.  I mean, in |
| 09:28:41 | 12 | nursing, we will add, you know, hospital settings and we |
| 09:28:46 | 13 | will put a lot of resources towards simulation labs and |
| 09:28:52 | 14 | virtualization now, which has come into play. |
| 09:28:55 | 15 |         So as there are advances in techniques to educate |
| 09:29:01 | 16 | students, particularly skills-based education, we invest |
| 09:29:05 | 17 | heavily to that to make it a better experience for our |
| 09:29:07 | 18 | students. |
| 09:29:10 | 19 | Q.    And so, the result of upgrades like that is never |
| 09:29:13 | 20 | that a student is unable to complete their program of |
| 09:29:17 | 21 | study. |
| 09:29:19 | 22 | A.    Students are -- it's available for students to |
| 09:29:22 | 23 | complete the program, but students don't finish their |
| 09:29:25 | 24 | program for a lot of reasons.  I mean, there's a lot of |
| 09:29:28 | 25 | life issues that come into play with students.  Sometimes |

| | | |
|---|---|---|
| 09:29:31 | 1 | they have financial issues, sometimes there's a sickness |
| 09:29:33 | 2 | in the family, sometimes they need to take a break and, |
| 09:29:37 | 3 | you know, take a job.  So there's a lot of reasons why. |
| 09:29:42 | 4 | But no, I mean, I think students are always available to |
| 09:29:47 | 5 | finish if they can, but things get in the way most of the |
| 09:29:50 | 6 | time. |
| 09:29:51 | 7 | Q.   But you would agree when they don't finish, it's not |
| 09:29:54 | 8 | because of the upgrade of the program. |
| 09:29:56 | 9 | A.   No. |
| 09:30:05 | 10 | Q.   And again, just to reiterate, you've reviewed the |
| 09:30:08 | 11 | full rule before your testimony today? |
| 09:30:10 | 12 | A.   Yes, I did. |
| 09:30:11 | 13 | Q.   Sir, are you aware that in the rule the department |
| 09:30:15 | 14 | states that continuation of the student's program of |
| 09:30:20 | 15 | study, even at another location of the institution, is |
| 09:30:23 | 16 | treated as completion of that program for purposes of the |
| 09:30:26 | 17 | school discharge rule? |
| 09:30:27 | 18 | A.   Yes.  However, if the student changes programs or the |
| 09:30:33 | 19 | program zip code changes, that is not considered the same |
| 09:30:38 | 20 | program.  So a student that may have been in software |
| 09:30:42 | 21 | development decides to finish in cyber security, that is |
| 09:30:46 | 22 | now a student that did not finish the program.  If a |
| 09:30:49 | 23 | student's in mechatronics program decides to go into |
| 09:30:53 | 24 | engineering technology just because the schedule is super |
| 09:30:56 | 25 | or they now want to do that, that is now considered a |

| 09:30:58 | 1 | student that didn't finish the program.  So they have to |
| 09:31:01 | 2 | finish -- not only do they have to finish the exact same |
| 09:31:05 | 3 | program at the new facility and students do change |
| 09:31:09 | 4 | programs. |
| 09:31:10 | 5 | Q.   But in the circumstance you are describing, would you |
| 09:31:13 | 6 | agree that that's the choice of the student?  It's not |
| 09:31:16 | 7 | attributable to the opening of a new location or the |
| 09:31:20 | 8 | upgrading of that program and study? |
| 09:31:22 | 9 | A.   That's the choice except it's still a discharge. |
| 09:31:30 | 10 | Q.   I'm going to ask you a couple of questions about the |
| 09:31:33 | 11 | second institution in Texas that ECPI had contemplated |
| 09:31:37 | 12 | opening up.  Could you tell me what date you began |
| 09:31:41 | 13 | considering opening up that second campus? |
| 09:31:44 | 14 | A.   Probably 2019. |
| 09:31:47 | 15 | Q.   And when did you abandon those plans? |
| 09:31:50 | 16 | A.   We abandoned them this spring. |
| 09:31:53 | 17 | Q.   This spring, 2023? |
| 09:31:55 | 18 | A.   Uh-huh. |
| 09:31:56 | 19 | Q.   And you said that that site was in Dallas, Texas, |
| 09:32:03 | 20 | right? |
| 09:32:04 | 21 | A.   Correct. |
| 09:32:08 | 22 | Q.   What sort of programs were contemplated to be offered |
| 09:32:12 | 23 | at that campus? |
| 09:32:13 | 24 | A.   Similar to the San Antonio nursing, cyber security, |
| 09:32:17 | 25 | engineering technology. |

| | | |
|---|---|---|
| 09:32:22 | 1 | Q.   Would any students be able to claim from the San |
| 09:32:30 | 2 | Antonio campus that their program of study had ended if |
| 09:32:34 | 3 | the new campus in Dallas were opened up? |
| 09:32:37 | 4 | A.   No. |
| 09:32:44 | 5 | Q.   No further questions, your Honor.  Thank you, Mr. |
| 09:32:47 | 6 | Dreyfus. |
| 09:32:47 | 7 | THE COURT:  Any followup? |
| 09:32:49 | 8 | RE-DIRECT EXAMINATION |
| 09:32:59 | 9 | BY MS. BAKER: |
| 09:32:59 | 10 | Q.   Mr. Dreyfus, I want to ask you a few followup |
| 09:33:07 | 11 | questions, if that's okay. |
| 09:33:14 | 12 | You currently at ECPI retain records associated |
| 09:33:20 | 13 | with various aspects of the admissions process, right? |
| 09:33:25 | 14 | A.   Yes. |
| 09:33:25 | 15 | Q.   What is your understanding of how the rule that's |
| 09:33:31 | 16 | expected to take effect on July 1 will change those record |
| 09:33:35 | 17 | retention obligations? |
| 09:33:37 | 18 | A.   We will have to retain records for 30 or 40 years |
| 09:33:42 | 19 | because it has to be over the life of the loan.  So |
| 09:33:47 | 20 | currently, you know, we don't retain records for 40 years |
| 09:33:51 | 21 | on students in that detail. |
| 09:33:59 | 22 | Q.   You just provided a response to Mr. Knapp's question |
| 09:34:04 | 23 | about recoupment and your understanding of how the new |
| 09:34:10 | 24 | rule expected to take effect on July 1st will treat |
| 09:34:15 | 25 | recoupment as it relates to loans that are disbursed |

| | | |
|---|---|---|
| 09:57:04 | 1 | department is clear that it intends to rely on the group |
| 09:57:10 | 2 | claim process to very quickly clear out a substantial |
| 09:57:14 | 3 | backlog.  Now, the rule doesn't tell us how big that |
| 09:57:16 | 4 | backlog is, but there are several references to, you know, |
| 09:57:19 | 5 | half a million claims or one in five.  So there are, you |
| 09:57:24 | 6 | know, repeated references to a pileup of claims. |
| 09:57:27 | 7 | And they say in the net impact statement that the |
| 09:57:30 | 8 | groups claim process is how they're going to package them |
| 09:57:34 | 9 | and move them through.  So they talk about they need to -- |
| 09:57:39 | 10 | they need to speed this up.  They need to get this |
| 09:57:42 | 11 | through. |
| 09:57:42 | 12 | Q.   And as you talk about the group claims process and I |
| 09:57:46 | 13 | think we heard some testimony earlier about that process, |
| 09:57:48 | 14 | as well.  What is your understanding of how that group |
| 09:57:52 | 15 | claims process will particularly affect the small |
| 09:57:56 | 16 | proprietary schools you've just been describing? |
| 09:57:59 | 17 | A.   So I want to talk a little bit about the group claims |
| 09:58:01 | 18 | process because I think that it's the way these groups |
| 09:58:06 | 19 | come together that concerns me.  So, you know, as was |
| 09:58:11 | 20 | mentioned earlier, a school that has 150 students could |
| 09:58:16 | 21 | find on July 1 or July 2 that it has a group claim |
| 09:58:20 | 22 | presented to it with 300 students in that group.  And the |
| 09:58:26 | 23 | school does need to look at each individual because the |
| 09:58:30 | 24 | way the school responds to that claim will likely |
| 09:58:35 | 25 | determine what happens in a recoupment proceeding. |

| | | |
|---|---|---|
| 09:58:39 | 1 | So the school does have -- so the department has |
| 09:58:42 | 2 | said, you know, we don't want to look at individuals. |
| 09:58:45 | 3 | That's really burdensome.  But the school has to look at |
| 09:58:48 | 4 | individuals because there are people in that group that |
| 09:58:51 | 5 | never said they were harmed.  There were people who -- so |
| 09:58:54 | 6 | the school essentially has to prove that they didn't do |
| 09:58:57 | 7 | something to somebody who never said they did something. |
| 09:59:02 | 8 | So that universe of what you might have to prove, |
| 09:59:08 | 9 | you know, it's huge.  And so, if you are a small school |
| 09:59:14 | 10 | and you have one registrar and, you know, you wake up on |
| 09:59:19 | 11 | July 1 and you're in box is this group claim, you have to |
| 09:59:23 | 12 | pull people off of their other duties, serving students, |
| 09:59:27 | 13 | making sure records are clear, processing transcripts, |
| 09:59:30 | 14 | because you have to respond to that claim.  And when a |
| 09:59:34 | 15 | school responds to those claims, they have to do things |
| 09:59:37 | 16 | like pull enrollment agreements that students sign, pull |
| 09:59:43 | 17 | disclosures that students sign, pull e-mail communication |
| 09:59:46 | 18 | between students and faculty.  They have to if they've |
| 09:59:51 | 19 | been recording phone calls have them transcribed. |
| 09:59:55 | 20 | So there is a lot of work that goes into |
| 09:59:59 | 21 | providing information in response to the claim and it gets |
| 10:00:02 | 22 | a little more complicated.  And this sort of goes back to |
| 10:00:04 | 23 | the point you were just making about recoupment.  It is |
| 10:00:09 | 24 | true that the rule says that it won't attempt a recoupment |
| 10:00:13 | 25 | effort based on the 2023 standard, but it will and can and |

|          |     |                                                           |
|----------|-----|-----------------------------------------------------------|
| 11:16:26 | 1   | <u>RE-DIRECT EXAMINATION</u>                              |
| 11:16:26 | 2   | BY MS. BAKER                                              |
| 11:16:33 | 3   | Q.   Mr. Dreyfus, as you note, you're still under oath and |
| 11:16:36 | 4   | I wanted to just ask you some additional questions in     |
| 11:16:39 | 5   | connection with the Judge's question about resource       |
| 11:16:43 | 6   | allocation.                                               |
| 11:16:44 | 7   |        So you've testified about the compliance costs     |
| 11:16:47 | 8   | that are associated with the rule that is scheduled to    |
| 11:16:49 | 9   | take effect on July 1.  Do you recall that testimony?     |
| 11:16:52 | 10  | A.   Yes.                                                 |
| 11:16:52 | 11  | Q.   And what I want to understand is, how is the school  |
| 11:16:57 | 12  | paying for those compliance costs?                        |
| 11:17:00 | 13  | A.   We have a limited amount of resources as I mentioned |
| 11:17:03 | 14  | earlier.  Because of the financial responsibility         |
| 11:17:06 | 15  | regulations, you have to have a profit.  From that profit,|
| 11:17:11 | 16  | you pay taxes.  In addition, you use those resources to   |
| 11:17:16 | 17  | reinvest in the institution, whether it's through hiring, |
| 11:17:19 | 18  | new faculty, or adding facilities or, in essence, really  |
| 11:17:24 | 19  | upgrading your facilities, which is what we do.  I mean,  |
| 11:17:27 | 20  | we're not receiving grants from anyone to build buildings.|
| 11:17:31 | 21  | We're not receiving funds from the state.  We have to do  |
| 11:17:33 | 22  | that internally.                                          |
| 11:17:34 | 23  |        So any improvements or any new programs that we    |
| 11:17:37 | 24  | offer comes from our profit.  And in this particular case,|
| 11:17:43 | 25  | if resources are diverted, it will, in essence, come out  |

| | | |
|---|---|---|
| 11:17:47 | 1 | of what the Judge says is profits, of course; but at the |
| 11:17:52 | 2 | same time, it reallocates those resources so that we |
| 11:17:55 | 3 | cannot reinvest in things that we believe will help |
| 11:17:58 | 4 | students in the long run.  And because of the financial |
| 11:18:01 | 5 | responsibility regulations, once you have a claim, you |
| 11:18:05 | 6 | basically go down this slippery slope and that slippery |
| 11:18:08 | 7 | slope is, it may be announced to the world, which would |
| 11:18:12 | 8 | have a detrimental impact on our reputation, and then, |
| 11:18:15 | 9 | also, you run afoul of some other regulations. |
| 11:18:18 | 10 | So it really becomes this snowball effect that |
| 11:18:22 | 11 | once you have a claim like this and if it's a large claim, |
| 11:18:26 | 12 | it certainly takes a huge amount of resources.  It may be |
| 11:18:29 | 13 | more than a particular year's profitability and if that's |
| 11:18:32 | 14 | the case, you cannot have a loss.  I mean, basically the |
| 11:18:37 | 15 | financial responsibility regs require you to have a |
| 11:18:42 | 16 | profit, otherwise, you're in jeopardy of closing. |
| 11:18:45 | 17 | So it's kind of a catch-22.  If, all of a sudden, |
| 11:18:48 | 18 | now resources are diverted towards these particular |
| 11:18:51 | 19 | actions and then, you have a recoupment claim that you |
| 11:18:54 | 20 | have to pay, you potentially have an existential threat to |
| 11:18:59 | 21 | the institution. |
| 11:19:01 | 22 | Q.   Thank you. |
| 11:19:03 | 23 | MS. BAKER:  I don't know if your Honor has any |
| 11:19:04 | 24 | questions for the witness. |
| 11:19:04 | 25 | THE COURT:  I don't.  Thank you.  Any questions? |

| | | |
|---|---|---|
| 11:19:06 | 1 | MR. KNAPP:  Just a couple, your Honor. |
| 11:19:08 | 2 | THE COURT:  Okay. |
| 11:19:09 | 3 | RE-CROSS EXAMINATION |
| 11:19:09 | 4 | BY MR. KNAPP: |
| 11:19:16 | 5 | Q.   Hello again, Mr. Dreyfus. |
| 11:19:17 | 6 | A.   Hello. |
| 11:19:20 | 7 | Q.   A school's participation in the Title IV student loan |
| 11:19:23 | 8 | programs is voluntary; is that right? |
| 11:19:25 | 9 | A.   Correct. |
| 11:19:27 | 10 | Q.   It's possible that a school can profit outside of |
| 11:19:30 | 11 | that context; is that right? |
| 11:19:32 | 12 | A.   Yes. |
| 11:19:35 | 13 | Q.   How are the profits allocated across your campuses? |
| 11:19:42 | 14 | Are they pooled sort of at the corporate level or is -- |
| 11:19:45 | 15 | A.   Yes. |
| 11:19:45 | 16 | Q.   -- each institution -- |
| 11:19:46 | 17 | A.   I mean, we are one entity.  So yes, it's pooled. |
| 11:19:50 | 18 | It's one entity. |
| 11:19:51 | 19 | Q.   And are the compliance costs shared similarly across? |
| 11:19:55 | 20 | A.   Yes, they are. |
| 11:20:00 | 21 | Q.   No further questions. |
| 11:20:04 | 22 | THE COURT:  Anything further? |
| 11:20:05 | 23 | MS. BAKER:  If I may follow up.  Thank you, your |
| 11:20:05 | 24 | Honor. |
| 11:20:07 | 25 | |

RE-DIRECT EXAMINATION

BY MS. BAKER:

Q.   Mr. Dreyfus, why does ECPI participate in Title IV programs?

A.   It allows an opportunity for our students to get associate's, bachelor's, master's degrees and, in essence, it's an entitlement to the students to pursue education. We deal with adult learners, we deal with a lot of different students from a lot of different backgrounds, and it really helps them get the education.  And we can provide better faculty.  Our faculty come from the same institutions that traditional schools come from and, you know, so it does allow them to get a better education.

Q.   You talked about the regulations that require you to -- school to maintain a profit.  What are those regulations as you understand them?

A.   The financial responsibility regulations?

Q.   Yes.

A.   In essence, you have to show -- there's certain ratios that you have to maintain and you have to have financial stability.  One of the issues that I believe in the past the department is fearful of -- and I think it's actually noted in this particular regulation that schools that are in financial jeopardy are at risk of closure and the department wants to, you know, know when a school is

| | |
|---|---|
| 11:21:28 | 1 |
| 11:21:31 | 2 |
| 11:21:36 | 3 |
| 11:21:39 | 4 |
| 11:21:43 | 5 |
| 11:21:46 | 6 |
| 11:21:49 | 7 |
| 11:21:51 | 8 |
| 11:21:54 | 9 |
| 11:21:54 | 10 |
| 11:22:05 | 11 |
| 11:22:08 | 12 |
| 11:22:11 | 13 |
| 11:22:15 | 14 |
| 11:22:17 | 15 |
| 11:22:20 | 16 |
| 11:22:22 | 17 |
| 11:22:24 | 18 |
| 11:22:30 | 19 |
| 11:22:34 | 20 |
| 11:22:38 | 21 |
| 11:22:41 | 22 |
| 11:22:44 | 23 |
| 11:22:48 | 24 |
| 11:22:51 | 25 |

1  in that range of potentially closing.

2        So you have to maintain certain ratios to

3  basically be in good standing as an institution and part

4  of that is you have to show a profit.

5  Q.   And so, if you have to reallocate resources from that

6  profit, the other option is, what, to raise tuition?

7  A.   Yes.

8  Q.   No further questions.  Thank you.  Your Honor, do

9  you?

10        THE COURT:  No.  Thank you.  You may step down.

11        MS. BAKER:  I wanted to talk about a couple of

12  other components of irreparable harm that your Honor heard

13  some testimony about and has read about in the submitted

14  declarations, as well.  And then, I wanted to speak about

15  the balance of harms, as well, your Honor, if that's okay.

16        THE COURT:  Please.

17        MS. BAKER:  So as your Honor heard, in addition

18  to the irreparable harm that will absolutely happen on

19  July 1 as a function of the group claims process and then,

20  the subsequent need to respond to that process, the costs

21  associated with responding to that process, the subsequent

22  recoupment process, which is contemplated by the rule and

23  expected by the rule, we've talked about the compliance

24  costs associated with complying with the rule, which, as

25  your Honor knows, is its own form of irreparable harm.

EXHIBIT 4

**U.S. District Court [LIVE]**
**Western District of Texas (Austin)**
**CIVIL DOCKET FOR CASE #: 1:23−cv−00433−RP**

Career Colleges & Schools of Texas v. United States Department
of Education et al
Assigned to: Judge Robert Pitman
Case in other court:  Texas Northern, 4:23−cv−00206
Cause: 05:702 Administrative Procedure Act

Date Filed: 04/18/2023
Jury Demand: None
Nature of Suit: 899 Other Statutes:
Administrative Procedures Act/Review or
Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Career Colleges & Schools of Texas**                represented by    **Allyson B. Baker**
Paul Hastings LLP
2050 M Street, N.W.
Washington, DC 20036
202−551−1700
Email: allysonbaker@paulhastings.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Meredith L. Boylan**
Paul Hastings LLP
2050 M Street, N.W.
Washington, DC 20036
202−551−1831
Fax: 202−551−0331
Email: meredithboylan@paulhastings.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Murray**
Paul Hastings LLP
Paul Hastings LLP
2050 M Street NW
Washington, DC 20036
202−551−1730
Email: michaelmurray@paulhastings.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Philip Avery Vickers**
Cantey Hanger LLP
600 West 6th Street, Suite 300
Fort Worth, TX 76102−3685
(817) 877−2849
Fax: (817) 877−2807
Email: pvickers@canteyhanger.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sameer P. Sheikh**
Paul Hastings LLP
2050 M Street NW
Washington, DC 20037
202−551−1700
Email: sameersheikh@paulhastings.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen Blake Kinnaird**
Paul Hastings LLP

App.054

2050 M Street NW
Washington, DC 20036
202–551–1842
Fax: 202–551–1705
Email: stephenkinnaird@paulhastings.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katherine R. Hancock**
Cantey Hanger LLP
600 West 6th Street
Suite 300
Fort Worth, TX 76116
817–877–2800
Email: khancock@canteyhanger.com
*ATTORNEY TO BE NOTICED*

**Tor Tarantola**
Paul Hastings LLP
2050 M Street NW
Washington, DC 20036
202–551–1843
Email: tortarantola@paulhastings.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **United States Department of Education** | represented by | **Cody T. Knapp** |

U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
(202) 514–5578
Email: cody.t.knapp@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christine L. Coogle**
U.S. Department of Justice
Federal Programs Branch, Civil Division
1100 L St. NW
Washington, DC 20005
202–880–0282
Email: christine.l.coogle@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Robert Charles Merritt**
U.S. DOJ, Civil Divison, Federal Programs
Branch
20 Massachusetts Ave., NW
Washington, DC 20530
202–616–8098
Email: robert.c.merritt@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Miguel Cardona**<br>*in his official capacity as the Secretary of Education* | represented by | **Cody T. Knapp**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

App.055

**Christine L. Coogle**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert Charles Merritt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Project on Predatory Student Lending**
*TERMINATED: 05/18/2023*

represented by **Rebecca Clare Eisenbrey**
Project on Predatory Student Lending
769 Centre Street
Jamaica Plain, MA 02130
617–322–2808
Email: reisenbrey@ppsl.org
*TERMINATED: 05/18/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wendy Liu**
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
202–588–1000
*TERMINATED: 05/18/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Public Citizen**
*TERMINATED: 05/18/2023*

represented by **Rebecca Clare Eisenbrey**
(See above for address)
*TERMINATED: 05/18/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wendy Liu**
(See above for address)
*TERMINATED: 05/18/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/28/2023 | 1 | COMPLAINT against All Defendants filed by Career Colleges & Schools of Texas. (Fee Paid – ATXNDC–13549972.) Clerk to issue summons(es). In each Notice of Electronic Filing, the judge assignment is indicated, and a link to the Judges Copy Requirements and Judge Specific Requirements is provided. The court reminds the filer that any required copy of this and future documents must be delivered to the judge, in the manner prescribed, within three business days of filing. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information – Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Attachments: # 1 Cover Sheet) (Vickers, Philip) Modified on 2/28/2023 (tjc). [Transferred from Texas Northern on 4/18/2023.] (Entered: 02/28/2023) |
| 02/28/2023 | 2 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by Career Colleges & Schools of Texas. (Clerk QC note: Affiliate entry indicated). (Attachments: # 1 Appendix to Certificate of Interested Parties) (Vickers, Philip) [Transferred from Texas Northern on 4/18/2023.] (Entered: 02/28/2023) |

| 02/28/2023 | 3 | New Case Notes: A filing fee has been paid. File to: Judge O Connor. Pursuant to Misc. Order 6, Plaintiff is provided the Notice of Right to Consent to Proceed Before A U.S. Magistrate Judge. Clerk to provide copy to plaintiff if not received electronically. Attorneys are further reminded that, if necessary, they must comply with Local Rule 83.10(a) within 14 days or risk the possible dismissal of this case without prejudice or without further notice. (tjc) [Transferred from Texas Northern on 4/18/2023.] (Entered: 02/28/2023) |
|---|---|---|
| 02/28/2023 | 4 | Summons issued as to Miguel Cardona, United States Department of Education, U.S. Attorney, and U.S. Attorney General. (tjc) [Transferred from Texas Northern on 4/18/2023.] (Entered: 02/28/2023) |
| 02/28/2023 | 5 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC−13552310) filed by Career Colleges & Schools of Texas (Attachments: # 1 Additional Page(s) Certificate of Good Standing)Attorney Sameer P Sheikh added to party Career Colleges & Schools of Texas(pty:pla) (Sheikh, Sameer) [Transferred from Texas Northern on 4/18/2023.] (Entered: 02/28/2023) |
| 03/01/2023 | 6 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC−13554294) filed by Career Colleges & Schools of Texas (Attachments: # 1 Additional Page(s) Certificate of Good Standing)Attorney Allyson B Baker added to party Career Colleges & Schools of Texas(pty:pla) (Baker, Allyson) [Transferred from Texas Northern on 4/18/2023.] (Entered: 03/01/2023) |
| 03/01/2023 | 7 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC−13555355) filed by Career Colleges & Schools of Texas (Attachments: # 1 Additional Page(s) Certificate of Good Standing)Attorney Michael Murray added to party Career Colleges & Schools of Texas(pty:pla) (Murray, Michael) [Transferred from Texas Northern on 4/18/2023.] (Entered: 03/01/2023) |
| 03/08/2023 | 8 | SUMMONS Returned Executed as to Miguel Cardona ; served on 2/28/2023; United States Department of Education ; served on 2/28/2023. (Hancock, Katherine) [Transferred from Texas Northern on 4/18/2023.] (Entered: 03/08/2023) |
| 03/13/2023 | 9 | Court Request for Recusal: Judge Reed C. O'Connor recused. Pursuant to instruction in Special Order 3−249, the Clerk has reassigned the case to Judge Mark Pittman for all further proceedings. Future filings should indicate the case number as: 4:23−cv−00206−P. (bcr) [Transferred from Texas Northern on 4/18/2023.] (Entered: 03/13/2023) |
| 03/13/2023 | 10 | New Case Notes: A filing fee has been paid. File to: Judge Pittman. Pursuant to Misc. Order 6, Plaintiff is provided the Notice of Right to Consent to Proceed Before A U.S. Magistrate Judge. Clerk to provide copy to plaintiff if not received electronically. Attorneys are further reminded that, if necessary, they must comply with Local Rule 83.10(a) within 14 days or risk the possible dismissal of this case without prejudice or without further notice. (bcr) [Transferred from Texas Northern on 4/18/2023.] (Entered: 03/13/2023) |
| 03/17/2023 | 11 | NOTICE of Attorney Appearance by Cody Taylor Knapp on behalf of Miguel Cardona, United States Department of Education. (Filer confirms contact info in ECF is current.) (Knapp, Cody) [Transferred from Texas Northern on 4/18/2023.] (Entered: 03/17/2023) |
| 03/17/2023 | 12 | MOTION to Dismiss *for Improper Venue*, MOTION to Transfer Case out of District/Division *to the District of Columbia or the Austin Division of the Western District of Texas* () filed by Miguel Cardona, United States Department of Education (Attachments: # 1 Proposed Order)Attorney Cody Taylor Knapp added to party Miguel Cardona(pty:dft), Attorney Cody Taylor Knapp added to party United States Department of Education(pty:dft) (Knapp, Cody) [Transferred from Texas Northern on 4/18/2023.] (Entered: 03/17/2023) |
| 03/17/2023 | 13 | Brief/Memorandum in Support filed by Miguel Cardona, United States Department of Education re 12 MOTION to Dismiss *for Improper Venue* MOTION to Transfer Case out of District/Division *to the District of Columbia or the Austin Division of the Western District of Texas* (Knapp, Cody) [Transferred from Texas Northern on 4/18/2023.] (Entered: 03/17/2023) |

| 03/17/2023 | 14 | Appendix in Support filed by Miguel Cardona, United States Department of Education re 12 MOTION to Dismiss *for Improper Venue* MOTION to Transfer Case out of District/Division *to the District of Columbia or the Austin Division of the Western District of Texas* (Knapp, Cody) [Transferred from Texas Northern on 4/18/2023.] (Entered: 03/17/2023) |
|---|---|---|
| 03/22/2023 | 15 | SUMMONS Returned Executed as to All Defendants. (Hancock, Katherine) [Transferred from Texas Northern on 4/18/2023.] (Entered: 03/22/2023) |
| 04/02/2023 | 16 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC–13632505) filed by Career Colleges & Schools of Texas (Attachments: # 1 Exhibit(s) Certificate of Good Standing)Attorney Stephen Blake Kinnaird added to party Career Colleges & Schools of Texas(pty:pla) (Kinnaird, Stephen) [Transferred from Texas Northern on 4/18/2023.] (Entered: 04/02/2023) |
| 04/03/2023 | 17 | ELECTRONIC ORDER granting 16 Application for Admission Pro Hac Vice of Stephen Kinnaird. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Mark Pittman on 4/3/2023) (rjh) [Transferred from Texas Northern on 4/18/2023.] (Entered: 04/03/2023) |
| 04/03/2023 | 18 | NOTICE of Attorney Appearance by Robert Charles Merritt on behalf of Miguel Cardona, United States Department of Education. (Filer confirms contact info in ECF is current.) (Merritt, Robert) [Transferred from Texas Northern on 4/18/2023.] (Entered: 04/03/2023) |
| 04/04/2023 | 19 | ELECTRONIC ORDER granting 5 Application for Admission Pro Hac Vice of Sameer P. Sheikh. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Mark Pittman on 4/4/2023) (rjh) [Transferred from Texas Northern on 4/18/2023.] (Entered: 04/04/2023) |
| 04/04/2023 | 20 | ELECTRONIC ORDER granting 6 Application for Admission Pro Hac Vice of Allyson B. Baker. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Mark Pittman on 4/4/2023) (rjh) [Transferred from Texas Northern on 4/18/2023.] (Entered: 04/04/2023) |
| 04/04/2023 | 21 | ELECTRONIC ORDER granting 7 Application for Admission Pro Hac Vice of Michael Murray. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Mark Pittman on 4/4/2023) (rjh) [Transferred from Texas Northern on 4/18/2023.] (Entered: 04/04/2023) |
| 04/04/2023 | 22 | NOTICE of Attorney Appearance by Christine L. Coogle on behalf of Miguel Cardona, United States Department of Education. (Filer confirms contact info in ECF is current.) (Coogle, Christine) [Transferred from Texas Northern on 4/18/2023.] (Entered: 04/04/2023) |
| 04/05/2023 | 23 | MOTION for Injunction *Motion for Preliminary Injunction* filed by Career Colleges & Schools of Texas (Vickers, Philip) [Transferred from Texas Northern on 4/18/2023.] (Entered: 04/05/2023) |
| 04/05/2023 | 24 | Brief/Memorandum in Support filed by Career Colleges & Schools of Texas re 23 MOTION for Injunction *Motion for Preliminary Injunction* (Vickers, Philip) [Transferred from Texas Northern on 4/18/2023.] (Entered: 04/05/2023) |
| 04/05/2023 | 25 | Appendix in Support filed by Career Colleges & Schools of Texas re 23 MOTION for Injunction *Motion for Preliminary Injunction*, 24 Brief/Memorandum in Support of Motion (Vickers, Philip) [Transferred from Texas Northern on 4/18/2023.] (Entered: 04/05/2023) |
| 04/07/2023 | 26 | RESPONSE filed by Career Colleges & Schools of Texas re: 12 MOTION to Dismiss *for Improper Venue* MOTION to Transfer Case out of District/Division *to the District* |

| | | *of Columbia or the Austin Division of the Western District of Texas* (Sheikh, Sameer) [Transferred from Texas Northern on 4/18/2023.] (Entered: 04/07/2023) |
|---|---|---|
| 04/07/2023 | 27 | Appendix in Support filed by Career Colleges & Schools of Texas re 26 Response/Objection, *to Defendants' Motion to Dismiss or Transfer* (Sheikh, Sameer) [Transferred from Texas Northern on 4/18/2023.] (Entered: 04/07/2023) |
| 04/10/2023 | 28 | ORDER: Before the Court is Plaintiff's Response to Defendants' Motion to Dismiss for Improper Venue or to Transfer Out of District. ECF No. 26 . The Court finds that an expedited reply from Defendants is necessary. Therefore, the Court ORDERS that on or before April 14, 2023, Defendants shall file their reply to Plaintiff's response. (Ordered by Judge Mark Pittman on 4/10/2023) (fba) [Transferred from Texas Northern on 4/18/2023.] (Entered: 04/10/2023) |
| 04/11/2023 | 29 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC−13656716) filed by Career Colleges & Schools of Texas (Attachments: # 1 Additional Page(s) Certificate of Good Standing)Attorney Tor Tarantola added to party Career Colleges & Schools of Texas(pty:pla) (Tarantola, Tor) [Transferred from Texas Northern on 4/18/2023.] (Entered: 04/11/2023) |
| 04/12/2023 | 30 | ELECTRONIC ORDER granting 29 Application for Admission Pro Hac Vice of Tor Tarantola. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Mark Pittman on 4/12/2023) (rjh) [Transferred from Texas Northern on 4/18/2023.] (Entered: 04/12/2023) |
| 04/14/2023 | 31 | REPLY filed by Miguel Cardona, United States Department of Education re: 12 MOTION to Dismiss *for Improper Venue* MOTION to Transfer Case out of District/Division *to the District of Columbia or the Austin Division of the Western District of Texas* (Knapp, Cody) [Transferred from Texas Northern on 4/18/2023.] (Entered: 04/14/2023) |
| 04/17/2023 | 32 | MOTION for Extension of Time to File Response/Reply to 23 MOTION for Injunction *Motion for Preliminary Injunction* filed by Miguel Cardona, United States Department of Education (Attachments: # 1 Proposed Order) (Knapp, Cody) [Transferred from Texas Northern on 4/18/2023.] (Entered: 04/17/2023) |
| 04/17/2023 | 33 | OPINION & ORDER: Before the Court is Defendants' Motion to Dismiss for Improper Venue or in the Alternative to Transfer. ECF No. 12 . This Court GRANTS Defendants' motion in part and TRANSFERS this case to the Western District of Texas, Austin Division. (See order for specifics) (Ordered by Judge Mark Pittman on 4/17/2023) (fba) [Transferred from Texas Northern on 4/18/2023.] (Entered: 04/17/2023) |
| 04/18/2023 | 34 | Case electronically transferred in from Northern District of Texas−Fort Worth ; Case Number 4:23−cv−00206. (Entered: 04/18/2023) |
| 04/18/2023 | | Case assigned to Judge Robert Pitman. CM WILL NOW REFLECT THE JUDGE INITIALS AS PART OF THE CASE NUMBER. PLEASE APPEND THESE JUDGE INITIALS TO THE CASE NUMBER ON EACH DOCUMENT THAT YOU FILE IN THIS CASE. (cr5) (Entered: 04/19/2023) |
| 04/18/2023 | | If ordered by the court, all referrals and consents in this case will be assigned to Magistrate Judge Howell. (cr5) (Entered: 04/19/2023) |
| 04/19/2023 | 35 | Pro Hac Vice Letter to Allyson B. Baker, Meredith L. Boylan, Stephen B. Kinnaird, Michael Murray, Sameer P. Sheikh, and Tor Tarantola. (cr5) (Entered: 04/19/2023) |
| 04/19/2023 | 36 | Pro Hac Vice Letter to Katherine Hancock. (cr5) (Entered: 04/19/2023) |
| 04/19/2023 | 37 | Case Transfer and Opening Letter sent to all Counsel. (cr5) (Entered: 04/19/2023) |
| 04/20/2023 | 38 | MOTION to Appear Pro Hac Vice by Philip Avery Vickers *Allyson B. Baker's Motion for Admission Pro Hac Vice* ( Filing fee $ 100 receipt number ATXWDC−17340006) by on behalf of Career Colleges & Schools of Texas. (Vickers, Philip) (Entered: 04/20/2023) |

| 04/20/2023 | 39 | MOTION to Appear Pro Hac Vice by Philip Avery Vickers *Sameer P. Sheikh's Motion for Admission Pro Hac Vice* ( Filing fee $ 100 receipt number ATXWDC–17340057) by on behalf of Career Colleges & Schools of Texas. (Vickers, Philip) (Entered: 04/20/2023) |
|---|---|---|
| 04/20/2023 | 40 | MOTION to Appear Pro Hac Vice by Philip Avery Vickers *Michael Murray's Motion for Admission Pro Hac Vice* ( Filing fee $ 100 receipt number BTXWDC–17340791) by on behalf of Career Colleges & Schools of Texas. (Vickers, Philip) (Entered: 04/20/2023) |
| 04/24/2023 | 41 | MOTION to Appear Pro Hac Vice by Philip Avery Vickers *Stephen Kinnaird's Motion for Admission Pro Hac Vice* ( Filing fee $ 100 receipt number ATXWDC–17351996) by on behalf of Career Colleges & Schools of Texas. (Vickers, Philip) (Entered: 04/24/2023) |
| 04/24/2023 | 42 | Response in Opposition to Motion, filed by Career Colleges & Schools of Texas, re 32 MOTION for Extension of Time to File Response/Reply to 23 MOTION for Injunction *Motion for Preliminary Injunction* filed by Miguel Cardona, United States Department of Education (Vickers, Philip) (Entered: 04/24/2023) |
| 04/25/2023 | | Text Order GRANTING 32 Motion for Extension of Time to File Response/Reply to 23 Motion for Preliminary Injunction entered by Judge Robert Pitman. IT IS ORDERED that Defendants shall respond to Plaintiff's Motion for Preliminary Injunction on or before May 15, 2023. IT IS FURTHER ORDERED that Plaintiff's reply, if any, shall be filed on or before May 22, 2023. (This is a text–only entry generated by the court. There is no document associated with this entry.) (Entered: 04/25/2023) |
| 04/25/2023 | 43 | ORDER SETTING PRELIMINARY INJUNCTION HEARING. Hearing set for 5/31/2023 at 09:00 AM before Judge Robert Pitman. Signed by Judge Robert Pitman. (jv2) (Entered: 04/25/2023) |
| 05/01/2023 | 44 | ORDER GRANTING 38 Motion to Appear Pro Hac Vice for Attorney Allyson B. Baker for Career Colleges & Schools of Texas. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Robert Pitman. (jv2) (Entered: 05/01/2023) |
| 05/01/2023 | 45 | ORDER GRANTING 39 Motion to Appear Pro Hac Vice for Attorney Sameer P Sheikh for Career Colleges & Schools of Texas. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Robert Pitman. (jv2) (Entered: 05/01/2023) |
| 05/01/2023 | 46 | ORDER GRANTING 40 Motion to Appear Pro Hac Vice for Attorney Michael Murray for Career Colleges & Schools of Texas. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Robert Pitman. (jv2) (Entered: 05/01/2023) |
| 05/01/2023 | 47 | ORDER GRANTING 41 Motion to Appear Pro Hac Vice for Attorney Stephen Blake Kinnaird for Career Colleges & Schools of Texas. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Robert Pitman. (jv2) (Entered: 05/01/2023) |
| 05/01/2023 | 48 | MOTION to Appear Pro Hac Vice by Philip Avery Vickers *Meredith Boylan's Motion for Admission Pro Hac Vice* ( Filing fee $ 100 receipt number ATXWDC–17384692) by on behalf of Career Colleges & Schools of Texas. (Vickers, Philip) (Entered: 05/01/2023) |
| 05/03/2023 | 49 | MOTION to Appear Pro Hac Vice by Philip Avery Vickers *Tor Tarantola's Motion for Admission Pro Hac Vice* ( Filing fee $ 100 receipt number ATXWDC–17397036) by on behalf of Career Colleges & Schools of Texas. (Vickers, Philip) (Entered: |

| | | |
|---|---|---|
| | | 05/03/2023) |
| 05/04/2023 | 50 | ORDER GRANTING 48 Motion to Appear Pro Hac Vice as to MEREDITH L. BOYLAN. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Robert Pitman. (cc3) (Entered: 05/04/2023) |
| 05/04/2023 | 51 | ORDER GRANTING 49 Motion to Appear Pro Hac Vice as to TOR TARANTOLA. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Robert Pitman. (cc3) (Entered: 05/04/2023) |
| 05/10/2023 | 52 | REQUEST FOR ISSUANCE OF SUMMONS by Career Colleges & Schools of Texas. (Vickers, Philip) (Entered: 05/10/2023) |
| 05/11/2023 | 53 | Summons Issued as to Miguel Cardona, United States Department of Education via U.S. Attorney (jv2) (Entered: 05/11/2023) |
| 05/11/2023 | 54 | Consent MOTION for Leave to Exceed Page Limitation by Miguel Cardona, United States Department of Education. (Attachments: # 1 Proposed Order)(Merritt, Robert) (Entered: 05/11/2023) |
| 05/15/2023 | 55 | MOTION to Exclude *Expert Declaration* by Miguel Cardona, United States Department of Education. (Attachments: # 1 Proposed Order)(Coogle, Christine) (Entered: 05/15/2023) |
| 05/15/2023 | 56 | Memorandum in Opposition to Motion, filed by Miguel Cardona, United States Department of Education, re 23 MOTION for Injunction *Motion for Preliminary Injunction* filed by Career Colleges & Schools of Texas (Merritt, Robert) (Entered: 05/15/2023) |
| 05/16/2023 | | Text Order GRANTING 54 Motion for Leave to File Excess Pages entered by Judge Robert Pitman. IT IS ORDERED that Defendants' motion is GRANTED. (This is a text–only entry generated by the court. There is no document associated with this entry.) (lolc) (Entered: 05/16/2023) |
| 05/16/2023 | 57 | Unopposed MOTION for Leave to Exceed Page Limitation by Career Colleges & Schools of Texas. (Attachments: # 1 Proposed Order)(Tarantola, Tor) (Entered: 05/16/2023) |
| 05/17/2023 | 58 | MOTION for Leave to File Amicus Brief by Project on Predatory Student Lending and Public Citizen Litigation Group (Attachments: # 1 Brief, # 2 Proposed Order)(Eisenbrey, Rebecca) Modified on 5/17/2023 (jv2). (Entered: 05/17/2023) |
| 05/17/2023 | 59 | MOTION to Appear Pro Hac Vice by Rebecca Clare Eisenbrey *for Wendy Liu* ( Filing fee $ 100 receipt number ATXWDC–17447506) by on behalf of Project on Predatory Student Lending. (Eisenbrey, Rebecca) (Entered: 05/17/2023) |
| 05/17/2023 | | Text Order GRANTING 57 Motion for Leave to File Excess Pages entered by Judge Robert Pitman. For good cause shown, IT IS ORDERED that Plaintiff's reply shall not exceed 25–pages. (This is a text–only entry generated by the court. There is no document associated with this entry.) (lolc) (Entered: 05/17/2023) |
| 05/17/2023 | 60 | Response in Opposition to Motion, filed by Career Colleges & Schools of Texas, re 58 MOTION for Leave to File Amicus Brief by Rebecca Eisenbrey. filed by Public Citizen Litigation Group, Amicus Project on Predatory Student Lending (Tarantola, Tor) (Entered: 05/17/2023) |
| 05/18/2023 | 61 | REPLY to Response to Motion, filed by Project on Predatory Student Lending, re 58 MOTION for Leave to File Amicus Brief by Rebecca Eisenbrey. filed by Public Citizen Litigation Group, Amicus Project on Predatory Student Lending (Eisenbrey, Rebecca) (Entered: 05/18/2023) |
| 05/18/2023 | 62 | ORDER DENYING 58 Motion for Leave to File Amicus Brief by non–parties Public Citizen and Project on Predatory Student Lending. Signed by Judge Robert Pitman. (jv2) (Entered: 05/18/2023) |

| 05/22/2023 | 63 | Response in Opposition to Motion, filed by Career Colleges & Schools of Texas, re 55 MOTION to Exclude *Expert Declaration* filed by Defendant Miguel Cardona, Defendant United States Department of Education (Attachments: # 1 Exhibit A – Declaration Filed in Sweet v. Cardona)(Sheikh, Sameer) (Entered: 05/22/2023) |
| 05/22/2023 | 64 | REPLY to Response to Motion, filed by Career Colleges & Schools of Texas, re 23 MOTION for Injunction *Motion for Preliminary Injunction* filed by Career Colleges & Schools of Texas (Sheikh, Sameer) (Entered: 05/22/2023) |
| 05/24/2023 | | Text Order MOOTING 59 Motion to Appear Pro Hac Vice entered by Judge Robert Pitman. See Order Dkt # 62 denying amicus filing (This is a text–only entry generated by the court. There is no document associated with this entry.) (jg3) (Entered: 05/24/2023) |
| 05/24/2023 | 65 | Witness List by Career Colleges & Schools of Texas. (Sheikh, Sameer) (Entered: 05/24/2023) |
| 05/26/2023 | 66 | REPLY to Response to Motion, filed by Miguel Cardona, United States Department of Education, re 55 MOTION to Exclude *Expert Declaration* filed by Defendant Miguel Cardona, Defendant United States Department of Education (Attachments: # 1 Exhibit 1)(Coogle, Christine) (Entered: 05/26/2023) |
| 05/31/2023 | 67 | Minute Entry for proceedings held before Judge Robert Pitman: Motion Hearing held on 5/31/2023 re 23 MOTION for Preliminary Injunction filed by Career Colleges & Schools of Texas. Taken under advisement. Written order forthcoming. (Minute entry documents are not available electronically.). (Court Reporter Lily Reznik.)(jv2) (Entered: 05/31/2023) |
| 05/31/2023 | 68 | Witness List for Preliminary Injunction Hearing held 05/31/2023 before Judge Robert Pitman. (jv2) (Entered: 05/31/2023) |
| 05/31/2023 | 69 | EXHIBITS for Preliminary Injunction Hearing held 05/31/2023 before Judge Robert Pitman. (jv2) (Entered: 05/31/2023) |
| 06/27/2023 | 70 | Opposed MOTION to Stay by Career Colleges & Schools of Texas. (Tarantola, Tor) (Entered: 06/27/2023) |
| 06/28/2023 | 71 | Response in Opposition to Motion, filed by Miguel Cardona, United States Department of Education, re 70 Opposed MOTION to Stay filed by Plaintiff Career Colleges & Schools of Texas (Knapp, Cody) (Entered: 06/28/2023) |
| 06/29/2023 | 72 | REPLY to Response to Motion, filed by Career Colleges & Schools of Texas, re 70 Opposed MOTION to Stay filed by Plaintiff Career Colleges & Schools of Texas (Tarantola, Tor) (Entered: 06/29/2023) |

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| CAREER COLLEGES<br>& SCHOOLS OF TEXAS,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>EDUCATION; MIGUEL CARDONA,<br>in his official capacity as the Secretary<br>of Education,<br><br>　　　　　　Defendants. | CASE NO.: 4:23-CV-206 |

**COMPLAINT**

Plaintiff CAREER COLLEGES & SCHOOLS OF TEXAS ("CCST") for its complaint against Defendants the U.S. DEPARTMENT OF EDUCATION (the "Department") and the Honorable MIGUEL CARDONA, in his official capacity as the Secretary of the Department of Education (the "Secretary"), alleges, by and through its undersigned attorneys, as follows:

**INTRODUCTION & NATURE OF THE ACTION**

1.　　　　Pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 551–706 ("APA") and the U.S. Constitution, CCST brings this action challenging the Department's November 1, 2022 final rule regarding the Department's administration of student loans under the William D. Ford Federal Direct Loan ("Direct Loan"), the Federal Perkins Loan ("Perkins"), and the Federal Family Education Loan ("FFEL") programs. *See* 87 Fed. Reg. 65,904 (Nov. 1, 2022) (the "Final Rule").

App.064

2.      On November 1, 2022, the Department adopted the Final Rule, which, as it stands, will take effect on July 1, 2023.

3.      As set forth in greater detail below, CCST is a trade association for the proprietary sector of higher education.  The majority of CCST's more than 70 member schools participate in the Direct Loan Program.  CCST and its member schools support lawful, rational regulations governing federal aid, which can support students and promote institutional accountability. Although CCST's members are career-oriented, private institutions, the new regulations also apply to all participants in Title IV programs under the Higher Education Act of 1965 ("HEA"), including public and nonprofit schools.

4.      The Final Rule upends critical regulations governing borrower defenses to repayment ("BDR"). For the third time since 2016, the Department has introduced amendments aimed at "streamlining" the resolution of borrower defense claims.  Among other things, the latest iteration creates a borrower defense framework with new federal standards, adjudicatory schemes, and evidentiary presumptions.  The apparent goals of this new framework are to accomplish massive loan forgiveness for borrowers and to reallocate the correspondingly massive financial liability to institutions of higher education.  The Final Rule will cause financial and reputational harm to schools, educational harm to students, and budgetary harm to the public fisc.

5.      The Final Rule represents enormous Executive overreach in violation of the Department's statutory authority and the separation of powers.  In Section 455(h) of the HEA, Congress granted the Department a very specific and limited rulemaking power: to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under" the Direct Loan Program.  20 U.S.C. § 1087e(h). Invoking this limited grant and the agency's general rulemaking powers, the Department has

generated a sprawling rule that not only redefines such acts and omissions, but remakes borrower "defenses" into claims with no limitations period. The Department arrogates to itself the power to adjudicate such borrower "claims" in both individual and group proceedings and then shift potentially existential liability to schools and institutions in separate recoupment proceedings that likewise are without statutory basis. In its self-created proceedings, the Department will enforce both federal standards of its own invention as well as breach-of-contract and other state-law claims against schools. That breathtaking assertion of federal administrative power is unauthorized by statute; it also violates the U.S. Constitution by exceeding restrictions on the administrative exercise of judicial power, abrogating state laws and prerogatives, and denying jury trial rights.

6.     Not only are the processes created under the Final Rule unlawful, but they also fail to serve any legitimate purpose of the underlying statute. The new processes do not further the fair and accurate adjudication of borrower defense claims. Instead, they are designed to achieve the non-statutory and impermissible objective of massive student loan forgiveness. Rather than merely facilitate or "streamline" the resolution of borrower claims, the Department designed its Final Rule with a thumb on the scale to maximize the number and amount of loan discharges with little regard for the merits of the claims or the rights of schools.

7.     Among the most remarkable features of the Final Rule is that it creates a new vehicle for forgiving individual student loans via "group process," a form of class action, which has its own substantive evidentiary presumptions. If a borrower brings an individual claim, he or she must submit a sworn declaration establishing that the act or omission caused the injury justifying full discharge of his or her loan obligations (and reimbursement of any amounts paid). But if the claim is asserted on behalf of a group, injury and entitlement to full loan discharge are presumed, and there are no procedures (such as discovery or individual witness examination) that

3

enable its rebuttal, either in the borrower proceeding or a subsequent recoupment proceeding against a school.  A results-oriented rule that creates more favorable substantive outcomes for borrowers in group versus individual proceedings—and thus encourages the filing of group claims—is not only impermissible under the HEA, it is arbitrary and capricious, and violates fundamental principles of due process.

8.    The Department has made clear that the Final Rule is one part of its arsenal to pursue broad forgiveness of student loans.  The federal courts have blocked the Administration's student loan forgiveness plan, and the legality of the Administration's plan is now pending before the United States Supreme Court. This Court should block the unlawful Final Rule, which represents the Department's latest attempt to bypass Congress in the pursuit of loan forgiveness.

9.    For the reasons set forth herein, the Final Rule must be vacated and set aside, and Defendants should be enjoined from implementing or enforcing the Final Rule in any manner.

## PARTIES

10.    CCST is a 501(c)(6) board of trade for the proprietary sector of higher education. CCST represents more than 70 postsecondary schools, institutes, colleges, and universities, which reside not only in this District (and the Division) but across the State of Texas. CCST's express mission is to serve and protect the interests of its members, career education schools of Texas, and their students. By supporting and protecting quality career education schools in Texas, CCST further aims to enable more students to reach their career goals, to provide employers with a large and necessary pool of competitive skilled workers, and to further attract and expand business in Texas.

11.    Defendant U.S. Department of Education is an executive agency of the United States government, 5 U.S.C. §§ 101, 105, subject to the APA, *id.* § 551(1).  The Department, in its

App.067

current form, was created by the Department of Education Organization Act of 1979, 20 U.S.C. § 3401 *et seq.*, Pub. L. No. 96-88, 93 Stat. 668 (1979).

12.     Defendant Miguel Cardona is the U.S. Secretary of Education.  The Secretary is named as a party to this matter in his official capacity as the head of the Department of Education. The Secretary, in his official capacity, is responsible for the Department's promulgation of the challenged regulations and for related acts and omissions alleged herein.

## JURISDICTION & VENUE

13.     This Court has subject-matter jurisdiction because this civil case arises under the Constitution and the laws of the United States, including the APA.  *See* 28 U.S.C. §§ 1331, 2201–2202; 5 U.S.C. §§ 701–706.

14.     This Court has venue because a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Texas.

15.     Texas is home to 2.9 million student loan borrowers, the second largest number of borrowers of any state; these borrowers hold $85.4 billion of student loan debt in 2019, the second largest amount of debt of borrowers in any state.  *See* Zack Friedman, *Student Loan Debt Statistics In 2022: A Record $1.7 Trillion*, Forbes.com (May 16, 2022), https://www.forbes.com/sites/ zackfriedman/2022/05/16/student-loan-debt-statistics-in-2022-a-record-17-trillion/.  A significant number of the borrowers who will be subject to the challenged rule reside in this District.

16.     Texas is also home to approximately 346 institutions of higher learning that participate in the Direct Loan Program and will be subject to the challenged rule.  *See* U.S. Dep't of Educ, *2023–24 Federal School Code List of Participating Schools (November 2022)*, https://fsapartners.ed.gov/knowledge-center/library/federal-school-code-lists/2022-10-31/2023-24-federal-school-code-list-participating-schools-november-2022.

App.068

17.     A significant number of those institutions are present in this District, including major institutions like Texas Tech University, Texas Christian University, Southern Methodist University, and the University of Texas-Arlington.

18.     CCST's member schools that reside in this District (and in the Fort Worth Division) and are Direct Loan program participants (collectively, the "Fort Worth Schools") will suffer concrete injury from the Final Rule.

19.     A large number of students and graduates of CCST member schools, especially the Fort Worth Schools, who hold federal student debt and can file borrower defense to repayment claims reside in this District and the Fort Worth Division.

20.     During the 2020-2021 school term alone, the Fort Worth Schools provided employment to hundreds of residents as instructional staff members, and were responsible for providing education and workforce training to more than 5,000 students—of which 66% were female, 29% were Hispanic or Latino, and 29% were Black or African American.

21.     The Final Rule will harm not only the Fort Worth Schools directly, but by extension the local communities they serve.  By constraining educational resources and causing school closures, the Final Rule will deprive communities of essential workers, and students of access to critical career education opportunities.

**STANDING**

22.     CCST is harmed and its mission is frustrated and endangered by unlawful agency actions, such as the Final Rule, which not only increase regulatory burdens and compliance costs, but also threaten irreparable and even existential liability for proprietary schools, ultimately reducing access to career education and hindering workforce development.  To the extent such liability will result in the closure of CCST's member schools, the Final Rule would greatly hinder

App.069

CCST's operations and effectiveness. Further, there is resulting irreparable reputational harm to CCST, as a prominent representative of the interests of Texas career education schools, which the Final Rule purposely disfavors.

23.     CCST has diverted significant organizational resources to identify and counteract the harms of the Final Rule. In response to the Department's July 13, 2022 Notice of Proposed Rulemaking (NPRM), CCST joined with over a dozen organizations also representing career and private schools around the country. The group submitted 137 pages of comments, urging the Department to withdraw the then-proposed rule due to its numerous legal and regulatory deficiencies. Before and after the publication of the Final Rule, CCST has been working with its members and affiliate organizations to prepare for the future regulatory landscape.

24.     CCST also has associational standing to bring this suit on behalf of its members.

25.     CCST's membership includes more than 70 postsecondary schools, institutes, colleges, and/or universities, of which there are at least 54 that are accredited by a U.S. Department of Education recognized agency, participate in the Ford Direct Loan Program and will suffer concrete injury from the Final Rule—and thus have individual standing to sue in their own right.

26.     CCST's member schools have trained, and are responsible for training, thousands of students to serve in highly demanded skilled professions, including nurses and medical assistants, welders, HVAC repair technicians, and trucking maintenance and automotive technology specialists. These are professions that are essential to not only the communities in this district but the State of Texas as a whole.

27.     CCST's members participating in the Direct Loan Program suffer concrete injury from the Final Rule and have standing to sue in their own right. Each participating member school is required to conform to the substantive provisions of the Final Rule specifying acts or omissions

App.070

that give rise to borrower defenses. Violations of those provisions subject the school to potential liability for discharged loans, to revocation or denial of eligibility to participate in the federal student loan programs, and to restrictions upon participation. *See, e.g.*, 34 C.F.R. §§ 668.71(a), 668.500(b).[1]  Each participant is subject to new and unlawful Departmental procedures that threaten unwarranted reputational injury and enormous financial liability. The Final Rule requires participating member schools to take immediate or imminent action to avoid reputational harms, liability, and exclusion from (or restrictions upon) participation in the federal student loan program under the Final Rule.

28.     The member interests at stake are germane to the organization's purpose, which includes protecting members from unjust laws and regulations, promoting student access to career education, and serving as an advocate for member interests before governmental bodies.

29.     Neither the claim asserted nor the relief requested requires the participation of individual members in this pre-enforcement challenge.  Each CCST member school that participates in the Direct Loan Program is equally subject to the Final Rule's substantive and procedural provisions, and no facts or legal issues specific to individual CCST members require adjudication to resolve the legal claims presented.

30.     The Final Rule constitutes final agency action and becomes effective on July 1, 2023.  All claims are strictly legal and based on a complete administrative record.  Schools must conform their conduct, recordkeeping activity, and compliance efforts immediately or imminently to avoid reputational injury, potentially substantial financial liability, and exclusion from (or restriction upon) participation in the federal student loan programs.

---

[1] Citations herein to the C.F.R. shall refer to provisions upon codification of the Final Rule unless otherwise stated. *See* 87 Fed. Reg. 66,039–66,073 (setting forth Final Rule amendments to the C.F.R.).

App.071

## BACKGROUND

I.    **The Higher Education Act & the History of the Department's BDR Rules**

31.    The HEA establishes several student loan programs. The three most relevant to this lawsuit are the Direct Loan, Perkins, and FFEL programs. *See* 87 Fed. Reg. 65,904 (citing 20 U.S.C. §§ 1071 *et seq*., 1087a *et seq*.).

32.    Section 455(h) of the HEA provides, in pertinent part, that:

[T]he Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan . . . except that in no event may a borrower recover from the Secretary, in any action arising from or relating to a loan made under this part, an amount in excess of the amount such borrower has repaid on such loan.

20 U.S.C. § 1087e(h). The "part" referred to in Section 455(h) is the Direct Loan program, which is part D of Title 20, Chapter 28, Subchapter IV, which sets forth student assistance programs. Thus, the Secretary's authority to promulgate BDR regulations is limited to Direct Loans.

33.    Section 455(h) is a minor provision of the HEA that, in its first two decades of existence, had rarely been invoked. 87 Fed. Reg. 65,980 ("[T]he [borrower defense] process . . . was rarely used prior to 2015."); 81 Fed. Reg. 75,926 ("[The] [s]ection . . . governing defenses to repayment[] has been in place since 1995 but, until recently, has rarely been used.").

34.    Pursuant to the HEA, the Department promulgated borrower defense regulations in 1994, including one stating that where a borrower's defense against repayment is successful, a borrower may be "relieved of the obligation to repay all or part of the loan and associated costs and fees." 34 C.F.R. § 685.206(e)(12)(i). The Department also announced the standards for permitting a borrower to "assert as a defense against repayment, any act or omission of the school attended by the [borrower] that would give rise to a cause of action against the school under applicable State law." *See* William D. Ford Federal Direct Loan Program, 59 Fed. Reg. 61,664, 61,696 (Dec. 1, 1994).

App.072

35.     In 1994, the Department's understanding of Section 455(h) was that if the Secretary or other authorized person brings "an action" for repayment, the borrower "may assert as a defense" an institutional act or omission specified in Department regulations. 59 Fed. Reg. 61,696. The Department's 1994 Rule explicitly contemplated that a "defense" would be asserted in existing formal collection proceedings. Indeed, it provided that "[i]*n any proceeding to collect on a Direct Loan,* the borrower may assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." 34 C.F.R. § 206(c) (1995) (emphasis added). The Department commented that "the regulations identify *formal proceedings* in which borrowers may raise the acts or omissions of the school as a defense against collection of the loan," 59 Fed. Reg. 61,671 (emphasis added), which would include "(i) Tax refund offset proceedings under 34 CFR 30.33"; "(ii) Wage garnishment proceedings under Section 488A of the Act"; "(iii) Salary offset proceedings for Federal employees under 34 CFR Part 31"; and "(iv) Credit bureau reporting proceedings under 31 U.S.C. § 3711(f)." *Id.*

36.     Only after more than 20 years of implementing Section 455(h) and more than 50 years since the passage of the HEA did the Department devise a novel scheme to adjudicate borrower defense "claims" and school liability in the absence of any loan enforcement action.

37.     In 2016, in response to increased borrower defense claims asserted by attendees of the Corinthian Colleges, the Department proposed new regulations ostensibly to "streamline the borrower defense process" that would apply to Direct Loans made on or after July 1, 2017 ("2016 Rule"). *See* William D. Ford Federal Direct Loan Program, 81 Fed. Reg. 39,330, 39,331 (June 16, 2016).

App.073

38.     Under the 2016 Rule, schools bore an inequitable burden in defending against borrower defense claims.  For example, the 2016 Rule established for the first time a "group" claim process, whereby the Department could, in its own discretion, initiate the grouping of individual borrower defense claims whenever the Department would determine that there were sufficient factual commonalities between the claims.  Under this group claim process, schools had the onus to rebut the presumption that all members of the group reasonably relied on the alleged misrepresentation or omission.  Further, the 2016 Rule introduced a prohibition on the requirement or enforcement of pre-dispute agreements to arbitrate borrower defense claims and of class-action waivers, even if the provisions were agreed upon in binding contracts prior to the July 1, 2017 effective date.

39.     On account of litigation initiated against the Department, as well as the Department's initiation of a negotiated rulemaking process, the 2016 Rule's effective date was delayed until October 2018.  In 2019, "following consideration of public comments on the 2018 NPRM, the Department published new final borrower defense regulations that applied to loans made on or after July 1, 2020." ("2019 Rule").  *See* William D. Ford Federal Direct Loan Program, 84 Fed. Reg. 49,788 (Sept. 23, 2019).

40.     The 2019 Rule attempted to correct numerous deficiencies in the borrower defense claim adjudication process that existed under the 2016 Rule—namely, the need for due process protections for schools to ensure a borrower defense claim adjudication process that is fair and equitable.  Specifically, the 2019 Rule implemented certain protections against meritless borrower defense claims by instituting the requirement that claimants prove that a school had in fact engaged in a misrepresentation that was made with knowledge of its false, misleading, or deceptive nature or with a reckless disregard for the truth.   Moreover, the 2019 Rule required that the alleged

App.074

misrepresentation or omission directly and clearly relate to enrollment or continuing enrollment at the school or to the provision of educational services for which the loan was disbursed. Further, it required the claimant to have actually suffered harm from the alleged misrepresentation or omission.

41.     The 2019 Rule precluded tag-along claims by requiring that the Department consider each borrower claim independently and on a case-by-case basis, thus mitigating the risk of erroneous loan discharge.  Under the 2019 Rule, a requirement to disclose the use of mandatory pre-dispute arbitration agreements and class action waivers replaced the 2016 Rule's blanket prohibition of such provisions.  The 2019 Rule covered loans first disbursed on or after the effective date, July 1, 2020.

42.     The current Administration has made student loan forgiveness one of its top priorities.  The President initially acknowledged that he could not forgive student loan debt by executive fiat.   Cory Turner, *Biden pledged to forgive $10,000 in student loan debt. Here's what he's done so far*, National Public Radio (Dec. 7, 2021) ("NPR Article"), https://www.npr.org/2021/12/07/1062070001/student-loan-forgiveness-debt-president-biden-campaign-promise.  Despite strong political crosswinds, the Biden Administration ultimately announced plans to cancel approximately $500 billion in student borrower debt.  Adam Looney, *Does Biden's student debt forgiveness achieve his stated goals?*, Brookings Institute (Sept. 26, 2022), https://www.brookings.edu/blog/up-front/2022/09/26/does-bidens-student-debt-forgiveness-achieve-his-stated-goals/.

43.     Before announcing its general student loan forgiveness plan, the Biden Administration pursued the same ends by extending or "expanding a handful of programs that were already on the books," including BDR rules.  NPR Article, *supra*; *see also id.* ("'We're working

App.075

really hard to get students the relief that they're entitled to' through these preexisting programs,"
said Under Secretary of Education James Kvaal); Hugh T. Ferguson, *Kvaal Highlights 'Complex'*
*Nature of Efforts to Implement Student Debt Cancellation*, National Association of Student
Financial                    Aid                    Administrators                    (July                    25,                    2022),
https://www.nasfaa.org/news-item/27656/Kvaal_Highlights_Complex_Nature_of_Efforts_to_Im
plement_Student_Debt_Cancellation; Lili Stenn, *U.S. Education Under Secretary Kvaal Outlines*
*Efforts    to    Expand    Student    Loan    Relief*,    Rogue    Rocket    (Jul.    20,    2022),
https://roguerocket.com/2022/07/20/under-secretary-kvaal-expand-student-loan-relief/;
James Kvaal (@UnderSecKvaal), Twitter (Apr. 19, 2022) ("Already the Biden Administration has
canceled 725,000 entire debts for borrowers in public service, who became disabled, or who were
cheated by their colleges – while investing more in Pell grants and college oversight to prevent
future abuses.").

## II.    The July NPRM and its Procedural Deficiencies

44.    On July 13, 2022, the Department published in the Federal Register (87 Fed. Reg.
41,878 (July 13, 2022)) a Notice of Proposed Rulemaking ("July NPRM") under the caption of
"Student Assistance General Provisions." *Id.*

45.    The July NPRM included the then-proposal to amend regulations governing the
administration of loans disbursed pursuant to the Direct Loan program to establish a new borrower
defense framework, including a significantly modified process for adjudicating borrower defense
claims ("Draft Rule").

46.    The Department's Draft Rule included proposals to prohibit schools from
contracting with and entering into mandatory pre-dispute agreements to arbitrate and to forgo class
action; to expand the scope and eligibility criteria for loan discharge for reasons of total and

App.076

permanent disability ("TPD"), closed school, and false certification; to eliminate interest capitalization where not required by statute; and to ease standards to qualify for the Public Service Loan Forgiveness Program.

47.     The Final Rule substantially adopted each of these proposals.

48.     The publication of the July NPRM followed three public hearings and three negotiated rulemaking sessions.

49.     The Negotiated Rulemaking Committee (the "Committee") reached consensus on the proposed rules for: improving the process for loan discharges due to total and permanent disability; eliminating interest capitalization in circumstances not required under statute; streamlining applications for loan discharge based on false certification; and "establishing a framework for Pell Grant Eligibility for Prison Education Programs." 87 Fed. Reg. 41,882.

50.     The Committee did not reach consensus on the proposed amendments to the borrower defense provisions, including and especially changes to the borrower defense framework—the component of the July NPRM that elicited some of the strongest and most critical comments.

51.     The July NPRM set an August 12, 2022 deadline for comment submissions. 87 Fed. Reg. 41,878.

52.     Many, including CCST and Members of Congress on the U.S. Senate Committee on Health, Education, Labor and Pensions and the U.S. House Committee on Education and Labor (now the Committee on Education and the Workforce), *see* Letter from Sen. Richard Burr and Rep. Virginia Fox to Secretary Cardona (Aug. 12, 2022), https://edworkforce.house.gov/uploadedfiles/8.12.22_foxx_and_burr_to_cardona.pdf, took issue with the Department's refusal to extend the

30-day period, especially given the July NPRM's numerous and complex regulatory proposals, which spanned several hundred pages. Notwithstanding the Department's refusal to extend the deadline, the July NPRM elicited more than 5,300 public comment submissions, including CCST's comment submission.

53.     A little more than a month following the comment deadline, the Department distributed the proposed Final Rule for interagency review.

54.     The Department ignored significant concerns regarding procedural deficiencies in the July NPRM that necessitated the withdrawal of the Draft Rule, pending necessary corrections. Among other things, there were substantial changes in circumstances that required the Department to redo or to conduct for the first time certain analyses.

55.     Yet the Department did not undertake or include in its July NPRM or Final Rule a proper cost/benefit or budgetary impact analysis. Indeed, the Department altogether failed to take into account the Biden Administration's widespread loan relief programs, which will impact at least 43 million student loan borrowers (which is the majority of the country's federal student loan borrowers) and, further, will incur $600 billion in costs.

56.     The Department ignored these and other concerns, failed to consider meaningfully the thousands of public comment submissions, and proceeded with haste in promulgating the Final Rule on November 1, 2022.

**III.     The Final Rule**

57.     The Final Rule articulates new federal standards and processes for adjudicating a claim for borrower defense to repayment of a loan.

58.     The new Final Rule greatly broadens the substantive grounds for relief to borrowers (and liability for schools). The Final Rule recognizes five grounds on which a borrower defense

claim may be brought: "substantial" misrepresentation under the new uniform federal standard; "substantial" omission of fact; breach of contract; aggressive or deceptive recruitment; or a state or federal judgment or final Department action against an institution that could give rise to a borrower defense claim. *See* 34 C.F.R. § 685.401(b)(1)–(5).

59.    Under the new standard, a misrepresentation is deemed *substantial* if a borrower reasonably relied upon it or "*could* reasonably be expected to rely" upon it to his or her detriment. 34 C.F.R. § 668.71 (emphasis added).  A *substantial* omission of fact may be "the concealment, suppression, or absence of material information relating to the nature of the institution's educational programs, financial charges, or the employability of the institution's graduates," 34 C.F.R. § 668.75, but the Final Rule does not exhaustively define the term.

60.    The Department purports to have "incorporate[d] the conventional elements of injury and causation" because the Final Rule requires that in order to approve a claim, the Department "must conclude that the institution's act or omission is an actionable ground for [defense to repayment] that caused detriment to the borrower that warrants relief."  87 Fed. Reg. 65,908.  "In considering whether an institution's acts or omissions caused detriment that warrants this form of relief, the Department would consider the totality of the circumstances, including the nature and degree of the act or omission and of the harm or injury along with other relevant factors." *Id.*

61.    Even though Section 455(h) applies only to the Direct Loan Program, the Final Rule extends the reach of borrower defenses to borrowers with Perkins and FFEL loans as well, *see* 34 C.F.R. § 685.219(c)(3).

62.    The Final Rule also defines adjudicatory procedures for BDR "claims."  In addition to authorizing individuals to file BDR claims, it permits "group" consideration of borrower defense

App.079

claims and establishes a process for grouping and adjudicating such claims based on the existence of "common facts and circumstances." 87 Fed. Reg. 65,998.  The Secretary may initiate a group process upon the Department's own determination, creating a group based on federal or state law enforcement activity, individual claims, and/or lawsuits filed against institutions.  34 C.F.R. § 685.402(a), (b).  The Final Rule also permits state government entities and legal assistance organizations to initiate the group claim process.  87 Fed. Reg. 65,938; 34 C.F.R. § 685.401.

63.    The Department predicts that its "inclusion of third-party requestors from the legal assistance community means the possible number of requests for considering a group claim could be *substantially higher* than anticipated . . . ."  87 Fed. Reg. 65,938 (emphasis added).

64.    For group processes, the Department has established "a rebuttable presumption that the act or omission giving rise to the borrower defense affected each member of the group in deciding to attend, or continue attending, the institution, and that such reliance was reasonable." 34 C.F.R. § 685.406(b)(2).

65.    The Final Rule expanded the types of "evidence" that can prove a borrower defense to include any information submitted with a claim or group application, or possessed by the Department, regardless of whether it is sworn, authenticated, or hearsay.  And "there are situations where the evidence supporting the approval of a borrower's claim could come solely from the application submitted by the borrower."  87 Fed. Reg. 65,939.  Although the regulations provide for an institutional response to an allegation of wrongdoing, the regulations provide no opportunity for the institution to discover or test evidence from the borrower(s) or cross-examine any borrower. 34 C.F.R. §§ 685.405, 685.406(b),(c).

66.     The Final Rule does not provide for partial loan discharge; rather, the Department "will award *a full discharge* for approved claims."  84 Fed. Reg. 65,946 (emphasis added); 34 C.F.R. § 685.408.

67.     Under the Final Rule, borrowers may raise a defense to repayment "at any time," so long as the borrower has a balance due on a Direct Loan or another loan that may be consolidated into a Federal Direct Consolidation loan.  34 C.F.R. § 685.401(b).

68.     The Final Rule provides that borrowers may seek reconsideration of decisions denying their borrower defense claims. Further, the Final Rule permits borrowers to seek reconsideration of a claim under a State law standard if their initial claim is denied. The Department did not afford schools any corresponding opportunity to seek reconsideration of or to appeal an adverse decision of the Department in a borrower defense claim proceeding.

69.     Under the Final Rule, after the Department approves a borrower defense, there is a separate process for seeking recoupment against schools.  The Secretary can seek recoupment through a process that is used for program reviews under part 668, subpart H, during which the ability to submit evidence is circumscribed.  The Final Rule imposes the burden on the institution to disprove the propriety of the discharge and its liability for the amount, but does not provide for discovery or any witness examination.

**IV.    Prohibition On Arbitration and Class Action Waiver Provisions**

70.     The Final Rule prohibits schools from agreeing with students to arbitrate and to resolve claims on an individual basis, rather than through class actions. 87 Fed. Reg. 65,953; 34 C.F.R. §§ 668.41, 685.300, 685.304.

71.     Prior regulations permitted arbitration and class action waivers in contracts between schools and students while seeking to "provide students with information that they need to

App.081

empower themselves to understand [their] legal rights and available remedies."  87 Fed. Reg. 49,843 (2019 Rule).  For example, previous rules required institutions to "make available to enrolled students, prospective students, and the public, a written (electronic) plain language disclosure of those conditions of enrollment."  87 Fed. Reg. 49,910 (2019 Rule).

72.     According to the Department's 2019 estimate, approximately one-half of participating proprietary institutions agree with students, upon enrollment, to arbitrate potential future disputes and/or resolve them on an individual, case-by-case basis, rather than through class action processes.  *See* 84 Fed. Reg. 49,904 (2019 Rule) ("Of the 1,888 proprietary institutions participating in the title IV, HEA programs, we estimate that 50 percent or 944 will use a pre-dispute arbitration agreement and/or class action waiver and will provide the required information electronically.").

## V.    Closed School Loan Discharges

73.     Under the Final Rule, students whose schools "closed" while or shortly after the students attended may be eligible to have their loans discharged.  The Department will seek to recover funds from the institutions that are subject to this provision.  87 Fed. Reg. 65,913.

74.     The Final Rule affords the Secretary wide discretion to determine the date that the school "closed," which is when the Secretary deems that the school ceased to provide instruction in "most" programs or for "most of its students." More specifically, the Final Rule affords the Secretary discretion to determine that a school's closure date is the earlier of the date that the school ceased to provide instruction in *most* programs, as "determined by the Secretary," or a date chosen by the Secretary "that reflects when the school ceased to provide educational instruction for all of its students."  34 C.F.R. §§ 674.33(g)(1)(ii)(A), 682.402(d)(1)(ii)(A), 685.214(a)(2)(i).

App.082

75.     In addition, the Final Rule empowers the Secretary or a guaranty agency to discharge an FFEL loan "without an application for an [eligible] borrower" where the Secretary or guaranty agency has information that the borrower did not complete an institutional teach-out plan or teach-out agreement at another approved school.  *Id.* §§ 674.33(g)(3)(i)(B), 682.402(d)(8)(i)(B) and 685.214(c)(1).

76.     The Final Rule also disposes of the current requirement that a borrower may only receive a closed school discharge without an application if the borrower does not enroll in another Title IV school within three years of the prior school's closure date.  *Id.* §§ 674.33(g)(3)(ii), 682.402(d)(8)(ii) and 685.214(c)(1).

## THE FINAL RULE EXCEEDS THE DEPARTMENT'S AUTHORITY, VIOLATES THE APA, AND IS UNCONSTITUTIONAL

### I.    The Department Lacks Authority to Fashion the Final Rule's Novel Adjudication System for Loan Forgiveness and Liability Shifting.

77.     Section 455(h) of the HEA provides that "the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan."  20 U.S.C. § 1087e(h).  It is apparent from its face that this provision enables the Department to specify *defenses* to repayment and not to invent *affirmative* claims. Section 455(h) does not grant the Department power to define private or public rights of action.

78.     Not only does the Final Rule depart from the statutory text by converting borrower defenses into affirmative claims, it also weaves from whole cloth adjudicatory processes designed to shift liability to institutions without due process or any colorable opportunity to develop a defense.

79.     The Department wrongly arrogates to itself a vast and unconventional adjudicatory and loss-recovery authority based on the statute's limited *rulemaking* grant for the precise purpose

App.083

of identifying acts or omissions of schools that borrowers can assert as defenses to repayment. Where Congress grants rulemaking powers "to be exercised in specific ways," those limitations must be observed. *Gonzales v. Oregon*, 546 U.S. 243, 259 (2006). Agency power to adjudicate must be expressly authorized by Congress. *Bank One Chicago, N.A. v. Midwest Bank & Trust Co.*, 516 U.S. 264, 274 (1996). No such authority has been granted here.

80.     Section 455(h) gives the Department rulemaking power *to define* borrower defenses based on institutional acts and omissions; it grants no power to *adjudicate* borrower defenses, much less claims. The power to make rules does not subsume the power to adjudicate violation of those rules. *RLC Indus. Co. v. CIR*, 58 F.3d 413, 417–18 (9th Cir. 1995).

81.     Not only is there no textual hook for the Department's novel adjudicatory and liability-shifting scheme, but one would not expect Congress to grant such far-reaching authority on such a slender statutory basis. As the U.S. Supreme Court recently admonished in *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022), the fundamental inquiry into agency authority is "whether Congress in fact meant to confer the power the agency has asserted." Under the major questions doctrine, an act of vast "economic and political significance" must be viewed in light of the "history and the breadth of the authority . . . asserted." *Id.* (internal quotation marks omitted). Just as the EPA could not seize upon an "ancillary" and "rarely used" statute to promulgate major climate change regulations, *id.* at 2610–11, the Department cannot refashion its modest authority to define borrower defenses into a wellspring of power to achieve massive loan forgiveness, a controversial maneuver that may impose billions of dollars of burden on the public fisc. *See Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (*per curiam*) (holding that an economic impact of $50 billion had vast significance). As the Department recognized when it disavowed the power to cancel loan debt e*n masse*, "Congress does not

impliedly delegate a policy decision of massive economic and political magnitude – as blanket or mass cancellation, compromise, discharge, or forgiveness of student loan principal balances, or the material modification of the repayment terms or amounts thereof, surely would be – to an administrative agency."  Memorandum from U.S. Dep't of Educ., Off. of the General Counsel to the Secretary of Educ., Betsy DeVos (Jan. 12, 2021) *Re: Student Loan Principal Balance Cancellation, Compromise, Discharge, and Forgiveness Authority*, at 2; *see also* 87 Fed. Reg. 65,906 ("[T]he statute does not authorize the Secretary to . . . forgiv[e] all student loans [or] set[] interest rates to 0 percent.").  So, too, Congress did not delegate in obscure fashion the broad debt cancellation powers effectively exercised in the Final Rule.

82.     Moreover, the statute refers to borrower defenses raised "*in any action* arising from or relating to a loan made under this part."  20 U.S.C. § 1087e(h) (emphasis added).  Because an "action" refers to a judicial proceeding, the plain meaning of the statute does not permit the Department to create new administrative proceedings in which borrower defenses may be raised as claims.

83.     Section 455(h)'s grant of rulemaking power also does not authorize adjudication of an institution's liability to the Government for any amount of loans discharged.

84.     The Department claims the authority to adjudicate because Congress has granted it rulemaking authority to "carry out functions otherwise vested in the Secretary," 20 U.S.C. § 1221e–3, and to "manage the functions of the Secretary or the Department," *id.* § 3474.  But Congress did not vest the Secretary with the function of adjudicating borrower defenses to repayment or school liability for loans discharged in borrower proceedings.

85.     Whether to commit public rights to agency adjudication is a decision that belongs exclusively to Congress.  *See Atlas Roofing Co. v. Occupational Safety and Health Review*

App.085

*Comm'n*, 430 U.S. 442, 452, 460–61 (1977).  Congress has not authorized the Department to create public rights of action or to adjudicate them.

86.     Finally, even if Congress authorized the Department both to create public rights of action and to adjudicate both borrower defenses and school liability, Article III of the Constitution forbids the Department to adjudicate private rights, including breach of contract.  *See also infra*, §§ II.A.3, II.H.

**II.   Critical Components of the Final Rule Are Unlawful.**

87.     Not only is the Final Rule as a whole *ultra vires*, but its individual components are unlawful as well, presenting independent grounds on which this Court should vacate and set aside the Final Rule.

     **A.     The Department's Definitions of Substantive Borrower Defenses Violate the Statute, the Administrative Procedure Act, and the Constitution.**

88.     Section 455(h) authorizes the Department to specify acts or omissions that a borrower may assert as a defense to repayment.  Even if, arguendo, the Department may convert a borrower defense into a borrower claim, the Department's defenses violate the statute or the Constitution (or both) and are arbitrary and capricious.

     **1.     The Department's Failure to Require Intent for Actionable Misrepresentation is Arbitrary and Capricious.**

89.     In Subpart F of the Final Rule, specifically 34 C.F.R. §§ 668.72–74, the Department defines misrepresentation as a borrower defense, and broadly "establishes the types of activities that constitute substantial misrepresentation by an eligible institution."  34 C.F.R. § 668.71(b); *see also* 87 Fed. Reg. 65,920.

90.     The Department's nominal changes to the section defining misrepresentation fail to resolve the deficiencies that were noted in comment submissions and acknowledged by the

App.086

Department in both the July NPRM as well as the Final Rule. *See* 87 Fed. Reg. 41,889; 87 Fed.

Reg. 65,920.

91.     The Department acknowledged in the July NPRM that "substantial
misrepresentations constitute most of the claims that the Department has approved to date and
have consistently served as a basis for borrower defense discharges across the several sets of
regulations." 87 Fed. Reg. 41,889. The new Final Rule eliminates most of the elements that have
comprised a misrepresentation claim, including that the alleged misrepresentation was made with
intent. Instead, the Final Rule defines a misrepresentation broadly as:

> Any false, erroneous or misleading statement an eligible institution, one of its
> representatives, or any ineligible institution, organization, or person with whom the
> eligible institution has an agreement to provide educational programs, or to provide
> marketing, advertising, recruiting or admissions services makes directly or
> indirectly to a student, prospective student or any member of the public, or to an
> accrediting agency, to a State agency, or to the Secretary. A misleading statement
> includes any statement that has the likelihood or tendency to mislead under the
> circumstances.

34 C.F.R. § 668.71(c).

92.     The Department should have restricted the defense to only *intentional*
misrepresentations. Instead, the Final Rule imposes liability for any erroneous representation,
however inadvertent. This strict-liability rule of misrepresentation is arbitrary and capricious and
cannot stand.

93.     First, the Department claims that "[r]equiring intent would place too great a burden
on an individual borrower." 87 Fed. Reg. 69,521. However, the Department overlooks the
practical realities: intent is a common element of proof throughout the law; intent is often proven
through circumstantial evidence; an institution's response to a claim could provide relevant
evidence; and a finder of fact can make inferences from the totality of evidence presented.
Eliminating the intent element in order to facilitate relief to a borrower is not justified. The

App.087

Department gives no reasoned explanation why this context is so different from others where individual plaintiffs must prove institutional intent. Nor does the Department give a reasoned explanation why a school should have liability for discharged loans without any proof of culpability (not even, for example, negligence).

94.     Absent a meaningful intent requirement, the Final Rule effectively imposes a strict liability regime on schools—one in which a borrower can discharge her loans based on allegations of a single statement "likel[y] . . . to mislead."  Many schools may not survive such liabilities and would be forced out of business (especially if subject to group claims), to the detriment of their students and communities over the long run.

95.     Second, the Department notes that "if the action resulted in detriment to the borrower that warrants relief, the Department does not believe whether it was taken with knowledge or intent should be relevant."  87 Fed. Reg. 65,921.   But that justification does not withstand scrutiny because the Department will presume the existence and causation of detriment without proof in two of the most common circumstances where relief is likely to be granted (group claims and closed school discharges).  Additionally, the Department watered down the requirement to show detriment such that a claim "may be based on an inference of causation that does not meet the strictures of a conventional common law fraud claim."  87 Fed. Reg. 65,922.

96.     The Department uses its new misrepresentation standard not only to grant relief to injured borrowers, but to fine schools and revoke, restrict, or deny their participation in the federal student loan program even without proof of borrower detriment.  34 C.F.R. § 668.71(a).  It is arbitrary and capricious to authorize the sanctioning of a school for innocent and unintentional misstatements of fact.

App.088

**2.     The Department's Freestanding "Omission of Fact" Defense Violates the Statute and Is Arbitrary and Capricious.**

97.     An omission of fact is a misrepresentation under Section 668.71 "if a reasonable person would have considered the omitted information in making a decision to enroll or continue attendance." 34 C.F.R. § 668.75.

98.     The Final Rule's misrepresentation defense separately includes misrepresentations based on omission that make other statements misleading. *See* 34 C.F.R. § 668.71(c) ("Misrepresentation includes any statement that omits information in such a way as to make the statement false, erroneous, or misleading.").

99.     In the Final Rule, the Department has created a novel, open-ended borrower defense based on inadvertent or unanticipated nondisclosures, even where there was no prior duty of disclosure and no breach of good faith.  The Department's newly fashioned duty to disclose arises merely upon retrospective proof that a borrower would have "considered" the fact in a borrowing or enrollment decision.  The absence of such information is actionable even if its absence did not render any actual misrepresentation misleading, even if the fact was objectively unimportant, and even if the omission was wholly accidental.  The new standard based on what a prospective student would "consider" is vague and unworkable, fails to create a concrete standard of conduct for schools, and is arbitrary and capricious.

100.     The Department's freestanding omissions rule is not within the scope of Section 455(h).

101.     In authorizing the Secretary to specify borrower defenses to contractual repayment obligations based on omissions by the school, Congress drew upon a long tradition of contractual defenses based on omission.  Absent a relationship of trust and confidence, an omission provides a contractual defense only when a party knows that the other party will be misled: *i.e.*, knowledge

App.089

that (1) nondisclosure will make a prior representation fraudulent or material; (2) that nondisclosure will not correct another's mistake of fact, if nondisclosure is contrary to principles of good faith and fair dealing; and (3) that the other person is mistaken as to some fact as to the content or effect of the instrument. *Restatement (Second) of Contracts* § 161 (1981).

102.    The Department acknowledges that an omission must be misleading to be a misrepresentation.  87 Fed. Reg. 65,925 (noting that Section 668.75 "incorporate[s] the definition of misleading conduct from part 668, subpart F, which requires that the omission make the school's interaction with a borrower misleading under the circumstances").  But by failing to define the omissions that can justify rescission of loan obligations, the Department has failed to "specify in regulations *which* acts or *omissions* of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part."  20 U.S.C. § 1087e(h) (emphasis added).  Consequently, the omissions rule cannot flow from the statute, which authorizes only defenses based on specified omissions.

103.    The Department's omissions rule is also arbitrary and capricious.  It imposes unreasonable duties upon institutions at pain of potentially existential liability. An inadvertent failure to disclose potentially triggers liability to the entire "affected" cohort and for the full amount of their loans.  Liability could be in the millions of dollars (even hundreds of millions for larger institutions) for an inconsequential and inadvertent omission.  Omissions of fact are also grounds for fining schools or revoking, restricting, or denying their participation in the federal student loan program.  *See* 34 C.F.R. § 668.71(a), (c).

104.    The Department provided no rational explanation justifying this arbitrary and capricious rule, which imposes amorphous duties that no school can meet.

App.090

105.    The Department defends the open-ended disclosure duty on the ground that it is paired with a requirement of borrower injury, 87 Fed. Reg. 65,925, but for group and closed-school claims, that fact is presumed and need not be proven.  Thus, the injury requirement cannot justify the open-ended "omissions" defense to repayment, which broadly applies to individual, group, and closed-school claims.

### 3.    The Department's "Breach of Contract" Defense Does Not Define "Acts and Omissions" as the Statute Requires and Is Constitutionally Infirm.

106.    The Final Rule creates a defense to repayment where "[t]he institution failed to perform its obligations under the terms of a contract with the student and such obligation was undertaken as consideration or in exchange for the borrower's decision to attend, or to continue attending, the institution, for the borrower's decision to take out a covered loan, or for funds disbursed in connection with a covered loan."  34 C.F.R. § 685.401(b)(3).

107.    It is common practice for students to sign enrollment agreements, *i.e.*, binding contracts between student and school.

108.    The power to resolve contract disputes must be expressly authorized by Congress and is not authorized in these circumstances.  *See Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 234–35 (1995).

109.    Similarly, because breach-of-contract claims are not public rights and litigants have a right to a jury trial of such claims in federal court, the Department's rule also violates Article III and the Seventh Amendment.  *See, e.g.*, *Stern v. Marshall*, 564 U.S. 462, 490–91 (2011) (finding that that a State law counterclaim was not a public right); *Granfinanciera, S.A., v. Nordberg*, 492 U.S. 33, 51–52 (1989) ("[Congress] lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury.").

App.091

110.    By establishing its own peculiar BDR right of action for contract breach, the Department impermissibly abrogates State law rights.  First, the Department is creating its own law of borrower recovery from contract breaches, even though the latter is governed by specific State law.  This effectively allows the Department to pre-empt state contract laws by awarding a form of consequential discharges to borrowers who have not shown any cognizable damages that are causally connected to a breach, or established their efforts to mitigate or avoid such damages.

111.    Second, the Department has abrogated an important State law right of institutions derived from statutes of limitations, which can vary depending on the state and the type of contract. Under the Final Rule, borrowers face no limitations period for bringing a BDR claim for breach of contract potentially even decades after the borrower has ceased enrollment.  BDR claims will now be brought for contract breaches even when State law causes of action for breach are extinguished.

112.    Third, contracts may generally be enforced only by parties or, in carefully delineated circumstances, third-party beneficiaries, and are typically enforced before judges and juries in adversarial judicial proceedings between plaintiffs and defendants in which all claims, defenses, and remedies are resolved after discovery of relevant facts.  The Department has no grounds to subject contract disputes to impermissible bifurcated proceedings involving no discovery, a series of presumptions that are not grounded in State law, and procedures designed to prejudice the rights of institutions.

113.    The Final Rule is also arbitrary and capricious because it provides for adjudication of contract rights by any designated Department official, not even an administrative law judge.

114.    To the extent the Department's decisions will follow state law, the Final Rule will require the agency to interpret and apply the state laws of every jurisdiction in the United States—

29

App.092

a task it has no competence or expertise to perform.  *See* 81 Fed. Reg. 75,957 (acknowledging the "significant burden" that reliance upon State law places on Department officials).  To the extent the Department will not adhere to state law, the Final Rule violates principles of federalism and the Tenth Amendment.

> **4.    The Department's "Aggressive Recruitment" Defense Violates the Statute and Is Arbitrary and Capricious.**

115.    The Final Rule includes a new standalone basis for borrower defense: aggressive and deceptive recruitment conduct or tactics.  The Final Rule defines aggressive recruitment only by example, such as where a school "pressure[s] the student . . . to make . . . decisions immediately" or "engage[s] in unsolicited contact . . . after the student . . . has requested not to be contacted." 34 C.F.R. §§ 668.501(a).    Any form of aggressive and deceptive recruitment practice now constitutes a defense of repayment.  The borrower need not even prove that the alleged aggressive recruitment practice was antecedent to the relevant lending or attendance decision, or involved misrepresentation.  *See, e.g.*, 84 Fed. Reg. 65,928 (defending "aggressive recruitment" as a "pathway to relief" precisely when there are no misrepresentations).

116.    The Department's use of a non-exhaustive list of examples in Section 668.501 without an overarching definition constitutes an abdication of the Department's statutory duty to specify which acts or omissions give rise to a borrower defense.  The result renders institutions vulnerable to liability based on amorphous and highly subjective standards.  For example, the Final Rule does not explain how the Department intends to assess what might constitute improper "pressure" or how to assess the reasonableness or credibility of a student's subjective assertion that he or she felt pressured.

117.    The vagaries of the aggressive recruitment provision are multiplied by the group claim process and the Department's presumption that everyone in the group was affected by

aggressive recruiting.  Given that the grounds for asserting an aggressive recruitment claim are numerous, highly subjective, and dependent on individualized facts (*e.g.*, what the prospective student knew about postsecondary education processes and what the recruiter knew about the prospective student's knowledge), the Department cannot simply bypass fact-finding in favor of a presumption that all members of a group are entitled to a discharge.  Rather, the Department must determine an aggressive recruitment claim based on individual proof and on an individual basis.

>    **5.    The Department's Defense Based on a Prior Judgment Against an Institution Under Any State or Federal Law Expands the Borrower Defense Framework Beyond the Statute.**

118.    The Final Rule recognizes the following as an additional basis for a borrower defense claim:

> The borrower, whether as an individual or as a member of a class, or a governmental agency has obtained against the institution a favorable judgment based on State or Federal law in a court or administrative tribunal of competent jurisdiction based on the institution's act or omission relating to the making of covered loan, or the provision of educational services for which the loan was provided.

34 C.F.R. § 685.401(b)(5)(i).  Critically, the standard would apply regardless of whether the judgment was obtained by the borrower as an individual or member of a class, or was obtained by a State's Attorney General or other governmental agency. According to the Department, the defense could apply even to a nondefault, contested "judgment[] obtained against an institution based on any State or Federal law . . . whether obtained in a court or an administrative tribunal of competent jurisdiction." 87 Fed. Reg. 65,932.

119.    This provision of the Final Rule violates the statute. Section 455(h) provides that "the Secretary shall specify in regulations which acts or omissions . . . a borrower may assert as a defense." 20 U.S.C. § 1087e(h).  A judgment against an institution is not an "act or omission" of an institution.  Furthermore, judgments can be based on an indeterminate number of acts or omissions of institutions that happen to violate Federal law, State statutory or regulatory law, state

common law, municipal law, or even foreign law. The Department has thus abdicated its duty to specify the acts or omissions and has failed to analyze why such acts justify relief, which is the expert decision that Congress delegated to the Secretary.

120.    To permit any judgment based on any Federal or State law to serve as the basis for a borrower defense claim would defeat the purpose of the borrower defense provisions, which require the Secretary to evaluate and specify which acts or omission of the institution justify loan discharge. And, for the same reasons discussed with regard to breach of contract, the Department does not have authority to supplant State law or other Federal laws it does not administer by creating additional liability or relief and overriding legal restrictions on relief. Nor may it effectively extend any applicable statute of limitations. This is yet another example of an amendment designed to ensure increased loan discharges and administrative recoupment, regardless of whether the grounds for the underlying claim are attenuated or meritless.

121.    The Department's rule also offends longstanding principles of claim preclusion. A prior judgment "prevents litigation of *all grounds for*, or defenses to, *recovery* that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding." *Lucky Brand Dungarees, Inc. v. Marcel Fashions Group, Inc.*, 140 S. Ct. 1589, 1594–95 (2020) (emphasis added) (quoting *Brown v. Felsen*, 442 U.S. 127, 131 (1979)).

122.    The Department attempts to disregard claim preclusion by the ruse of bifurcating proceedings so that the BDR claim is brought only against the Secretary, with the Secretary then recouping liability from the school. But in substance, the BDR operates prospectively to impose liability on the institution for any discharge granted to the borrower. It is at a minimum arbitrary and capricious to trample on the institution's rights of repose in a judgment. And there is no reason for the Department to grant additional relief when the court that issued the judgment presumably

App.095

granted the plaintiff the full relief to which they were entitled after evaluating the facts and the nature of the legal violation.

123.    If the borrower has already received a judgment for a particular violation of law, that should be *res judicata* and the end of the matter, regardless of whether the borrower might reap more benefits for the same act or omission. A judgment may also preclude re-litigation of issues, but issue preclusion should be applied neutrally whether it benefits the borrower or the institution.

> **6.    The Department's Defense Based on Departmental Adverse Actions Exceeds Its Statutory Authority and Violates the Constitution and the APA.**

124.    The Final Rule defines a borrower defense where "[t]he Secretary sanctioned or otherwise took adverse action against the institution" in certain program review proceedings "based on the institution's acts or omissions that could give rise to a borrower defense claim" under the new federal standard.  34 C.F.R. § 685.401(b)(5)(ii).

125.    The Secretary's sanction or adverse action cannot qualify as a borrower defense under Section 455(h) because it does not "specify in regulation *which* acts or omissions of an institution of higher education a borrower may assert as a defense."  20 U.S.C. § 1087e(h) (emphasis added).

126.    Additionally, the Final Rule does not require that the Department's action satisfy the standards for a borrower defense claim—only that the adverse Department decision was "based on . . . acts or omissions that *could* give rise" to a borrower defense claim under one of the other provisions.  34 C.F.R. § 685.401b)(5)(ii) (emphasis added).  Even if it did, it would simply be redundant.

127.    The Department's purpose appears to dispense with any need to prove a borrower's defense by creating a novel form of issue preclusion.  As the Supreme Court has explained,

App.096

collateral estoppel applies to agency action only "[w]hen an administrative agency is acting in a judicial capacity and resolved disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate." *United States v. Utah Const. & Min. Co*., 384 U.S. 394, 422 (1966). Not only does Section 455(h) not authorize the creation of new rules of issue preclusion across proceedings, but the regulation violates fundamental principles of collateral estoppel, which are grounded in due process. *See Blonder-Tongue Lab'ys, Inc. v. Univ. of Illinois Found*., 402 U.S. 313, 329 (1971).

128.    The Final Rule deprives institutions of a full and fair opportunity to litigate the borrower defense aspect of the "adverse action."

129.    The Final Rule does not guarantee notice to the institution that the Department action may subsequently be used to determine a borrower defense claim.

130.    The adverse actions on which the Secretary relies can be non-adjudicative, such as an audit or a program review. The Final Rule effectively makes a non-adjudicatory adverse finding conclusive in a subsequent adjudication. The Final Rule thus violates the principles of collateral estoppel that are fundamental to agency practice and due process.

> ### 7.  The Department's Newly Established Defense Based on Any State Law Violation Exceeds its Statutory Authority and Violates the Constitution and the APA.

131.    For loans disbursed before July 1, 2017, the Final Rule also permits a borrower to seek reconsideration under state law, if the school "committed any act or omission that relates to the making of the loan for enrollment at the school or the provision of educational services for which the loan was provided that would give rise to a cause of action against the school under applicable State law without regard to any State statute of limitations." 34 C.F.R. § 685.401(c).

132.    This defense violates Section 455(h) because it does not specify which acts or omissions give rise to a borrower defense to repayment. The Secretary must determine what acts

App.097

or omissions justifies rescission of contractual repayment obligations and cannot depend upon the vagaries of state law, which creates an inconsistent and fluctuating federal standard.

133.    Furthermore, the Department lacks statutory and constitutional authority to adjudicate state causes of action, which are not federal public rights.  Adjudication of state-law causes of action violates Article III and, for actions for which there is a right to jury trial, the Seventh Amendment.

134.     The Department's abrogation of state statutes of limitations is without statutory authority, is arbitrary and capricious, and violates due process, principles of federalism, and the Tenth Amendment.

    **B.**    **The Department's Creation of Substantive Presumptions Exceeds its Statutory Authority and Violates the APA and the Due Process Clause.**

135.    The core, irreducible meaning of institutional "acts or omissions" giving rise to a borrower's "defense to repayment" under Section 455(h) is that the act or omission must make it inequitable for the borrower to be held to perform his or her contractual repayment obligations.

136.    The Department has recognized this principle in defining a "borrower defense to repayment" as an act or omission of a school relating to enrollment or borrowing "that caused the borrower detriment."    34 C.F.R. § 685.401(a)(ii) ("Borrower defense to repayment"). Furthermore, because the Department has resolved that any borrower defense entitles the borrower to a total discharge of the loan, the detriment must "warrant[] relief" of total forgiveness of outstanding borrower debt and reimbursement of amounts previously paid on the loan.  *Id.*

137.    That injury requirement is the crux of any Section 455(h) defense, and particularly so given the Secretary's specification of actionable acts or omissions.  The Secretary has defined acts or omissions broadly and categorically to cover any act or omission that might conceivably negatively affect a given borrower.  For example, actionable misrepresentations can include

App.098

erroneous statements about "*any . . . fact* related to the degree, diploma, certificate of completion, or any similar document that the student is to be, or is, awarded upon completion of the course of study" or "the existence of contracts with specific externship sites."  34 C.F.R. § 668.72(k), (p) (emphasis added).  It would be absurd to award a borrower full discharge of loans and reimbursement of all past loan repayments if the act in question did not cause the borrower detriment warranting such relief.  Nonetheless, the Department does not require proof of detriment warranting relief in two common circumstances in which borrower defenses will be adjudicated: group claims and closed-school claims.

138.    For any group claim "for which the Department official determines that there may be a borrower defense under § 685.401(b), there is a rebuttable presumption that the act or omission giving rise to the borrower defense affected each member of the group in deciding to attend, or continue attending, the institution, and that such reliance was reasonable."  34 C.F.R. § 685.406(b)(2).

139.    Furthermore, "[f]or borrowers who attended a closed school shown to have committed actionable acts or omissions that caused the borrower detriment, there will be a rebuttable presumption that the detriment suffered warrants relief under this section."  34 C.F.R. § 685.401(e).

140.    The Department has no statutory authority to create such presumptions.  The Department's limited rulemaking authority under Section 455(h) extends only to specifying institutional acts or omissions that can serve as borrower defenses to loan repayment, not defining rules as to how defenses may be proven.

141.    Furthermore, even if such authority exists, it is arbitrary and capricious for an agency to create rebuttable presumptions where there is no rational nexus between proven and

App.099

presumed facts (*i.e.*, where proof of one fact does not render so probable the existence of a second fact that it is unnecessary to prove it). *See, e.g.*, *Chemical Mfrs Ass'n v. Dep't of Transp.*, 105 F.3d 702, 703–05 (D.C. Cir. 1997).

142.    Under the group-claim presumption, a presumption of detriment warranting relief arises simply if the Department official finds that an act or omission occurred.  Proof of an act or omission does not logically mean that any borrower was detrimentally affected by it, much less that all borrowers were.  Nor is it logical to infer, upon proof of any detriment, that the detriment warrants total forgiveness of debt and reimbursement of past payments.

143.    Furthermore, it is arbitrary and capricious, and contrary to due process, for the application of a certain procedure to affect substantial rights.  The fact that a particular borrower's claim is adjudicated in a group rather than an individual proceeding should not affect the outcome or reduce the proof required.

144.    It is also arbitrary and capricious to apply a special presumption when the borrower attended a school that is now closed (which can happen for innumerable reasons). There is no logical nexus to presume that any proven detriment to a borrower renders so probable that the relief warranted because of an act is full forgiveness of the loan and reimbursement of past loan repayments, simply because the school is closed.  Whether the borrower suffers detriment, and whether that detriment warrants full relief, is information solely in possession of the borrower and should be proven; there is no need or justification for a presumption simply because the school has closed.

145.    The very notion of a borrower "defense" implies that the borrower should bear the burden of proof, but by creating a presumption, the Department has effectively removed any requirement of proof of the full defense.

146.    Although the presumption is nominally rebuttable, the Department's processes provide no opportunity for rebuttal.  The borrower-defense phase of the proceeding is not an adversarial adjudication where the institution can discover facts from the adversary and introduce them at trial.  The institution is limited to providing a response to the borrower's claim in Section 685.405, but the institution will not generally have possession of evidence relevant to rebutting the presumption of causation and extent of borrower injury.  The Department is not adversarial to the borrower, and nothing in the Final Rule calls for the Department to discover or investigate evidence relevant to rebutting the presumption.

147.    Furthermore, if a recoupment proceeding is brought against a school, no mechanism is provided to enable the school to rebut the presumption.  The Final Rule does not permit a school in a recoupment proceeding to take discovery, at trial or otherwise, even though the borrower ostensibly possesses evidence regarding the causation and extent of injury.  The presumptions are rebuttable in name, but not in practice. These are not *bona fide* evidentiary presumptions, but impermissible policy presumptions to maximize loan forgiveness for borrowers.

### C.    The Elimination of a Limitations Period is Unlawful, Arbitrary and Capricious, and Violative of Due Process.

148.    The Department compounded its unlawful conversion of "borrower defenses to repayment" into actionable borrower claims by providing that no BDR claim shall be subject to a limitation period.  87 Fed. Reg. 65,935.  Thus, into perpetuity, a borrower is free to bring a claim dating back to 1994, the date of the first borrower defense to repayment rule.

149.     Limitations periods are "'designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.'"  *Cunningham v. M & T Bank Corp*., 814 F.3d 156, 164 (3d Cir. 2016), *as amended* (Feb. 24, 2016) (quoting *Order of R.R. Telegraphers v.*

*Ry. Express Agency*, 321 U.S. 342, 348–49 (1944)).  The types of claims that comprise the Final Rule causes of action—*e.g.*, claims sounding in fraud, tort, and contract—are routinely subject to statutes of limitations in other contexts, as they should be here.  But the Department's rule allowing any borrower with an active loan dating from 1994 onward to file a BDR claim—including for amounts paid years before—violates this well-established principle.  It is thus arbitrary, capricious, and fundamentally unfair, in violation of due process.

150.    The Department has no authority to determine whether or not limitations periods should apply to borrower defense claims; Section 455(h) authorizes only that the Department may specify institutional acts or omissions that give rise to a borrower defense to repayment.

151.    Eliminating a limitations period is incompatible with—indeed, likely renders unworkable—the Department's BDR claim adjudication process.  The Department states elsewhere that its framework "will ensure institutions have ample opportunity to respond" and "to present their evidence and arguments before an independent hearing official in an administrative proceeding."  87 Fed. Reg. 65,912.

152.    Yet, the Department fails to acknowledge that schools, faced with responding to cases that may be decades old, will be substantially hampered in their ability to proffer evidence and present a defense.  The lack of a limitations period will prevent schools from participating in the BDR response process and contributing to the "complete record" the Department purportedly desires, 87 Fed. Reg. 41,901, as documentary and testimonial evidence frequently will be unavailable. Where evidence is unavailable due to the passage of time, it may be impossible for schools to disprove borrower claims that they were misled, that a school breached an education contract, or that a school engaged in "aggressive recruitment," along with other theories included in the Department's expansive rule.  (The Department also states that it "has the ability to request

additional information from either the borrower or institution as needed," assuming that such information would exist, which, for aged claims, is unlikely.  87 Fed. Reg. 65,939.)

153.    The elimination of a limitations period is inconsistent with the Department's rationale for affirming a three-year record retention requirement. In discussing schools' record retention obligations, and whether the three-year period is compatible with the Final Rule's lack of a limitations period, the Department surmised that the financial aid records that must be retained under the Final Rule are "unlikely . . . [to] be the most relevant records in question to adjudicate the BD claim." 87 Fed. Reg. 65,941.  Rather, according to the Department, more relevant evidence would be "related to recruitment and admission practices, advertising campaigns, brochures, and handbooks."  *Id.*  Yet, while simultaneously claiming that schools subject to BDR claims "have kept poor records," 87 Fed. Reg. 65,935, the Department provides no explanation as to why it is reasonable to expect that schools would have maintained these manuals or brochures indefinitely (particularly when these records were not within the scope of Title IV records retention requirements), or why it is reasonable to expect them to do so in the future.

154.    Further, notwithstanding the Department's speculation that "the financial aid records of individual borrowers" are unlikely to be germane to defending a BDR claim, schools facing the possibility of BDR claims well into the future will confront two problematic options: (a) retaining such records long-term out of an abundance of caution in the event that they are relevant to a BDR defense, and (b) disposing of such records as a matter of the Department's student privacy and data security best practices.

155.    The Department excuses its open-ended claim adjudication process by asserting that "the passage of time would also affect the evidence that could be available in favor of the claim." 87 Fed. Reg. 65,935.  But the Department does not consider how the passage of time may

not burden both sides equally. For example, the borrower need not retain documents or records because, as the Department contemplates elsewhere, claims tend to center on the borrower's "story." 87 Fed. Reg. 41,890. Additionally, that the borrower has the burden to show evidence that meets the BD standard, 87 Fed. Reg. 65,935, is not persuasive in light of the other inequitable provisions and presumptions adopted by the Final Rule. And, in any event, the existence of a standard for approving claims does not distinguish this claims process from any other; there is no reason that borrowers should have an indefinite timeline to bring a claim.

156.    In its July NPRM, the Department attempted to explain that institutions do not need the protections of a limitations period because "[o]ther elements of the proposed regulations would protect institutions from concerns about a lack of relevant records to respond to a borrower's claim." 87 Fed. Reg. 41,902. Contrary to the Department's terse argument, the six-year limitations period on recoupment will not "provide[] adequate protection for institutions." 87 Fed. Reg. 41,913; *see also* 87 Fed. Reg. 65,935. Even when a six-year limitation applies to recoupment proceedings,[2] the claim can assert wrongful acts or omissions without time limitation. Schools must face the costs of defending against stale claims during the initial adjudication process without sufficient evidence, and the reputational harm that will ensue if these stale claims are routinely granted, including *en masse* through the group process. Further, the taxpayers will bear the massive burden of funding BDR claims that are granted because schools are unable to put forth defensive evidence at the borrower adjudication stage, and which are so aged that they fall outside of the six-year recoupment limitations period.

---

[2] The six-year limitations period for recoupment proceedings has several exceptions, which substantially undermine these purported "protections." For example, all the Department has to do notify the institution that a BDR claim is pending within the six-year period, and the limitation period does not apply to certified classes or pending state or federal investigations. *See* 34 C.F.R. § 685.409(c)(2), (3).

App.104

157.    The Department went so far as to contend that, because it intends to notify schools through the institutional response process of the claims against them, the schools will therefore have "sufficient notice to retain pertinent records."  87 Fed. Reg. 41,902.  But this is an oversimplification that fails to address that claims may be many years old and that schools may receive notice long after claims are filed; by then, it may be impossible to "retain" already long-lost records pertinent to those stale allegations.

158.    The Department's rationale for disposing of a limitations period for borrower defense claims is heavily tied to the "operational challenges of administering a limitations period." 87 Fed. Reg. 65,935.  The Department argued in the July NPRM that applying a limitations period "would not align with the Department's proposal to allow group claims," *id.*, ignoring that class action claims (a form of group claim) are subject to statutes of limitation.  *See, e.g.*, *Lewis v. Becerra*, No. CV 18-2929 (RBW), 2022 WL 1262122, at *8, 12 (D.D.C. Apr. 28, 2022) (concluding that "the number of putative class members in this case should be reduced to account for those individuals who … did not file their claims within the applicable statute of limitations window").

159.    The Department worries about "a situation in which a borrower is still obligated to repay a loan . . . solely because the individual did not fill out an application in time."  87 Fed. Reg. 65,935 (footnote omitted).  That a limitations period may interfere with the Department's policy goals, which could be said of any limitations period, is not a basis to ignore this fundamental procedural protection.

160.    It is neither rational nor lawful for the Department to shirk its responsibility to adjudicate claims fairly and timely, while increasing exponentially the number of claims schools must defend, on the ground that adjudication is burdensome.

> **D.     The Group Process Regulation Violates the Statute, Is Arbitrary and Capricious, and Violates the Due Process Rights of Schools.**

161.    The Final Rule resurrects and then expands the flawed group adjudication process from the 2016 regulations.  *See* 34 C.F.R. § 402; 87 Fed. Reg. 65,936-65,939.  This component of the Final Rule exceeds the Department's statutory authority, is arbitrary and capricious in violation of the APA, and violates the due process rights of schools.

162.    The group process provisions conflict with the HEA.  Not only does the Department lack any adjudicatory authority, but *a fortiori* Congress did not grant the Department the authority to promulgate or administer group or class action procedures.  *See West Virginia*, 142 S. Ct. at 2609 ("Agencies have only those powers given to them by Congress.").

163.    Quite the contrary, Congress authorized the Department merely to specify which "acts or omissions" "a borrower may assert as a defense."  20 U.S.C. § 1087e(h).

164.    Nothing on the face of the statute authorizes the Department to consider borrower defense claims on a group basis.  Indeed, the same statute defines a "borrower" as "an individual who is a new borrower on the date such individual applies for a loan under this part . . . ."  20 U.S.C. § 1087e(f)(4).

165.    Moreover, courts must presume that "Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia*, 142 S. Ct. at 2609 (internal quotation marks omitted).  Resolving claims through group or class action procedures is a significant policy decision in multiple ways.  First, as the Department recognized in the course of rescinding group procedures in the 2019 regulations, "a group discharge process could place an extraordinary burden on both the Department and the taxpayer."  83 Fed. Reg. 37,244 (July 31, 2018).  Second, the Department itself admits it will disproportionately burden the public fisc, by acknowledging that most of the cost of the new regulations will arise from the granting of group

App.106

claims. *See* 87 Fed. Reg. 65,994–65,996. Congress cannot be presumed to delegate by silence such a major decision to the Department.

166.    Even if the Department has the statutory authority, the Department's group procedure to adjudicate claims is inconsistent with section 455(h) because it provides no mechanism for the determination of whether an individual borrower was in fact injured and to what extent the borrower was injured for purposes of the amount of discharge.

167.    The group process regulation is also arbitrary and capricious. As an initial matter, there is no reasoned basis for a group process. There is no evidence that a group or class action procedure "will ensure a more efficient process." 87 Fed. Reg. 65,993. Rather, if a common issue is resolved after full and fair litigation in an individual proceeding, re-litigation of that issue could be precluded in subsequent proceedings against the school through ordinary principles of collateral estoppel, thereby minimizing litigation costs.

168.    The Department has implied that it will grant a higher rate of borrower defense claims through a group process. *See* 87 Fed. Reg. 66,010–66,012. That is a wholly improper rationale for adopting a group procedure: procedural changes are not supposed to alter substantive outcomes. *See, e.g.*, 28 U.S.C. § 2072(b) (Federal Rules Enabling Act providing that procedural rules, including class action rules, "shall not abridge, enlarge or modify any substantive right"). That divergence in predicted approval rate also indicates that the adoption of the group procedure is in fact an alteration of the substantive standard for the approval of a borrower defense claim. Indeed, the presumption of reliance is in fact different for group claims.

169.    The true nature of the group process as simply a means to grant broader relief to borrowers is revealed by the extraordinary provision that if a group claim is not resolved within one year, "the loans, or portion of the loans in the case of a Direct Consolidation Loan, will not be

44

enforceable by the Department against the borrower." 34 C.F.R. § 685.406(g)(5). Thus, the Department will discharge student loan debt even without any proof of a borrower defense to repayment, in direct contravention of Section 455(h).

170.    The Department's group process also fails to specify adequate criteria for when a group process is appropriate. The Final Rule permits the Department to institute a group process "[u]pon consideration of factors including, but not limited to, the existence of common facts and claims by borrowers, the likelihood of actionable acts or omissions that were pervasive or widely disseminated, and the promotion of compliance by an institution or other title IV, HEA program participant." 34 C.F.R. § 685.402(a). The only justification for a group procedure would be if common issues predominate and if the procedure provides a fair and efficient means of resolving common issues while respecting matters that require individualized proof.   In contrast, the Department's open-ended criteria are arbitrary and capricious.

171.    Further, it is arbitrary to determine whether to proceed on a group basis in a present proceeding based on whether doing so will affect a regulated party's behavior in the future.  That is especially true because the Department elsewhere estimated that the effect of its regulations on behavior is minimal in the short-term. *See* 87 Fed. Reg. 66,014–66,015.

172.    Additionally, the group process regulation arbitrarily restricts the opportunity for institutions whose rights will be affected to object to group formation.   Only if a third party, not the Secretary, proposes a group process can institutions then object. 34 C.F.R. 685.402(c)(4). In cases where the Secretary *sua sponte* forms a group, institutions are completely denied the opportunity to be heard at the equivalent of the class-certification stage.

173.    Despite numerous issues critical to a borrower defense claim, including reliance, injury, and damages, involve individualized issues of proof, the Department has jettisoned any of

the protections common to class-action procedures, such as those embodied in Rule 23 of the Federal Rules of Civil Procedure. The Department's group process impermissibly fails to limit class-like procedures to common issues and ensure separate determination of matters that require individualized proof.

174.    The Final Rule's group process regulation accordingly is arbitrary and capricious and contravenes due process, which requires that a party be able to present a defense to allegations of wrongdoing. *Degen v. United States*, 517 U.S. 820, 828 (1996); *Hovey v. Elliott*, 167 U.S. 409, 433 (1897). That includes presenting individualized evidence on matters of individualized proof. *See, e.g.*, *Western Elec. Co, v. Stern*, 544 F.2d 1196, 1199 (3d Cir. 1976).

175.    One need look no further than the Department's own discussion of the timeline for adjudication of a group claim to see that the Department plans to gloss over individualized issues in the group process. The July NPRM proposed asymmetrical timelines in which group claims would be adjudicated in two years but individual claims, three years. The Department reasoned, "Individual claims would be subject to a longer adjudication timeframe because they may include case-specific research on the merits." 87 Fed. Reg. 41,904. Then, in the Final Rule, the Department actually "shorten[ed] the time to render a final decision on the group claim to 1 year." 87 Fed. Reg. 65,938. The obvious implication is that the Department intends to rush through group adjudication to grant bulk loan forgiveness without conducting too much "research on the merits." The Department's own estimates—that only 12% of individual claims will be approved while 75% of group claims will be approved, 87 Fed. Reg. 41,959 (Table 5)—corroborate these concerns.

176.    Indeed, on the issues of reliance and the fact and extent of injury, the Department simply relieves the borrowers of any need to adduce proof. Instead, it erects the "rebuttable presumption" that "the act or omission . . . affected each member of the group in deciding to attend,

or continue attending, the institution, and that such reliance was reasonable." 34 C.F.R. § 685.406(b)(2). As noted above, *see supra* ¶¶ 129–142, there is no lawful basis for that presumption, and there is no mechanism by which the presumption can be rebutted in a proceeding.

177. The Department's slanted and results-driven proceeding cannot satisfy due process. *See Mathews v. Eldridge*, 424 U.S. 319 (1976). Because borrower-defense liabilities are potentially massive, the private interests at stake are substantial. The risk of error in determining borrower defenses is high, and the value of standard safeguards—such as reserving matters of individualized proof for individualized proceedings—is substantial. Any additional administrative cost to the Government is more than justified by the avoidance of waste of substantial government funds from granting unjustified loan discharges.

178. The Department states that an institution would "have a separate opportunity to respond to a claim during any recoupment proceeding," but the procedures it adopts for recoupment do not provide an effective opportunity to contest reliance, effect on borrowers, or amount of discharge. Schools are injured by the Department's skewed group-claim process because they bear the burden in the recoupment proceeding of proving that the borrower-defense determination is wrong, *see* 34 C.F.R. § 668.125(e), but have no meaningful ability to defend against the discharges decided in the group process in a recoupment proceeding.

47

App.110

E.    **The All-Or-Nothing Approach to Discharge Amounts Violates the HEA and is Arbitrary and Capricious.**

179.    Nothing in Section 455(h), which authorizes the Secretary to specify institutional acts or omissions, grants the Department the power to prescribe rules for assessing discharge amounts, which should be left to the appropriate tribunal.  Nevertheless, to the extent the Department is deemed to have both broad rulemaking authority over discharge amounts *and* adjudicatory authority over borrower defenses, the Department must make individualized determinations of the amount of discharge based on the harm or injury to the borrower caused by the conduct that prompted the loan obligation.  *See* 20 U.S.C. § 1087e(h).  The Final Rule does not satisfy that statutory requirement.

180.    The clear text of the statute indicates that the amount of the discharge must be based on the harm or injury to the individual borrower. A "defense to repayment" is a circumstance that excuses the repayment of a loan that was caused by an antecedent to the "act or omission" giving rise to the defense.  In other words, a borrower has a "defense to repayment" when the borrower cannot equitably be held responsible for repayment of all or part of the loan obligation. That, of course, depends on the borrower's actual, individualized harm or injury, that is, a determination that the borrower, as a result of the institution's act or omission, would not have incurred the loan, suffered harm from attending the institution or enrolling in a particular program, or did not receive the value of the promised education that the loan funded.  *Id.*  Disconnecting the amount of discharge from the amount of harm or injury to the borrower, the Department transforms the HEA into a massive windfall for borrowers.

181.    The Department's discharge rule abrogates section 455(h)'s causation requirement because it provides for the discharge of the borrower's loan obligations even if they *preceded* the

48

App.111

act or omission that gives rise to the defense. 20 U.S.C. § 1087e(h). If, for example, there is a misrepresentation concerning the provision of educational services to a student in her senior year, there is no reason to discharge the entirety of her debt from the prior three years. There must be at a minimum an inquiry into what loans the student would not have taken out but for the school's act or omission. But under the Department's binary approach, if a borrower defense is found, the Department will discharge "*all* amounts owed to the Secretary on a Direct Loan" and reimburse "*all* payments previously made to the Secretary on the Direct Loan." 34 C.F.R. § 685.401(a)(ii) (emphasis added).

182.    This rule will sometimes unfairly work to the disadvantage of the borrower, but more often to the disadvantage of the school. If the act or omission occurs late in the student's course of studies, the Department might decide that the act does not cause her injury warranting the full relief of total discharge and total reimbursement. That is unfair to a borrower deserving discharge of *some* obligations caused by the act. Conversely, even in circumstances where only partial discharge is warranted, the Department may grant the full discharge and attempt to saddle the school with liability (especially if it invokes the presumptions applicable to group or closed-school claims). Either way, the Department's binary all-or-nothing discharge rule is irreconcilable with the causation of injury requirement of Section 455(h).

183.    In addition, the Final Rule eliminates any intelligible principle for determining the amount of discharge. Courts are loathe to interpret statutes to have delegated unbridled discretion to agencies. The Department cannot rescind loan obligations that are not causally related to the act in question.

184.    The Department's fiat that the only permissible remedy is full rescission of all loan obligations and full restitution of past repayments is also arbitrary and capricious. Equity allows

49

App.112

restitution and rescission in carefully defined circumstances. The Department has broadly defined as borrower defenses to encompass a broad array of acts and omissions that "relate[] to the making of a Direct Loan for enrollment at the school or the provision of educational services for which the loan was provided." 34 C.F.R. § 685.401(a). The Department cannot declare such a broad range of borrower defenses and then declare that rescission or restitution of the student's entire loan obligation is the sole remedy. This underscores that Congress meant, as Section 455(h) clearly provides, that the Department's writ is only to specify defenses to loan repayment, not supersede the law of remedies in judicial actions for enforcement of debt.

185.    The Department fails to provide reasoned explanation why the amount of discharge can never depend on the loss suffered by the borrower (*e.g.*, a loss determined by the comparison between the value of the education received and the loan obligation), as the agency had previously required. *See, e.g.*, 81 Fed. Reg. 75,974 (2016 Rule) (emphasizing that the amount of relief turns on the "value of the education" that the borrower received notwithstanding a school's misconduct); 84 Fed. Reg. 49,834 (2019 Rule) (similar).

186.    Without much explanation, the Final Rule deviates from the Department's long-held position that the amount of discharge is tied to educational value. The Department arbitrarily presumes a full, automatic discharge is appropriate absent rebuttal and removes the requirement that the borrower must prove individualized harm *even though* the Department in the July NPRM "recognize[d] that there may be circumstances in which the financial harm experienced by a borrower is less than the amount of a full loan discharge." 87 Fed. Reg. 41,908.

187.    The Department's position is not justified by the Department's proffered reasons. First, the Department stated in its July NPRM that the individualized-harm requirement "could have the unintended consequence of providing lesser amounts of relief for a borrower who

50

succeeded despite their program." 87 Fed. Reg. 41,908.  That argument rests on the premise that

the Department cannot assess harm to an individual borrower; indeed, the Department expresses

concerns that assessing harm is a "subjective" or difficult enterprise.  *Id.* at 41,909; *see also* 87

Fed. Reg. 65,946.  In addition to being flatly inconsistent with the Department's 25 year-old

position, *see, e.g.*, 84 Fed. Reg. 49,834, the Department offers no explanation as to why it—the

primary Federal regulator of educational institutions—cannot assess the "value of educational

services," especially when tribunals across the country routinely assess individualized harm in tort

cases outside of their expertise.

188.   Second, the Department's Final Rule stated that an individualized-harm

requirement is "an inappropriate barrier to relief for the borrower" because it "require[s] the

borrower to have knowledge about regional and national employment opportunities."  87 Fed. Reg.

65,910.  "We believe that a borrower is unlikely to know how to locate regional or national

unemployment rates and connect those data to their own experience."  *Id.*  This argument only

applies to one particular measure of harm; the Department never establishes why it cannot adopt

other individualized measures of harm even if this concern were valid.  Furthermore, the

Department does not explain why it believes borrowers are incapable of gathering evidence to

prove harm.  Nor does it explain why its concern that harm is difficult to prove would justify

simply presuming the existence of harm.

189.   Because, according to the Department, how much to award a borrower meriting

only partial discharge would be "difficult to reliably estimate," 87 Fed. Reg. 65,946, the new rule

is tantamount to an improper presumption of full discharge.  The proof of a borrower defense claim

on the merits, on whatever basis, does not render a full discharge so probable that individual fact-

finding can be bypassed. *Chemical Mfrs Ass'n*, 105 F.3d at 705.  That renders the Department's Final Rule unlawful.

**F.     The Extension of BDR Regulations to Perkins and FFEL Loans Violates the Statute.**

190.     Section 455(h) authorizes borrower defenses to repayment under the Direct Loan Program only to a loan "made under this part," namely, Part D (the William D. Ford Federal Direct Loan Program).  20 U.S.C. § 1087e(h).  The Department acknowledges this limitation but applies the Final Rule to both FFEL and Perkins Loans that have been *or could be* consolidated with Direct Loans. Indeed, the Department states that the BDR application will itself serve as the application for consolidation, and that consolidation can occur *after* a borrower defense is granted.  *See* 34 C.F.R. § 685.401(a) ("Covered loan"); 87 Fed. Reg. 65,915–65,916.  This rule cannot be squared with Section 455(h).

191.     Congress chose to authorize a BDR only for Direct Loans because the government is the lender, and thus Congress has only authorized the Department to specify borrower defenses to repayment of the government's own lending contracts. FFEL and Perkins loans—which have not been issued since 2010 and 2017 respectively, 87 Fed. Reg. 65,906 n.3—stand on a different footing.  FFEL loans are agreements that the borrower executes with private lenders, for which the United States guaranteed repayment.  Federal Student Aid, Department of Education, *Federal Family Education Loan (FFEL) Program*, https://studentaid.gov/help-center/answers/article/ffel-program.  Perkins loans involve a lending contract with the school, which the United States subsidizes.  Financial Aid Programs, https://www.benefits.gov/benefit/418; Federal Student Aid, Department of Education, *Participating in the Perkins Loan Program*, https://fsapartners.ed.gov/knowledge-center/fsa-handbook/2021-2022/vol6/ch3-participating-perkins-loan-program.  Congress granted the Department no authority to specify borrower

defenses to repayment of loans to private or institutional lenders under the FFEL or Perkins programs.

192.    A Federal Direct Consolidation Loan ("FDCL") is a loan under Part D (the William D. Ford Federal Direct Loan Program), and thus the Department may specify as borrower defenses to repayment under Section 455(h) acts or omissions taken against a borrower who at the time holds or is applying for a FDCL.  *See* 20 U.S.C. § 1087e(a)(2)(C).  But the Department may not recognize a borrower defense based on acts or omissions against a student who at the time funded her education with FFEL or Perkins loans, not Direct Loans. That is beyond the authority delegated by Congress.

193.    Indeed, the Department's position leads to unfair and arbitrary treatment of similarly situated individuals.  Students who took out FFEL loans at the same time and are subject to the same acts or omissions receive relief if they have not paid them back, but none if they repaid them.  There is no rationale for treating similarly situated borrowers so radically differently, and indeed treating borrowers who have dutifully met their repayment obligations worse. This arbitrariness would have been avoided had the Department properly interpreted Section 455(h) to apply the defense only to borrowers who funded their education with Direct Loans.

194.    The Department justifies its consolidation rule because Congress has provided that Direct Loans should be made under the same "terms, conditions, and benefits" as FFEL Program loans.  87 Fed. Reg. 65,916 & n.47 (citing 20 U.S.C. §§ 1087a(b)(2), 1087e(a)(1)).  But BDR is not a term, condition, or benefit of a FFEL Program loan; it is a statutory provision specific to Direct Loans, and cannot be extended to FFEL and Perkins loans through consolidation.  The Department must comply with the statute as written, not as it wishes it was written.

195.    Furthermore, the statute contemplates only "a defense to *repayment* of a loan *made under this part.*" 20 U.S.C. § 1087e(h) (emphasis added).  One cannot assert a defense unless the Direct Loan has already been "made," past tense; further, there is no such thing as "repayment" of a Direct Loan that has not yet been made. But under the Department's consolidation rule, the Department first adjudicates a borrower defense even when no Direct Loan has been made, and then consolidates other loans into a Direct Loan "only … if the claim is approved," "streamlin[ing] the claims process."  87 Fed. Reg. 65,916.  The statute does not permit the granting of borrower defenses to putative "repayment" of future Direct Loans that have not yet been "made." The Department's rule violates this provision of the statute.

196.    Finally, the Department's consolidation rule is at odds with its regulatory definition of a "borrower defense."  The definition provides that "*Borrower defense to repayment* means an act or omission of the school attended by the student that relates to *the making of a Direct Loan* for enrollment at the school or the provision of educational services for which *the loan* [*i.e.*, the Direct Loan] was provided . . . ."  34 C.F.R. § 685.401(a)(ii) ("Borrower defense to repayment)." That would exclude acts or omissions that relate to the making of an FFEL or Perkins loans, which are not Direct Loans. The Department did not cure the problem by declaring that BDR includes "repayment of amounts owed to the Secretary on a Direct Loan including a Direct Consolidation Loan that was used to repay" FFEL and Direct Loans.  *Id.*, subpart (i).  Under the regulation, there is still no defense if the act or omission did not relate to the making of a Direct Loan, or if no Direct Loan was provided to pay for educational services. The Department's regulations are an exercise in contradiction.

54

G.    **The Final Rule's Establishment of a Reconsideration Process for Borrowers But Not For Schools Is Arbitrary and Capricious.**

197.    The Department's rule regarding reconsideration is arbitrary and capricious and violates the Constitution.  The Final Rule enshrines a one-sided process by which only borrowers and state requestors may seek reconsideration and in which State law matters may be adjudicated. 34 C.F.R. § 685.407. The former is discriminatory and arbitrary in violation of the APA and the latter violates due process and the Seventh Amendment.

198.    The one-sided nature of the Department's reconsideration regulation is discriminatory and arbitrary. Administrative agencies "must accredit themselves by acting in accordance with the cherished judicial tradition embodying the basic concepts of fair play." *Morgan v. United States*, 304 U.S. 1 (1938).  Accordingly, due process instructs administrative agencies to provide both sides of a dispute with an opportunity to be heard.

199.    Here, only one side of a dispute—the borrower or the state requestor—has the opportunity to be heard by requesting reconsideration. The Department asserts that borrowers or state requestors may want to seek reconsideration due to administrative or technical errors and new evidence, but provides no reason to think that schools will not want to seek reconsideration on the same grounds. And it provides no reason to distinguish between schools and borrowers or state requestors in this regard, nor why duplicating judicial review for borrowers but not institutions is appropriate. Drawing such a distinction without a rationale is discriminatory, and thus arbitrary. It also is particularly harmful because schools are provided limited procedural rights in both discharge and recoupment proceedings.

H.    **The Recoupment Procedures Violate the Statute, the APA, and the Constitution.**

200.    To justify massive loan forgiveness, the Department attempts to make it easier to recoup its losses from institutions, thereby shifting the risks of nonpayment of student loans from

App.118

borrowers and itself to institutions. The Department provides that it may collect the liability for

any borrower defense discharge from the school in a proceeding analogized to a "program review."

*See* 34 C.F.R. § 685.409; 87 Fed. Reg. 65,912.

201.    In that proceeding, the Department provides written notice to the school of the

borrower-defense determination, the basis of liability, and the amount of the discharge. 34 C.F.R.

§ 668.125(a). The institution must request review by a designated Department official. *Id.*

§ 668.125(b). If it does request review, a hearing will be held. *Id.* § 668.125(c)-(d). The

Department only has "the burden of production to demonstrate that loans made to students to attend

the institution were discharged on the basis of a borrower defense to repayment claim." *Id.*

§ 668.125(e)(1). By contrast, "[t]he institution has the burden of proof to demonstrate that the

decision to discharge the loans was incorrect or inconsistent with law and that the institution is not

liable for the loan amounts discharged or reimbursed. *Id.* § 668.125(e)(2).

202.    The evidence allowed is extremely restricted. The only evidence allowed is (1) any

materials submitted to the Department in the BDR process by the borrowers, the institution, or

third parties; (2) any materials that the Department relied on that it chooses to provide to the

institution; and (3) any "documentary evidence" that the institution submits that relates to the bases

of the borrower defense or recoupment claim. *Id.* § 668.125(e)(3).

203.    The resulting rule far exceeds the Department's statutory authority, violates the

Constitution, and contravenes the APA. The flaws in the recoupment processes are more important

than ever before because of the massive amount of liability the Department has now shifted onto

institutions of higher education.

204.    The Department's recoupment procedures exceed its statutory authority: Congress

has not granted the Department authority to recover discharged loans at all, and the Department

certainly does not have the authority to establish internal procedures that make it a judge in its own cause.  Agencies may exercise only those authorities that Congress provides by statute. "[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).  In particular, where "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Aishat v. U.S. Dep't of Homeland Sec.*, 288 F. Supp. 3d 261, 267 (D.C. Cir. 2018).

205.    Here, Section 455 of the HEA does not provide the Department with the authority to recover the amount of loans discharged by way of borrower defense.  *See* 20 U.S.C. § 1087e(h).  That stands in stark contrast to other parts of the HEA, which do provide such authority.  *See, e.g.*, 20 U.S.C. § 1087(c)(1) (in cases of closed schools, false certification, and lender refunds, "the Secretary shall discharge the borrower's liability on the loan (including interest and collection fees) by repaying the amount owed on the loan and shall subsequently pursue any claim available to such borrower against the institution and its affiliates and principals or settle the loan obligation pursuant to the financial responsibility authority under subpart 3 of part H").  Indeed, the Department appears to have admitted as much.  *See* 81 Fed. Reg. 75,929.

206.    The Department points to Section 454(a)(3) of the HEA,  20 U.S.C. § 1087d(a)(3), as authority for its recoupment procedures.  *See* 87 Fed. Reg. 41,911, 65,948.  But that provision states merely that a Program Participation Agreement must "provide that the institution accepts responsibility and financial liability stemming from its failure to perform its functions pursuant to the agreement." 20 U.S.C. § 1087d(a)(3). The provision notably does not by itself connect an institution's "responsibility and financial liability" to the Department's discharge of loans related

to borrower defense and it would be odd to infer it did so in light of specific statutory grant of such authority elsewhere in the HEA.  Furthermore, that provision does not authorize the Department to prescribe procedures for the adjudication of recoupment claims or to adjudicate an institution's liability in a given case.

207.    Congress must expressly authorize an agency to adjudicate public rights.  Further, the Supreme Court has instructed in *West Virginia v. EPA*, and other cases, that agencies only enjoy those powers provided them by Congress and, when major questions are involved, a "clear congressional authorization" is required.  *West Virginia*, 142 S.Ct. at 2614 (internal quotation marks omitted).  The Department cannot place the burden on the private party to disprove the agency's authority, rather than on the agency to justify its authority. In addition, Congress' provision of specific authority indicates that it did not intend to provide other authority.

208.    To the extent administrative adjudication is permitted, the Department's creation of bifurcated group and individual borrower claim processes in 34 C.F.R. §§ 685.402, 685.403, and 685.406—in which the school has no right of discovery or ability to examine either the borrower or a third-party witness, and is limited to providing an institutional response pursuant to 34 C.F.R. § 685.405—is arbitrary and capricious and in violation of the school's due process rights.

209.    In addition to exceeding the Department's statutory authority, the Department's Final Rule violates a host of constitutional protections.

210.    The recoupment procedures do not ensure adjudication by a neutral decision-maker, in violation of due process.  It is a fundamental principle of due process (and also consequently the APA) that the adjudicator of a claim must be unbiased.  Here, the Department

stands to gain financially from deciding to recoup discharged loan amounts from schools because it is able to shift its risk of the nonpayment of student loans from itself to institutions.

211.    It is particularly problematic that the Department has arrogated to itself the power to adjudicate its own liability for such a large amount of money, billions of dollars, without clear congressional authorization.

212.    The Final Rule's established procedures violate Article III and the Seventh Amendment. The Seventh Amendment protects the right to trial by jury for actions that arise "at common law."  U.S. Const. amend. VII; *Tull v. United States*, 481 U.S. 412, 417 (1987).  Under both Article III and the Seventh Amendment, Congress may assign an action to administrative adjudication only when it involves "public rights."  *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 450 (1977).  Here, a recoupment action arises "at common law" and does not involve "public rights."

213.    The right that the Department seeks to vindicate in a recoupment action arises at common law. The Department admitted as much in 2016, conceding that recoupment was a "common law claim."  81 Fed. Reg. 75,929.

214.    In addition, any administrative recoupment proceeding that is based on a borrower defense that turns on a violation of State law or breach of contract involves the common law under any plausible reading of Supreme Court precedent. This right is not a public right that can be committed to administrative adjudication. A right may be committed to administrative adjudication when it is a "new action" and jury trials would "dismantle the statutory scheme" and "impede swift resolution" of the agency's prosecutions.  *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989); *see Jarkesy v. Sec. & Exch. Comm'n*, 34 F.4th 446, 455 (5th Cir. 2022).

App.122

215.   The Department's new procedures also do not satisfy procedural due process protections. The Constitution guarantees due process in administrative adjudications that will deprive an entity of a property interest. *See, e.g.*, *Mathews v. Eldridge*, 424 U.S. 319 (1976).

216.   At common law, the Secretary would have the burden to prove indemnification in court; it is fundamentally unfair and unwarranted for the Final Rule to shift the burden to the school to *disprove* the propriety of the borrower defense determination, especially when the Department has controlled the underlying borrower defense proceeding.

217.   Furthermore, there are no mechanisms for the school to discover critical evidence from either third parties or the borrower or to test the credibility of the borrower.  Although the school may sometimes have internal evidence regarding its own acts or omissions, the occurrence or nature of an act or omission may often be disputed.  For example, if the institution disputes the claim that aggressive or deceptive recruitment occurred, it has no mechanism to discover the borrower's evidence, to test borrower's testimony in a prior proceeding, or to compel the testimony of the borrower or necessary third parties.   Typically, only the borrower will possess certain critical evidence, including whether he or she received or relied on a misrepresentation, whether he or she suffered detriment due to an alleged act or omission, or the extent of that detriment.  The school has no means—and the Final Rule provides none—to discover or adduce such critical evidence.  Even worse, when the Department adjudicates group claims or closed-school claims, those key facts will simply be presumed.  Yet the Final Rule places the burden of proof on the school, which cannot gather and produce evidence essential to refuting liability.

218.   The obvious and most efficient alternative, if administrative adjudication is to be permitted at all, would be a single adversarial hearing before an administrative law judge where the borrower (the claimant) bears the burden of the proof.  Both parties would have access to the

limited discovery needed for the generally straightforward issues of whether and what act or omission occurred and whether it caused the borrower injury justifying the extraordinary relief of discharge. Further, such an adjudication process would present the opportunity to submit and pressure test evidence at trial. That is the standard fare for formal administrative adjudication, and there is no reason such hearings could not be held in these cases where large sums are at stake.

219.    Alternatively, even if the Department deemed it necessary to bifurcate the two proceedings, it could still provide for a recoupment hearing with discovery and witness examination, with the Government bearing the burden of proof. The Department previously provided for formal adjudication of all recoupment actions in evidentiary hearings (including a unified borrower defense/recoupment adjudicatory proceeding at the hearing official's discretion). *See* 37 C.F.R. § 668.87 (2022). The Department has not provided a reasoned explanation as to why bifurcated proceedings without administrative trials are more efficient mechanisms for arriving at the correct and just conclusion. The only possible (illegitimate) reason for the Department's particular bifurcated proceedings is to maximize borrower relief and deny schools a fair opportunity to contest liability, thus ensuring that the financial burden of discharge falls on the school and not the Department.

220.    Due process is especially important given that the recoupment procedures implicate such significant private interests. A borrower defense results in a complete discharge of a borrower's loan obligations and reimbursement of amounts paid (either voluntarily or though enforced collection), so recoupment of any individual borrower defense can involve tens or hundreds of thousands of dollars. A group claim can potentially involve many millions of dollars.

221.    In light of the interests at stake, additional safeguards—indeed, safeguards that are ingrained in American law—are necessary for the just resolution of recoupment disputes. Such

App.124

basic procedures such as discovery and witness hearings are the only means by which a school can develop evidence on (and thus meaningfully contest) numerous important issues, including reliance, injury, and whether the injury justifies the full relief awarded.  Without these procedures, the risks of error and erroneous discharges are high.

222.    Yet the government's interest in not providing these procedural safeguards is very low.  Indeed, the Department has not yet offered any reason why it cannot provide these safeguards, which are typical even in agency adjudicatory proceedings.  The lack of explanation forecloses any meaningful opportunity for the public to comment.  One conceivable objection to discovery could be the potential for delay, but the Department acknowledges and accepts that the "rights of institutions . . . can take months if not years to fully exhaust." *See, e.g*., 87 Fed. Reg. 41,912.

223.    The Department's recoupment procedure also violates the APA because it lacks a reasoned basis.

224.    The Final Rule makes clear that it is the expectation, indeed designed intent, of the Department for the recoupment process to have the punitive and "deterrent effect" against educational institutions. 87 Fed Reg. 65,908 ("These regulations should have a deterrent effect dissuading institutions from engaging in conduct that would give rise to a defense to repayment.").

225.    In the July NPRM, the Department argued that the purpose is to separate borrower defense application reviews from recoupment proceedings.  87 Fed. Reg. 41,912.  But those two proceedings were already separate under the 2019 regulations (if not the 2016 regulations) and the Department has failed to explain why the separated procedures that already existed under the 2019 regulations are insufficient.  *Compare* 34 C.F.R. § 685.206(e)(1)-(15) (discussing how borrower defense claim is adjudicated), *with* 34 C.F.R. § 685.206(e)(16) (setting forth how Department may

App.125

recover after "borrower's successful borrower defense to repayment" through 34 C.F.R. § 668.87, that is subpart G of part 668). The Department's rationale appears to misunderstand the current regulation and thus violates the APA.

226. The Department also incorrectly claimed that institutions would prefer the program review process in part H because it is more "familiar." 87 Fed. Reg. 41,912. But—even if schools would sacrifice procedural fairness for "familiarity"—the Department's recoupment procedures as they *currently exist* under the 2019 regulations are also based on part G, and certainly familiar to institutions. The difference between part G, which the 2019 recoupment process relied on, and part H, which the Department has now adopted, is that part H provides fewer procedural protections (part G hearings, while not perfect, do allow institutions to put on witnesses, submit expert testimony, and engage in motions practice). Schools are equally familiar with both longstanding parts of their governing regulations, and the Department's reasoning for the changes does not pass muster.

227. The Department fails to credit concerns that bifurcated proceedings will subject schools to substantial reputational harms before (and notwithstanding) the final adjudication of borrower defense claims. To the extent that a school has any meaningful procedural rights, it cannot exercise them until a recoupment proceeding, which necessarily occurs after a successful application. In the meantime, the institution will lose community support; its reputation will be tarnished in the eyes of accreditors, state authorization agencies, and employers; alumni will lose opportunities; and prospective students will be discouraged from applying and enrolling. Separating application review and recoupment only serves to exacerbate these incalculable reputational harms while a school waits for the opportunity to defend itself.

I.       **The BDR Constitutes Impermissible Retroactive Rulemaking.**

228.     It is a bedrock principle that an agency cannot engage in retroactive rulemaking without congressional authorization. *Bowen v. Georgetown University Hosp.*, 488 U.S. 204, 208 (1988).  A rule is retroactive if, among other things, it operates to "create a new obligation, impose a new duty, or attach a new disability, in respect to transactions or considerations already past." *Vartelas v. Holder*, 566 U.S. 257, 266 (2012) (brackets and internal quotation marks omitted).  A rule is thus retroactive if "the new provision attaches new legal consequences to events completed before its enactment." *Landgraf v. USI Film Products*, 511 U.S. 244, 270 (1994).

229.     The Department recognizes this limitation, 87 Fed. Reg. 65,915, but failed to honor it.  The Department has forsworn collecting any liability from schools if the applicable standard became effective after the first disbursement of the loan.  34 C.F.R. § 685.409(b).  But retroactivity depends on when the act or omission of the school occurred, not when the loan was disbursed.  The disbursement of a loan is not the institutional conduct being penalized under the new BDR standard; it is the act or the omission of the school.  A school is entitled to notice of the legal standard so that it can conform its conduct to that standard, and thus "the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place." *Landgraf*, 511 U.S. at 265.  Thus, at a minimum, the legal standards set by the 1994, 2016, 2019, and 2023 rules cannot apply to any act or omission of an institution occurring before the effective date of those regulations, even if the disbursement date occurs after the effective date of the applicable standard.

230.     The impermissible retroactivity is most glaring with regarded to consolidated FFEL and Perkins Loans.  The Department treats as the applicable disbursement date the date on which the consolidated loan is disbursed, rather than the disbursement date of the original Direct, FFEL,

or Perkins loan.[3] The FFEL and Perkins programs were discontinued in 2010 and 2017 respectively; any act or omission that might conceivably give rise to a borrower defense in relation to those loans necessarily happened before those times. But those acts or omissions cannot be governed by the new harsher legal standard simply because the consolidation loan (which may now be executed *after* the borrower defense is approved) is deemed disbursed after 2023. The applicability of the various legal standards in the 1994, 2016, 2019, and 2023 rules should at a minimum turn on whether the effective date of the regulation occurs before the act or omission, and should not turn on the loan disbursement date.

231.   Independently, the rule violates the prohibition against retroactive rulemaking because it declares illegal conduct that predates the new rule, with severe consequences. The Department's attempt—unique to this borrower defense rulemaking—to avoid triggering the rule against retroactive rulemaking by asserting that it is decoupling the approval of a borrower defense claim and the adjudication of recoupment against an institution, 87 Fed. Reg. 65,915, does not save it from the rule against retroactive rulemaking.  The Department's promise that it will not attempt recoupment for acts or omissions that are only now deemed illegal does not change that the rule retroactively renders them unlawful, which has legal consequences for the borrower and for the school apart from whether recoupment occurs.

232.   Moreover, the rule is retroactive because application of the new BDR standard to find violations based on past conduct will have collateral consequences for accreditation and state approvals and will cause negative harms to reputation.

---

[3] 87 Fed. Reg. 41,887 ("[T]he Department treats the date of the consolidation loan as the one used to determine what regulation their claim should be adjudicated under").

App.128

**J.    The Final Rule Relies on an Incomplete and Flawed Cost/Benefit Analysis.**

233.    The Department's cost/benefit analysis is flawed and rests on implausible assumptions, is incomplete and incapable of proper evaluation, and demonstrates the arbitrariness and capriciousness of the Department's regulations.

234.    As an initial matter, even the Department's (unduly low) estimates of costs are staggering. The Department estimates (as its "primary" estimate) that the borrower defense changes alone in its proposal will cost $17 billion retroactively and $2.7 billion over the next 10 years. 87 Fed. Reg. 41,961.  That is a tremendous number and reinforces the argument that courts should require clear congressional authorization for such a major policy decision.

235.    The Department's estimates are flawed and rest on several implausible assumptions that understate the potential costs of the Department's rule. First, the Department provides no explanation for its estimate that only 12% of individual claims will be approved, while 75% of group claims will be approved.  87 Fed. Reg. 41,959 (Table 5).  This is especially troubling when the overall estimate for approval of claims in the 2016 regulations was 65%.  *See* 87 Fed. Reg. 41,833.  Raising the estimate for individual claims would increase the costs.

236.    Second, the Department is underestimating the amount of loan volume subject to BDR.  It predicts that the loan volume of proprietary schools subject to BDR claims will actually decrease as time passes, notwithstanding the loosening of the standard and the corresponding strengthened incentives to file a borrower defense claim with loosened standards, and the lack of a similar prediction for non-profit institutions.  *See* 87 Fed. Reg. 66,010 (Table 7, predicting decline in loan volume for proprietary institutions).

237.    Third, the Department underestimates its recovery percentages, thereby underestimating the harm to institutions.  The Department's estimates that it will recover only 15% of discharged loans from proprietary institutions and 12% from non-profit institutions seem low

in light of the fact that the recoupment procedures do not allow the institution much opportunity at all to defend itself.  87 Fed. Reg. 66.012 (Table 7).  This assumption is particularly incongruous with the Department's earlier estimate of recovering 20% from proprietary and private institutions and 75% from public institutions under the 2019 regulations and 37% from proprietary and private institutions and 75% from public institutions under the 2016 regulations.  *See* 87 Fed. Reg. 66,013 (Table 8).  The Department utterly fails to explain why these estimates differ so greatly.

238.    Indeed, the Department's tabular assumptions as a whole lack adequate explanation.  The Department hardly explained how it arrived at its estimates other than a fleeting reference to the President's Budget.  For example, the Department acknowledged that it "has only begun one recovery action related to approved BDR claims, and it has yet to conclude." 87 Fed. Reg. 66,015; *see also* 87 Fed. Reg. 65,990 ("To date, the Department has yet to complete a recoupment effort . . . .").  Without data, the Department lacked a rational method to predict the likelihood of recovery.

239.    In addition, the Department's cost/benefit analysis was incomplete and incapable of proper evaluation as required by the APA.  Although the Department had already proposed a settlement agreement in *Sweet v. Cardona*, the Final Rule "did not incorporate the effects of the proposed settlement." 87 Fed. Reg. 65,990.  The settlement agreement has now received approval and will almost certainly result in the grant of complete loan discharges to hundreds of thousands of borrowers.  The Department could not have properly evaluated its proposal from a cost/benefit perspective without accounting for the massive settlement.  Even if the settlement were ultimately not approved, the Department's assumptions were inaccurate because the mere announcement of the settlement spurred a tremendous number of filings.  Since the settlement agreement's execution date but before its final approval, approximately 250,000 applications were submitted by

borrowers who attended approximately 4,000 schools. *See Sweet v. Cardona*, No. C 19-03674 WHA, 2022 WL 16966513, Dkt. No. 380 (N.D. Cal.).

240.    Further, the Department's cost/benefit analysis demonstrates the arbitrariness and capriciousness of the new regulations. The Department states that for the 2019 regulations, it had estimated that 7.5% of claims were approved and for the 2016 regulations, 65% of claims were approved. 87 Fed. Reg. 65,991. The July NPRM drew the inaccurate inference from those bare statistics that the 2019 regulations led to "denials for too many claims." 87 Fed. Reg. 41,883. At a minimum, it is entirely arbitrary to conclude that a 7.5% approval rate is too low absent an analysis of the error rate for the Department. That is especially true because the 7.5% statistic is simply an estimate, for the Department did not adjudicate any claims under the 2019 regulations. The Department's analysis demonstrates that its rule is not designed to approve legitimate borrower defense claims, but rather to increase the approval of borrower defense claims regardless of their legitimacy to some pre-conceived and arbitrary rate. That is not reasoned decision-making.

III.    **The Department's Prohibition on Pre-Dispute Arbitration Agreements and Class Action Waivers Contravenes the Federal Arbitration Act, the Spending Clause, the Due Process Clause, and the APA.**

241.    Relying solely on the HEA § 454's vague permission to condition funding on "such other provisions as the Secretary determines are necessary," 20 U.S.C. § 1087d(a)(6), the Department's Final Rule bluntly bans advance agreements between schools and students to arbitrate. 34 C.F.R. § 685.300(e).

242.    By forbidding reliance on arbitration agreements, the Final Rule renders them invalid and unenforceable—an out-and-out nullification of the Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq.*

243.    The Department insists that its arbitration ban would neither "displace or diminish the effect of the FAA" nor "invalidate any arbitration agreement," 87 Fed. Reg. 65,956, but instead "simply condition the institution's future participation in the Direct Loan Program on the institution not enforcing of certain [arbitration or class action] provisions in those contracts going forward," 87 Fed. Reg. 41,917.  In the Department's strained view, the Final Rule does not render any arbitration agreement unenforceable; it only threatens to withhold funding critical to the existence of any school that enforces an arbitration agreement.

244.    Even accepting the Department's euphemism—that the Final Rule is a "simple condition" and not a ban—the FAA preempts *any* discrimination against arbitration not authorized by Congress.  *See Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017).  Under prevailing Supreme Court precedent, there is no difference between an outright prohibition on arbitrating a certain type of claim and a "rule that covertly accomplishes the same objective."  *Id.* However described, the Department's rule is unlawful because it "fails to put arbitration agreements on an equal plane with other contracts."  *Id.* at 1426–27.

245.    In addition, the Department's reliance on its vague power to place conditions for Federal funding as authority for this regulation violates the Spending Clause because in the absence of unambiguous congressional intent, it wrongly coerces schools to agree to a condition not related to the purpose of Federal funding.  The Department never addressed this constitutional issue in its Final Rule.

246.    The Department asserts that this regulation serves the purposes of the Direct Loan Program because arbitration agreements "discourage borrowers from pursuing complaints," prevent borrowers from "hav[ing] their day in court," and "insulate[] institutions from the potential financial risk."  87 Fed. Reg. 65,980.  These terse arguments, which would justify a ban on

arbitration agreements and class-action waivers in any contract related to federal funding, are vague and generic; they provide no rationale for banning arbitration of disputes related to the provision of education services.

247.    Moreover, the Department's assertion of relatedness is also fundamentally inconsistent with the borrower defense statute, which provides for borrower "defenses" in collection proceedings, not the massive scheme the Department has enacted to produce mass loan forgiveness.  In any event, the Department has not explained why a provision that restricts student choice in education is related to a program whose purpose is increasing student choice in education.

248.    Apart from the plain contravention of the FAA and the Spending Clause, the Final Rule is arbitrary and capricious for failing to weigh the benefits of arbitration in any meaningful way. In 2019, the Department's "extensive review" suggested that arbitration of BDR-related claims made sense for borrowers in light of "the burdens attending litigation."  84 Fed. Reg. 49,843.  In comparison to the courts, the Department said, "arbitration adjudicates claims relatively quickly, cheaply, and, concurrently, gives the 'customers' what they want."  *Id.*  More specifically, arbitration is "more accessible to borrowers since it does not require legal counsel and can be carried out more quickly than a legal process that may drag on for years."  83 Fed. Reg. 37,265.  Quicker adjudication of borrower defense claims benefits not only the individual claimant, but also future students. Arbitration is preferable because: (a) it enables "an institution to more quickly identify and stop bad practices to ensure that other students are not harmed" and (b) "it may reduce the expense of litigation that a university would otherwise pass on to students in the form of higher tuition and fees."  *Id.*

249.    The Final Rule failed to consider these benefits, which directly address the Department's stated concern that arbitration agreements "undermin[e] borrowers' rights to avail

App.133

themselves of certain loan discharges, depriving borrowers of the protections in the HEA."  87 Fed. Reg. 65,980.  Unfortunately, it is all too often the case that the overburdened Federal court system stymies effective resolution, which would undermine borrowers' rights under the HEA. Likewise, class actions in the Federal court system can be lucrative for plaintiffs' lawyers, yet provide slow and paltry relief for class members.   In contrast, the American Arbitration Association's Consumer Rules, utilized by hundreds if not thousands of educational institutions, are designed first and foremost to "achieve a fair, efficient, and economical resolution."  *See, e.g.*, AAA Consumer Arbitration Rules (effective Sept. 1, 2014) R-22, R-23, R-51.

250.    The Department never engages in a real comparison between arbitration and litigation on these points, acknowledging in passing that "arbitration lowers the costs" but ignoring the myriad other benefits.  87 Fed. Reg. 65,980.  *Cf. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem."); *Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 962 (D.C. Cir. 2003).   The Department abandoned its unexplained and unsupported argument in the July NPRM that arbitration somehow "impede[s] borrowers' ability to file borrower defense claims and receive appropriate relief."  87 Fed. Reg. 41,914.  In the Final Rule, the Department elliptically asserts that arbitration agreements "effectively discourage borrowers from pursuing complaints."  87 Fed. Reg. 65,980.  Rather than review any literature on the accessibility, efficacy, and fairness of arbitration, the Department just threw up its hands; the July NPRM excused the Department's failure to consider these benefits on the unpersuasive ground that "no study . . . has addressed arbitration in the context of higher education and student loans."  87 Fed. Reg. 41,915.

App.134

251.     The most concrete evidence marshaled against arbitration agreements was the July NPRM's vague citation to "the Department's experience with Corinthian Colleges." *Id.* Even if this sort of tunnel vision were a permissible mode of agency decision-making, the agency's reasoning ultimately relied on a counterfactual—*not its experience*—that Corinthian would have possibly faced "significant deterrent threat" if not for its arbitration provisions. *Id.* The agency cannot (of course) prove its counterfactual history, which also glosses over a host of reasons for the failure of Corinthian Colleges that had nothing to do with pre-dispute arbitration clauses.

## IV.   The Closed School Discharge Provisions Violate the Statute and Due Process.

252.     The Department's expansion of the definition of a "closed school" is contrary to the statute.  In the preamble, the Department refers to closed school discharge as something borrowers are "legally entitled to in the HEA," 87 Fed. Reg. 65,906, and declares that the Final Rule changes "streamline and strengthen the closed school discharge process" for students whose schools closed while the students were attending an institution or shortly after the students left the institution, 87 Fed. Reg. 65,969.  But the Final Rule goes well beyond the HEA, including in its highly expanded and discretionary definition of what constitutes a "closed school."

253.     The Final Rule affords the Secretary discretion to determine that a school's closure date is the earlier of the date that the school ceased to provide instruction in "most" programs, "as determined by the Secretary," or "a date chosen by the Secretary that reflects when the school had ceased to provide educational instruction for most of its students."  87 Fed. Reg. 65,966.[4]

---

[4] The Department has stated that it will provide additional guidance as to what constitutes a closed school in Volume 2 of the Federal Student Aid Handbook, *see* 87 Fed. Reg. 41,923, 41,924.  To the extent this forthcoming guidance includes triggering events that are inconsistent with the statute, it is objectionable and unlawful.

254.    The HEA, however, does not suggest that a school closure is—or should be—defined as a scenario where "most" programs have ceased or "most" students have ceased to receive educational instruction.  Rather, the HEA describes the discharge as applying where:

> [A] borrower who received, on or after January 1, 1986, a loan made, insured, or guaranteed under this part and the student borrower, or the student on whose behalf a parent borrowed, is unable to complete the program in which such student is enrolled ***due to the <u>closure</u> of the institution.***

20 USC § 1087(c)(1) (emphasis added).

255.    "Closed" is an unambiguous term that plainly means "not open." *See, e.g., Closed*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/closed; *Closed*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/closed.    The Department's attempt to rewrite the term "closed," and to give the Secretary ***additional*** discretion to interpret the Department's rewritten definition, contradicts the U.S. Supreme Court's instruction that: "An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms." *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 325 (2014).

256.    Further, utilizing a new definition of "closed" to provide discharges for "mostly closures" that may have occurred in the indefinite past (because there is no limitations period, which itself is unfair and prejudicial, *see supra* Section III), is improperly retroactive. The Department's closed school discharge rule cannot apply to any act or omission of an institution occurring before the effective date of those regulations.

257.    The Department's definition also affects the practical operation of schools in an ever-changing economic environment.  Institutions evaluate the labor market and make decisions to add or discontinue program offerings or school facilities in response to market demand and student needs. The Department's vague definition of what constitutes a closure risks penalizing schools that adjust their programming to reflect market shifts, and could be particularly damaging

App.136

to small institutions that wish to make changes to their portfolio of programs.[5]  Instead of starting new programs and discontinuing old programs, some colleges may keep old programs afloat simply to avoid school loan liability.

258.    Similarly, institutions may wish to cease operations at certain facilities while continuing to operate at others, a common scenario the Final Rule treats no differently than an institution that completely shuts down.  In tandem with the Department's highly discretionary and arbitrary process for determining when a school has "closed," the definition introduces considerable financial risk to what should be an efficient and flexible use of facilities to meet program demands as they ebb and flow.  An institution may desire to close a facility and reallocate its resources for the overall health of the institution, its faculty, and its students.  But under the Final Rule, such a decision could be extremely costly and even pose an existential threat.  The Department arbitrarily failed to consider these effects on the students of an institution that remains "open" in the conventional sense of the word.

259.    The Department has unlawfully expanded the categories of borrowers who may be entitled to closed school discharge and relieved many borrowers of the requirement to apply for relief.  The Final Rule allows borrowers who withdrew from the school not more than 180 days before closure to receive a full discharge.  On its face, the Final Rule is at odds with the statute, which states that closed school discharges are available only to those students who are "unable to complete the program in which such student is enrolled."  20 U.S.C. § 1087(c)(1).  Further, the

---

[5] Although the Department contended in the July NPRM that "[t]his provision would not automatically apply if, for example, a small institution remains open but ends a program or two but would capture a circumstance where an institution continues only one small program while otherwise ceasing all other enrollment," 87 Fed. Reg. 41,923, given the Secretary's discretion to interpret what constitutes the termination of "most" programming, the risk to small institutions remains substantial.

Final Rule makes no distinction between borrowers who may have left their schools due to circumstances unrelated to the educational programming, *e.g.*, illness, locational preference, change in family situation, job change. Thus, the Final Rule arbitrarily allows discharges even where there is no causal connection between a student's decision to withdraw from school and a school's closure.

260.   The Department stated in its July NPRM that it would seek to recover funds "especially" for "closed school discharges" 87 Fed. Reg. 41,881. Yet, the Final Rule fails to provide any procedural protections for institutions (or their affiliates or principals), 20 U.S.C. § 1087(c)(1), to allow them to present evidence to defend against an application or recoupment. This is unfair and a violation of the due process rights, particularly where the Secretary is empowered to pursue "closed" school discharges against schools that remain open. And for schools that are closed, the taxpayers likely will bear much of the burden of funding the discharge amounts.

261.   The Department also lacks statutory authority to impose closed school BDR liability against affiliated persons. The Final Rule, "in the case of a closed school," allows the Department to pursue BDR recovery for loans disbursed on or after July 1, 2023, from "a person affiliated with the school." 34 C.F.R. § 685.409(a). The term "affiliated person" is described elsewhere in Department regulations and generally hinges on the level of ownership or control a person or entity exercises over the institution (which includes directors and executive officers). *See, e.g.*, 20 U.S.C. §§ 1001, 1002 (limiting the definition of "institutions of higher education" to the institutions themselves); *id.* §§ 1087(c)(1), 1099(c),(e) (differentiating controlling and affiliated persons). Congress has authorized limited recourse against principals and affiliates of a closed school. In Section 437 of Part B, governing FFEL, Congress has provided,

> If a borrower who received, on or after January 1, 1986, a loan made, insured, or guaranteed under this part and the student borrower, or the student on whose behalf a parent borrowed, is unable to complete the program in which such student is enrolled due to the closure of the institution or if such student's eligibility to borrow under this part was falsely certified by the eligible institution or was falsely certified as a result of a crime of identity theft, or if the institution failed to make a refund of loan proceeds which the institution owed to such student's lender, then the Secretary shall discharge the borrower's liability on the loan (including interest and collection fees) by repaying the amount owed on the loan and shall subsequently pursue any claim available to such borrower against the institution and its affiliates and principals or settle the loan obligation pursuant to the financial responsibility authority under subpart 3 of part H. In the case of a discharge based upon a failure to refund, the amount of the discharge shall not exceed that portion of the loan which should have been refunded. The Secretary shall report to the authorizing committees annually as to the dollar amount of loan discharges attributable to failures to make refunds.

20 U.S.C. § 1087(c)(1). If the borrower's loan is discharged pursuant to Section 437(c)(1), the borrower "shall be deemed to have assigned to the United States the right to a loan refund up to the amount discharged against the institution and its affiliates and principals." *Id.* § 1087(c)(2).

262. There is no comparable authority under Part D, the William D. Ford Federal Direct Loan Program. Nonetheless, the Department claims the authority to recover approved BDR discharges from, "in the case of a closed school, a person affiliated with the school as described in § 668.174(b) of this chapter." 34 C.F.R. § 685.409(a)(1). Section 668.174(b) describes affiliated persons as those who individually or with family members exercise substantial control or ownership of the institution, or have liability for violation of a Title IV, HEA requirement, including directors, executive officers, and general partners. 34 C.F.R. § 668.174(b).

263. The Department cannot create BDR liability for controlling or affiliated persons without statutory authority. No such authority can be derived, directly or indirectly, from Section 437(c)(1). Section 437(c)(1) is limited by its terms and does not permit attribution of BDR liability for Direct Loans to controlling persons. It only applies to FFEL loans made under Part B, not Direct Loans under Part D. It authorizes discharges (and recovery against an institution and its

affiliates and principals) only in one of three circumstances: (1) inability to complete the program; (2) false certification by the eligible institution; or (3) false certification because of identity theft. 20 U.S.C. § 1087(c)(1).  And it allows the Secretary to recover any discharge amount by one of two mechanisms. The Secretary "shall subsequently pursue any claim available to such borrower against the institution and its affiliates and principals," which means that the *borrower* must have a claim of legal liability that can be asserted against those persons (and which Section 437(c)(2) has assigned to the Secretary by operation of law).  *Id.* § 1087(c)(1),(2).  Or the Secretary may "settle the loan obligation pursuant to the financial responsibility authority under subpart 3 of part H," *id.* § 1087(c)(1), under which the Secretary may require for specific institutions sufficient cash reserves, third-party guarantees, financial guarantees from controlling persons, or the assumption of personal liability by controlling persons.  *Id.* § 1099c(c), (e).

264.    The Department rationalizes its expansion of liability to individuals on the ground that it would "protect taxpayers as much as possible," 87 Fed. Reg. 65,948, but that does not provide a statutory basis.  Moreover, to the extent the Department's reading of the statute imputes the acts or liabilities of certain individuals to the institutions, or vice versa, those matters should be covered by traditional principles of agency and derivative liability.

265.    The Department's only discussion of its extension of closed-school discharge provisions to Direct Loans is the summary statement in its July NPRM that "[t]he closed school discharge provisions also apply to Direct Loans, under the parallel terms, conditions, and benefits provision in Section 455(a) of the HEA."  87 Fed. Reg. 41,920; 20 U.S.C. § 1087e(a)(1) ("Unless otherwise specified in this part, loans made to borrowers under this part shall have the same terms, conditions, and benefits, and be available in the same amounts, as loans made to borrowers, and first disbursed on June 30, 2010, under Sections 1078, 1078–2, 1078–3, and 1078–8 of this title.").

But the Secretary's rights to recover BDR losses against institutions and affiliated persons are not the "terms, conditions, and benefits" of FFEL "loans made to borrowers." *See id.*

266.     Recovery under the BDR (which is a defense against a Secretary's claim to enforce repayment obligations of a Direct Loan) does not involve a legal "claim *available to such borrower against* the institution and its affiliates and principals." 20 U.S.C. § 1087(c)(1) (emphasis added). A borrower cannot bring a BDR "claim" against an institution or its affiliates and principals. And the alternative enforcement mechanism authorized by Section 437(c)(1) under the financial responsibility regulations would apply to affiliates and principals only of specific schools where such persons have made financial guarantees or assumptions of institutional liabilities pursuant to 20 U.S.C. § 1099c(c), (e). There is no basis for the Department's universal claim that it can seek to recoup institutional BDR liability from any affiliated person who meets the definition in 34 C.F.R. § 668.174(b),(c).

## COUNT ONE
### (BDR Regulations: No Statutory Authority)

267.     Plaintiff repeats and incorporates the preceding paragraphs as though fully set forth herein.

268.     The Final Rule's provisions regarding borrower defenses to repayment are not authorized under the HEA, 20 U.S.C. § 1001 *et seq.*

269.     Those provisions exceed the Department's statutory jurisdiction and authority and do not comport with the terms of the HEA, General Education Provisions Act, the Department of Education Organization Act, or any other identifiable statutory source of authority Congress has conferred upon the Department.  The regulations impermissibly turn a statutory defense into a novel cause of action with a novel adjudicatory process in contravention of the plain meaning of the HEA.

App.141

270.   Specific BDR regulations set forth in the Final Rule—34 C.F.R. §§ 668.75, 668.125, 668.500-501, 685.300(13), and 685.401-409—violate or are unauthorized by statute.

271.   Retroactive application of the Final Rule and the regulations identified above is unauthorized by statute.

272.   Consequently, the Final Rule's provisions concerning borrower defenses to repayment  in excess of statutory authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT TWO
### (BDR Regulations: Arbitrary & Capricious)

273.   Plaintiff repeats and incorporates the preceding paragraphs as though fully set forth herein.

274.   The Department failed to consider the thousands of public comments submitted in response to the July NPRM prior to hastily promulgating the Final Rule.

275.   The Final Rule's provisions regarding borrower defenses to repayment, and specific regulations therein—34 C.F.R. §§ 668.71-75, 668.125, 668.500-501, 685.300(13), and 685.401-409—lack sufficient reasonable basis, reasoned explanation, and consideration of appropriate factors, and do not serve the purposes of the Act.

276.   Consequently, the Final Rule's provisions concerning borrower defenses to repayment are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT THREE
### (BDR Regulations: Constitutional Violations)

277.   Plaintiff repeats and incorporates the preceding paragraphs as though fully set forth herein.

App.142

278.    The Final Rule's provisions regarding borrower defenses to repayment, and specifically the regulations described in 34 C.F.R. § 668.125, 668.300(13), and 685.401-409, violate the Due Process Clause of the U.S. Constitution.

279.    By providing for administrative adjudication of private rights, or of public rights without congressional authorization, the Final Rule and its component regulations violate Article III of the U.S. Constitution and constitutional principles of the separation of powers.

280.    By providing for administrative adjudication of federal and state rights to which a right of jury trial exists, including misrepresentation, contract, and recoupment claims, the Final Rule and its component regulations violate the Seventh Amendment to the U.S. Constitution.

281.    By providing for administrative adjudication of any state law claim, and abrogating requirements or limitations under state law, the Final Rule and its component regulations violate the Tenth Amendment and constitutional principles of federalism.

282.    Consequently, the Final Rule is contrary to constitutional right, power, privilege, or immunity, in violation of 5 U.S.C. § 706(2)(B), and is not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

### COUNT FOUR
### (Arbitration and Class Action Provisions: No Statutory Authority)

283.    Plaintiff repeats and incorporates the preceding paragraphs as though fully set forth herein.

284.    The Final Rule's provisions concerning arbitration and class-action contracts between schools and students are not authorized under the HEA, 20 U.S.C. § 1001 *et seq.*

285.    These provisions exceed the Department's statutory jurisdiction and authority and do not comport with the terms of the HEA.  Among other things, the regulations are not tied to any

App.143

specific grant of authority conferred by the HEA, they conflict with the Federal Arbitration Act, and were not otherwise authorized by Congress.

286.    Consequently, the Final Rule's provisions concerning arbitration and class-action agreements are in excess of statutory authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT FIVE
### (Arbitration and Class Action Provisions: Arbitrary & Capricious)

287.    Plaintiff repeats and incorporates the preceding paragraphs as though fully set forth herein.

288.    The Final Rule's provisions concerning arbitration and class-action contracts between schools and students are arbitrary and capricious.  Among other things, the regulations fail to confront or acknowledge the benefits of individual arbitration to schools and students and fail to consider industry reliance on the terms of private contracts.

289.     Consequently, the Final Rule's provisions concerning arbitration and class-action agreements are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT SIX
### (Arbitration and Class Action Provisions: Constitutional Violation)

290.    Plaintiff repeats and incorporates the preceding paragraphs as though fully set forth herein.

291.    The Final Rule's provisions concerning arbitration and class-action contracts between schools and students violate the Spending Clause of the U.S. Constitution.  Among other things, the regulations wrongly coerce recipients of Title IV funding to agree to a condition not related to the purpose of such funding and not intended by Congress.  *Nat'l Fed'n. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581-82 (2012).

App.144

292.     The Final Rule's provisions concerning arbitration and class-action contracts between schools and students violate the Due Process Clause of the U.S. Constitution by retroactively voiding private contracts.

293.      Consequently, the Final Rule is contrary to constitutional right, power, privilege, or immunity, in violation of 5 U.S.C. § 706(2)(B), and is not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

### COUNT SEVEN
**(Closed School Discharge Provisions: No Statutory Authority)**

294.     Plaintiff repeats and incorporates the preceding paragraphs as though fully set forth herein.

295.     The Final Rule's provisions concerning closed school loan discharges are not authorized under the HEA, 20 U.S.C. § 1001 *et seq*.

296.     These provisions exceed the Department's statutory jurisdiction and authority and do not comport with the terms of the HEA, which do not permit the Department to rewrite unambiguous language nor grant the Secretary discretion to determine when a school has closed or to impose liability upon affiliated persons.  The regulations are not tied to any specific grant of authority conferred by the HEA and were not otherwise authorized by Congress.

297.     Consequently, the Final Rule's provisions concerning closed school loan discharges are in excess of statutory authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

### COUNT EIGHT
**(Closed School Discharge Provisions: Arbitrary & Capricious)**

298.     Plaintiff repeats and incorporates the preceding paragraphs as though fully set forth herein.

App.145

299.    The Final Rule's provisions concerning closed school loan discharges are arbitrary and capricious because, among other reasons, there is no necessary causal connection between a school's closure and harm to an individual borrower.

300.    Consequently, the Final Rule's provisions concerning closed school loan discharges are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT NINE
### (Closed School Discharge Provisions: Constitutional Violation)

301.    Plaintiff repeats and incorporates the preceding paragraphs as though fully set forth herein.

302.    The Final Rule's provisions concerning closed school loan discharges violate the Due Process Clause of the U.S. Constitution because schools inadequate procedural protections for defending against application or recoupment actions, particularly where the Secretary decides what constitutes a school closure.

303.    Consequently, the Final Rule is contrary to constitutional right, power, privilege, or immunity, in violation of 5 U.S.C. § 706(2)(B), and is not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

(a)    Declare the Final Rule unlawful.

(b)    Vacate and set aside the Final Rule.

(c)    Declare that any action taken by Defendants pursuant to the Final Rule is null and void.

App.146

(e)     Enjoin Defendants and their officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the Final Rule.

(f)     Issue all process necessary and appropriate to postpone the effective date of the regulations and to maintain the status quo pending the conclusion of this case.

(g)     Exercise equitable discretion to declare provisions of the Final Rule inseverable in whole or in part to prevent unfair or prejudicial administration of its provisions.

(h)     Award Plaintiff its costs and reasonable attorneys' fees as appropriate.

(i)     Grant such further and other relief as this Court deems just and proper.


Dated: February 28, 2022          Respectfully submitted,

                                  /s/ Allyson B. Baker
                                  Allyson B. Baker (*pro hac* application forthcoming)
                                  Meredith L. Boylan (*pro hac* application forthcoming)
                                  Stephen B. Kinnaird (*pro hac* application forthcoming)
                                  Michael Murray (*pro hac* application forthcoming)
                                  Sameer P. Sheikh (*pro hac* application forthcoming)
                                  PAUL HASTINGS LLP
                                  2050 M Street NW
                                  Washington, DC 20037
                                  allysonbaker@paulhastings.com
                                  (202)-551-1830

                                  /s/ Philip Vickers
                                  Philip Vickers
                                  Texas Bar No. 24051699
                                  pvickers@canteyhanger.com
                                  Katherine Hancock
                                  Texas Bar No. 24106048
                                  khancock@canteyhanger.com
                                  CANTEY HANGER LLP
                                  600 West 6th Street, Suite 300
                                  Fort Worth, TX 76102
                                  (817) 877-2800
                                  (817) 877-2807 – Fax

                                  *Attorneys for Plaintiff*
                                  *Career Colleges & Schools of Texas*

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| CAREER COLLEGES<br>& SCHOOLS OF TEXAS,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>EDUCATION; MIGUEL CARDONA,<br>in his official capacity as the Secretary<br>of Education,<br><br>    Defendants. | CASE NO.:   4:23-cv-00206-P |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff CAREER COLLEGES & SCHOOLS OF TEXAS ("CCST") respectfully moves the Court for a preliminary injunction enjoining the United States Department of Education (the "Department") and Secretary of Education Miguel Cardona (together, the "Defendants") from enforcing, applying, or implementing the November 1, 2022 final rule regarding the Department's administration of student loans under the William D. Ford Federal Direct Loan ("Direct Loan"), the Federal Perkins Loan ("Perkins"), and the Federal Family Education Loan ("FFEL") programs, *see* 87 Fed. Reg. 65,904 (Nov. 1, 2022) (the "Rule"), anywhere within the Department's jurisdiction.

As set forth in the companying memorandum of law in support, CCST is likely to prevail on the merits; CCST and its member schools will suffer irreparable harm absent the requested injunctive relief; and the balance of equities and public interest considerations favor an order of preliminary injunction.

Further, expedited relief is necessary because the Rule is set to take effect on July 1, 2023. *See* 87 Fed. Reg. 65,904.

WHEREFORE, for the reasons set forth in the accompanying brief, CCST respectfully requests that the Court issue a preliminary injunction enjoining the Defendants from enforcing, applying, or implementing the Rule anywhere within the Department's jurisdiction.

Dated: April 5, 2023                    Respectfully submitted,

                                        /s/ Allyson B. Baker
                                        Allyson B. Baker (*pro hac vice*)
                                        Meredith L. Boylan (*pro hac vice*)
                                        Stephen B. Kinnaird (*pro hac vice*)
                                        Michael Murray (*pro hac vice*)
                                        Sameer P. Sheikh (*pro hac vice*)
                                        PAUL HASTINGS LLP
                                        2050 M Street NW
                                        Washington, DC 20037
                                        allysonbaker@paulhastings.com
                                        (202)-551-1830

                                        /s/ Philip Vickers
                                        Philip Vickers
                                        Texas Bar No. 24051699
                                        pvickers@canteyhanger.com
                                        Katherine Hancock
                                        Texas Bar No. 24106048
                                        khancock@canteyhanger.com
                                        CANTEY HANGER LLP
                                        600 West 6th Street, Suite 300
                                        Fort Worth, TX 76102
                                        (817) 877-2800
                                        (817) 877-2807 – Fax

                                        *Attorneys for Plaintiff*
                                        *Career Colleges & Schools of Texas*

Case 4:23-cv-00206-P     Document 23     Filed 04/05/23     Page 3 of 3     PageID 341

**CERTIFICATE OF CONFERENCE**

On April 3, 2023, I conferred by telephone with R. Charlie Merritt, counsel for the Defendants, regarding this Motion and the relief requested herein. Mr. Merritt stated that Defendants oppose this Motion and the relief Plaintiff seeks.

/s/ Michael Murray          
Michael Murray

**CERTIFICATE OF SERVICE**

I certify that on April 5, 2023, a true and correct copy of the foregoing document was served upon all counsel of record in this action via the Court's CM/ECF system.

/s/ Philip Vickers          
Philip Vickers

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| CAREER COLLEGES<br>& SCHOOLS OF TEXAS,<br><br>               Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>EDUCATION; MIGUEL CARDONA,<br>in his official capacity as the Secretary<br>of Education,<br><br>            Defendants. | CASE NO.:   4:23-cv-00206-P |

**PLAINTIFF'S BRIEF IN SUPPORT OF ITS
MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 3

I.   The Department Has Limited Authority to Discharge Student Loan Debt ......................... 3

II.  The Biden Administration Makes Debt Cancellation a Top Priority and Declares Its
     Willingness to Extend or Expand Existing Programs to Accomplish That Goal .............. 4

III. Stripping Away Protections for Schools and Granting Complete Loan Discharges to
     Borrowers, the Department's Rule Prioritizes Debt Forgiveness over Due Process.......... 4

IV.  CCST Brings This Action to Ensure That Its Member Schools Continue to Provide
     a Necessary Pathway to Highly Demanded Skilled Trade Professions in this
     District and Across the State of Texas .............................................................. 7

ARGUMENT ....................................................................................................... 8

I.   CCST is Likely to Prevail on the Merits.............................................................. 8

     A. The Department Lacks the Statutory and Constitutional Authority to  Adjudicate
        Borrower Defense "Claims" or Recoupment Actions Against Schools ......................... 9

     B. The Department's Definitions of Borrower Defenses Are Unlawful. ........................... 15

     C. The Rule's Substantive Presumptions and Full Discharge Requirement Exceed Its
        Statutory Authority, and Violate the APA and the Due Process Clause ....................... 18

     D. The Department's Closed School Discharge Rule Is Unlawful. ................................. 20

II.  CCST and CCST Schools Have Suffered and Are Likely to Suffer Further
     Irreparable Injury, Absent the Requested Injunctive Relief ............................................ 20

     A. Substantial Threat of Injury Is Substantiated by Recent Outcomes,  Including in
        the *Sweet v. Cardona* Litigation .................................................................. 21

     B. CCST and CCST Schools Have Suffered and Will Suffer Harms That Cannot Be
        Undone ................................................................................................. 23

III. The Balance of Harms and Public Interest Weigh in Favor of  Preliminary
     Injunction ............................................................................................... 24

CONCLUSION................................................................................................... 25

CERTIFICATE OF SERVICE ............................................................................... 26

App.154

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
    141 S. Ct. 2485 (2021) ..............................................................................................14

*Allied Home Mortg. Corp. v. Donovan*,
    830 F. Supp. 2d 223 (S.D. Tex. 2011) ........................................................................8

*Atlas Roofing Co. v. Occupational Safety and Health Review Comm'n*,
    430 U.S. 442 (1977) ..................................................................................................11

*Bank One Chicago, N.A. v. Midwest Bank & Trust Co.*,
    516 U.S. 264 (1996) ..................................................................................................11

*Burgess v. FDIC.*,
    No. 7:22-CV-00100-O, 2022 WL 17173893 (N.D. Tex. Nov. 6, 2022) ............22, 25

*Chemical Mfrs Ass'n v. Dep't of Transp.*,
    105 F.3d 702 (D.C. Cir. 1997) ..................................................................................19

*Coit Indep. Joint Venture v. Fed. Sav. and Loan Ins. Corp.*,
    489 U.S. 561 (1989) ..................................................................................................11

*Dennis Melancon, Inc. v. City of New Orleans*,
    703 F.3d 262 (5th Cir. 2012) ....................................................................................21

*Doran v. Salem Inn, Inc.*,
    422 U.S. 922 (1975) ..................................................................................................22

*Equitable Equip. Co. v. Director, Office of Worker's Comp. Programs*,
    191 F.3d 630 (5th Cir. 1999) ....................................................................................11

*Fed. Maritime Comm'n v. S.C. State Ports Auth.*,
    535 U.S. 743 (2002) ..................................................................................................11

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ....................................................................................................7

*Granfinanciera, S.A., v. Nordberg*,
    492 U.S. 33 (1989) ....................................................................................................16

*Irwin v. Dep't of Veterans Affairs*,
    498 U.S. 89 (1990) ....................................................................................................11

*Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*,
   140 S. Ct. 1589 (2020) ................................................................................16

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) ................................................................................20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................................................17

*Murray's Lessee v. Hoboken Land & Improvement Co.*,
   59 U.S. 272 (1855) ..........................................................................11, 13

*National Fuel Gas Supply Corp. v. FERC*,
   811 F.2d 1563 (D.C. Cir. 1987) ................................................................11

*Pendergest-Holt v. Certain Underwriters at Lloyd's of London*,
   600 F.3d 562 (5th Cir. 2010) ......................................................................8

*RLC Indus. Co. v. CIR*,
   58 F.3d 413 (9th Cir. 1995) ....................................................................12

*Stern v. Marshall*,
   564 U.S. 462 (2011) ..........................................................................11, 16

*Sweet v. Cardone*
   495 F. Supp. 3d 835 (N.D. Cal. 2019) ................................................21, 22, 23

*Texas v. EPA*,
   829 F.3d 405 (5th Cir. 2016) ..................................................................8, 23

*Texas v. EPA*,
   No. 3:23-CV-17, 2023 WL 2574591 (S.D. Tex. Mar. 19, 2023) ...........................24

*Tull v. United States*,
   481 U.S. 412 (1987) ................................................................................13

*United States v. Nordic Village, Inc.*,
   503 U.S. 30 (1992) ..........................................................................11, 12

*West Virginia v. Environmental Protection Agency*,
   142 S. Ct. 2587 (2022) ......................................................................11, 14

**Statutes**

5 U.S.C.

   § 705 ....................................................................................................8
   § 706(2)(A) ..........................................................................................16

iv

20 U.S.C.

    § 1087(c)(1) ..............................................................................................13, 20
    § 1087e(h) ......................................................................................1, 3, 9, 15
    § 1221e-3 ..............................................................................................12

28 U.S.C. § 2072 ..............................................................................................19

31 U.S.C. § 3711(f) ..............................................................................................10

Higher Education Act of 1965 .................................................................... *passim*

Institutional Eligibility Under the Higher Education Act of 1965.................................................1

**Regulations**

34 C.F.R.

    § 668.71(a)(1)-(4) ..............................................................................................17
    § 668.71(c) ..............................................................................................4, 17
    § 668.75 ..............................................................................................4, 15, 17
    § 668.125 ..............................................................................................6
    § 668.501 ..............................................................................................15
    § 674.33(g)(1)(ii)(A) ..............................................................................................6
    § 682.402(d)(1)(ii)(A) ..............................................................................................6
    § 685.206(c) (1995) ..............................................................................................10
    § 685.214(a)(2)(i) ..............................................................................................6
    § 685.401 ..............................................................................................5
    § 685.401(a) ..............................................................................................18
    § 685.401(b) ..............................................................................4, 5, 10, 15, 16, 18
    § 685.401(c) ..............................................................................................4, 16
    § 685.401(e) ..............................................................................................6, 18
    § 685.402 ..............................................................................................5
    § 685.402(a) ..............................................................................................5
    § 685.402(b) ..............................................................................................5
    § 685.403 ..............................................................................................5
    § 685.405 ..............................................................................................5
    § 685.406(a) ..............................................................................................10
    § 685.406(b)(2) ..............................................................................................5, 18
    § 685.406(c) ..............................................................................................5
    § 685.407 ..............................................................................................4
    § 685.407(ii) ..............................................................................................16

59 Fed. Reg. 61,664 (Dec. 1, 1994) .................................................................... *passim*

81 Fed. Reg. 75,926 (Nov. 1, 2016)..............................................................................................13

87 Fed. Reg. 65,904 (Nov. 1, 2022)............................................................................. *passim*

**Other Authorities**

Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/closed....................20

U.S. Const. art III..............................................................................................................1, 7, 10, 16

**INTRODUCTION**

In furtherance of the Biden Administration's "debt cancellation" agenda, Defendants the U.S. Department of Education ("the Department") and Secretary Miguel Cardona ("the Secretary") (collectively, "Defendants") have engaged in a breathtaking arrogation of power.

In Section 455(h) of the Higher Education Act ("HEA"), Congress granted the Department a very specific and limited rulemaking power: to "specify in regulations *which acts or omissions* of an institution of higher education a borrower may assert as a defense to repayment" to loans made under the William D. Ford Federal Direct Loan ("Direct Loan") program. 20 U.S.C. § 1087e(h) (emphasis added). From that single sentence, the Department issued a sprawling rule. *See* Institutional Eligibility Under the Higher Education Act of 1965, 87 Fed. Reg. 65,904 (Nov. 1, 2022) (the "Rule").

The Rule converts defenses into affirmative borrower "claims" that are not subject to limitations periods; and proclaims the Department's authority to adjudicate not only borrower claims but also recoupment actions against schools. The Department even declares the power to adjudicate administratively borrower claims that arise under state law, such as breach of contract. These provisions not only exceed the Department's authority but are also unconstitutional. Only Congress can authorize the administrative adjudication of public rights, and (for borrower claims against the Secretary) only Congress can waive sovereign immunity. Moreover, state law claims are not public rights. Accordingly, the Rule violates Article III, the Seventh and Tenth Amendments, and principles of separation of powers and federalism. Not only is there no colorable statutory authority for the Rule, but the "major questions" canon prohibits an agency from claiming extraordinary and constitutionally suspect powers from obscure statutes.

App.159

The Department compounded this overreach by stacking the deck in favor of borrowers and against schools. The Rule's substantive definitions of borrower defenses include unintentional and innocent erroneous representations or omissions—imposing a form of strict liability—even absent any proof of harm to the borrower. The Rule permits claims to be brought on behalf of groups of borrowers (without traditional class action safeguards), and creates the unfounded presumption that the entire class relied upon misrepresentations or were otherwise injured by prohibited institutional acts or omissions—without the need to provide an iota of proof. The Rule declares, without reasoned basis, that a similar presumption would apply to claims against "closed schools", which the Rule expansively defines to include *open* schools that have moved or consolidated campuses to provide improved facilities or meet student demand.

Although reliance and injury is information possessed by the borrower alone, the Rule denies schools discovery or the opportunity to examine evidence or witnesses, which are standard features of administrative adjudication, thus rendering rebuttal of the presumptions practically impossible. And if a borrower defense is proven, the Rule declares that the borrower's *entire student debt* is discharged, without any proof of what financial harm actually resulted from the institutional act or omission, and even though Congress granted the Department no rulemaking authority over discharge amounts.

The Rule's objective is to "streamline" claim approval, without regard to actual proof, statutory or constitutional authority—ultimately leaving schools and taxpayers to foot the bill for the Department's backdoor loan forgiveness program. Given the ease with which total loan forgiveness can now be secured, come July 1, 2023, proprietary schools across the country will find themselves defenseless in the face of a torrent of borrower defense claims.

Even while this litigation is pending, Texas schools suffer consequent injury that cannot be undone. Member schools of Plaintiff Career Colleges and Schools of Texas ("CCST") face an immediate quandary in conforming conduct to the Department's new conflicting strict-liability standards—pursuant to which, inadvertent erroneous representations are grounds for loan discharges, but so are erroneous omissions of fact. CCST and its member schools have been forced to divert extensive resources in order to revamp compliance programs and prepare for a deluge of meritless borrower defense claims that will be adjudicated pursuant to the Rule's strict liability standard and deficient processes; and have been forced to abandon plans to build, expand, or consolidate campuses or facilities in the face of near unlimited liability stemming from the new regulations governing closed schools.

Accordingly, CCST respectfully requests that the Court enter an order of injunctive relief to stay implementation of and enjoin the Department from enforcing the Rule pending adjudication of the merits of a final and permanent injunction. Absent the requested relief, the Rule threatens irreparable harm to schools—including and especially CCST and its member schools—and, by extension, current and future generations of students in this State and across the country.

## BACKGROUND

## I.    The Department Has Limited Authority to Discharge Student Loan Debt

In a minor provision of the HEA, Congress granted the Department a very specific and limited rulemaking power: to "specify in regulations *which acts or omissions* of an institution of higher education a borrower may assert as a defense to repayment of a loan made under" the Direct Loan Program. 20 U.S.C. § 1087e(h) (emphasis added).

II.     **The Biden Administration Makes Debt Cancellation a Top Priority and Declares Its Willingness to Extend or Expand Existing Programs to Accomplish That Goal**

The Biden Administration has made it no secret that one of its top priorities is the cancellation or forgiveness of hundreds of billions of dollars in student borrower debt. *See* CCST Complaint ("Compl.") ¶ 42. Indeed, prior to promulgating the Rule, the administration declared its willingness to pursue these ends by extending or expanding pre-existing programs or regulations, including those that the Rule would subsequently amend. *See id.* ¶ 43 (citing public statements made by administration officials about their intent to "expand[] a handful of programs that were already on the books.").

III.    **Stripping Away Protections for Schools and Granting Complete Loan Discharges to Borrowers, the Department's Rule Prioritizes Debt Forgiveness over Due Process**

The Rule was promulgated with undue haste, and without a proper cost/benefit or budgetary analysis. *See* Compl. ¶¶ 53-56, 233-240.  CCST's Complaint discusses each aspect of the Rule at ¶¶ 57-76, but the following provisions are relevant to this motion.

1.      *Borrower Defenses to Repayment.*  Articulating a new federal standard, the Rule recognizes five grounds on which a borrower defense claim may be brought: (1) "substantial" misrepresentation under the new uniform federal standard; (2) "substantial" omission of fact; (3) breach of contract; (4) aggressive or deceptive recruitment; or (5) a state or federal judgment or final Department action against an institution that could give rise to a borrower defense claim. *See* 34 C.F.R. § 685.401(b)(1)–(5) (Citations to the C.F.R. refer to provisions upon codification of the Rule unless otherwise stated.  *See* 87 Fed. Reg. 66,039-66,073 (setting forth Rule amendments to the C.F.R.)).  If the borrower does not prevail, on reconsideration, borrowers whose loans were disbursed before July 1, 2017 get a second bite at the apple by proving any cause of action they have against the school under state law.  *Id.* §§ 685.401(c), 685.407.  A misrepresentation is deemed substantial if a borrower reasonably relied upon it or "could reasonably be expected to

rely" upon it to his or her detriment. *Id.* § 668.71(c). A substantial omission of fact may be "the concealment, suppression, or *absence* of material information [relating to] [t]he nature of the institution's educational programs, the institution's financial charges, or the employability of the institution's graduates." *Id.* § 668.75 (emphasis added). Because a misrepresentation need not be intentional, knowing, or negligent, 87 Fed. Reg. at 65,921, and any "absence of material information" is actionable, schools face strict liability for erroneous representations or omissions.

2.  *Borrower Claim Adjudication.*   The Rule provides for both individual and group adjudication of borrower defense claims, *id.* §§ 685.402, 685.403, although the Rule authorizes the Department only to specify institutional acts or omissions that can be asserted as defenses, and does not authorize adjudication.  The so-called claims are not subject to a limitation period; they may be filed "at any time," so long as the borrower has a balance due on a direct loan or any loan that may be consolidated into a direct loan. *Id.* § 685.401(b).

The Secretary may initiate a group process upon the Department's own determination, creating a group based on federal or state law enforcement activity, individual claims, and/or lawsuits filed against institutions. *Id.* § 685.402(a), (b). The Rule also permits state government entities and legal assistance organizations to initiate the group claim process. *See* 87 Fed. Reg. at 65,938; 34 C.F.R. § 685.401. For group processes, to avoid adjudication of issues requiring individualized proof, the Department has established a special "rebuttable presumption that the act or omission giving rise to the borrower defense affected each member of the group in deciding to attend, or continue attending, the institution, and that such reliance was reasonable." *Id.* § 685.406(b)(2).  Although the regulations provide for an institutional response to an allegation of wrongdoing, the regulations provide no opportunity for the institution to discover or test evidence

5

proffered by the borrower(s) or to cross-examine any borrower or purported witness. *Id.* §§ 685.405, 685.406(b), (c).

3. *Full Discharge.*  The Rule abolishes the current requirement that a borrower prove financial harm, and fully discharges the borrower's total paid and unpaid debt if a defense is proven, no matter whether that debt was caused by (or even antecedent to) the act or omission. *See* 87 Fed. Reg. 65,946; 34 C.F.R. § 685.401(b) (*Borrower defense to repayment*, (i)-(ii)).

4. *Recoupment Adjudication.*  The Rule establishes a separate and unfair process through which the Department can seek recoupment against schools for loan discharges the Department approved. *See* 34 C.F.R. § 668.125.  The Rule shifts the burden to the school to prove that the defense was improper, but restricts the evidence schools can adduce and fails to provide schools with the opportunity to conduct discovery or examine witnesses. *See* Compl. ¶¶ 215-227.

5. *Closed School Discharge.*  Under the Closed School Discharge provision, students whose schools are deemed to be "closed" either during or shortly after attendance would be eligible to have their loans discharged. 87 Fed. Reg. 65,913. Further, the Department had made clear that it will seek to recover funds from the institutions that are subject to this provision. *Id.*

The Rule affords the Secretary wide discretion in determining the date that the school "closed," which is the earlier of whichever date the Secretary decides is when the school ceased to provide instruction in "most" programs or for "most of its students." 34 C.F.R. §§ 674.33(g)(1)(ii)(A), 682.402(d)(1)(ii)(A), 685.214(a)(2)(i).  To maximize recovery, the Department relieves attendees of closed schools of having to prove the usual burden that they have suffered detriment warranting full relief.  *Id.* § 685.401(e).

App.164

IV.     **CCST Brings This Action to Ensure That Its Member Schools Continue to Provide a Necessary Pathway to Highly Demanded Skilled Trade Professions in this District and Across the State of Texas**

CCST is a trade association whose express mission is to represent and protect the interests of its career education member schools and, more broadly, career education as a whole in Texas. *See* Decl. England ¶8 [App-23]. CCST's membership consists of more than 70 postsecondary schools, institutes, colleges, and universities (collectively, the "CCST Schools"), which reside not only in the Northern District of Texas and the Fort Worth Division, but across the State of Texas. *See id.* ¶6 [App-23]. The majority of CCST Schools, or 54 of the more than 70 schools in its membership, which includes schools in this District and the Fort Worth Division (collectively, the "Fort Worth Schools"), participate in the Direct Loan Program and are thus subject to the Rule. *See id.* ¶19 [App-25]. Moreover, a large number of students and graduates of CCST member schools, especially the Fort Worth Schools, who hold federal student debt and can file borrower defense to repayment claims (regardless of the merits) reside in this District and the Fort Worth Division. *See* Decl. Shaw ¶¶ 9-12 [App-32]; Decl. Arthur ¶¶ 12-13 [App-39].

CCST Schools have trained, and are responsible for training, thousands of students to serve in highly demanded skilled professions, including nurses and medical assistants, welders, HVAC repair technicians, and trucking maintenance and automotive technology specialists. *See* Decl. Shaw ¶6. These are professions that are essential to not only the communities in this District but the State of Texas as a whole. *See* Decl. England ¶ 7 [App-23]. CCST's members are also injured because they are directly regulated and required to conform to unlawful substantive standards; required to submit to unauthorized agency adjudication in violation of constitutional rights; and subject to skewed presumptions and one-sided procedures that will subject them to massive and (for some schools) potentially existential liability. *See* Decl. Jones ¶¶ 20-36 [App-6—11].

CCST is also injured by the rule in its own right. *See* Decl. England ¶¶ 27-37 [App-27—28]. As a trade association, CCST has Article III standing to bring suit on behalf of its member schools because (1) the schools themselves would have standing, (2) the rulemaking at issue is germane to CCST's purpose, and (3) the participation of CCST's individual members is not required because the Rule applies equally to all of them, and all of the challenges brought are legal. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). CCST seeks preliminary injunctive relief to avert irreparable injury from the Defendant's unlawful action and to preserve the status quo ante.

ARGUMENT

A plaintiff is entitled to a preliminary injunction if it is "likely to succeed on the merits," "likely to suffer irreparable harm in the absence of preliminary relief," the "balance of equities tips in [its] favor," and an injunction "is in the public interest." *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 600 F.3d 562, 568-69 (5th Cir. 2010). The same factors govern motions to postpone the effective date of agency action under 5 U.S.C. §705. *See Texas v. EPA*, 829 F.3d 405, 424, 435 (5th Cir. 2016). CCST meets each requirement for preliminary injunctive relief.

## I.    CCST is Likely to Prevail on the Merits

To be entitled to an order of preliminary injunction, a plaintiff neither has to "demonstrate that he is certain to win" nor that he "is entitled to a summary judgment." *Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 227 (S.D. Tex. 2011) (citing *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 595-96 (5th Cir. 1974)). Rather, "[i]t will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult[,] and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.*

8

App.166

In evaluating the likely success on the merits, "the court considers the 'standards provided by the substantive law.'" *Id.* (quoting *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011)).

A.  The Department Lacks the Statutory and Constitutional Authority to Adjudicate Borrower Defense "Claims" or Recoupment Actions Against Schools.

Section 455(h) of the HEA provides, in pertinent part, that:

> the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan . . . except that in no event may a borrower recover from the Secretary, in any action arising from or relating to a loan made under [the Direct Loan Program], an amount in excess of the amount such borrower has repaid on such loan.

20 U.S.C. § 1087e(h).

i.    *Section 455(h) Does Not Authorize The Secretary to Define Borrower Defense "Claims" Against The Government.*

Section 455(h) is limited in scope and plain in meaning.  The Secretary is directed to promulgate regulations to identify "acts or omissions" of schools "a borrower may *assert as a defense* to repayment of a loan."  20 U.S.C. § 1087e(h) (emphasis added).  Because defendants assert defenses, Section 455(h) contemplates that the Secretary's regulations shall specify defenses that a borrower would assert when defending an action for repayment.  This is confirmed in the next clause, which addresses circumstances when a defense would entitle the borrower to recover money already paid: "in no event may a borrower recover from the Secretary, in any *action* arising from or relating to a loan made under this part, an amount in excess of the amount such borrower has repaid on such loan."  *Id.* (emphasis added).  An action is a judicial proceeding.  *See* Legal Information Institute, Wex, "action," https://www.law.cornell.edu/wex/action (June 2022).

It is apparent from its face that this provision enables the Department to specify *defenses* to repayment that a borrower may assert in collection actions, and not to invent *affirmative* claims. Indeed, the Department so interpreted Section 455(h), shortly after its enactment in 1994.  The

App.167

Department declared that, if the Secretary or other authorized person brings "an action" for repayment, the borrower "may assert as a defense" an institutional act or omission specified in Department regulations.  59 Fed. Reg. 61,664, 61,696 (Dec. 1, 1994).  Such a "defense" would be asserted in existing collection proceedings: "*In any proceeding to collect on a Direct Loan,* the borrower may assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." 34 C.F.R. § 685.206(c) (1995) (emphasis added).  The Department commented that "the regulations identify *formal proceedings* in which borrowers may raise the acts or omissions of the school as a defense against collection of the loan," 59 Fed. Reg. at 61,671 (emphasis added), which would include "(i) Tax refund offset proceedings under 34 CFR 30.33"; "(ii) Wage garnishment proceedings under Section 488A of the Act"; "(iii) Salary offset proceedings for Federal employees under 34 CFR Part 31"; and "(iv) Credit bureau reporting proceedings under 31 U.S.C. § 3711(f)."  *Id.* at 61,696.

The Rule, by contrast, prescribes an elaborate system for the adjudication of "borrower defense claim[s]," *see* 34 C.F.R. § 685.406(a), and indeed allows such claims to be brought and decided "at any time" (without any limitation period), *id.* § 685.401(b).  The Department's action exceeds its statutory authority.

<ul>
<li>ii.    <u>Congress Did Not Authorize The Secretary To Adjudicate Borrower Defense Claims.</u></li>
</ul>

Not only does the Rule depart from the statutory text by converting borrower defenses into affirmative claims, but it also improperly fashions out of whole cloth adjudicatory processes designed to implement a policy of massive loan forgiveness and shift liability to institutions.  Even if Section 455(h) authorized the creation of oxymoronic borrower defense "claims," nothing in the statute authorizes the Department to adjudicate such claims.

The judicial power of the United States is vested in Article III courts, U.S. Const. art III, but Congress may assign to administrative tribunals the adjudication of "public rights": namely, "cases in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert Government agency is deemed essential to a limited regulatory objective within the agency's authority." *Stern v. Marshall*, 564 U.S. 462, 490 (2011).  But this prerogative belongs to Congress alone:   "[C]ongress may or may not bring [public rights] within the cognizance of the courts of the United States, as it may deem proper." *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1855); *Atlas Roofing Co. v. Occupational Safety and Health Review Comm'n*, 430 U.S. 442, 452, 460–61 (1977).

"Agencies have only those powers given to them by Congress," *West Virginia v. Environmental Protection Agency*, 142 S. Ct. 2587, 2609 (2022), and Congress must *explicitly* grant the power of adjudication to agencies, *National Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563, 1569 (D.C. Cir. 1987).  Courts have repeatedly denied agencies adjudicatory powers that were not expressly conferred by Congress.  *See*, *e.g.*, *Bank One Chicago, N.A. v. Midwest Bank & Trust Co.*, 516 U.S. 264, 273-75 (1996); *Coit Indep. Joint Venture v. Fed. Sav. and Loan Ins. Corp.*, 489 U.S. 561, 572-74 (1989); *Equitable Equip. Co. v. Director, Office of Worker's Comp. Programs,* 191 F.3d 630, 632-33 (5th Cir. 1999).

Moreover, the Rule purports to authorize administrative adjudication of claims for financial relief against the Government.  *See* 87 Fed. Reg. at 65,910 (borrower defense claims assert rights against government, not schools), *id.* at 65,941, 65,945.  Because such claims require a waiver of sovereign immunity, congressional authorization must be not only express but unequivocal.  Sovereign immunity applies to administrative adjudication, *Fed. Maritime Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760-61 (2002), and Congress must "'unequivocally express[]'" its

11

App.169

intention to waive sovereign immunity in the statutory text. *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33-34, 37 (1992) (quoting *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95 (1990)). "A waiver of sovereign immunity cannot be implied." *Irwin*, 498 U.S. at 95. The Government's consent to be sued "must be construed strictly in favor of the sovereign, and not enlarged beyond what the language requires." *Nordic Village*, 503 U.S. at 34 (internal quotation marks, brackets, and ellipsis omitted).

There is no express, much less unequivocal, statutory authorization of borrower defense claims against the Government. Section 455(h) gives the Department rulemaking power *to define* borrower defenses based on institutional acts and omissions; it grants no power to *adjudicate* borrower defenses, much less claims. The power to make rules does not subsume the power to adjudicate violation of those rules. *See RLC Indus. Co. v. CIR*, 58 F.3d 413, 417-18 (9th Cir. 1995).

The Department claims the authority to adjudicate because Congress has granted it rulemaking authority to "carry out functions otherwise vested in the Secretary," 20 U.S.C. § 1221e-3, and to "manage the functions of the Secretary or the Department," *id.* § 3474. *See* 87 Fed. Reg. at 65,910. Generalized rulemaking grants do not constitute the express authorization required for public-rights adjudications, much less waivers of sovereign immunity. Regardless, those provisions are inapplicable because Congress did not vest the Secretary with the "functions" of adjudicating borrower defenses to repayment. The adjudication of borrower defense claims is beyond the Department's statutory authority and violates the separation of powers.

     *iii.*       *Section 455(h) Does Not Authorize The Secretary To Adjudicate Recoupment Actions Against Schools.*

For all the same reasons, the statutes cited by the Department (Section 455(h) and the general rulemaking grants) do not authorize the adjudication of recoupment actions against schools after a borrower defense claim has been granted.

The Department dismissed challenges to its statutory authority on the grounds that "Sec[tion] 454(a)(3) of the HEA provides that an institution must accept responsibility and financial liability stemming from its failure to perform the functions set forth in its PPA [Program Participation Agreement]—the signed document required for participating in the Federal financial aid programs through which the institution and other relevant parties agree to abide by the rules and requirements governing the programs."  87 Fed. Reg. at 65,948 (citing 20 U.S.C. § 1087d (a)(3)).  But that provision does not address how financial liability should be adjudicated, whether by the courts or the Department.

Section 454(a)(3) stands in stark contrast to other parts of the HEA, which do provide the Department such authority.  *See, e.g.*, 20 U.S.C. § 1087(c)(1) (in cases of false certification, closed schools, and lender refunds, granting Secretary specific authority to "subsequently pursue any claim available to such borrower against the institution").  Thus, even if recoupment were *arguendo* a public right, it is not one that Congress has assigned to the agency to adjudicate rather than the courts.  Section 454(a)(3) does not by itself connect an institution's "responsibility and financial liability" to the Department's discharge of loans related to borrower defense and it would be odd to infer it did so in light of specific statutory grant of such authority elsewhere in the HEA.

Furthermore, the Department has acknowledged that any recoupment right "arises not by virtue of any statutory requirement, but under common law."  Student Assistance General Provisions, 81 Fed. Reg. 75,926, 75,929 (Nov. 1, 2016).  Congress could not have granted the Department the power to adjudicate recoupment actions even if it wanted to, for it cannot "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law …."  *Murray's Lessee*, 59 U.S. at 284. Indeed, the Seventh Amendment provides

App.171

that "the right of trial by jury shall be preserved . . ." in actions for monetary recovery at common law. *Tull v. United States*, 481 U.S. 412, 417 (1987)

> iv.    *The Major Questions Canon Militates Against Finding Statutory Authority For The Rule.*

Not only is there no textual hook for the Department's novel adjudicatory and liability-shifting scheme, but one would not expect Congress to grant such far-reaching authority on such a slender statutory basis.  As the U.S. Supreme Court recently admonished in *West Virginia v. EPA*, 142 S. Ct. at 2608, the fundamental inquiry into agency authority is "whether Congress in fact meant to confer the power the agency has asserted."  Under the major questions doctrine, an act of vast "economic and political significance" must be viewed in light of the "history and the breadth of the authority . . . asserted."  *Id.* Delegations of extraordinary powers should not be readily gleaned from "ancillary" and "rarely used" statutory provisions. *Id.* at 2610-11.

Section 455(h) is a minor provision of the HEA that, in its first two decades of existence, had rarely been invoked.  87 Fed. Reg. at 65,979 ("[T]he [borrower defense] process . . . was rarely used prior to 2015.").  The Department cannot refashion its modest authority to define borrower defenses into a wellspring of power to achieve massive loan forgiveness, a controversial maneuver that may impose billions of dollars of burden on the public fisc and existential liability on post-secondary schools that are vital to the country's economic future.  *See Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (holding that an economic impact of $50 billion had vast significance).

As the Department recognized when it disavowed the power to cancel loan debt e*n masse*, "Congress does not impliedly delegate a policy decision of massive economic and political magnitude – as blanket or mass cancellation, compromise, discharge, or forgiveness of student loan principal balances, or the material modification of the repayment terms or amounts thereof,

14

App.172

surely would be – to an administrative agency."  U.S. Department of Education, Office of the General Counsel, Memorandum to the Secretary Re: Student Loan Principal Balance Cancellation, Compromise, Discharge, and Forgiveness Authority, at 2 (Jan. 12, 2021).  So too Congress did not delegate in obscure fashion the broad debt-cancellation and liability-shifting powers exercised in the Rule.

   B.  The Department's Definitions of Borrower Defenses Are Unlawful.

      Section 455(h) commands that the Secretary "specify in regulations *which acts or omissions* of an institution of higher education" can be asserted as a defense. 20 U.S.C. § 1087e(h) (emphasis added). This requires the Department to define actual acts or omissions with enough specificity so that regulated parties can conform their conduct accordingly.

      The Department's definitions of substantive borrower defenses do not comply with that mandate.  First, the Department creates a novel defense of "[a]ggressive and deceptive recruitment tactics or conduct," but the Rule does not define that term, instead listing six non-exclusive examples and arrogating to the Department the discretion to determine, on a case-by-case basis, what qualifies as "aggressive." 34. C.F.R. § 668.501.

      Second, the Department creates a freestanding defense for *any* omission of a fact that a reasonable person merely "would have considered … in making a decision to enroll or continue attendance," *id.* § 668.75, but that open-ended rule falls short of specifying "which … omissions" relieve the borrower of his loan obligations.  20 U.S.C. § 1087e(h).  Third, the Department recognizes as a "borrower defense" a "favorable judgment" against an institution "based on State or federal law", or any Departmental sanction or adverse action, "based on the institution's acts or omissions" that could otherwise give rise to a borrower defense claim under the new federal standard. 34 C.F.R. § 685.401(b)(5)(i)-(ii). But judgments and Departmental sanctions and adverse actions are not acts or omissions of institutions; the Department has thus abdicated its duty to

15

App.173

specify the acts or omissions and has failed to analyze why such acts justify relief, which is the expert decision that Congress delegated to the Secretary. These latter provisions are arbitrary and capricious end-runs around the rules of claim preclusion—which bar additional recovery on the claims embodied in the judgment, *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1594–95 (2020)—and issue preclusion.

In addition, the Department cannot arrogate to itself the power to adjudicate and enforce state law, such as breach of contract, 34 C.F.R. § 685.401(b)(3); state law underlying judgments, *id.* § 685.401(b)(5); and "any applicable State law standard," which borrowers may raise on reconsideration if their federal claims fail, *id.* § 685.407(ii), "without regard to any State statute of limitations," *id.* § 685.401(c). Because breach-of-contract and many other state claims are not public rights susceptible of administrative adjudication, and litigants have a right to a jury trial of such claims in federal court, the Department's rule violates Article III and the Seventh Amendment. *See, e.g.*, *Stern*, 564 U.S. at 490–91(finding that that a State law counterclaim was not a public right); *Granfinanciera, S.A., v. Nordberg*, 492 U.S. 33, 51-52 (1989) ("[Congress] lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury.").

The Department violates the Tenth Amendment and principles of federalism by pre-empting or modifying state law rights without congressional authorization. The Department has no warrant to nullify state limitations periods. And in fashioning monetary relief for contract breaches that can eventually be recouped from schools, the Department is impermissibly abrogating state damages laws by awarding a form of consequential damages to borrowers who have shown no causal connection to a breach, or established their efforts to mitigate or avoid such damages. *See, e.g.*, Restatement (Second) of Contract §§ 344-351 (1981).

16

App.174

Finally, the Rule's "misrepresentation" and "omission" defenses are arbitrary and capricious under the APA. *See* 5 U.S.C. § 706(2)(A). A federal agency has a duty to reach substantively reasonable conclusions based on the record before it and to explain its reasoning. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Department failed to do that here.

The Department imposes a strict-liability standard for misrepresentation and omissions of fact, with no requirement to prove intent to deceive or indeed any form of culpability (such as negligence). *See* 34 C.F.R. §§ 668.71(c), 668.75; *see* Compl. ¶¶ 91, 97-99. Because a loan that is discharged will presumptively trigger liability against the school, this standard dramatically increases the risk that a school will be subject to enormous liability based on innocent misstatements or omissions made by its employees or contractors. Furthermore, the Department uses its new misrepresentation standard not only to grant relief to injured borrowers, but to fine schools and revoke, restrict, or deny their participation in the federal student loan program even without proof of borrower detriment. 34 C.F.R. § 668.71(a)(1)-(4).

The Department's first rationale for eliminating this requirement is that "[r]equiring intent would place too great a burden on an individual borrower." 87 Fed. Reg. at 65,921. But that burden—which plaintiffs in any fraud action must bear—does not outweigh the potentially substantial liabilities faced by schools as a result, nor the consequences for students, employees, and communities that such liabilities would cause. Second, the Department notes that "if the action resulted in detriment to the borrower that warrants relief, the Department does not believe whether it was taken with knowledge or intent should be relevant." *Id.* But that justification does not withstand scrutiny because the Department will presume the existence and causation of detriment without proof in two of the most common circumstances in which is relief is likely to be granted

(group and closed-school claims). *See* 34 C.F.R. §§ 401(b), 685.401(e). It is arbitrary and capricious to sanction a school for innocent and unintentional misstatements or omissions of fact, especially without any proof anyone actually relied upon them or was injured thereby.

C. The Rule's Substantive Presumptions and Full Discharge Requirement Exceed Its Statutory Authority, and Violate the APA and the Due Process Clause

The Department has recognized that a "borrower defense to repayment" requires an act or omission of a school relating to enrollment or borrowing "that caused the borrower detriment." 34 C.F.R. § 685.401(a). Even though injury is the crux of any section 455(h) defense, the Department has created unwarranted evidentiary presumptions of injury to favor borrowers. First, for any group claim "for which the Department official determines that there may be a borrower defense under § 685.401(b), there is a rebuttable presumption that the act or omission giving rise to the borrower defense affected each member of the group in deciding to attend, or continue attending, the institution, and that such reliance was reasonable." *Id.* § 685.406(b)(2). Second, "[f]or borrowers who attended a closed school shown to have committed actionable acts or omissions that caused the borrower detriment, there will be a rebuttable presumption that the detriment suffered warrants relief under this section." *Id.* § 685.401(e).

These presumptions—coupled with the rule that a borrower who establishes a defense receives a full discharge of all his debt, even if not antecedent to or connected to the violation, 34 C.F.R. § 685. 401(a) (Subsections (i)-(ii))—reveal that the Department's purpose is maximum loan forgiveness, not rational administration of borrower defenses.

The Department has no statutory authority to create either presumptions or discharge amounts. The Department's limited rulemaking authority under Section 455(h) extends only to specifying institutional acts or omissions that can serve as borrower defenses to loan repayment, not defining how defenses or discharge amounts may be proven.

App.176

Furthermore, even if such authority exists, it is arbitrary and capricious for an agency to create rebuttable presumptions where there is no rational nexus between proven and presumed facts (*i.e.*, where proof of one fact does not render so probable the existence of a second fact that it is unnecessary to prove it). *See, e.g.*, *Chemical Mfrs Ass'n v. Dep't of Transp.*, 105 F.3d 702, 703-05 (D.C. Cir. 1997).

Under the group-claim presumption, a presumption of detriment warranting relief arises simply if the Department official finds that an act or omission occurred. Proof of an act or omission does not logically mean that any borrower was detrimentally affected by it, much less that all borrowers were. Nor is it logical to presume that the detriment warrants total forgiveness of debt and reimbursement of past payments. Furthermore, it is arbitrary and capricious, and contrary to due process, for the application of a certain procedure to affect substantial rights. *See, e.g.*, 28 U.S.C. § 2072 (Federal Rules Enabling Act providing that procedural rules, including class action rules, "shall not abridge, enlarge or modify any substantive right"). The fact that a particular borrower's claim is adjudicated in a group rather than an individual proceeding should not affect the outcome or reduce the proof required.

It is also arbitrary and capricious to apply a special presumption when the borrower attended a school that is now closed (which can happen for innumerable reasons). The presumptions purport to be rebuttable, but the Rule includes no provision for a school to secure the evidence necessary to rebut the presumption. Information concerning a borrower's reliance and injury are fully within the possession and control of the borrower, but in neither the borrower defense nor recoupment process does the Rule permit discovery from, or witness examination of, borrowers. Given the high private stakes (including potential existential liability for schools), the high risk of error from slanted procedures, and the value of traditional administrative-adjudication

19

App.177

safeguards like discovery and trial, the Rule violates due process. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

    D.   The Department's Closed School Discharge Rule Is Unlawful.

       The challenged regulations unduly expand the definition of a "closed school" in order to allow more borrowers to discharge their loans on that basis. Under the new regulation, the Department can decide that a school has closed when it stops providing instruction in "most" programs, "as determined by the Secretary," or "when the school ha[s] ceased to provide educational instruction for most of its students." 87 Fed. Reg. at 65,966. This goes beyond the Department's authority under the HEA, which contemplates discharge of a loan when a student "is unable to complete the program in which such student is enrolled due to the closure of the institution." 20 USC § 1087(c)(1).

       The plain meaning of "closed" is "not open." *See Closed*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/closed. A school that closes a part of its campus, downsizes a department or program, or reduces its enrollment size, has not "closed" in the plain sense of the word. Yet the Rule establishes amorphous criteria to provide the Department with broad discretion to decide that a school has "closed" and that its current and recent students' loans should be completely discharged, which then places liability on the school or its affiliates for that amount. This stretches the plain text of the statute beyond its reasonable limits.

**II.    CCST and CCST Schools Have Suffered and Are Likely to Suffer Further Irreparable Injury, Absent the Requested Injunctive Relief**

       CCST, CCST Schools, and schools across the country participating in the Direct Loan Program have suffered and will continue to suffer a cognizable injury, unless and until an order of injunctive relief is granted. Further, there is a substantial threat of significant irreparable injury

upon the impending effective date if the injunctive relief is not granted.  Accordingly, CCST satisfies the injury prong of the preliminary injunctive analysis.

"[W]hen the threatened harm is more than de minimis, it is not so much the magnitude but the *irreparability* that counts for purposes of a preliminary injunction. It is thus well-established that an injury is irreparable only if it cannot be undone through monetary remedies." *Dennis Melancon*, *Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012). Here, the financial harms that CCST and CCST Schools have suffered and will suffer cannot be remedied upon CCST prevailing on the merits of its case.

A. Substantial Threat of Injury Is Substantiated by Recent Outcomes, Including in the *Sweet v. Cardona* Litigation

Upon the July 1, 2023 effective date, there is a substantial threat of immediate injury to CCST Schools that places their viability in question. As earlier discussed, the Rule's borrower-friendly standard and adjudication process are almost certain to result in schools in Texas and across the country being suddenly inundated by tens of thousands of borrower defense claims that will be subject to a rubber-stamp process that presumes liability, provides schools with no notice, permits tag-along claims, and incentivizes borrowers with the prospect of large dollar loan discharges without risk or downside to submitting a claim.

Indeed, this phenomenon has occurred before, most recently in *Sweet. v. Cardona* (previously, *Sweet v. DeVos*), 495 F. Supp. 3d 835 (N.D. Cal. 2019) ("*Sweet*"). In *Sweet*, the Department entered into an orchestrated, proposed settlement, the terms of which included complete federal loan discharges and refunds of amounts paid for plaintiffs and any borrower who attended for-profit institutions on a specified list of schools. *See id.*  The mere prospect of complete loan discharges for graduates of the specified schools led to a torrent of borrower defense applications. In response to Judge Alsup's inquiry, the Department informed the N.D. Cal. court

that, in the weeks following the settlement agreement's execution, *"250,000 [borrower defense] applications"* had been submitted *"from approximately 206,000 borrowers who attended approximately 4,000 schools*." *Sweet*, Response to Court's Inquiry Concerning Number of Post-Class Applicants, 3:19-cv-03674 (N.D. Cal Feb. 16, 2023), ECF No.380 (emphasis added), [App-47].

There is substantial reason to believe the outcome will be the same following the July 1 effective date. Indeed, there is no "specified list of schools" in the Rule, and thus the number of applications submitted is likely to be several times larger. The financial and reputational harm that will result from schools having to defend against a deluge of borrower defense claims—while being subject to an adjudicatory process that imposes a strict-liability standard, and deprives schools of due process protections and appeal rights—will be immediate and irreparable, and cannot be undone. In fact, for smaller schools, including those that make up CCST's membership, the harm described poses an existential threat. *See* Decl. Jones ¶¶ 34 [App-10];  *see also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) (concluding that threat of bankruptcy was "[c]ertainly" enough to demonstrate irreparable harm and warrant a preliminary injunction).

Regardless, the harms of infringing on participating schools' constitutional rights are irreparable per se. "[T]hat a violation of a constitutional right in and of itself constitutes irreparable injury has been universally recognized and is not open to debate." *Burgess v. FDIC.*, No. 7:22-CV-00100-O, 2022 WL 17173893, at *11 (N.D. Tex. Nov. 6, 2022). This includes the likely deprivation of a participating school's Seventh Amendment right to a jury. *See id*. ("Since the Court has determined that Plaintiff was entitled under the Seventh Amendment to a jury trial, the irreparable injury requirement is automatically satisfied without the need to consider Plaintiff's particular showings of irreparable harm."). As shown by the deluge of filings after the *Sweet*

settlement, the probability is significant that at least some CCST member schools will be subject to unconstitutional recoupment proceedings. This alone constitutes irreparable injury.

B. CCST and CCST Schools Have Suffered and Will Suffer Harms That Cannot Be Undone

The Fifth Circuit has held that "complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d at 433 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and in the judgment)). Here, CCST and CCST Schools continue to undertake significant efforts and investment of resources toward complying with the impending Rule. *See* Decl. England ¶¶ 21, 30 [App-25, 27]; Decl. Shaw ¶ 20 [App-33]; Decl. Arthur ¶¶ 16-20 [App-39—41].

In advance of the July 1, 2023 effective date, CCST Schools will necessarily expend substantial time and financial resources into undertaking efforts to conform their conduct, recordkeeping activity, and compliance efforts, and abandoning longstanding business plans to build new and upgrade or consolidate existing schools, all in an effort to mitigate the risk of reputational injury, substantial financial liability, and exclusion from (or restriction upon) participation in the federal student loan programs, based on the new standard and processes set forth under the Rule. *See* Decl. Jones ¶ 8 [App-4]; Decl. Arthur ¶¶ 16-20 [App-39—41]. These are not harms that can be remedied upon prevailing on the merits of the case.

On account of the Rule's amorphous criteria for what constitutes a "closed school", CCST Schools have been forced to abandon plans to build new campuses, transition students away from older facilities and to new and improved, or otherwise consolidate campuses in order to expand educational offerings or otherwise improve student experiences. *See* Decl. Arthur ¶¶ 22-26 [App-41—42]. Indeed, there is legitimate concern that the Department would invoke its broad discretion to determine that the school "closure" criteria are met, thus resulting in complete loan discharges

App.181

for borrowers and recoupment against schools. *See* Decl. Jones ¶¶ 30-34 [App-9—10]. The effect of these forced business actions is lost business opportunity in addition to loss of time and investment made. *See id.* These are not harms that can be remedied by CCST's prevailing on the merits of its case.

Finally, CCST itself is being forced to divert substantial time and resources away from existing advocacy and educational programs and toward assisting CCST Schools with necessary compliance initiatives, including but not limited to extensive data preservation and recordkeeping and organization efforts, given the effect of the Rule's newly imposed requirements. *See* Decl. England ¶¶ 27-32 [App-27—28]. The demand for time and further financial resources will only increase as the effective date draws near. Accordingly, CCST has satisfied the injury prong of the preliminary injunction analysis.

III.    **The Balance of Harms and Public Interest Weigh in Favor of Preliminary Injunction**

"'Once an applicant satisfies the first two factors,' the equities and public-interest factors 'merge when the Government is the opposing party.'" *Texas v. EPA*, No. 3:23-CV-17, 2023 WL 2574591, at *11 (S.D. Tex. Mar. 19, 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). The balance of harms and the public interest favor a preliminary injunction.

Schools subject to the new regulations will be—and have been—significantly harmed through the compliance costs needed to anticipate and comply with the regulations' new substantive requirements. In addition, to the extent the Department adjudicates borrower-defense claims and recoupments against schools before this action is finally adjudicated, the potential liability could be substantial and, for many schools, existential. Schools will be forced to close, end programs, lay off employees, or increase tuition as a result, causing irreparable harm. Allowing the Department to implement the new regulations, only to have them vacated after a final

adjudication, would also cause significant disruption to regulated entities, borrowers, and other parties affected by them. Commencing discharge and recoupment proceedings that are later invalidated would only waste borrower, school, and government resources.

By contrast, delaying the implementation of the new regulations would not harm the Defendants. Regardless, "[a]s to the public interest, '[a]n injunction does not disserve the public interest when it prevents constitutional deprivations.'" *Burgess*, 2022 WL 17173893, at \*12 (quoting *U.S. Navy SEALs 1-26 v. Biden*, 578 F. Supp. 3d 822, 840 (N.D. Tex. 2022)). The deprivation of participating schools' constitutional rights is therefore dispositive of this factor.

## CONCLUSION

For these reasons and those set forth in the Complaint, CCST respectfully requests an order of preliminary injunction delaying implementation of the Rule prior to its July 1, 2023 effective date and otherwise enjoining Defendants from implementing or enforcing any provision of the Rule, or adjudicating any borrower defense to repayment claims pursuant to the standard and processes prescribed under the Rule, anywhere within the jurisdiction of the Department, until this action is resolved.

App.183

Dated:  April 5, 2023

/s/ Allyson B. Baker
Allyson B. Baker (*pro hac vice*)
Meredith L. Boylan (*pro hac vice*)
Stephen B. Kinnaird (*pro hac vice*)
Michael Murray (*pro hac vice*)
Sameer P. Sheikh (*pro hac vice*)
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20037
allysonbaker@paulhastings.com
(202)-551-1830

/s/ Philip Vickers
Philip Vickers
Texas Bar No. 24051699
pvickers@canteyhanger.com
Katherine Hancock
Texas Bar No. 24106048
khancock@canteyhanger.com
CANTEY HANGER LLP
600 West 6th Street, Suite 300
Fort Worth, TX 76102
(817) 877-2800
(817) 877-2807 – Fax

## CERTIFICATE OF SERVICE

I certify that on April 5, 2023, a true and correct copy of the foregoing document was served upon all counsel of record in this action via the Court's CM/ECF system.

/s/ Philip Vickers
Philip Vickers

App.184

# EXHIBIT 8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

CAREER COLLEGES
& SCHOOLS OF TEXAS,

                Plaintiff,

v.

UNITED STATES DEPARTMENT OF
EDUCATION; MIGUEL CARDONA,
in his official capacity as the Secretary
of Education,

                Defendants.

CASE NO.:   4:23-cv-00206-P

**APPENDIX IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

| Description | Appendix Page Number |
|---|---|
| Expert Declaration of Diane Auer Jones | App-1 |
| CV of Expert Diane Auer Jones | App-15 |
| Declaration of Nikki England | App-22 |
| Declaration of Scott Shaw | App-30 |
| Declaration of Jeff Arthur | App-37 |
| Department's Response to Court's Inquiry Concerning Number of Post-Class Applicants in *Sweet v. Cardona*. | App-47 |

Dated: April 5, 2023                    Respectfully submitted,

                                        /s Allyson B. Baker
                                        Allyson B. Baker (*pro hac vice*)
                                        Meredith L. Boylan  (*pro hac vice*)
                                        Stephen B. Kinnaird  (*pro hac vice*)
                                        Michael Murray  (*pro hac vice*)
                                        Sameer P. Sheikh  (*pro hac vice*)
                                        PAUL HASTINGS LLP
                                        2050 M Street NW
                                        Washington, DC 20037
                                        allysonbaker@paulhastings.com
                                        (202)-551-1830


                                        Philip Vickers
                                        Texas Bar No. 24051699
                                        pvickers@canteyhanger.com
                                        Katherine Hancock
                                        Texas Bar No. 24106048
                                        khancock@canteyhanger.com
                                        CANTEY HANGER LLP
                                        600 West 6th Street, Suite 300
                                        Fort Worth, TX 76102
                                        (817) 877-2800

                                        *Attorneys for Plaintiff*
                                        *Career Colleges & Schools of Texas*


### CERTIFICATE OF SERVICE

I certify that on April 5, 2023, a true and correct copy of this Appendix was served upon all counsel of record in this action via the Court's CM/ECF system.


                                        /s/ Philip Vickers
                                        Philip Vickers

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

CAREER COLLEGES
& SCHOOLS OF TEXAS,

             Plaintiff,

v.

UNITED STATES DEPARTMENT OF
EDUCATION; MIGUEL CARDONA,
in his official capacity as the Secretary
of Education,

             Defendants.

CASE NO.:   4:23-cv-00206-P

**EXPERT DECLARATION OF DIANE AUER JONES
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## I.     INTRODUCTION

1.      My name is Diane Auer Jones.

2.      I was retained by counsel for Plaintiff Career Education Colleges & Schools of
Texas ("CCST") to offer my expert opinion based on my 30-year career in higher education and
public policy, including as Assistant Secretary for Postsecondary Education during the George
W. Bush Administration, and Principal Deputy Under Secretary (delegated the Duties of Under
Secretary) of Education during the Donald J. Trump Administration.

3.       In this Declaration, I offer my expert opinion in connection with CCST's motion
for a preliminary injunction to enjoin the United States Department of Education ("Department")
from implementing its November 1, 2022 final rule regarding the Department's administration of
student loans under the William D. Ford Federal Direct Loan ("Direct Loan"), the Federal
Perkins Loan ("Perkins"), and the Federal Family Education Loan ("FFEL") programs. *See* 87
Fed. Reg. 65,904 (Nov. 1, 2022) (the "New Rule").

4.      As detailed below, it is my opinion that the Department's New Rule imposes a
standard and process that prejudices schools and was designed to ensure that borrower defense
claims, regardless of their legitimacy, will be approved. The New Rule, which takes effect on
July 1, 2023, threatens substantial financial and reputational harm to not only proprietary
schools, including those that make up CCST's membership, but also the countless students they
prepare for direct entry into jobs or professions that meet the needs of the local economy and for
which there is a critical need throughout the country.  Conversely, given that the regulations
already in place afford both schools and students necessary protections that do not exist under
the New Rule, there will be no harm to the Department by delaying implementation of the New
Rule. By the same token, delaying implementation of the New Rule would prevent unnecessary
and significant harm to schools and students that cannot be reversed. For example, once the

Department forgives a student loan under the New Rule's standard and process, that decision that cannot be reversed. There is no way to undo the harm that would have already been inflicted upon schools and taxpayers.

5.      The opinion presented reflects my personal knowledge and familiarity with the New Rule and related regulations, as well as extensive experience working on borrower defense issues. I am being compensated at a rate of $600/hour by CCST's counsel for time spent in connection with preparing this report. My compensation is not contingent upon my opinions or conclusions, the testimony I may give, or the outcome of this litigation.

## II.    PROFESSIONAL BACKGROUND AND QUALIFICATIONS

6.      I have served in multiple capacities at the U.S. Department of Education, including as the Senate-confirmed Assistant Secretary for Postsecondary Education during the George W. Bush Administration and as the Principal Deputy Under Secretary, delegated the duties of Under Secretary of Education, during the Donald J. Trump Administration.  During my tenure at the Department, I oversaw the development and implementation of programs and regulations authorized by the Higher Education Act, as amended, including Federal Student Aid programs, postsecondary grants programs and accrediting agency recognition.  During both the Bush and Trump Administrations, I served as the Senior Department Official for Accrediting Agency Recognition.

7.      I have an extensive understanding of and experience working on issues related to the borrower defense to repayment regulations. During the Trump Administration, I oversaw the development of the 2019 borrower defense regulations ("2019 Rule"), which were designed to correct deficiencies in the 2016 regulations ("2016 Rule").

8.      It was during my work at a proprietary institution that I came to understand just how difficult and costly it is for schools to respond to a significant change in regulations. That burden is all the greater in the case of the New Rule, which imposes impossible expectations on schools, as I discuss below.

9.      Through my work at the Department, I gained a keen insight into and appreciation of the issues that impact proprietary schools, including those that comprise CCST's membership.

10.     During my 30-year career in higher education, I also held teaching and administrative positions at numerous institutions, including a community college, a four-year public institution, an Ivy League university (Princeton University), a proprietary education provider that operated schools in the State of Texas, and a Washington-based consortium of the nation's top business schools, including the Mays Business School at Texas A & M University and McCombs School of Business at the University of Texas at Austin.

11.     I have also held senior staff positions serving the U.S. House of Representatives Committee on Science and Technology, the White House Office of Science and Technology Policy, the U.S. Department of Labor, the U.S. Department of Education, and the National Science Foundation.

12.     I hold a Bachelor of Science in biology with a minor in chemistry from Salisbury University, and a Master of Science in applied molecular biology from University of Maryland Baltimore County. I additionally completed the coursework required for a PhD in molecular and cellular biology.

13.     My complete CV appended to my report.

### III.    EVIDENCE CONSIDERED

14.     Prior to preparing this report, I closely reviewed and considered the New Rule, as it was published in the Federal Register.  87 Fed. Reg. 65,904.   In reaching my opinion, I relied upon my professional judgement and expertise directly working on issues pertinent to borrower defense regulations, including but not limited to the 2016 Rule and 2019 Rule.

15.     My opinions are based on the information available to me as of the date of this declaration. I may modify or supplement my opinions, if necessary and allowed, based on review and analysis of information provided to me after the filing of this declaration.

### IV.    FAMILIARITY WITH CCST SCHOOLS SUBJECT TO THE NEW RULE AND THE STUDENTS THEY EDUCATE

16.     I am well familiar with the types of schools that comprise CCST's membership and are subject to the New Rule.

17.     CCST member schools are private, proprietary institutions and career education schools that participate in the Direct Loan program and enroll students in certificate and degree programs that lead to specific career or vocational opportunities.

18.     Graduates of career education schools go on to serve their local communities and the State economy as skilled trade professionals, including as welders, plumbers, truck drivers, electricians, mechanics, and as necessary service providers at medical clinics, salons, and restaurants. Career education schools have helped to address persistent shortages in essential workers, such as allied health workers, who are responsible for keeping doctor's offices, long-term care facilities, and hospitals staffed and operating at full capacity.   The occupations for which students at proprietary institutions prepare are in great demand throughout our country.

19.     In addition to serving as a necessary pathway to highly demanded professions, these schools serve a population of students that is otherwise underserved by larger colleges, including

2-year community colleges with limited vocational education opportunities and often much more expensive four-year non-profit public and private institutions that provide even fewer vocational education options. Unlike most large institutions, career education schools are small, are more accessible to students, provide a more personalized learning experience, offer opportunities for adults to learn away from distractions, and cater to the unique needs of non-traditional students. These schools often construct specialized facilities, and acquire expensive, state of the art equipment to provide practical career-focused education to students to prepare them to work immediately after graduation.

## V.    DEFICIENCIES IN THE NEW RULE AND THE HARM TO SCHOOLS AND STUDENTS, BOTH BEFORE AND AFTER THE JULY 1, 2023 EFFECTIVE DATE

20.     The Department's New Rule eliminates procedural protections for schools that previously existed under the 2019 Rule. By denying schools a fair process and applying a standard that tips the scale heavily in favor of claim approval, even when there is no compelling evidence of a misrepresentation, the New Rule will result in massive financial liabilities for schools and taxpayers, who will be responsible for what cannot be recovered from schools.

### Separate Claim Adjudication and Recoupment Processes Deny Schools the Ability to Defend Against Liability

21.     Under the process and standard that existed prior to the promulgation of the New Rule, for loans disbursed on or after July 1, 2020, the regulations required evidence from claimants that they actually suffered harm as a result of the alleged conduct or omissions, provided schools and students the ability to review all of the evidence on which the adjudication process would rely, and afforded each party an opportunity to rebut any of the evidence provided by the other party. The New Rule strips away these due process rights and protections exclusively from schools. .

22.     The New Rule creates two separate processes each with limitations that tie the hands of schools and thus prejudges their fate. During the New Rule's recoupment proceedings, for example, schools bear the burden of defending against the imposition of a loan discharge and liability for the corresponding amount. The New Rule does not, however, provide any mechanism by which the school can access evidence to establish that that the borrower was not injured.

23.     The Department states in the New Rule that it is "an insurmountable administrative burden" to have to determine borrower relief and school liability at the same time. 87 Fed. Reg. 65909. But that is neither true, nor an excuse for denying schools their right to defend against recoupment actions for claims based on highly questionable "evidence" or, on some issues, no evidence at all.

**Overly Broad Borrower Defenses Lack Definitions,
Ensure Claim Approval and Will Cause Untold Liability for Schools**

24.     Whereas the 2019 Rule relied on a standard that distinguished between inadvertent misrepresentations and knowing and reckless misrepresentations of material facts, limiting loan discharges to approved claims based on the latter, the New Rule imposes overly broad and catch-all definitions. This, in my opinion, was intentional. An overly broad definition improperly gives the Department the ability to find schools liable and grant complete loan discharges to large numbers of borrowers on the basis of even minor errors or a single, accidental misstatement. And the New Rule's vague requirement that the Department will determine that the borrower suffered detriment warranting the relief of a full discharge is not a substitute for limiting the borrower's recovery to ***actual*** harm.

25.     By doing away with the elements that commonsensically make up a misrepresentation claim, including the requirement of intent, the New Rule has fashioned an all or

nothing standard of liability against schools that did not exist under the 2019 Rule and is not contemplated in any way under the Higher Education Act.

26.     Further, the New Rule's definitions for substantial misrepresentation or omission leave schools in an impossible situation. On the one hand, they are liable for an inadvertent and innocent misstatement, and on the other they can be liable for an inadvertent and innocent omission. It begs the question as to how a school can practicably comply with such a standard, without altogether prohibiting staff and faculty from engaging in open dialogue with students and answering the types of questions students routinely ask about program details and the nature of various careers. These are the types of conversations that can be easily, and unfairly, misconstrued by borrowers for purposes of pursuing a claim and loan discharge.

**Group Claim Process is a Vehicle for Mass Discharge of Loans**

27.     Prior to promulgating the 2019 Rule, the Department carefully considered but ultimately decided not to include a group claim process on account of significant risk of erroneous discharges and approval of claims without merit. When formulating the 2019 Rule, the Department understood that claims are best adjudicated on an individual basis because the highly individualized facts and considerations that are integral to fairly and equitably determining whether a claim has merit and that the borrower suffered harm as a result of the alleged misstatement or omission.

28.     The 2019 Rule permitted the Department to review and use the same evidence to adjudicate claims for more than one borrower, if each was subject to the same misrepresentation. But it required each student to attest that he or she had been the victim of a substantial misrepresentation and had been harmed by that misrepresentation.  The requirement to provide at least some proof was necessary to protect against the approval of improper and meritless claims.

29.     The New Rule's group claim process imposes no such requirements of proof from borrowers, and thus exposes schools and taxpayers to untold liability on account of a process that appears designed to grant loan discharges en masse. Under the group claim process, it is presumed that the statement or omission giving rise to the common claim harmed each member of the group, that it impacted each borrowers' decision to attend the school and, further, that each borrower's reliance was reasonable. This essentially amounts to an all or nothing approach, whereby schools are presumed liable and cannot easily prove otherwise. After all, it's hard to prove a negative. This problem is further exacerbated by the fact that the New Rule also permits third party legal organizations to initiate a group process, where previously under the 2019 Rule, only the Department or a state attorney general could do so.

**Closed School Criteria Will Increase Discharges and Discourage
Schools From Investing in Better Campuses, and Improved Education and Facilities**

30.     A similar defect exists with respect to the New Rule's closed school discharge provisions, which also grant a presumption in favor of borrowers and against schools, thus again establishing an all-or-nothing standard of liability for schools.

31.     In addition, the closed school provision defines "closed school" in such a manner as to include schools that are actually open and merely relocated to a new, geographically proximate, campus.  Take, for example, a situation in which a school moves to a new and larger campus in the same community in order to offer students the benefit of more modern facilities. Even though there is no burden to students, but rather a benefit to them, this would still be considered a "closed school" under the New Rule's criteria. In situations such as this, loan discharges would be approved and schools would suffer tremendous undeserved financial liability, simply for having tried to do the right thing, and serve the best interests of students.

32.     For example, both proprietary and non-profit schools frequently open temporary satellite campuses when enrollments surge or a new employer brings sudden but temporary opportunities with training requirements to a local community. Based on a plan that must be approved by both the state authorizing agency and the school's accrediting agency, schools will open the satellite campuses with the intent of closing them when demand subsides, and cease operations of the older campus as students are transitioned to the new campus. Under the broad criteria for "closed schools" in the New Rule, the school is potentially liable for complete loan discharges for students who attended the "closed" school.

33.     As a result of the closed school discharge provision, proprietary schools will be rightfully reluctant and potentially unable to relocate to better facilities, phase out educational programs that no longer meet workforce needs, add new programs that serve a critical, but potentially short-term need or improve co-curricular opportunities and student services by moving to a larger, more accessible campus or one that offers students more amenities. In fact, as the effective date approaches, many schools will be required to cancel planned investments in new facilities that would otherwise serve the best interests of students. The closed school discharge rule thus significantly harms both schools and students.

34.     Proprietary schools are relatively small, especially as compared to larger non-profit institutions. They do not have the financial means or other resources to withstand the massive liability to which they are undoubtedly exposed, even when no substantial misrepresentation has occurred, by virtue of the New Rule's expansive federal standard and borrower defense claim adjudication process. In my estimation, if the New Rule is permitted to take effect on July 1, 2023, we will see numerous schools forced to close, unable to defend themselves or their reputations in the face of mass borrower defense claims and an all-or-nothing approach to loan forgiveness.

**The Ban on Arbitration Agreements and Class Action Waivers Contradicts Fact and
Experience that Arbitration is More Efficient and Less Costly for Students**

35.     The 2019 Rule protected the right of schools and students to enter into agreements
with arbitration provisions and class action waivers. However, it required institutions to provide
in clear and conspicuous writing information for students and borrowers on how to access the
arbitration process and initiate a demand against the school.  Schools had to demonstrate that they
had made it clear to the student that enrollment at the institution requires the student to agree to
arbitration in the event of a dispute, and a student who did not want to accept binding arbitration
could enroll elsewhere.  The Department previously protected the right of arbitration on account
of ample evidence that arbitration is the most efficient and, for students/borrowers, least costly
method to resolve a dispute.  The New Rule's prohibition against arbitration agreements and class
action waivers disregards all of what the Department knows about the benefits of arbitration,
including that through arbitration, a student with valid concerns or complaints against a school can
receive a full refund of all tuition and fees paid, and not merely the forgiveness of the federal
student loan.

36.     As evidenced by the Department's lacking or dismissive justifications and
reasoning in the Federal Register announcing the New Rule, the Department either improperly
downplayed or completely disregarded patent deficiencies in the New Rule's borrower defense
regulations, which deny schools essential due process protections and otherwise ensure that
baseless borrower defense claims will be approved.

**Reputational Harm to Schools, Students, and Graduates**

37.     The Department's complete disregard for the extensive studies and well-accepted
findings during prior administrations, including the Trump Administration, strongly suggests that
the New Rule is part of the Biden Administration's multi-pronged effort to impose wide scale debt

relief. In addition to financial liability, the power negative effect is massive reputational harm to proprietary institutions through a process that empowers the Department to serve as prosecutor, judge and jury without due process safeguards. By inflicting reputational harm against these schools, the Department is by extension harming their students and graduates of those institutions. Graduates of schools subject to borrower defense claims, regardless of their lack of merit, will likely have greater difficulty finding employment, despite their ample job position qualifications and desire to contribute to society.

38.     When the Department solicits or otherwise discusses borrower defense claims in connection with a particular institution, it feeds the misperception that the claims are supported by evidence. Even worse, the Department has a history of employing inflammatory words like *bad actor* and *fraud* to describe the schools that have faced mere allegations of misrepresentations, and without regard for the lack of evidence, whether it was the misstatement was minor or unintentional, and whether students benefited from a rigorous educational program that prepared them for employment in their chosen field.

39.     In my experience, even if the Department was to cease the practice of using inflammatory language to describe the schools, there would nonetheless be significant reputational harm to schools that are the subject of these claims. Prospective students and potential employers often incorrectly view the fact of borrower defense claims as an indication of substandard education.

40.     When potential employers improperly view schools through a negative lens based on a misperception of the quality of training a school provides, they are reluctant to hire from those institutions. The risk of such misperception increases substantially when the borrower defense standard and adjudication process is designed to ensure claim approval, particularly as against

proprietary institutions, which do not have the resources or established reputational history of large non-profit institutions.

     41.    For the reasons explained in this Declaration, I believe that significant harm will assuredly result from the New Rule.  The long-term damage to past, present and future students, as well as taxpayers, strongly outweighs any good it could possibly do given the protections that the 2019 Rule already affords borrowers who have been victims of misrepresentation.  As a result, there would be no harm to the Department or students by delaying implementation of the New Rule.

(Signature on following page)

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 4th day of April, 2023.

DIANE AUER JONES

# Diane Auer Jones

## Contact Information

*22 Old Granary Court*
*Catonsville, MD 21228*
410-218-0433
dauerjones@me.com

## Education

*Ph.D. – Cellular and Molecular Biology (coursework completed, degree not completed),*
    *University of Maryland, Baltimore County. 1998-2000*
*M.S. – Applied Molecular Biology, University of Maryland, Baltimore County. 1986-1988*
*B.S. – Biology, Summa Cum Laude, Salisbury University, 1982 – 1986*

## Experience

***U.S. Department of Education: Principal Deputy Under Secretary Delegated the Duties of Under Secretary: June, 2018 – January, 2021; Also served as Senior Policy Advisor to the Assistant Secretary for Postsecondary Education (February, 2018 – June, 2018) and Acting Assistant Secretary for Postsecondary Education (June, 2018 – August, 2019)***

Serve as senior higher education policy official, overseeing the Office of the Under Secretary; the Office of Postsecondary Education; the Office of Career, Technical and Adult Education; Federal Student Aid (FSA) and the White House Initiative on Historically Black Colleges and Universities. Lead the development and implementation of the Secretary's higher education agenda, including reforming higher education accreditation, reducing regulatory burden, enabling innovation in distance learning, engaging employers in creating new postsecondary education and workforce development opportunities, and modernizing the Federal Student Aid program to integrate the use of new technologies, improve customer support and expand borrower education. Led one of the largest postsecondary education negotiated rulemaking efforts in the Department's history and achieved consensus on final rules designed to reform accreditation, protect the rights of faith-based institutions, improve the administration of TEACH grants, and promote innovation in distance education. Oversaw the development of regulatory waivers and new funding programs in response to the COVID-19 pandemic.

***Senior Policy Advisor to the Secretary, U.S. Department of Labor: November 2017 – February 2017***

Led the Task Force on Expanding Apprenticeship, which was established in response to President Trump's Executive Order, *Expanding Apprenticeships in America,* and included leaders from business, industry, labor, higher education and workforce development that made recommendations for expanding apprenticeship in America. Also oversaw the activities and staff of the Office of Apprenticeship within the Employment and Training Administration.

***Senior Fellow, Urban Institute: October 2015 to November 2017***

Served as senior fellow in the Center on Labor, Human Services and Population where I conducted research on higher education quality and workforce development. As part of this work, I manage a $3.2 million technical assistance contract awarded by the U.S. Department of Labor to assist and advise them in developing and implementing competency-based occupational standards for registered apprenticeship programs.

***President and CEO, AJsquared Consulting, LLC: March 2015 to November 2017***

Established and served as president of a higher education consulting firm dedicated to advancing innovation in higher education, developing new methods for quality evaluation and assurance, evaluating learning effectiveness, designing institutional research plans, promoting evidence-based public policies and reviewing institutional compliance with all federal and state regulatory requirements. Also engage in public speaking, including keynote addresses, plenary sessions and expert panel discussions related to higher education quality, accessibility and accountability.

**Diane Auer Jones**

***Career Education Corporation: October 2010 – March 2015, SVP & Chief External Affairs Officer (2013 - 2015); President, Career Education Scholarship Fund (2012 - 2015); SVP External and Regulatory Affairs (2012 - 2013); VP External and Regulatory Affairs (2010 - 2012)***

Served as a member of the executive leadership team (ELT) and led the company's regulatory operations, government relations, public affairs, corporate communications and centralized academic support services divisions.  As the only experienced academic on the ELT, also served as the principal advisor on educational innovation (including online and adaptive learning), student success and academic programming for the organization.  Served as president of the Career Education Scholarship Fund, an independent non-profit organization that raised funds to award both need-based and merit-based academic scholarships.  Represented both the company and the larger higher education community in advocacy, public speaking and editorial activity.  Participated in strategic planning and development, profit and loss management, risk assessment and mitigation, reputation building, creating a positive and ethical corporate culture, change management and improving employee morale and collaboration.  Also served as a leader in academic program development, student learning and outcomes assessment and the development and implementation of innovative learning technologies, including adaptive learning technology.

***President & CEO, The Washington Campus, Washington, DC:  June 2007 – October 2010***

Led non-profit educational organization founded by Bill Seidman, which served as the Washington, DC campus of a consortium of the nation's top graduate schools of business.  Developed and delivered educational programs to undergraduate and graduate students, non-profit leaders and corporate executives about the intersection between business and public policy, the federal regulatory environment and methods for effectively and ethically interacting with public policy leaders in order to preserve and advance free markets.  Recruited new board members, developed a new marketing strategy including a new branding and advertisement campaign, and dramatically improved organizational efficiency while reducing administrative costs.  Expanded client base and program offerings to include international organizations and instruction on the structure and function of the European Commission.

***Assistant Secretary for Postsecondary Education, US Department of Education:  August 2007 – May 2008 (Deputy Assistant Secretary from May 2007 – August 2007)***

Nominated by President George W. Bush and confirmed by the U.S. Senate to lead the U.S. Department of Education's Office of Postsecondary Education with responsibility for developing and overseeing the agency's postsecondary grant programs, its higher education accreditation program, its teacher education and foreign language programs and its higher education policy division, which developed and interpreted regulations for all Federal Student Aid programs.  Served as senior administrative leader of the White House Initiative on Tribal Colleges and of the Historically Black Colleges and Universities Initiative.  Provided leadership for the development of the Administration's higher education priorities and budget requests to Congress and participated in the development of several major pieces of legislation, including the College Cost Reduction and Access Act of 2007 and the Higher Education Opportunity Act of 2008.  Served as the senior department official for negotiated rule making and participated in numerous public speaking opportunities and media events.

***Deputy to the Associate Director for Science, White House Office of Science and Technology Policy:  November 2005 – May 2007***

Supported the President's Science Advisor and the Associate Director for Science in developing the Administration's programs, policies and budget requests to Congress for all initiatives related to scientific research, science policy and STEM education policy.  Served as one of the lead authors of President Bush's American Competitiveness Initiative (ACI), which was introduced during the 2006 State of the Union Address and worked with federal agencies and Congress in the development and implementation of the America COMPETES Act. Coordinated multiple federal interagency working groups that included the US Trade Representative,

## Diane Auer Jones

Department of State, Department of Health and Human Services, Department of Education, National Science Foundation, NASA, Environmental Protection Agency, US Geological Service, National Oceanographic and Atmospheric Administration, Department of Commerce and the Department of Homeland Security. Served as the US representative and delegation leader to the US-EC Task Force on Biotechnology Research and was elected by the Organization for Economic Cooperation and Development (OECD) Working Party on Biotechnology to serve as its chair. Participated in the creation, organization and work of the National Mathematics Advisory Panel.

***Director, Office of Government Affairs, Princeton University: December 2002 – November 2005***
Served as Princeton University's principal representative in Washington, DC on matters related to higher education, labor, tax, intellectual property and scientific research and development policy. Chaired the Intellectual Property Working Group of the Council of Federal Relations for the Association of American Universities, led the Science 101 Initiative of The Science Coalition, and represented Princeton's interests to the American Council on Education, the Coalition for National Science Funding, the Coalition for National Scientific Research, the Council on Government Relations, the Council of Graduate Schools and the Energy Sciences Coalition. Supported Princeton Alumni Relations and Development Offices in their work with Washington-based alumnus. Served as guest lecturer in the Woodrow Wilson Policy School on federal science and higher education policy.

***Professional Staff Member and Acting Staff Director, Research Subcommittee of the US House of Representatives Committee on Science (Majority Staff to Chairman Sherwood Boehlert, R-NY) – February 2001- November 2002***
Provided staff leadership for policy, budgetary, programmatic and legislative development and oversight for the National Science Foundation, the Federal Emergency Management Agency and the US Fire Administration. Participated in the development and passage of authorizing legislation including: HR 4464 The National Science Foundation Authorization of 2002 (*PL 107-368*); HR3394 The Cyber Security Research and Development Act (*PL 107-305*); and HR 4687 The National Construction Safety Team Act (*PL 107-231*). Also participated in the development of the National Nanotechnology Research and Development Act (*PL 108-153*). Provided technical expertise to the Committee on: K-graduate science, technology, engineering and mathematics (STEM) education; teacher preparation; intellectual property rights; US Patent and Trademark Office standards and procedures; technology transfer; earthquake and natural hazards mitigation and management; major research equipment and national research facilities; immigration and the high technology workforce; and the Federal Research and Development funding portfolio. Co-led the Congressional engineering investigation of the collapse of the World Trade Center following the 9/11 terrorist attacks. Developed, organized and recruited witnesses for Congressional hearings held by the Committee.

***Program Director, National Science Foundation, Division of Undergraduate Education.  Temporary Assignment through the Intergovernmental Personnel Act.  June 2000 – February 2001***
Served as the lead program director for the Computer Science, Engineering and Mathematics Scholarships program providing management and oversight for all aspects of the program, including awarding grants to institutions of higher education. Also served as a program director for the Advanced Technological Education program and the Course, Curriculum and Laboratory Improvement programs. Reviewed proposals, organized and managed peer review sessions and made award decisions in the areas of biotechnology, molecular biology, environmental biology, plant biology and biochemistry. Provided guidance and oversight for funded projects and worked with the external academic community to encourage innovation in instruction and the preparation of more effective pre-K through graduate teachers and instructors. Managed a portfolio of approximately $70 million.

App-17

App.204

## Diane Auer Jones

*Associate Professor of Biology (2000-2001), Assistant Professor of Biology (1998-2000), Full-Time Instructor (1995-1998), Adjunct Faculty Member (1988-1993), Community College of Baltimore County*
Served as lecturer and laboratory instructor for several core courses including anatomy and physiology, biology, genetics and biotechnology and served as the course coordinator for human anatomy and physiology II, biotechnology and genetics.  Established and directed the NSF-funded Biotechnology Institute.  Founded and directed the Consortium for Statewide Biotechnology Education in Maryland and served as an elected member of the Faculty Senate and a chair of the Student and Community Affairs Senate Subcommittee.  Participated in the College Speaker's Bureau, served as a faculty mentor for various student clubs and activities, and served as a faculty advisor for the Minority Student Mentoring program.  Secured grant funding to support several STEM education summer programs for middle school students and for middle and high school teachers.


### Entrepreneurial Activities

*Founder and President, AJsquared Consulting, Washington, DC – 2015 – 2017 and 2021 - present*
Consulting firm dedicated to improving access to and quality of higher education, to ensuring regulatory compliance by institutions and to providing thought leadership regarding contemporary challenges in the higher education marketplace.

*Founding Partner, Athena Environmental Sciences, Inc., Baltimore, Maryland - 1995 - 2001*
Subchapter S corporation that conducted research, development and small-scale manufacturing of microbial products for use in environmental bioremediation, molecular biology research, enzymatic industrial processes and protein biosynthesis.

*Consultant, Applied Biotech Consortium, Baltimore Maryland - 1991-2000*
Consulting firm provided environmental and biotechnology laboratory consulting including technical support, methods development, trouble-shooting, employee training, document preparation, safety instruction and inspection, laboratory hazard evaluation and mitigation and EPA certification instruction and support to new and expanding laboratories.  Served as curriculum development consultant for Baltimore County Public Schools.

*Owner, Good & Good For You Natural Market, Catonsville, Maryland - 1992-1999*
Founded and managed gourmet and natural foods store, gift shop and tearoom.

**Owner, Holistic Wellness Center, Catonsville, Maryland - 1991-1999**
Founded and managed alternative health care facility staffed by 15 alternative health care practitioners.


### Legislative and Regulatory Activities

**U.S. Department of Education**
Oversaw negotiated rule making and the promulgation of regulations for new higher education grant programs, new Federal Student Loan repayment and loan forgiveness programs and other elements of Higher Education Act Title IV programs following changes in legislation.

Served as the Administration's representative in negotiating and advancing priorities for the following legislation:
- The Higher Education Opportunity Act of 2008 *(PL 110-315)*
- The College Cost Reduction and Access Act 0f 2007 *(PL 110-84)*
- Ensuring Continued Access to Student Loans of 2008 (*PL 110-227*)

App-18

App.205

## Diane Auer Jones

**White House Office of Science and Technology**
- Annual President's Budget Request to Congress (budgets and policy priorities for science and STEM education)
- President's American Competitiveness Initiative
- America COMPETES Act (*PL 100-69*)

**U.S. House of Representatives Committee on Science**
- HR 3130 - The Technology Talent Act
- HR 4664 - The Investing in America's Future Act (National Science Foundation Reauthorization Bill) (*PL 107-368*)
- HR 4687 - The National Construction Safety Team Act of 2002 (*PL 107-231*)
- HR 3394 - The National Cyber Security Research and Development Act (*PL 107-305*)
- HR 3400 - The Networking and Information Technology Research Advancement Act
- HR 2051 - The Regional Plant Genome and Gene Expression Research and Development Centers Act
- HR 1858 - The National Mathematics and Science Partnerships Act
- The 21st Century Nanotechnology and Research Development Act (*PL 108-153*)

**Testimony**
- Testified before the Florida State Senate Committee on Education Appropriations about Institutional Cohort Default Rates, February 2015.

**Congressional Hearings (Organized and Staffed)**
- Conducting Research during the War on Terrorism: Balancing Openness and Security (October 10, 2002)
- The Investigation of the World Trade Center Collapses: Findings, Recommendations and Next Steps (May 1, 2002)
- A View from the Blackboard: The 2001 Presidential Awardees for Excellence in Science and Mathematics Teaching (March 20, 2002)
- Meeting the Demands of the Knowledge Based Economy: Strengthening Undergraduate Science, Mathematics, Engineering and Technology Education (March 7, 2002)
- Learning from 9/11: Understanding the Collapse of the World Trade Center (March 6, 2002)
- Strengthening National Science Foundation Sponsored Agricultural Biotechnology Research: HR 2051 and HR 2912 (September 25, 2001)
- National Science Foundation's Major Research Facilities: Planning and Management Issues (September 6, 2001)
- Innovation in Information Technology: Beyond Faster Computers and Higher Bandwidth (July 31, 2001)
- National Science Foundation FY02 Budget Request: Research and Related Activities (June 6, 2001)
- Classrooms as Laboratories: The Science of Learning Meets the Practice of Teaching (May 10, 2001)
- Improving Math and Science Education so that No Child is Left Behind (May 2, 2001)

## Sample Publications and Presentations
- ***New Skills Marketplace Podcast: The Role of Apprenticeship in Filling Workforce Gaps.*** *Hosted by Andy Smarick and John Bailey, American Enterprise Institute, September 25, 2017.*
- ***Measuring the Impact of Interventions in Tertiary Education: Is there Room to Develop and Use More Effective Performance Indicators?*** The World Bank, Washington, DC. 2017.
- ***Risk Adjusted Metrics: Using Statistical Methods to More Accurately Assess Student Outcomes.*** Keynote address at the invitation of the International Network for Quality Assurance in Higher Education for their Annual Conference in Bahrain. 2016.
- ***Using Sound Science to Determine Student Outcomes and Evaluate Institutional Value.*** Presented to the Council of Higher Education Accreditors, the Council for Regional Accreditors, the Distance Education Accreditation Consortium, the University of Maryland Provosts Meeting and the University of Arkansas Provosts Meeting. 2015.

App-19

App.206

## Diane Auer Jones

- An Education Agenda for 2016:  Conservative Solutions for Expanding Opportunity. Chester E. Finn Jr., Michael Q. McShane, John Bailey, Frederick M. Hess, Katharine B. Stevens, Diane Auer Jones, Kevin J. James, Andrew P. Kelly, American Enterprise Institute. June, 2015.
- ***How Much Government Regulation is Too Much?*** (panelist) Annual Meeting of the Higher Learning Commission, Program for Presidents and Trustees, Chicago, Illinois.  April 2014.
- ***Apprenticeships as an Alternative Route to Skills and Credentials*** *(Commissioned chapter), Getting to Graduation:  The Completion Agenda in Higher Education;* edited by Andrew P. Kelley and Mark Schneider, The Johns Hopkins University Press, 2012, pages 126-153.
- Assessment Changes Online Teaching from Art to Science *(Commissioned paper), The Chronicle of Higher Education,* Special Report on Online Learning, October 2012.
- ***Financial Pain Should Focus Universities*** *(Commissioned Paper), Nature* 465:  32-33, 2010.
- ***Apprenticeships:  Back to the Future, Issues in Science and Technology***, Summer 2011.  National Academy of Science and National Academy of Engineers press.
- ***Analytics and Data Drive Decision Making*** (panelist), EDUCAUSE Annual Conference, October 2014.
- ***How Gainful Employment Fits into the Toolbox for Measuring Institutional Effectiveness*** (panelist), ACICS Policy Forum. New Orleans, LA, 2014.
- *Distance Education Workshop* (presenter), Accrediting Commission of Independent Colleges and Schools, 2011 ACICS Leadership and Annual Conference, Grapevine, TX, 2011.
- ***No Good Deed: Disclosure of Performance Indicators In Advertising and Marketing*** (panelist), ACICS Annual Conference, Nov 7, 2013.
- *Women Leading in Proprietary Education* (panelist), APSCU Convention and Exposition.  Orlando, Florida. June 7, 2013.
- ***Career Colleges go to Washington:  How We Got Here.*** (Keynote Address) FAPSC Annual Administrator Conference. Florida  August 3, 2011.
- ***The Texas Saga:  Needed Reform or Impending Disaster?*** (Panelist)  Squeezing the Tower: Are We Getting All We Can from Higher Education?  Cato Institute.  Washington, DC.  November 18, 2011.
- ***Rebooting Higher Education:  change.edu and the Future of Postsecondary Education in the United State****s* (panelist), American Enterprise Institute.  Washington, DC, November 16, 2011.
- ***Opening Pandora's Box....Again!*** Keynote address to the Higher Earning Commission of the North Central Association, Annual Conference, April 2009.
- Commencement Speaker at Ball State University, May 2007.
- Wrote weekly editorials and blogs for the *Chronicle of Higher Education, 2008 – 2010.*

### Board Activities

- *TranzEd Apprenticeship Board of Directors, The Children's Guild – 2016 – 2017*
- *American Academy for Liberal Education, President (2015 – 2017), Executive Committee (2008 – 2017)*
- *Brooks Institute, Board of Trustees – 2012 to 2015*
- *Colorado Technical University, Board of Trustees - 2010 - 2015*
- *American InterContinental University, Board of Trustees - 2010 - 2015*
- *UMBC Research Park, Inc. - Board Member 1994-2007  (Secretary and Executive Board Member 1994 –2001)*
- *UMBC President Freeman Hrabowski's Community Advisory Board - 1994 – 2000*
- *Greater Catonsville Chamber of Commerce – 1994 - 1996  (Secretary and Executive Board Member)*
- *Catonsville 2000, Inc.  (Secretary 1994, Vice President 1995-1996)*
- *Advisory Board, Western School of Environmental Science and Technology -  1993 - 1996*

### Awards and Honors

- *Outstanding Alumna Award, UMBC, 2006*
- *The Community College of Baltimore County, Faculty Service Award, 2000*
- *American Society for Microbiology Faculty Travel Award, 1997*
- *Catonsville Community College Outstanding Adjunct Faculty Award, 1993*
- *University of Maryland Graduate Fellowship Award, 1987*
- *Alex Brown & Sons Scholarship Award, 1987*

App-20

App.207

**Diane Auer Jones**

### Grants and Contracts Awarded

*Technical Assistance to the U.S. Department of Labor Office of Apprenticeship for Developing Competency-Based Registered Apprenticeships (2016).* $3.5 million over 5 years to develop standardized processes for performing occupational analyses and developing occupational standards, competency-based instruction and competency assessments for use in the Registered Apprenticeship program.

*Council for Innovative Student Learning, The Community College of Baltimore County, 1999.* $15,000 to purchase a 5-headed Nikon teaching microscope for The Biotechnology Institute.

*National Science Foundation, Advanced Technology Education Program, 1998-2001.* $499,000 to establish the Consortium for Statewide Biotechnology Education and  the Biotechnology Institute, which provides biotechnology technician training at the Community College of Baltimore County.

*National Science Foundation, Instrumentation Laboratory Improvement Program, 1998-2000.* $62,000 to purchase new instruments for biology classes at Catonsville Community College.

*Maryland Department of Education, Collaborative Training Grant, 1994.* Environmental Sciences Summer Camp at Catonsville Community College

*Baltimore County Department of Environmental Protection and Resource Management, 1988-1991.* $1,000,000 to establish the Upper Chesapeake Bay Water Quality Assessment Center at Essex Community College.

*National Science Foundation, 1990-1992.* $56,000 to establish the Young Scholars Environmental Science and Technology Program at Essex Community College.

*Chesapeake Bay Trust, 1989.* $17,690 for Establishing an Upper Chesapeake Bay Volunteer Monitoring Program at Essex Community College.

App-21

App.208

Case: 23-50489          Document: 6          Page: 209          Date Filed: 06/30/2023

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| CAREER COLLEGES<br>& SCHOOLS OF TEXAS,<br><br>                 Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>EDUCATION; MIGUEL CARDONA,<br>in his official capacity as the Secretary<br>of Education,<br><br>                 Defendants. | CASE NO.: 4:23-cv-206-P<br><br>**DECLARATION OF**<br>**NIKKI ENGLAND** |

I, Nikki England, do hereby declare and state as follows:

**<u>BACKGROUND</u>**

1.      I make this declaration in support of Career Colleges & Schools of Texas's ("CCST") Motion for Preliminary Injunction. This declaration is based on my personal knowledge, and I could and would competently testify to its contents if called to do so.

2.      I am a product of career education and proud graduate of a proprietary school.

3.      I serve as Chair of CCST's Board of Directors, and have served in this capacity since October 26, 2022. Prior to that, I served as a member of the Board of Directors for more than four years.

4.      As Chair, I am responsible for, among other things, convening and overseeing meetings of the board of directors for CCST, engaging with CCST members on issues facing the

1

App-22

Case: 23-50489    Document: 6    Page: 210    Date Filed: 06/30/2023

career education industry and proprietary sector, and engaging with skilled trade employers who have provided, and will provide, employment opportunities to career education graduates in Texas.

5.      In addition to serving as Chair of the CCST Board of Directors, I have extensive experience in the career education industry, having spent the last 16 years working on issues that impact career education, proprietary schools, and the American educational system, generally.

6.      CCST's headquarters is in Austin, Texas, but its members—of which there are more than 70 postsecondary schools, institutes, colleges, and universities—are located in Fort Worth, Grand Prairie, Arlington, elsewhere in the Northern District of Texas, and across the State of Texas.

7.      Career education schools are essential to preparing individuals to enter the skilled trade workforce, in Texas and around the country. Graduates of career education schools continue on to serve their communities and our country as nurses and medical assistants, plumbers and HVAC repair technicians, mechanics and truck repair specialists, and information technology and cybersecurity experts, among other skilled trade professions. Today, the need for skilled trade workers in our country has never been greater.

8.      CCST's mission is to represent and protect the interests of its career education school members, the students they train, as well as of career education, more generally, in the State of Texas.

**THE FINAL RULE**

9.      In my capacity as Chairwoman of CCST, I am familiar with the Department of Education's (the "Department") November 1, 2022 final rule regarding the Department's administration of student loans under the William D. Ford Federal Direct Loan ("Direct Loan"),

App-23

App.210

Case: 23-50489     Document: 6     Page: 211     Date Filed: 06/30/2023

the Federal Perkins Loan, and the Federal Family Education Loan programs. *See* 87 Fed. Reg. 65,904 (Nov. 1, 2022) (the "Final Rule").

10.    I am both personally familiar as well as knowledgeable based on my discussions with CCST member schools about the significant harm that the Final Rule continues to have and will have on career education schools both before and after the rule takes effect on July 1, 2023.

11.    I understand that the Final Rule applies to Direct Loan program participants, and greatly broadens the substantive grounds for relief to student loan borrowers. For instance, I know that the Final Rule amends regulations, and establishes a new standard and process for adjudicating borrower defenses to repayment claims.

12.    The new borrower defense regulations hold schools strictly liable for even minute and inadvertent misstatements and omissions, and have established processes that all but ensure borrower defense claims will be approved – regardless of whether the borrower can demonstrate harm. Lax standards for approval and the promise of debt cancellation will undoubtedly open the floodgates to such claims. Further, once the borrower defense claims are approved, the Department will have the ability to seek recoupment of monies from the schools, or otherwise force the taxpayer to bear the burden.

13.    Further, under the Final Rule, group consideration of borrower defense claims are permitted, the possibility of anything less than a 100% loan discharge is removed, there is no statute of limitations for borrowers, and schools cannot seek reconsideration of or appeal an adverse decision by the Department in a borrower defense claim proceeding.

14.    Additionally, the Final Rule prohibits the inclusion of mandatory arbitration provisions and class action waivers in contracts between institutions and students.

App-24

App.211

15.     Most CCST member schools currently have mandatory arbitration provisions and class action waivers in contracts between the school and its students.

16.     The implications of the Final Rule on CCST and its member schools are extensive, and both CCST and its member schools have already expended and continue to expend significant resources in anticipation of the Final Rule's effective date.

17.     If enacted, the Final Rule would continue to drain the resources of CCST and its member schools; would result in reputational harm; and is extremely likely to result in excessive liability and even closure of member schools, irreparably harming schools and frustrating CCST's mission to support and grow career education schools in Texas.

18.     Reputational harm to schools will, by extension, harm students and graduates, especially those seeking employment. Regulations that disproportionately punish career education and vocational schools will taint the entire career education industry, discourage future applicants, and, ultimately, harm communities and industries that critically rely on skilled trade workers.

## HARM TO CCST MEMBER SCHOOLS AND THEIR STUDENTS

19.     The majority or 54 of CCST's member schools participate in the Direct Loan program, including participating schools in Tarrant County, and throughout the State of Texas.

20.     As such, these schools are subject to and directly impacted by the Final Rule's provisions, including the BDR regulations.

21.     Each of these member schools will be required to conform to the substantive provisions of the Final Rule specifying acts or omissions that give rise to borrower defenses. This will require schools to expend money and resources on measures necessary to confirm with the requirements imposed under the Final Rule. For example, the removal of any time limitation on when a borrower defense claim, and the burden placed on schools to disprove claims, necessarily

means that schools are now required to maintain extensive and long-term recordkeeping practices for past, current, and future students in anticipation of potential claims. Correspondingly, schools will bear the burden associated with   and compliance efforts in order to avoid reputational and financial liability.

22.     Additionally, each member school is subject to significantly increased liability due to the Final Rule's relaxation of BDR standards and elimination of the possibility of less than complete loan forgiveness.

23.     Violations of the Final Rule's provisions would subject member schools to potential liability for discharged loans, revocation or denial of eligibility to participate in the federal student loan programs, or restrictions upon participation.

24.     Further, the closed school discharge provisions of the Final Rule have had the effect of forcing institutions to abandon plans of opening new schools, building larger campuses to expand programmatic offerings and provide improved facilities, or relocating campuses to this District to meet increased demand for career education. The closed school discharge provisions will limit educational opportunities for future students and result in reduced quality of education for existing students.

25.     Above all, regulations like those in the Final Rule that disproportionately harm career education schools, ultimately punish students, communities, and state and local economies. A decline in career education schools and vocational training will mean fewer welders, surgical technicians, truck drivers and repair personnel, and other skilled trade professionals that are the backbone of our country's infrastructure, security, and technology industries.

26.     The Final Rule is already harming schools and students and the threat of substantial harm come July 1, 2023 is undoubtedly great.

App-26

App.213

Case: 23-50489    Document: 6    Page: 214    Date Filed: 06/30/2023

**HARM TO CCST**

27.    A significant amount of CCST's resources have already been and continue to be diverted in order to identify and counteract the harms of the Final Rule. Indeed, CCST has already expended approximately three hundred staff hours working on issues integral to the Final Rule, including compliance measures that need to be undertaken in anticipation of the effective date.

28.    Critically, CCST has lost out on potential additional members, and existing members have abandoned plans to build new schools, campuses, and facilities, on account of the new closed school discharge provisions in the Final Rule. The lost potential members has directly resulted in lost revenues to CCST, which relies on member dues that are calculated based on, among other things, the size of the schools' presence in Texas.

29.    CCST, along with over a dozen other organizations representing career and private schools around the country, submitted 137 pages of comments before publication of the Final Rule in response to the Department's July 13, 2022 Notice of Proposed Rulemaking ("NPRM"). In its comments, CCST highlighted that the implementation of the Final Rule would threaten disproportionate financial and reputational harm to schools and would result in burdensome operational challenges.

30.    CCST has additionally been working with its members and affiliate organizations to prepare for the future regulatory landscape, both before and after the publication of the Final Rule. This has included working with schools to manage heightened cost and resource demands related to a borrower defense process that permits borrowers to bring claims several years later.

31.    CCST's resources will continue to be diverted should the Final Rule go into effect on July 1, 2023. In order to comply with the sweeping changes in the Final Rule, CCST will incur increased regulatory burdens and compliance costs. The effect of that is anticipated reduced

App-27

App.214

revenues and resources needed to support existing and future members. This will frustrate CCST's mission by diverting essential resources towards compliance with new regulations.

32.     Additionally, CCST would experience drastically increased costs in order to support its members. Such costs include, but are not limited to, engagement of third-party training provider organizations to assist schools in conforming to expensive and burdensome compliance requirements under the Final Rule.

33.     Liability against proprietary schools also substantially threatens the financial survival of CCST's member schools, which threatens CCST's operations and undermines its mission.

34.     Moreover, the closed school discharge provision of the Final Rule has had the effect of forcing institutions to abandon plans of opening new schools, building larger campuses, or relocating campuses to this District, on account of the closed school discharge provision's overly broad criteria for what constitutes a "closed school" for purposes of granting complete loan discharges. This too has had the effect of eroding the growth of CCST's membership and will inevitably lead to a decrease in the membership of Texas schools.

35.     A reduction in the number of CCST members would correspondingly result in reduced membership dues and other fees, on which CCST relies entirely to cover operations costs.

36.     Putting aside the loss of future or potential members, the substantial threat of school closures and a drastic reduction in the number of CCST members, with particular effect on schools outside large populous cities, correspondingly threatens the survival of CCST itself.

37.     Finally, as a prominent representative of the interests of Texas career education schools, CCST would incur irreparable reputational harm by the Final Rule, which disproportionately threatens career education schools and the proprietary sector.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 5th day of April, 2023. .

NIKKI ENGLAND

App-29

App.216

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

CAREER COLLEGES
& SCHOOLS OF TEXAS,

    Plaintiff,

v.

UNITED STATES DEPARTMENT OF
EDUCATION; MIGUEL CARDONA,
in his official capacity as the Secretary
of Education,

    Defendants.

CASE NO.: 4:23-cv-206-P

**DECLARATION OF**
**SCOTT SHAW**

I, Scott Shaw, do hereby declare and state as follows:

**BACKGROUND**

1.  I make this declaration in support of Career Colleges & Schools of Texas's ("CCST") Motion for Preliminary Injunction. This declaration is based on my personal knowledge, and I could and would competently testify to its contents if called to do so.

2.  I am the President and Chief Executive Officer of Lincoln Educational Services Corporation ("Lincoln Tech"), which is headquartered in Parsippany, New Jersey. I have held this position since July 2015. I originally joined Lincoln Tech in 2001 as the Chief Financial Officer.

3.  As President and Chief Executive Officer, I am responsible for, among other things, overseeing our schools' operational activities. In addition, I am familiar with the extensive efforts undertaken by Lincoln Tech to ensure compliance with applicable regulations.

1

4.     Founded in 1946, Lincoln Tech is now one of the country's largest providers of career education and training, operating 22 campuses in 14 states under four brands: Lincoln College of Technology, Lincoln Technical Institute, Lincoln Culinary Institute, and Euphoria Institute of Beauty Arts and Sciences. Our schools offer programs in health sciences, automotive technology, skilled trades, hospitality services, and business and information technology. Since our Lincoln Tech's founding in 1946, our schools have graduated more than 250,000 students.

5.     Lincoln Tech has long supported carefully crafted rules, regulations, and legislation that protect both students and borrowers alike. However, the newly issued borrower defense regulations stack the decks against schools. They threaten substantial harm to not only Lincoln Tech schools but career education institutions across the country.

## LINCOLN TECH GRAND PRAIRIE

6.     One of Lincoln Tech's premier schools is the Lincoln Technical Institute in Grand Prairie, Texas ("Lincoln Tech Grand Prairie"). Lincoln Tech Grand Prairie was formed in 1966 as an automotive technical school. The school's program offerings have expanded over the decades and currently include automotive technology, collision repair and refinishing, diesel technology, HVAC service and repair, machining and manufacturing, and welding technology.

7.     Lincoln Tech Grand Prairie is a member of trade association Career Colleges and Schools of Texas (CCST).

8.     Lincoln Tech Grand Prairie participates in the Direct Loan Program and is thus subject to the Department of Education's (the "Department") November 1, 2022 final rule regarding the Department's administration of student loans under the William D. Ford Federal Direct Loan ("Direct Loan"), the Federal Perkins Loan, and the Federal Family Education Loan programs. *See* 87 Fed. Reg. 65,904 (Nov. 1, 2022) (the "Rule").

2

9.      Lincoln Tech Grande Prairie has two campuses. The main campus is located at 2915 Alouette Drive in Grand Prairie. The second campus is located at 2501 Arkansas Lane in Grand Prairie.

10.     Both campuses of Lincoln Tech Grand Prairie are located in Tarrant County, which I understand to fall within the Fort Worth Division of the Northern District of Texas.

11.     During the 2022 academic year, Lincoln Tech Grand Prairie served proximately 900 students, the vast majority of whom took out Direct Loans to finance their education and meet their obligations.

12.     Over the last 15 years, Lincoln Tech Grand Prairie has enrolled 14,854 students, approximately 31% of whom reside in one of the counties that fall within the Fort Worth Division; and approximately 41% of whom reside within the Northern District of Texas.

13.     According to the Department's Rule, any of these students and alumni who have loan balances would be eligible to file a borrower defense claim based on the Rule's new standard, which lowers the threshold for claim approval and presume liability against schools, regardless of whether the borrower has any proof of harm.

**THE DEPARTMENT'S RULE AND**
**HARMS SUFFERED PRIOR TO EFFECTIVE DATE**

14.     I have reviewed the Rule. I am familiar with its provisions and how they have harmed and are likely to harm Lincoln Tech schools and their staff, students, alumni, and communities both before and after the Rule takes effect.

15.     Lincoln Tech Grand Prairie participates in the Department of Education's Direct Loan Program and will be subject to the Rule's requirements when they go into effect.

16.     As President and Chief Executive Officer, I am additionally responsible for overseeing Lincoln Tech's strategic planning, including decisions about how to adjust the

3

allocation of the Lincoln Tech's resources in response to changes in student demand. These decisions include whether to open campuses in new markets, whether to close or consolidate facilities, and whether to expand or limit certain program offerings.

17.     The Rule's closed school discharge provisions will have a significant and adverse impact on Lincoln Tech's future decisions regarding growth and expansion. If the Rule should become effective, Lincoln Tech will be forced to reconsider the opening of new campuses and upgrading of existing ones, whether in Texas, or other parts of the country. This is because of the potential liability resulting from "closing a school" – as that term is broadly defined in the new regulations. Under the new Rule, the consolidation of facilities, closing of one campus to open a newer and better one, or the reallocation of funding from one program to invest in others that have greater demand from students, could each constitute a "closed school" under the Rule, which gives the Department wide discretion to determine. In such a case, Lincoln Tech would be held liable for all outstanding loan balances for current and recent students of the "closed school" – even though there was no adverse impact (and more likely a positive impact) on the students' education.

18.      The Rule's closed school provisions create a significant disincentive for schools to explore new program offerings, build new or upgrade existing campuses, or otherwise improve the facilities and services for students.

19.     I am also responsible for, among other things, overseeing Lincoln Tech's financial performance, including its staffing and compliance costs.

20.     As a result of the Rule, Lincoln Tech Grand Prairie and other schools are effectively being forced to expend time and resources that could otherwise be spent on educational programming to instead prepare to comply with new regulations. Such preparatory activities include, but are not limited to: counseling Lincoln Tech's schools and staff on the Rule's

requirements; reviewing every marketing and advertising material and training recruitment and admissions staff on account of the regulations' imposition of strict liability against schools; dedicating or allocating staff and resources to handle the anticipated flood of meritless borrower defense claims that will be submitted following the effective date and as a result of the lowered threshold for claim approval; and developing and upgrading recordkeeping systems to maintain student records for perpetuity, on account of the fact that there is no statutory of limitations to borrower defense claims.

21.    I expect that compliance-related costs and burdens to Lincoln Tech schools will increase substantially if the Rule is allowed to go into effect.

### SUBSTANTIAL THREAT OF IMPENDING HARM THAT CANNOT BE UNDONE

22.    I understand that under the Rule's new borrower defense standard, even inadvertent misstatements or omissions by school representatives or contractors could result in an approved borrower defense claim and the school's being liable for the complete loan discharge.

23.    By eliminating the requirement of proof of harm and permitting claims based on unintentional and innocent erroneous statements or omissions to be the basis for an approved borrower defense claim, the Rule has the effect of holding schools like Lincoln Tech Grand Prairie strictly liable for meritless claims based on harmless conduct.

24.    Further, under the Rule's new group claim process, there is the significant risk of tag-a-long claims. As a result, schools like Lincoln Tech could be liable for loan discharge amounts for entire groups of borrowers, regardless of whether each student was actually ever harmed by the school's alleged conduct.

25.    Group claims and the resulting financial harm to schools would be so great as to threaten their closure, or at the very least divert resources away from educational offerings, thus

denying current and future generations of career education students the opportunity to better themselves and their communities.

26.    Even if Lincoln Tech Grand Prairie were not forced to close as a result of liability, the reputational harm to the school of a borrower discharge would be substantial. Such a discharge by the Department may create a false impression that the school provides poor service, which would hurt the school's ability to recruit new students.

27.    Such reputational harm to the school is also likely to harm the school's students and alumni in finding employment, as potential employers will wrongly conclude on the basis of the approval of a borrower defense claim and granting of a loan discharge that the students and graduates have received a subpar education – when the opposite is true.

28.    Given the significantly lower burden that a borrower would need to meet for a claim to be approved, and the promise of a financial windfall as a result of a complete loan discharge, there are likely to be many students of Lincoln Tech Grand Prairie and other Lincoln Tech schools that will apply for such a discharge, especially when the Rule does not require borrowers to prove that they were ever harmed by the conduct the allege occurred.

29.    Defending against the inevitable deluge of borrower defense claims will be costly and, given the new standard that presumes liability without due process protections for schools, effectively futile.

30.    If the Rule is permitted to take effect on July 1, schools like Lincoln Tech Grand Prairie will suffer harm that cannot be undone.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 3rd day of April, 2023.

_____
SCOTT SHAW

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

CAREER COLLEGES
& SCHOOLS OF TEXAS,

            Plaintiff,

v.

UNITED STATES DEPARTMENT OF
EDUCATION; MIGUEL CARDONA,
in his official capacity as the Secretary
of Education,

            Defendants.

CASE NO.: 4:23-cv-206-P

**DECLARATION OF**
**JEFF ARTHUR**

    I, Jeff Arthur, do hereby declare and state as follows:

<u>**BACKGROUND**</u>

    1.    I make this declaration in support of Career Colleges & Schools of Texas's ("CCST") Motion for Preliminary Injunction. This declaration is based on my personal knowledge, and I could and would competently testify to its contents if called to do so.

    2.    I am the Vice President of Regulatory Affairs and Chief Information Officer for ECPI University, which is headquartered in Virginia Beach, VA. I joined ECPI University in April 1993, and have worked in career education and the proprietary sector for almost 40 years.

    3.    As Vice President of Regulatory Affairs and Chief Information Officer, I am responsible for, among other things, overseeing our schools' compliance with Title IV and other regulations.

App-37

App.224

4.      Founded in 1966, ECPI University was initially formed as an institution focused entirely on accelerated education in computer science and computer programming. ECPI University has since expanded to the bachelor's and master's degree levels with educational offerings that include nursing, advanced clinical and health sciences, electronics engineering, and business. Today, ECPI University is one of the country's most prominent providers of career education and training, with enrollment of over 12,000, operating six colleges and 20 campuses across five states, including the State of Texas.

5.      Over the last 50 years, ECPI University has graduated more than 75,000 students. Its graduates have earned degrees in computer science, electronics engineering technology, health science, nursing, business, criminal justice, and the culinary arts.

## ECPI University—Texas

6.      One of ECPI University's most exciting developments has been its expansion to Texas, beginning with the development of a state of the art campus with facilities in San Antonio, Texas ("ECPI Texas").

7.      ECPI Texas, like all ECPI University campuses, participates in the Direct Loan Program.

8.      ECPI Texas's educational offerings include nursing, computer science, and engineering technologies.

9.      Since its founding, ECPI Texas has been a member of trade association Career Colleges and Schools of Texas (CCST).

## THE FINAL RULE

10.     In my role at ECPI University, I have developed a keen understanding of the issues and implications of the Department of Education (the "Department")'s November 1, 2022 final

Case: 23-50489   Document: 6   Page: 225   Date Filed: 06/30/2023

Case: 23-50489    Document: 6    Page: 226    Date Filed: 06/30/2023

rule regarding the Department's administration of student loans under the William D. Ford Federal Direct Loan ("Direct Loan"), the Federal Perkins Loan, and the Federal Family Education Loan programs. *See* 87 Fed. Reg. 65,904 (Nov. 1, 2022) (the "Final Rule").

11.     I am especially familiar with the Final Rule's provisions and how they have harmed, continue to harm, and will substantially threaten further harm to ECPI University, their staff, students, alumni, and the communities they serve both before and after the Final Rule takes effect on July 1, 2023.

12.     On account of its participation in the Department of Education's Direct Loan Program, ECPI Texas is subject to the Final Rule's provisions and requirements.

13.     The majority of the students enrolled at ECPI Texas have taken out Direct Loans to support their educational goals.

14.     ECPI University fully supports carefully considered and thoughtful regulations that preserve and equally protect the rights of students and the schools that educate them; however, the Final Rule does not exhibit those qualities and, in fact, has and will substantially threaten the viability of not only ECPI University, but career education schools across the country.

## PREPARATORY EFFORTS AND ONGOING HARM

15.     As VP of Regulatory Affairs, I oversee ECPI University's regulatory compliance initiatives and resources, including those related to staffing and compliance costs. ECPI University has four staff directly responsible for monitoring regulations and ensuring its schools' compliance with state and federal regulations, and an additional 10-12 who directly monitor all Title IV documentation for compliance.

16.     In anticipation of the Final Rule's July 1, 2023 effective date, ECPI has already undertaken and continues to undertake significant efforts to comply with the Rule's requirements

3

Case: 23-50489      Document: 6      Page: 227      Date Filed: 06/30/2023

and to, as best as possible, prepare for the anticipated harms that will result from the overhauled borrower defense to repayment regulations. ECPI has expended significant time and effort preparing and training staff to comply with the new regulations. These preparations include:

    a. Training ECPI University staff on the Final Rule's requirements;

    b. Reviewing recruitment and advertising materials and training recruiting, admissions, financial aid, and student records staffs. Preparing to train faculty and other staff in connection with the Final Rule's borrower defense regulations, which presume liability against schools;

    c. Rewriting our enrollment agreements to remove arbitration and class action waiver provisions;

    d. Implementing new record-keeping policies and training to account for the removal of the statute of limitations period on borrower defense claims and the possibility that recoupment proceedings could be instituted for ECPI University graduates whose enrollments ended several years ago;

    e. Implementing and dramatically expanding systems that monitor representations made by hundreds of staff both in recruiting processes and to our tens of thousands of students, including verbal and digital communications, including engaging in extensive legal reviews of the monitored content.

    f. Ensuring a considered and thorough legal review of proposed communications, documents, and scripts.

    17. ECPI University employs ~60 staff members who are responsible for monitoring and complying with Department of Education regulations. These staff members are being and will need to be further trained regarding Final Rule's provisions and requirements.

4

**App-40**

Case: 23-50489    Document: 6    Page: 228    Date Filed: 06/30/2023

18.     ECPI employs 95 staff members who are responsible for assisting students in obtaining loans through the Direct Loan Program. These staff members are being and will need to be constantly trained regarding Final Rule's provisions and requirements.

19.     ECPI also employs over 100 staff members who are responsible for new student engagement, advertising of the school's educational programs, and preparing marketing materials. These staff members are being and will need to be constantly trained regarding Final Rule's provisions and requirements.

20.     I expect that the costs and burdens to ECPI Texas and ECPI University, generally, associated with the aforementioned activities will only increase further with incredible urgency if the Final Rule is permitted to go into effect.

## CLOSED SCHOOL DISCHARGE, BORROWER DEFENSE TO REPAYMENT, AND ARBITRATION AND CLASS ACTION WAIVER PROVISIONS

21.     In my role at ECPI University, I am also involved in decisions concerning growth and strategic planning, including decisions about ways in which to meet or respond to changes in employer demand for career education and new programming. These decisions include whether to open campuses in new geographic regions, close or consolidate campuses and facilities, transfer students to improved or upgraded facilities, and expand or modify certain program offerings in accordance with student needs and convenience.

22.     As a result of the Final Rule's closed school discharge provisions, ECPI University has been forced to abandon plans to build new or upgrade existing schools in not only Texas but across the country. The risk is simply too great.

23.     This is because of potential and extensive liability that will result from the Final Rule's overly broad criteria for what constitutes a "closed school" and imposition of complete loan discharges to students who attend or have attended the school.

24.     Pursuant to the Final Rule's criteria, a "closed school discharge" could be triggered by consolidating facilities or cutting back certain programs, even if a campus remains open and certainly when ECPI University remains open. Upon the Department's determination that the criteria is met, a school would be presumptively held liable for the entire amount of the resulting loan discharges. Not only is this a significant portion of revenue, but it would also include any loan funds received by the student to pay for their personal expenses, including rent, food, transportation, and computer equipment. This would be a considerable multiple of realized proceeds presenting a serious threat to ECPI University, its staff, and its students.

25.     For example, if ECPI University were to:

a.   consolidate two campuses;

b.   upgrade to an additional facility and later move that facility back to its parent campus;

c.   move a location from one institution to another under the same control for reasons beneficial to the institution and its students (i.e. more favorable accreditation with stronger standards and protections for students); or

d.   relocate due to student demand in some situations,

the Department would determine under the Final Rule's criteria that these scenarios would amount to a closed school, thus resulting in complete loan discharges for all borrowers with a subjective close date and an extensive look back period for those that had attended, regardless of the benefit they received or the purpose of the consolidation or relocation.

26.     The Final Rule's closed school provisions create a significant disincentive for schools to open new campuses or explore new program offerings or facility expansions to improve

App-42

App.229

Case: 23-50489   Document: 6   Page: 230   Date Filed: 06/30/2023

the quality of education students receive. This harms both schools and students, not to mention career education generally.

27.    With respect to the new borrower defense to payment regulations, ECPI is deeply concerned that the potential liability that schools face has increased significantly under the Final Rule.

28.    Under the new borrower defense regulations, even inadvertent or otherwise inconsequential misstatements or omissions by school representatives or contractors can result in the school's being liable for the full balance of a borrower's loan.

29.    Further, under the new group claims process, schools could be liable for the discharge amounts for an entire group of students, regardless of whether each student proves that they were harmed by school's alleged conduct. ECPI, like schools across the country, are rightfully concerned that the low barrier to approval and promise of loan discharges will invite tag-along claims. In my estimation, group claims could be so costly for schools that they would force them to reduce educational offerings and substantially threaten the school's financial viability.

30.    Moreover, under the Final Rule's group process, institutions would be effectively prevented from defending against the primary claim before the Department makes the decision to group it with other claims, solely on the basis that the primary claim 'appears credible.' In reaching that primary determination, the Department would have reached its conclusion before the school has the ability to rebut the allegations on which the primary claim is premised.

31.    The above discussed dangers associated with the group process are compounded by the fact that, under the Final Rule, third party legal advocacy organizations may also initiate the group process.

App-43

App.230

32.     Putting aside the financial harms, there is significant reputational harm to schools as a result of borrower defense claim approval. The approval of claims will create a false impression that a school's educational offerings are substandard or that the school knowingly engaged in wrongful conduct, when all that might've happened was that a single admissions officer made an inadvertent misstatement to a student. Regardless of the merits, approved borrower defense claims would hurt the school's ability to recruit new students.

33.     Such reputational harm to the school is also likely to harm the school's students and alumni in finding employment, as potential employers will wrongly associate the approval of a borrower defense claim and granting of a loan discharge with lower-quality training.

34.     Given the significantly lower burden that a borrower would need to meet in order to receive a full loan discharge, and the amount of money at stake in providing complete loan forgiveness, there are almost certainly going to be students of ECPI Texas and other ECPI University campuses who will apply for such a discharge, given the possibility of a sure-fire payout with no risk or downside.

35.     Given this strong likelihood, I believe ECPI Texas, and the entire ECPI University, would suffer both reputational and financial harm – if the Final Rule were allowed to go into effect. The harm could not be undone even if the Rule were later vacated.

36.     Additionally, the Final Rule prohibits the inclusion of mandatory arbitration provisions and class action waivers in contracts between institutions and students.

37.     In arbitration, majority of the cost is borne by the school and the proceedings are more streamlined, bringing about quicker resolution for both students and schools. Indeed, for this very reason, ECPI University previously included pre-dispute arbitration, with an opt-out provision, in its contracts with students, as well as a class-action waiver.

App-44

App.231

38.     However, once the Final Rule goes into effect, the schools will not be able to renegotiate its agreements with students, and it will irreparably have lost the right to arbitrate disputes and avoid class-action litigation. As a result, in the event of a dispute, students and schools will be forced to engage in protracted litigation that is both costly and inefficient to both parties, and often favors attorneys over students.

39.     Putting aside our belief that prohibitions against arbitration are illegal, the Final Rule's provisions will ultimately harm students and schools, banning a less expensive (for students) and more efficient process for resolving potential disputes.

App-45

App.232

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 4th day of April, 2023.

Jeff Arthur

App-46

App.233

BRIAN D. NETTER
Deputy Assistant Attorney General
STEPHANIE HINDS
United States Attorney
MARCIA BERMAN
Assistant Branch Director
R. CHARLIE MERRITT
STUART J. ROBINSON
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Telephone: (415) 436-6635
E-mail: stuart.j.robinson@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THERESA SWEET, ALICIA DAVIS, TRESA APODACA, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, and JESSICA JACOBSON on behalf of themselves and all others similarly situated, | **Case No. 19-cv-03674-WHA** |
| *Plaintiffs*, | **RESPONSE TO COURT'S INQUIRY CONCERNING NUMBER OF POST-CLASS APPLICANTS** |
| v. | |
| MIGUEL CARDONA, in his official capacity as Secretary of the United States Department of Education, and | |
| THE UNITED STATES DEPARTMENT OF EDUCATION, | |
| *Defendants*. | |

During the hearing on February 15, 2023, the Court inquired about the number of "post-class applicants" who submitted borrower defense applications after the settlement agreement's execution date but before the final approval date. That group consists of approximately 250,000 applications from approximately 206,000 borrowers who attended approximately 4,000 schools.

Case: 23-50489    Document: 6    Page: 235    Date Filed: 06/30/2023

Case 3:19-cv-03674-WHA   Document 380   Filed 02/16/23   Page 2 of 2
Case 4:23-cv-00206-P   Document 25   Filed 04/05/23   Page 50 of 50   PageID 423

Dated:  February 16, 2023

Respectfully submitted,

BRIAN D. NETTER
Deputy Assistant Attorney General

STEPHANIE HINDS
United States Attorney

MARCIA BERMAN
Assistant Branch Director

*/s/ Stuart J. Robinson*
R. CHARLIE MERRITT
STUART J. ROBINSON
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20055
Telephone: (415) 436-6635
E-mail: stuart.j.robinson@usdoj.gov

*Counsel for Defendants*

Response to Court's Inquiry
19-cv-03674-WHA

2

App-48

App.235

# EXHIBIT 9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

CAREER COLLEGES & SCHOOLS OF
TEXAS,

                              Plaintiff,

          v.                                          Case No. 23-cv-433-RP

U.S. DEPARTMENT OF EDUCATION *et al.*,

                              Defendants.

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION[1]

---

[1] This brief exceeds the page limit set forth in Local Rule CV-7(d)(3). On May 11, 2023, Defendants filed a consent motion to exceed that page limit and to file a 40-page brief in opposition to Plaintiff's motion for a preliminary injunction. *See* ECF No. 54. For the reasons set forth in that motion, Defendants respectfully renew their request for leave to file the attached overlength opposition brief.

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................3

I.   Statutory and Regulatory Background ........................................................................3

     A.   The Higher Education Act and Borrower Defense to Repayment.................3

     B.   Regulatory History.........................................................................................3

     C.   The 2022 Rule ...............................................................................................6

II.  This Lawsuit....................................................................................................................7

LEGAL STANDARD ...........................................................................................................8

ARGUMENT .........................................................................................................................8

I.   The Court Lacks Jurisdiction to Grant CCST's Motion ...........................................8

     A.   CCST Lacks Standing to Bring the Claims at Issue......................................8

          1.   CCST has not clearly shown a likelihood of associational standing.................9

          2.   CCST has not clearly shown a likelihood of organizational standing ............11

     B.   The Claims at Issue Are Not Ripe ...............................................................13

II.  CCST Cannot Show a Likelihood of Success on the Merits ................................15

     A.   The Borrower-Defense Provisions Are Statutorily Authorized ..................15

          1.   The HEA authorizes borrower defense claims adjudication.........................15

          2.   The Department's reasonable interpretation is entitled to deference ...........22

          3.   The major questions doctrine does not apply ...................................................22

     B.   The Borrower-Defense Provisions Are Reasonable ....................................24

     C.   The Borrower-Defense Provisions Are Constitutional ...............................29

     D.   The Closed-School Discharge Provisions Are Lawful.................................31

III. CCST Has Failed to Establish Any Irreparable Harm .........................................32

IV.  The Balance of the Equities and Public Interest Weigh Against Injunctive Relief.......................38

V.   CCST's Requested Relief Is Overbroad .................................................................38

App.238

CONCLUSION..................................................................................................................40

# TABLE OF AUTHORITIES

**Cases**

*Acosta v. Hensel Phelps Construction Co.*,
909 F.3d 723 (5th Cir. 2018) ........................................................................ 18, 22

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ............................................................................................. 35

*Alabama Ass'n of Realtors v. HHS*,
141 S. Ct. 2485 (2021) ......................................................................................... 24

*Ass'n of Proprietary Colls. v. Duncan*,
107 F. Supp. 3d 332 (S.D.N.Y. 2015) ................................................................. 31

*Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n*,
430 U.S. 442 (1977) ............................................................................................. 29

*Cal. Ass'n of Private Postsecondary Schs. v. DeVos*, ("CAPPS"),
344 F. Supp. 3d 158 (D.D.C. 2018) ............................................................ *passim*

*Carpenters Dist. Council of New Orleans v. Dillard Dep't Stores, Inc.*,
15 F.3d 1275 (5th Cir. 1994) .............................................................................. 17

*CCST v. U.S. Dep't of Educ.*,
No. 4:23-cv-206-P, 2023 WL 2975164 (N.D. Tex. Apr. 17, 2023) .................... 8

*Chamber of Commerce v. Hugler*,
2017 WL 1062444 (N.D. Tex. Mar. 20, 2017) .................................................. 35

*Chauffeur's Training School, Inc. v. Spellings*,
478 F.3d 117 (2d Cir. 2017) ........................................................................ 21, 22

*Chevron v. NRDC*,
467 U.S. 837 (1984) ............................................................................................. 22

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012) ............................................................................................. 26

*City of Arlington v. FCC*,
569 U.S. 290 (2013) ................................................................................. 16, 19, 32

*Commonwealth v. Biden*,
57 F.4th 545 (6th Cir. 2023) ............................................................................... 39

*Cornish v. Dudas*,
540 F. Supp. 2d 61 (D.D.C. 2008) ...................................................................... 38

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ............................................................................................... 8

App.240

*Daves v. Dallas Cnty.,*
   22 F.4th 522 (5th Cir. 2022) (en banc) ........................................................ 39

*Def. Distributed v. U.S. Dep't of State,*
   121 F. Supp. 3d 680 (W.D. Tex. 2015) ........................................................ 38

*Div. 80, LLC v. Garland,*
   2022 WL 3648454 (S.D. Tex. Aug. 23, 2022) .......................................... 36, 38

*DM Arbor Cit., Ltd. v. City of Houston,*
   988 F.3d 215 (5th Cir. 2021) ........................................................................ 13

*Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,*
   762 F.2d 464 (5th Cir. 1985) ........................................................................ 32

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ...................................................................................... 25

*FCC v. Prometheus Radio Project,*
   141 S. Ct. 1150 (2021) .................................................................................. 25

*Franciscan All., Inc. v. Burwell,*
   227 F. Supp. 3d 660 (N.D. Tex. 2016) .......................................................... 40

*Freedom Holdings, Inc. v. Spitzer,*
   408 F.3d 112 (2d Cir. 2005) .......................................................................... 35

*FTC ex rel. Yost v. Educare Centre Servs., Inc.,*
   2020 WL 4334117 (W.D. Tex. Apr. 3, 2020) ................................................ 36

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l,*
   695 F.3d 330 (5th Cir. 2012) .......................................................................... 9

*Georgia v. President of the United States,*
   46 F.4th 1283 (11th Cir. 2022) ...................................................................... 39

*Gill v. Whitford,*
   138 S. Ct. 1916 (2018) .................................................................................. 39

*Google, Inc. v. Hood,*
   822 F.3d 212 (5th Cir. 2016) ........................................................................ 37

*Green Valley Special Util. Dist. v. City of Schertz,*
   969 F.3d 460 (5th Cir. 2020) ........................................................................ 39

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982) .......................................................................... 11, 12, 13

*Huawei Techs USA v. FCC,*
   2 F.4th 421 (5th Cir. 2021) .......................................................... 22, 24, 25, 27

*Inv. Co. Inst. v. CFTC,*

720 F.3d 370 (D.C. Cir. 2013) ........................................................ 25

*Jarkesy v. SEC,*
    34 F.4th 446 (5th Cir. 2022) ...................................................... 30

*Johnson v. Owens,*
    2013 WL 12177176 (W.D. Tex. Aug. 5, 2013) .......................... 32

*Jordan v. Fisher,*
    823 F.3d 805 (5th Cir. 2016) ........................................................ 8

*K Mart Corp. v. Cartier, Inc.,*
    486 U.S. 281 (1988) .................................................................... 40

*Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019) ................................................................ 26

*Littlepage v. Trejo,*
    2017 WL 3611773 (W.D. Tex. Aug. 21, 2017) ........................... 37

*Long Island Care at Home, Ltd. v. Coke,*
    551 U.S. 158 (2007) .............................................................. 15, 16

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .................................................................. 9, 33

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) .................................................................... 14

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) .................................................................... 40

*Massimo Motor Sports LLC v. Shandong Odes Indus. Co.,*
    2021 WL 6135455 (N.D. Tex. Dec. 28, 2021) ........................... 33

*Munaf v. Geren,*
    553 U.S. 674 (2008) ...................................................................... 8

*N.Y. Legal Assistance Grp. v. DeVos,*
    527 F. Supp. 3d 593 (S.D.N.Y. 2021) ........................................ 25

*NAACP v. City of Kyle,*
    626 F.3d 233 (5th Cir. 2010) ...................................................... 12

*Nat'l Council of Agr. Emp's v U.S. Dep't of Labor,*
    2023 WL 2043149 (D.D.C. Feb. 16, 2023) ................................ 38

*Nat'l Fuel Gas Supply Corp. v. FERC,*
    811 F.2d 1563 (D.C. Cir. 1987) .................................................. 19

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
    538 U.S. 803 (2003) .............................................................. 13, 14

*NFIB v. OSHA*,
  142 S. Ct. 661 (2022) ........................................................................................... 24

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................................. 38

*North Dakota ex rel. Bd. of Univ. Sch. Lands*,
  461 U.S. 273 (1983) ............................................................................................. 20

*OCA-Greater Houston v. Texas*,
  867 F.3d 604 (5th Cir. 2017) .............................................................................. 12

*ODonnell v. Harris Cnty.*,
  892 F.3d 147 (5th Cir. 2018) .............................................................................. 39

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
  138 S. Ct. 1365 (2018) ........................................................................................ 30

*Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*,
  492 F. Supp. 3d 701 (E.D. Tex. 2020) ............................................................... 36

*Perez v. Mortg. Bankers Ass'n*,
  135 S. Ct. 1199 (2015) ........................................................................................ 28

*Pruvit Ventures, Inc. v. Forevergreen Int'l LLC*,
  2015 WL 9876952 (E.D. Tex. Dec. 23, 2015) .................................................. 34

*Restaurant Law Ctr. v. U.S. Dep't of Labor*,
  2023 WL 3139900 (5th Cir. Apr. 28, 2023) ...................................................... 37

*Roark & Hardee LP v. City of Austin*,
  522 F.3d 533 (5th Cir. 2008) .............................................................................. 13

*Rozelle v. Lowe*,
  2015 WL 13236273 (W.D. Tex. June 1, 2015) ................................................. 32

*Serrano v. U.S. Customs & Border Prot.*,
  975 F.3d 488 (5th Cir. 2020) .............................................................................. 31

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  482 F. Supp. 3d 543 (W.D. Tex. 2020) .............................................................. 33

*Somerset House, Inc. v. Turnock*,
  900 F.2d 1012 (7th Cir. 1990) ............................................................................ 37

*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir. 2020) ................................................................................ 9

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ............................................................................................... 9

*Sweet v. Cardona*,

2022 WL 16966513 (N.D. Cal. Nov. 16, 2022) ........................................................ *passim*

*Sweet v. Cardona,*
    2023 WL 2213610 (N.D. Cal. Feb. 24, 2023) ................................................ 34

*Texas v. Biden,*
    10 F.4th 538 (5th Cir. 2021) ........................................................................ 35

*Texas v. EPA,*
    829 F.3d 405 (5th Cir. 2016) ...................................................................... 36

*Texas v. EPA,*
    2023 WL 2574591 (S.D. Tex. Mar. 19, 2023) ............................................ 37

*Texas v. United States,*
    523 U.S. 296 (1998) .................................................................................... 14

*Union Home Mortg. Corp. v. Cromer,*
    31 F.4th 356 (6th Cir. 2022) ...................................................................... 39

*United States v. City of Los Angeles,*
    595 F.2d 1386 (9th Cir. 1979) .................................................................... 35

*United States v. Mead Corp.,*
    533 U.S. 218 (2001) .................................................................................... 22

*Utility Air Regul. Gp. v. EPA,*
    573 U.S. 302 (2014) .................................................................................... 24

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022) .......................................................................... 23, 24

*Winter v. NRDC, Inc.,*
    555 U.S. 7 (2008) .......................................................................................... 8

*Vara v. DeVos,*
    2020 WL 3489679 (D. Mass. June 25, 2020) .................................... 17, 18, 19

*Zimmerman v. City of Austin,*
    881 F.3d 378 (5th Cir. 2018) ...................................................................... 13

**Statutes**

5 U.S.C. § 705 ...................................................................................................... 40

20 U.S.C. § 1070 ................................................................................................... 3

20 U.S.C. § 1082 ................................................................................................. 20

20 U.S.C. § 1087 ...................................................................................... 3, 31, 32

20 U.S.C. § 1087d ........................................................................................ 20, 30

20 U.S.C. § 1087e .......................................................................... 3, 16, 20, 30

20 U.S.C. § 1094 .................................................................................................. 3, 10

20 U.S.C. §§ 1071–1087-4 ...................................................................................... 3

20 U.S.C. §§ 1221e-3, 1082, 3441, 3474, 3471 ..................................................... 3

**Regulations**

34 C.F.R. § 685.222 .................................................................................................. 5

34 C.F.R. §§ 685.206(c)(2), 685.222(e) .................................................................. 5

59 Fed. Reg. 42,646 (Aug. 18, 1994) ............................................................... *passim*

59 Fed. Reg. 61,664 (Dec. 1, 1994) .............................................................. 4, 17, 32

60 Fed. Reg. 37,768 (July 21, 1995) ................................................................. 4, 17

81 Fed. Reg. 75,926 (Nov. 1, 2016) ................................................................ *passim*

82 Fed. Reg. 6253 (Jan. 19, 2017) ......................................................................... 5

84 Fed. Reg. 49,788 (Sept. 23, 2019) .............................................................. *passim*

86 Fed. Reg. 28,299 (May 26, 2021) ....................................................................... 6

87 Fed. Reg. 41,878 (July 13, 2022) ............................................................... *passim*

87 Fed. Reg. 52,943 (Aug. 30, 2022) ................................................................... 23

87 Fed. Reg. 65,904 (Nov. 1, 2022) ................................................................ *passim*

App.245

**INTRODUCTION**

Congress charged the Secretary of Education with administering the federal student loan programs and thereby ensuring that eligible borrowers can obtain the benefits of postsecondary education. It recognized, however, that a federal student loan recipient might be deprived of the intended educational benefits through improper acts or omissions by the borrower's school. And to ensure that, in those circumstances, borrowers do not bear the costs of school misconduct, Congress authorized the Secretary to specify in regulations the institutional acts and omissions that a borrower may claim as a defense to the general obligation to repay a federal student loan. Such borrower-defense claims, as they have become known, are between the borrower and the Department of Education. While the Department may subsequently recoup discharged loan amounts from the school whose misconduct necessitated discharge—thereby ensuring that taxpayers do not bear the cost of school misconduct—recoupment occurs in wholly separate proceedings with the school.

Beginning in 2015, an unprecedented number of borrowers invoked borrower defenses to repayment following the discovery of widespread fraud by a large chain of for-profit colleges. In response, the Department updated, and has continued to update, its regulations to specify and improve processes for resolving borrower-defense claims. Those updates have responded to changing demands in ways that protect borrowers, schools participating in the federal loan programs, and the public monies that support them. The Rule at issue in this case, set to take effect on July 1, 2023, sets out the latest updates, alongside other related (and unrelated) provisions.

Plaintiff Career Colleges and Schools of Texas (CCST)—a trade association dedicated to the interests of for-profit colleges and similar post-secondary institutions in Texas—seeks to enjoin the Rule and, in doing so, thwart much-needed regulatory improvements and undermine the decades-old foundations of the statutory borrower-defense scheme. This extraordinary request should be rejected.

To start, CCST has not made a clear showing that it has standing to obtain its requested relief.

1

App.246

Though it purports to challenge the Rule on behalf of its member schools, CCST has not identified any member that would have standing in its own right. Nor has CCST shown the Rule's challenged provisions will harm it directly. And in this pre-enforcement context, CCST's claims rest on contingencies and speculation that leave them unripe for judicial review.

CCST fares no better on the merits of its Administrative Procedure Act (APA) claims. Congress provided the Secretary with express authority to create and administer borrower-defense regulations. CCST's arguments that the Secretary nonetheless lacked authority to promulgate the borrower-defense provisions of the Rule defy statutory text, reason, and history, and are unlikely to succeed. Likewise, CCST's substantive objections to the Department's borrower-defense standards and procedures cannot support an injunction because the Department's choices were reasonable and reasonably explained. And CCST's undeveloped constitutional arguments lack foundation.

Nor has CCST demonstrated any certainly impending, irreparable harm absent preliminary relief. CCST insists that the Rule's provisions addressing relief to borrowers harmed by school misconduct will render its members' business models unviable. Yet CCST supports its prognostication with only conjecture and inapt comparisons and impermissibly seeks to evade the irreparable-harm requirement through cursory invocations of compliance costs and underdeveloped constitutional claims.

Finally, CCST has not shown the wholesale nationwide injunction it seeks is in the public interest. The challenged Rule represents the Department's considered judgment on the best means of realizing the congressional objective to afford relief to thousands of student borrowers harmed by schools' misconduct. Against these compelling interests, CCST offers only its members' economic interest in continuing to profit from the federal student aid programs in which they voluntarily participate. No injunction should issue in these circumstances, much less one that governs nationwide against the Rule in its entirety.

2

App.247

## BACKGROUND

I.     **Statutory and Regulatory Background**

A.     **The Higher Education Act and Borrower Defense to Repayment**

Title IV of the Higher Education Act of 1965 (HEA) charges the Department of Education (Department) with the administration of federal student loan programs to "mak[e] available the benefits of postsecondary education to eligible students." 20 U.S.C. § 1070(a). Initially, the largest such program involved Federal Family Education Loans (FFEL)—loans issued by non-federal lenders and supported by the federal government. *See id.* §§ 1071–1087-4. In 1993, Congress created the Direct Loan Program, through which "loan capital is provided directly to student and parent borrowers by the Federal Government rather than through private lenders." 59 Fed. Reg. 42,646 (Aug. 18, 1994). The Department's portfolio now consists of more than 43 million student loans, and Congress has granted the agency broad authority to promulgate regulations to administer these loans and carry out its duties under Title IV. *See, e.g.,* 20 U.S.C. §§ 1221e-3, 1082, 3441, 3474, 3471. Congress has also authorized the Department to issue regulations to ensure that the schools with which it contracts to provide Title IV funds comply with program requirements. *See id.* §§ 1094(c)(1); 1099c(c).

Generally, borrowers must repay all federal student loans received, but the HEA provides authority to relieve this obligation in some circumstances, including based on misconduct by the borrower's school. In particular, the HEA requires the Secretary to specify by regulation "which acts or omissions of an institution of higher education a [Direct Loan] borrower may assert as a defense to repayment of a loan." 20 U.S.C. § 1087e(h). The HEA also requires the Department to "discharge [a] borrower's liability on [a] loan" where that borrower "is unable to complete the program in which such student is enrolled due to the closure of the institution." *Id.* § 1087(c).

B.     **Regulatory History**

Over the past 30 years, the Department has promulgated four sets of borrower-defense

regulations.  The first, in 1994, explained that borrowers in the newly enacted Direct Loan Program could request that the Secretary "exercise his long-standing authority to relieve the borrower of his or her obligation to repay a loan on the basis of an act or omission of the borrower's school."  59 Fed. Reg. at 42,649.  The 1994 rule permitted a borrower to assert as a defense to repayment "any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law."  59 Fed. Reg. 61,664, 61,696 (Dec. 1, 1994).  The rule also provided a non-exhaustive list of "proceedings" in which the borrower could assert a defense, *id.*, and created a "system for adjudicating claims by borrowers that have a defense against repayment of a loan based on the acts or omissions of the school," *id.* at 61,671.  The Department explained that the regulations were designed to continue in the Direct Loan Program the same liability that institutions had long faced under the FFEL program for misconduct related to recruiting and enrolling federal student loan borrowers, *see* 60 Fed. Reg. 37,768 (July 21, 1995)—namely, that such borrowers could assert "both claims and defenses to repayment, without regard as to whether such claims or defenses could only be brought in the context of debt collection proceedings."  81 Fed. Reg. 75,926, 75,956 (Nov. 1, 2016).

The 1994 rule left to the Secretary's discretion the relief to be afforded to successful borrower-defense applicants.  *See* 59 Fed. Reg. at 61,696.  And it authorized the Secretary to "initiate an appropriate proceeding to require the school whose act or omission resulted in the borrower's successful defense against repayment of a Direct Loan to pay to the Secretary the amount of the loan to which the defense applies."  *Id.*; *see also* 60 Fed. Reg. at 37,770 (explaining such recovery proceedings would be conducted "in the same manner and based on the same reasons" as they had historically been conducted in the FFEL Program).

For the next 20 years, the Department's borrower defense regulations were used relatively infrequently.  *See* 81 Fed. Reg. at 75,926.  But in 2015, in response to the high-profile collapse of one of the country's largest for-profit colleges, the Department began to receive an unprecedented "flood

4

of borrower defense claims." *Id.* The Department announced that it would issue a new rule to "establish a more accessible and consistent borrower defense standard and clarify and streamline the borrower defense process." *Id.* This second rule, published on November 1, 2016, established a uniform federal standard governing what institutional "acts or omissions" give rise to a borrower defense, *see* 34 C.F.R. § 685.222(a)-(d), and created a procedural framework to address the surge of borrower-defense claims the Department had begun to receive. *Id.* §§ 685.206(c)(2), 685.222(e). It also built on the Secretary's existing authority to take "remedial actions . . . to collect losses arising out of successful borrower defense claims for which an institution is liable." 81 Fed. Reg. at 75,927. In such proceedings, institutions are "afforded a full and fair opportunity to defend themselves," 82 Fed. Reg. 6253 (Jan. 19, 2017), including notice, the opportunity to present evidence, and a hearing. *See generally* 34 C.F.R. 668, subpart G.

In 2019, the Department published a third rule revising the borrower-defense standard and amending related claim-review procedures. *See* 84 Fed. Reg. 49,788 (Sept. 23, 2019). The 2019 rule reaffirmed that the Department would continue to accept "affirmative" defense-to-repayment claims outside of formal debt collection proceedings, *id.* at 49,795-97, and it expanded "institutional responsibility and financial liability" for losses resulting from approved claims. *see id.* at 49,790.

Under each of these earlier rules, the Department would adjudicate applications from federal student loan borrowers to discharge their student loan repayment obligations based on misconduct by their institutions. In appropriate circumstances, the Department has also initiated subsequent proceedings to recoup discharged amounts from the school whose misconduct necessitated the loss to the taxpayer. Because the various regulations set forth different substantive standards and procedural rules depending on the disbursement date of a given loan, the Department determined, based on its experience reviewing "hundreds of thousands of claims" over the past several years, 87 Fed. Reg. 41,878, 41,889 (July 13, 2022), that new regulations were necessary to, among other things,

"clarif[y] [the] process for" borrowers to submit applications and "creat[e] . . . a single upfront Federal standard to streamline the Department's consideration of applications." *Id.* at 41,880.

### C.    The 2022 Rule

The Department initiated the latest rulemaking in 2021. *See* 86 Fed. Reg. 28,299 (May 26, 2021). After engaging in a statutory negotiated rulemaking process, the Department published a notice of proposed rulemaking (NPRM) in July 2022. The NPRM proposed "several significant improvements to existing programs authorized under the [HEA] that grant discharges to borrowers who meet specific eligibility conditions." 87 Fed. Reg. at 41,879. After receiving more than 4,000 public comments, the Department issued its final rule, updating regulations governing borrower defense and closed school discharges, along with a number of other provisions affecting a broad swath of statutory programs. *See* 87 Fed. Reg. 65,904 (Nov. 1, 2022) (2022 Rule or Rule).

Like the 2016 and 2019 rules, the 2022 Rule creates a uniform federal standard defining the acts and omissions that a Direct Loan borrower can assert as a defense to repayment. The Rule states that, for all loans disbursed on or after July 1, 2023, and with respect to all applications pending as of that date, a borrower defense will be based on the Department's conclusion "by a preponderance of the evidence that the institution committed an actionable act or omission and, as a result, the borrower suffered detriment of a nature and degree [] warranting relief." 87 Fed. Reg. at 66,068. The Rule then lists five categories of acts or omissions that are actionable when connected to a borrower's decision to attend an institution or take out a covered loan: (1) substantial misrepresentations that mislead a borrower, (2) substantial omissions of fact, (3) failures to perform contract obligations, (4) uses of aggressive and deceptive recruitment methods, and (5) conduct giving rise to court or administrative tribunal judgment, or Department sanctions, favorable to the borrower. *Id.* at 66,068–69.

The Rule also sets forth revised procedures to govern a borrower's assertion of a defense to repayment and the Department's consideration thereof. These procedures require that borrowers

submit an application, "under penalty of perjury," describing the institutional act or omission giving rise to the application; that institutions receive notice of any claims against them and the opportunity to respond; and that the Secretary issue a written decision approving or denying the claim and notifying the applicant of any relief awarded. *Id.* at 66,070–72.

The 2022 Rule again "provide[s] a path for recouping the cost of approved discharges from institutions when warranted and after significant due process opportunities." *Id.* at 65,907. Recoupment remains a separate proceeding, conducted only after the Department grants relief to a borrower. The Department must provide the borrower's school written notice and an opportunity to present evidence and a hearing, and must prove that any amounts it seeks to recover were discharged on the basis of a borrower-defense claim. *See id.* at 66,041, 66,072–73. And the 2022 Rule makes clear that "the Department will not attach any new liability for institutions to actions or transactions that were permissible when the events occurred." *Id.* at 65,941.

The Department also amended its closed-school discharge regulations (which provide relief separate from a defense to repayment) to "expand borrower eligibility for automatic discharges," *id.* at 65,904, by changing the criteria for determining the "closure date for a school that has ceased overall operations," *id.* at 65,966. The Rule provides that a school closure date is, as determined by the Secretary, the earlier of the date "that the school ceased to provide educational instruction in programs in which most students at the school were enrolled" or the date "that reflects when the school ceased to provide educational instruction for all of its students." *Id.* at 66,060. This ensures that "[a] school that has remained open would not be considered a closed school," while closing existing loopholes that allowed schools to sometimes "deny[] closed school discharges to [otherwise eligible] borrowers." *Id.* at 65,966. The Rule only "establish[es] a closure date for a school that has ceased overall operations," *id.*, and does not expand the overall scope of the closed-school definition.

7

## II.     This Lawsuit

CCST is a trade association for Texas-based, for-profit, higher education institutions that claims "more than 70 member schools." Compl. ¶ 3, ECF No. 1. It initially filed this case in February in the Northern District of Texas. *Id.* at 1. Several weeks later, on April 5, 2023, CCST moved for a preliminarily injunction. *See* Br. in Supp. of Mot. for Prelim. Inj., ECF No. 24 ("PI Br."). The case was then transferred to this District. *See CCST v. U.S. Dep't of Educ.*, No. 4:23-cv-206-P, 2023 WL 2975164 (N.D. Tex. Apr. 17, 2023). While its motion only addresses claims against the 2022 Rule's provisions concerning borrower-defense claims and closed school discharges, CCST seeks a nationwide preliminary injunction against the Rule in its entirety.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy" that should "never [be] awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted). A plaintiff may obtain this "extraordinary remedy" only "upon a clear showing" that it is "entitled to such relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008). The plaintiff must show (1) "a substantial threat of irreparable injury," (2) "a substantial likelihood of success on the merits," (3) "that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted," and (4) "that the grant of an injunction will not disserve the public interest." *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016) (citation omitted). The plaintiff must "clearly carr[y] the burden of persuasion on all four requirements." *Id.* (citation omitted).

## ARGUMENT

## I.     The Court Lacks Jurisdiction to Grant CCST's Motion

### A.     CCST Lacks Standing to Bring the Claims at Issue

Standing is a jurisdictional requirement, and it must be established "for each form of relief sought," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (citation omitted). Because CCST

App.253

seeks a preliminary injunction on behalf of both itself and its members, it must "clearly show" a likelihood that it has direct or "associational standing" to bring each of its claims on the merits. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329–30 (5th Cir. 2020). CCST cannot make either showing.

### 1.    CCST has not clearly shown a likelihood of associational standing

To establish associational standing, an organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Speech First*, 979 F.3d at 330 (citation omitted). At the first step, the organization must "make specific allegations establishing that at least one identified member ha[s] suffered or [will] suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). "To make this showing when seeking an injunction, the organization must show an individual [member] who has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct, and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 (5th Cir. 2012) (citation omitted). CCST's allegations fail at this threshold step.

As to the Rule's borrower-defense provisions, CCST asserts that some of its members are "required to conform" to the challenged provisions, which could one day "subject [them] to *potential* liability for discharged loans, to revocation or denial of eligibility to participate in the federal student loan programs, and to restrictions upon participation," and leave them facing "reputational injury and enormous financial liability." Compl. ¶ 27 (emphasis added). These allegations involve only "conjectural or hypothetical" injuries dependent on the independent actions of third parties (student-borrowers), rather than any direct injury to a CCST member from the borrower-defense provisions that is "real and immediate." *Funeral Consumers*, 695 F.3d at 344; *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Even assuming that some student at some CCST member school will someday be

9

injured by that school in a manner contemplated by the Rule and then assert a related borrower-defense claim to the Department, any pecuniary or reputational injury to the school is still further steps removed.  The Department must then decide the claim in favor of the student—hardly a foregone conclusion—and then also initiate a subsequent recoupment action against the school.  *See, e.g.*, 87 Fed. Reg. at 65,909.  Even then, the school may contest its financial liability before the agency and may seek judicial review of any final recoupment decision.  *See Cal. Ass'n of Private Postsecondary Schs. v. DeVos* ("*CAPPS*"), 344 F. Supp. 3d 158, 180-81 (D.D.C. 2018) (finding that association of for-profit schools lacked standing and did not present ripe challenges to the 2016 borrower defense rule).

CCST's supporting declarations only underscore the conjectural nature of these supposed harms.  For example, one states that Lincoln Tech schools are engaging in preparatory activities such as "allocating staff and resources" and "upgrading recordkeeping systems" to deal with an "anticipated flood of meritless borrower defense claims."  Decl. of Scott Shaw (Shaw Decl.) ¶ 20, ECF No. 25 at 4-5.  But it offers no facts to support the prediction that borrowers who attend or attended Lincoln Tech schools will bring "meritless" claims.  And allocating staff to ensure compliance with the requirements of a program that a school voluntarily participates in and benefits from is not a concrete injury attributable to the Rule.  Indeed, the absence of any "real and immediate" injury is also shown by the fact that ECPI University *already* employs significant staff whose job duties include ensuring compliance with Title IV and other state and federal regulations.  *See* Decl. of Jeff Arthur (Arthur Decl.) ¶ 15, ECF No. 25 at 41.  These compliance efforts are plainly preexisting efforts required to participate in the Direct Loan Program.  *See, e.g.*, 20 U.S.C. § 1094 (placing compliance requirements on Title IV participation).

CCST's claims of injury from the closed school discharge provisions are even more vague and attenuated.  CCST asserts that member schools have "abandon[ed] plans to build, expand, or consolidate campuses or facilities" because of their perceived risk of "liability stemming from the new

10

regulations governing closed schools."  PI Br. at 3; *see* Arthur Decl. ¶ 22, ECF No. 25 at 43 (alleging that "ECPI University has been forced to abandon plans to build new or upgrade existing schools"); Shaw Decl. ¶ 17, ECF No. 25 at 35 (alleging vaguely that Lincoln Tech schools will "reconsider the opening of new campuses and upgrading of existing ones").  None of this demonstrates any real and immediate injury sufficient for standing.  CCST does not identify any specific plans that have been or may be delayed or abandoned, nor explain why the closed school discharge provisions would necessitate any such changes to members' unspecified plans.  And mere "uncertainty" about what the Rule actually requires "falls short of the type of actual and imminent threat needed to show" CCST's entitlement to relief, *CAPPS*, 344 F. Supp. 3d at 172, particularly in light of the Department's stated intent to provide further guidance as to what constitutes a closed school.  *See* 87 Fed. Reg. at 41,924.

As with the borrower-defense provisions, any concrete harm that CCST's members might suffer from the closed school discharge provisions remains several steps down the line.  To start, CCST does not allege that any member school has closed or plans to close.  And the imposition of closed school liability against apparently open schools based on their hypothetical future plans to "build, expand, or consolidate campuses," PI Br. at 3, is not only unlikely, but could occur only after the Department prevails in an administrative proceeding, after having granted relief to eligible student-borrowers.  *Cf.* Arthur Decl. ¶ 24, ECF No. 25 at 44 (contending that "a 'closed school discharge' *could* be triggered by consolidating facilities," for which a school potentially "*would* be presumptively held liable" in the event that the Department "determin[es] that the criteria is met" (emphases added)).  That potential outcome is too remote to provide associational standing here.

## 2.     CCST has not clearly shown a likelihood of organizational standing

To establish organizational standing, CCST must make the same showing required of an individual plaintiff: an injury in fact that is "concrete and demonstrable," fairly traceable to the challenged agency conduct, and likely to be redressed by a favorable court decision.  *Havens Realty*

*Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982); *see OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017).  It is not enough to show merely "a setback to the organization's abstract social interests." *Havens*, 455 U.S. at 379.  Rather, CCST must demonstrate that it "diverted significant resources to counteract the defendant's conduct," which "significantly and 'perceptibly impaired' the organization's ability to provide its 'activities—with the consequent drain on the organization's resources.'" *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010) (quoting *Havens*, 455 U.S. at 379).

CCST alleges direct injury in the form of (1) a "frustrated" mission; (2) "reputational harm" as a representative of purportedly "disfavor[ed]" institutions; and (3) the diversion of resources to "identify" the effects of the Rule, to submit comments on the proposed rulemaking, and to "prepare for the future regulatory landscape." Compl. ¶¶ 22–23.  None of these constitutes an injury in fact.

To bolster CCST's cursory allegations of a frustrated mission, CCST asserts in a declaration that its mission—"to represent and protect the interests of its career education school members [and] the students they train, as well as of career education, more generally, in the State of Texas," Decl. of Nikki England (England Decl.) ¶ 8, ECF No. 25 at 25—will be negatively affected by "regulations like those in the Final Rule," that allegedly will cause a "decline in career education schools and vocational training," *id.* ¶ 25, ECF No. 25 at 28.  This conclusory assertion is nothing more than an unspecified "setback to the organization's abstract social interests"—and "far more" is required to establish organizational standing.  *Havens*, 455 U.S. at 379.

As to reputational harm, allegations of injury to CCST are even more abstract than those concerning its member schools: each of CCST's alleged injuries depend on the already-speculative harms that its member schools allegedly have suffered or will suffer.  *See supra* pp. 9-11.  Similarly, as to the closed-school discharge provisions, CCST's allegation that its "operations" would be "hinder[ed]," "*[t]o the extent*" that liability of its member schools "will result in the closure" of some schools under the Rule, is vague and speculative.  Compl. ¶ 22 (emphasis added).  The closed school

discharge provisions do not threaten any real and immediate injury to the member schools, and CCST does not identify any concrete, direct effect on its own operations.

Finally, CCST's allegations that it has expended resources to "identify" and "prepare for" the effects of the Rule, Compl. ¶ 23, fall far short of showing a "drain" on its resources significant enough to "perceptibly impair[]" its activities in support of member schools, *Havens*, 455 U.S. at 379. CCST states that it submitted comments on the Department's proposed rule, but voluntarily submitting such comments does not give rise to an injury in fact. *Cf. Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018) ("[S]tanding cannot be conferred by a self-inflicted injury."). Nor does "working with schools to manage" unidentified demands on resources that certain aspects of the Rule may cause. England Decl. ¶ 30, ECF No. 25 at 29. Contrary to showing a drain on organizational resources and impairment of the organization's activities, actions such as advocating for and working with member schools appear to align comfortably with the organization's ordinary activities. *See* Compl. ¶¶ 10, 28.

**B.     The Claims at Issue Are Not Ripe**

CCST also fails to establish that its pre-enforcement challenges to the Rule are ripe. The ripeness doctrine requires a reviewing court to ensure "that federal courts do not decide disputes that are premature or speculative," reflecting both "Article III limitations on judicial power, as well as prudential reasons for refusing to exercise jurisdiction." *DM Arbor Ct., Ltd. v. City of Houston*, 988 F.3d 215, 218 (5th Cir. 2021) (citation omitted); *see Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003). The ripeness inquiry relies on two factors: (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 545 (5th Cir. 2008). A case is ripe only "when it would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future." *DM Arbor Ct.*, 988 F.3d at 218 (citation omitted). Claims are not ripe if they "rest[] upon 'contingent future events that may not occur as anticipated, or indeed may not occur at

all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted).

CCST's claims against the Rule's borrower-defense provisions fail both prongs of the ripeness inquiry. First, they are not "fit" for judicial decision because they rest on "contingent future events." *Texas*, 523 U.S. at 300. The Rule's standards and procedures for adjudicating borrower-defense claims principally concern borrowers and the taxpayers who foot the bill for relieving borrowers of their obligation to repay their loans; they could potentially threaten harm to a school only to the (at this point hypothetical) extent that the Department engages in a recoupment proceeding designed to impose financial liability on the school. This has been true under every iteration of the borrower-defense regulations, and any assertion that the number of borrower-defense actions by students at CCST member schools (and subsequent recoupment proceedings) will increase under the Rule is wholly speculative. If a school is ultimately subject to a recoupment proceeding, it will then have the opportunity to contest the facts underlying that proceeding—with a fully developed record, supplemented by the school—followed by an opportunity to appeal the agency decision, and it may challenge the result and procedures in federal court. None of the steps in that process have been taken here, and it is uncertain how the relevant standards and procedures might be applied as to any CCST member. It would thus be "premature" to adjudicate CCST's claims at this stage. *Nat'l Park Hosp.*, 538 U.S. at 807; *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) ("[A] regulation is not ordinarily considered . . . 'ripe' for judicial review under the APA until the scope of the controversy has been reduced . . . by some concrete action applying the regulation to the claimant's situation[.]").

Nor will CCST or its members suffer hardship from withholding review of CCST's borrower-defense challenges. Again, the relevant provisions will be applied to impose liability on any school, if at all, only after an actual recoupment proceeding, in which the school will have ample opportunity to contest liability and the ability to seek judicial review of any final recoupment decision. Postponing review until after the conclusion of any such proceedings will impose no hardship on CCST or its

member schools. *See CAPPS*, 344 F. Supp. 3d at 181–82 (finding challenge to 2016 borrower-defense rule unripe given "the undisputed availability of APA review of any final recoupment decision").

CCST's claims challenging the closed school discharge provisions are likewise premature. As described above, the potential for closed-school liability is several steps removed from CCST's allegations. Without the benefit of the relevant factual development, CCST's claims challenging these provisions are not ripe. Indeed, the inchoate nature of CCST's concerns with the closed school discharge provisions reinforces this conclusion, as does the fact that the Department has stated that it will provide further administrative guidance on those provisions. *See* 87 Fed. Reg. at 41,924; Compl. at 72 n.4. Given that CCST identifies no specific effects that the closed school discharge provisions will have on member schools before any liability proceedings, it will not suffer hardship absent a judicial decision on its claims at this stage.

## II.    CCST Cannot Show a Likelihood of Success on the Merits

### A.    The Borrower-Defense Provisions Are Statutorily Authorized

On the merits, CCST's principal argument is that, notwithstanding the HEA's clear directive that the Secretary "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a [Direct] loan," the Secretary lacks authority either to "adjudicate borrower defense claims" at all or to recoup amounts discharged on the basis of successful borrower defense claims from Title IV participating institutions. *See* PI Br. at 9. CCST's argument that these borrower-defense provisions are unlawful is inconsistent with the plain meaning of the HEA, common sense, and the agency's three-decade uninterrupted history of interpreting and applying the statutory provision.

#### 1.    The HEA authorizes borrower-defense claims adjudication

The HEA broadly delegates to the Department the authority to issue regulations giving shape to the statutory concept of borrower defense. *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158,

15

App.260

165 (2007) (the "power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress" (citation omitted)).  Coupled with the Department's general authority to promulgate regulations to effectuate its responsibilities under the federal student loan programs, *see supra* p. 3, the HEA authorizes the longstanding provisions of the Rule to which CCST objects.  *See City of Arlington v. FCC*, 569 U.S. 290, 296 (2013) (Congress "knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion").

      1.      To start, there is no statutory basis for CCST's attempted distinction between "*defenses* to repayment that a borrower may assert in collection actions" and "*affirmative* claims."  PI Br. at 9. The HEA refers broadly to a borrower's ability to "assert . . . a defense to repayment."  20 U.S.C. § 1087e(h).  And as the Rule explains, "the concept of repayment is widely understood to encompass not just borrowers in default but also those actively repaying their loans."  87 Fed. Reg. at 65,914. That makes sense: a borrower maintains an ongoing obligation to repay federal student loans, whether collection is attempted by sending the borrower monthly billing statements or via "involuntary" proceedings—such as offset or wage garnishment—once a borrower falls into default.  It is the "existing obligation to repay" the loan, *id.*, not the pendency of any formal action to collect a defaulted loan, that gives rise to the defense against repayment.[2]  Indeed, as the Rule explains, limiting borrowers to so-called "defensive" assertions of their right against repayment would be "illogical" because it would "place borrowers in an unfair situation of either intentionally defaulting in the hopes that a BD claim is successful or repaying a loan that potentially should be discharged."  *Id.*; *see also* 84 Fed. Reg. at 49,796 (noting problems associated with interpreting the HEA to "provide borrowers with an

---

[2] For this reason, among others, CCST's reductive assertion that Congress intended to limit the availability of the student loan borrower defense to individuals already in default merely because the statute uses the words "defense" and "defendants assert defenses," PI Br. at 9, is unpersuasive.

incentive to default"). The HEA—which to the contrary recognizes a broad "right to raise 'defense[s] to repayment," *Vara v. DeVos*, 2020 WL 3489679, at *2 (D. Mass. June 25, 2020)—does not require that perverse result. *See Carpenters Dist. Council of New Orleans v. Dillard Dep't Stores, Inc.*, 15 F.3d 1275, 1285 (5th Cir. 1994) (courts should "avoid any interpretation that would lead to absurd results or unreasonable outcomes").

CCST seeks support for its interpretation in the Department's 1994 rule, which provided for borrower defenses to be asserted in enumerated "proceeding[s] to collect on a Direct Loan." PI Br. at 9–10. But that selective reference to the Department's historical practice is misleading. *See supra* pp. 4-5. Setting aside that the 1994 rule's list of proceedings was not exhaustive, *see* 59 Fed. Reg. at 61,696, it has always been the case that "borrowers who are not facing [default collection] proceedings and, indeed, not in default at all may nonetheless assert and obtain an adjudication of their borrower defense." *Vara*, 2020 WL 3489679, at *3. The HEA's reference to "defense to repayment" codified the Secretary's "long-standing authority to relieve [a] borrower of his or her obligation to repay a loan on the basis of an act or omission of the borrower's school," 59 Fed. Reg. at 42,649, and the Department's borrower defense regulations were "intended to ensure that institutions participating in" the Direct Loan Program have "similar potential liability" as participants in the older FFEL Program, 60 Fed. Reg. at 37,769. And in *that* program, borrowers have long been permitted to "assert both claims *and* defenses to repayment, without regard as to whether such claims or defenses could only be brought in the context of debt collection proceedings." 81 Fed. Reg. at 75,956.

Across three rulemakings over the last few years, the Department has consistently reaffirmed its common-sense understanding that the HEA permits borrowers to assert institutional misconduct as a defense at any point during the repayment process. *See, e.g.*, 84 Fed. Reg. at 49,796 ("throughout the history of the [1994] borrower defense repayment regulation, the Department has approved . . . affirmative borrower defense to repayment requests"). In short, "the texts of the HEA and the [1994]

17

App.262

borrower defense regulation, as well as Education's contemporaneous interpretations, contracts, and adjudicatory practices, demonstrate that the agency must adjudicate affirmative applications for borrower defense relief." *Vara*, 2020 WL 3489679, at *6; *see also Acosta v. Hensel Phelps Constr. Co.*, 909 F.3d 723, 736 (5th Cir. 2018) (agency's "contemporaneous construction of applicable law and subsequent consistent interpretation" is entitled to "persuasive weight" (citation omitted)).

2.    Next, CCST contends that the HEA does not authorize the Department to adjudicate borrower defense claims at all. *See* PI Br. at 10-12 (arguing that even if the HEA authorizes the creation of affirmative borrower defense claims, nothing authorizes the Department to adjudicate them). This argument fails for many of the same reasons discussed above. CCST in effect argues that, even though Congress explicitly provided for borrowers to broadly assert defenses to their ongoing repayment obligations based on the misconduct of their schools, Congress nonetheless made no provision for the Department to actually review those assertions or to provide relief from the referenced repayment obligations. That is self-evidently an unreasonable interpretation of the borrower defense statutory provision, and it ignores the broad rulemaking authority that Congress has otherwise granted the Department to carry out its statutory duties and administer the programs that Congress creates. *See supra* p. 3.

As the Department has explained, these provisions "grant the Department authority to promulgate regulations giving content to the statutory BD provision, including an adjudication framework" for determining whether a borrower's asserted institutional "acts or omissions" meet the regulatory defense-to-repayment standard. 87 Fed. Reg. at 65,913; *see also* 84 Fed. Reg. at 49,706 ("by providing that the Department may regulate borrowers' assertion of borrower defenses to repayment, [the HEA] grants the Department the authority to . . . establish the procedures for receipt and adjudication of borrower claims"); 81 Fed. Reg. at 75,965 (Congress "gave the Department the authority to determine such subordinate questions of procedure, such as . . . how . . . claims by

18

App.263

borrowers should be determined"). Within the context of that statutory scheme, the Department has the statutory authority to adjudicate whether asserted acts or omissions establish a borrower's defense to repayment. *See Vara*, 2020 WL 3489679, at *3 (where "Congress has delegated to an agency the task of administering federal programs, that agency undertakes a non-discretionary duty to adjudicate claims or applications that are essential to the administration of those programs" (citation omitted)); *Sweet v. Cardona*, 2022 WL 16966513, at *1 (N.D. Cal. Nov. 16, 2022) (recognizing Department's authority to adjudicate borrower-defense claims).

CCST has no real rejoinder to any of this. Rather, it relies on an unreasonably crabbed reading of the HEA and the curious assertion that any power of adjudication must be "*explicitly*" granted to federal agencies. PI Br. at 11 (emphasis in original). But the case it cites for that proposition, *National Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563 (D.C. Cir. 1987), imposed no such blanket requirement. Indeed, it recognized the general principle that "where Congress has made an explicit *or implicit* grant of power to an agency over certain matters, that grant of power . . . compels deference from the courts in reviewing how that power is exercised," *id.* at 1570 (emphasis added). Given how well settled the authority of agencies to conduct adjudications is, *see, e.g.*, *City of Arlington*, 569 U.S. at 304 n.4 ("Agencies make rules . . . and conduct adjudications . . . and have done so since the beginning of the Republic."), the question of whether a particular statute permits an agency to conduct adjudications is resolved not by asking whether Congress has provided a clear statement, but by asking, as in any other question of agency statutory interpretation, "whether the statutory text forecloses the agency's assertion of authority." *Id.* at 301. The HEA does not.

CCST also contends that it would somehow "require a waiver of sovereign immunity," PI Br. at 11, for the Department to provide borrower-defense loan discharges in administrative proceedings. But sovereign immunity is a defense to be asserted by the United States in court proceedings initiated against the federal government; it is not a limitation on an agency's ability to disburse benefits

19

according to a congressionally created scheme. *See, e.g., Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983). When federal student loan recipients assert defenses against their repayment obligations, they are not making "claims for financial relief against the Government," PI Br. at 11, much less bringing suits against the United States in which the sovereign immunity defense might apply. *See Sweet*, 2022 WL 16966513, at *13 ("Discharge of an obligation to repay a debt does not constitute monetary damages."). In any event, the HEA waives sovereign immunity with respect to any civil action relating to the Secretary's performance of "the functions, powers, and duties, vested in him by" the FFEL and Direct Loan Programs. 20 U.S.C. § 1082(a)(2); *see also id.* § 1087e(a)(1).

3.    Finally, CCST asserts that the Department lacks statutory authority to "adjudicat[e] . . . recoupment actions against schools after a borrower defense claim has been granted." PI Br. at 12. As explained above, any challenge to the Department's recoupment procedures is not ripe. *See supra* Sec. I.B. Even setting that aside, CCST again challenges a feature of the Rule that has been in place, without incident and across multiple versions, for almost 30 years. *See, e.g.*, 81 Fed. Reg. at 75,931 (the Department has, "from the inception of the Direct Loan Program, considered its administrative authority under the HEA . . . to authorize the Department to hold schools liable for losses incurred through borrower defense, and to adopt administrative procedures to determine and liquidate those claims"). And, as CCST appears to recognize, PI Br. at 13, the Department's authority to hold institutions liable for losses that they generate through participation in Title IV is well established. *See* 87 Fed. Reg. at 65,948 (explaining that the HEA requires "that an institution must accept responsibility and financial liability stemming from its failure to perform the functions set forth" in its participation agreement with the Department); 20 U.S.C. § 1087d(a)(3). This is an important aspect of the Department's stewardship of the public fisc; the Department loans billions of dollars to students attending participating institutions every year to further their higher education, and being able to recoup from schools the "discharge-related liabilities" that their acts or omissions create is a "critical

20

tool" for protecting the taxpayer investment.  87 Fed. Reg. at 65,948; *see also* 84 Fed. Reg. at 49,838.

In light of this clear statutory authority, CCST's objection appears to be that the HEA does not explicitly address whether the schools' financial liability should be "adjudicated . . . by the courts or the Department."  PI Br. at 13.  That argument presents a false choice because any final recoupment decision by the Department is subject to judicial review under the APA.  And as explained, *infra* Sec. II.C, there is no doubt that the Department may use administrative adjudication, subject to judicial review, to determine entitlements and liabilities that exist only by virtue of federal law.[3]  Because the HEA provides for the Department to discharge loans based on institutional misconduct and requires schools to accept financial liability arising from their participation in Title IV, the Department is authorized to initiate administrative proceedings to recoup from schools amounts discharged on the basis of borrower defense.  *See Chauffeur's Training Sch., Inc. v. Spellings*, 478 F.3d 117, 125–30 (2d Cir. 2007) (upholding Department's authority to "administratively assess a liability for loan program violations" even where the HEA was "silent" with respect to the particular context at issue).

CCST notes that the Department's right to recoup amounts associated with other kinds of loan discharges is expressly stated in the HEA.  *See* PI Br. at 13.  But that is no reason to conclude that Congress intended to preclude the Department from seeking recoupment in connection with its longstanding "authority to relieve [a] borrower of his or her obligation to repay a loan on the basis of an act or omission of the borrower's school."  59 Fed. Reg. at 42,649.  The HEA broadly authorizes the Secretary to recover liabilities incurred by Title IV participating schools, and its express—and nonexclusive—provision for recoupment in certain circumstances is "not inconsistent with implied

---

[3] CCST misleadingly contends that the Department has previously recognized that its recoupment authority arises "not by virtue of any statutory requirement, but under common law."  PI Br. at 13.  That quote is taken from the 2016 rule, which in actuality states that the Secretary's authority to seek recoupment arises from "two distinct, and overlapping, lines of authority"—the HEA *and* "the government's rights under common law."  81 Fed. Reg. at 75,930.

authorization to recover funds" discharged on the basis of borrower defense. *Chauffeur's Training Sch.*, 478 F.3d at 127; *see* 81 Fed. Reg. at 75,930 (explaining how additional provisions of the HEA support the Department's recoupment authority).

### 2.     The Department's reasoned interpretation is entitled to deference

Even if there were any doubt about whether the Department's interpretations of these statutory issues represent the best reading of the HEA, the Court should defer to those interpretations. In instances where an agency interpretation carries the force of law and Congress has not "directly spoken to the precise question at issue," *Chevron, USA, Inc. v. NRDC, Inc.*, 467 U.S. 837, 842–43 (1984), courts "defer to the agency's" interpretation so long as it is "based on a permissible construction of the statute." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 433 (5th Cir. 2021). There can be no question that the Rule carries the force of law—Congress has "delegated authority to the agency generally to make rules carrying the force of law," and the Rule was "promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001).

For the reasons explained above, the Department's interpretation that the HEA permits it to adjudicate defense to repayment claims from borrowers and to initiate corresponding administrative recoupment proceedings is reasonable. This is especially true because the interpretations are nearly 30 years old and unchanged across multiple rulemakings dating back to the period contemporaneous to Congress' enactment of the borrower defense statutory provision. *See, e.g.*, *Acosta*, 909 F.3d at 735–36 (upholding as "well within the bounds of permissible interpretation" agency position that "makes practical sense" and was "consistently held . . . for decades").

### 3.     The major questions doctrine does not apply

Perhaps recognizing the weakness of its statutory arguments, CCST resorts to the major questions doctrine. But that doctrine—which is reserved for "extraordinary cases," involving assertions of "extravagant statutory power over the national economy" or "highly consequential power

beyond what Congress could reasonably be understood to have granted," *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (citations omitted), has no application here. The provisions of the Rule that CCST challenges have been in effect for more than 30 years and were enacted pursuant to a statutory provision that codified the Department's "long-standing authority to relieve [a] borrower of" his or her loan repayment obligation based on "an act or omission of the borrower's school." 59 Fed. Reg. at 42,649.

CCST's basis for invoking the major questions doctrine is that the rule "may impose billions of dollars of burden on the public fisc and existential liability on [some] post-secondary schools." PI Br. at 14. That use of "may" is telling—as discussed, CCST comes nowhere close to establishing that the Rule will actually have such calamitous effects. Even setting that aside, "*West Virginia* made clear that determining whether a case contains a major question is not merely an exercise in checking the bottom line." *Sweet*, 2022 WL 16966513, at *6. And this is not a case where the "sheer scope" of the agency's claimed authority provides a "reason to hesitate," *West Virginia*, 142 S. Ct. at 2608. To the extent the provisions CCST challenges affects schools at all, they operate as conditions on the receipt of federal funds, applicable only to the entities that choose to contract with the Department. The Rule does not apply outside the Department's contractual relationships or the field of higher education financing, and it does require any school to take any action at all; if the schools disagree with the challenged provisions of the Rule, they are free to decline the funds.[4] This is unlike the assertions of

---

[4] CCST's reference to a January 2021 memorandum from the Department's Office of General Counsel addressing the Secretary's authority to cancel Title IV loan debt on a "blanket or mass" basis, PI Br. at 14, is a non-sequitur. The Rule defines, in accordance with specific statutory authorization, the types of institutional misconduct that a borrower can assert as a defense to repayment and articulates standards for the Department to adjudicate such assertions and provide relief where the defense is established by a preponderance of the evidence. It obviously does not involve the mass cancellation of all existing federal student loan debt. In any event, the cited memorandum has no binding effect because the Department later concluded that it was "not properly promulgated." *See* 87 Fed. Reg. 52,943, 52,945 (Aug. 30, 2022).

sweeping regulatory authority to which the Supreme Court has applied the doctrine, such as when OSHA sought to adopt "a broad public health regulation" requiring vaccination or other COVID-19 precautions in the workplace, *NFIB v. OSHA*, 142 S. Ct. 661, 666 (2022); the CDC sought to regulate "the landlord-tenant relationship" through a nationwide eviction moratorium, *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021); or the EPA contemplated regulation of power plants that would require restructuring the country's mix of electricity generation, *West Virginia*, 142 S. Ct. at 2608.

Nor does the Rule represent a novel exercise of agency authority or rely on an "ancillary," *id.* at 2602, statutory provision. *See Utility Air Regul. Gp. v. EPA*, 573 U.S. 302, 324 (2014) (invoking major questions doctrine "[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy'" (citation omitted)). The parts of the Rule that CCST challenges—providing for the assertion and adjudication of borrower defense to repayment based on institutional misconduct—are based on a statutory provision that requires the Department to issue regulations governing the institutional misconduct that borrowers can assert as defense to repayment. They have been consistently included in four different versions of the same regulation, dating back to 1994. And they are in the heartland of the Department's statutory expertise in administering federal student loans and issuing rules to govern the award of relief from repayment obligations in statutorily-recognized circumstances. This is not a case where an agency is attempting to use vague statutory language to justify expansive regulatory action, and the major questions doctrine does not apply.

### B.    The Borrower-Defense Provisions Are Reasonable

Unable to show that the Rule's borrower-defense provisions are altogether unauthorized under the HEA, CCST next assails them as substantively unreasonable. *See* PI Br. at 15–20. These arguments are properly considered under the "narrow and highly deferential" arbitrary-and-capricious standard of review, *Huawei Techs.*, 2 F.4th at 449 (citation omitted), which requires simply that the

agency "has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision," *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). "[A] court is not to substitute its judgment for that of the agency," and should uphold even a decision of "less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (citation omitted). The Rule readily satisfies this deferential standard. *See N.Y. Legal Assistance Grp. v. DeVos*, 527 F. Supp. 3d 593, 604–09 (S.D.N.Y. 2021) (rejecting arbitrary-and-capricious challenges to the 2019 borrower-defense rule).

Before adopting the Rule's borrower-defense provisions, the Department considered its decades of experience with borrower-defense applications, and it reviewed how recent developments had undermined its previous approaches to borrower-defense claims. 87 Fed. Reg. at 41,883. Among other things, the Department explained that the precipitous collapse of Corinthian Colleges, Inc. in 2015 had led to a flood of borrower-defense claims; that this flood of claims had revealed significant inadequacies in the Department's existing regulations; and that the rate of borrower-defense claims had not meaningfully abated in the ensuing years. *See* 87 Fed. Reg. at 65,910. Based on its review, the Department was concerned that "too many borrowers who were subjected to an act or omission by their institution that should give rise to a successful defense to repayment have not received appropriate relief, at least in part because the regulatory requirements have created unnecessary or unfair burdens for borrowers." *Id.* at 65,908. In light of these concerns, the Department explained the need to adopt updated standards and procedures for resolving borrower-defense claims that would balance "transparency, clarity, and ease of administration" with "adequate protections to borrowers, institutions, the Department, and the public monies that fund Federal student loans." *Id.* This response to changed circumstances, carefully explained in response to commenters, falls well within the "zone of reasonableness," even if CCST might have "weighed the evidence differently." *Huawei Techs.*, 2 F.4th at 449, 451; *see also Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 377 (D.C. Cir. 2013).

App.270

CCST quibbles with the Rule's new standards for defining the institutional acts and omissions that may give rise to a meritorious borrower defense to repayment and potentially provide a basis for a recoupment action, but those objections lack foundation.  According to CCST, the five common-sense categories adopted by the Department, fleshed out with real-world examples, lack sufficient "specificity" to allow regulated parties to "conform their conduct," thus subjecting institutions to potential yet unpredictable liability for recoupment.  PI Br. at 15.  But the APA does not require the Department to list every conceivable act and omission.  Indeed, the definitional ambiguity to which CCST objects is "a familiar problem in administrative law," reflecting "well-known limits of expression or knowledge." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2410 (2019).  And notwithstanding CCST's apparent opposition to a "case-by-case" evaluation of institutional conduct, PI Br. at 15, "factual investigations" and "consult[ation] with affected parties" are a well-established (even lauded) method for resolving edge applications of a regulation.  *Kisor*, 139 S. Ct. at 2413.  CCST's concerns should be assuaged by the robust procedural protections afforded to institutions in recoupment proceedings, 87 Fed. Reg. at 66,072–73, and the familiar principles of administrative law that safeguard against the sort of impermissible applications of the Rule that CCST seems to fear.  *Cf. Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156–57 (2012) (rejecting agency interpretation that would have caused unfair surprise by imposing retroactive liability for longstanding conduct the agency had never addressed).

For similar reasons, there should be no concern that borrower-defense claims based on court judgments and Departmental sanctions lack any basis in an act or omission of the relevant institution or otherwise constitute an "end-run[] around the rules of claim preclusion . . . and issue preclusion." PI Br. at 15–16.  In those circumstances, the Rule specifies that the earlier judgment or sanction must be "based on" an act or omission by the institution that relates to a borrower-defense claim.  87 Fed. Reg. at 66,069.  And because any remedies provided in those earlier proceedings may not supplant the relief provided by a borrower defense to repayment, there is no reason to foreclose borrowers from

26

pursuing a borrower defense as well. *Id.* at 65,932. Moreover, nothing in the Rule purports to reverse the Department's longstanding practice of following established principles of collateral estoppel in its determination of borrower defense claims. *Id.* Rather, the Rule reasonably leaves an institution's defenses to liability intact, while promoting full relief for borrowers whose experiences warrant it.

CCST portrays the Rule's allowance for borrower-defense claims based on substantial misrepresentations and substantial omissions of fact as threats "to sanction a school for innocent and unintentional misstatements or omissions of fact." PI Br. at 18. But that caricature bears no resemblance to the Rule's actual standards, for which culpable conduct by a borrower's institution is an essential element. *See* 87 Fed. Reg. at 65,920 ("to approve a claim, the Department must find that the institution committed 'an actionable act or omission and, as a result, the borrower suffered detriment of a nature and degree warranting the relief provided by a borrower defense to repayment'"); *id.* at 65,921 ("[H]armless and inadvertent errors are unlikely to be approved."). Having required a causal link between a school's conduct and a borrower's injury, the Department was not required to condition approval of borrower-defense claims on a further finding that the school knew of or intended to cause harm to the borrower. *Contra* PI Br. at 17. And the Department reasonably concluded that requiring proof of intent would place an unreasonable burden on individual borrowers at the claims stage to prove the state of mind of an institution and its representatives, without any concomitant benefit to the Department's objective of ensuring that injured borrowers can access appropriate relief. *See* 87 Fed. Reg. at 65,921. The obvious distinctions between recoupment proceedings and adjudications of borrower defense claims reinforce that conclusion: in the latter, a school's interests are collateral and extensive adversarial proceedings are administratively infeasible, while in the former, a school may meaningfully contest liability. CCST might have imposed a higher burden on borrowers at the threshold, *see* PI Br. at 17, but bare disagreement with the Department's approach is no cause to enjoin the Rule. *See Huawei Techs.*, 2 F.4th at 451.

CCST's remaining arguments merely quibble with the Department's chosen procedures for adjudicating borrower defense applications. It is black letter law, however, that beyond the minimum procedural requirements for agency action set forth in the APA (which CCST does not dispute have been followed here), "courts lack authority to impose upon an agency its own notions of which procedures are best." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 102 (2015) (citation omitted). In any event, there is nothing unreasonable about the Rule's procedures for group adjudications. *Contra* PI Br. at 18. Much like class actions in the judicial system, a group-based process for adjudicating borrower-defense claims is appropriate given the common and recurring issues involved: often, an institution's act or omission (such as misrepresenting its graduates' employment rates in mass communications to prospective students) will have affected many borrowers. 87 Fed. Reg. at 65,937. It would be inefficient—and a waste of public resources—for the Department to perform individualized adjudications of virtually identical claims involving the same facts and circumstances.

CCST's attack on the Rule's rebuttable presumption in favor of relief where a borrower's defense concerns a closed school is similarly meritless. *See* PI Br. at 19. As an initial matter, this presumption factors into a remedial determination only once a borrower has shown all other required elements—actionable acts or omission, causation, and harm. *See* 87 Fed. Reg. at 65,920. CCST misapprehends this distinction by confusing the remedial element with the factual elements of causation and harm. *See* PI Br. at 19. CCST is equally mistaken in contending that this presumption somehow expands its liability. In fact, the element to which this presumption applies operates as a *limitation* on relief and, thus, on a school's potential liability. *See* 87 Fed. Reg. at 65,947 ("[T]he language ensuring that an approved claim must warrant this relief adds a requirement that the circumstances justify the remedy BD provides.").

In any event, the presumption is reasonable. The remedial prong of a borrower-defense claim is intended to ensure that approved claims match circumstances warranting the full array of remedies

that a defense to repayment provides. *See id.* at 65,920. And in the Department's experience, that remedy is often particularly appropriate when the borrower's school has closed and, prior to closure, has been responsible for injurious acts or omissions, but relief can be challenging to obtain due to the absence of evidence necessary to fully establish the nature and degree of detriment. *Id.* at 65,947. The Department reasonably relied on that experience to conclude that a rebuttable presumption in favor of relief was appropriate in adjudications involving closed schools. And that conclusion is not undermined by the presumptive remedy of full discharge when it is warranted by the totality of the circumstances, *contra* PI Br. at 18, given the documented difficulties associated with measuring harm and calibrating relief in this context, and the underlying equitable purposes of the borrower-defense provisions. *See* 87 Fed. Reg. at 65,946 (concluding that "a clear and consistent standard for applying a partial discharge is not feasible"); *see also id.* (analogizing borrower defenses to rescissionary remedies that seek to "restore the injured party to a pre-transaction status").

### C.     The Borrower-Defense Provisions Are Constitutional

Briefly, CCST raises the specter of constitutional infirmities in the Rule's borrower-defense provisions, but its concerns are unfounded. For one thing, the challenged provisions do not "arrogate" to the Department "the power to adjudicate and enforce state law," nor abridge the Seventh Amendment's guarantee that the right of a trial by jury shall be preserved in suits at common law involving more than twenty dollars. *Contra* PI Br. at 16. As the Supreme Court has explained, "Congress is free to provide an administrative enforcement scheme without the intervention of a jury," *Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n*, 430 U.S. 442, 448 (1977), and the Seventh Amendment does not apply to administrative proceedings involving "public rights created by statutes within the power of Congress to enact," *id.* at 450. Congress has accorded to borrowers a federal statutory right to assert defenses recognized by the Department against the government's otherwise-prevailing right to recover on student-loan debts. 20 U.S.C. § 1087e(h). Congress has

29

likewise empowered the Department to recover losses it incurs as a result of a Title-IV-participating school's actionable acts or omissions. *See* 20 U.S.C. § 1087d(a)(3). In no sense, then, do borrower-defense adjudications pursuant to the Rule contravene the Seventh Amendment.

As noted above, the claims in some adjudications might resemble common law causes of action or incorporate similar standards because the Department has chosen to recognize such standards as good indicators of the kind of acts or omissions that can justify a federal student loan borrower's defense against repayment. But what is being adjudicated is the borrower's repayment obligations—not any rights or liabilities a school might otherwise possess outside of Title IV. In any event, borrower-defense claims concern rights "so closely integrated with a comprehensive regulatory scheme"—that governing federal student loan programs—that they are "appropriate for agency resolution." *Jarkesy v. SEC*, 34 F.4th 446, 453 (5th Cir. 2022); *cf. Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373 (2018) ("[T]he public-rights doctrine applies to matters arising between the government and others, which from their nature do not require judicial determination and yet are susceptible of it." (citation omitted)).

CCST also claims that the Rule "violates the Tenth Amendment and principles of federalism by preempting or modifying state law rights without congressional authorization," PI Br. at 16, but that argument is a red herring. The borrower-defense claims that the Rule governs do not arise under state law, do not substitute for claims under state law, and do not turn on the procedural rules that apply under state law. *See, e.g.*, 87 Fed. Reg. at 65,946 (describing how the borrower-defense "remedy differs from damages"). Indeed, whether or not a borrower prevails on a borrower-defense claim before the Department, resolution of that administrative claim does not dispose of related state-law claims or defenses that the borrower or the borrower's institution might assert in collateral litigation. And contrary to CCST's suggestion, any recoupment action by the Department does not result in a "fine," but simply the recovery of federal funds. *See* 87 Fed. Reg. at 65,949 (explaining that

recoupment is a "means of recovering federal funds" rather than a "punitive step[]").

Finally, CCST cursorily raises due process concerns with the Rule's provisions permitting group adjudications and establishing a presumption in favor of relief for borrower-defense claims concerning closed schools. *See* PI Br. at 19. Even assuming *arguendo* that institutions' protected property or liberty interests are implicated in the Rule's borrower-defense provisions—*but see, e.g.*, *Ass'n of Proprietary Colls. v. Duncan*, 107 F. Supp. 3d 332, 349–50 (S.D.N.Y. 2015) (rejecting due process claim because the HEA "does not create entitlements that receive constitutional protection")—the Rule affords adequate process. Indeed, at the claim-adjudication stage, institutions are provided notice of a borrower's claim and an opportunity to respond with contradictory evidence and responsive legal arguments. An institution may not appeal a decision at that particular stage, but that is entirely proper because loan-discharge proceedings are between the borrower and the Department. When the institution's interests are at issue in any subsequent recoupment proceedings, the Rule affords robust and familiar procedural protections for the institution—including *additional* opportunities to challenge the Department's evidence and findings, present relevant evidence of its own, and pursue an administrative appeal from any adverse determination. The Department's approach appropriately balances the various interests involved in adjudications of borrower-defense claims and the relative benefit of more stringent procedures, calibrating them at each step. Given that "due process is flexible and calls [only] for such procedural protections as the particular situation demands," *Serrano v. U.S. Customs & Border Prot.*, 975 F.3d 488, 496 (5th Cir. 2020) (citation omitted), CCST's procedural qualms are without merit.

### D.     The Closed-School Discharge Provisions Are Lawful

CCST also challenges the closed-school discharge provisions on the ground that the Secretary does not have authority to define the statutory phrase "closure of the institution." PI Br. at 20; *see* 20 U.S.C. § 1087(c)(1) ("the Secretary shall discharge" the loan of a student borrower "unable to complete

[a] program . . . due to the closure of the institution"). CCST objects that the statute's language is so precise that there exists no room for interpretation—because "clos[ed]" is an unambiguous term meaning "not open." PI Br. at 20. But it was well within the Department's authority to define the relevant statutory phrase, *see City of Arlington*, 569 U.S. at 296 (courts defer to "reasonable" agency interpretations of "[s]tatutory ambiguities"), as it has done since 1994, *see* 59 Fed. Reg. at 61,701. The Rule's grant of authority to the Secretary to determine a school's "closure date" is consistent with both the HEA and CCST's definition: as the Rule explains, "[a] school that has remained open would not be considered a closed school." 87 Fed. Reg. at 65,966. And the Rule's interpretation of the operative phrase—to be applied by the Secretary on a case-by-case basis—is reasonable: it reflects a common-sense understanding of when a student borrower's inability to complete a program would be "due to" the closure of their school, 20 U.S.C. § 1087(c)(1), while allowing for the various circumstances in which this may occur. *See, e.g.*, 87 Fed. Reg. at 65,966 (explaining that the definition's language protects "against a situation where an institution could intentionally keep a single, small program open long enough to avoid [liability], otherwise denying closed school discharges to borrowers").

## III.    CCST Has Failed to Establish Any Irreparable Harm

Clearly demonstrating irreparable injury is a "heavy burden," *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985), and "a preliminary injunction will not be issued simply to prevent the possibility of some remote future injury," *Johnson v. Owens*, 2013 WL 12177176, at *1 (W.D. Tex. Aug. 5, 2013). Rather, a movant must affirmatively demonstrate a substantial likelihood that, in the absence of the extraordinary remedy it seeks, it will suffer injury that is "both certain and great," "actual and not theoretical." *Rozelle v. Lowe*, 2015 WL 13236273, at *1 (W.D. Tex. June 1, 2015) (citation omitted). CCST has not carried this burden.

Although CCST now contends that it and its member schools "have suffered and will continue to suffer" irreparable injury "unless and until" temporary injunctive relief is granted, PI Br. at 20, its

delay of more than five months in seeking such relief "militates against the issuance of a preliminary injunction." *Massimo Motor Sports LLC v. Shandong Odes Indus. Co.*, 2021 WL 6135455, at *2 (N.D. Tex. Dec. 28, 2021) (citation omitted).  Looking past CCST's lack of urgency in moving for emergency relief, its asserted injuries are plainly insufficient to demonstrate irreparable harm.

        <u>Exposure to Borrower Defense Claims</u>:  CCST claims to face a threat of "financial and reputational harm" resulting from its member schools having to "defend against a deluge of borrower defense claims."  PI Br. at 22.  But the Rule was promulgated more than five months ago, and CCST provides no evidence any member school is facing any concrete financial consequence as a result of its revised borrower-defense provisions.  Instead, CCST offers the prognostication of for-profit college officials that the Rule will lead to an "inevitable deluge of borrower defense claims," *see* Shaw Decl. ¶¶ 24–29, ECF No. 25 at 36–37, or "increase[] significantly" the "potential liability that schools face," Arthur Decl. ¶ 27, ECF No. 25 at 45.  This unsubstantiated conjecture cannot substitute for actual evidence of harm, and it fails to establish an injury "of such imminence that there is a clear and present need for equitable relief."  *Sierra Club v. U.S. Army Corps of Eng'rs*, 482 F. Supp. 3d 543, 559 (W.D. Tex. 2020) (citation omitted). CCST's speculation about how third-party federal student loan borrowers are likely to react to the Rule cannot establish standing, *Lujan*, 504 U.S. at 562, much less irreparable harm.

        CCST's failure to demonstrate irreparable harm from the Department's revised borrower-defense standards is unsurprising.  Those standards will necessarily be applied on a case-by-case basis in proceedings between borrowers and the Department and could only result in financial liability for participating institutions many steps down the road.  Even assuming (because CCST has submitted no evidence on this point) that CCST member schools will be named in an increased number of borrower-defense applications going forward as a result of the Rule, and even assuming the Department granted some portion of those applications after providing notice to the school and an

opportunity to respond, "*the grant of a borrower-defense application has no binding effect on the school.*" *Sweet*, 2022 WL 16966513, at *9 (emphasis in original). At that point, the Department could initiate a separate recoupment proceeding against the school on the basis of the approved claim—but even then, "the school still retains all due process rights, is not bound by the success of the student's application, and is free to litigate *ab initio* the merits of its performance." *Id.* In other words, no CCST member school is currently at imminent risk of "los[ing] a dime," *id.*—much less facing liability that "places their viability in question," PI Br. at 21. CCST cannot show irreparable harm based on speculation about the outcome of hypothetical future recoupment proceedings. *See CAPPS*, 344 F. Supp. 3d at 182–83 (finding that association of for-profit schools failed to demonstrate irreparable harm from 2016 borrower defense provisions for similar reasons).[5]

CCST claims support for its theory in "recent outcomes," namely a settlement agreement that, according to CCST, "led to a torrent of borrower defense applications." PI Br. at 21 (citing *Sweet v. Cardona*). Again, even if that were true, a mere increase in borrower defense applications does not impose any financial consequence on the schools involved, much less create any imminent threat of irreparable harm. Indeed, the court in *Sweet* rejected similar arguments because, regardless of whether any school exercises its ability to participate in the Department's first-step adjudication of a borrower's application, a "school cannot be held liable for any remedial measures absent proceedings initiated specifically against them." *Sweet*, 2022 WL 16966513, at *9.

In any event, the settlement in *Sweet* constituted an exercise of the "plenary settlement

---

[5] CCST's conclusory reference to "reputational injury," *see* PI Br. at 23, also fails to establish irreparable harm, as it is "unsupported by evidence[,] is far from self-evident, . . . [and] does not demonstrate that type of 'actual and not theoretical' harm necessary to support a preliminary injunction." *CAPPS*, 344 F. Supp. 3d at 182-83 (rejecting similar theory of reputational injury); *see also Sweet v. Cardona*, 2023 WL 2213610 (N.D. Cal. Feb. 24, 2023) (rejecting claims of irreparable reputational harm from borrower defense applications); *Pruvit Ventures, Inc. v. Forevergreen Int'l LLC*, 2015 WL 9876952, at *5 (E.D. Tex. Dec. 23, 2015) (to constitute irreparable injury, "showing of reputational harm must be concrete and corroborated, not merely speculative" (citation omitted)).

authority of the Secretary and Attorney General" to resolve the massive backlog of borrower-defense claims at issue on a class basis, without undertaking the "individualized reviews" that the borrower-defense regulations would otherwise require.  *Id.* at *7; *see also id.* at *10 (emphasizing that "the settlement does not constitute a successful or approved borrower-defense claim").  The response of individuals entitled to a measure of relief under the settlement says nothing about how borrowers are likely to respond to the Department's comprehensive and multifaceted new borrower-defense provisions.  And indeed, CCST provides no indication that any member school is, in fact, being "inundated by thousands of borrower defense claims."  PI Br. at 21.

Compliance Costs:  CCST also claims harm in the form of "substantial time and financial resources" dedicated towards "complying with the impending Rule."  PI Br. at 23.  But CCST member schools are under no obligation to participate in the Title IV program, and if they object to the Rule, they can simply decline such funds and obviate the need to incur any costs complying with Title IV funding conditions.  *See, e.g.*, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) ("[I]f a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds.").  Any costs CCST member schools incur complying with the funding conditions set forth in the Rule thus cannot constitute irreparable harm.  *See, e.g.*, *Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (self-inflicted harm is not irreparable); *United States v. City of Los Angeles*, 595 F.2d 1386, 1391 (9th Cir. 1979) (irreparable harm cannot be established simply because an agency action "may require recipients of congressional largesse to expend large amounts of time and [monetary] resources").

Even setting that aside, it is well established that "ordinary compliance costs are typically insufficient to constitute irreparable harm."  *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) (collecting cases); *see also Chamber of Commerce v. Hugler*, 2017 WL 1062444, at *2 (N.D. Tex. Mar. 20, 2017) ("an injury resulting from attempted compliance with government regulation ordinarily is not irreparable harm" (citation omitted)).  With good reason—the general rule is that "economic

App.280

harms cannot, as a matter of law, constitute irreparable harm." *Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*, 492 F. Supp. 3d 701, 725 (E.D. Tex. 2020).  There is a narrow "exception" for economic harm that is "so great as to threaten the existence of the movant's business." *FTC ex rel. Yost v. Educare Centre Servs., Inc.*, 2020 WL 4334117, at *4 n.2 (W.D. Tex. Apr. 3, 2020) (citation omitted); *see also Div. 80, LLC v. Garland*, 2022 WL 3648454, at *4 (S.D. Tex. Aug. 23, 2022).  The types of economic harms that CCST attributes to complying with the Rule—such as "recordkeeping activity," "compliance efforts," "lost business opportunity," "abandon[ed] plans to build or consolidate campuses," and "divert[ed]" resources," PI Br. at 23–24—fall well short of this standard.  *See CAPPS*, 344 F. Supp. 3d at 171 (finding that similar declarations from schools about the compliance-related costs of the 2016 borrower defense rule failed to present the requite "specific details regarding the extent to which [their] business will suffer" (citation omitted)).

CCST tries to avoid this straightforward conclusion by emphasizing that "complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs."  PI Br. at 23 (quoting *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016)).  But this selective quotation from *Texas v. EPA* cannot bear the weight CCST places upon it.  Most obviously, that case involved regulatory standards that the record demonstrated would require regulated entities to either install emission controls or close facilities at a cost of $2 billion and "threaten the very existence of some of Petitioner's businesses." *Texas v. EPA*, 829 F.2d at 433.  CCST has not shown that federal funding conditions—which member schools are free to decline—impose the same kind of substantial injuries, *id.*, *i.e.*, "irreversible, extensive, and expensive actions," on any member school. *FTC ex rel. Yost*, 2020 WL 4334117, at *4; *see also Div. 80, LLC*, 2022 WL 3648454, at *2–5 (distinguishing *Texas v. EPA* and declining to find irreparable harm based on alleged cost of complying with agency regulation).

Moreover, the Fifth Circuit has been "less generous with private-sector plaintiffs' efforts to

36

App.281

show irreparable harm" based on the costs of complying with agency regulations. *Texas v. EPA*, 2023 WL 2574591, at *10 (S.D. Tex. Mar. 19, 2023). As in a more recent case in which a trade association similarly attempted to demonstrate irreparable harm on that basis, CCST's "conclusory and speculative allegations" about the hypothesized effect of agency action "simply do not show that [the plaintiff trade associations] or their members face irreparable harm." *Id.* at *10–11 (emphasizing that private plaintiffs must show "more specificity" and "ascribe more urgency to the consequences of a challenged action" than a state plaintiff); *cf. Restaurant Law Ctr. v. U.S. Dep't of Labor*, 2023 WL 3139900, at *3 (5th Cir. Apr. 28, 2023) (finding that regulated entities could demonstrate irreparable harm where the plaintiffs "introduced evidence that their members would" be required by regulation to "incur exactly the kinds of continuing compliance costs predicted by the [agency] itself").

        <u>Constitutional Allegations:</u>  CCST contends that its constitutional claims demonstrate harm that is "irreparable per se," PI Br. at 22, but does not even attempt to quantify any associated harm, and mere allegations of a constitutional deprivation do not relieve a party of its burden of actually showing irreparable harm. Indeed, even in the context of alleged First Amendment violations—not at issue here—where courts sometimes find irreparable harm based on a regulation's alleged chilling effect, a party must "demonstrate that First Amendment interests are either threatened or in fact being impaired at the time relief is sought." *Google, Inc. v. Hood*, 822 F.3d 212, 227–28 (5th Cir. 2016). No authority holds that parties making claims based on the constitutional provisions CCST invokes are entitled to preliminary injunctive relief without otherwise demonstrating irreparable harm. *See, e.g.*, *Somerset House, Inc. v. Turnock*, 900 F.2d 1012, 1018 (7th Cir. 1990) (declining to presume irreparable harm in a due process case); *Littlepage v. Trejo*, 2017 WL 3611773, at *6 (W.D. Tex. Aug. 21, 2017).

* * *

        Ultimately, it "proves too much to suggest"—as CCST does—"that 'irreparable' injury exists, as a matter of course, whenever a regulated party seeks preliminarily to enjoin the implementation of

App.282

a new regulatory burden." *CAPPS*, 344 F. Supp. 3d at 170. Rather, "[i]t remains that in this circuit, a 'preliminary injunction is not appropriate where the potential harm to the movant is strictly financial, unless the potential economic loss is so great as to threaten the existence of the movant's business.'" *Div. 80, LLC*, 2022 WL 3648454, at * 4 (citation omitted). Because CCST has not carried that burden here, it is not entitled to extraordinary emergency relief against revisions to an existing regulatory program the broad parameters of which have been in place for nearly 30 years. *See Nat'l Council of Agr. Emp's v U.S. Dep't of Labor*, 2023 WL 2043149, at *10 n.10 (D.D.C. Feb. 16, 2023) ("frustration at the complexity of an already-existing regulatory program is [not] sufficient harm to warrant extraordinary injunctive relief to prevent a rule revising the program from taking effect.").

## IV.     The Balance of the Equities and Public Interest Weigh Against Injunctive Relief

When a plaintiff seeks an injunction against the federal government, the balance-of-equities and public-interest factors merge, *Nken v. Holder*, 556 U.S. 418, 435 (2009), and "require weighing of the respective interests of the parties and the public" to ensure "that the threatened injury out-weighs any damage that the injunction may cause the opposing party and that the injunction will not disserve the public interest," *Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 689 (W.D. Tex. 2015). "[T]here is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop." *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008). And, as the Rule explains, both Congress and the Department have found it in the public interest to ensure that borrowers harmed by the misconduct of their schools can access debt relief. The Rule represents significant steps toward reaching those goals, and these substantial public interests are not outweighed by the parochial and pecuniary interests of CCST and its member schools. The balance of the harms and the public interest thus tilt decisively in favor of Defendants.

## V.     CCST's Requested Relief Is Overbroad

Even if the Court were to reject all of Defendants' arguments above, it still should not grant

App.283

the relief CCST seeks. In a case challenging federal regulations, a court may award preliminary injunctive relief only as to those regulatory provisions that the court finds are likely to inflict irreparable harm on the plaintiff and also are likely to be invalidated on the merits. *See Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."); *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 478 n.39 (5th Cir. 2020) (instructing that "the scope of injunctive relief is dictated by the extent of the violation established" (citation omitted)); *cf. Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 364 (6th Cir. 2022). Yet CCST seeks relief— "enjoining the Defendants from enforcing, applying, or implementing the Rule anywhere within the Department's jurisdiction," ECF No. 23 at 2—that would sweep far beyond its motion. That request is decidedly overbroad, and it should not be granted. *See ODonnell v. Harris Cnty.*, 892 F.3d 147, 163 (5th Cir. 2018) ("A district court abuses its discretion if it does not narrowly tailor an injunction to remedy the specific action which gives rise to the order." (citation omitted)), *overruled on unrelated grounds*, *Daves v. Dallas Cnty.*, 22 F.4th 522 (5th Cir. 2022) (en banc).

The mismatch between CCST's contentions and the relief it seeks is striking. Even as it forecasts localized impacts on its Texas-based membership, *see* PI Br. at 7–8, CCST contends that Defendants should be barred from implementing or enforcing the Rule nationwide, *id.* at 25. But CCST's members are readily identifiable, geographically bounded, and easily distinguished from other regulated entities, so there is no reason why CCST's views on the Rule should govern for the rest of the country. *See Georgia v. President of the United States*, 46 F.4th 1283, 1306–07 (11th Cir. 2022) (noting importance that "injunctive relief operate[] on specific parties" in cases challenging federal administrative actions); *see also Commonwealth v. Biden*, 57 F.4th 545, 557 (6th Cir. 2023).

Similarly out of proportion is CCST's insistence that the Court should "enjoin[] Defendants from implementing or enforcing *any* provision of the Rule." PI Br. at 25 (emphasis added). Many (if not most) of the Rule's provisions are not challenged in this case, *see, e.g.*, 87 Fed. Reg. at 66,063–65

39

(unchallenged provision regarding the Public Service Loan Forgiveness Program), and CCST has pointedly declined to claim a likelihood of success even as to all of the provisions that it *does* challenge. *See, e.g.*, Compl. ¶¶ 283–293 (detailing claims against Rule's "arbitration and class action provisions" not addressed in CCST's preliminary-injunction motion). CCST cannot obtain relief as to claims for which it has not even attempted to demonstrate a likelihood of success on the merits. And the clear indications that the Department intended for the Rule's provisions to be severable, *see, e.g.*, 87 Fed. Reg. at 66,042**,** 66,073, make an injunction against the Rule wholesale even less proper here. *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988) (invalidating only the regulatory provision found to exceed an agency's statutory authority); *cf. Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016) (same).[6] So even if it finds *some* preliminary relief appropriate, the Court should reject CCST's overbroad request and craft a narrower remedy "no more burdensome to [Defendants] than necessary to provide complete relief." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).

## CONCLUSION

For the reasons herein, this Court should deny CCST's request for extraordinary relief.

Dated: May 15, 2023                          Respectfully submitted,

                                             BRIAN M. BOYNTON
                                             Principal Deputy Assistant
                                             Attorney General

                                             MARCIA BERMAN
                                             Assistant Branch Director

                                             */s/ R. Charlie Merritt*
                                             CHRISTINE L. COOGLE

---

[6] Even if CCST's request for a preliminary injunction were analogized to a motion for a stay of agency action, *see* PI Br. at 8 (citing 5 U.S.C. § 705), CCST's request would remain overbroad. The APA authorizes a court to "postpone the effective date of an agency action," but that authority is limited "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. For all the reasons explained *supra*, CCST's requested relief would far exceed these limits.

CODY T. KNAPP
R. CHARLIE MERRITT
Trial Attorneys
U.S. Department of Justice
Civil Division
Federal Programs Branch
1100 L St. NW
Washington, D.C. 20005
Telephone: (202) 616-8098
Facsimile: (202) 616-8470
E-mail: robert.c.merritt@usdoj.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was filed electronically via the Court's ECF system, which sent notification of such filing to counsel of record.

*/s/ R. Charlie Merritt*

# EXHIBIT 10

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

CAREER COLLEGES & SCHOOLS
OF TEXAS,

              Plaintiff,

v.

UNITED STATES DEPARTMENT OF
EDUCATION; MIGUEL CARDONA,
in his official capacity as the Secretary
of Education,

              Defendants.

Case No. 1:23-cv-00433-RP

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS
MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

ARGUMENT .......................................................................................................... 2

    I.   This Court Has Jurisdiction ........................................................................... 2

        A.  CCST Has Standing. ............................................................................. 2

            (i).     Associational Standing ................................................................ 2

            (ii).    Organizational Standing ............................................................. 8

        B.  CCST's Claims Are Ripe........................................................................ 9

    II.  CCST Is Likely To Prevail On The Merits ................................................. 10

        A.  The Department Lacks the Statutory and Constitutional Authority to Adjudicate Borrower Defense "Claims" or Recoupment Actions Against Schools. ................... 10

            (i). Section 455(h) Does Not Authorize the Secretary to Define Borrower Defense "Claims" Against the Department. ................................... 10

            (ii).    Congress Did Not Authorize The Secretary To Adjudicate Borrower Defense Claims............................................................... 11

            (iii).   Section 455(h) Does Not Authorize The Secretary To Adjudicate Recoupment Actions Against Schools. ........................................ 15

        B.  The Department's Definitions of Borrower Defenses Are Unlawful. .......................... 17

        C.  The Rule's Group Claim Provisions, and Particularly the Procedure-Specific Presumption That a Violation Adversely Affected Attendance Decisions, Are Unlawful. ....................................................................................... 18

        D.  The Department's Closed School Discharge Rule Is Unlawful................................... 21

    III.  CCST and Its Member Schools Have Suffered and Are Likely to Suffer Irreparable Harm, Absent Preliminary Injunctive Relief................................................. 22

    IV.  CCST's Requested Relief Is Narrowly Tailored to the Harms Identified ....................... 25

CONCLUSION...................................................................................................... 25

CERTIFICATE OF SERVICE .............................................................................. 26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Lab'ys v. Gardner,*
    387 U.S. 136 (1967)................................................................4, 8, 9

*Bank One Chicago, N.A. v. Midwest Bank & Trust Co.,*
    516 U.S. 264 (1996)................................................................11, 12

*Burgess v. FDIC.,*
    No. 7:22-CV-00100-O, 2022 WL 17173893 (N.D. Tex. Nov. 6, 2022) ................................23

*Chauffeur's Training School, Inc. v. Spellings,*
    478 F.3d 117 (2d Cir. 2007)................................................................16

*Chemical Mfrs. Ass'n v. Dep't of Transp.,*
    105 F.3d 702 (D.C. Cir. 1997)................................................................19

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB,*
    NO. A-18-CV-0295, 2018 WL 6252409 (W.D. Tex. Nov. 6, 2018)......................................25

*Coit Indep. Joint Venture v. Fed. Sav. and Loan Ins. Corp.,*
    489 U.S. 561 (1989)................................................................12

*Constr. Indus. Ass'n of Sonoma Cnty. v. City of Petaluma,*
    522 F.2d 897 (9th Cir. 1975) ................................................................8

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.,*
    779 F.3d 258 (5th Cir. 2015) ................................................................2, 4, 14

*Czyzewski v. Jevic Holding Corp.,*
    580 U.S. 451 (2017)................................................................5

*Dep't of Com. v. New York,*
    139 S. Ct. 2551 (2019)................................................................7

*Ecosystem Inv. Partners v. Crosby Dredging, L.L.C.,*
    729 F. App'x 287 (5th Cir. 2018) ................................................................5

*FCC v. Prometheus Radio Project,*
    141 S.Ct. 1150 (2021)................................................................18

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
    528 U.S. 167 (2000)................................................................2

App.291

*Gardner v. Toilet Goods Ass'n,*
    387 U.S. 167 (1967)................................................................................................9, 10

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.,*
    804 F.2d 1390 (5th Cir. 1986) ..............................................................................22

*Louisiana v. Ctrs. For Disease Control & Prevention,*
    603 F. Supp. 3d 406 (W.D. La. 2022)...................................................................22

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992)..............................................................................................2, 5

*Massachusetts v. U.S. Dep't of Educ.,*
    No. 1:17-cv-2679 (TNM), 2018 WL 3820021 (D.D.C. May 31, 2018)................14

*McLaughlin v. Am. Tobacco Co.,*
    522 F.3d 215 (2d Cir. 2008)..................................................................................20

*Mullins v. City of New York,*
    626 F.3d 47 (2d Cir. 2010)....................................................................................22

*Murray's Lessee v. Hoboken Land & Improvement Co.,*
    59 U.S. 272 (1855).................................................................................................17

*NAACP v. Alabama ex rel. Patterson,*
    357 U.S. 449 (1958).................................................................................................8

*National Fuel Gas Supply Corp. v. FERC,*
    811 F.2d 1563 (D.C. Cir. 1987).............................................................................12

*NCAA v. Governor of New Jersey,*
    730 F.3d 208 (3d Cir. 2013)....................................................................................8

*Nigmadzhanov v. Mueller,*
    550 F. Supp. 2d 540 (S.D.N.Y. 2008)...................................................................13

*OCA-Greater Houston v. Texas,*
    867 F.3d 604 (5th Cir. 2017) ..................................................................................2

*Ramos v. Uber Techs., Inc.,*
    No. CIV.A. SA-14-CA-502, 2015 WL 222414 (W.D. Tex. Jan. 14, 2015) ............4

*RLC Indus. Co. v. CIR,*
    58 F.3d 413 (9th Cir. 1995) ...................................................................................12

*Roark & Hardee LP v. City of Austin,*
    522 F.3d 533 (5th Cir. 2008) ..........................................................................5, 6, 7

*Somerset House, Inc. v. Turnock*,
  900 F.2d 1012 (7th Cir. 1990) ............................................................23

*Tex. Democratic Party v. Benkiser*,
  459 F.3d 582 (5th Cir. 2006) ...............................................................3

*Texas v. EEOC*,
  933 F.3d 433 (5th Cir. 2019) ........................................................2, 3, 4

*Texas v. EPA*,
  829 F.3d 405 (5th Cir. 2016) .........................................................23, 24

*Texas v. United States*,
  523 U.S. 296 (1998)..............................................................................9

*Thomas v. Union Carbide Agric. Prod. Co.*,
  473 U.S. 568 (1985).....................................................................6, 9, 10

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014)............................................................................21

*Vara v. DeVos*,
  No. 19-12175-LTS, 2020 WL 3489679 (D. Mass. June 25, 2020) ........................12

*W. Elec. Co, v. Stern*,
  544 F.2d 1196 (3d Cir. 1976)...............................................................20

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022)........................................................................11

**Statutes**

5 U.S.C.
  § 705...............................................................................................25
  § 706...............................................................................................25

12 U.S.C. § 4010(f)..................................................................................11

15 U.S.C.
  § 1641(d)(1) .....................................................................................11
  § 1666i(b).........................................................................................11

20 U.S.C.
  § 1078e(a)(1)....................................................................................15
  § 1087(c)(1) ........................................................................15, 16, 20, 21
  § 1087(d)..........................................................................................15
  § 1087e(h).................................................................................10, 17
  § 1094(c)..........................................................................................16

v

App.293

Administrative Procedure Act............................................................................9

**Regulations**

34 C.F.R.

    § 668.71(b).......................................................................................3
    § 668.71(c)...................................................................................3, 17
    § 668.72(f).......................................................................................18
    § 668.72(p)......................................................................................18
    § 668.73(c)......................................................................................18
    § 668.74(e)......................................................................................18
    § 668.75..........................................................................................17
    § 668.500(a).....................................................................................3
    § 685.206(c) (1995) .......................................................................13
    § 685.214(a)(2)(i)...........................................................................21
    § 685.214(a)(2)(ii)..........................................................................20
    § 685.401(a) .......................................................................17, 19, 21
    § 685.401(e)....................................................................................21
    § 685.402(a)....................................................................................18
    § 685.402(b)....................................................................................18
    § 685.402(d)(1)...............................................................................18
    § 685.403(b)....................................................................................19
    § 685.405(b)......................................................................................6
    § 685.405(d)....................................................................................19
    § 685.406(g)....................................................................................19
    § 685.406(b)(2)...............................................................................19
    § 685.409(c)(1).................................................................................7

81 Fed. Reg. 39,330 (June 16, 2016) ............................................................13

81 Fed. Reg. 75, 926 (Nov. 1, 2016)........................................................15, 16

83 Fed. Reg. 37, 242, (July 31, 2018) ...........................................................13

84 Fed. Reg. 49,788, (Sept. 23, 2019) ..........................................................13

87 Fed. Reg. 65,904 (Nov. 1, 2022)...................................................... *passim*

**Other Authorities**

David Owen, *The Great Electrician Shortage*, The New Yorker (Apr. 24, 2023)..........................1

Dep't of Educ., Press Release, *Education Department Takes Steps to Hold
    Leaders of Risky Colleges Personally Liable*, https://www.ed.gov/news/press-
    releases/education-department-takes-steps-hold-leaders-risky-colleges-
    personally-liable (Mar. 2, 2023) ...........................................................7

App.294

Dep't of Educ., *2023-24Federal School Code List of Participating Schools (November 2022)*, https://fsapartners.ed.gov/knowledge-center/library/federal-school-code-lists/2022-10-31/2023-24-federal-school-code-list-participating-schools-november-2022 ................................................................................5, 6

Joy Addison, *Skilled Labor Workforce Sees Severe Nationwide Shortage*, Fox Business (Feb. 4, 2022), https://www.foxbusiness.com/features/skilled-labor-workforce-severe-nationwide-shortage ......................................................................1

Project on Predatory Student Lending at the Legal Services Center of Harvard Law School, Comment Letter on Proposed Rule (Aug. 2, 2018), available at https://www.regulations.gov/comment/ED-2018-OPE-0027-0011 ........................................13

App.295

**INTRODUCTION**

Nowhere in its 40-page Opposition Brief ("Opp.") does the Department cite any apposite authority to support the proposition that an agency may create from whole cloth a novel claim adjudication scheme untethered to any statutorily authorized proceeding and, further, appropriate to itself the unchecked power to adjudicate those claims. Nor could it. What the Department seeks to accomplish through the Rule is extraordinary, has vast economic and political significance, and is precisely what the major questions doctrine aims to prevent.

The Department acknowledges but attempts to downplay the irreparable harm that CCST and its member schools have suffered and will suffer as a result of the Rule. As set forth in the submitted declarations, and as will be presented through live witness testimony at the May 31 hearing, schools have been forced to divert time and extensive resources to revamp compliance programs and prepare for a deluge of borrower defense claims that will be adjudicated pursuant to the Rule's strict liability standard and deficient processes. Further, they have been forced to abandon plans to build new schools, invest in existing campuses, or expand educational offerings in the State of Texas, resulting in corresponding harm to CCST, as well as students and communities that rely on these institutions as necessary pathways to skilled trade professions (further exacerbating a dire shortage in the State of Texas and across the country[1]).

By contrast, maintaining the status quo and delaying the implementation of the new regulations a few short months will not harm the Department or the public. For the reasons set

---

[1] *See* David Owen, *The Great Electrician Shortage*, The New Yorker (Apr. 24, 2023), https://www.newyorker.com/news/dept-of-energy/the-great-electrician-shortage; *see also* Joy Addison, *Skilled Labor Workforce Sees Severe Nationwide Shortage*, Fox Business (Feb. 4, 2022), https://www.foxbusiness.com/features/skilled-labor-workforce-severe-nationwide-shortage.

1

forth herein, as well as those in CCST's Opening Brief ("Pl. Br."), the Court should stay the Rule's effective date pending final judgment.

## ARGUMENT

**I.    This Court Has Jurisdiction**

A.    <u>CCST Has Standing.</u>

CCST has standing to bring suit on behalf of its members ("associational standing") and on its own behalf ("organizational standing"). *See OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017).

(i). *Associational Standing*

Of CCST's more than 70 member schools, at least 54 participate in the Direct Loan Program ("Participating Schools") and will be subject to the challenged regulations. Compl. ¶ 25. As a trade association, CCST has Article III standing to sue on behalf of these member schools because (1) the schools themselves would have standing, (2) the rulemaking at issue is germane to CCST's purpose, and (3) the participation of CCST's individual members is not required. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

The Department claims only that CCST is unlikely to meet the first requirement. But Participating Schools themselves would have standing because they would (1) suffer concrete injury that is (2) traceable to the challenged regulations and (3) would be redressed by a favorable decision. *See Friends of the Earth*, 528 U.S. at 180-81.

**1. Compliance Burdens and Costs.** When a challenged regulation applies to a plaintiff directly, "there is ordinarily little question" that the plaintiff has standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992); *see also Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015) ("[W]e find no reason to depart from the ordinary rule that Contender Farms and McGartland, as objects of the Regulation, may challenge it."). Indeed, "[a]n

increased regulatory burden typically satisfies the injury in fact requirement." *Texas v. EEOC*, 933

F.3d 433, 446 (5th Cir. 2019) (quoting *Contender Farms*, 779 F.3d at 266).

There is no serious question that all of CCST's Participating Schools are objects of the

challenged regulations' substantive provisions, which impose new prohibitions on unintentional

misstatements and omissions and "aggressive" recruitment activities. *See* 34 C.F.R. § 668.71(b)

("Substantial misrepresentations are prohibited in all forms . . . ."); *id.* § 668.500(a) ("Aggressive

and deceptive recruitment tactics or conduct are prohibited in all forms . . . ."); *see also id.*

§ 668.71(c) (including inadvertent and innocent errors and omissions in the new definition of

"misrepresentation").[2] Indeed, one of the Department's stated reasons for promulgating the new

rules is to regulate schools' conduct. *See, e.g.*, 87 Fed. Reg. at 65,908  ("By setting forth a clearer

and more robust Federal standard for B[orrower] D[efense] claims and a rigorous group claim

process, institutions that might otherwise engage in questionable behavior will change their

practices and act more ethically and truthfully.").

Participating Schools will be required to comply with these new requirements in order to

avoid liability and exclusion from the Direct Loan Program. For example, schools will face

significant compliance costs in order to meet the BDR Rule's new strict-liability standard and

prevent its representatives and contractors from making inadvertent misstatements or omissions.

*See infra* 17. They must also ensure that their recruiters do not use methods that the Department

might consider "aggressive." *See infra* 7-8, 17. These compliance burdens, and the financial costs

associated with them, are quintessential concrete injuries. *See Texas v. EEOC*, 933 F.3d at 446;

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the regulations that
will go into effect on July 1, 2023 under the challenged rulemaking. *See* 87 Fed. Reg. 65,904,
66,039-73 (Nov. 1, 2022).

*Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006) ("[E]conomic injury is a quintessential injury upon which to base standing.").

Whether participation in Title IV programs is truly voluntary, as the Department suggests (*see* Opp. 10), is of no moment. *See Contender Farms*, 779 F.3d at 266 (finding that imposing conditions on participation in an important but voluntary category of horse show was a concrete injury to competitors, despite participation in other horse shows being unaffected); *Ramos v. Uber Techs., Inc.*, No. CIV.A. SA-14-CA-502, 2015 WL 222414, at *3 (W.D. Tex. Jan. 14, 2015) ("The denial of an opportunity to benefit from services, whether caused by direct interaction with barriers or discriminatory actions or policies or by their resulting deterrent effect and loss of opportunity, is a sufficient injury for standing purposes.").

Nor does the possibility of non-enforcement (*see* Opp. 9-10) countermand the "ordinary rule" that a regulated entity has standing to challenge a regulation with which it must comply. *Contender Farms*, 779 F.3d at 266. The burdens and costs of complying with the regulation is injury enough. *See Texas v. EEOC*, 933 F.3d at 446; *see also Abbott Lab'ys v. Gardner*, 387 U.S. 136, 154 (1967), *abrogated in other respects by Califano v. Sanders*, 430 U.S. 99, 97 (1977) ("[T]here is no question in the present case that petitioners have sufficient standing as plaintiffs: The regulation is directed at them in particular; it requires them to make significant changes in their everyday business practices; if they fail to observe the Commissioner's rule they are quite clearly exposed to the imposition of strong sanctions.").

"Causation and redressability then flow naturally from the[se] injur[ies]," which result directly from the changes made by the challenged regulations and would be redressed by an order vacating them or enjoining their implementation. *Contender Farms*, 779 F.3d at 266.

4

App.299

**2. Abandoned Plans for Expansion.** Participating Schools will also be prevented from scaling back programs or consolidating campuses in order to avoid potentially significant liability under the Department's expanded definition of a "closed school." *See infra* 20-21. At least one CCST member has already abandoned plans to build new facilities because of the risks posed by this new provision, giving up the potential benefits of expanded operations. *See* Arthur Decl. ¶¶ 22-23 [App-41[3]]. "This sort of injury falls squarely within a well-established line of cases holding that loss of a non-illusory opportunity to pursue a benefit constitutes injury in fact." *Ecosystem Inv. Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287, 292 (5th Cir. 2018) (unpublished); *see also Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) (holding that a lost chance to obtain a settlement was sufficient injury to confer standing). This is true even when the foregone benefit was not certain to materialize. *See Czyzewski*, 580 U.S. at 463-64. The evidence here shows that such an injury has already been incurred by a CCST member school, that the injury was caused by the challenged regulations, and that it would be redressed by CCST's requested relief. *See* Arthur Decl. ¶¶ 22-23 [App-41]. Nothing more is required to establish standing on these claims.

**3. Violations of Procedural Rights.** A plaintiff seeking equitable relief satisfies the concrete-injury prong by showing a "significant possibility of future harm," including from the violation of procedural rights. *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 542-43 (5th Cir. 2008). "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7. In just the five months following the settlement in *Sweet v. Cardona*, about 250,000 claims were filed. *See* Response to Court's Inquiry Concerning Number of Post-

---

[3] References herein to "App." are to the Appendix filed in support of CCST's Opening Brief (ECF No. 25), and the corresponding pages therein.

Class Applicants, *Sweet v. Cardona*, No. 3:19-cv-03674 (N.D. Cal Feb. 16, 2023) [App-47]. These claims pertain to attendance at about 4,000 schools, or about 65 percent of the roughly 6,200 schools that participate in Title IV programs. *See id*.; Dep't of Educ., *2023-24 Federal School Code List of Participating Schools (November 2022)*, https://fsapartners.ed.gov/knowledge-center/library/federal-school-code-lists/2022-10-31/2023-24-federal-school-code-list-participating-schools-november-2022. While the identities of these 4,000 schools are unknown, it is a statistical near-certainty that at least one of them is a CCST member.[4] Many of these claims will likely be adjudicated after the Rule goes into effect, meaning that at least one CCST school will be coerced into participating in unlawful proceedings under pain of conceding a borrower defense, 34 C.F.R. § 685.405(b), and will be subject to recoupment proceedings in which they will bear the burden of proving the incorrectness of the borrower-defense determination, *id.* 668.125(e)(2).

A litigant has "an independent right to adjudication in a constitutionally proper forum," and the Supreme Court has found that litigants "aggrieved by the threat of an unconstitutional arbitration procedure" before an administrative agency satisfy Article III's concrete-injury requirement. *Thomas v. Union Carbide Agric. Prod. Co.*, 473 U.S. 568, 579 (1985). Here, CCST has alleged that agency adjudication is unauthorized and unconstitutional.

Similarly, in *Roark & Hardee*, bar owners claimed that Austin's no-smoking ordinance violated procedural due process. 522 F.3d at 543. The Fifth Circuit found that the possibility of enforcement, and the fact that the City had not disclaimed its intent to enforce the challenged provisions, was enough to show concrete injury. *Id.* Causation and redressability are similarly easy

---

[4] The probability that at least one of CCST's 54 Participating Schools is among these 4,000 schools is about 99.9999 percent, or $(1 - (1-0.645)^{54})$.

to establish. *See id*. at 544 ("The significant threat of prosecution that Plaintiff bar owners face is directly traceable to the City's intention to enforce the ordinance against them, and a judicial invalidation of the ordinance would give Plaintiffs direct relief from being prosecuted.").

The Department argues that CCST lacks standing because recoupment actions are "conjectural or hypothetical," requiring third parties (borrowers) to request discharge and that the Department seek recoupment. Opp. 9. This argument rings hollow. First, hundreds of thousands of borrowers filed discharge claims in the short time after the *Sweet* settlement was approved, [App-47], and a similar flood of claims can be expected once the Rule goes into effect and similarly lowers to bar to discharge, *see* England Decl. ¶ 12 [App-24]; Shaw Decl. ¶ 20 [App-33—34]. When the decisions of third parties are "the predictable effect of Government action," those decisions do not bar standing. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019).

Second, the Department has made clear its intention both to discharge as many loans as possible (*see* Compl. ¶¶ 42-43) and to aggressively seek recoupment from schools: "Recoupment is a critical tool for ensuring that the institution that committed acts or omissions that lead to approved claims help offset that cost," and there are only "limited circumstances under which the Department would not recoup from institutions." 87 Fed. Reg. at 65,948; 34 C.F.R. § 685.409(c)(1)).[5] Together, these facts show more than a "significant possibility" that at least some of CCST's Participating Schools will be subject to the challenged proceedings. *See Roark & Hardee*, 522 F.3d at 542-43. This possibility constitutes a concrete injury. *See id.*

---

[5] *Cf.* U.S. Dep't of Educ., Press Release, *Education Department Takes Steps to Hold Leaders of Risky Colleges Personally Liable*, https://www.ed.gov/news/press-releases/education-department-takes-steps-hold-leaders-risky-colleges-personally-liable (Mar. 2, 2023) (quoting Federal Student Aid Chief Operating Office Richard Cordray) ("When financially risky schools jeopardize the safety of the government's Title IV funds and take advantage of students, we intend to hold those individuals accountable.").

7

(ii). *Organizational Standing*

CCST also has Article III standing in its own right. Its injuries are twofold.

*First*, additional costs and liability exposure experienced by CCST's members threaten CCST's operations, which are funded by dues and fees from members. Schools have already abandoned plans to open new campuses in Texas because of the challenged regulations, resulting in a reduction (or elimination) of membership dues that CCST would collect and on which CCST relies to remain operational. *See* England Decl. ¶¶ 28, 34-35 [App-27-28]; Arthur Decl. ¶ 22 [App-41]. *Cf.* Shaw Decl. ¶¶ 17-18 [App-33]. This actual and threatened loss of dues is a concrete injury. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 459–60 (1958) (relying on the "reasonable likelihood that the Association itself through diminished financial support and membership may be adversely affected "); *Constr. Indus. Ass'n of Sonoma Cnty. v. City of Petaluma*, 522 F.2d 897, 903 (9th Cir. 1975) (economic injury in fact to association from loss of dues). These injuries would be redressed by vacating the challenged Rule.

*Second*, as the primary trade association for career colleges in Texas, CCST's reputation will be injured by the new regulations, which will subject the industry that CCST represents to sweeping new liability and a potentially significant increase in borrower claims and recoupment proceedings, creating the impression that the members of its industry routinely make fraudulent statements or omissions and use unfairly aggressive tactics in recruitment, even when there is no evidence to support such assertions. *See NCAA v. Governor of New Jersey,* 730 F.3d 208, 220 (3d Cir. 2013), *abrogated in other respects by Murphy v. NCAA*, 138 S. Ct. 1461 (2018) (finding standing based on reputational injury caused by a state law permitting gambling). These injuries, caused by the challenged Rule and redressable by vacatur, give CCST standing in its own right.

B.  CCST's Claims Are Ripe.

In deciding whether a claim is ripe for adjudication, federal courts consider (1) their fitness for judicial determination and (2) the hardship to the plaintiff if such a determination is withheld. *Abbott Lab'ys*, 387 U.S. at 149.

*First*, CCST's claims are fit for judicial determination because they are purely legal and do not involve factual or technical questions that would benefit from further pre-judicial development. *See Abbot Lab'ys*, 387 U.S. at 149. The Department points to no such factual or technical questions, suggesting only that "it is uncertain how the relevant standards and procedures might be applied as to any CCST member." Opp. 14. But the questions at the core of CCST's claims— whether the Department has constitutional and statutory authority to adjudicate schools' liability, and whether their procedures meet the requirements of due process and the Seventh Amendment— would not be informed by the outcomes of particular enforcement proceedings. *See Union Carbide*, 473 U.S. at 581 (finding ripe an Article III claim challenging the legality of forced arbitration because it was "purely legal, and will not be clarified by further factual development").

Nor does the possibility of non-enforcement in certain cases mean that CCST's claims are unfit for determination. *See* Opp. 14. What matters is that a Participating School could face severe and possibly existential liability by failing to conform to the regulations' new prohibitions. The Supreme Court in *Abbot Laboratories* held that, "where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts under the Administrative Procedure Act . . . must be permitted." 387 U.S. at 153. By contrast, *Texas v. United States*, 523 U.S. 296, 298-99 (1998), on which the Department relies, did not involve the regulation of conduct. Rather, it involved the legality of two hypothetical sanctions that a state official could levy against underperforming

9

App.304

school districts. *Id.* Here, by contrast, the challenged rules require Participating Schools to conform to new prohibitions under the threat of serious liability.

*Second*, as to hardship, the challenged regulations force Participating Schools to choose between costly compliance and risking serious consequences, including significant liability, disqualification from Title IV programs, and reputational harm. This kind of forced choice constitutes a hardship. *See Abbott Lab'ys*, 387 U.S. at 152-53; *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 172 (1967) (noting that hardship includes the harm to "public good will" that would be suffered by refusing to comply with the challenged regulations). Requiring the industry to proceed when the constitutionality of the Department's adjudicatory scheme is in question is "'palpable and considerable hardship.'" *Union Carbide*, 473 U.S. at 581 (citation omitted). The Department points to a school's ability to seek judicial review after an enforcement proceeding. *See* Opp. 14-15. But this was also true of the plaintiffs in *Abbott Laboratories* and *Toilet Goods*. As in those cases, Participating Schools should not be asked to risk violating the new regulations—and accept the enormous risks that come with noncompliance—while waiting to prevail on judicial review. Dismissing this case as unripe would force schools to take that untenable gamble.

## II.    CCST Is Likely To Prevail On The Merits

### A.    The Department Lacks the Statutory and Constitutional Authority to Adjudicate Borrower Defense "Claims" or Recoupment Actions Against Schools.

#### (i).    *Section 455(h) Does Not Authorize the Secretary to Define Borrower Defense "Claims" Against the Department.*

The Department disregards the text of Section 455(h). This narrow statutory grant of rulemaking power provides that "the Secretary shall specify in regulations *which acts or omissions* of an institution of higher education a borrower *may assert as a defense* to repayment of a loan …." 20 U.S.C. § 1087e(h) (emphasis added). By its plain terms, the statute authorizes the Secretary to define the acts or omissions that constitute contractual defenses; it delegates

10

lawmaking power in that limited respect.  The statute says nothing about claims (which are the polar opposite of defenses), much less the power to adjudicate claims.

The Department argues that a defense to repayment exists whether the borrower is actively repaying her loan or in default, Opp. 16, but that is irrelevant.  The borrower may do what any contracting party with a partial or complete contractual defense may do: stop performance to the extent of the defense, and litigate the defense in the appropriate tribunal.  This is hardly "illogical," as the Department asserts, *id.*; it is how the Department implemented Section 455(h) in its initial rulemaking.  Pl. Br. 9-10.  Congress commonly distinguishes between the assertion of claims and defenses.[6]  If the Department believes a borrower should have the right to bring administrative claims for financial relief, the remedy is with Congress.

> *(ii).*   <u>Congress Did Not Authorize The Secretary<br/>To Adjudicate Borrower Defense Claims.</u>

Even if the term "defense" could be construed to encompass a "claim," that would not aid the Department because the statute does not grant the Secretary the power to adjudicate those claims.   On this front, the Department's response is notable for what it fails to address.

First, the Department does not address the basic principle that "[a]gencies have only those powers given to them by Congress." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022).  Because Congress alone decides whether public rights are committed to agency adjudication, Pl. Br. 11, courts must find an express conferral of adjudicatory power.  Thus, in *Bank One Chicago, N.A. v. Midwest Bank & Trust Co.*, 516 U.S. 264 (1996), Congress "authorize[d] the Federal Reserve Board to 'impose on or allocate among depository institutions the risks of loss and liability in

---

[6] *See, e.g.,* 15 U.S.C. § 1666i(b) ("The amount of claims or defenses asserted by the cardholder may not exceed the amount of credit outstanding …"); *Id*. § 1641(d)(1) (mortgage assignee "shall be subject to all claims and defenses with respect to that mortgage that the consumer could assert against the creditor of the mortgage").

connection with any aspect of the [check] payment system,'" *id.* at 272 (quoting 12 U.S.C. § 4010(f)), yet the Supreme Court held that Congress did not grant adjudicatory authority. "Congress no doubt intended rules regarding interbank losses and liability to be developed administratively. But nothing in § 4010(f)'s text suggests that Congress meant the Federal Reserve Board to function as both regulator and adjudicator in interbank controversies." *Id.* at 273. The Court found it significant that the statute "does not explicitly confer adjudicatory authority on the Board, nor 'set forth the relevant procedures' for resolution of private disputes." *Id.* at 275. Here, too, Section 455(h) grants only the rulemaking power to specify what acts or omissions may be asserted as defenses, without any conferral of adjudicatory authority or identification of procedures. *See also Coit Indep. Joint Venture v. Fed. Sav. and Loan Ins. Corp.*, 489 U.S. 561, 572-74 (1989). These cases answer the Department's extraordinary claim (Opp. 19) that an agency has adjudicatory power unless the statute expressly forecloses it. And there is no statutory ambiguity to which deference is owed. *See id.* 21.[7]

Second, the Department ignores precedent that a grant of *rulemaking* authority—which is all that Section 455(h) is—does not grant authority to *adjudicate* rule violations. The Ninth Circuit held that the statutory grant of the power to the Commissioner of Internal Revenue to promulgate regulations on depletion allowances "does not subsume within it the authority to decide individual cases," and instead "merely gives the Commissioner the authority to prescribe regulations setting forth standards by which courts will determine the reasonableness of depletion allowances." *RLC*

---

[7] The Department affirmatively mischaracterizes *National Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563 (D.C. Cir. 1987), as recognizing that Congress may implicitly grant adjudicatory authority. Opp. 19. *National Fuel Gas* says the opposite; it declares, that in "contrast" to an implicit delegation to an agency to resolve ambiguities in statutes it administers, "the delegation of adjudicative authority to an agency that is empowered to hear disputes, receive settlement proposals, and enter binding orders is *explicit*." 811 F.2d at 1569 (emphasis added).

12

App.307

*Indus. Co. v. CIR*, 58 F.3d 413, 417-18 (9th Cir. 1995). Section 455(h)'s grant of rulemaking power likewise does not authorize adjudication of borrower defenses to repayment.

Rather than confront those precedents, the Department relies on an unpublished district court decision that "the HEA and the 1995 borrower defense regulation require the Secretary to adjudicate borrower defense claims." *Vara v. DeVos*, No. 19-12175-LTS, 2020 WL 3489679, at *2 (D. Mass. June 25, 2020). *See* Opp. 17-18. *Vara* is unpersuasive. It draws an inapposite analogy to cases holding that immigration officials have a duty to adjudicate immigration applications; in those cases, Congress made an "explicit delegation of the power (and responsibility) to process form I–485 applications" to the agency, and the courts rejected the proposition that adjudication was not required simply because the granting of relief was discretionary. *Nigmadzhanov v. Mueller*, 550 F. Supp. 2d 540, 546 (S.D.N.Y. 2008) (cited in *Vara*, 2020 WL 3489679, at *3).

The Department also claims that CCST's reliance on the 1994 rule is misleading, Opp. 17, but it is the Department's arguments that deserve that appellation. The 1994 rule makes clear that a borrower may assert a defense to repayment "[i]n any proceeding to collect on a Direct Loan," and then sets forth four non-exhaustive examples of such collection proceedings; discharge relief followed a successful defense. 34 C.F.R. § 685.206(c) (1995). The Department acknowledged in 2016 that "[t]he current regulations for borrower defense do not provide a process for claims." 81 Fed. Reg. 39,330, 39,346 (June 16, 2016). In 2018, the Department declared that [f]rom 1994 to 2015, the Department's regulation … provided defense to repayment loan discharge opportunities only to borrowers who were in a collections proceedings." 83 Fed. Reg. 37, 242, 37,253 (July 31, 2018). The Department then amended that statement to acknowledge that there were "limited circumstances" in which "the Department has approved a small number of affirmative borrower

13

App.308

defense to repayment requests." 84 Fed. Reg. 49,788, 49,796 (Sept. 23, 2019). Those few circumstances either settled litigation against the Department, or involved unpaid refunds or stipulations of fact by the institution in judgments that established the defense.[8] These were not claims adjudications, and the current Rule does not reflect a consistent interpretation of 30 years. *See* Mem. of Defs., *Massachusetts v. U.S. Dep't of Educ.*, No. 1:17-cv-2679 (TNM), 2018 WL 3820021 (D.D.C. May 31, 2018) (*ad hoc* claims adjudication began with closure of Corinthian schools in 2015). Regardless, the Department's views cannot cure an absence of statutory authority.

The Department relies on the Department's general rulemaking powers, Opp. at 18-19, but such grants are limited to carrying out expressly delegated powers and are not an independent source of authority. *See* Pl. Br. 12; *Contender Farms*, 779 F.3d at 273. Agencies have the power to promulgate procedures when vested with adjudicatory powers, but Congress has vested the Department with no such power. And the Department cannot rely on general rulemaking powers to "carry out" the limited rulemaking power of Section 455(h), which does not extend to adjudication.

Not only must a grant of adjudicatory powers be express, but a waiver of sovereign immunity must be unequivocal. Pl. Br. 11-12. The Department protests that sovereign immunity is not implicated, Opp. 19-20, but cannot escape its own characterization that a borrower-defense claim "is invoked against the Department, not schools." 87 Fed. Reg. at 65,909-11 (state law claims under the Rule are asserted "against … a Federal agency"); 65,923 ("the Department is the party against which borrowers assert a defense to repayment"). The Department has characterized

---

[8] *See* Project on Predatory Student Lending at the Legal Services Center of Harvard Law School, Comment Letter on Proposed Rule (Aug. 2, 2018), available at https://www.regulations.gov/comment/ED-2018-OPE-0027-0011 (attachments).

14

borrower-defense relief as equivalent to "remedies like rescission, avoidance, restitution, and certain forms of out-of-pocket or reliance costs." *Id.* at 65,914. The Department could not be sued for such remedies in court absent an unequivocal waiver of sovereign immunity, and the same is true for claims before an agency tribunal. Before the Department grants financial relief in the many billions of dollars, *id*. at 66,017, Congress must waive sovereign immunity. *See also* Pl. Br. 14-15 (applying major-questions doctrine).

(iii). <u>Section 455(h) Does Not Authorize The Secretary To Adjudicate Recoupment Actions Against Schools.</u>

The Department cites to no statutory provision that authorizes recoupment from institutions, much less grants the Secretary the right to adjudicate recoupment actions *for its own recovery* (which violates due process). It is undisputed that program participants accept financial liability for their failure to perform agreement obligations, 20 U.S.C. § 1087(d), but that begs the question of what constitutes a failure to perform agreement obligations, and what tribunal determines the fact and amount of liability.

Here, Section 455 of the Higher Education Act ("HEA") does not provide the Department with the authority to recover the amount of loans discharged by way of borrower defense. That stands in stark contrast to other parts of the HEA, which do provide certain recoupment authority. *See* 20 U.S.C. § 1087(c)(1) (Federal Family Education Loan program ("FFEL")).

Unable to point to any statutory authority, the Department relies on what it claims is 30 years of Departmental practice in recovering loan discharges from institutions. *See* Opp. 20. But the Department ignores what the Department has said about recoupment, none of which can justify administrative adjudication of claims for recoupment of borrower-defense discharges.

First, the Department has said that section 487(c)(1), applicable to FFEL loans, authorizes the Secretary "to pursue any claim of the borrower against the school, its principals, or other

15

App.310

source, and the borrower is deemed to have assigned his or her claim against the school to the Secretary." 81 Fed. Reg. 75, 926, 75,930 (Nov. 1, 2016) (citing 20 U.S.C. § 1087(c)(1)). The Department claims that this same provision applies to Direct Loans by virtue of 20 U.S.C. § 1078e(a)(1), which provides that Direct Loans have the same terms and conditions as FFEL loans. 81 Fed. Reg. at 75,930. The Secretary's recoupment right against institutions under section 487(c)(1) is not a term or condition of a student loan; in any event, the statute applies only to three types of discharges (inability to complete a program because of school closure; false certification of loan eligibility; and failure to refund), and would not support the Department's recoupment regulation. *See* 20 U.S.C. § 1087(c)(1). Regardless, the Department has always insisted that this provision provided no greater rights in recoupment than the borrower had against the institution, and created no new liabilities for the school. 81 Fed. Reg. at 75,930-31. That rationale would not justify the current Rule, which creates new liabilities and does not limit recovery to vindication of borrower rights against the school that have an independent source in law.

Not only has Congress not granted recoupment rights to the Secretary for all borrower-defense discharges, but it also did not take the further step of authorizing the Department to adjudicate any recoupment claim. The Department did not analyze this point in the current Rule, but the Department now points to *Chauffeur's Training School, Inc. v. Spellings*, 478 F.3d 117, 125–30 (2d Cir. 2007). *See* Opp. 21. But that case is not authority that the Department can conduct recoupment adjudications without statutory authorization.

There, the Second Circuit noted that the statute authorized hearings for terminations, suspensions, and fines, *see* 20 U.S.C. § 1094(c), and held that "it would be unreasonable to view the specification of remedies set forth in § 1094(c)" as excluding relief to recover guarantee payments. 478 F.3d at 127-29. The analysis is wrong but, significantly, the Department is doing

16

more than grafting additional remedies unto an authorized statutory proceeding; indeed, for recoupment, the Department denies institutions hearings under Subpart G of Part 668, which implements § 1094(c). *See* 87 Fed. Reg. at 65,949. *Chauffeur's* does not support the Department's wholesale creation of a novel adjudication scheme untethered to any authorized statutory hearing.

The alternative ground for recoupment that the Department has asserted is the common-law right to recover damages for breach of fiduciary authority.  81 Fed. Reg. at 75,931-32.  That theory cannot support broad recoupment rights (schools are not agents or fiduciaries of the Department in recruiting students or in most communications), but regardless, Congress never authorized the Department to adjudicate common-law causes of action, and, indeed, could not do so.  Even Congress cannot "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law …." *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1855).

   B.  <u>The Department's Definitions of Borrower Defenses Are Unlawful.</u>

The Department objects that it need specify every act or omission that can constitute a borrower defense, Opp. 26, but that is exactly what Section 455(h) commands: "the Secretary shall specify in regulations *which acts or omissions* of an institution of higher education" can be asserted as a defense. 20 U.S.C. § 1087e(h) (emphasis added). The omissions, aggressive recruitment, contract, judgment, adverse-action, and catch-all state law defenses fail this test.  Pl. Br. 15-16.

The Department complains that it is a "caricature" to say that the Rule permits sanctioning a school for innocent and unintentional misstatements or omissions of fact.  Opp. 27.  But that is indisputably what the Rule does: *any* substantial "erroneous" statement, 34 C.F.R. § 668.71(c), or "absence of material information" that a reasonable borrower would have considered, *id.* § 668.75, provides a defense, even if the school is not culpable.  The Department says that the need to redress

the borrower's injury justifies the breadth of the defense, but for group claims—anticipated to be 75% of the claim volume for proprietary schools, 87 Fed. Reg. at 65,993—reliance and injury are presumed, not proven, with no means of rebutting that presumption. And, even though Section 455(h) does not authorize rules for determining the amount of discharge, the Department has unlawfully declared that borrowers will receive a full discharge of their entire debt, without any proof that the institutional act or omission caused or even *preceded* the borrowing in question. 34 C.F.R. § 685.401(a); Pl. Br. 18. Many of the specific offenses are potentially picayune—*e.g.*, incorrect information about books or supplies, 34 C.F.R. § 668.72(f), the customary nature of "a particular charge," *id.* § 668.73(c), contracts with specific externship sites, *id.* § 668.72(p), or Government job market statistics, *id.* §668.74(e)—and so would rarely justify the cancellation of a student's entire debt. The combination of these provisions creating a strict liability regime for schools for the entirety of borrower debts—without any proof of reliance, injury, or causation—is arbitrary and capricious because it is not both "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S.Ct. 1150, 1158 (2021). Moreover, contract and other state law rights are not federal public rights that can be committed to agency adjudication, and (contrary to the Department's claim, Opp. 30) do not lose their character as private rights simply because the Department designates them as defenses. Pl. Br. 16.

C. The Rule's Group Claim Provisions, and Particularly the Procedure-Specific Presumption That a Violation Adversely Affected Attendance Decisions, Are Unlawful.

The Department's group claim provisions are fundamentally unfair and not designed to determine the truth. There are no prerequisites to the Department's decision to invoke a group procedure akin to the numerosity, commonality, typicality, and adequacy requirements of Federal Rule of Civil Procedure 23(a). The Department has simply identified a non-exhaustive list of factors it may consider, one of which—"the promotion of compliance by an institution or other

title IV, HEA program participant"—is irrelevant to the truth-finding process and betrays its results-oriented approach. 34 C.F.R. § 685.402(a). The Secretary may initiate a group, or may accept third-party requests that primarily address the evidence of the alleged institutional conduct. *Id.* § 685.402(b). Once a group is formed, a Department official "present[s] the side of the group." *Id*. § 685.402(d)(1), even though nominally "the Department is the party against which borrowers assert a defense to repayment," 87 Fed. Reg. at 65,923. An institution must present a response or else is deemed not to contest the claim—but has no right of subpoena, discovery, or witness examination to develop necessary evidence from third parties. 34 C.F.R. § 685.405(d). Even though an individual borrower claimant must present a sworn declaration describing reliance and injury, *id.* § 685.403(b), no similar requirement is required of identified group members. The group process must be completed in 1 year from group formation (versus 3 years for individuals), or else the loan is unenforceable. *Id.* § 685.406(g).

Because Congress clearly did not intend that a borrower be relieved of loan obligations if they were not injured by an institutional act or omission, the crux of any borrower defense is that the act caused the borrower detriment. 34 C.F.R. § 685.401(a). But the Rule presumes that if a group claim is proven, "there is a rebuttable presumption that the act or omission giving rise to the borrower defense affected each member of the group *in deciding to attend, or continue attending*, the institution, and that such reliance was reasonable." *Id.* § 685.406(b)(2) (emphasis added).

The Department cannot defend the presumption. It has no answer to the contention that evidentiary presumptions are outside the scope of Section 455(h), or that a procedural rule should not affect substantive rights. Pl. Br. 18-19. Moreover, a presumption is arbitrary and capricious if there is no rational nexus between proven and presumed facts. *See, e.g., Chemical Mfrs. Ass'n v. Dep't of Transp.*, 105 F.3d 702, 703-05 (D.C. Cir. 1997). The Department avers that "often, an

19

App.314

institution's act or omission . . . will have affected many borrowers."  Opp. 28.  That is not true of all the enumerated prohibitions, but regardless that is not the test; rather proof of a violation has to render so probable that every individual suffered the presumed injury that individual proof is unnecessary.  *Chemical Mfrs.*, 105 F.3d at 705.  Here, the Department overlooks that the presumption is that the individual would not have attended, or continued attending the institution, absent reliance on the violation, *and* that the reliance was reasonable.  The reasons that a borrower decides to attend, or continue attending, a school are highly individualistic and variegated, and reasonable reliance depends on the totality of the facts and circumstances.

It cannot be presumed that for *every* violation *every* borrower in a group reasonably relied on that alleged representation or omission in making the decision to enroll.  For example, assume an error in an employment statistic on the website; a student in their final year may never have seen the statistic, much less relied on it, and if they have a job lined up it may not have been reasonable under the circumstances to rely on that statistic to terminate their attendance.  The Department cavalierly states that it cannot be bothered with individualized adjudication, Opp. 28, but due process does not allow collective determination of matters of individualized proof.  S*ee, e.g., W. Elec. Co, v. Stern*, 544 F.2d 1196, 1199 (3d Cir. 1976); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 232 (2d Cir. 2008), *abrogated in other respects by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).

Furthermore, the Department does not contest that the presumption—because reliance and attendance decisions are information solely in the possession of the buyer, and there is no mechanism in either the group or recoupment proceedings to develop that evidence by subpoena, discovery, or witness examination—is effectively irrebuttable.  The group procedures do not comport with due process.  Pl. Br. 19-20.

20

App.315

D.  <u>The Department's Closed School Discharge Rule Is Unlawful.</u>

The HEA authorizes discharge when a student "is unable to complete the program in which such student is enrolled due to the closure of the *institution*," 20 USC § 1087(c)(1) (emphasis added).  The Department cannot reasonably interpret "school" to mean any location or branch of a school even if not a Title IV eligible institution, *see* 34 C.F.R. § 685.214(a)(2)(ii), and then provide that the school is closed on "the date, determined by the Secretary, that the school ceased to provide educational instruction in programs in which *most* students at the school were enrolled," *id.* § 685.214(a)(2)(i) (emphasis added).  A school that remains open but eliminates certain locations or programs is not closed.  "An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms."  *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 325–26 (2014).

Furthermore, even for students who do not fall within section 1087(c)(1), the Department presumes that any borrower at a school that is subsequently closed who proves a defense is entitled to have their total debt erased.  34 C.F.R. § 685.401(e).  As an initial matter, the Department provides no response to CCST's showing that the full-discharge rule is *ultra vires* and arbitrary and capricious.  Pl. Br. 18.  Be that as it may, the Department does not have the power to define evidentiary presumptions, and there is no nexus such that proof of any detriment dispenses with proof that the detriment warrants the relief of total discharge, just because the school is closed.[9] The Department's invocation of experience with closed schools, Opp. 29, is a makeweight, since it has no experience with the new borrower-defense standards and the detriment violations of those standards cause.  Nor is the availability of evidence from closed schools relevant, *id.*; not only is

---

[9] The Department's contention that the presumption does not expand a school's liability, Opp. 28, is puzzling.  Absent the presumption, if the borrower does not prove that the injury warrants relief, the defense fails and there is no discharge.  *See* 34 C.F.R. § 685.401(a).

the information about borrower detriment not in the school's possession, but it is the nexus to proven facts (not availability of evidence) that must justify a presumption.   Like any borrower, a borrower at a school that has closed should have to prove that their injury warrants full debt relief.

### III.   CCST and Its Member Schools Have Suffered and Are Likely to Suffer Irreparable Harm, Absent Preliminary Injunctive Relief

CCST has demonstrated a substantial threat of irreparable injury to not only CCST's member schools, but schools across the country, absent an order of preliminary injunctive relief. To establish the likelihood of irreparable harm, CCST "need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986); *see also Louisiana v. Ctrs. For Disease Control & Prevention*, 603 F. Supp. 3d 406, 439-40 (W.D. La. 2022).  CCST has done so here.

Come July 1, there is a substantial threat of immediate and irreparable harm to CCST Schools. The Rule's borrower-friendly and liability-presumptive standard and adjudication process are almost certain to result in schools in Texas and across the country being suddenly inundated by tens of thousands of borrower defense claims that will be subject to a slanted process that presumes liability without means of rebuttal, and incentivizes borrowers with the prospect of large dollar loan discharges without risk or downside to submitting a claim.

The Department's argument that the pending and forthcoming borrower defense applications have not yet been adjudicated against the schools pursuant to the new Rule is unpersuasive. The Rule will take effect on July 1, and it is not yet July 1. However, a plaintiff need only show "a *threat* of irreparable harm, not that irreparable harm already ha[s] occurred." *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010) (emphasis in original).  The Department attempts to downplay but cannot deny the fact that, on July 1, schools will be inundated by a torrent

App.317

of borrower defense applications, as evidenced by the *Sweet v. Cardona* preliminary settlement, which resulted in the immediate submission of "250,000 [borrower defense] applications from approximately 206,000 borrowers who attended approximately 4,000 schools" in a matter of weeks. Response to Court's Inquiry Concerning Number of Post-Class Applicants, No. 3:19-cv-03674 (N.D. Cal Feb. 16, 2023) [App-47]. The corresponding threat of immediate and irreparable harm to schools forced to defend against a deluge of borrower defense claims—while being subject to an unauthorized and unconstitutional adjudicatory process that imposes a strict-liability standard, and deprives schools of due process protections and appeal rights—is thus more than sufficient for purposes of preliminary injunctive relief. *See Burgess v. FDIC*, No. 7:22-CV-00100-O, 2022 WL 17173893, at *11 (N.D. Tex. Nov. 6, 2022) ("[T]hat a violation of a constitutional right in and of itself constitutes irreparable injury has been universally recognized and is not open to debate.").[10]

Further, CCST and its member schools have already suffered harm in advance of the July 1 effective date by having to expend time and significant efforts, incur costs or loss of benefits, and invest resources toward complying with the impending Rule. *See* England Decl. ¶¶ 21, 30 [App-25-27]; Shaw Decl. ¶ 20 [App-33-34]; Arthur Decl. ¶¶ 16-20 [App-39—41]. Courts in this and other circuits have repeatedly held that "complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21

---

[10] The Department cites *Somerset House, Inc. v. Turnock*, 900 F.2d 1012 (7th Cir. 1990), but to no avail. There, the Seventh Circuit held that there was no deprivation of rights *where there was a pre-deprivation* hearing that afforded the subjected party ample notice and opportunity to respond, including the opportunity to collect and present evidence as well as to present legal or factual arguments. *Id.* The Rule's deprivation of due process rights for CCST and its member schools is an irreparable harm for which there is no meaningful remedy.

23

App.318

(1994) (Scalia, J., concurring in part and in the judgment)). In preparation for the impending effective date for the Rule, and its new processes and standard, CCST Schools have and continue to necessarily expended substantial time and financial resources into undertaking efforts to conform their conduct, recordkeeping activity, and compliance efforts, all in an effort to mitigate the risk of reputational injury, substantial financial liability, and exclusion from participation in the federal student loan programs, based on the new standard and processes set forth under the Rule. *See, e.g.,* Jones Decl. ¶ 8 [App-4]; Arthur Decl. ¶¶ 16-20 [App-39—41]. These are not harms that can be remedied upon prevailing on the merits of the case. *See Texas v. EPA*, 829 F.3d at 433.

CCST schools have been forced to abandon or cancel longstanding business plans to build new and upgrade or consolidate existing schools on account of the Rule's amorphous criteria for what constitutes a "closed school", and the threat of resulting and overwhelming financial liability. *See* Arthur Decl. ¶¶ 22-26 [App-41—43]; Pl. Br. 6, 20; *see also* Jones Decl. ¶¶ 30-34 [App-9—10]. The effect of these forced business actions is lost business opportunity in addition to loss of time and investment made. *See id.* These are not harms that can be remedied by CCST's prevailing on the merits of its case.

Finally, CCST itself has suffered injury in at least three ways. First, as a result of institutions abandoning plans to build new schools or campuses in Texas on account of the closed school provision, CCST has suffered (or will suffer) financial harm in the way of lost membership dues, on which CCST relies to support its business viability and growth plans. *See* England Decl. ¶¶ 28, 34 [App-27—28]. Second, the resulting stunted growth (and, inevitable, reduction) in career education institutions and offering of skilled trade training programs in Texas further harms and directly undermines CCST's central mission and organizational purpose. *See id.* ¶¶ 34-37 [App-28]. Third, CCST has been forced to divert substantial time and resources away from existing

24

App.319

advocacy and educational programs and toward assisting CCST Schools with necessary compliance initiatives, including but not limited to extensive data preservation and recordkeeping and organization efforts, given the effect of the Rule's newly imposed requirements. *See id.* ¶¶ 27-32 [App-27—28]. Accordingly, CCST has satisfied the irreparable injury prong of the preliminary injunction analysis.

## IV.   CCST's Requested Relief Is Narrowly Tailored to the Harms Identified

In its preliminary injunction motion, CCST requests the standard temporary relief under the APA: to maintain the status quo by staying the effective date of the agency action (here, the Rule) until this Court renders final judgment. *See* 5 U.S.C. § 705. For a nationally applicable regulation, such relief is not limited to the parties.  Moreover, the irreparable injuries that CCST members suffer are no different from that suffered by other schools across the country.  Nor ultimately is the permanent relief that this Court would order if CCST prevails in this APA challenge party-specific; if CCST proves an APA violation, "[t]he reviewing court *shall* . . . hold unlawful and set aside agency action, findings, and conclusions," without any requirement for a party to demonstrate irreparable injury or the requisites of a permanent injunction. *Id.* § 706 & (2) (emphasis added).  There is no reason to require schools or associations across the country to file duplicative actions to secure a stay of the effective date for each individually. This is consistent with what courts across the country, including this Court, have done in the cases involving similar APA challenges. *See, e.g., Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, NO. A-18-CV-0295, 2018 WL 6252409, at *1 (W.D. Tex. Nov. 6, 2018) ("[T]he court concludes that to prevent irreparable injury a stay of the Rule's current compliance date of August 19, 2019, is appropriate." (citing 5 U.S.C. §705.))

## CONCLUSION

For the foregoing reasons, the Court should grant CCST's motion.

App.320

Dated:  May 22, 2023

/s Philip Vickers                        /s Allyson B. Baker

Philip Vickers                        Allyson B. Baker (*pro hac vice*)
 Texas Bar No. 24051699                 Stephen Kinnaird (*pro hac vice*)
Katherine Hancock                      Michael Murray (*pro hac vice*)
 Texas Bar No. 24106048                 Sameer P. Sheikh (*pro hac vice*)
CANTEY HANGER LLP                      Tor Tarantola (*pro hac vice*)
600 West 6th Street, Suite 300         PAUL HASTINGS LLP
Fort Worth, TX 76102                   2050 M Street NW
pvickers@canteyhanger.com              Washington, DC 20037
(817) 877-2800                         allysonbaker@paulhastings.com
    (202)-551-1830

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2023, a true and correct copy of the foregoing document was served upon all counsel of record in this action via the Court's CM/ECF system.

/s Allyson B. Baker
Allyson B. Baker

*Attorney for Plaintiff CCST*

# EXHIBIT 11

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| CAREER COLLEGES & SCHOOLS OF TEXAS, | |
| Plaintiff, | |
| v. | Case No. 1:23-cv-00433-RP |
| UNITED STATES DEPARTMENT OF EDUCATION; MIGUEL CARDONA, in his official capacity as the Secretary of Education, | |
| Defendants. | |

## PLAINTIFF'S OPPOSED EMERGENCY MOTION FOR TEMPORARY ADMINISTRATIVE INJUNCTION STAYING THE EFFECTIVE DATE OF THE RULE

In light of the impending July 1, 2023, effective date of the rulemaking at issue in this case, *see* 87 Fed. Reg. 65904 (Nov. 1, 2022) ("Rule"), and in order to allow the Court the necessary time to resolve CCST's motion for preliminary injunction (ECF No. 23), Plaintiff CCST respectfully requests that the Court enter a temporary administrative injunction staying the effective date of the Rule until the Court enters an order deciding the motion. *See* 5 U.S.C. § 705; Fed. R. Civ. P. 62(d); *S. L. V. v. Rosen*, No. SA-21-CV-0017-JKP, 2021 WL 243442, at *7 (W.D. Tex. Jan. 25, 2021) (finding administrative stay of removal order appropriate while determining the court's jurisdiction); *Republican Nat'l Comm. v. Pelosi*, No. CV 22-659 (TJK), 2022 WL 1604670, at *1 (D.D.C. May 20, 2022) (granting a "brief administrative injunction," despite deciding that an injunction pending appeal was unwarranted, so the plaintiff could seek relief from the Court of Appeals); *Trump v. Thompson*, No. 21-5254, 2021 WL 5239098, at *1

1

(D.C. Cir. Nov. 11, 2021) (granting an emergency motion for administrative injunction in order "to protect the court's jurisdiction"); *see also All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, No. 2:22-CV-223-Z, 2023 WL 2825871, at *32 (N.D. Tex. Apr. 7, 2023) (staying the effective date of challenged agency actions, and also staying the stay so the Government could seek appellate relief). A temporary injunction is warranted for all of the reasons stated in CCST's briefs supporting that motion. *See* ECF Nos. 24, 64. Finally, a very brief stay of the effective date of the Rule will not unduly prejudice Defendants.

      Plaintiff has conferred with Defendants, who oppose this motion.

Dated: June 27, 2023              Respectfully submitted,

                            */s/ Allyson B. Baker*
                            Allyson B. Baker (*pro hac vice*)
                            Meredith L. Boylan (*pro hac vice*)
                            Stephen B. Kinnaird (*pro hac vice*)
                            Michael Murray (*pro hac vice*)
                            Sameer P. Sheikh (*pro hac vice*)
                            Tor Tarantola (*pro hac vice*)
                            PAUL HASTINGS LLP
                            2050 M Street NW
                            Washington, DC 20037
                            Telephone: (202) 551-1830
                            Fax: (202) 551-0330
                            Email: allysonbaker@paulhastings.com

                            Philip Vickers (TX Bar No. 24051699)
                            Katherine Hancock (TX Bar No. 24106048)
                            CANTEY HANGER LLP
                            600 West 6th Street, Suite 300
                            Fort Worth, TX 76102
                            Telephone: (817) 877-2800
                            Fax: (817) 877-2807
                            Email: pvickers@canteyhanger.com

                            *Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record via the Court's CM/ECF system on June 27, 2023.

/s/ Allyson B. Baker
Allyson B. Baker

# EXHIBIT 12

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| CAREER COLLEGES & SCHOOLS OF TEXAS, <br><br> Plaintiff, <br><br> v. <br><br> U.S. DEPARTMENT OF EDUCATION *et al.*, <br><br> Defendants. | Case No. 23-cv-433-RP |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S
EMERGENCY MOTION FOR TEMPORARY ADMINISTRATIVE INJUNCTION**

In a scant one-and-a-half pages, CCST moved yesterday, on an "emergency" basis, for "a temporary administrative injunction" against the Final Rule it challenges in this case.  Pl.'s Motion, ECF No. 70, at 1.  CCST grounded its emergency motion on an apparent concern that the Court will not resolve CCST's other pending, fully-briefed-and-argued preliminary-injunction motion before the Final Rule takes effect on July 1, 2023.  The Court is well-aware of the Rule's effective date, however, and it indicated at the evidentiary hearing and oral argument on the preliminary-injunction motion, held four weeks ago, that it would endeavor to rule on the motion by July 1.  The Court should deny CCST's latest motion and decide the preliminary-injunction motion in due course.

As an initial matter, CCST's latest motion is improper because it presents a duplicative request for relief.  Through its pending motion for a preliminary injunction, CCST already asked this Court for an "injunction delaying implementation of the Rule prior to its July 1, 2023 effective date."  Pl.'s PI Br., ECF No. 24, at 25.  That is the very same relief CCST asks for in its instant emergency motion.  *See* Pl.'s Motion, ECF No. 70, at 1 (seeking an "injunction staying the effective date of the Rule").  But parties are not permitted to file repeat motions for the same relief.  *See, e.g., Stann v. First Liberty Ins.*

App.327

*Corp.*, No. 6:18-cv-1499, 2022 WL 682759, at *2 (M.D. Fla. Mar. 8, 2022) (admonishing counsel for "attempting to relitigate pending issues"); *Roggio v. United States*, No. 11-cv-22847, 2013 WL 11320225, at *8 (S.D. Fla. June 13, 2013) (concluding that a party "may not seek duplicative relief by repackaging the allegations in the form of two motions"). "Filing a second motion requesting the same relief as a previous, still pending motion only serves to further clog the Court's docket, slow the judicial process, and . . . create confusion for the Court" and parties. *Greene v. Lassiter*, No. 1:19-cv-224-MR, 2020 WL 3270390, at *1 n.1 (W.D.N.C. June 17, 2020); *cf. ODonnell v. Harris Cnty.*, 260 F. Supp. 3d 810, 815 (S.D. Tex. 2017) (noting that "a motion to stay [pending appeal] should not be used to relitigate matters, submit new evidence, or raise arguments which could, and should, have been made before the judgment issued" (quotations omitted)). Try as it might, CCST cannot avoid this problem through labelling; any distinction between a "preliminary injunction," Pl.'s PI Br., ECF No. 24, at 25, and a "temporary injunction," Pl.'s Motion, ECF No. 70, at 2, is illusory. And in the context of this case, where the Court has moved expeditiously to consider the parties' claims and arguments, CCST's redundant request is particularly unwarranted. For these reasons, and in the interest of conserving judicial resources and safeguarding the judicial process, the Court should deny Plaintiffs' motion for "a temporary administrative injunction" as duplicative.

CCST's latest motion also fails on substance. Federal Rule of Civil Procedure 62(d) applies only "where an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction," and no such appeal is pending in this case. And while 5 U.S.C. § 705 authorizes a court to "postpone the effective date of an agency action," that authority is governed by the same factors governing issuance of a preliminary injunction—it does not supplant them. *See Texas v. EPA*, 829 F.3d 405, 424, 435 (5th Cir. 2016) (applying traditional injunctive-relief factors); *R.J. Reynolds Tobacco Co. v. FDA*, No. 6:20-CV-00176, 2022 WL 17489170, at *10 n.93 (E.D. Tex. Dec. 7, 2022) ("The judicial process 'appropriate' under 5

U.S.C. § 705 is determined by the traditional 'balancing process which attends the grant of injunctive relief.'" (quoting *Sampson v. Murray*, 415 U.S. 61, 80 (1974))).  Thus, in asking the Court to enter a "temporary" injunction before it conducts the analysis required to support *any* injunction, *see* Pl.'s Motion, ECF No. 70, at 1, CCST puts the cart before the horse.

Unsurprisingly, then, none of the cases referenced by CCST support the notion that a district court may grant a temporary injunction to allow itself more time to consider claims for preliminary-injunctive relief.  At most, those cases demonstrate that, in extraordinary circumstances, courts may exercise otherwise-available authority to prevent a party from taking actions that would threaten the courts' jurisdiction.  *See, e.g.*, *S. L. V. v. Rosen*, No. 21-cv-17, 2021 WL 243442, at *8 (W.D. Tex. Jan. 25, 2021) (defending issuance of administrative stay of immigrant's removal "for the very limited purpose to determine [the court's] own jurisdiction"); *see also id.* at *6 (discussing case where "the Supreme Court found that 'the District Court unquestionably had the power to issue a restraining order for the purpose of preserving existing conditions pending a decision upon its own jurisdiction'" (quoting *United States v. United Mine Workers of America*, 330 U.S. 258, 290 (1947))); *RNC v. Pelosi*, No. 22-cv-659, 2022 WL 1604670, at *1 (D.D.C. May 20, 2022) (granting limited administrative injunction pending appeal to forestall compliance with a subpoena while party sought emergency relief from the D.C. Circuit); *Trump v. Thompson*, No. 21-5254, 2021 WL 5239098, at *1 (D.C. Cir. Nov. 11, 2021) (granting administrative injunction against release of allegedly privileged documents "to protect the court's jurisdiction to address appellant's claims of executive privilege"); *accord All. for Hippocratic Med. v. FDA*, --- F. Supp. 3d ----, 2023 WL 2825871, at *3, 32 (N.D. Tex. Apr. 7, 2023) (finding relief appropriate under § 705 only after analyzing the preliminary-injunction factors).  Because no such extraordinary circumstances exist here, CCST's motion provides no cause to deviate from the normal course of preliminary-injunction proceedings.  *Cf. Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 944 (D. Md. 2020) (challenged rules took effect while the court weighed pending motions).

App.329

CCST asserts, without any justification, that delaying the Rule's effective date "will not unduly prejudice Defendants."  Pl.'s Motion, ECF No. 70, at 2.  But in fact, the unwarranted delay sought by CCST would interfere with the long-planned implementation of important policies to improve the federal student loan programs.  As Defendants have already explained, *see* Defs.' Opp'n Br., ECF No. 56, at 38, the public's interest in seeing those policies implemented outweighs CCST's parochial and pecuniary interests.  And in any event, CCST has again failed to justify its request for an overbroad, nationwide injunction against the entirety of a multi-faceted and severable Rule, many aspects of which CCST does not even purport to challenge.  *See id.* at 38–40.

For all these reasons, the Court should deny CCST's emergency motion for a temporary administrative injunction.

Dated: June 28, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Cody T. Knapp*
CHRISTINE L. COOGLE
CODY T. KNAPP (NY #5715438)
Trial Attorneys
U.S. Department of Justice
Civil Division
Federal Programs Branch
1100 L St. NW
Washington, D.C. 20005
Telephone: (202) 532-5663
Facsimile: (202) 616-8470
E-mail: cody.t.knapp@usdoj.gov

*Counsel for Defendants*

App.330

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically via the Court's ECF system, which sent notification of such filing to counsel of record.

*/s/ Cody T. Knapp*

# EXHIBIT 13

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

|  |  |
|---|---|
| CAREER COLLEGES & SCHOOLS OF TEXAS,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION; MIGUEL CARDONA, in his official capacity as the Secretary of Education,<br><br>    Defendants. | Case No. 1:23-cv-00433-RP |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS
OPPOSED EMERGENCY MOTION FOR TEMPORARY ADMINISTRATIVE
INJUNCTION STAYING THE EFFECTIVE DATE OF THE RULE**

Defendants' Opposition, ECF No. 71, misses the mark. A motion for a temporary administrative stay while the Court decides an underlying motion for preliminary injunction is neither duplicative nor improper. CCST's motion is not duplicative because it seeks an immediate temporary injunction during the pendency of its preliminary-injunction motion, while its preliminary-injunction motion seeks an injunction *during the pendency of the case*, which is only effective once the motion is decided. Those forms of relief are mutually exclusive by definition.

Nor is such a request improper. *Cf. In re Abbott*, 800 F. App'x 296, 298 (5th Cir. 2020) ("Entering temporary administrative stays so that a panel may consider expedited briefing in emergency cases is a routine practice in our court."). It is blackletter law that courts may issue

1

App.333

temporary injunctions in order to preserve their jurisdiction by preserving the status quo. *See S.L.V. v. Rosen*, No. SA-21-CV-0017-JKP, 2021 WL 243442, at *6 (W.D. Tex. Jan. 25, 2021) ("[F]ederal district courts may issue an injunction to preserve the status quo . . . .").

Finally, despite its allusion to "long-planned implementation," Defs.' Opp'n Br., ECF No. 71, at 4, the Department still has not pointed to any concrete prejudice that it would suffer from a temporary injunction. The harms suffered by CCST's members, on the other hand, are significant and irreparable. *See* Pl.'s Br. in Support of its Mot. for Prelim. Inj., ECF No. 24, at 20-24.

CCST respectfully urges the Court to grant its motion.

Dated:  June 29, 2023

Respectfully submitted,

 */s/ Allyson B. Baker*
Allyson B. Baker (*pro hac vice*)
Meredith L. Boylan (*pro hac vice*)
Stephen B. Kinnaird (*pro hac vice*)
Michael Murray (*pro hac vice*)
Sameer P. Sheikh (*pro hac vice*)
Tor Tarantola (*pro hac vice*)
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20037
Telephone: (202) 551-1830
Fax: (202) 551-0330
Email: allysonbaker@paulhastings.com

Philip Vickers (TX Bar No. 24051699)
Katherine Hancock (TX Bar No. 24106048)
CANTEY HANGER LLP
600 West 6th Street, Suite 300
Fort Worth, TX 76102
Telephone: (817) 877-2800
Fax: (817) 877-2807
Email: pvickers@canteyhanger.com

*Counsel for Plaintiff*

2

App.334

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record via the Court's CM/ECF system on June 29, 2023.


*/s/ Allyson B. Baker*
Allyson B. Baker

# EXHIBIT 14



# DEPARTMENT OF EDUCATION

**34 CFR Parts 600, 668, 674, 682, and 685**

[Docket ID: ED–2021–OPE–0077]

RIN 1840–AD53, 1840–AD59, 1840–AD70, 1840–AD71

**Institutional Eligibility Under the Higher Education Act of 1965, as Amended; Student Assistance General Provisions; Federal Perkins Loan Program; Federal Family Education Loan Program; and William D. Ford Federal Direct Loan Program**

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Final regulations.

**SUMMARY:** The Secretary establishes new regulations governing the William D. Ford Federal Direct Loan (Direct Loan) Program to establish a new Federal standard and a process for determining whether a borrower has a defense to repayment on a loan based on an act or omission of their school. We also are amending the Direct Loan Program regulations to prohibit participating schools from using certain contractual provisions regarding dispute resolution processes and to require certain notifications and disclosures by institutions (institutions or schools) regarding their use of mandatory arbitration. Additionally, we are amending the Direct Loan regulations to eliminate interest capitalization in instances where it is not required by statute. We are also amending the regulations governing closed school discharges and total and permanent disability (TPD) discharges in the Federal Perkins Loan (Perkins), Direct Loan, and Federal Family Education Loan (FFEL) programs. We are also amending the regulations governing false certification discharges in the Direct Loan and FFEL programs. Finally, we are amending the regulations governing Public Service Loan Forgiveness (PSLF) in the Direct Loan program to improve the application process, and to clarify and expand definitions for full-time employment, qualifying employers, and qualifying monthly payments. The changes would bring greater transparency and clarity and improve the administration of Federal student financial aid programs to assist and protect students, participating institutions, and taxpayers.

**DATES:** These regulations are effective July 1, 2023. For the implementation dates of the regulatory provisions, see the Implementation Date of These Regulations in **SUPPLEMENTARY INFORMATION.**

**FOR FURTHER INFORMATION CONTACT:** For further information related to interest capitalization, contact Vanessa Freeman at (202) 987–1336 or by email at *vanessa.freeman@ed.gov.* For further information related to borrower defenses to repayment (BD) or pre-dispute arbitration, contact Rene Tiongquico at (202) 453–7513 or by email at *rene.tiongquico@ed.gov.* For further information related to TPD, closed school, and false certification discharges, contact Brian Smith at (202) 987–1327 or by email at *brian.smith@ed.gov.* For further information related to PSLF, contact Tamy Abernathy at (202) 453–5970 or by email at *tamy.abernathy@ed.gov.*

If you are deaf, hard of hearing, or have a speech disability and wish to access telecommunications relay services, please dial 7–1–1.

**SUPPLEMENTARY INFORMATION:**

## Executive Summary

The Secretary amends the regulations in seven areas affecting the Direct Loan Program and several areas that also affect the Perkins Loan Program or the FFEL Program. First, we amend the regulations governing the Direct Loan Program to establish a new Federal standard and process for determining whether a borrower has a defense to repayment of a loan. We also limit the use of certain contractual provisions regarding dispute resolution processes by participating institutions and require certain notifications and disclosures by institutions regarding their use of mandatory arbitration. Additionally, we amend the Perkins, Direct Loan, and FFEL program regulations to improve the process for granting TPD discharges by eliminating the income monitoring period, expanding the circumstances in which borrowers can qualify for discharges based on a finding of disability by the Social Security Administration, expanding allowable documentation, and allowing additional health care professionals to provide a certification that a borrower is totally and permanently disabled. We further amend the closed school discharge provisions in the Perkins Loan, Direct Loan, and FFEL programs to expand borrower eligibility for automatic discharges and eliminate provisions pertaining to reenrollment in a comparable program. Additionally, we amend the Direct Loan and FFEL regulations to streamline the regulations governing false certification discharges. We also amend the Direct Loan regulations to eliminate interest capitalization in instances where it is not required by statute. Finally, we amend regulations governing PSLF in the Direct Loan program to improve the application process and to clarify and expand the definitions of full-time employment, employee or employed, and qualifying monthly payments. The changes will bring greater transparency and clarity and improve the administration of Federal student financial aid programs to assist and protect students, participating institutions, and taxpayers.

### Purpose of This Regulatory Action

Summary of the Major Provisions of This Regulatory Action

The final regulations—
• Amend the Direct Loan regulations to establish a new Federal standard for BD claims applicable to applications received on or after July 1, 2023. Applications pending on July 1, 2023, will also be considered under the new standard. In addition, this final rule expands the existing definition of misrepresentation, provides an additional basis for a BD claim based on aggressive and deceptive recruitment practices, and allows claims based on State law standards for loans first disbursed prior to July 1, 2017.
• Provide that the Department will use a preponderance of the evidence standard to determine whether the institution committed an actionable act or omission and, as a result, the borrower suffered detriment, such that the circumstances warrant BD relief and the borrower's BD claim should be approved. In determining whether relief is warranted the Secretary will consider the totality of the circumstances, including the nature and degree of the acts or omissions and of the detriment caused to borrowers.
• Provide for a full discharge of all remaining loan balances and a refund of all amounts paid to the Secretary for loans associated with an approved BD claim.
• Establish processes for group BD claims that may be formed in response to evidence provided by third-party requestors or at the Secretary's discretion, including based on prior Secretarial Final Actions. We define Secretarial Final Actions as fine, limitation, suspension, or termination actions taken by the Department against the institution, denying the institution's application for recertification, or revoking the institution's provisional program participation agreement.
• Stop interest accrual on the borrowers' loans beginning 180 days after the initial grant of forbearance or

stopped collections in the case of an individual BD claim and immediately upon formation for a group BD claim.
• Issue decisions on claims within a certain period or the loans will be deemed unenforceable.
• Establish a reconsideration process for review of denied BD claims.
• Establish a process for recouping the cost of approved discharges.
• Prohibit institutions that wish to participate in title IV programs from requiring borrowers to agree to mandatory pre-dispute arbitration agreements or waiver of class action lawsuits.
• Require institutions to disclose publicly and notify the Secretary of judicial and arbitration filings and awards pertaining to a BD claim.
• Eliminate interest capitalization on Direct Loans where such capitalization is not required by statute.
• Modify the Perkins, FFEL, and Direct Loan regulations to streamline the application process for a TPD discharge by expanding the Department's use of Social Security Administration (SSA) continuing disability review codes beyond "Medical Improvement Not Expected" when deciding if a borrower qualifies for TPD discharge.
• Revise the Perkins, FFEL, and Direct Loan regulations to eliminate the 3-year post-discharge income monitoring period for borrowers eligible for TPD discharge to allow borrowers to retain their discharges without unnecessary paperwork burden.
• Allow borrowers to receive a TPD discharge if the established onset date of their disability as determined by SSA was at least 5 years prior to the application to better align the regulations with statutory requirements for a TPD discharge.
• Expand the list of health professionals who may certify that a borrower is totally and permanently disabled to include licensed nurse practitioners (NPs), physician's assistants (PAs), and clinical psychologists to help borrowers more easily complete the application for a TPD discharge.
• Amend the Perkins, FFEL, and Direct Loan regulations to simplify the closed school discharge process by expanding access to automatic discharges and clarify the circumstances when borrowers who reenroll in a comparable program are not eligible for a discharge.
• Streamline the FFEL and Direct Loan false certification regulations to provide one set of regulatory standards that will cover all false certification discharge claims.

• Clarify that, to determine eligibility for a false certification discharge, the Department relies on the borrower's status at the time the Direct loan was originated, and at the time the FFEL loan was certified.
• Revise the regulations for PSLF to improve the application process, expand what counts as an eligible monthly payment, expand the definition of "full-time" employment, and provide additional clarifying definitions of public service employment to reduce confusion and to clearly establish the definitions of qualifying employment for borrowers.
• Expand the definition of "employee" or "employed" to include someone who works as a contracted employee for a qualifying employer in a position or provides services which, under applicable State law, cannot be filled or provided by a direct employee of the qualifying employer.

*Background*

Affordability of postsecondary education and student loan debt have been significant challenges for many Americans. Total outstanding student loan debt has risen over the past 10 years as student loan repayment has slowed, while the inability to repay student loan debt has been cited as a major obstacle to entry into the middle class.[1]

This final rule provides several significant improvements to existing programs authorized under the Higher Education Act of 1965, as amended (HEA)[2] that grant loan discharges to borrowers who meet specific eligibility conditions. Despite the presence of these discharge authorities for years, the Department is concerned that too many borrowers have been unable to access loan relief authorized by statute. In some situations, this has been due to regulatory requirements that created unnecessary or unfair burdens for borrowers.

The final rule makes changes related to discharges available to borrowers in the three major Federal student loan programs: Direct Loans, FFEL, and Perkins Loans. The most significant effects are in the Direct Loan program, which has been the predominant source of all new Federal student loans since 2010. In this program, the Department makes loans directly to the borrower

and then contracts with private companies known as student loan servicers to manage the borrower's repayment experience on behalf of the Department. Several components of these regulations, such as interest capitalization, BD, the prohibition on the use of mandatory pre-dispute arbitration and class action waivers, and the PSLF program only apply to Direct Loans. Other provisions addressed in these regulations, such as closed school discharge, and TPD discharges, affect Direct Loans as well as loans previously made under the FFEL Program and the Perkins Loan Program.[3] False certification discharges only affect Direct Loans and FFEL Program loans. In the FFEL program, private lenders made Federally insured and subsidized student loans using their own funds. The lender was protected from the risk of default or loss by Federal insurance. In the Perkins program, institutions issued Federal student loans using a combination of Federal and institutional funds.

The negotiated rulemaking committee (Committee) that considered the draft regulations on these topics reached consensus on the proposed regulations relating to interest capitalization, false certification discharges, and TPD; they did not reach consensus on BD, pre-dispute arbitration agreements and class action waivers, closed school discharge, or PSLF.

On July 13, 2022, the Secretary published a notice of proposed rulemaking (NPRM) for these parts in the **Federal Register**.[4] The NPRM included proposed regulations on which the Committee reached consensus and the Department's proposed rules for those issues where consensus was not reached. These final regulations reflect the results of those negotiations and respond to the public comments received on the regulatory proposals in the NPRM. The final regulations also contain changes from the NPRM, which are fully explained in the *Analysis of Comments and Changes* section of this document. These final rules do not speak to one issue raised by commenters in response to the NPRM—whether and in what circumstances private for-profit employers, including those that provide early childhood services, should be treated as qualifying employers for the purposes of PSLF. That issue, and the responses to comments related to it, will be addressed in a future final rule. The

---

[1] R. Chakrabarti, N. Gorton & W. van der Klaauw, "Diplomas to Doorsteps: Education, Student Debt, and Homeownership," Federal Reserve Bank of New York, *Liberty Street Economics* (blog), April 3, 2017, *http://libertystreeteconomics.newyorkfed.org/2017/04/diplomas-to-doorsteps-education-student-debt-and-homeownership.html*.
[2] 20 U.S.C. 1001, *et seq.*

[3] There have been no new FFEL Program loans originated since June 30, 2010, and no new Perkins Loans since September 30, 2017.
[4] *https://www.regulations.gov/document/ED-2021-OPE-0077-1350*.

Department is separating this issue for a future final rule because we received significant and detailed comments in response to our questions around the possible treatment of for-profit companies that provide early childhood education as qualifying employers for PSLF. These comments included a number of proposals that address operational, legal, and policy considerations, which the Department needs additional time to consider.

*Costs and Benefits:* As further detailed in the *Regulatory Impact Analysis,* the benefits of the final regulations include: (1) a clarified process for BD discharge applications assisted by the creation of a primary Federal standard to streamline the Department's consideration of applications, while affording institutions an opportunity to respond to allegations contained in BD claims; (2) increased opportunities for borrowers to seek relief from institutional misconduct by prohibiting the use of mandatory pre-dispute arbitration and class action waivers; (3) improved school conduct and offsetting some of the costs of discharges to the Federal government and taxpayers as a result of holding individual institutions financially accountable for BD discharges and deterring misconduct; (4) increased automated discharges for borrowers, with the option to opt out; and (5) improved access to and expanded eligibility for, where appropriate, PSLF, closed school, TPD, and false certification discharges.

The costs to taxpayers in the form of transfers include BD claims that are not reimbursed by institutions; additional relief through closed school, PSLF, TPD, and false certification discharges to borrowers through programs to which they are legally entitled under the HEA; and the foregone interest where capitalizing interest is not required. The paperwork burden associated with reporting and disclosure requirements necessary to ensure compliance with these regulations represents an additional cost to institutions.

*Implementation Date of These Regulations:* Section 482(c) of the HEA requires that regulations affecting programs under title IV of the HEA be published in final form by November 1, prior to the start of the award year (July 1) to which they apply. That section also permits the Secretary to designate any regulation as one that an entity subject to the regulations may choose to implement earlier and the conditions for early implementation.

Consistent with the Department's objective to improve the implementation of PSLF, the Secretary intends to exercise his authority under section 482(c) to designate the simplified definition for full-time employment in PSLF as a provision that an entity subject to the provision may, in the entity's discretion, choose to implement prior to the effective date of July 1, 2023. The Secretary may specify in the designation when, and under what conditions, an entity may implement the provision prior to the effective date. The Secretary will publish any designation under this subparagraph in the **Federal Register**.

The Secretary does not intend to exercise his authority to designate any other regulations in this document for early implementation. The final regulations included in this document are effective July 1, 2023.

*Public Comment:* In response to our invitation in the July 13, 2022, NPRM, 4,094 parties submitted comments on the proposed regulations. In this preamble, we respond to those comments.

**Analysis of Comments and Changes**

We developed these regulations through negotiated rulemaking. Section 492 of the HEA requires that, before publishing any proposed regulations to implement programs under title IV of the HEA, the Secretary must obtain public involvement in the development of the proposed regulations. After obtaining advice and recommendations, the Secretary must conduct a negotiated rulemaking process to develop the proposed regulations. The negotiated rulemaking Committee considered each issue separately to determine consensus and reached consensus on the proposed regulations addressing interest capitalization, TPD, and false certification discharges. The Committee did not reach consensus on the remaining proposed regulations that we published on July 13, 2022.

We group major issues according to subject, with appropriate sections of the regulations referenced in parentheses. We discuss other substantive issues under the sections of the regulations to which they pertain. Generally, we do not address minor, non-substantive changes (such as renumbering paragraphs, adding in a word, or typographical errors). Additionally, we do not address recommended changes that the statute does not authorize the Secretary to make (such as forgiving all student loans, setting interest rates to 0 percent, or providing forgiveness under PSLF after 60 payments instead of 120) or comments pertaining to operational processes. We also do not address comments pertaining to issues that were not within the scope of the NPRM. An analysis of the public comments

received and of the changes in the regulations since publication of the NPRM follows.

*Negotiated Rulemaking*

*Comments:* A few commenters suggested the negotiated rulemaking table must include representatives from civil rights organizations as well as student representation, stating that communities and people of color are disproportionately impacted by postsecondary education and need to be included in rulemaking discussions. These commenters further urged the Department to include more than two student representatives in negotiated rulemaking, noting that student representatives were outnumbered more than two to one by higher education and lending industry representatives. Other commenters suggested that for-profit institutions are significantly impacted by these regulations and should have had more representation at negotiated rulemaking. Finally, numerous commenters said the negotiated rulemaking process felt rushed because of the number of issues involved and holding the meetings virtually. They suggested the Department return to in-person negotiated rulemaking.

*Discussion:* On August 10, 2021, the Department published a notice in the **Federal Register** announcing its intention to establish a negotiated rulemaking Committee to prepare proposed regulations for these issues.[5] The notice set forth a schedule for the Committee meetings and requested nominations for individual negotiators to serve on the committee. As we stated in that solicitation and request for nominations for negotiators, we select individual negotiators who reflect the diversity among program participants, in accordance with Sec. 492(b)(1) of the HEA. Our goal was to establish a Committee and a Subcommittee that allowed significantly affected parties to be represented while keeping the Committee size manageable.

As the Federal negotiator explained in the first negotiated rulemaking session, the Department deliberately placed students front and center in the discussion by including constituencies for dependent students, independent students, and student loan borrowers.[6] As with all other Committee representatives, each of these constituencies had primary representatives and alternates. The Department believes the negotiated

---

[5] 86 FR at 43609.
[6] *https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/104am.pdf,* page 61.

rulemaking Committee captured the diverse universe of students.

While the Department did not identify civil rights organizations as a stand-alone constituency for this negotiated rulemaking table, representatives from that group had several opportunities to be involved with negotiated rulemaking, including during the public comment period after each rulemaking session and by submitting written comments on the proposed rule. In fact, several civil rights organizations submitted comments to the Department. With respect to the request for greater representation of proprietary schools, the Department believes it correctly identified proprietary institutions as a single constituency group. None of the negotiated topics discussed during these sessions related solely to the proprietary sector. Moreover, these institutions represent a smaller share of students than those in the private nonprofit sector, which also had only a single representative.

The full negotiated rulemaking Committee reached agreement on its protocols, including the constituencies represented on the committee and committee membership.

Finally, the Department disagrees that the negotiated rulemaking process was rushed. We conducted three public hearings to comment on the rulemaking agenda.[7] We also held three negotiated rulemaking sessions that ran for five days each from 10 a.m. to 4 p.m. EST, which included a half hour of public comment every day except the final day of the last session. The Department gave stakeholders and members of the public the opportunity to weigh in on the development of the language reflected in the regulations through a public comment period.

*Changes:* None.

*Public Comment Period*

*Comments:* Several commenters requested a 45- or 60-day comment period on the proposed rules. Some of these commenters asserted that under the principles of Executive Orders 12866 and 13563, the Department must adhere to at least a 60-day comment period.

*Discussion:* The Department shares commenters' belief in the importance of giving the public a robust opportunity to publicly comment on the Department's regulations. The Department received thousands of written comments and considered every comment it received in response to the NPRM. We note that the negotiated rulemaking process provides significantly more opportunity

for public engagement and feedback than notice-and-comment rulemaking without a negotiated rulemaking component. The Department began this process of developing regulations more than a year ago by inviting public input through a series of public hearings in June 2021. We selected negotiators to represent a range of constituencies. During the negotiated rulemaking sessions, the Department provided opportunities for the public to comment throughout the process, including after seeing draft regulatory text—some of which was available prior to the first session and all of which was available prior to the second and third sessions. Each of these opportunities took place before the formal comment period on the proposed rules. Considering these efforts, the Department believes that the 30-day public comment period was sufficient time for interested parties to submit comments. The 30-day comment period on the NPRM is not unique, and the Department has fully complied with the appropriate Executive Orders regarding public comments. First, the Department notes that over the last several years and under multiple Administrations, the Department has relied on a 30-day comment period for many regulations including: BD;[8] distance education and innovation;[9] and rescission of the gainful employment regulations.[10]

Second, while the Executive Orders cited by the commenters direct each agency to afford the public a meaningful opportunity to comment, those Executive Orders do not require a 60-day comment period.

Unlike simple notice-and-comment rulemaking, the negotiated rulemaking process affords ample opportunities for the public to not only comment but also to understand the Department's proposed rules and policies. We livestreamed the complete negotiated rulemaking sessions on our website, posted recordings of the livestreams, as well as the transcripts of the rulemaking sessions for later review. In addition, we provided an opportunity for public comment at the end of each day the committee met, and posted each iteration of draft proposed regulatory text that the committee reviewed. Thus, the Department has met the requirements provided in those Executive Orders to afford the public a meaningful opportunity to comment and participate in the Department's rulemaking process.

*Changes:* None.

## Borrower Defense to Repayment—General (§ 685.401)

### General Support for Regulations

*Comments:* The Department received many comments in support of the proposed regulations on BD accompanied by testimonial accounts of borrowers' experiences at institutions and the loan debt they incurred. One commenter, for example, felt that institutions need to better inform students about their academic programs, as well as employment prospects after graduation. Many commenters supported the proposed regulations because they felt the 2019 BD regulations required borrowers to meet an unrealistic standard that made it extremely difficult to prove harm. Commenters further cited the anticipated low approval rates for BD claims under the 2019 BD regulations compared to the 2016 BD regulations as further support for creating a new set of regulations that are more balanced toward students. Commenters also expressed support for many specific elements of the NPRM, including a strong upfront Federal standard, the addition of aggressive and deceptive recruitment as a type of act or omission that could give rise to an approved claim, the ability to adjudicate group claims, the opportunity for State requestors to submit applications for considering group claims, the clearer inclusion of FFEL loans, codifying procedures such as stopping the accumulation of interest, and establishing deadlines for reviewing claims. Other commenters supported the proposed regulations citing that they are more streamlined, easier to administer, less confusing, and they eliminate unreasonable burdens on borrowers.

*Discussion:* We appreciate the comments in support of our proposals. We believe these final regulations strike the right balance of creating a process that will result in BD discharges, where appropriate, while denying claims without merit. In doing so, the Department believes these regulations will clarify the claims process for borrowers and institutions, create transparent and realistic timelines, and make the process easier to administer.

These regulations also provide a path for recouping the cost of approved discharges from institutions when warranted and after significant due process opportunities. We address commenters' arguments with respect to specific provisions of the regulations in the sections of this preamble specific to those provisions.

*Changes:* None.

---

[7] May 6, 2021, 86 FR at 28299.

[8] 83 FR at 37242 (July 31, 2018).

[9] 85 FR at 18638 (April 2, 2020).

[10] 83 FR at 40167 (August 14, 2018).

*General Opposition to Regulations*

*Comments:* Many commenters expressed general concerns about the regulations. These commenters believe that the regulations would lead to frivolous claims and greater costs to institutions, both in terms of defending against recoupment efforts associated with what commenters described as claims that should not have been approved, but also reputational harm for institutions, the potential for actions by other regulators, loss of private financing, and the possibility of borrower lawsuits. Similarly, some former students expressed concern that their degrees would be devalued if the institution they attended had BD claims approved against it.

Commenters also argued that the Department lacks the legal authority to issue these regulations, that components of the regulations were too vague, that institutions are not afforded sufficient due process under the proposed rules, and that the regulations represented impermissible Departmental involvement in matters of State law. Commenters also expressed displeasure with other specific components of the regulations, such as the proposed group process.

*Discussion:* As we explained in the NPRM, despite the presence of the BD discharge authority for decades, the Department is concerned that too many borrowers who were subjected to an act or omission by their institution that should give rise to a successful defense to repayment have not received appropriate relief, at least in part because the regulatory requirements have created unnecessary or unfair burdens for borrowers.[11] In these rules, the Department crafted a BD framework that strikes a balance between providing transparency, clarity, and ease of administration while simultaneously giving adequate protections to borrowers, institutions, the Department, and the public monies that fund Federal student loans.

The Department believes that the proposed rule included procedures that would allow it to deny claims that lacked sufficient evidence or that did not meet the standard for a BD claim. In particular, under the proposed rules, the Department would obtain information from institutions and, in the case of a claim alleging misrepresentation by the institution, require a showing of reasonable reliance by the borrower. Nevertheless, in this final rule we have adopted additional changes suggested by commenters to clarify the standard

that must be met for a claim to be approved and to specify how the Department will ensure claims include sufficient detail to permit consideration by the Department. The final regulations require that, to approve a claim, the Department must conclude that the institution's act or omission is an actionable ground for BD that caused detriment to the borrower that warrants relief (the Federal standard definition for a BD in § 685.401). This general standard incorporates enumerated categories of conduct ("actionable act or omission") that affect the fairness of the transaction underlying the borrower's loan obligation. (Unless otherwise indicated hereinafter, "act or omission" refers to an "*actionable* act or omission" within the meaning of the BD standard and is shortened to aid with readability.) This standard provides that a borrower must suffer detriment as a result of the conduct, which incorporates the conventional elements of injury and causation. It also requires that the outcome of the borrower's loan-and-enrollment transaction was financial harm, lost value, or other cognizable injury caused by the actionable conduct. Finally, it requires that the circumstances of the borrower's resulting detriment warrant the form of relief—discharge of the entire remaining loan balance, refund of all payments made to the Secretary, and other remedial measures such as removing the borrower from default and updating credit reports. There will be a rebuttable presumption that such relief is warranted in cases involving closed schools, which reflects past experience. This standard thus establishes the concept that the institution's act or omission and the detriment they cause must be of such a nature that the remedy provided would be appropriate—specifically, a discharge of all remaining loan obligations, refund of all past amounts paid to the Secretary, and curative steps related to default, credit-reporting, and eligibility, if applicable. An act or omission resulting in borrower detriment that is marginal or attenuated from the decision to borrow or enroll would thus not be grounds for an approval because the relief of a full discharge, refund, and associated steps would not be an appropriate remedy. In considering whether an institution's acts or omissions caused detriment that warrants this form of relief, the Department would consider the totality of the circumstances, including the nature and degree of the act or omission and of the harm or injury along with other relevant factors. The standard also

reflects the Department's experience that the circumstances warranting such relief are likely to exist in cases involving closed schools shown to have committed actionable acts or omissions, and the standard thus provides a rebuttable presumption that relief is warranted in those cases.

Under this standard and its accompanying regulations, the Department will have flexibility in determining the universe of evidence to be considered, while ensuring that relief-worthy claims are supported by sufficient evidence of the institution's wrongdoing. The Department is also providing greater clarity regarding what constitutes a materially complete application that can then be adjudicated (§§ 685.402(c) and 685.403(b)), which will ensure that applications include a sufficient degree of detail and, where applicable, evidentiary support.

These regulations should have a deterrent effect dissuading institutions from engaging in conduct that would give rise to a defense to repayment. To be clear, however, the Department does not consider recoupment for the amounts of BD discharges to be a sanction or punishment for the acts or omissions that impugn the underlying transaction involving a borrower's enrollment, tuition, and loan. The deterrent effect that flows from the risk of punishment is applied by operation of the Department's regulations providing for fine, suspension, termination, and other sanctions.

The regulations should, however, have the type of deterrent effect that proceeds from predictably ensuring parties fulfill the commitments they have made. By setting forth a clearer and more robust Federal standard for BD claims and a rigorous group claim process, institutions that might otherwise engage in questionable behavior will change their practices and act more ethically and truthfully. That is, the Department believes the standards and processes in this rule will mitigate the risk of moral hazard if unfulfilled commitments are ignored. The Department believes there will be a future deterrent effect even in the situations where the institution is not held liable for the expense of the approved discharge because there would be a higher likelihood of successful recoupment on more recently disbursed loans.

In this context, the Department notes that the circumstances in which an institution is most likely to face considerable costs related to BD claims are likely the strongest indication of actionable wrongdoing. BD applications filed by State regulators following

[11] 87 FR at 41879.

investigations that find acts or omissions, and cases with a significantly large volume of independently filed individual applications with common claims, are two such examples. Furthermore, we believe that the regulations requiring borrowers to submit materially complete individual applications will increase the quality and detail of claims without posing unnecessary barriers for borrowers.

The Department also does not agree that the commenters' concerns about reputational harm for institutions, the potential for actions by other regulators, and the possibility of borrower lawsuits solely stemming from approved claims are reasons to make significant changes to the proposed rules. To the extent commenters refer to the risk of erroneous BD decisions causing harm to the institution, we will only grant a discharge when adequate evidentiary support exists—a finding that will occur only after considering evidence and arguments submitted by the institution. Additionally, we only assess liabilities against the institution if we initiate a recoupment action. That action will afford schools the same procedural rights and protections available in any other situation in which an institution is assessed a monetary liability associated with title IV.[12]

Regarding potential risks for institutions independent of actual liability determinations, the Department notes that the HEA clearly provides borrowers the right to assert a defense to repayment based on an alleged wrongdoing by an institution in the same way any consumer may invoke legal remedies against a seller or service provider. The Department is obligated to consider those claims. The Department does not conclude that concerns about hypothetical institutional harms, independent of actual liability determinations, override the concern for students harmed by institutional misconduct and the Department's obligation to consider claims alleging such harm.

To the extent commenters are concerned with risks flowing from the sole act of the Department granting claims, irrespective of recoupment or any determination of actual liability on the school's part, the Department does not consider the marginal risk of such harm to warrant conditioning borrower relief on a finding of school liability or changing the sequence of those determinations. Were the Department to

make borrower relief and school liability coextensive or to make each adjudicatory step an adversarial process between the borrower and the school, it would create unrealistic barriers for borrowers and an insurmountable administrative burden for the Department.

Furthermore, although the Department must disclose certain records upon request, it does not publicize the outcomes of individual BD applications. Commenters did not point to specific or particularized harm that any open school has suffered as a result of the Department granting any individual applications in the past. At least one comment from an institution referenced inquiries it had received from a State regulator and a lender because the settlement agreement that, at the time of this final rule, has received preliminary approval.[13] The commenter said the part of the settlement agreement to automatically discharge all claims associated with that school was an indicator of reputational harm. That example simply mentioned inquiries, however, and no actual harm suffered. We believe those concerns are unwarranted. The relief for class members described in that proposed settlement was agreed to in order to resolve that particular litigation and undertaken in exercise of the Secretary's settlement and compromise authority. It does not reflect ''approved'' BD claims or involve the process contemplated by the proposed regulation.

To the extent that harm from solely granting a borrower's claim could be shown, either now or in the future, that is simply a by-product of the statute and structure of title IV. First, by its terms, the defense to repayment under the HEA is invoked against the Department, not schools. For that reason, regulations giving context to the HEA's BD provision must principally address the circumstances in which borrowers invoke that defense. Properly separating the BD discharge decisions from liability determinations provides a process that is administratively feasible for the Department and allows borrowers to have claims based on that defense asserted and resolved in a realistic way.

Second, the risk of harm from relief determinations between the borrower and the Department, to the extent there is any, is simply a by-product of participation in title IV that schools are aware of when they seek eligibility. Indeed, the processes set forth in the HEA and Department regulations,

including Department BD relief determinations, are expressly incorporated into schools' program participation agreements (PPAs). Title IV funding is structured such that schools receive federal funds that can be used to pay tuition and fees up front and leave the subsequent details of repayment, including defenses thereto, to borrowers and the Department. If the Department's resolution of borrower claims implicates some attenuated risks, without any determination of actual liability, then that is simply a by-product of title IV's inherent structure.

The Department also notes that institutional participation in the Direct Loan program is voluntary, and the BD rules, including possible BD liability, have been part of the program almost since its inception. The proposed regulation has incorporated safe harbors so as not to enlarge schools' liability for past conduct beyond what was included in past versions of the regulation and provided robust procedural rights in cases where the Department assesses actual liability against the school. If, going forward, institutions find the risk of hypothetical collateral risks too great, they can easily avoid those risks by choosing not to participate in title IV loan programs.

Finally, regarding the potential for regulatory scrutiny from other agencies or borrower lawsuits, the Department does not dictate evidentiary standards applicable to other regulators, nor do our regulations impact the pleading rules or evidentiary standards for borrower lawsuits.

*Changes:* We revised the Federal standard for BD applications received on or after July 1, 2023, and for applications pending with the Secretary on July 1, 2023, in § 685.401(b) to provide that a borrower with a balance due on a covered loan will be determined to have a defense to repayment if we conclude that the institution's act or omission caused detriment to the borrower that warrants relief. We also added language in § 685.401(e) noting that in determining whether a detriment caused by an institution's act or omission warrants relief under this section, the Secretary will consider the totality of the circumstances, including the nature and degree of the acts or omissions and of the detriment caused to borrowers. For borrowers who attended a closed school shown to have committed actionable acts or omissions that caused the borrower detriment, there will be a rebuttable presumption that the detriment suffered warrants relief under this section. We also revised the definition of a materially complete

---

[12] *See, e.g.,* 34 CFR part 668, subpart G (proceedings for limitation, suspension, termination, and fines).

[13] *See Sweet* v. *Cardona,* No. 3:19–cv–03674 (C.D. Cal. filed June 25, 2019).

individual application in § 685.403(b) and the requirements for third-party requestor applications in § 685.402(c) to ensure the Department obtains the information it needs to make appropriate determinations under the Federal standard.

*Comments:* In the NPRM, the Department noted that one of its concerns about the 2019 regulation was how it addressed the issue of common evidence—the Department's term for evidence that could be applied to similarly situated borrowers. In the NPRM, we also stated that the 2019 regulations limited the Department's ability to consider common evidence held in its possession. A few commenters asserted that we mischaracterized the 2019 regulation, pointing to a section of that final rule that states the Department was allowed to consider common evidence during adjudication so long as it was shared with both the borrower and the institution and that they are given the opportunity to respond to it. Other commenters argued that it would be difficult for a borrower to show individualized harm under the 2019 regulation.

*Discussion:* We appreciate the commenters' perspective and reiterate that the Department remains concerned about burdens placed on applicants under the 2019 regulations. The commenters are correct that, under the 2019 regulations, the Department may employ common evidence for consideration of individual claims. But the Department's greater concern is that the 2019 regulations do not allow for the consideration of group claims, for which employing common evidence across the group is important. Our statement about limits on use of common evidence was primarily made in that context.

The 2019 regulations also required the borrower to prove individualized harm. Our experience in processing claims has shown that certain calculations used to determine the amount of relief in the 2019 regulations would be an inappropriate barrier to relief for the borrower, not because harm did not occur, but because the process to show individualized harm required the borrower to have knowledge about regional and national employment opportunities. We believe that a borrower is unlikely to know how to locate regional or national unemployment rates and connect those data to their own experience.

*Changes:* None.

*Legal Authority*

*Comments:* Several commenters asserted that the Department lacks statutory authority to regulate on BD. Specifically, several commenters stated the Department does not have the statutory authority to design a process that facilitates the discharge of loans. Commenters further argued that the proposed regulations and BD framework will result in the unallowable discharge of loans that in turn will cause increased inflation. Commenters argued that the Department is limited to specifying which institutional acts or omissions may form the basis of a BD claim. The commenters further stated the proposed rule will result in an unprecedented and unlawful mass discharge of student loans.

*Discussion:* We disagree with these commenters who state that the Department lacks the statutory authority to regulate on BD. Throughout the NPRM, we explain that Sec. 455(h) of the HEA requires the Secretary to specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to the repayment of a Direct Loan (*i.e.,* a borrower defense).[14] In addition to Sec. 455(h), Sec. 410 of the General Education Provisions Act (GEPA) gives the Secretary authority to make, promulgate, issue, rescind, and amend rules and regulations governing the applicable programs administered by the Department and the manner in which they are operated.[15] Under Sec. 414 of the Department of Education Organization Act, the Secretary is authorized to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department.[16] These general provisions, together with the HEA provision noted above, authorize the Department to promulgate regulations that govern defense to repayment standards, process, adjudication, and institutional liability. We note that the Department has had regulations on this issue since the inception of the Direct Loan Program in 1994 and the Department's authority to issue those regulations has not been questioned by Congress or the courts.[17]

Collectively, the authorities granted to the Secretary in the HEA and other general provisions provide the statutory basis to develop a BD framework. In response to the comment that this regulatory scheme is unprecedented and unlawful, the Department reminds commenters that the collapse of the Corinthian Colleges (Corinthian) and the flood of claims submitted by Corinthian students stemming from the institution's misconduct necessitated the need for a more robust BD regulatory framework. Prior to Corinthian's precipitous closure, BD was a rarely used discharge despite the fact that those regulations existed since 1995. And the number of BD applications has not meaningfully abated in the years since Corinthian's closure, further supporting the continued need for clear regulations to address claims from hundreds of thousands of borrowers. Here, based on the Department's broad statutory authority, we are building upon the lessons learned from past BD frameworks to ensure borrowers have full access to the discharge provided by law.

*Changes:* None.

*Comments:* A few commenters suggested the proposed rule is unconstitutional because the separation of powers doctrine precludes the Department from adjudicating liability between students and institutions. The commenters further stated the Department proposes to delegate to itself the authority to adjudicate traditional common law actions and defenses. The commenters noted that there is a ''public rights'' exception to the separation of powers doctrine that applies when the sole source of recovery is a Federal statute, but that such exception does not apply here where some of the underlying bases supporting a BD claim are more typically the province of the courts. Along similar grounds, some commenters argued that the inclusion of breaches of contract based upon State law also violated the separation of powers.

*Discussion:* We disagree with the commenters. As an initial matter, BD adjudications do not involve determinations of private rights as between schools and borrowers. As we explain in several sections of this document and as we explained in the 2016 final rule, borrowers have certain rights regarding the obligation to repay a loan made by the Federal Government, including the right to raise defenses to collection of the loan. Additionally, the Federal Government has the right to recover liabilities from the school for losses incurred as a result of the act or omission of the school participating in the Federal loan program.[18] That is, a defense to repayment against the Department does not involve schools, and should the Department seek recoupment, any issues of school liability are separately determined in independent proceedings—a distinction

---

[14] 20 U.S.C. 1087e(h).
[15] 20 U.S.C. 1221e–3.
[16] 20 U.S.C. 3474.
[17] 81 FR 75926, 75932.

[18] 81 FR at 75929.

that is even clearer under these regulations' approach. In that context, the Department's BD adjudication process is not resolving disputes that would otherwise be litigated between schools and borrowers in an Article III court or state court of general jurisdiction.

Additionally, with very limited exceptions, BD adjudications do not involve the enforcement of common law causes of action at all. That is, they apply a federal standard that differs from that of actions for common law fraud or contract. Although a BD claim may incorporate common law principles, it differs with respect to the claim's scope, application, and available remedies. The limited exception is for claims based on loans disbursed before July 1, 2017, which if denied may invoke state-law causes of action in a request for reconsideration. But even in such cases, the dispute does not involve claims between two private parties in the same way as cases that implicate separation-of-powers concerns.[19]

To the extent that entertaining state-law claims on reconsideration implicates "private rights" limitations, those rights are asserted against or by a Federal agency and have the character of public rights, even if the resolution of those rights invokes some common law principles because it turns on application of State law.

Finally, there is no separation-of-powers issue here because BD claims and potential subsequent recoupment actions are adjudicated through processes to which both the borrower and participant school have consented.

*Changes:* None.

*Comments:* Several commenters contend that the proposed BD regulation violates the Administrative Procedure Act (APA) and that the proposed regulations are arbitrary and capricious. These commenters claimed the Department does not "examine the relevant data," nor does it rest its conclusions on "factual findings," or a "reasoned explanation" for these BD regulations as required by the APA. Commenters argued that the Department did not sufficiently explain the basis for its changes from the 2019 regulation. Commenters argued that because the Department has not enforced the 2019 regulation, it could not have conducted an analysis of the 2019 regulation's impact. Commenters also argued that citing estimates from regulatory impact analyses issued with prior regulations

was not sufficient justification for making a change.

*Discussion:* We disagree with these commenters. In taking this regulatory action, we have considered relevant data and factors, considered and responded to comments, and articulated a reasoned basis for our actions. The Department gathered substantial evidence to support the positions taken in these regulations, as described in painstaking detail in the NPRM and in this document.

As a threshold matter, the absence of adjudications under the 2019 rule is not a "refusal to administer it," as one comment claims, and instead simply reflects practical circumstances. That is, the 2019 regulation went into effect on July 1, 2020. This fell between two important events. The first occurred roughly three months earlier when the pause on student loan repayment, interest, and collections stemming from the COVID–19 national emergency began. Because this pause affected all new loans, loan issued on or after July 1, 2020, have not entered repayment. Without an ongoing loan payment, a borrower may not yet fully appreciate the effects of enrolling in a program or institution and incurring student loans due to one of the bases for borrower defense.

The second event occurred about three months after the regulation's effective date, when in October 2020, the Department entered a stipulation in the then-titled case *Sweet* v. *DeVos* agreeing not deny any claims of class members—which, until the settlement agreement, was defined as any borrower with a pending borrower defense claim—until the court reached a final judgment on the merits.[20] It would have been effectively impossible for a new borrower to have a claim reviewed under the 2019 regulation prior to that October stipulation, since they would have had to take the loan out roughly three months prior, file a claim almost immediately, and get a decision.

Nonetheless, the Department did perform initial reviews of some claims that would have been covered by the 2019 regulation in connection with borrowers consolidating older loans but found that all of them would have been barred by the regulation's statute of limitations. However, because it had stipulated that it would not issue denials, it could not adjudicate those claims and issue a final agency decision.

It would also make little practical sense to address the relatively sparse

volume of pending claims subject to the 2019 regulation (approximately 3 percent of claims filed since July 1, 2020) in light of the large volume of pending claims it does not cover. The Department has a significant number of pending claims stemming from the lack of decisions being rendered on claims for multiple years. The number of claims filed has only increased since then. To address that backlog without violating the commitment on denials, the Department has prioritized claims that fall into large groups with compelling evidence supporting approval. Based on time alone, those claims are much more likely to fall under the 1994 and 2016 regulations. They are unlikely to fall under the 2019 regulation, which only took effect several months before the Department agreed to halt denials. To say that adjudications have not proceeded under the 2019 regulation reflects that reality rather than a refusal to apply it.

We disagree with the comments arguing that the Department's experience adjudicating claims under the 1995 and 2016 regulation cannot inform its conclusions of the need for changes from the 2019 regulation. Courts have long acknowledged that changed circumstances and experience provide a permissible basis for improving existing regulations, noting "it is not arbitrary and capricious for an agency to change its mind in light of experience".[21] Likewise, "the mere fact that an agency interpretation contradicts a prior agency position is not fatal."[22] An agency need only give "good reasons" for a new policy,[23] which the Department has done at length during the rulemaking.

Here, the Department's experience evaluating claims under the 1995 and 2016 regulations provides a valuable reference for how that process would unfold for the 2019 regulation.[24] After all, the 2019 regulation involves applying many of the same fundamental principles that animate its earlier iterations: all three versions of the

---

[19] *See Stern* v. *Marshall*, 564 U.S. 462, 473 (2011) (widow's claim for tortious interference); *Commodity Futures Trading Comm'n* v. *Schor*, 478 U.S. 833, 836 (1986) (contract claims between broker and investor).

[20] *Sweet* v. *Cardona*, No. 3:19–cv–03674 (N.D. Cal.), ECF Nos. 163 at 1, 150–1 ¶ 5; *see also* ECF No. 46 at 14 (defining class).

[21] *New Eng. Power Generators Ass'n, Inc.* v. *FERC*, 879 F.3d 1192, 1201 (D.C. Cir. 2018).

[22] *Smiley* v. *Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996).

[23] *F.C.C.* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

[24] For details on the numerous cases that the Department has recently addressed, *see* FSA, *Borrower Defense Updates, StudentAid.gov, https://studentaid.gov/announcements-events/borrower-defense-update.* Summaries of some examples include Westwood Coll. Exec. Summary (Aug. 30, 2022); ITT Tech. Inst. Exec. Summary (Aug. 16, 2022); Kaplan Career Inst. Exec. Summary (Aug. 16, 2022); Corinthian Colls. Inc. Exec. Summary (June 2, 2022); Marinello Sch. of Beauty Exec. Summary (Apr. 28, 2022); DeVry Univ. Exec. Summary (Feb. 16, 2022).

regulation involve similar determinations about schools' acts or omissions, their impact on borrowers' enrollment and borrowing decisions, and the detriment borrowers may suffer as a result. Thus, the 2019 regulation shares many of the earlier regulations' core features and differs by further requiring a multitude of additional findings and procedural steps that would require considerably more time and resources from the borrowers, institutions, and the Department.[25] It is reasonable for the Department to draw on its expertise in administering title IV and on its experience applying similar concepts under the other existing standards and processes. Indeed, considerable deference is given to an agency's administrability-related conclusions and predictive judgments about matters on which the agency is uniquely knowledgeable, such as a rule's practical impact.[26] The Department's knowledge and experience inform its judgments here on an approach that will facilitate addressing BD claims in the most effective way.

Finally, in the time since the 2019 rule's promulgation, the Department has learned that there are implementation challenges with administering the 2019 regulation and with reviewing claims under the standard and processes it would require. The issue relates to the requirement that the Department share not just the borrower's application for relief but also a copy of all other evidence related to the claim in the Department's possession. The Department is currently unable to comply with those record-sharing requirements, nor have we identified a workable platform to do so. In some cases, the evidence relevant to one applicant's claim may flow from information that includes other borrowers' personally identifiable information, which cannot be shared with the applicant without violating those other borrowers' privacy rights. In other situations, the Department has received large amounts of evidence related to the claim (some of which might not be relevant to the final determination). The Department does not have a mechanism for transmitting such large amounts of information and it would likely overwhelm the borrower

as well as many institutions. The Department has also found that it does not have the capacity to provide the necessary evidentiary redactions on a borrower-by-borrower basis as anticipated by the 2019 regulation. These experiences thus inform our decision to improve upon the 2019 regulation's approach in this rule.

The Department thus fully considered the likely effect of the 2019 regulations on the adjudication of claims and is making appropriate changes to counter those effects.

*Changes:* None.

*Comments:* Several commenters argued that the proposed BD regulations lack equitable standards and due process protections and will facilitate erroneous discharges that harm students, taxpayers, institutions, and borrowers. These commenters warned of tuition increases and increased costs to the taxpayers as a result of the implementation of this BD framework.

*Discussion:* We disagree with these commenters. The Department carefully crafted a BD framework that will ensure that borrowers have the opportunity to provide the details sufficient to justify the BD application without establishing barriers too complicated for borrowers to meet and that will ensure institutions have ample opportunity to respond to a BD claim as described in detail in § 685.405. Collectively, these regulations provide an equitable standard for all parties. The Department reminds the commenters that institutions will have an opportunity to submit a response to claims before they are adjudicated or before the final Secretarial action occurs, and will not be held liable for approved borrower defense claims until after a separate process that gives institutions the opportunity to present their evidence and arguments before an independent hearing official in an administrative proceeding. As the Department explained in the NPRM, we will initiate such liability proceedings through the appeal procedures for audit and program review determinations in 34 CFR part 668, subpart H. This provides robust due process protections to institutions during the recoupment proceedings. The institutions will be presented with the findings and evidence against them. They will have an opportunity to challenge that evidence by filing an appeal with the Office of Hearings and Appeals where they can challenge the evidence and findings and present relevant evidence to bear that they identify. The hearing officer's decision can be appealed to the Secretary, who would not have been involved in the decision to pursue the

liability or the decision by the hearing officer. These are the same protections institutions receive in other similar proceedings. Thus, while we pursue liabilities from the responsible institutions to avoid burdening taxpayers with the cost of these discharges, we will also provide a full opportunity to institutions to respond.

We acknowledge that regulations have added costs, and we explain how those costs may be offset in the *Regulatory Impact Analysis* section of this document.

*Changes:* None.

*Comments:* A few commenters asserted that schools may have liberty and property interests in continued eligibility for benefits (program participation) under the HEA that are subject to due process protections. The commenters asserted that institutions have a right to retain the title IV benefits they previously received, and that the proposed regulations allegedly deprive them of these interests without adequate due process. Specifically, the commenters assert that the group approval loan discharges and the process of evaluating and approving group discharges does not provide institutions with sufficient notice and opportunity to respond.

*Discussion:* We disagree with the commenters' assessment of both the interests at stake and the process provided under the regulations. As an initial matter, the commenters appear to suggest that the BD regulations implicate a property or liberty interest in continued participation in the title IV programs. They do not. Rights acquired by the institution under agreements already executed with students remain fully enforceable on their own terms. The BD regulations only address loan discharge for borrowers and potential recoupment of discharged amounts from the institutions that engaged in the acts or omissions that prompted the discharge. These borrower defense regulations do not directly impact an institution's continued eligibility, but findings of substantial misrepresentation or other serious violations that resulted in approved BD claims could impact an institution's title IV eligibility. In other words, the Department's approval of BD claims for borrowers has no direct impact on the institution's title IV eligibility. However, the improper actions by the institution that provide the basis for approving a BD claim also will likely violate the statutory and regulatory requirements of the title IV programs. The Department could determine that the institution's violation of those rules could affect title IV eligibility if the claims were

[25] For example, the 2019 and 2016 regulations both include a misrepresentation as a basis for relief. *Compare* § 685.206(e)(3) (2019 regulation), *with* § 685.222(d) (2016 regulation). The same concept is commonplace under State law causes of action that the 1994 regulation incorporates. § 206(c)(1).

[26] *Nat'l Tel. Co-op. Ass'n v. F.C.C.*, 563 F.3d 536, 541 (D.C. Cir. 2009); *BNSF Ry. Co. v. Surface Transp. Bd.*, 526 F.3d 770, 781 (D.C. Cir. 2008).

approved due to a finding of a violation of the HEA that merits additional adverse actions. Even if the regulations did implicate continued eligibility, however, the institution has no property right to continue to participate in the title IV programs on the terms under which the institution previously participated. Section 452(b) of the HEA states, "No institution of higher education shall have a right to participate in the [Direct Loan] programs authorized under this part [part D of title IV of the HEA]." [27]

Because the commenters misconstrue the scope and impact of the regulations, they also misapply the due process analysis. The regulations provide ample due process at all stages and with respect to all interested parties. Fundamentally, the commenters failed to distinguish between the BD loan discharge process and the BD recoupment process. As clearly stated in the regulations and discussed throughout this document, the loan discharge process is between the borrower and the Secretary. The regulations include extensive processes tailored to that relationship, which includes the opportunity for institutional response. In response to public comment, the Department enhanced the proposed procedures to provide more notice to affected parties, to require BD discharge applications to be submitted under penalty of perjury, and to add an additional opportunity for institutional response prior to the decision on whether to form a group for adjudication.

The loan discharge process is separate from any recoupment proceeding that the Secretary elects to pursue against an institution. The recoupment efforts contemplated are recoveries of financial liabilities, not sanctions. The recoupment process involves a number of procedural steps, including many of the protections the commenters claimed were missing from the regulations, such as motions practice, interlocutory challenges, and multiple levels of appeals. *See* 34 CFR part 668, subpart H. The Department's hearing procedures provide ample due process, which is confirmed by the conclusions in caselaw cited by commenters. [28] As

clearly stated in the regulations, moreover, any recoupment proceeding under these regulations will only be undertaken prospectively, with respect to loans disbursed after July 1, 2023. The Department's final regulations in § 685.409 were revised to make that even clearer than before. If recoupment is occurring on claims associated with loans disbursed prior to July 1, 2023, that is because the actions or omissions that led to that approval would also have violated the borrower defense regulations in effect when those loans were first disbursed. [29]

*Changes:* None.

*Comments:* A few commenters suggested that erroneous BD discharges could prompt mandatory financial responsibility triggers, which we discussed during a spring 2022 negotiated rulemaking session involving separate student loan issues, that could cause the Department to determine inappropriately that an institution is not financially responsible.

*Discussion:* We disagree with these commenters. Erroneous discharges are unlikely to occur given the adjudicative framework we crafted, which gives the institution and the requestor an opportunity to present evidence and provides that, to approve a discharge, the Department must conclude that the institution's act or omission caused detriment to the borrower that warrants relief. The bifurcated process, separating claim adjudication from recovery of the amounts discharged, further minimizes the risk of any hypothetical collateral effect on institutions.

As of the publication of these final regulations, the financial responsibility regulations referred to by the commenters are proposals, not binding regulations. Current regulations at § 668.171(c)(1)(i)(A) require the Department to establish liability against an institution under an administrative proceeding in which the institution has an opportunity to present its position before a hearing official. That structure addresses the concerns raised by the commenters. The public will have an

opportunity to provide comments on any future regulations related to financial responsibility triggers when they are published in an NPRM.

*Changes:* None.

*Comments:* Commenters stated that HEA Sec. 455(h) does not grant power of adjudication to circumscribe presumptions or assign liability to institutions. Several commenters argue that the proposed BD improvements exceed the Department's authority based on principles articulated in the Supreme Court's recent decision in *West Virginia* v. *EPA*. [30]

*Discussion:* The rule falls comfortably within Congress's statutory directive that the Secretary specify in regulations the acts or omissions by schools that provide borrowers a defense to repayment. [31] One commenter argued the rule falls outside the statute's grant of authority because it will account for "highly-complex" and "fact-specific borrower claims." But those complexities and the need for fact-specific review stem from the increased number of claims that rest on acts or omissions found by court judgments or regulatory investigations, which invoke the defense to repayment specifically referenced in the HEA. Indeed, another commenter argues that such increased volume suggests the Department lacks authority to improve the existing rule, but the volume of applications and the acts or omissions that motivated them are precisely why the rule needs improvement. That is, foregoing the improvements included in these rules would do nothing to change the number of borrowers invoking the statutory remedy.

With respect to the comment that the HEA does not grant power of adjudication to circumscribe presumptions, we again refer commenters to the general provisions granting authority to the Secretary in GEPA, authority extended in the Department's organization act, and numerous provisions in the HEA. Along with a statutory directive to define which acts and omissions provide a defense to repayment, those statutory provisions grant the Department authority to promulgate regulations giving content to the statutory BD provision, including an adjudication framework like the one this rule prescribes. We discuss the issues pertaining to liabilities more fully and elsewhere in this document.

The Department disagrees that the Supreme Court's *West Virginia* decision undermines the Department's authority

---

[27] 20 U.S.C. 1087b(b); *see Ass'n of Priv. Sector Colls. & Univs.* v. *Duncan*, 110 F. Supp. 3d 176, 198 (D.D.C. 2015).

[28] *See Cont'l Training Servs., Inc.* v. *Cavazos*, 893 F.2d 877, 893–94 (7th Cir. 1990) (school's ability to submit written and oral statements was "quite a lot of predeprivation process" and "all the process constitutionally required"); *see also id.* at 892 (that schools may have certain liberty or property interests entitles them to "*some* predeprivation process," but "does not determine *how much* predeprivation process should be required").

[29] At least one comment invokes schools' liberty and property interests with reference to *Continental Training Services*. The Department notes that the interests acknowledged in *Continental Training* were tied to the school's eligibility for title IV funding, *id.* at 892, which is not at stake as part of the BD process—either for claim adjudication or recoupment. Nonetheless, schools are afforded meaningful opportunities to be heard during both phases under the updated rule and, to the extent the same facts cause schools to face other eligibility-related determinations, they have robust procedural protections as part of that process too. To that point, we also note that the *Continental Training* court concluded the process afforded the school in that case was adequate to survive constitutional scrutiny. *See id.* at 894.

[30] 142 S. Ct. 2587 (2022).

[31] *See* 20 U.S.C. 1087e(h).

to promulgate the proposed rule's BD improvements.[32] That decision described "extraordinary cases" in which an agency asserts authority of an "unprecedented nature" to take "remarkable measures" for which it "had never relied on its authority to take," with only a "vague" statutory basis that goes "beyond what Congress could reasonably be understood to have granted." [33] The rule here does not resemble the rare circumstances in *West Virginia*. First, there is nothing unprecedented or novel about the Department relying on the "Borrower defenses" subsection of 20 U.S.C. 1087e to authorize a BD regulation with standards and procedures to effectuate that subsection. That section, in fact, requires the Secretary to issue regulations specifying the actions or omissions a borrower may assert as a defense to repayment. Indeed, the Code of Federal Regulations has included multiple versions of regulations governing BD claims since 1995.[34]

Thus, contrary to the commenters' arguments, the rule does not reflect "unheralded" action only loosely tethered to a congressional grant of authority.[35] To the contrary, the rule gives context to the defenses that Congress instructed the Department to define,[36] and does so in a way that accounts for all involved parties' rights.

*Changes:* None.

*Comments:* A few commenters stated that the BD regulations violate the separation of powers doctrine. These commenters state that the rule impermissibly assigns the Department an adjudicatory role for claims and defenses that are constitutionally required to be decided by courts.

*Discussion:* We disagree that these regulations violate the separation of powers doctrine. Administrative agencies commonly combine both investigatory and adjudicative functions, *see Winthrow* v. *Larkin*,[37] and due process does not require a strict

separation of those functions as long as adequate process is provided.[38] The Department is no different and performs both investigative and adjudicative functions in other contexts, including those that involve borrower debts [39] and institutional liabilities.[40]

*Changes:* None.

*Comments:* A few commenters argued that there is no legal ground in the HEA for affirmative BD claims, which in the 2019 regulation was defined as claims from borrowers who were in repayment as opposed to defensive claims, which are for borrowers in default.

*Discussion:* We disagree with the commenters. Section 455(h) of the HEA requires the Secretary to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part." This language in no way limits the remedy to a defense asserted in collection proceedings. Rather, the concept of "repayment" is widely understood to encompass not just borrowers in default but also those actively repaying their loans. As we note elsewhere, BD relief, though unique, bears features of remedies like rescission, avoidance, restitution, and certain forms of out-of-pocket or reliance costs. Those remedies are appropriate as a defense to the obligation to repay, not simply as backstops for contingencies like default. In that context, we do not see these comments' distinction between "affirmative" and "defensive" claims to be a meaningful one considering a defense to repayment is only relevant in the context of an existing obligation to repay.

Moreover, limiting BD only to loans in default would be illogical. Only allowing claims from loans in default would place borrowers in an unfair situation of either intentionally defaulting in the hopes that a BD claim is successful or repaying a loan that potentially should be discharged due to the acts or omissions of an institution. Given that institutions must keep their default rates below certain thresholds

established in statute and regulations, creating an incentive for default could end up inadvertently hurting an institution that has large numbers of BD claims.

*Changes:* None.

*Comments:* Some commenters raised concerns about how the inclusion of new items in part 668, subpart F as well as the new part 668, subpart R would be used for other Department oversight or enforcement activity. They raised concerns about institutions potentially facing adverse actions for past conduct now covered by these additions.

*Discussion:* The Department notes that some of the changes to Part 668, subpart F represent items that are not new but have simply been moved to other locations or slightly restated. Other elements in that subpart, as well as part 668, subpart R are new. For the items that are new, the Department could bring adverse actions in relation to conduct that occurs on or after July 1, 2023.

*Changes:* None.

*Effective Date of Regulations, Claims Covered Under Regulations*

*Comments:* The Department received several comments related to the treatment of borrowers who have already paid off their loans. A few commenters requested clarification as to whether these individuals are eligible for BD. Others argued that a borrower who has paid off their loan should be prohibited from filing a BD claim because there would be no repayment to defend.

*Discussion:* A borrower who submits a BD claim is asserting that they should no longer be required to repay the loan they owe to the Department. BD claims are thus limited to loans that are still outstanding and are associated with the institution whose alleged act or omission could give rise to the defense to repayment. This concept is embedded in the definition of "borrower defense to repayment," which makes the defense available for "all amounts owed to the Secretary on a Direct Loan." § 685.401(a). The next paragraph of the definition provides for reimbursement of all payments "previously made to the Secretary on the Direct Loan," which is a direct reference back to the loan identified in the first paragraph (on which amounts must still be outstanding). Thus, if a borrower no longer has a loan outstanding, they do not have a defense to repayment as there would no longer be any loans to repay.

*Changes:* None.

*Comments:* Commenters recommended that the regulatory text expressly state that new BD standards

---

[32] One commenter suggested that the NPRM's omission of a case-specific discussion of *West Virginia* requires that the Department abandon and reconsider this proposed rule because, according to the commenter, that decision signals a "restive" judicial attitude toward major regulatory actions that the NPRM was required to address. The comment cites no authority, nor is the Department aware of any, requiring agencies to foresee hypothetical changes in law based on signals of restiveness. In any event and for the reason explained herein, the Department does not read the Court's decision in *West Virginia* as reason to reconsider the rule.

[33] *West Virginia*, 142 S. Ct. at 2608–09.

[34] 59 FR at 61664 (Dec. 1, 1994); 81 FR at 75926 (Nov. 1, 2016); 84 FR at 49788 (Sept. 23, 2019).

[35] *See West Virginia*, 142 S. Ct. at 2608.

[36] 20 U.S.C. 1087e(h).

[37] 421 U.S. 35 (1975).

[38] *See Hortonville Joint Sch. Dist. No. 1* v. *Hortonville Educ. Ass'n*, 426 U.S. 482, 493 (1976).

[39] For example, the Department provides both schools and borrowers the opportunity to request and obtain an oral evidentiary hearing in both offset and garnishment actions against a borrower and in an offset action against a school. *See* 34 CFR 30.25 (administrative offset generally); 34 CFR 30.33 (Federal payment offset); 34 CFR 34.9 (administrative wage garnishment).

[40] *See* 34 CFR 668.24 and part 668, subparts G and H (proceedings for limitation, suspension, termination and fines, and appeal procedures for audit determinations and program review determinations).

will not retroactively apply to institutions for alleged misconduct that occurred prior to the effective date of these regulations. They also noted that, while the preamble to the NPRM stated that retroactive application would not occur, such statements were not reflected in the accompanying regulatory text.

*Discussion:* BD is fundamentally a process between the borrower and the Department. It is a claim brought by the borrower that they should no longer have to repay an outstanding debt owed to the Secretary. The reason for such a claim is due to an alleged act or omission by the institution. The Department must review that allegation to determine whether the borrower should be relieved of their obligation to repay. Whether the Department chooses to seek recoupment from the institution for the cost of approved discharges is a separate question and subject to a separate set of procedures. This is in keeping with how the Department handles discharges for closed school and false certification discharges as well.

In this regulation, the Department simplifies the standard that governs whether the borrower should be relieved of their loan repayment obligation. The Department's approach ensures that a single standard is used to evaluate BD claims arising from the same acts or omissions, regardless of whether the borrower has multiple loans that were obligated in multiple years or whether a borrower's loans were consolidated. This approach ensures more consistent decision-making and treatment of borrowers.

The Department is not applying this approach to recoupment. Institutions will only be subject to recoupment actions for claims that would be approved under the standard in place at the time the act or omission occurred. In other words, a claim that is approved due to a misrepresentation, omission, breach of contract, aggressive and deceptive recruitment, judgment, or final Secretarial action that occurred prior to July 1, 2023, would only result in recoupment if the claim would have been approved under the 1994, 2016, or 2019 regulations, whichever is applicable. We appreciate the feedback from commenters who noted that this concept was not sufficiently expressed in the NPRM and have updated the final amendatory text to make this point clearer.

*Changes:* While claims that are pending on or received on or after July 1, 2023 will be adjudicated under this standard, we have added language in § 685.409(b) noting that the Secretary

will not collect any liability to the Secretary from the school for any amounts discharged or reimbursed to borrowers for an approved claim under § 685.406 for loans first disbursed prior to July 1, 2023, unless the claim would have been approved under the standards for what constitutes an approved claim under the three different borrower defense regulations. The standards are contained in § 685.206(c), the 1994 regulation, for loans first disbursed before July 1, 2017; under § 685.206(d), the 2016 regulation, for loans first disbursed on or after July 1, 2017, and before July 1, 2020; or under § 685.206(e), the 2019 regulation, for loans first disbursed on or after July 1, 2020, and before July 1, 2023.

*Comments:* Many commenters wrote in saying that the proposed regulations are impermissibly retroactive. They cited a body of case law supporting a presumption against retroactive regulations.

*Discussion:* Courts have regularly rejected retroactivity challenges to regulations that operate like these. As with statutes,[41] newly promulgated regulatory measures are not improperly retroactive, "so long as the Department's regulations do not alter the past legal consequences of past actions."[42] That is, a regulation raises concerns of unconstitutional retroactivity if it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."[43] Thus, whether a regulation "operates retroactively" turns on "whether the new provision attaches new legal consequences to events completed before its enactment."[44] It is, however, well settled that "[a] statute is not rendered retroactive merely because

[41] Courts routinely apply the same principles to statutes and regulations to evaluate concerns about impermissibly retroactive applications. *See St. Louis Effort for AIDS* v. *Huff,* 782 F.3d 1016, 1023 (8th Cir. 2015) ("Although we examine regulations, not statutes, the[ ] same principles apply."); *Little Co. of Mary Hosp. & Health Care Ctrs.* v. *Shalala,* 994 F. Supp. 950, 960 (N.D. Ill. 1998) (stating that the same principles "suppl[y] the test to decide when a statute (or by natural extension a regulation) operates retroactively").

[42] *Ass'n of Priv. Sector Colls. & Univs.,* 110 F. Supp. 3d at 196 (internal marks and emphasis omitted).

[43] *Ass'n of Proprietary Colls.* v. *Duncan,* 107 F. Supp. 3d 332, 356 (S.D.N.Y. 2015). *See also Ass'n of Accredited Cosmetology Schs.* v. *Alexander,* 774 F. Supp. 655, 659 (D.D.C. 1991), *aff'd,* 979 F.2d 859 (D.C. Cir. 1992), and *order vacated in part on other grounds sub nom. Delta Jr. Coll., Inc.* v. *Riley,* 1 F.3d 45 (D.C. Cir. 1993); *Ass'n of Accredited Cosmetology Schs.* v. *Alexander,* 979 F.2d 859, 864 (D.C. Cir. 1992) (no retroactivity-based infirmities with determining eligibility based on pre-rule data of cohort default rates).

[44] *Ass'n of Priv. Sector Colls. & Univs.,* 110 F. Supp. 3d at 196.

the facts or requisites upon which its subsequent action depends, or some of them, are drawn from a time antecedent to the enactment."[45] Nor is a statute impermissibly retroactive simply because it "upsets expectations based in prior law."[46] Under these regulations, while all claims pending on or received on or after July 1, 2023 will be reviewed under the standards in this final rule, an institution will not be liable for the amount of the BD claim paid by the Department unless the claim would have been approved under the standards in the regulations in place at the time the claim arose. Thus, these regulations are not retroactive for institutions.

*Changes:* None.

*Comments:* Several commenters recommended the Department continue to process pending BD claims, regardless of any new regulation, and urged the Department to process claims under the 2019 regulations. The commenters further suggested the Department should revisit claims approved for partial discharges to reconsider the amount of discharge that is appropriate; assess whether all available evidence was considered with respect to claims that have been denied; investigate and process claims from institutions for which no student has yet received relief; and establish processes to more quickly adjudicate new claims as they come in while regulations are ongoing.

*Discussion:* The Department continues to process BD claims as well as abiding by commitments the agency has made in ongoing litigation. As we specified in the NPRM, we proposed new regulations to establish a new Federal standard for BD claims applicable to applications received on or after July 1, 2023, and to those pending before the Secretary on July 1, 2023. To date, all approved claims have been for full discharges, so the need to contemplate past instances of partial discharge is not needed. As noted, this new standard will apply to all claims that are pending on or received on or after July 1, 2023.

*Changes:* None.

### Eligible Loan Types

*Comments:* A few commenters commended the Department for providing FFEL borrowers with access to the BD claim process through loan consolidation, including by giving borrowers the option on their application to request consolidation of their loans into a Direct Loan if their claim is approved. A few commenters,

[45] *Id.*
[46] *Id.*

however, were concerned that by limiting the definition of BD to the making of a Direct Loan, the provision could be read to exclude claims that pertain to the making of a FFEL loan, even if such FFEL loan is later consolidated into a Direct Loan. These commenters suggested some regulatory changes to ensure FFEL borrowers have access to relief.

Commenters also raised concerns that some FFEL borrowers are ineligible to consolidate into Direct Loans, thus making it impossible for them to receive a BD discharge if their claim was approved. As examples of FFEL borrowers who cannot consolidate into Direct Loans, these commenters pointed to borrowers who are current on a FFEL Consolidation Loan and do not have any additional loans to consolidate, as well as FFEL borrowers who are subject to enforced collection orders, such as wage garnishment, or who have a judgment on their FFEL loans. These commenters suggested that the Department promulgate final regulations that make borrower defense discharges available to borrowers with FFEL Loans, including FFEL Consolidation loans, even if they cannot or do not consolidate.

Commenters also expressed concerns that a FFEL borrower whose defense to repayment claim is only partially approved may be left worse off if the resulting Direct Consolidation Loan is not fully discharged and urged the Department to ensure that a Direct Consolidation loan would not be automatically effectuated if doing so would adversely affect the borrower. These commenters noted that consolidation is one of the few avenues that borrowers can use to get their loans out of default but borrowers whose loans are already consolidated generally lose the option to consolidate. Commenters stressed that these borrowers should not lose the option to get out of default, arguing that many borrowers with approved borrower defense claims are also likely to be at high risk of delinquency or default.

Commenters requested that the Department clarify whether it will refund amounts paid on FFEL loans before they were consolidated.

Other commenters did not support the inclusion of FFEL borrowers. They argued that a BD claim is based on the acts or omissions of an institution at the time the loan was issued, which for any FFEL loan would precede the issuance of any Direct Loan through consolidation. That is, because Sec. 455 of the HEA only applies to Direct Loans, the commenters argued that conduct that occurred while the loan was in the FFEL Program should not qualify for a

BD discharge. These commenters argued that FFEL loans should be ineligible for a BD discharge.

*Discussion:* The Department affirms its position that FFEL borrowers should retain a pathway to BD discharges. The HEA directs that, generally, Direct Loans are made under the same ''terms, conditions, and benefits'' as FFEL Loans.[47] In 1994 and 1995, the Department interpreted that Direct Loan authority as giving the Department authority to hold schools liable for BD claims under both the FFEL and Direct Loan programs, and stated that, for this reason, it was not pursuing more explicit regulatory authority to govern the BD process.

We also want to assure commenters who were concerned that the regulatory language might not provide adequate protection for FFEL borrowers who consolidated into a Direct Loan. Through a Direct Consolidation Loan, FFEL borrowers will have a pathway to BD.[48] Specifically, § 685.401(a) states that relief for actionable conduct includes a ''defense to repayment of all amounts owed to the Secretary on a Direct Loan including a Direct Consolidation Loan that was used to repay a Direct Loan, [and] a FFEL Program Loan[.]'' Additionally, § 685.401(b) makes clear that a BD claim is available to a ''borrower with a balance due on a covered loan[,]'' which includes ''a Direct Loan or other Federal student loan that is or could be consolidated into a Federal Direct Consolidation Loan.'' § 685.401(a). With these references, we believe that viewing the BD framework in the totality should allay any concerns about a FFEL borrower receiving a pathway to BD.

Operationally, the Department will streamline the claims process for FFEL borrowers by having the BD claim application also function as a Direct Consolidation Loan application, which would only be executed if the claim is approved. In 2009, the Department issued Dear Colleague letter FP–09–03 in which we told FFEL lenders that they cannot decline to complete a Loan Verification Certificate solely because the borrower is attempting to consolidate only a FFEL Consolidation Loan without any additional loans.[49] The question of whether to complete the consolidation thus rests with the Department. Improvements to the loan consolidation process will be reflected

when the Department redesigns the BD form, which will separately go through public comment. The Department will also provide other sub-regulatory guidance on how it will treat borrowers with covered loans that are not Direct Loans. Moreover, the Department notes that since approved claims will receive a full discharge the question of whether a consolidation is in the borrower's best interest will be simpler to assess.

The Department appreciates the commenters' concern for borrowers with an involuntary collection order such as wage garnishment or a judgment through a court order but notes the statutory constraints and the Department's limitations. As provided in Sec. 428C(a)(3)(A)(i) of the HEA, borrowers will need to take preliminary steps, such as having those wage garnishment orders lifted or those judgements vacated, in order to facilitate consolidation. Finally, with respect to refunds, the Department will refund amounts previously paid to the Department. We cannot refund amounts the Department did not receive.

*Changes:* None.

*Definitions*

*Changes:* None.

*Comments:* Commenters provided several different suggestions on the proposed ''Department official'' definition. A few commenters suggested that the Department should preclude staff from Federal Student Aid (FSA) from serving as a Department official. These commenters stated that FSA is responsible for oversight and monitoring and that if the Department had exercised appropriate oversight, we would not have issued the loans related to a BD claim in the first place. The commenters argued that allowing FSA to determine the outcome of BD claims raises the appearance of a conflict of interest. Other commenters argued for a similar change, asserting that the Department official lacks neutrality, because they review and make a recommendation on the merits of a claim. These commenters stated that a borrower defense claim should be adjudicated by an administrative law judge (ALJ), arbitrator, or some other neutral party. On the other hand, a few commenters argued that even an ALJ could not be a neutral party, because they are still a Department employee.

Other commenters argued that the Department official should be an ''officer'' rather than a career employee, suggesting further that ideally this individual would be a principal officer who is named by the President and confirmed by the U.S. Senate. Commenters argued for this change

---

[47] 20 U.S.C. 1087a(b)(2), 1087e(a)(1).

[48] *See* 87 FR at 41886.

[49] *https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2009-04-03/fp-09-03-subject-completion-loan-verification-certificates.*

because the decision of whether to approve or deny a BD claim is a final agency decision made on behalf of the Federal government and such decisions cannot be made by career staff.

*Discussion:* We disagree with the commenters and see no need for such limitations on which employees could serve as a Department official. We have, however, clarified the roles fulfilled by the Department official versus those of the Secretary to make clear that the Secretary is the final decision maker.

The role of the Department official is to review the BD claim, consider the evidence, and recommend approval or denial of the claim. The Department official also recommends whether a group should be formed where applicable. The Secretary or the Secretary's delegate may accept or reject the recommendations and is the final decision maker. The Department has clarified this through changes to § 685.406.

We do not agree with the commenters who believe that the Department official cannot be part of FSA, or must be a third-party, such as an ALJ. These FSA staff members handle BD processes, which is separate from the institutional compliance work performed by FSA program reviewers and enforcement staff.

After the collapse of Corinthian in 2016, the then-Under Secretary of Education appointed a BD Special Master to advise the Department on BD issues.[50] The Special Master agreed with Department leadership that the best way to create a fair, transparent, and efficient process for handling BD claims was to establish an infrastructure that was flexible and scalable. By dedicating a team with the human capital and resources to handle BD claims, as we have in FSA's BD Group, led by a director, the Department believes that it has created a nimble framework that accommodates an efficient and fair resolution of BD matters. We plan to continue with this framework.

The Department further believes that requiring the Department official to be a certain type of individual—such as a special master or ALJ—would impermissibly tie the agency's hands with respect to future Congressional appropriations. Requiring that claims only be considered by a certain type of employee would constrain the Department in how to best use Congressional appropriations for salaries and expenses and would limit the Secretary's flexibility to address

changing circumstances and appropriations. The definition of Department official in these regulations provides necessary flexibility to allocate staff to review and make recommendations on BD claims.

Furthermore, under Sec. 412 of the Department of Education Organization Act,[51] the Secretary may delegate the authority to perform the functions and duties of the position. A BD claim represents a defense to repaying all amounts owed to the Secretary, and the initial adjudication and resolution of those claims is a function that the Secretary may delegate to an inferior officer or other Department official.

*Changes:* We revised the regulatory text in § 685.406 to clarify the role of the Department official, who makes a recommendation to the Secretary and that the Secretary, or his delegate will make final decisions.

*Comments:* Commenters suggested that the Department replace "Direct Loan" in § 685.401 with "Direct Loan or other Federal student loan that is consolidated into a Federal Direct Consolidation Loan," as the Department states in § 685.401(b)(2) through (5), to ensure FFEL borrowers have access to relief. These commenters feared that without an explicit reference to "other Federal student loan that is consolidated into a Federal Direct Consolidation Loan," FFEL borrowers would be unable to access the BD discharge.

*Discussion:* We assure these commenters that the regulations will give FFEL borrowers access to a BD discharge. Although we did not adopt the specific language the commenters suggested, we created a new definition of a "covered loan" in § 685.401(a). This change does not substantively change the types of loans eligible for relief, because we cannot change the statutory definition of "Direct Loan" (see Part D of title IV of the HEA). These regulations make clear, however, that FFEL borrowers may access the BD process through a Direct Consolidation Loan. A covered loan remains a Direct Loan or other Federal student loan that is or could be consolidated into a Federal Direct Consolidation Loan.

*Changes:* We added a new definition of "covered loan" in § 685.401(a), which includes a Direct Loan or other Federal student loan that is or could be consolidated into a Federal Direct Consolidation loan.

*Comments:* Many commenters expressed disappointment that the Department excluded legal assistance organizations from the parties eligible to

request consideration of group claims, as we allow for State requestors in these BD regulations. These commenters stated that excluding legal assistance organizations will disadvantage borrowers who attend smaller institutions that are less likely to attract the attention of State officials. Similarly, these commenters were concerned about borrowers in States that do not have the capacity to investigate predatory institutions and pursue group discharges or have declined not to do so for lack of resources or policy reasons. The commenters stated that legal assistance organizations are well-versed in the application of States' laws and the nuances of States' higher education regulatory systems, which would make them well-positioned to request consideration of group discharges under State law. Additionally, the commenters asserted that these organizations may possess greater awareness of institutions using predatory conduct against low-income students than government agencies. Other commenters agreed with the NPRM's limitation of the entities eligible to bring forth group claims.

A few commenters suggested the Department permit representatives of certified classes of borrowers to submit group BD applications. These commenters further stated the Department repeatedly acknowledges the value of lawsuits, particularly class action lawsuits, to promote the purposes of the Direct Loan program. They noted that permitting only State requestors to submit group applications will likely result in differential treatment of student borrowers based solely on where they live. In addition, the commenters stated that counsel representing classes of harmed borrowers can assemble a wealth of relevant evidence.

*Discussion:* During negotiated rulemaking session 3, the Department initially considered allowing legal assistance organizations to submit group requests. Upon further consideration, however, the Department concluded that limiting the group formation request to State requestors would facilitate a more efficient process. The Department has consistently and repeatedly received valuable information from States that played a key role in the adjudication of BD applications. For example, we received evidence from State attorneys general that we used to approve claims related to several institutions across the country. The Department received evidence from the California Attorney General that helped document that Corinthian Colleges misrepresented its job placement rates. Evidence from the

---

[50] https://www2.ed.gov/documents/press-releases/report-special-master-borrower-defense-1.pdf.

[51] 20 U.S.C. 3472.

New Mexico Attorney General helped establish that ITT Technical Institute misled students about obtaining accreditation for its associate degree in nursing programs. More than two dozen State attorneys general submitted evidence related to ITT giving students false, erroneous, or misleading statements about the value of its education. The Department received evidence from the Illinois and Colorado attorneys general that demonstrated Westwood College led students about the ability for criminal justice students to get a job as a police or corrections officer in Illinois and that it made false promises at all of its campuses about guaranteed prospects for students who could not find a job. The Department likely would have been unable to approve many of the claims associated with those schools without that evidence.

After careful reconsideration, we are persuaded by the commenters' arguments that allowing legal assistance organizations to request a group formation could give borrowers who would otherwise not have a pathway to relief the ability to file a BD claim. Allowing these additional organizations to request the consideration of group claims affords another channel for the Department to receive valuable information that we can use to assess BD claims. The commenters' point that legal assistance organizations may have potentially greater awareness regarding some institutional conduct than States is important, given that we have received claims pertaining to thousands of institutions.

The Department also initially cited concerns about the potential added burden of allowing legal assistance organizations to make group requests. The overall requirements for a group request will mitigate this concern, particularly the requirement that a group request must include evidence beyond sworn borrower statements to be considered for a decision. Though not an exhaustive list, in the past the Department has found that additional evidence such as an institution's internal training materials and communications, the documentation used to calculate job placement rates, and copies of misleading advertisements have all been helpful in adjudicating BD claims. Group requests without additional evidence and information will be deemed incomplete. That means a group request will require additional evidence from the third-party requestor.

To make this change operationally manageable, the Department is adding a new definition of a "third-party requestor," which will encompass State

requestors and "legal assistance organizations" (also newly defined in the regulations) and will allow such third-party requestor the ability to request group formation, subject to certain conditions. The definition of "legal assistance organization" in the regulations is drawn, in part, from Sec. 428L(b)(1) of the HEA which defines a civil legal assistance attorney with the exception of where their employer receives their funding as outlined in Sec. 428L(b)(1)(A)(ii) of the HEA. Beyond being a nonprofit organization, we do not believe a legal assistance organization's funding source should have any bearing on their request to form a group under § 685.402. We believe relying on a modified definition created by Congress is better than trying to craft a new one.

The regulations also add a requirement that third-party requestors that are legal assistance organizations may only request to form a group in which all borrowers have entered into a representation agreement with the legal assistance organization. In this respect, legal assistance organizations significantly differ from State requestors. This legal distinction is required for several reasons. First, confidential borrower-related information must be exchanged as part of BD determinations. The Department is permitted to exchange that information with the offices of State attorneys general but must obtain borrower-specific privacy waivers to share such information with private counsel. It is far more likely that the Department will be able to exchange such borrower-related information for borrowers that legal assistance organizations represent. Second, State attorneys general may act as their constituents' public legal representative based on the nature of their role. Non-governmental groups, on the other hand, generally have no comparable right to assert claims on behalf of non-clients. Class counsel who represent plaintiffs in a civil class action lawsuit are one exception to this general bar, but only following specific determinations about class counsel and the class representatives, their clients.[52] The Department lacks the resources or procedures to recreate a similar process for group BD requests from legal assistance organizations that the Department is able to do so for State attorneys general. For these and other

practical reasons, requests submitted by a legal assistance organization to form a group must contain a certification that the requestor has legal representation authority for each borrower identified as a member of the group, which must be based on individual representation agreements or on a court appointing the legal assistance organization to represent a certified class that includes all members of a requested group in connection with claims substantially similar to BD. As we explain later in the *Group Process and Group Timelines* section, the Department will retain the flexibility to approve a group that is broader or narrower than the one requested by a third party based upon a review of the evidence.

The Department declines to allow representatives of certified classes of borrowers to submit requests to form a group seeking BD if they do not fall under the definition of a legal assistance organization. While we appreciate these external entities' interest, the Department believes that expanding the scope of third-party requestors presents administrative issues that are not feasible for the Department to address at this time. We also note that the ability to use judgments to support BD claims means that representatives of certified classes can obtain relief for their clients if they secure a judgment that meets the requirements under § 685.401(b)(5). And, of course, nothing prevents these entities from independently sharing general information with the Department.

*Changes:* We added definitions of "legal assistance organization" and "third-party requestor" in § 685.401(a). Throughout the document, we also revised any reference to "State requestor" to be "third-party requestor" to reflect inclusion of legal assistance organizations. We also amended § 685.402(c) to state that third-party requestors that are legal assistance organizations may not request to form a group that includes any borrower who has not entered into a representation agreement with the legal assistance organization. We also added a corresponding new paragraph § 685.402(c) that requires a legal assistance organization submitting a group claim to certify that it has entered into a legal representation authority with each borrower identified as a member of the group.

*Comments:* Many commenters supported allowing States to request a consideration of a group claim. Those commenters noted the importance of State attorneys general in identifying important evidence and the overall importance of having group claims. We

[52] *See, e.g.,* Fed. R. Civ. P. 23(a) (requiring representative plaintiffs to have claims typical of the class and to be adequate class representatives); Fed. R. Civ. P. 23(g) (setting forth various requirements, duties, and obligations of class counsel).

also received many comments that opposed this provision. Commenters argued that the Department did not sufficiently justify why it was including State requestors and that it lacked the legal authority to include them. Commenters also argued that the Department was adopting this position to circumvent limitations on its own investigatory power and that it can already share information and does not need this provision. Commenters also alleged that this provision would involve the Department in internal matters between attorneys general and State authorizing agencies that may not want to take action. Commenters also raised concerns that State requests could be used to try and influence ongoing settlement negotiations. Commenters also asked if State requestors would have to limit their requests to only cover borrowers in their states. Finally, a few commenters argued that the Department would struggle to sift through the material from states.

*Discussion:* We appreciate the support from commenters who are in favor of including State requestors.

We disagree with commenters opposed to the inclusion of State requestors. As discussed in the NPRM as well as in this final rule, the Department has benefited repeatedly from information provided by State attorneys general in its adjudication of claims. The Department has also received many requests for consideration of group claims from attorneys general. Creating a formal process for the handling of these group requests is better for States, the Department, affected borrowers, and institutions. For States, the regulations provide more clarity around what is needed in an application and lays out timelines for when to expect decisions. Borrowers who may not understand how to file a BD claim or who may not have the information necessary to support all elements of a claim on their own will benefit from the expertise and support of state officials who regularly act on behalf of consumers in their states in many contexts. For institutions, they will also have a clearer role in responding to both the request to form the group, as well as whether the group should be approved. These regulations also give the Department a clear process to follow for the handling of group claims and will ensure consistent treatment and consideration of claims. We also note that third-party requestors are only involved in the submission of claims by borrowers; they are not involved in any proceeding brought by the Department against the institution.

We disagree with the concerns raised that allowing any third-party requestor—whether from a State or legal assistance organization—would result in attempts to influence the Department or influence litigation or oversight matters within a state. The Department's concern is ensuring it receives evidence that can help it make fair decisions about the merits of BD claims. The Department does not have a role in the resolution of matters at the State level between an attorney general and an institution or other State entities.

With regard to which borrowers a State may request a group around, the Department does not believe it needs to add any language specifying the extent of a group. We note that to date all requests for group consideration from State attorneys general have only covered borrowers within their states.

Finally, the Department believes it will have the capacity to review material from States. It has already done so for several group requests and the requirements for what is needed in a group application will help ensure the Department will receive additional useful evidence when reviewing requests for group claims.

*Changes:* None.

*Comments:* One commenter requested that the Department add State authorizing agencies to the list of State requestors under § 685.401, noting that in at least one State the authorizing agency has responsibility for reviewing title IV aid issues and eligibility requirements that incorporate title IV aid elements.

*Discussion:* The Department agrees with the commenter. In adopting a definition of State requestor, the Department sought to include entities that have authority from the State to oversee institutions of higher education, including reviewing and approving institutional conduct. We modified the language of State requestor to include State entities that are responsible for approving educational institutions in the State.

*Changes:* We have added a State entity responsible for approving educational institutions in the State to the definition of a "State requestor" in § 685.401.

*Comments:* A few commenters believed the definition of "school" and "institution" in § 685.401(a) was duplicative and too broad. Commenters stated that inclusion of the cross-reference to § 668.174(b) in this definition can be read to mean that, for the purposes of adjudicating a BD claim, the conduct of an institution could be imputed to any other institutions that are under common ownership.

*Discussion:* We concur with the commenters. The Department contemplated covering in the definition of "school" or "institution" a person affiliated with the institution as described in § 668.174(b). This was done for purposes of recovery from the institution in § 685.409.[53] The Department already retains the authority to assess a past performance liability for individuals associated with the institution under the financial responsibility regulations, however. Therefore, a cross-reference to § 668.174(b) in the definition of school or institution is unnecessary.

*Changes:* We revised the definition of "school" or "institution" (which are used interchangeably) by removing the sentence "*School* or *institution* also includes persons affiliated with the institution as described in § 668.174(b) of this section."

*Federal Standard*

*Comments:* Many commenters supported the establishment of a strong Federal BD standard that better captures the full scope of institutional misconduct relevant for a BD claim. These commenters noted that, to date, the BD claims review process has been burdensome, with different regulatory standards depending on loan disbursement date. Commenters said the different Federal standards and processes contributed to inequities among similarly situated borrowers, resulted in a backlog, and delayed adjudication while borrowers were left in the dark. The commenters praised the new Federal standard, noting it established clearer and expanded grounds for BD claims and was a tremendous step in protecting consumers and ensuring the integrity of the Federal financial aid programs.

*Discussion:* We thank the commenters for their support.

*Changes:* None.

*Comments:* Many commenters indicated that the Department should be required to find some or all of the following elements to approve a claim: reliance by the borrower, detriment to the borrower, materiality, adverse effect, financial damages or harm to the borrower, and intentionality by the institution. They raised these comments with respect to each component of the BD standards: substantial misrepresentation, substantial omission of fact, breach of contract, aggressive and deceptive recruitment, judgments, and final Secretarial actions.

Commenters argued that the absence of some or all of these elements would

⁵³ See 87 FR at 42009–42010.

result in the approval of claims that they described as having minimal allegations or documentary evidence or that did not result in any harm and thus should be denied. Commenters also said the proposed Federal standard would encourage the filing of what commenters described as frivolous claims. These commenters indicated that under the proposed rules the Department could approve claims as a result of errors by the institution in good faith, as a result of acts or omission in which the borrower did not in fact suffer any injury, or with virtually no factual allegations or documentary support. Commenters said the NPRM's approach is impermissibly broad and noted that the absence of some elements such as reliance appears to be inconsistent with the definition of a substantial misrepresentation in § 668.71. Commenters also noted that without the inclusion of some or all of these elements, it is unclear how institutions could successfully challenge liability during the institutional response stage, contributing to concerns about the due process rights of institutions. Similarly, many commenters raised concerns that an institution could be held accountable for inadvertent mistakes unless intent is required for a BD claim.

*Discussion:* We agree with the commenters in part. Upon consideration of each of the items suggested by commenters, we modified the proposed Federal standard to provide that, to approve a claim, the Department must find that the institution committed "an actionable act or omission and, as a result, the borrower suffered detriment of a nature and degree warranting the relief provided by a borrower defense to repayment as defined in this section." § 685.401(b). The final clause ("warranting the relief provided by a borrower defense to repayment as defined in this section") refers to the steps set forth in § 685.401(a)'s definition that comprise the remedy that BD provides, which are (i) relief from future repayment obligations of covered loans, (ii) reimbursement of all amounts paid to the Secretary, and, where applicable, curing consequences related to (iii) default or eligibility and (iv) adverse credit reporting. This general standard supplies a claim's primary elements of actionable conduct, injury, causation, and conditions justifying the remedy.

The Federal standard goes on to enumerate the different categories of conduct that, if shown, may serve as a sufficient basis for satisfying the general definition's first prong ("actionable act or omission"). That is, the following

subsections enumerate the "acts or omissions" that fall within the scope of what is "actionable" for purposes of BD, which are: substantial misrepresentation, substantial omission of fact, breach of contract, aggressive and deceptive recruitment, judgments, and final Secretarial actions. By structuring the standard with general elements proceeding from the BD definition, claims must satisfy each of those general elements to be approved under any of the different conduct-related grounds for BD.

This simplified approach sets forth the shared elements of a claim: actionable acts or omissions by the institution; detriment to the borrower from having taken out a loan and enrolled; a causal link between the school's conduct and the borrower's injury; and that the appropriate remedy for such conduct and resulting injury is to discharge the borrower's remaining repayment obligations, refund payments already made to the Secretary, and take curative steps for any prior consequences related to credit reporting or default. The first three elements involve a factual determination about school's conduct and its impact on the borrower. The final prong ties those elements to the unique remedy that a defense to repayment provides. The section below on "*Amounts to be Discharged/Determination of Discharge*" provides a more comprehensive discussion of the remedy that BD provides.

The changes to the definition of a BD make several improvements that clarify the standard and address various commenters' concerns. Principally, a general definition accompanied by enumerated actionable acts or omissions clarifies the shared elements without shoehorning them into each specific way of establishing a defense to repayment.[54] A definition of general elements also considers commenters' requests to require that the act or omission be accompanied by one or more variations of the elements of causation and detriment to the borrower.

For causation, the Department chose a straightforward general element of causation instead of specific articulations such as reliance and materiality. First, a general causation

element fulfills the function that reliance and materiality play in many actions for common law fraud, but in a way that more appropriately reflects the unique context of BD and student loans generally. Indeed, the decision to take out Federal loans to pay tuition in exchange for education, training, and credentials differs from the conventional context of common law fraud. The core concern for BD is ensuring it is a remedy for injuries caused by the identified acts and omissions, which is a concern that a general causation standard more appropriately addresses.

General causation can also be expressed in terms that will make more sense to a borrower. As numerous commenters observed, requiring applicants to use specific phrases risks filtering out applicants who do not understand terms with specific legal meanings instead of focusing on the borrower's actual entitlement to relief. The Department was also persuaded by concerns from commenters that reliance is a complicated element to rebut because only the borrower will truly know if they relied upon an act or omission. Causation, meanwhile, requires describing factual circumstances that show a connection between the act and the detriment to the borrower.

Detriment to the borrower is also a general element of a defense to repayment. The Department opted for this element rather than the suggestion of a few commenters to require borrowers to establish harm in specific forms or financial quantities. As noted in the NPRM, the Department is concerned that past requirements to establish harm have set unrealistic bars for borrowers, such as ruling out factors like regional or national recessions and a poor job-search process as causes for a borrower's inability to find employment or denying relief to borrowers who succeed despite their program. Requiring specific forms or values of harm would present an unrealistic barrier for many borrowers likely entitled to relief.

Furthermore, some comments on this topic appear to conflate the *fact* of detriment with the *measure* of resulting harm for remedial purposes.[55] The "detriment" element ensures that an applicant or group of applicants did, in fact, suffer harm caused by the relevant act or omission. In the BD context, that will frequently take the form of lost

---

[54] In addition to bringing the shared claim elements one step higher on the definitional tree, the modifier "actionable" also defines the phrase "actionable act or omission" as a BD-specific term that means one of the categories of conduct enumerated in § 685.401(b)(1)–(5). That is intended to clarify that other instances of the term "act or omission" in CFR, Title 34 may overlap with the enumerated BD categories but are not necessarily coextensive.

[55] *See* Dan Dobbs & Caprice Roberts, Law of Remedies § 3.1 (3d ed. 2018) (explaining the distinction between the fact of legal injury and measures of harm caused for purposes of calculating damages remedy).

value or economic loss as a result of the transaction to take out a loan and enroll. Limits on the form or degree of that injury are more appropriately treated as remedy-related issues, as explained in the paragraphs that follow and in the "*Amounts to be Discharged/ Determination of Discharge*" section.

A claim's final general element proceeds from the remedy for BD, and involves a determination that the nature of the relevant acts or omissions and resulting detriment warrant the remedy available in BD. This feature of the updated definition and Federal standard, among others, addresses many of the concerns raised by commenters representing institutions or the interests of institutions. Regarding the concerns these comments raise, an approved claim requires the Department to conclude that the act or omission caused detriment to the borrower such that the circumstances warrant the relief of removing the borrower's obligation to repay the loan's remaining balance, refunding amounts paid to the Secretary, and other benefits like changes to credit reporting and determining that the borrower is not in default. In making that determination, the Secretary will weigh the totality of the circumstances, including the nature and degree of the acts or omissions and of the detriment caused to borrowers, along with any other relevant facts. As explained below, when making that determination for cases involving closed schools, there will be a rebuttable presumption that relief is warranted, which reflects the Department's experience that the circumstances warranting such relief are likely to exist in cases involving closed schools shown to have committed actionable acts or omissions.

As we explain elsewhere, BD relief, though unique, bears features of remedies like rescission, restitution, avoidance, reliance costs, and an obligor's claims and defenses against the enforcement of an unsecured loan. As rules and principles for those remedies reflect, whether rescissionary relief is appropriate often depends on the facts and circumstances of a particular case.[56] Although we did not adopt precise standards from these related areas of law, the Department expects to draw on principles and reasoning underlying the application of rescissionary remedies

---

[56] *See, e.g.,* Restatement (Third) of Restitution & Unjust Enrichment § 54 (2011) ("Rescission is appropriate when the interests of justice are served by allowing the claimant to reverse the challenged transaction instead of enforcing it."); Restatement (Second) of Contracts § 344 cmt. a (1981)(relief flexibly tailored "as justice requires" to protect reliance and restitutionary interests).

that BD resembles, where factual circumstances call for it, and will make explanations of important remedy-related determinations public. The relief available under BD and determinations on whether certain circumstances warrant relief are explained in greater detail in the "*Amounts to be Discharged/Determination of Discharge*" section.

The Department considers this flexible inquiry superior to specific benchmarks of cognizable harm requested by numerous commenters. Principally, it corresponds more closely to the remedy of a discharge and refund. As noted, the remedies that BD resembles generally call for a weighing of equities and case-specific circumstances. Because of the variety of interests involved in BD and the nature of the remedy it provides, a similar approach is appropriate to incorporate into the Federal standard. It also provides a limiting principle that addresses the comments concerned that full discharges and refunds would be warranted for trivial misstatements or borrowers with negligible harm.

As part of this determination, the standard provides for a rebuttable presumption that applicants who attended closed schools and otherwise establish a claim to relief are presumed to have suffered detriment that warrants BD relief. This presumption is based on the Department's experience that the circumstances in which BD has been the appropriate remedy to date are in cases involving closed schools. This does not mean that every alleged act or omission by a closed school will warrant relief, nor does it mean that borrowers who attended a closed school should expect the Department to automatically grant applications for BD. In cases where a school closes but there is no evidence of an act or omission that could give rise to a BD claim, the HEA still provides a path for borrowers who are otherwise harmed by the closure itself to get relief through the closed school discharge process. Applicants for BD who attended closed schools will still have to show, by a preponderance of the evidence, that the school committed actionable acts or omissions that caused them detriment. Although there is a presumption that such circumstances warrant BD remedies, it may be rebutted by evidence or reasons suggesting that the circumstances do not warrant the remedy of discharge and refund. The Department opted for this presumption because it acknowledges the context and challenges with obtaining additional evidence that often accompanies closed schools, while also allowing the Department to exercise its discretion

based on the specific circumstances of each case.

Finally, the Department disagrees with the suggestion that the regulations require a finding of intent or knowledge by the institution for a BD claim to be approved. Requiring intent would place too great a burden on an individual borrower, who would need to have some way to know why the institution, or its representative committed the improper act or omission. Moreover, if the action resulted in detriment to the borrower that warrants relief, the Department does not believe whether it was taken with knowledge or intent should be relevant. The borrower still suffered detriment that warrants relief and so, if proven, should be relieved of their repayment obligation. The inclusion of a requirement that the action caused detriment to the borrower that warrants the relief of a full discharge and refunds means that harmless and inadvertent errors are unlikely to be approved. It is unlikely that a trivial action caused detriment and the Department will most likely not reach that conclusion. An error of consequence that causes detriment to a borrower that warrants relief should result in relief, however, regardless of whether it was made with knowledge.

*Changes:* We revised § 685.401(b), the Federal standard for a BD, to require the Department to conclude that the institution committed "an actionable act or omission and, as a result, the borrower suffered detriment of a nature and degree warranting the relief provided by a borrower defense to repayment as defined in this section."

We also added, in § 685.401(e), the general parameters that the Department will consider when determining whether detriment caused by a school's act or omission warrants relief. This involves the Secretary considering the totality of the circumstances, including the nature and degree of the acts or omissions and of the detriment caused to borrowers. The standard also provides that for borrowers who attended a closed school shown to have committed actionable acts or omissions that caused the borrower detriment, there will be a rebuttable presumption that the detriment suffered warrants relief under this section.

*Comments:* The Department received many comments with differing opinions on whether to presume reasonable reliance for an individual claim, as well as a group one. A few commenters requested a more explicit statement from the Department that we would presume reasonable reliance for an individual claim. Others, however, argued that the Department did not have

the statutory authority to use a presumption of reliance and did not provide sufficient evidence for this proposal. These commenters also argued that a presumption of reliance, coupled with the absence of requirements such as showing harm, and the broad definitions of terms like aggressive recruitment, would lead to the approval of frivolous claims. Commenters also argued that concerns that borrowers fail to state reliance do not provide legal grounds for adopting a presumption in regulation. They argued that when agencies establish a presumption, they typically do so using a rational nexus between the proven and presumed facts and that the Department has not showed that would be the case.

Commenters also disagreed with the Department's citation to authority held by the Federal Trade Commission (FTC). The commenters argued that the FTC can only employ its presumption when there is proven widespread violations, which include material and widely disseminated misrepresentations. The commenters argued that the Department's proposed standard represented a lower bar than what the FTC uses. The commenters also said the presumption does not comport with Supreme Court rulings related to the application of presumptions and stated that some misrepresentations as outlined in § 668.72 must require a showing of individual reliance. Finally, a few commenters stated that borrowers should bear the burden of proving reliance. They noted that only the borrower knows if they relied upon a particular act or omission, and it would be difficult for an institution to rebut a presumption of reliance.

*Discussion:* We take seriously the concerns the comments express, and have revised the amendatory text, where appropriate, but we disagree with much of the commenters' reasoning.

Regarding concerns about applying a presumption of individual reliance, the final regulation includes a general causation element in the definition of BD that addresses this concern in some ways. In this respect, approved claims must be based on a showing that a school's actionable act or omission caused the borrower detriment. That showing may be based on an inference of causation that does not meet the strictures of a conventional common law fraud claim, but the Department will not presume causation based on a borrower establishing an actionable act or omission, standing alone. The general causation requirement and the reasons for adopting it are explained in response to other comments in this section.

The updated regulation does, however, retain the feature that adopts a rebuttable presumption that identified acts or omissions impacted each borrower in a group recommended for consideration under the proposed § 685.402. This is a logical feature of a process that considers claims collectively.

Contrary to a few commenters' suggestions, this feature does not permit a presumption where there is no rational nexus between the established and presumed facts. Rather, the regulation contemplates that a recommendation to consider certain borrowers' claims as a group will stem from facts supporting a logical inference that certain acts or omissions impacted members of the group in similar ways. For that reason, the rebuttable presumption accompanying a formed group will reflect a rational nexus between the proven facts and the presumed facts.[57]

Likewise, a rebuttable presumption does not change the burden of persuasion, which will still require that the evidence show an entitlement to relief by a preponderance of the evidence. For purposes of schools' liabilities, the presumption will simply operate to shift the evidentiary burden to the school, while still allowing the school to rebut the presumption as to individuals in the identified group, or as to the group as a whole. In any recoupment action related to such a case, the members of the group will be identified. Although the group may include borrowers who did not file an individual application, the members of the group will be known as part of the fact-finding process. Because the Federal standard now focuses on causation rather than reliance, there is no need for the changes regarding presumptions for individual claims that commenters requested.

We disagree that the Secretary lacks the authority to provide for presumptions in the procedures for resolving BD claims. It is a well-established principle that administrative agencies may establish adjudication procedures that include evidentiary presumptions based on logical inferences drawn from certain facts.[58]

We also disagree with commenters' attempts to distinguish the principles underlying presumptions drawn from FTC jurisprudence. The presumptions that the FTC uses are not limited to contempt proceedings and also apply in

actions for restitution under Sec. 19 of the FTC Act.[59] What is more, commenters ignore key differences between FTC enforcement and BD that underscore the Department's authority here. First, the FTC actions that commenters reference involve civil enforcement proceedings meant to encourage compliance with general commercial standards and deter practices that financially harm consumers in general. In contrast, the Department's BD-related recoupment actions against schools involve the collection of discharged loan amounts so that the party that caused the loss reimburses the Government and taxpayers. That is, unlike the civil remedies that the FTC deploys, the Department's BD-related proceedings with schools simply involve the Department seeking reimbursement for liabilities owed to the Department as a result of the schools' voluntary participation in the title IV programs. Second and relatedly, the FTC's enforcement authority stems from more than 70 different laws and covers an extensive range of consumer interactions that make commercial actors subject to the FTC's consumer-oriented jurisdiction simply by virtue of engaging in economic activity with consumers. The scope of BD, on the other hand, only encompasses Federal loans paid to schools through the Department-administered title IV programs in which schools affirmatively and voluntarily sought eligibility to participate. To be eligible to participate in these programs, a school must also expressly agree to be subject to the Department's regulations, which includes assuming responsibility and liability for losses the Department incurs from relevant discharges. *See* 34 CFR 685.300. Not only do the regulations explicitly provide for such reimbursements, but they also have included features like the presumption commenters reference long before this rule. The 2016 regulation specifically provides for such presumptions.[60] Similarly, the 1994 regulation empowered the Department to apply State law, which would include presumptions applied in many jurisdictions. As we explained when the final 2016 regulations were published, the presumption that those regulations codified did not "establish[ ] a different standard than what [wa]s required under the . . . [1995] regulations" in place at that time.[61] Indeed, as noted,

---

[57] *See Cole* v. *U.S. Dep't of Agric.,* 33 F.3d 1263, 1267 (11th Cir. 1994).

[58] *Chem. Mfrs. Ass'n* v. *Dep't of Transp.,* 105 F.3d 702, 705 (D.C. Cir. 1997).

[59] *See, e.g., F.T.C.* v. *Figgie Int'l, Inc.,* 994 F.2d 595, 605 (9th Cir. 1993).

[60] 34 CFR 222(f)(3).

[61] 81 FR at 75971.

agencies retain the discretion to apply presumptions in the adjudication process that are not codified in regulations at all so long as a rational nexus exists between the relevant evidence and presumptive inferences to be drawn from it.[62]

The upshot of these differences is that the procedural steps required for FTC presumptions are based on many reasons that do not apply to the BD context. That obviates the need to recreate similar procedures as a prerequisite to applying presumptions in BD-related proceedings. That is particularly the case because recreating such procedures would meaningfully hinder the efficient administration of BD proceedings, which are an integral part of the Department's role as the administrator of title IV Federal loan programs. The Department has authority to administer those programs in a way that honors borrowers' right under the HEA to raise a defense to collection of their loan and that ensures schools satisfy the financial commitments and obligations they undertake as a condition of title IV participation. Thus, the interagency differences that the comments mention support the Department's authority to craft a context-specific process for resolving claims for BD.

*Changes:* The Department revised § 685.401(b) to provide that, to approve a claim, the Department must conclude the institution made an actionable act or omission that caused detriment to the borrower that warrants the relief provided under BD.

*Comments:* A few commenters argued that the Department should adopt a plausible basis requirement for BD claims similar to the Federal pleading standard. In this situation, the Department would assume that well-articulated factual allegations are true and then determine whether they give rise to relief. The commenters also argued that the claimant should be required to state the claim with particularity as required under certain elements of the Federal Rules of Civil Procedure.

*Discussion:* We agree in part with the comments but disagree that it would be appropriate to adopt specific pleading standards—whether heightened or relaxed—drawn from civil litigation. Without adopting specific standards, the Department has made revisions that address many of the concerns expressed in these comments.

With regard to pleading standards, revisions to the regulations set forth basic requirements for a materially

complete individual claim application. These requirements are discussed in greater detail in the section in *Process to Adjudicate Borrower Defense Claims,* but their core purpose is to increase the quality of and content in individual applications by requiring an adequate description of the alleged acts or omissions, along with their relevant circumstances, impact, and resulting detriment. This differs from a particularity requirement such as Federal Rule of Civil Procedure 9(b) but addresses some commenter concerns.

The Department declines to adopt a plausibility requirement. Principally, the BD adjudication process does not implicate the plausibility standard's goal of resolving claims early to avoid expensive and burdensome discovery costs.[63] Nor does the BD process implicate other pleading-related concerns of providing a defendant adequate notice,[64] because the Department is the party against which borrowers assert a defense to repayment. Otherwise, we think the updated guidelines for a materially complete application will adequately address concerns about applications lacking sufficient information.

*Changes:* We clarified the definition of a materially complete application in §§ 685.402(c) and 685.403(b) to require that borrowers provide certain details that form the basis of a claim.

*Comments:* Some commenters raised concerns about whether the Department would terminate or otherwise sanction institutions for past behavior based upon new items in part 668, subpart F or the new part 668, subpart R. They raised concerns about institutions potentially facing adverse actions for past conduct now covered by these additions.

*Discussion:* The Department notes that some of the changes to Part 668, subpart F represent items that are not new but have simply been moved to other locations or slightly restated. Other elements in that subpart, as well

as part 668, subpart R are new. For the items that are new, the Department could bring adverse actions in relation to conduct that occurs on or after July 1, 2023 that violates those new provisions.

*Changes:* None.

*Comments:* Some commenters argued that the Federal standard and its relation to other prior standards would confuse borrowers and adds unnecessary complexity.

*Discussion:* We disagree. As noted in the NPRM, the Department is concerned that the fact that the current framework of associating a regulation with a disbursement date can be very confusing for borrowers, especially if their borrowing spans multiple regulations or they consolidate. The single upfront Federal standard will reduce that confusion. This approach avoids the possibility that different loans held by the same borrower and related to the same allegations could otherwise result in different adjudication outcomes, which would be confusing.

*Changes:* None.

### Substantial Misrepresentation

*Comments:* A commenter made several suggestions regarding the definition of misrepresentations related to job placement rates in § 668.74. These included clarifying that these are misrepresentations related to the use of placement rates in marketing materials, not what is reported to accreditors or State agencies; allowing paid internships of a certain minimal length to be considered a placement; saying that placement rates can align with the methodology historically accepted by an accreditor or State agency; counting borrowers who were placed prior to graduation as part of a clear disclosure; and, allowing for the exclusion of non-respondents after a good faith attempt to contact them and alongside a disclosure. The commenter also provided regulatory text to execute their suggested changes.

*Discussion:* § 668.74 (g)(1) already states that a misrepresentation exists if the actual employment rates are materially lower than the rates included in the institution's marketing materials, website, or other communications, so we do not believe further clarification is needed there. However, after reviewing § 668.74(g)(1)(ii) we believe the phrasing there was not sufficiently clear. Accordingly, we have revised § 668.74(g)(1)(ii) to clarify that the rates in question are the ones disclosed to students. In reviewing the request for greater clarity we also concluded that the language in 668.74(g)(1)(ii)(C) did

---

[62] *See Chem. Mfrs. Ass'n,* 105 F.3d at 705.

[63] *See Bell Atl. Corp.* v. *Twombly,* 550 U.S. 544, 558 (2007); *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan* v. *Morgan Stanley Inv. Mgmt. Inc.,* 712 F.3d 705, 719 (2d Cir. 2013).

[64] *See* Fed. R. Civ. P. 8.

App.356

not fully capture the issues that the Department has seen in that space. Accordingly, we clarified that language to say "assessments of employability" in addition to difficulty with placement. This addresses two issues the Department has seen. One is institutions excluding borrowers from a placement rate solely because they did not follow a strictly defined job search process as laid out by the institution. The other is excluding students because the institution thinks the person would have a hard time finding a job, which can include someone who is pregnant. Regarding the other suggestions, we believe it is important for the placement rates provided to borrowers to be as straightforward as possible, and the comment did not provide reasons for further limiting the grounds for misrepresentation set forth in § 668.74(g)(1)(ii)(A) through (C). We have, however, deleted § 668.74(g)(1)(ii)(D). The commenter noted that the treatment of non-respondents could potentially also deflate placement rates if someone who is placed does not respond. Given the potential for the treatment of non-respondents to increase or decrease the placement rate, we believe this provision is not as consistent in resulting to rates that are overstated as paragraphs (A) through (C).

The Department also notes that the Federal standard for BD incorporates misrepresentations as defined in § 668.71(c), which include representations to accrediting agencies, State agencies, and others. Whether any such statement amounts to a substantial misrepresentation will depend on whether it is false or misleading. For purposes of BD, the Department would have to further conclude that the misrepresentation misled a particular borrower and caused the borrower detriment such that it warrants a full discharge and refund. Thus, not every substantial misrepresentation under part 668, subpart F will support a defense to repayment and the remedies it entails. In addition to this flexibility, the regulations permit the Department to seek additional evidence from requestors, when appropriate, and permit schools with various opportunities to be heard. Given these features, the Department disagrees that the definition of substantial misrepresentation should be changed.

*Changes:* We have revised § 668.74(g)(1)(ii) to clarify it applies to rates disclosed to students. We have clarified § 668.74(g)(1)(ii)(C) to note this also includes assessments of employability. We have also deleted § 668.74(g)(1)(ii)(D).

*Comments:* One commenter stated that the Department's proposal to add false, erroneous, or misleading statements concerning institutional selectivity rates or rankings as a form of misrepresentation was confusing and pointed out possible inconsistencies in that approach. Another commenter requested clarification on the Department's approach to "highly ranked and highly selective programs."

*Discussion:* We appreciate the questions raised by the commenters. The goal behind § 668.72(m) is to capture misrepresentations in which the institution misleads students into thinking the school itself or a program it offers has selective entrance requirements when that is not the case. The Department had attempted to capture this concept by pointing to two different types of misrepresentations. The first type would have been when the school's actual selectivity or admissions profiles or requirements are materially different than how they were presented by the school, such as representations making it seem to students that a school is highly selective when it is in fact open access. The other type would have been when an institution's actual rankings are materially different from those advertised.

After reviewing the proposed language following questions from the commenters, the Department has simplified the phrasing in § 668.72(m) concerning selectivity rates to state: "Institutional or program admissions selectivity if the institution or program actually employs an open enrollment policy." This language better captures the concept in the first type of misrepresentation, which involves the false presentation of an institution as selective when it is in fact open access. We added "program" to this definition as well, to acknowledge that some open-access institutions have individual programs that are selective and thus would not trigger a misrepresentation under this section.

In making this change, the Department deleted the components related to admissions profiles and requirements, which are vague and difficult to follow. We have also deleted the references to presenting rankings that are materially different from those presented to others. The Department is not aware of instances where an institution has presented a ranking different than what a rankings organization published. Instead, the Department has seen instances in which institutions have presented incorrect data that resulted in the ranking assigned being higher than it would

otherwise have been and that ranking is then advertised accurately. Accordingly, we have simplified this type of misrepresentation to reflect past misbehavior observed at institutions.

In response to the commenter who requested clarification on the Department's approach to "highly ranked and highly selective programs," we decline to further elaborate as we have revised the definition of this type of misrepresentation under § 668.72(m).

*Changes:* We revised § 668.72(m) to provide that misrepresentation concerning the nature of an eligible institution's educational program includes, but is not limited to, false, erroneous or misleading statements concerning institutional or programmatic admissions selectivity if the institution or program employs an open enrollment policy.

*Omission of Fact*

*Comments:* The Department received numerous comments alleging instances where institutions omitted facts about their academic program. For example, a commenter stated that they discovered that they needed additional certifications and training to be employed in the field but only learned about this well after enrollment. This commenter claimed that their institution did not inform them of the additional requirements needed beyond the degree program, including subsequent training or education, and had they known, they would not have pursued the degree.

*Discussion:* The Department appreciates hearing about the commenters' experiences. These reports, along with the Department's oversight and compliance work, validate the Department's determination to include an omission of fact as one of the bases for a defense to repayment claim. Had institutions not omitted material information about the nature of their educational programs, but instead disclosed such information upfront, this could have resulted in a different outcome for the student and negated the need for a defense to repayment claim.

*Changes:* None.
*Comments:* Commenters requested that omission of fact be revised so that an omission be considered a defense to contract performance only when there is knowledge that omission makes it fraudulent, or contrary to good faith and fair dealing, or trust and confidence.

*Discussion:* We disagree with comments requesting that actionable omissions be required to meet conventional elements of common law fraud or defenses to contract performance. Many of those elements

are intended to ensure proof that the omission caused the harm asserted or formation of the relevant contract, respectively. We consider the general causation element added to the definition of BD and the Federal standard to adequately ensure a causal link between a potential omission and the detriment to a borrower. We also note that the breach-of-contract basis for showing an actionable act or omission does not require fraud, but rather failure to perform an obligation promised in exchange for the borrower's decision to enroll or take out a loan or to accept a disbursement of the loan.

As for the omission-related element commenters sought, we note that actionable omissions incorporate the definition of misleading conduct from part 668, subpart F, which requires that the omission make the school's interaction with a borrower misleading under the circumstances. Otherwise, we disagree that an omission must be accompanied by a specific duty to disclose or scienter requirement to be actionable. Not only would those requirements be unrealistic for borrowers to prove without the tools of civil discovery, but it would overlook the realities of transactions at the core of student loans and BD. In circumstances where the school's failure to disclose certain facts causes the borrower to be misled, such circumstances should be actionable. The updated regulations reflect that reality, but by adding a general causation element, it also ensures that defense to repayment is only available when such omissions are shown to have caused the borrower detriment.

*Changes:* None.

*Comments:* Commenters representing the legal aid community expressed support for the proposed condition in § 668.75(a) about omissions related to "[t]he entity that is actually providing the educational instruction, or implementing the institution's recruitment, admissions, or enrollment process." These commenters noted that in their work they have frequently found that borrowers report being dismayed when they find out that someone, they thought was a school employee was in fact a contractor. The commenters noted that these borrowers indicated that they would have approached the conversation with a higher degree of skepticism had they understood that they were speaking with a contractor. Similarly, the commenters stated they heard concerns from students who enrolled in online programs where the organization that designed the curriculum and provided the instruction was not the same as the

institution under whose branding the program appeared. Other commenters raised concerns that this condition would confuse borrowers who may not understand the relationship between service providers and the institution, and that organizations with trusted contractors do not commonly require employment disclosures before discussions with students or prospective students. A commenter also noted that institutions sometimes use contractors to assist them during the busiest parts of the financial aid year and asked if such a situation would require disclosure that such a person is a contractor. That commenter also asked why the requirement that contractors be identified as third-party servicers with the Department is not sufficient to address this concern.

*Discussion:* The Department appreciates the comments noting support for its proposed rule on this issue. As commenters noted through testimony from borrowers, had the student known they were talking to an employee of the institution versus someone employed to recruit on behalf of the school, that student would have changed their perception of the transaction. While that does not necessarily mean they would not still have enrolled, the borrowers did report that they would have exercised a greater degree of skepticism than they otherwise employed. Similarly, borrowers should be clear about who will be providing the education in which they are investing. When a borrower enters into a financial transaction as significant as attending college, they should have sufficient clarity into the source of the education they are purchasing. That means understanding if they will be receiving instruction provided by employees of the institution or something that is fully or partially outsourced. Knowing this information allows them to more properly evaluate what they should be receiving at the outset and should reduce concerns later that the education was not what was promised.

With regard to the commenters who are concerned that requiring employment disclosures would confuse borrowers, adding the requirement in the Federal standard that the Department must conclude the act or omission caused detriment to the borrower that warrants relief gives an institution a framework to consider whether failing to disclose the role of a contractor could meet such a standard. If failure to provide such a disclosure does not meet this standard, then it would not result in an approved borrower defense claim.

The reporting of third-party servicers to the Department is insufficient to address this concern. The regulations at § 668.25 provide the general framework governing the situations in which schools may contract with entities to help with administering the title IV programs but this relationship is largely unknown to students or borrowers; these students and borrowers view the third-party servicer and the institution as one and the same. Moreover, the regulations are intended to address the responsibilities of the institution and third-party servicer to the Department within the context of the title IV programs. While both the school and the third-party servicer are liable for any related actions by the third-party servicer, the school is ultimately held accountable if a third-party servicer mismanages the title IV programs. As noted by the commenters, a borrower's understanding of whether they are talking to an employee or contractor when making judgments about whether to enroll is important for making a decision. Such information thus needs to be provided to the borrower if failing to tell them could cause detriment to the borrower that warrants borrower defense relief.

*Changes:* We revised § 685.401(b), the standard for a borrower defense to repayment, to provide that, to approve a BD claim, the Department must conclude that the institution committed "an actionable act or omission and, as a result, the borrower suffered detriment of a nature and degree warranting the relief provided by a borrower defense to repayment as defined in this section."

*Comments:* A few commenters requested that the Department make the list of omissions exhaustive while deleting § 668.75(e) (which makes actionable any omission of fact regarding the nature of the institution's educational programs, the institution's financial charges, or the employability of the institution's graduates), saying that category would lead to an overwhelming number of disclosures for borrowers. Commenters noted that an exhaustive list of omissions would give institutions more clarity. Similarly, a few commenters made general requests for greater clarity and specificity. Some also proposed a safe harbor for institutions if they provide documentation that shows students received all disclosures already required under other Department regulations. Other commenters asked the Department to either include a list of required disclosures or incorporate by reference the disclosures imposed by State and accrediting agencies so that borrowers will know what they need to

receive, and institutions will know how to meet agency expectations. Other commenters cited the types of statements they have in their enrollment agreements that require students to acknowledge the information received and that they understood it as a way of showing the kind of evidence they would want to submit to disprove a borrower's allegations.

*Discussion:* The concerns of the commenters are best addressed by the Department's changes to the overall Federal standard that require the act or omission to cause detriment to the borrower that warrants relief. Adopting those elements will protect against the concerns raised by commenters, such as that the omission of an unimportant piece of information could lead to an approved claim. We believe our changes give institutions clarity in thinking about whether an act or omission may give rise to an approved borrower defense claim and eliminates the need for additional specificity within the elements in § 668.75. The Department declines to make the list exhaustive, as the list of misrepresentations is similarly non-exhaustive as a way of giving the Department flexibility to identify other concerning acts or omissions that may arise over time. The proposed safe harbor or list of disclosures would be inappropriate because institutions are already required to abide by the disclosure requirements in 34 CFR part 668, subpart D (institutional and financial assistance information for students), and such a safe harbor or list would mean just following the Department's regulations even if the institution does so while still failing to inform borrowers of other critical information that is not explicitly provided. The Department appreciates the examples raised by commenters of how some institutions ask borrowers to acknowledge the receipt of certain information provided to them. That type of information would be considered during the fact-specific review of a BD claim.

*Changes:* We revised § 685.401(b), the standard for a borrower defense to repayment, to provide that, to approve a claim, the Department must conclude that the institution committed "an actionable act or omission and, as a result, the borrower suffered detriment of a nature and degree warranting relief provided by a borrower defense to repayment as defined in this section."

*Breach of Contract*

*Comments:* Many commenters wrote in expressing support for the inclusion of a breach of contract standard.

*Discussion:* The Department thanks the commenters for their support and agrees with the importance of including this as an element of an approved borrower defense claim.

*Changes:* None.

*Comments:* Many commenters opposed the inclusion of breach of contract and asked for its removal. They said that the Department lacked the statutory authority to include it. Some argued that a breach of contract would either be a misrepresentation or an instance where a college closed and that anything in between was too vague to include. A few commenters also argued that the Department lacked the ability to properly interpret State contract law and did not specify how it would reconcile State contract law with Federal law. Commenters also argued that the Department should not preempt State remedies for breaches of contract and noted that the lack of a limitations period for filing a borrower defense claim was contrary to limitations that may apply to contracts.

*Discussion:* We disagree with the commenters who said that we lacked the statutory authority to include breach of contract as an act or omission. As we've explained throughout the NPRM and this final rule, Sec. 455(h) of the HEA requires the Secretary to specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to the repayment of a Direct Loan and the Department is asserting, and explains in detail,[65] that a breach of contract is an appropriate act or omission to include in the borrower defense Federal standard.

The commenters mischaracterize the Department's regulations. Under these regulations the Department will only determine whether the borrower has stated a basis for a BD claim on their Direct Loan based on the alleged breach of contract by the school. This determination resolves the borrower's qualification for a Federal benefit and does not make any determination of the rights of the parties under the contract itself or under the State laws which apply to those contracts.

While we acknowledge that a breach of contract could be a misrepresentation, in some instances a breach of contract claim may very well not fit into the Department's substantial misrepresentation standard. Where a breach of contract does not meet the elements of substantial misrepresentation, borrowers would have a basis for a BD claim based on the institution's failure to deliver

educational services per the contract. We also explain in the NPRM why we were convinced to include breach of contract in the Federal standard and concluded that borrowers may be able to allege breach of contract more readily.[66]

We further dismiss any notion that the Department's inclusion of breach of contract would be too vague to include in the Federal standard. A breach needn't be an extreme case such as, for example, a closed school. Because a breach of contract is a cause of action that is well established with the same basic elements in the laws of all States, territories, and the District of Columbia, codifying breach of contract in the Federal standard in the area of contracts between the student-institution would ensure consistency and predictability in this area. Furthermore, it is a common practice for the standards in Federal regulations draw on common law concepts and principles.[67]

*Changes:* None.

*Comments:* A few commenters requested that the Department clarify what constitutes a contract for purposes of a borrower asserting a defense to repayment under a breach of contract. They said otherwise the proposed standard is too vague and overbroad.

*Discussion:* For purposes of BD, the terms of a contract between the school and a borrower will largely depend on the circumstances of each claim. As we stated in the NPRM for the 2016 regulations, a contract between the school and a borrower may include an enrollment agreement and any school catalogs, bulletins, circulars, student handbooks, or school regulations.[68] 81 FR at 39341. We decline to clarify the elements of what constitutes a contract because that is a fact-intensive determination best made on a case-by-case basis. We also acknowledge that

---

[65] 87 FR at 41893.

[66] 87 FR at 41893.

[67] *See, e.g.,* 12 CFR 51.7(c) (authority of receiver of uninsured bank; includes powers under "the common law of receiverships"); 12 CFR 109.24(c) (privileges in agency proceeding; includes those that "principles of common law provide"); 20 CFR 404.1007(a) (existence of employer-employee relationship; based on "common-law rules"); 26 CFR 1.385–1 (tax treatment of interests in a corporation as stock or indebtedness; "determined based on common law"); 38 CFR 13.20 (veterans benefits; spousal relationships include "common law marriage"); 45 CFR 160.402(c) (organizational liability for civil penalties; "Federal common law of agency").

[68] *See Ross* v. *Creighton Univ.,* 957 F.2d 410, 416 (7th Cir. 1992). In describing the limits of a contract action brought by a student against a school, the *Ross* court stated that there is "'no dissent'" from the proposition that "'catalogues, bulletins, circulars, and regulations of the institution made available to the matriculant'" become part of the contract. *See* 957 F.2d at 416 (citations omitted). *See also Vurimindi* v. *Fuqua Sch. of Bus.,* 435 F. App'x 129, 133 (3d Cir. July 1, 2011) (quoting *Ross*).

State law generally guides what constitutes a contract and that such laws vary among States. Similar to our position in 2016, the Department intends to make these determinations of what constitutes a breach of contract consistent with generally recognized principles applied by courts in adjudicating breach of contract claims. To the extent that Federal and State case law has resolved these issues, we will be guided by that precedent. Application of the standard will thus be guided but not controlled by State law. Moreover, the Department will continue to evaluate claims as they are received and may issue further guidance on this topic as necessary.[69]

*Changes:* None.

*Comments:* One commenter stated it was unclear if an act or omission in § 685.401(a) must directly relate to or give rise to the breach of contract or must itself constitute the breach of contract.

*Discussion:* Consistent with the Department's interpretation of its authorizing statute, the act or omission by the school must be the breach of contract itself. We are clarifying, however, that the breach of contract must be related to the BD claim.

*Changes:* We revised § 685.401(b)(3) to state that a borrower has a defense to repayment if the institution failed to perform its obligation under the terms of a contract with the student and such obligation was undertaken as consideration for the borrower's decision to attend, or to continue attending, or for the borrower's decision to take out a covered loan.

*Comments:* One commenter expressed concern that the breach of contract standard fails to protect institutions for situations out of their control. They pointed to the COVID–19 pandemic, the need to move classes online, and the resulting lawsuits.

*Discussion:* We believe that the changes we have made to the proposed regulations address the commenter's concern. A breach of contract is a defense to repayment only if the institution failed to perform its obligations under the contract and the obligation was consideration for the borrower's decision to attend or continue attending the institution or for the borrower's decision to take out a covered loan. We believe that this additional language will largely limit the approval of BD claims based on a breach of contract to those within the institution's control or those that the institution could have avoided.

*Changes:* We revised § 685.401(b)(3) to state that a borrower has a defense to repayment if the institution failed to perform its obligation under the terms of a contract with the student and such obligation was undertaken as consideration for the borrower's decision to attend, or to continue attending, or for the borrower's decision to take out a covered loan.

*Aggressive and Deceptive Recruitment*

*Comments:* Many commenters approved of the Department's definition of aggressive and deceptive recruitment tactics or conduct (hereafter "aggressive recruitment") and supported the inclusion of this category. They shared examples from borrowers of aggressive recruitment. Other commenters expressed concern that the proposed definition and its terminology were vague. Commenters said this could result in the Department approving claims even if the information the institution presented to the borrower was accurate and without omission; such commenters suggested that the Department be required to make a determination of reasonable, actual reliance and material harm to the borrower's detriment with respect to aggressive recruitment. These commenters alleged that the terms "take advantage," "pressure," "immediately," "repeatedly," and "unsolicited contact" are ambiguous and further definitions are necessary to educate institutions and clarify what evidence would be required to allege or defend such a claim. Commenters raised similar concerns about the reference to "threatening or abusive language or behavior." Commenters asked for more guidance on what it would take to disprove allegations under each prong. Commenters also raised concerns about what it would mean to "take advantage" of a student's lack of knowledge or experiences in postsecondary education if they were unaware of a given student's background or circumstances. Other commenters claimed the definition of aggressive recruitment is not supported by statute and does not provide reasonable clarity to students, institutions, or the public. Many commenters called for removing aggressive and deceptive recruitment from the Federal standard. Others did not call for the removal of the standard but did express concerns about how to distinguish aggressive recruitment from typical institutional contact, such as notifying students about impending deadlines. Along similar lines, a commenter identified situations where there are in fact hard deadlines for students where communicating urgency

is important. Others also raised concerns about how § 668.501(a)(1) would affect situations where the program does in fact have limited spots. Similarly, other commenters argued that the acts or omissions covered under subpart R would not be prohibited by any existing State laws. Other commenters argued that any elements that led to an approved borrower defense claim under subpart R would already be captured under misrepresentations or omissions.

Several commenters expressed confusion about the phrasing in § 668.500(a) that says aggressive and deceptive recruitment is prohibited in all forms, including "the effects of those tactics or conduct" that are reflected in the institution's marketing or promotional materials, among other things. They said it is unclear how the effect of a tactic can be expressed in marketing materials. Other commenters suggested that § 685.501(a)(3) be rewritten to require the institution took "unreasonable" advantage instead of just advantage of the student. Many commenters also expressed concerns about § 685.501(a)(5) saying it was unclear how failing to respond to information could be considered aggressive recruitment and expressing concerns about how to handle excessive requests for information from borrowers. One commenter asked for a safe harbor tied to this provision if they could show that an institution provided necessary information at some point during the enrollment process. Several commenters in the cosmetology sector also provided examples of mandated disclosures required by their accreditor in which students sign agreements noting that they understood provisions about an institution's programs and courses, among other things. They asked how that would interact with aggressive recruitment.

*Discussion:* Section 455(h) of the HEA requires the Secretary to specify the acts or omissions that would give rise to a successful BD claim. As with misrepresentations and omissions of fact, the concepts underpinning aggressive and deceptive recruitment resemble many causes of action under State law,[70] with the common attribute of being practices that prevent the consumer from making an informed decision free of manipulation and misinformation. The items laid out in the definition of aggressive recruitment provide more detailed examples of conduct that would fall under this

[70] *See, e.g.,* Kan. Stat. § 50–627; Ohio Rev. Code § 1345.03; Mich. Comp. Laws § 445.903; N.J. Stat. § 56:8–2.

category, however, because States typically do not have consumer protection laws that are specific to postsecondary education. As the NPRM explained, this reflects the Department's experience that certain practices are particularly likely to mislead prospective borrowers, especially borrowers that are targeted for recruitment because of specific vulnerabilities.

We disagree with commenters who state that our definition of aggressive recruitment is not supported by statute and does not provide reasonable clarity to students, institutions, or the public.[71] Section 432 of the HEA states that the Secretary has the authority to issue regulations deemed necessary to carry out the purposes of the program and to establish minimum standards for sound management and accountability of the programs. Furthermore, Sec. 498 of the HEA (20 U.S.C. 1099c) provides that the Secretary determines and institution's administrative capability. These authorities give the Secretary adequate basis for defining aggressive recruitment for oversight purposes and as an act that would give rise to a defense to repayment claim.

In keeping with the other grounds for BD that emphasize the importance of borrowers making enrollment and borrowing decisions uncorrupted by misinformation and manipulation, the specific conduct in the definition of aggressive recruitment is derived from what the Department has seen in its own oversight work as well as in State and other Federal investigations into conduct by postsecondary institutions.[72] Indeed, regulators at the

State and Federal level have long recognized that consumers may be misled not just by a seller's communications, but by the pressure a recruiter or salesperson can create.[73] As we explain in the NPRM, we incorporated some of the negotiators' proposals on aggressive recruitment, consulted with the FTC, and analyzed other Federal laws on unfair, deceptive, and abusive acts or practices (UDAP).[74]

We disagree with commenters who state that a BD claim that is approved under subpart R would be captured as a substantial misrepresentation or substantial omission of fact. In the NPRM, we cite our reason for including this new designation of acts or omissions as its own category. To those same points, aggressive and deceptive tactics capture a category that is in keeping with the other types of acts or omissions that are actionable, because based on the Department's experience, the combination of deceptive statements and aggressive tactics may coerce borrowers in such a way that in their enrollment or borrowing decisions they are similarly deprived of the right to make such consequential choices free of misinformation and manipulation. While these misrepresentations or omissions might not, on their own, amount to an act or omission that causes detriment warranting relief, when combined with aggressive sales tactics, it may deprive borrowers of the right to make a full and informed choice.[75] Borrowers who are misled by this combination of aggressive and misleading conduct may otherwise be unable to successfully make out a BD claim under the specific grounds of a substantial misrepresentation or omission. Retaining aggressive and deceptive recruitment as its own category ensures these borrowers have a pathway to relief. There are also instances where aggressive recruiting on its own could lead to an approved BD claim even if it does not involve additional misrepresentations. The Department has seen instances where institutions use aggressive recruitment tactics such as: actively discouraging

borrowers from seeking information from other sources; presenting information so quickly that borrowers cannot fully ascertain the true price of the program; and, failing to give the borrower the information and time to assess how much financial aid they would receive, how long the program will take, or what type of job opportunities they would be qualified for after completing the program. Such recruitment tactics could lead to a borrower enrolling without fully understanding the program they are purchasing and may thus end up spending significantly more money for the program than they expected, or not be qualified for the types of jobs they sought to obtain by enrolling in the program. As with all other possible paths to an approved BD claim, simply alleging acts of aggressive recruitment will not automatically result in an approved BD claim. Nor would all substantiated instances of aggressive recruitment behavior result in an approval. Rather, the Department would have to conclude that the allegation is substantiated and that the school's actions caused detriment to the borrower that warrants relief.

Overall, laying out the categories of behavior that constitute aggressive and deceptive recruitment in a non-exhaustive list balances clarity for the field with enough flexibility such that other similar conduct identified later could also fall under this category. The commenters' concerns about vagueness are better addressed by the changes made to the overall Federal standard. The Department is changing § 685.401(b) to require that an approved borrower defense claim result from a finding that the act or omission by the institution caused detriment to the borrower that warrants relief. This requirement ensures that an inadvertent or immaterial instance of what otherwise might seem to be aggressive and deceptive recruitment, standing alone, will not necessarily warrant relief, nor would the type of reasonable contact that the commenters described—such as a reminder of upcoming financial aid deadlines. Rather, relief will be available in cases where the practices cause detriment to borrowers for which the appropriate remedy is discharge, refund, and other remedies that accompany a successful defense to repayment. This requirement also provides a framework for an institution to disprove an allegation of aggressive recruitment since they could show how the conduct did cause any detriment.

The Department did, however, identify some components of aggressive

---

[71] At least one comment suggested that the Department was somehow relying on state deceptive-practices or consumer-protection causes of action to incorporate this basis for relief. Although those types of claims may overlap with this prong of a BD claim, there are also many practices that could amount to cognizable state claims but would nonetheless fall short of a claim warranting discharge, refund, and the other relief provided by BD. In this respect, BD is not coextensive with all deceptive, unfair, or otherwise actionable practices that might serve the basis for a claim under state law. The same observations apply to comments asking that we adopt the CFPB's definition and application of the term "abusive." *See* 12 U.S.C. 5531(b). The Department may look to the application of that term by the CFPB and other agencies as a reference.

[72] *See, e.g.*, Complaint ¶¶ 14, 25, 65, *California* v. *PEAKS Trust 2009–1,* No. 20STCV35275 (L.A. Cty., Cal. Super. Ct. filed Sept. 15, 2020) (documenting aggressive tactics to leverage student borrowing decisions); S. Comm. on Health, Educ., Labor & Pensions, Rep. on For Profit Higher Education, S. Doc. No. 112–37, at 67–73 (2d Sess. 2012) (similar). The Department's own findings have also observed the harmful effects of aggressive and deceptive recruitment tactics. *E.g.,* Westwood Exec. Summary, *supra* note 24, at 1–2 ("aggressive sales tactics" paired with "a high-pressure sales environment

where recruiters made false or misleading statements to prospective students to persuade them to enroll"); ITT Tech. Exec. Summary, *supra* note 24, at 1–2 (same).

[73] *See, e.g.*, 37 FR 22933, 22937 (Oct. 26, 1972) ("FTC Cooling-Off Rule") (explaining the prevalence of high-pressure sales tactics "designed to create . . . desire for something [a consumer] may not need, or cannot afford").

[74] 87 FR at 41894; *see, e.g.,* 12 U.S.C. 5531(d)(2) (unreasonable advantages); 15 U.S.C. 1692 (FDCPA prohibitions on unsolicited contacts); 940 Mass. Code Regs. 31.06(9) (declaring high-pressure sales tactics on the part of for-profit colleges unfair).

[75] 87 FR at 41894.

recruitment where we agree with commenters that items could be deleted or altered to improve clarity. We edited §§ 668.501 and 685.401(b) to clarify our intention. We also revised § 668.501(a)(4) to remove the term "appear to" when referring to instances of aggressive recruitment when an institution or its affiliates obtains the student or prospective student's contact information through websites or other means that falsely offers assistance to individuals seeking government benefits. The Department is concerned with instances when these sites do falsely offer assistance, which is a clearer standard than whether they just appear to. We have combined § 668.501(a)(1) and (2) into a single item related to pressuring a student to enroll, including falsely claiming that a student would lose the opportunity to attend the institution. This change addresses concerns raised by a few commenters about legitimate instances when there may in fact be a hard deadline for a student to enroll or where spaces may in fact be limited. Similarly, the Department has adjusted what was § 668.501(a)(3) (now § 668.501(a)(2)) to indicate that we consider aggressive recruitment to occur when the institution takes unreasonable advantage of a student's lack of knowledge or experience with postsecondary education, as suggested by commenters—a higher requirement than just taking advantage of lack of knowledge. Setting a standard of "took unreasonable advantage" instead of "took advantage" better aligns these requirements with those used for similar practices laid out in the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act).[76] That legislation defines an abusive act as one that in part involves taking unreasonable advantage of a consumer.[77] The Consumer Financial Protection Bureau (CFPB) uses this definition in its work. Similarly, the FTC, CFPB, and State regulators and attorneys general consider whether a consumer could have reasonably avoided an injury in analyzing unfairness claims.[78] These are suitable comparisons because they reflect how other State and Federal agencies address

issues similar to what the Department is facing with BD claims.

Substantively, unreasonable advantage is a different concept than a requirement to show that an institution took advantage of someone. It acknowledges that the institution or its representatives had information not available to the borrower that indicated the product being marketed—in this case a postsecondary education—was not worth what the borrower was going to pay for it. This has shown up in the past when institutions made loans to students where they had estimates that showed 60 percent of more of the borrowers would likely default. Or, when an institution marketed programs that required externships that it knew it did not have sufficient spots for everyone it was admitting. As noted above, unreasonable advantage is also a concept that exists at the CFPB, which provides the Department additional precedent to consider. By contrast, simply requiring a finding that an institution took advantage of someone would be harder to ascertain because it would create a new legal standard that may be more challenging to define and apply consistently. Accordingly, a standard of unreasonable advantage will result in more consistent determinations.

Again, coupled with the requirement to show an act caused detriment to a student that warrants relief, this phrasing clarifies that the Department seeks to address conduct that falls outside normal and reasonable interactions and causes detriment that is appropriately addressed by discharging a borrower's outstanding loan balance, refunding amounts previously paid to the Secretary, and receiving the default-and credit-related relief that accompanies those two remedies. We also further revised § 668.501(a)(4) concerning an institution that obtains a student's or prospective student's contact information through websites to include other means of communication to curb aggressive communications regardless of the source. We have also accepted the recommendation of commenters to delete proposed § 668.501(a)(5) concerning failure to respond to a student or prospective student's requests for more information. While institutions should ensure students get the information they request, we are persuaded by the concern that this provision lacked clarity about what information the institution would need to provide in response or how to address repeated requests for significant amounts of unnecessary information. Removing this

requirement eliminates the need for the safe harbor requested by a commenter.

The Department also agrees with the commenters that the language in § 668.500(a) about the effect of tactics and conduct is confusing and will delete it.

Finally, with respect to the disclosures raised by commenters we note that such information would be useful to provide during the institutional response process in accordance with § 685.405.

*Changes:* We revised § 668.500(a) to delete the phrase "the effects of those tactics or conduct reflected." We revised § 668.501(a)(1) to provide that demanding or pressuring students or prospective students to make enrollment or loan-related decisions immediately includes the conduct previously included in § 668.501(a)(2), which is now removed. We revised what is now § 668.501(a)(2) to describe that taking advantage of a borrower's lack of knowledge must be "unreasonable." Additionally, we have removed § 668.501(a)(5) regarding failure to respond to students' requests for information. We made corresponding technical changes, such as renumbering, to reflect these edits. Finally, we revised § 685.401(b) to provide that, to approve a claim, the Department must find that any act or omission, including aggressive recruitment, caused detriment to the borrower that merits relief to assert a borrower defense to repayment.

*Comments:* A few commenters suggested the Department expressly provide that unfair or abusive conduct can give rise to a valid BD claim and suggested that the Department adopt an "unfair or abusive conduct" standard as grounds for relief in lieu of the aggressive recruitment standard. The commenters further stated the addition of unfairness or abusive conduct is particularly important if the Department excludes a State law standard in the initial review of an application, as many State laws include a broad definition of deceptive trade practices that incorporates unfair or abusive conduct. The commenters suggested the Department could adopt a similar approach and import established FTC case law regarding this standard, as well as the abusive practices standard within the Dodd-Frank Act and the CFPB's application of that law to protect student loan borrowers. Other commenters argued that the Department has not indicated it has the capacity to properly evaluate claims under the aggressive and deceptive recruitment standard after noting in the 2016

---

[76] Public Law 111–203.

[77] *Id.* § 203; 12 U.S.C. 5531(c)(1)(A).

[78] *See, e.g.,* 15 U.S.C. 45(n); 12 U.S.C. 5531(c)(1)(A); *Int'l Harvester Co.,* 104 F.T.C. 949, 1066 (1984); *id.* at 1070 (appending FTC Policy Statement on Unfairness); *Bank of America, N.a.,* CFPB No. 2022–CFPB–0004 ¶ 41 (July 14, 2022); *State* v. *Weinschenk,* 868 A.2d 200, 206 (Me. 2005); Ga. Dep't of Banking & Fin., *Guidance Re: Predatory Lending,* DBF SUP 20–002, at 3 (June 4, 2020), *https://dbf.georgia.gov/banks-holding-companies/ publications-and-guidance.*

regulation that it did not believe it could.

*Discussion:* In 2016, the Department decided to consider aggressive recruitment as a factor in determining whether a misrepresentation under part 668, subpart F, was substantial enough to merit approval.[79] Although the Department did not consider aggressive recruitment, standing alone, to warrant a distinct basis for a defense to repayment at that time, the Department's experience in the years since then along with developments in the law have led us to believe that an appropriate standard can now be articulated and enforced for BD and that including one as a distinct basis is a necessary addition to address gaps in the Federal standard.[80] When the Department drafted the 2016 BD regulation it had received a significant influx of applications disproportionately associated with Corinthian Colleges. These were claims seeking discharges under an authority that had been used sparingly since the 1990s and the Department did not have any dedicated staff for reviewing those applications. For most of the period during the negotiated rulemaking sessions and drafting of the NPRM that resulted in the 2016 regulations, the Department's framework for reviewing borrower defense claims relied on the help of a special master. As such, the 2016 regulation reflected the Department's best assessments at the time of what would make a sensible rule based upon the work it had done.

The situation is very different in 2022. The Department for several years has had a dedicated unit that has built up expertise in reviewing BD claims. We have approved findings at several different institutions and for misrepresentations related to employment prospects, the ability to transfer credits, whether the program had necessary accreditation, and other acts or omissions. The borrower defense group staff have reviewed hundreds of thousands of applications. This includes adjudicating well over 250,000 applications, though we note that roughly half of those were denials that have since been challenged in court. As a result, we have a much stronger sense of what types of allegations we receive, what evidence we have obtained from borrowers or other third parties that have been useful in adjudicating claims, and what type of conduct appears to be associated with practices that can result in borrowers being harmed.

Our years of experience since last considering this issue have shown that the recruitment process is consistently one of the most common concerns raised by borrowers and when many of the misrepresentations that lead to borrower defense approvals occurred. The recruitment process is thus a period that raises concerns for the Department that millions if not billions of dollars are being loaned to students as a result of a process that has not allowed borrowers to fully understand the educational product underlying those loans.

The types of aggressive and deceptive recruitment covered by this rule represent both specific practices the Department has grave reservations about in addition to recruitment processes that are designed to exploit borrowers, incentivize manipulatively aggressive tactics, and are implemented at a structural and organizational level. The specific practices that give the Department reservations include gaining borrowers' contact information under false pretenses by pretending to be a website for receiving other Federal benefits. The organizational approaches that exploit borrowers are recruiting structures that either implement or unavoidably incentivize practices like using abusive or threatening language, misrepresenting decision deadlines to manufacture time pressure, discouraging them from consulting other individuals, and rushing them through the enrollment process.

Today, the Department's accumulated capabilities combine additional experience evaluating practices generally and accumulated examples of aggressive and deceptive recruitment we have observed. Together, these give the Department confidence it can make consistent and reasoned decisions on whether to approve claims alleging aggressive and deceptive recruitment. We further explain the inclusion of aggressive recruitment as a basis for a defense to repayment in the NPRM, 87 FR 41878, 41893–95 (July 13, 2022). The Department also consulted with the FTC and other Federal agencies to thoroughly analyze Federal laws on UDAP, and we believe UDAP violations could act as a relevant factor that would favor a finding of one of the enumerated bases for a defense to repayment.

As we stated in 2016, we believe that a comprehensive Federal standard appropriately addresses the Department's interests in accurately identifying and providing relief to borrowers for misconduct by institutions in appropriate cases; providing clear standards for the resolution of claims; and, avoiding for all parties the burden of interpreting the authority of other Federal agencies and States in the BD context.[81] We believe that our comprehensive Federal standard, including the inclusion of aggressive recruitment as a new basis, would obviate the need for Department officials to become experts on State UDAP laws or to stand in the shoes of State courts. Furthermore, consumer protection laws sweep more broadly than the circumstances warranting BD relief. That is, UDAP and consumer fraud laws enforce certain warranty and transaction-related rights intended to remedy injuries that are different from the injuries that warrant a discharge, refund, and accompanying default- and credit-related remedies provided by a defense to repayment. For example, a seller charging small and incremental hidden fees or automatically renewing memberships at increased rates might create a cause of action under State UDAP laws. But such practices would be more appropriately addressed through damages awards or civil penalties. Adopting State UDAP laws as a standard would expand BD beyond its intended purpose. As a result, we decline to include UDAP violations as a basis for a defense to repayment.

*Changes:* None.

*Comments:* One commenter requested that aggressive recruitment not be triggered if the student is entering a program that has a trial or conditional enrollment period. The commenter stated that trial periods of enrollment have been permissible under Department guidance (see Dear Colleague Letter, GEN–11–12)[82] and serve to prevent the very kind of pressured decision-making that raises concerns. The commenter also included suggestions on altering the language about pressuring the student to enroll immediately, including on the same day of first contact to reflect the treatment of trial periods.

*Discussion:* The commenter misconstrues the intention of GEN–11–12, which was to ensure equitable and consistent treatment of students when institutions offer trial periods of enrollment in academic programs, after which time the student would be responsible for program charges and would, if otherwise eligible, become eligible for title IV assistance.

In general, a "trial period" is the beginning of the student's attendance in an eligible program where the institution has not admitted the student

---

[79] 87 FR at 41983.
[80] *Ibid.*

[81] 81 FR at 75940.
[82] *https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2011-06-07/gen-11-12-subject-trial-periods-enrollment.*

as a regular student. While the details of each program may vary, the trial period of attendance is part of the eligible program, and academic credit earned by the student will count toward the student's completion of that program if the student becomes a regular student after the trial period. Because this trial period is part of the eligible program if the institution admits the student as a regular student after the trial period, total charges for the eligible program would include the trial period, and, if otherwise eligible, the student could receive title IV funds for the trial period. At the end of the trial period, the student has the option to leave, incurring nominal fees (such as an application fee) or no charges. If the student elects to continue beyond the trial period, the student is eligible for title IV funds back to the beginning of the program.

The Department declines to incorporate the safe harbor provision that the commenter suggests. A safe harbor would allow institutions that have trial periods the ability to engage in aggressive recruitment as an act that could rise to a defense to repayment and borrowers would be unable to assert that conduct as an act that could give rise to a defense to repayment. The Department does not share the commenter's view that trial periods prevent the pressured decision-making envisioned in these regulations, because an institution could still engage in aggressive recruitment even if it offers a trial period. Regardless of whether a student decides to continue enrollment beyond the trial period, that student must be able to make an informed decision about continuing enrollment without unnecessary duress.

While the Department disagrees with the commenter's suggestion to eliminate the application of aggressive recruitment altogether during a trial period, we have combined proposed § 668.501(a)(1) and (2) into a single item related to pressuring a student to enroll, including falsely claiming that a student would lose the opportunity to attend. This removes the mention of enrollment on the first day, which the commenter had suggested removing. It also addresses other comments concerned about the vagueness of specific terms in § 668.501(a)(1).

*Changes:* None.

*Comments:* A few commenters suggested revising the definition of "representatives" for the purposes of aggressive recruitment.

*Discussion:* We disagree with the suggestion made by these commenters. This language is modeled on Part 668, subpart F, which also mentions a

representative without a definition and has been in place for years. The Department believes the plain meaning of this term in the context of the HEA and our regulations is clear and that an institution should know the individuals or entities acting as representatives on its behalf.

*Changes:* None.

*Comments:* A few commenters suggested better defining "prospective student" in the context of aggressive recruitment. These commenters state that while the intent appears to be limiting the use of deceptive advertising, drawing the definition of a prospective student so broadly as to include anyone who has viewed or received an institution's advertising is impractical.

*Discussion:* The Department appreciates the concerns of the commenters, but we believe the revised definition of a BD claim addresses this concern. The definition of a prospective student for the purposes of aggressive and deceptive recruitment is the same as the one in § 668.71. There, prospective student is defined as any individual who has contacted an eligible institution for the purpose of requesting information about enrolling at the institution or who has been contacted directly by the institution or indirectly through advertising about enrolling at the institution. However, there would still need to be an overall finding that the aggressive and deceptive recruitment occurred and that it caused detriment to the borrower that warrants relief. Those added requirements will protect against immaterial instances of otherwise well-meaning recruitment.

To ensure the community has an adequate definition of prospective student for purposes of subpart R, the Department will incorporate the definition of prospective student as defined in § 668.71.

*Changes:* We are adding a new paragraph in § 668.500(c) that defines prospective student for purposes of subpart R. The Department will incorporate the definition in § 668.71.

*Comments:* A few commenters wrote in noting that the provision in § 668.501(a) related to the use of abusive or threatening language was reasonable. They did, however, raise concerns about the subjectivity of what might fall under this standard and asked for requirements that any approval under this prong require objective documentation.

*Discussion:* Evaluating a BD claim is not a formulaic process. Each individual or group claim will raise its own allegations and evidence that requires a

fact-specific and tailored review. Those reviews inevitably require judgment by the individuals reviewing the claims, but the process for adjudicating a borrower defense claim and the standards a claim must meet are designed to ensure consistent decision-making—a process that addresses the commenters' concerns. First, the Department will review the application to ensure that it is materially complete. This will ensure there is enough detail for an institution to respond to the allegations. Second, the institution would have an opportunity to respond to those allegations. It would have an opportunity to both refute whether it thinks the abusive or threatening language occurred as well as whether if such action occurred, whether that action met the overall standard of causing detriment to the borrower that warrants relief. This produces evidence from both parties for consideration. Third, the Department would have to review that evidence. Fourth, the Department would have to conclude both that abusive or threatening language occurred and that the abusive or threatening language caused detriment to the borrower that is of a nature and degree that warrants relief. We believe this approach captures a process where the Department can make an objective determination as to whether a school's use of threatening or abusive language or behavior merits an approved BD claim under these regulations.

*Changes:* None.

*Judgments Against Institutions and Final Secretarial Actions*

*Comments:* Several commenters expressed support for the inclusion of judgments and final Secretarial actions as part of a strong Federal standard.

*Discussion:* The Department agrees with the commenters about the importance of these items and appreciates their support.

*Changes:* None.

*Comments:* Several commenters requested that the Department remove judgments from the Federal standard. They argued that a judgment is not an act or omission. They also argued that the judgment should preclude additional claims to avoid violating principles of collateral estoppel, including granting a discharge under borrower defense.

*Discussion:* The Department disagrees with the commenters. As we explained in the NPRM, including judgment against an institution as part of the Federal standard would allow for recognition of State law and other Federal law causes of action, but would

also reduce the burden on the Department and borrowers of having to make determinations on the applicability and interpretation of those laws. In addition, although a judgment is not itself an act or omission, it is necessarily based on acts or omissions. Relief is thus appropriate if those and the other factual findings essential to a judgment also support a BD claim.

We also decline to incorporate a bar on borrower defense claims if the borrower has sought or obtained independent relief from the school itself. Because different underlying legal or factual bases may have been involved in the judgment, the borrower could still raise a defense to repayment and have a valid claim that the institution otherwise engaged in an act or omission. Likewise, there are many potential actions that borrowers could have against schools that provide remedies that complement a defense to repayment rather than supplant it. The Department will, however, follow established principles of collateral estoppel in its determination of borrower defense claims, which reflects past Department practice.[83]

*Changes:* None.

*Comments:* Commenters suggested that judgments against institutions should be revised to clarify that the judgment must include a specific determination as to the act or omission of the institution that relates to the borrower defense claim and that the portion of the judgment relating specifically to the act or omission must have been favorable to the student borrower. Commenters also argued that solely saying a judgment had to be in connection with borrowing a loan was too broad and vague or that judgments themselves should not be sufficient bases for BD relief. A few commenters urged the Department to clarify that judgments obtained by State attorneys general are also included, even though such actions are not class actions, and the borrower would not be considered a party to the case. These commenters suggested that the rationale for approving a BD claim due to a contested judgment in a class action applies just as forcefully to a judgment obtained by a State attorney general. Other commenters suggested that allowing all favorable judgments to establish a BD claim ensures that borrowers will be able to obtain relief as a consequence of litigation, even if the judgment ultimately is uncollectible. Commenters also asked how a settlement that did not include an admission of wrongdoing would be considered.

*Discussion:* The final regulations provide that judgments obtained against an institution based on any State or Federal law may be a basis for a BD claim, whether obtained in a court or an administrative tribunal of competent jurisdiction. Under these regulations, a borrower may use such a judgment as the basis for a BD claim if the borrower was personally affected by the judgment, that is, the borrower was a party to the case in which the judgment was entered, either individually or as a member of a class. To support a BD claim, the judgment must pertain to the making of a Direct Loan or the provision of educational services to the borrower. We do not believe that further clarification is necessary because the judgment, itself, would have to be connected to the provision of educational services for which the loan was provided, or the institution's act or omission relating to the borrower's decision to attend or continue attending the institution or the borrower's decision to take out a Direct Loan. Absent that qualifier, the borrower would not have a defense to repayment claim on this basis. As we explained in the NPRM, the favorable judgment against the institution would still be required to relate to the making of the Federal student loan to ensure that the scope of the judgment justifies approval of a BD claim. 87 FR at 41896. That is, the judgment must necessarily include factual findings that may stand in the place of the factual findings required for an approved BD claim.

The Department does not believe that further elaboration is necessary regarding the inclusion of a judgment obtained by a governmental agency, such as a State attorney general, in the universe of acceptable judgments that could form the basis for a defense to repayment. Existing regulations at § 685.222(b) provide that the governmental agency (in the case of a State attorney general) that obtains a favorable judgment against the institution based on State or Federal law in a court or administrative tribunal, in connection with the provision of educational services for which the loan was provided or the institution's act or omission relating to the borrower's attendance, could assert this basis as a defense to repayment. Therefore, no further clarification is needed.

Finally, a settlement is not a judgment and thus would not be captured under this provision. The Department could, however, consider underlying evidence that may have been used, produced, or considered as part of a settled lawsuit's filings or proceedings as part of the process for adjudicating a borrower

defense claim under other elements of the Federal standard.

*Changes:* None.

*Comments:* A few commenters requested that the Department clarify that the judgment against the school needs to relate to the BD claim. Another commenter requested that a judgment against an institution should only be considered if the basis of the judgment was due to conduct by the school that would give rise to a BD claim under the Federal standard and that the favorable judgment alone should not be the basis of the BD claim.

*Discussion:* We concur. Consistent with our position that a breach of contract must relate to the BD claim, the act or omission by the school is the class action or judgment itself. We are clarifying, however, that the judgment against the school must be related to the BD claim. A favorable judgment against an institution, alone, from a court or tribunal of competent jurisdiction that was unrelated to a BD claim would not be sufficient.

*Changes:* We revised § 685.401(b)(5)(i) to state that a borrower has a defense to repayment if the borrower, whether as an individual or as a member of a class, or a governmental agency has obtained against the institution a favorable judgment based on State or Federal law in a court or administrative tribunal of competent jurisdiction based on the institution's act or omission relating to the making of a covered loan, or the provision of educational services for which the loan was provided.

*Comments:* A few commenters suggested that the Department clarify what constitutes final Secretarial sanctions or other adverse actions against the institution in § 685.401(b)(5)(ii). Other commenters raised questions about how the failure to meet cohort default rate requirements could lead to an approved BD claim. Commenters also asked for clarity about how an administrative capability finding could connect to a BD claim and said they were concerned about the breadth of that part of the regulations when coupled with what they described as a vague description of educational services. Finally, a few commenters raised concerns that this provision may encourage institutions to challenge Department findings they previously would have agreed to, increasing the cost to institutions and the Department around other oversight work. Alternatively, other commenters argued that the possibility of approved BD claims could force institutions to settle some of these actions to avoid the consequences of losing a challenge.

---

[83] 81 FR at 75942–43.

*Discussion:* The goal behind the process based on final Secretarial actions is to clarify the connections between oversight actions taken by the Department and the approval of BD claims if the conduct that led to those sanctions would also give rise to a BD claim. To accomplish that goal, we have clarified the description of a final Secretarial action under § 685.401(b)(5)(ii) to state that this will only encompass actions under part 668, subpart G, the denial of an institution's application for recertification or revoking the institution's provisional program participation agreement under § 668.13. We further note that those actions must be based upon acts or omissions by an institution that could rise to a BD under the standards for substantial misrepresentation, substantial omission of fact, breach of contract, or aggressive and deceptive recruitment.

This exhaustive list and the explicit mention of a connection to a BD claim will provide the clarity requested by commenters. It also results in the removal of the provisions where commenters raised concerns about a lack of clarity.

This list represents the most serious and significant actions that the Department takes against a participating institution. Institutions already would have significant interests in challenging these actions, especially those that could result in loss of participation in the Federal student financial aid programs. Accordingly, this provision does not present the risk raised by commenters that institutions might challenge actions they would not otherwise contest. Similarly, given the seriousness of these actions, it is unlikely that the possibility of a related BD claim will encourage institutions to attempt settlement just to avoid the findings.

*Changes:* We revised § 685.401(b)(5)(ii) to state that a borrower has a defense to repayment if the Secretary took adverse actions against the institution under a subpart G proceeding, denied an institution's application for recertification or revoked the institution's provisional program participation agreement under § 668.13 for reasons that could give rise to a BD claim under substantial misrepresentation, substantial omission of fact, breach of contract, or aggressive and deceptive recruitment.

*Comments:* Commenters argued that the inclusion of final Secretarial actions as the basis for a BD claim did not specify any acts or omissions that could appropriately give rise to an approved borrower defense claim. They also

argued that including this solely as a way of reducing burden was an insufficient rationale. They also expressed concerns about a lack of due process for final Secretarial actions.

*Discussion:* The Department disagrees with the commenters. The acts or omissions in question would still be subject to the elements of the Federal standard related to misrepresentation, omission, breach of contract, aggressive and deceptive recruitment, or judgment. The inclusion of final Secretarial actions relates to drawing a clearer connection to when the Department already takes a final action that relates to those items. Doing so provides greater clarity about how, for example, a denial of an institution's application for recertification because of a misrepresentation then connects to borrower defense relief. As for issues related to due process, all of the actions contemplated in the definition of a final Secretarial action already provide for extensive due process for institutions. This includes opportunities for challenging the grounds for the action that would in turn also lead to the approved borrower defense claims.

*Changes:* None.

*State Law Standard*

*Comments:* A few commenters urged the Department to allow borrowers to assert claims under the State law standard at the same time they assert claims under the Federal standard. They argued that it was too long for borrowers to wait up to 3 years for a review under the Federal standard, plus an indeterminate period for reconsideration under the State standard. They suggested that the Department could still choose to adjudicate claims under the Federal standard first.

Other commenters argued that the Department should limit application of the State law standard to borrowers with loans that would otherwise be covered under the 1994 regulations. They argued that the Department's rationale for including a State law standard, at most, justified its inclusion only for loans covered by the 1994 regulation. A few commenters argued for the complete elimination of the State law standard. Some commenters also argued against the use of a State law standard saying that it runs counter to the Department's arguments about streamlining the borrower defense process, that the Department lacks the ability to review State laws, and that inclusion of a State law standard violates principles of federalism.

*Discussion:* In the NPRM, § 685.401(c) provided that a violation of State law

could form the basis for a BD claim but only upon reconsideration. That meant State law could only be used after a claim was denied in whole or in part and if the Department received a request for a claim to be reconsidered. Similarly, § 685.407, provided that only an individual borrower, or a State requestor in the case of a group claim brought by a State requestor, could request reconsideration of the Secretary's full or partial denial of a claim.

As we explained in the NPRM, during negotiated rulemaking non-Federal negotiators proposed that violations of State law be included in the initial adjudication as one element of the Federal standard. The Department believed such an upfront analysis would be unduly burdensome and would delay relief to borrowers whose claims merited approval.[84] The Department reasoned that a strong Federal standard in the initial adjudication would also minimize confusion for borrowers.

In applying these regulations, the Department will first adjudicate the claim under the Federal standard in § 685.401(b) which we believe will resolve most claims that would be approved under either the Federal or State standard. Where adjudication under the Federal standard does not result in an approval, the State law standard is available to certain borrowers as part of the reconsideration process. Where applicable, both third-party requestors and individual claimants will be able to request application of a State law standard upon reconsideration.

The Department, however, is persuaded by both public comments and consideration of operational needs that determinations under State law should be limited to reconsideration for loans disbursed prior to July 1, 2017. On the first point, the Department has articulated that one of its goals in issuing this regulation is constructing a single Federal standard that can ensure consistency in decision-making across all claims pending on July 1, 2023, or received on or after that date. Adopting a single Federal standard provides clarity to borrowers who file an application so they know what standards will apply to their claim. The current lack of a uniform Federal standard for all claims risks substantial borrower confusion regarding the necessary elements for a successful claim. Those elements could vary widely depending on the applicable state law, which might also be unclear due to ambiguity from choice-of-law

[84] 87 FR at 41907.

issues. Adopting a single Federal standard also provides predictability to institutions and ensures more consistent decision-making by the Department, which will be using the same policies and procedures to review all claims. The use of a State law standard is necessary, for at least some period of time, because claims filed by all borrowers with loans disbursed prior to July 1, 2017 would currently be subject to that standard. However, the number of claims in that category will fall over time as those loans are paid off, while the number of claims from more recent years will grow as time passes. The relative share of claims that are potentially reviewable under two sets of standards should thus decline over time with the structure of this final rule. The indefinite inclusion of a State law standard works against that goal. It would mean that all loans in perpetuity are eligible for reviews under both a Federal and a State standard. This would undermine the goals of simplification and consistency because the latter option would vary based upon their state of residence, the school's location, and the manner in which they communicated and engaged with the school.

The ongoing usage of a State law standard also represents very significant operational challenges for the Department. For one, State laws frequently change. That would require the Department to regularly confirm laws haven't changed, and if they have, determine the dates that such alterations occurred and how they might affect borrowers, including those with pending claims. That would add a very significant amount of work and require the continual monitoring and analysis of all 50 State laws, plus the District of Columbia, Puerto Rico, and the territories. For each claim the Department would also have to conduct a choice-of-law analysis and confirm that we have the evidence needed to apply the relevant law selected. This all adds significant time and complexity to the claims resolution process. The Department is particularly concerned about the potential added time because this rule limits how much time the Department may take to decide applications or else declare the loans unenforceable. While the timelines established in these regulations do not include time for reconsideration, both initial decisions and reconsiderations will draw from the same pool of resources and personnel. (The actual staff that conduct the reconsideration of a given borrower's claim would be different than the one that did the initial

review). A potentially extensive number of reconsideration requests, all of which necessitate a more detailed legal review could jeopardize the Department's ability to meet the timelines for initial decisions or result in borrowers waiting inordinate periods for reconsideration decisions.

The indefinite inclusion of a State law standard also runs the risk of inaccurate decision-making. Adopting a Federal standard allows the Department to conduct training and ensure that its reviewers are applying consistent approaches and protocols to claims. It is unrealistic to be able to train all reviewers on 50-plus State standards. The result is there is greater risk that the decision made by one reviewer may be different when considering State laws.

For all the reasons identified above, we will keep the ability to bring a reconsideration request under the State law standard for loans disbursed prior to July 1, 2017. As noted, these borrowers already have access to State law review under the 1994 regulation and this leaves their treatment unchanged. This limitation will also result in a single Federal standard for all new loans issued over the last 5 years and into the future. Because borrowers with loans disbursed prior to July 1, 2017, always had access to a State law standard, it is not possible to fully eliminate this element, as requested by a few commenters.

Substantively, this limitation on the application of State law in the consideration of BD claims will not result in a material change to the likelihood that a borrower's claim will be approved. That is because the rule's unified Federal standard reflects elements of a variety of State laws, but its core elements—actionable conduct, causation, and detriment—are basic elements of fraud- or deception-based causes of action. The Department does not believe that an equivalent remedy would be available to a borrower under any individual State standard that is not available under the Federal standard.

Indeed, many State laws are narrower than the Federal standard. For instance, claims for common law fraud or violations of applicable UDAP statutes in many states require proof of intent, knowledge, or recklessness— requirements that are not present in the Federal standard. Many State-law causes of action also require particularized proof of causation-related elements such as reliance. The Federal standard employs a general causation element that does not force claimants to satisfy individual steps in the causal chain with a particular form of proof. Some State laws also demand a more

detailed showing of loss or harm to the borrower than the approach adopted by the Department. The Department also notes that, in conventional civil litigation, a plaintiff may principally benefit from invoking a certain State law due to the additional remedies available, which is not relevant here, because the available remedies are the same for all successful BD claims.

Therefore, the Department will limit the availability of the State law standard to reconsideration requests relating to loans that were first disbursed before July 1, 2017.

*Changes:* We revised § 685.401(c) to state that a borrower has a defense to repayment under the applicable State law standard, but only for loans disbursed before July 1, 2017, and only upon reconsideration as described under § 685.407.

*Limitations Period for Filing a Claim*

*Comments:* The Department received comments with differing opinions on whether borrowers should only be able to file a defense to repayment claim within a set period. Several commenters supported the Department's proposal to allow borrowers to submit a claim at any point. Other commenters asserted that there should be clearer statutes of limitations [85] for pursuing claims. These commenters expressed concerns that the absence of any meaningful limitations period contradicts existing public and judicial policy, which strongly favors statutes of limitation, and they asserted that a reasonable limitations period would guard against the litigation of stale claims, reduce the risk of an erroneous discharge and spare institutions the unfair task of defending an old claim. Commenters also argued that it was unreasonable to have a statute of limitations beyond the 3-year record retention requirement for student financial aid records. They said the longer period for filing a claim means that institutions must maintain records for longer than would be appropriate. They also disagreed with the Department's position in the NPRM that the most relevant records for adjudicating a BD claim would not be subject to a 3-year retention requirement. Commenters also argued that the requirement in the 2019 regulations that borrowers file a claim within 3 years of leaving an institution gave borrowers sufficient time to decide whether to raise a claim, especially if the act or omission in question occurred during the admission process and the

[85] Throughout this document, we use the term "statute of limitations" interchangeably with "limitations periods."

borrower attended the school for multiple years. These commenters also argued that, while the Department cited concerns about administering a statute of limitations, it did not sufficiently explain why a bright-line standard of 3 years after leaving school was not administrable. Finally, commenters argued that the lack of a statute of limitations, coupled with the reconsideration process, meant that institutions would lack any finality on claims.

Conversely, other commenters stated that many borrowers do not find out about their right to a discharge, or how to apply, until much later, which is often when the student is no longer enrolled at the institution, and these commenters supported the Department's proposal that borrowers with an outstanding loan balance would not be subject to a limitations period.

*Discussion:* The Department has concluded that there should be no statute of limitations for filing a BD claim, so long as the borrower still has outstanding loans related to attendance at the institution whose conduct the borrower is asserting could give rise to a discharge. As long as a borrower has an outstanding loan, they still face the possibility of delinquency, default, and the negative outcomes associated with those statuses, as well as the cost of making their monthly loan payments.

This position makes BD discharges consistent with all the other discharge opportunities available in the Direct Loan Program, such as closed school discharges, total and permanent disability discharges, and false certification discharges.

The Department reiterates the points raised in the NPRM regarding the operational challenges of administering a limitations period that varies by State or that requires a determination of when the borrower knew or could credibly have known about the act or omission.[86] With regard to the proposed bright-line standard of 3 years, this would still create operational difficulties because the starting point for a limitations period would still vary based on when the borrower left the school. The Department is also concerned that many of the schools against which it has approved BD claims to date have kept poor records. Poor record-keeping raises the risk that the limitations period—and ultimately the correct refund amount—would be improperly calculated due to mistakes by the school that cannot be corrected. This is not a speculative concern but is grounded in the Department's experience processing BD

discharges. For example, the Department discovered while processing eligibility for discharges for former students at Marinello Schools of Beauty that the enrollment periods reported by the school and the periods covered by loans did not always line up. The Department also has found that some schools do not accurately report the correct Office of Postsecondary Education Identifier (OPEID) for locations that their students attended, which raises the risk of applying the limitations period incorrectly. For example, Corinthian Colleges often reported students going to campuses other than those they actually attended, which makes it difficult to accurately apply a limitations period. This is an important consideration because the Department's initial findings around falsified job placement rates at Corinthian covered different periods by the campus. Inaccurate reporting by campus then risks that a borrower's BD claim is subject to one limitations period when in fact they should be subject to a different one. Similarly, inaccurate recordkeeping of when a borrower enrolled would also risk marking someone as enrolled earlier than they actually were, potentially making a claim seem like it was filed outside the limitations period when it in fact was not. The risk then is that even a standard that appears to be a bright line on paper may in fact be inconsistently applied. This could result in the Department failing to refund payments to borrowers that it should have, or if it were to adopt a limitations period, refunding payments that in fact occurred outside the limitations period. The Department is also concerned that requiring student loan servicers, which do not have systematic access to BD applications or know when a BD application was actually submitted, to apply differing limitations periods at the borrower level will increase a high risk of error, especially if loans have transferred among companies leaving records of when exactly payments were received hard to access. For instance, if a servicer has to discharge the loans of 1,000 different borrowers and each borrower has a slightly different limitations period, then they would have to engage in a highly manual process with significant possibility of applying the wrong limitations period.

The concerns raised by institutions about the staleness of evidence, record retention requirements, lack of finality, and related issues are addressed in several ways. First, the burden is to show, by a preponderance of the evidence, that the act or omission meets

the standard to approve a BD claim. The commenters do not consider how the passage of time would also affect the evidence that could be available in favor of the claim. Second, the Department has included a separate limitations period for the recoupment of costs associated with approved discharges from institutions. As noted already, claims pending on or received on or after July 1, 2023, will be adjudicated under this rule, the Department will not seek to recoup the cost of discharges on approved claims that are outside that limitations period. Nor, as noted elsewhere in this final rule, would institutions be subject to recoupment for conduct that occurred prior to July 1, 2023, unless such conduct was separately covered under the regulations for recoupment in effect at that time.

The Department does not want to create a situation in which a borrower is still obligated to repay a loan on which the Department has concluded that the borrower should have received a discharge due to the institution's misconduct solely because the individual did not fill out an application in time.[87]

*Changes:* None.

*Comments:* A few commenters said that State law claims should be subject to relevant State statutes of limitations.

*Discussion:* We disagree. As we explain elsewhere in this document, we believe that that there should be no statutes of limitation for filing a BD claim so long as the borrower still has outstanding loans related to attendance at the institution whose conduct the borrower is asserting should give rise to a discharge. This includes acts or omissions that would give rise to a cause of action against the school under applicable State law. We find it necessary to codify this position in the regulatory language in § 685.401(c) to make clear that there is no limitations period for a claim under the Federal standard or State law standard. The operational considerations outlined in the response about the lack of a limitations period for a Federal standard also apply with regard to State law adjudication. Furthermore, the operational issues would be magnified because the limitations would also vary by the State whose law the Department used for adjudication under a State law standard.

*Changes:* We have revised § 685.401(c) to state that borrowers who assert a defense to repayment under a State law standard do not have a limitations period for filing a claim. A borrower with a loan disbursed prior to

App.368

July 1, 2017, may assert, at any time through the reconsideration process, a defense to repayment under a State law standard of all amounts owed to the Secretary.

*Exclusions*

*Comments:* Commenters expressed differing views on the conduct that should be excluded from consideration as grounds for a BD claim as outlined in § 685.401(d). A few commenters expressed support for the Department's position that an institution's violation of an eligibility or compliance requirement in the HEA or its implementing regulations would not alone give rise to a BD claim. They, however, asked the Department to delete the phrase "unless the violation would otherwise constitute a basis for a borrower defense under this subpart," deeming it unnecessary.

Other commenters argued that the Department should explicitly state it is not excluding violations of civil rights laws that relate to the making of a Federal student loan for enrollment at the school or the provision of educational services. They pointed to ongoing litigation in cases that involve the Civil Rights Act and the Equal Credit Opportunity Act and noted that judgments on those grounds would give borrowers a defense under the Master Promissory Note.

*Discussion:* The Department appreciates the commenters' ideas but believes that additional changes are not necessary. With respect to deleting the clause in § 685.401(d), the Department believes this language is a helpful reminder that were these violations to be part of another ground for a BD claim, such as a misrepresentation, they could be included.

We disagree with the request to include civil rights laws more explicitly as grounds for a BD claim. Both cases cited by the commenters involve allegations of misrepresentations, which are already a component of the proposed Federal standard. Moreover, the Department's Office for Civil Rights has existing statutory authority to address civil rights violations.

*Changes:* None.

**Borrower Defense to Repayment— Adjudication (§§ Part 685, Subpart D)**

*Group Process and Group Timelines*

*Comments:* A few commenters stated that the HEA does not permit the Department to proactively certify a group of borrowers and initiate a proceeding without any BD claim filed or any showing that a borrower relied upon or was harmed by some act or omission of the institution. These commenters cited the recent Supreme Court ruling in *West Virginia* v. *EPA,* which stated that "[a]gencies have only those powers given to them by Congress, and 'enabling legislation' is generally not an 'open book to which the agency [may] add pages and change the plot line.'" [88] The commenters rationalized that since Congress did not explicitly include a group process in the borrower defense provision in the HEA, then the Department should not be making radical and fundamental changes to the BD scheme, including initiating a group process. These commenters argued that the Department should remove the language permitting group claims.

*Discussion:* The Department disagrees with the commenters' assertion that the proposed group process violates the HEA. The Department similarly rejected this argument in 2016. The Department's statutory authority to enact BD regulations is derived from Sec. 455(h) of the HEA, 20 U.S.C. 1087e(h), which states that "the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan. . ." While the language of the statute refers to a borrower in the singular, it is a common default rule of statutory interpretation that a term includes both the singular and the plural, absent a contrary indication in the statute. [89] We believe that, in giving the Secretary the discretion to "specify which acts or omissions" may be asserted as a defense to repayment of loan, Congress also gave the Department the authority to determine subordinate questions of procedure, such as what acts or omissions alleged by borrowers meet the Department's requirements, how such claims by borrowers should be determined, and whether such claims should be heard contemporaneously as a group or successively, as well as other procedural issues. [90]

Congress clearly contemplated group discharges for BD claims. Section 703 of the Consolidated Appropriations Act of 2021 (Pub. Law 116–260) amended the HEA to restore Federal Pell Grant eligibility during a period for which a student received a loan, and that loan is discharged "due to the student's successful assertion of a defense to repayment of the loan, including defenses provided to any applicable groups of students." Clearly, Congress envisioned a group BD process, including a group discharge process.

The Supreme Court's holding in *West Virginia* does not implicate the Department's inclusion of the group process to adjudicate BD claims. In *West Virginia,* the Supreme Court invalidated one aspect of the EPA's Clean Power Plan because the Court concluded the rule reflected a new and unprecedented change in how emissions would be measured, which would amount to a "wholesale restructuring" of the energy sector with little statutory language justifying the authority to do so. [91] There is no such issue here. BD claims invoke a defense to repayment that Congress created and that the Department clearly has the discretion to define and operationalize. That legislatively created defense will exist irrespective of Department regulations, as will the hundreds of thousands of BD applications that we have received in recent years. That is categorically different than the EPA rule that the Supreme Court considered in *West Virginia.* Finally, a process to consider certain claims in groups has existed since 2016 and was confirmed by Congress in the 2021 amendments mentioned above.

As noted earlier in this document, the general provisions granted to the Secretary in GEPA and the Department's organic act, along with the provisions in the HEA, authorize the Department to promulgate regulations that govern defense to repayment standards, including the initiation of a group process. And as we stated in 2016, and we reiterate again, in addition to giving the Secretary the discretion to "specify which acts or omissions" may be asserted as a defense to repayment of loan, Congress also gave the Department the authority to determine such subordinate questions of procedure, such as the scope of what acts or omissions alleged by borrowers meet the Department's requirements, how such claims by borrowers should be determined, and whether such claims should be heard contemporaneously as a group or successively, as well as other procedural issues. [92]

*Changes:* None.

*Comments:* Many commenters supported the Department reinstituting the group process for BD claims. A few commenters stated that requiring States to submit an additional request for consideration of group discharge applications under a State law standard is unnecessary and duplicative.

---

[88] 142 S. Ct. at 2608.

[89] *See* 1 U.S.C. 1.

[90] *FCC* v. *Pottsville Broad. Co.,* 309 U.S. 134, 138 (1940); *see* 81 FR at 75965.

[91] 142 S. Ct. at 2608.

[92] *Pottsville Broad. Co.,* 309 U.S. at 138; *see* 81 FR 75965.

*Discussion:* The Department thanks the commenters for their support for the group process. The Department discusses the State law standard elsewhere in this document.

*Changes:* None.

*Comments:* Several commenters argued that the Department could not form a group claim because claims must have individual showings of harm or reliance in order to be approved. Some argued that the Department could only form a group claim in limited circumstances in which the acts or omissions in question did not require individualized proof.

*Discussion:* As discussed in the NPRM as well as in this final rule, the Department disagrees that borrowers have to show individualized harm or reliance. There is nothing in the law that requires the Department to only process discharge claims on an individual borrower basis. The Department has in the past adjudicated group discharge claims where large numbers of borrowers were in the same situation. A group approach is more efficient for the Department and saves resources. Borrower defense claims are particularly appropriate for a group claim process since, in many cases, the error or omission of the institution is likely to have affected more than a single borrower and it would be inefficient for the Department to adjudicate large numbers of individual claims relying on the same facts and circumstances on a one-by-one basis.

*Changes:* None.

*Commenters:* A few commenters wrote in opposing the group claim on the grounds that the process lacked impartiality. They said the group process should require an ALJ or some other kind of neutral party. They argued that having the Department decide on whether to form the group and whether to approve it put in the role of both plaintiff's counsel and judge.

*Discussion:* The Department disagrees with the commenters. Just like individual adjudications, the group process is a method for the Department to decide whether to discharge outstanding loan obligations owed by borrowers. The institution is not a direct party in that consideration. If the Department attempts to recoup the amount of approved discharges resolved through a group process, the institution would have a full and fair opportunity to challenge the liability before an independent hearing official. This is different approach from that adopted in the 2016 regulation in which the group claim was resolved in the same procedure as the determination of the institution's liability. In that process,

the involvement of the hearing official made sense because the school's liability was directly implicated. The separation of approval from recoupment thus addresses the concerns about impartiality raised by institutions.

*Changes:* None.

*Comments:* Some commenters stated that the Department's group process proposal fails to specify adequate criteria for when a group process is appropriate. One of these commenters argued that criteria like commons facts and evidence was merely a threshold consideration and concerns like promoting compliance was vague and not a sufficient rationale for forming the group.

*Discussion:* We disagree with the commenters. The factors laid out in § 685.402(a) represent a sensible list of considerations that establish the use groups in situations in which acts or omissions were sufficiently widespread to affect a definable group of borrowers. While the commenter dismisses the concept of common facts or evidence, this is an important starting point. When facts, evidence, and legal issues are unlikely to apply group-wide, then the claims should be adjudicated individually. Similarly, the consideration of acts or omissions that are pervasive or widely disseminated adds further supports making group-wide determinations. Such cases are well suited for group treatment, which makes more sense than repeating substantially similar determinations in a series of individual adjudications. The list of factors thus represent items that speak to the core purpose of a group adjudication.

We similarly disagree about the lack of clarity for group claims based upon third-party requests. We specify in § 685.402(c) the criteria for when a third-party requestor may request the Secretary to form a group, and the documentation that must be submitted with such a request, including information about the group; evidence beyond sworn borrower statements that supports each element of the claim; and identifying information about the affected borrowers to the extent that information is available. While we customarily do not prescribe such granular details in regulations, we listed the application criteria in this instance, so requestors know exactly what to submit and the Department official knows what to consider in evaluating the appropriateness of forming a group.

In response to the commenters' concerns, and to provide interested parties with even more detail, the Department has revised the requirement that a third-party requestor must

provide evidence beyond sworn borrower statements that supports each element of the claim, to specify that such evidence must include, but is not limited to, evidence demonstrating that the conduct is pervasive or widely disseminated. While we do not prescribe what would constitute evidence beyond sworn borrower statements for the purposes of forming a group under this paragraph, we believe that this further clarification will provide requestors guidance while allowing the Department official to assess each group request on a case-by-case basis. The Secretary retains the authority and reserves the right to request other information or supporting documentation from the third-party requestor.

*Changes:* We revised § 685.402(c)(1) to reflect that a third-party requestor must provide evidence beyond sworn borrower statements that supports each element of the claim made in the application, including but not limited to, evidence demonstrating that the conduct is pervasive or widely disseminated.

*Comments:* A few commenters requested that institutions be allowed to review a State requestor's request to the Secretary to form a group under § 685.402(c). Other commenters raised concerns that institutions would not receive copies of decisions related to group claim requests from State requestors.

*Discussion:* As we note above, we are including a new definition of third-party requestors to include State requestors and legal assistance organizations. We agree that providing the institution an opportunity to review a third-party requestor's request to the Secretary would be valuable before determining whether to form a group. This will provide the Secretary adequate information to better determine whether a group should be formed, and if so, the proper definition of the group. After the institution is apprised of the third-party requestor's request to form a group, the institution will have 90 days to respond. Institutions will still be afforded the opportunity to respond to the Department official on any group after it is formed in accordance with § 685.405. Institutions will also be given a copy of the decision on whether to form a group under § 685.402(c).

Affording this additional opportunity for institutional response to a group formation, as well as the changes discussed earlier to allow legal assistance organizations to request consideration of a group claim means the initial review of group requests will take longer prior to issuing a decision

on whether to form the group. The Department anticipates that the number of group requests will increase. Because of this new opportunity, the Department will adjust the deadline by which the Department will respond to both the third-party requestor and the institution under § 685.402(c) to within 2 years of receipt of a materially complete group request. This is an increase from the 1-year timeline in the NPRM.[93] The Department extended this timeline because the inclusion of third-party requestors from the legal assistance community means the possible number of requests for considering a group claim could be substantially higher than anticipated in the NPRM. The inclusion of an additional institutional response period in the group also increases the amount of time needed to decide whether to form a group. Thus, it would not be realistic to conduct a longer review on what could be more group claim requests within the time period specified in the NPRM. However, by getting additional information earlier in the group process, the Department will shorten the time to render a final decision on the group claim to 1 year following the formation of a group instead of the 2 years in the NPRM. 87 FR at 42008. The result is the same overall timeline of 3 years, with the breakdown adjusted to better reflect the different evidence-gathering stages.

Second, we will remove the set time limit for the Department to respond to requests for reconsideration around the formation of a group by a third-party requestor from the 90 days proposed in the NPRM. In looking further at the extent of information provided under previous requests for group claims and the number of potential additional group claim consideration requests it might receive, the Department is concerned that it will not be feasible to fully consider all the evidence that may be received in a reconsideration request within 90 days, especially while still balancing other pending requests. Accordingly, we have adjusted § 685.402(c)(6) to remove the 90-day response deadline. Instead, the Department will provide responses to the third-party requestor and institution after making a decision on the reconsideration request. This approach also mirrors the treatment of reconsideration decisions elsewhere in the regulation, which do not contain timelines for rendering a decision.

The Department has also revised the regulations to provide that institutions will receive copies of all decisions that are given to third-party requestors.

*Changes:* We have added language in § 685.402(c) to provide that the Secretary will notify the institution of the third-party requestor's application that the Secretary form a group for BD discharge consideration. The institution will have 90 days to respond to the Secretary regarding the third-party requestor's application. We are also revising § 685.402(c) to clarify that the Secretary will respond to the third-party requestor and the institution within 2 years of the receipt of a materially complete group request from the third-party requestor. We are also revising § 685.402(c) to clarify that the Secretary will also provide a response to both the third-party requestor and the institution of a reconsideration request from the third-party requestor to form a group. We are revising § 685.402(c)(6) to note that the Secretary will provide a response on the reconsideration request when a decision is reached by the Secretary. Finally, we revised the time frame for adjudicating a group claim in § 685.406(g) to within 1 year of the date the Department official notified the third-party requestor under § 685.402(c)(4).

*Comments:* A few commenters asked the Department to remove the requirement that the third-party requestor must submit evidence beyond sworn borrower statements for group claim requests.

*Discussion:* The Department declines to make the requested change. The third-party requestor process is valuable because it creates a formal mechanism for the Department to receive evidence that will help it decide whether to form a group claim. Sworn borrower statements are important, but to date the Department has found that the most useful third-party evidence also include evidence of an institution's internal policies, procedures, or training materials, data used to calculate job placement rates, marketing materials, and other similar types of evidence. This does not preclude a third-party requestor from also attaching borrower statements but setting a higher evidentiary bar for considering a group claim request ensures the Department receives strong applications.

*Changes:* None.

*Comments:* A few commenters argued that the Department should not be able to form a group that encompasses borrowers from a given State if that State did not request it. They stated that allowing States to request consideration of group claims implies that if they do not ask for a group claim the Department should not consider one.

*Discussion:* We disagree with the commenter. The ability of States to request group claim consideration provides a mechanism for sharing evidence and information that may assist the Department. There may be many reasons why the Department chooses to form a group when a State does not request it. The Department may have evidence in its possession the State does not possess, or the Department could find a violation under the Federal standard that would not be a violation under a given State's law. The State request process thus complements, rather than precludes the Department's work.

*Changes:* None.

*Comments:* A few commenters claimed the Department is using the group process to simply get around limitations on its own oversight and investigatory authorities.

*Discussion:* The Department disagrees. The Department already has a robust ability to request information from the institutions it oversees. The rule also provides processes for the Secretary to initiate group claims at his own discretion. The third-party requestor process simply creates a formal way for the Department to receive additional evidence that will ensure it is making thorough, reasoned, and evidence-based decisions on the claims it receives. Obtaining evidence in this manner will make the adjudication process more efficient. This group process will not replace other oversight work. There is no requirement that the Department attempt or conduct an investigation of an institution before considering a group claim request and so it is possible the Department will receive evidence related to institutions it was not previously reviewing or concerned about.

*Changes:* None.

*Comments:* A few commenters argued that borrowers should have the ability to opt out of a group. They likened this to provisions that allow individuals to opt out of class action lawsuit, saying the Department cannot bind absent class members. Other commenters argued that any group should require borrowers to opt in.

*Discussion:* Being considered part of a group claim is not the same as class action litigation. For one, if the group claim is denied, the borrower would maintain the ability to file an individual claim. However, the Department recognizes that there could be situations in which a borrower may not want to want to accept the forbearance that comes with the formation of a group or may want to decline a discharge associated with an approved group claim for some reason. Accordingly, borrowers will have an opportunity to

---

[93] 87 FR at 41898.

opt out of the forbearance as well as a discharge if a group is approved. Borrowers may opt out of forbearance as provided in § 685.403(d)(1) or § 685.403(e)(4) in the case of enforced collections. The Department also disagrees with the proposal to make borrowers opt into any group. One of the Department's concerns in providing a group process is ensuring that borrowers who experienced detriment that warrants relief as a result of the institution's act or omission should receive a loan discharge regardless of whether they file an application. This is consistent with other changes being made to the regulations to remove barriers for borrowers in areas such as providing for automatic closed school discharges. Adding an opt in requirement would add administrative burden and increase the likelihood that borrowers who are eligible for relief miss out on it. Moreover, an opt in process would further burden the Department without any corresponding benefit to the process.

*Changes:* We are adding § 685.408(b) to state that members of a group that received a written notice of an approved borrower defense claim in accordance with § 685.406(f)(1) may request to opt out of the discharge for the group.

*Comments:* A few commenters objected to language about forming groups that covered multiple schools at once, challenging how the Department could find commonality in such a situation.

*Discussion:* The Department does not contemplate the formation of group claims that could cover institutions that share no common ownership. Rather, it is possible that the Department may end up forming a group claim that could cover some or all of the institutions within the same ownership group. The Department has seen instances where the company that owns multiple institutional brands exerts significant centralized control such that all institutions it owns use the same recruitment tactics or methods for calculating job placement rates. Whether a group claim covers some or all of the institutions under common ownership would depend on the underlying evidence.

*Changes:* None.

*Forms of Evidence*

*Comments:* Several commenters argued that the applications submitted by borrowers should be made under penalty of perjury, given that the Department is proposing to use that requirement for the response from institutions. Commenters also noted that such a requirement is important to ensure that institutions are not being held to a higher standard than students. Similarly, commenters also asked that the application made by State requestors be signed under penalty of perjury. A few commenters also proposed that State requestors be required to indemnify institutions for damages, including the costs of defending and investigating the claim, and that State requestors waive sovereign immunity to deter any errors in a group request. The commenter suggested these changes to deter the use of group processes to influence potential settlement negotiations between a State and an institution.

*Discussion:* As we note above, we are including a new definition of third-party requestors to include State requestors and legal assistance organizations. The Department agrees with commenters that the application from the borrower and the response from the institution be made under penalty of perjury. In fact, the existing BD application already contains this requirement. Accordingly, we are updating the regulatory text to reflect this current practice. Similarly, we will adopt a requirement that group requests submitted by third parties be signed under penalty of perjury. This will also apply to reconsideration requests.

We do not believe it would be appropriate to add the other requirements for third-party requestors as requested by commenters. The group request is a mechanism for a third-party requestor to share information with the Department, which evaluates what it receives and makes its own decision about whether to form a group. Adding the requirement that parties make submissions under the penalty of perjury sufficiently ensures the information shared under that practice is truthful and accurate and ensures that every external party providing information to the Department is held to the same standard.

*Changes:* We have updated §§ 685.403(b)(1)(i) and 685.402(c)(1) to indicate that applications from individuals and requests to consider a group from a third-party requestor be made under penalty of perjury. We have revised § 685.407(a)(4) to require individual claimants and third-party requestors who request reconsideration submit their request under penalty of perjury.

*Comments:* A few commenters requested the Department clarify that a sworn borrower statement alone would be sufficient evidence to approve a BD claim.

*Discussion:* As noted in § 685.401(b), approving a BD claim requires meeting a preponderance of the evidence standard. Whether a given claim meets that standard will require an assessment of all evidence in the Department's possession. This includes evidence from the sworn borrower statement, the institutional response, and anything else in the Department's possession. Because sworn borrower statements are themselves evidence, there are situations where the evidence supporting the approval of a borrower's claim could come solely from the application submitted by the borrower. But identifying the circumstances in which that occurs can only be determined on a case-by-case basis based upon a review of the specific evidence at hand. Given that the Department already spells out the process for considering evidence and the standards involved, there is no need for additional changes.

*Changes:* None.

*Comments:* A few commenters requested the Department confirm that, when the only evidence we possess is sworn statements from the borrower and the institution, we clarify that both those statements be given equal weight. The commenters also asked the Department to clarify how it verifies that the information provided by borrowers under a sworn statement is in fact accurate. They pointed to purported instances where institutions notified the Department of inaccuracies in a borrower statement and stated they were unclear if the borrower had addressed those concerns in the Department's adjudication process.

*Discussion:* As stated in the Federal standard for BD in § 685.401(b), approving a claim requires a determination based upon a preponderance of the evidence. That means when the Department only has sworn statements from both sides, it must determine whether the statement from the borrower, weighed and considered against the opposing statement, makes it more likely than not that facts exist sufficient to establish all essential elements. This requires a case-specific assessment of the evidence received. The Department also has the ability to request additional information from either the borrower or institution as needed. Accordingly, it would be inappropriate to conclude that the sheer presence of only having a sworn statement by each party inherently means that both are equal. Such a determination cannot occur without an actual review of the statements.

*Changes:* None.

*Institutional Response Process*

*Comments:* A few commenters stated that 90 days is insufficient for an institution to respond to a borrower's BD application or a group BD claim. A few commenters requested at least 180 days to respond to a group claim.

*Discussion:* We disagree. As we explained in the NPRM, we used the program review process to inform our proposal in § 685.405 to give institutions adequate time to respond.[94] The program review process mirrors some of the same BD processes, and where appropriate, we maintained similar procedures. In this case, we believe 90 days is a sufficient time for an institution to respond, and it is already twice as generous as the response time afforded to a school during a program review.

*Changes:* None.

*Comments:* One commenter stated that as the regulations are written, there is nothing to guarantee a 90-day period for the institution to respond to a BD claim and suggested that the Department could impose a more abbreviated time frame at the Department's discretion.

*Discussion:* The Department is clarifying that institutions will have 90 days to respond to a BD claim. Although we explicitly stated that institutions would receive 90 days to respond, including our rationale for doing so, we are convinced that we need slight modifications in the regulatory text.[95]

*Changes:* We revised § 685.405(b)(2) to state that the Department official requests a response from the institution which will have 90 days to respond from the date of the Department official's notification.

*Process Based on Prior Secretarial Actions*

*Comments:* A few commenters expressed support for the inclusion of approving BD claims tied to final Secretarial actions. Other commenters expressed opposition to the proposal to approve BD claims for borrowers based upon prior Secretarial actions. They argued that the proposed text did not specify the acts or omissions that would give rise to an approved BD claim. Other commenters requested greater specificity as to the types of prior actions that would be covered by this section and were concerned that some topics mentioned, such as administrative capability, were quite broad.

Commenters also argued that tying other Secretarial actions to BD claims

could result in more lawsuits on those actions rather than settlements since it would be more worthwhile for an institution to challenge those actions. Conversely, other commenters argued that approvals tied to prior Secretarial actions could encourage too many settlements so that institutions could avoid the threat of a group claim. Commenters also raised concerns about the lack of due process procedures for claims under this process.

*Discussion:* We appreciate the support from commenters in favor of including BD claim approvals tied to final Secretarial actions. We believe the commenters opposed to this treatment of final Secretarial actions misconstrued our position in suggesting that that we did not specify the acts or omissions that could give rise to an approved BD claim. As we stated in the NPRM,[96] § 685.404 establishes a process by which we could consider prior Secretarial actions in the context of forming and approving group BD claims. We outline the acts or omissions that could give rise to a borrower defense to repayment in § 685.401.

The Department appreciates the questions from commenters about exactly what types of final actions fall under this process. We updated the Federal standard in § 685.401(b)(5)(ii) to create an exhaustive list of the types of actions that fall under this standard. Those are actions taken under part 668, subpart G, action to deny the institution's application for recertification, or revoke the institution's provisional program participation agreement under § 668.13, if the institution's acts or omissions tied to those final actions could give rise to a BD claim under § 685.401(b)(1) (substantial misrepresentation), (b)(2) (substantial omission of fact), (b)(3) (breach of contract), or (b)(4) (aggressive recruitment). We provided a longer discussion of why we are making this change in the *Definitions* section of responses to comments. However, we note that those listed actions are the most serious actions that the Department can take against an institution. All also provide ample due process before they are final. When the Department initiates an action under part 668, subpart G the institution can request a hearing before an independent hearing officer, and the proceedings vary depending on if the proposed action is a suspension, fine, emergency action, or a limitation or termination action. But every action includes the opportunity for the institution to present evidence, as well as the

possibility of in-person or written testimony by fact or expert witnesses. The hearing officer's decision may be appealed to the Secretary. And, since employing those actions for a BD claim requires them to be related to conditions that could give rise to an approved claim due to misrepresentation, omission of fact, or aggressive and deceptive recruitment, the addition of another institutional response process would repeat an opportunity to rebut the Department's arguments.

Because we have moved the definition of what actions would fall under this process to § 685.401(b)(5)(ii), we have removed the additional clarifications that were in paragraphs (a)(1) through (5) of § 685.404.

*Changes:* We have updated the definition of a final Secretarial action in § 685.401(b)(5)(ii) to limit this provision to actions under part 668, subpart G, to action denying the institution's application for recertification, or revoking the institution's provisional program participation agreement under § 668.13, based on the institution's acts or omissions that could give rise to a BD claim under paragraphs § 685.401(b)(1) through (4). We removed paragraphs (a)(1) through (5) of § 685.404 and the actions that fall under this category are now listed in § 685.401(b)(5)(ii).

*Comments:* Commenters suggested that only Secretarial final actions initiated, finalized, and resolved after the effective date of these regulations should be subject to being employed as a basis to initiate a group process under § 685.404.

*Discussion:* We disagree with these commenters with respect to the approval of BD claims filed by borrowers but agree with the commenters regarding recoupment actions against institutions. The purpose of including a process based on Secretarial actions was to codify a process that better integrates the Department's oversight and compliance work with the adjudication of a BD claim. Doing so minimizes the duplication of work, as institutions would have already had multiple opportunities to respond to similar sets of findings in final actions that could give rise to a defense to repayment claim. In short, it streamlines the process to form groups for the purpose of adjudication. As these regulations bifurcate the adjudication and recovery processes, the recoupment of amounts discharged is conducted in a separate proceeding independent of the Secretarial final action described here. Additionally, because there is no time frame for a borrower to submit a claim, it would not be prudent to restrict final

---

[94] 87 FR at 41901.
[95] 87 FR at 41901.
[96] 87 FR at 41901.

Secretarial actions for purposes of forming groups on or after the effective date of these regulations.

As we explain elsewhere in this document, the Department will not attach any new liability for institutions to actions or transactions that were permissible when the events occurred. Thus, the formation of groups under § 685.404 exists independent of any recovery action that the Secretary could take after discharging a loan. To allay institutions' concerns, the Department codified in § 685.409 that we will only initiate recovery proceedings for loans first disbursed after the effective date of regulations if we would not separately approve claims and initiate recovery under the relevant regulation in effect at the time.

*Changes:* None.

*Comments:* One commenter stated that the Department does not explain why an institution's loss of eligibility due to its cohort default rate (CDR) should result in an approved BD claim.

*Discussion:* After further review, we concur with the commenter. While failing to meet the cohort default rate standards for continued participation in the Direct Loan Program is concerning, there is not an immediate connection between that occurrence and the types of acts and omissions that would give rise to a borrower defense claim. As such, we do not think it would be appropriate to draw such a connection. If an institution's high default rates were attributable to misrepresentations, omissions, or other actions that would be better captured by the Department's separate review of relevant evidence, then that evidence, not the cohort default rate, would be the grounds for considering a BD claim.

*Changes:* We removed an institution's loss of eligibility due to its CDR as a final action that the Department official may consider when forming a group in § 685.404.

*Record Retention*

*Comments:* Many commenters stated that institutions cannot be expected to, and do not, maintain the range of records required to defend a claim in perpetuity. These commenters also cite guidance from the Department and other Federal and State agencies to destroy data when they are no longer needed in the interests of data security, observing that, the longer data is retained, the more likely it is to be breached.

Thus, a few commenters proposed a 3-year limitations period for a borrower to bring a claim which would align to the general record retention period that institutions must adhere to regarding title IV records. A few commenters also

disagreed with the Department's statement in the NPRM that the financial aid records subject to the 3-year records retention requirement were less likely to be relevant in adjudicating a claim than other records.

*Discussion:* The Department acknowledges the importance of records management, including the proper disposition of records when they are no longer needed and the appropriate transfer of such records for preservation. As we stated in the NPRM, the Department does not contemplate new record retention requirements.[97] It is unlikely that the records subject to the general 3-year record retention period in § 668.24 would be the most relevant records in question to adjudicate the BD claim. To date, most approved borrower defense claims have centered on evidence related to recruitment and admission practices, advertising campaigns, brochures, and handbooks. Specific student financial aid records have not been nearly as critical. However, if institutions are concerned about their ability to defend themselves from a BD claim, there is no prohibition on retaining records longer than the 3-year period. As we stated in 1996, which remains true now, records may always be retained longer than required by regulation.[98] Proper management of records to ensure data security and protecting institutions against claims and liabilities need not be mutually exclusive, and the Department believes institutions can accomplish these goals simultaneously.

We explain our rationale for not imposing a limitations period for a borrower to file a BD claim elsewhere in this document under the "*Limitations Period*" section.

*Changes:* None.

*Borrower Status During Adjudication/ Forbearance/Stopped Enforced Collections*

*Comments:* Several commenters expressed concerns related to pending or undecided BD claims and stated borrowers should not have to choose between submitting claims and ballooning debt. These commenters suggested stopping interest accrual on individually submitted BD claims immediately instead of 180 days after the date of submission.

*Discussion:* As we explained in the NPRM, under current practice, we cease interest accrual once a claim has been pending for 1 year. In § 685.403, we reduce that time frame to 180 days.[99]

The Department reiterates its view that allowing interest to accumulate for some period is an important measure to encourage borrowers to submit the strongest application they can since a borrower would risk several months of interest accumulation. For a borrower whose claim is ultimately approved, the accumulation of interest during this 180-day period is moot since it would be discharged anyway. Thus, the effect of the interest accumulation, which has been significantly reduced, will only be felt by a borrower whose claim is denied. Moreover, the Department notes that the elimination of interest capitalization not required by statute will also mean that the borrower will not have this unpaid interest added to their principal balance. Allowing interest to accumulate for 180 days thus strikes a balance between giving a borrower a strong financial incentive to file the strongest possible claim, without making the financial risk of having a claim denied so great that a borrower would be dissuaded from applying if they do have a strong claim.

*Changes:* None.

*Comments:* One commenter stated that the Department should not grant forbearance (or stop collections) on a borrower's FFEL loans while the Department adjudicates a BD claim. They recommended that the applicable section and reference on granting forbearance or stopping collections refer only to Direct Loans and not title IV loans generally.

*Discussion:* The Department disagrees with the commenter and declines to incorporate their recommendation. As explained in the NPRM, *see* 87 FR at 41903, the Department is concerned that stopping collections on some loans but not others would be confusing for borrowers. By placing all of a borrower's loans in forbearance or stopped collection status, the Department would be able to automate the adjudication process more easily. Section 682.211(i)(7), for example, already requires FFEL lenders to put a FFEL borrower in forbearance upon notification from the Secretary while the Department official adjudicates the BD claim. Placing all of a borrower's loans into a forbearance (or stopped collections status in the case of a defaulted loan) gives these borrowers parity across all of their title IV loans and minimizes confusion. Non-Direct Loans could be consolidated into a Direct Loan, which could be discharged after a successful defense to repayment claim. Were the Department to limit forbearance or stopped enforced collections only to Direct Loans, borrowers could be harmed by

---

[97] 87 FR at 41902.

[98] 61 FR at 60495.

[99] 87 FR at 41903.

continuing loan payments, continuing to accrue interest, or facing enforced collections while their BD claims are adjudicated.

*Changes:* None.

*Timelines To Adjudicate*

*Comments:* Many commenters supported our proposal to include definitive timelines to adjudicate a BD claim. However, some of these commenters suggested that 3 years is too long for a borrower to wait for a decision and suggested 1 year as a more appropriate time frame. Yet another set of commenters suggested that the adjudication clock should begin from the time the Department receives an application.

Other commenters believed that the timeline to adjudicate is concerning as institutions do not have control over the timeline the Department may choose to process a claim. These commenters stated that deeming loans unenforceable after a certain time frame is a misuse of tax dollars and wasteful. One commenter argued that the timelines to decide on a claim would encourage all borrowers to file a claim in the hopes of overwhelming the Department. Similarly, another commenter pointed to program reviews that have taken as long as 5 years as evidence that the Department would not be able to decide claims within 3 years.

*Discussion:* We thank the commenters for their support and reiterate our goal of giving borrowers decisions in a timely fashion. As the Department has observed in its analysis of BD applications, many borrowers waited many years to have decisions rendered on their BD claims.[100] With the timelines in these regulations, the Department commits to continue its work to process and approve or deny claims.

While a few commenters believe 3 years is too long for a borrower to wait for a claim to be decided (in the case of an individual claimant), we reiterate that a thorough review of a claim cannot be achieved in a few weeks; we also reject the proposal to reduce the time to adjudicate claims to 1 year. The BD process requires many administrative steps, including identifying borrowers in the case of a group; collecting information pertinent to the claim; providing the institution an opportunity to respond; placing the borrower's loans in the appropriate status; reviewing what can be an extensive evidentiary record; making a recommendation to the Secretary; and issuing a decision. To mitigate risk of financial harm to

borrowers who filed a claim, the Department will place all of a borrower's loans in forbearance or cease mandatory enforcement collections, with interest accrual ceasing either immediately (in the case of a group claim) or after 180 days from the date the borrower was placed in forbearance or stopped enforced collections. The Department also added a provision in § 685.406(g)(5) that after the timelines expire, the loans covered by the claims that do not yet have a decision would be unenforceable. Collectively, these guardrails provide adequate protection to the borrower while giving the Department time to thoroughly adjudicate the claim.

With regard to the commenters who expressed concerns about the Department not being able to handle the number of possible claims, we believe the changes made to a materially complete application will address this concern. While not erecting major barriers, this requirement will ensure that borrowers provide sufficient details about the institution's acts or omissions such that there will be a baseline level of quality in applications that go through the full adjudication process and that those applications contain the details needed to fairly adjudicate them. The goal of ensuring applications contain sufficient information for adjudication is reflected in existing regulations permitting the Department to seek further details from the borrower;[101] the provisions on materially complete applications give more affirmative guidance to applicants on the level of detail that an application should include.

In this context, the Department recognizes that the interaction of the materially complete application provision and establishing July 1, 2023 effective date for then-pending applications could cause confusion surrounding the timeline for a borrower to receive a decision. To address this concern, we have clarified that the timeline for a decision on an individual application will be the later of July 1, 2026 or 3 years from the date the Department determines the borrower submitted a materially complete application. For applications that are pending on July 1, 2023, and that are not materially complete—that is, applications that lack sufficient information to adjudicate the claim—the Department will contact the applicant with an explanation of the details

needed to make out a materially complete application. This, however, is not a novel requirement or a departure from existing standards. The material-completeness threshold merely sets forth clearer guidance on the details needed to facilitate continued adjudication. Indeed, under existing regulations, applications that lack such details would prompt a request for further information or have a higher likelihood of a denial.[102]

With respect to the commenter who suggested that the timeline should begin upon receipt of an application, we decline to adopt this proposal. Determining that an application is materially complete ensures the Department has the information it needs to fully review a claim under the Federal standard. An incomplete application may be missing key details that must be received to continue the process. Having the Department bind itself with deadlines for review of claims thus makes the most sense to start from when the borrower has given us enough information to start other parts of the adjudication process, such as the institutional response.

We understand that commenters are concerned about timelines over which institutions may feel they have no control. When crafting these timelines, however, we considered the institution's stake in the lifecycle of a BD claim and have made adjustments described elsewhere in this document to accommodate institutional concerns. We believe that the timelines in these regulations provide all parties concerned an opportunity to be heard in the BD adjudication process.

Finally, while we acknowledge concerns from commenters that deeming loans unenforceable if the Department is unable to meet prescribed timelines may result in a cost to the taxpayer that cannot be recouped, the Department's goal is to ensure claims are adjudicated within the prescribed timelines and thus no costs are ultimately incurred from these deadlines.

*Changes:* We have adjusted § 685.406(g)(1)(ii) to note that the timeline for a decision on an individual application will be the later of July 1, 2026 or 3 years after the Department determines that the borrower submitted a materially complete application.

*Comments:* Commenters noted that the regulations lacked clarity on what it means for a loan to be unenforceable. Other commenters expressed concern that institutions could be subject to a recoupment action on loans deemed

[101] *See, e.g.,* 34 CFR 685.222(e)(1)(ii) ("an individual borrower must . . . [p]rovide any other information or supporting documentation reasonably requested by the Secretary").

[102] *See, e.g.,* 34 CFR 685.206(e)(8), 222(e)(1)(ii).

unenforceable without any due process protections. Some other commenters expressed concerns that an unenforceable loan would not receive all the benefits of a discharge, such as updating credit bureau reporting and restoring federal student aid eligibility for borrowers in default. They also recommend clarifying the treatment of loans not covered by the BD claim.

*Discussion:* The Department is clarifying the steps it will take after a loan is determined to be unenforceable. If the Department fails to meet the adjudication timelines in § 685.406, any loans covered by the BD claim will be considered unenforceable. For consolidation loans, this would mean the portion of the underlying loans in the consolidation loan attributed to the BD claim. The Secretary will not require the borrower to repay the loans covered under the BD application, but it will not be considered an approved BD discharge. Consequently, the Department will not initiate or attempt recovery proceedings against the institution for loans deemed unenforceable under that section.

The commenters are correct that there are some differences between an approved claim and a loan deemed unenforceable, which is another reason why the Department is committed to making decisions on claims before the time limits are reached.

Moreover, as we discuss elsewhere in this document, we would provide copies of the written decision to the institution so the institution will be aware of the status of the claim. We will also commit to giving the institution an interim update as we do for borrowers.

*Changes:* We have revised § 685.406(g) to provide interim updates to an individual claimant, the third-party requestor under a third-party requested group formation, and the institution contacted for the institutional response, that will report the Secretary's progress in adjudicating the claim and the expected timeline for rendering a decision on the claim. We have added language to § 685.406(g)(5) to clarify that an institution will not be liable for a loan deemed unenforceable against the borrower.

## Process To Adjudicate Borrower Defense Claims

*Comments:* A few commenters acknowledged that the proposed rules made significant improvements to the BD process by including a group process but expressed concern for applications adjudicated in the process for individual claims. These commenters suggested the Department consider other applications raising similar claims when adjudicating individual applications, so that the individual review process would mirror the group claim process; explicitly state that borrower attestations alone may be sufficient to substantiate a claim for relief; and explicitly state that the Department will apply a presumption of reliance when assessing individual applications.

*Discussion:* Individual borrowers have a full opportunity to file individual BD claims under these regulations. However, as we explained in the NPRM, the Department's recent experience with a significant influx of individual BD applications has convinced the Department that State partners can provide critical information in assessing BD claims.[103] Given this history, the Department believes that the group process, where warranted, provides the most efficient way to resolve claims for all parties—the borrowers, the institutions and the Department. The Department reserves the Secretary's right to form a group, including the ability to consolidate multiple individual applications as provided in § 685.402(b)(3).

The Department already explicitly states in the NPRM that the application itself, including the borrower's sworn statement, is a form of evidence. The Department has not deviated from this position and will consider the application as one of several components in the adjudication of a BD claim. Similarly, although the Department has updated the presumption applied to groups, it has not deviated from its position that, based on supporting factual evidence, it will apply a presumption that actionable acts or omissions affected each member of a group considered collectively.[104] With respect to applying the presumption to individual claims, the updated BD definition and its straightforward causation element address the concerns of comments seeking an individual presumption of reliance to avoid a barrier to relief reflecting mere formalism. That is less of a concern because individual claims will be assessed for whether the facts indicate the alleged acts or omissions caused the borrower detriment, rather than insisting on borrowers pleading specific technical terms. We discuss this topic further in the "*Federal Standard*" section.

*Changes:* None.

*Comments:* Several commenters requested that the Department adopt a liberal pleading standard when adjudicating an individual BD claim. In those requests, the commenters refer to pleading standards for *pro se* litigants in civil courts. The commenters believe that individual BD claimants warrant a similarly liberal standard for their BD applications because their experience and risk of confusion resembles that of *pro se* litigants in civil court.

*Discussion:* The Department believes that the improved processes included in these regulations and additional guidance provided to facilitate applications provided together will provide sufficient direction for borrowers to submit materially complete applications for BD. The Department believes that individual claimants will not need specialized legal expertise or training to file an individual BD claim under these rules. As we state in the NPRM, the BD application and accompanying sworn statements are forms of evidence.[105] Likewise, the details required for an individual application to be materially complete are all comprised of information that is readily available for an individual borrower without the assistance of a legal advocate. The Department official will adjudicate the claim upon receipt of a materially complete application from an individual claimant, along with information from the institution from the institutional response process and records within the Secretary's custody. Under § 685.403(b)(2), the Department can request more information from an individual borrower to materially complete the application, including a request to provide more information on some of the acts or omission that the borrower has alleged when a more robust narrative would give the Department a better understanding of what took place.

While the Department requires a materially complete application from an individual claimant to continue with adjudication, an otherwise complete application does not require legal analysis from the borrower. Although an individual's claim must still meet the same evidentiary standard whether or not represented by counsel,[106] individual adjudications will take into account the institution's response and potentially other information about the institution in the Department's possession, and even if the individual claimant does not capture the act or

---

[103] 87 FR at 41899.
[104] 87 FR at 41892.

[105] 87 FR at 41900.
[106] This reflects the approach to *pro se* litigants under the Federal Rules of Civil Procedure, which provide for the liberal construction of a *pro se* litigant's filings, but do not apply a more lenient evidentiary standard. *See* Fed. R. Civ. P. 59; *see also, e.g., Dunbar* v. *Foxx,* 246 F. Supp. 3d 401, 414 (D.D.C. 2017).

omission in precise terminology, the Department will make appropriate inferences based on the information available to it. Furthermore, the information available to the Department may include evidence from other sources, such as third-party requestors, investigations or reviews by the Department or other authorities, or other sworn applications. In effect, the Department's process for evaluating and adjudicating an individual claim already provides flexibility that incorporates the same principles motivating *pro se* pleading standards but is tailored to the BD process. Finally, it would not be appropriate to expressly adopt a standard applied in civil courts, because the requirements for submitting a BD application and the consequences of potential deficiencies differ from those applied under the Federal Civil Rules, State analogues, and various jurisdictions' local rules.

Therefore, we decline to alter the regulations or to expressly adopt a *pro se* pleading standard applied in civil courts, because the regulations afford sufficient flexibility to address these concerns.

*Changes:* None.

*Comments:* A few commenters observed that if the Department official requires additional information to adjudicate a claim, institutions must respond to a request within 90 days, whereas individual claimants must respond within a reasonable time frame. These commenters stated that the Department should not treat institutions and individual claimants differently.

*Discussion:* After further review, the Department concurs and believes 90 days is a reasonable time frame for an individual claimant to respond to a Department official's request for additional information. The Department believes 90 days is an adequate time for both the institution and the individual claimant to respond to a Department official's request for additional information that maintains parity for all parties.

In its proposal to give institutions 90 days to respond, the Department aligned the maximum time afforded to schools in the program review process.[107] When a borrower files a complaint with the Ombudsman in the FSA Feedback System, the borrower generally must respond within 60 days to the Ombudsman's request for additional information. Responding to such a request is similar to the Department seeking feedback from an individual to resolve a BD claim. Therefore, the Department will give both the

institution and the individual claimant the maximum time frame, 90 days in this case, to respond to a request for additional information.

*Changes:* We revised § 685.406(d) to provide that if the Department official requires additional information from an individual claimant, that individual must respond within 90 days.

*Comments:* A few commenters requested that the Department require the submission of factual information to refute vague or emotional claims. A few commenters stressed that a borrower's application must contain sufficient explanation so the institution can understand exactly what is being alleged, by whom, and the basis of the claim. Another commenter urged the Department to adopt a plausible basis requirement for claims and specify that pleadings offering formulaic recitation of the elements of a cause of action would be insufficient. Other commenters noted that the definition of what constitutes a materially complete application was not sufficiently clear. A few commenters also recommended deleting the mention of a materially complete application.

*Discussion:* The Department shares commenters' desire to provide a process that generates useful information for the Department official to fairly adjudicate a claim. As we state elsewhere in this document and in the NPRM, we recognize that the application itself is a form of evidence.[108] However, the entire record needs to sufficiently and adequately describe the underlying conduct serving as the potential basis for relief to allow the Department official to fully consider the claim.

After further consideration, we believe that BD claims from individual claimants need clearer standards so that such individuals have a clear understanding of what information is needed by the Department prior to adjudication. To that end, the Department will determine an individual's application to be materially complete when the application contains: a description of one or more acts or omissions by the institution; the school or school representative to whom the act or omission is attributed; approximately when the act or omission occurred; how the act or omission impacted the borrower's decision to attend, to continue attending, or to take out the loan for which they are asserting a defense to repayment; and a description of the detriment they suffered as a result of the institution's act or omission. Laying out these concepts will also guide borrowers in

creating the strongest claims possible and avoid denial of a valid claim because the borrower did not provide greater detail upfront. We reiterate, as we state elsewhere in this preamble, that an otherwise complete application lacking a legal analysis will not preclude adjudication. However, we believe it is reasonable to require an individual claimant to tell their story so the Department official can adjudicate the claim. By requiring all the aforementioned information, the Department believes it has created a framework that minimizes the likelihood of vague or emotional claims as suggested by the commenters. We also believe that the inclusion of the aforementioned information will be sufficient to allow the institution to understand and respond appropriately to the BD claim. Finally, by identifying the elements of a materially complete application package for an individual claim, we believe we have crafted a process that will result in a sufficient record to adjudicate, and we decline adopting any further requirements that would add unnecessary hurdles for a borrower to assert a defense to repayment.

*Changes:* We revised § 685.403(b) as described above to provide that the Secretary shall consider an individual BD claim to be materially complete when the borrower submits an application under penalty of perjury with the information enumerated in § 685.403(b).

*Decision Letters*

*Comments:* Commenters suggested that the Department should include language specifying that if the Department grants a partial discharge, the Department official must explain in writing the basis for its determination and how it calculated the proposed amount of a discharge. The commenters further suggested borrowers should be given the opportunity to respond and to submit evidence in support of further discharge amounts.

*Discussion:* Under § 685.406(f), the Department official issues a written decision of the adjudication of the BD claim. The Department believes this commenter's suggestion is no longer relevant because, as discussed below, approved claims will receive a full discharge and not a partial discharge. Nevertheless, the decision letter will contain information about whether the claim was approved, the evidence upon which the decision was based, and the loans that are due and payable to the Secretary in the case of a denial.

We already outline the conditions under which the Department would

---

[107] 87 FR at 41901.    [108] 87 FR at 41900.

entertain a reconsideration request by a borrower, which include: administrative or technical errors; consideration under a State law standard for loans first disbursed prior to July 1, 2017; and new evidence that came to light after the initial adjudication. We would expect borrowers to submit the best information they have at the time of application. To the extent that a borrower who receives a denial meets the criteria for reconsideration, that borrower may submit the request and the new evidence.

*Changes:* None.

*Comments:* Other commenters suggested the proposed BD regulations do not go far enough regarding decision letters. These commenters suggested the Department strengthen the regulations to make written decisions clear and actionable to borrowers when granting full approvals, partial denials, and full denials.

*Discussion:* The Department declines to make the changes suggested by the commenters. These regulations will result in decision letters with elements that will help a borrower determine their next steps after adjudication of the claim.

*Changes:* None.

*Comment:* Some commenters requested that the Department give copies of the written decision regarding a BD claim to the institution.

*Discussion:* The Department concurs that institutions should also be apprised of the outcome of the BD claim. Although we initially proposed that copies of the written decision would be made available to the institution to the extent practicable, we are removing the phrase "to the extent practicable" to ensure that the claimant, the institution, and, if applicable, the third-party requestor who requested the group claims process, will receive copies of the written decision.

*Changes:* We revised § 685.406(f)(3)(iii) to ensure that institutions will receive a copy of the written decision.

**Borrower Defense to Repayment—Post Adjudication (§§ Part 685, Subpart D)**

*Reconsideration Process*

*Comments:* Commenters expressed support for a reconsideration process. Many commenters suggested that institutions should have the opportunity to request reconsideration on the same terms as borrowers. Other commenters opposed a reconsideration process, adding that claims would lack finality and could be continuously granted reconsideration; institutions would, thus, have no way of knowing how often

and for how long they may be required to defend against the same BD claim. Similarly, some commenters argued that a reconsideration process violated *res judicata* and borrowers should not be given another opportunity to have their claim reviewed. A few commenters argued that it would not be appropriate to conduct a reconsideration under a different standard, which is what is contemplated by allowing for considerations under a State law standard. A commenter also expressed concern that asserting a claim under State law would be confusing for borrowers. Other commenters requested that borrowers have an unqualified right to reconsideration.

*Discussion:* We thank the commenters who expressed support for the reconsideration process.

After careful consideration of the commenters' suggestion that institutions be allowed to request reconsideration, we decline to make this change. We remind institutions of the bifurcated process of the BD framework—adjudicating the claim is a separate and distinct process from the process for recoupment from the institution for the amounts that the Secretary discharges. In crafting the reconsideration process, we distinguished the issue of whether the borrower has a defense to repayment from whether and how much the Secretary should recoup from the institution. Consideration of the borrower's BD claim is between the borrower and the Secretary, since it is the borrower raising a defense to repaying the Secretary on a loan that is payable to the Secretary. Allowing institutions to request reconsideration is inconsistent with the purpose of this process.

We disagree with the concerns that allowing reconsideration would result in a lack of finality of a claim and that a claim could be continuously granted reconsideration. We also disagree with the proposal to give borrowers an unqualified right to reconsideration. We outline the limited circumstances under which we would consider a reconsideration request: administrative or technical errors; consideration under an otherwise applicable State law standard for loans disbursed prior to July 1, 2017; and new evidence. Limiting the State law reconsideration only to borrowers who would have previously had access to it also should help reduce borrower confusion and address the concerns raised by commenters about the use of a different standard during reconsideration. As we expressed in the NPRM, the specific instances for reconsideration provide appropriate limits on the borrower's

ability to seek reconsideration or to ask for the same allegations to be reviewed repeatedly without a rationale for why the outcome may change.[109]

We also disagree with the commenters that the reconsideration process violates principles of *res judicata.* The bases for reconsideration involve certain legal and technical errors with the Department's decision or new evidence that was not previously considered. It is not simply the Department re-reviewing a decision for any reason. Moreover, the reconsideration process provides a step that is simpler for both the borrower and the Department by having a claim reconsidered instead of going to Federal district court for review.

*Changes:* None.

*Comments:* A few commenters suggested that the Department allow individual members of a group to request reconsideration on behalf of the entire group, on their own behalf, and for any individual borrower.

*Discussion:* As we discuss in the NPRM, we considered and rejected a proposal to allow an individual borrower that is part of a group claim to request reconsideration of a claim under a State law standard on behalf of the group, and we discussed our rationale for doing so. 87 FR at 41907. Similarly, as we discussed in the NPRM the regulations specify in § 685.407(a)(2)(ii) that an individual borrower from a group may not file a reconsideration request.

Nothing prevents an individual who is part of a group from submitting a new individual BD claim under § 685.403.

*Changes:* None.

*Comments:* Commenters recommended that if a borrower is denied relief, then the borrower should be entitled to request reconsideration from a different Department official to evaluate whether the first adjudicator made errors when assessing the facts or applying the law. These commenters suggested that under the proposed language, if a borrower believes the Department official adjudicating their claim made an error interpreting the facts or law, the borrower will be forced to challenge the Department's decision in court, which will be more burdensome for the Department and the borrower.

*Discussion:* As provided in § 685.407(b), the Secretary designates a different Department official for the reconsideration process than the one who conducted the initial adjudication.

*Changes:* None.

---

[109] 87 FR at 41906.

*Amounts To Be Discharged/ Determination of Discharge*

*Comments:* The Department received a range of comments regarding calculating discharge amounts for a borrower or borrowers with approved claims. Many commenters wrote in support of the proposal to adopt a presumption of full discharge. Many of these commenters, however, said that the Department should either eliminate the possibility of partial discharge or provide a much clearer and narrower set of instances when partial discharge could occur. These commenters pointed to the harms that borrowers suffer that go beyond the amount of the loan, aligning BD with the discharge amounts provided under closed school and other discharge programs operated by the Department, and the Department's history in struggling to define a proper formula for partial discharge. The commenters raised concerns that the examples of partial discharge are too vague, and that the overall Federal standard already would weed out trivial claims. Commenters asked that if partial discharge is maintained, it should be limited to clearly quantifiable sums, or the Department should provide greater clarity for what constitutes educational services or the outcome of a borrower's education. Commenters also suggested an opportunity for borrowers to provide additional evidence before finalizing a partial discharge decision.

Other commenters raised different objections to the proposed partial discharge approach. They said that the Department should not adopt a presumption of full discharge, should conduct its own fact finding for each individual borrower to determine discharge amounts, and give institutions an opportunity to provide additional evidence during the process of determining the discharge amount. Commenters argued that the Department should be capable of assessing the value of an education and did not explain why it no longer thought it could do so. Commenters also argued that the Department should be able to calculate the value of the education and that the proposal to provide a 50 percent discharge if the Department could not easily quantify the amount of harm was not sufficiently reasoned. Commenters also raised many concerns with the examples provided, arguing that some were unrealistic, some did not clarify how they would interact with the presumption of a full discharge, did not address fact-specific elements like a borrower not getting an internship because they lacked the academic qualifications to be eligible for one, and

displayed favoritism toward more selective institutions that were more likely to have claims against them result in partial discharge. Commenters argued for rebutting the presumption of a full discharge for claims approved under State law. Commenters argued that the risk of giving borrowers an insufficient amount of discharge needs to be better balanced against the risk of trying to recoup excessive sums from institutions. Commenters also connected the concerns about discharge amounts to other comments around the lack of harm in the overall standard. Commenters also disagreed with the Department's argument that all approved claims to date have been for full discharges since, in all but one instance, those were all against schools that were no longer in business.

*Discussion:* The Department has tried for many years to construct an approach for calculating partial discharges that is consistent and fair. This includes definitions that rest on principles and examples as well as formulas. The significant number of comments opposed to the concepts of partial discharge, both for those in favor of granting larger discharges and those in favor of granting smaller ones, demonstrate how complex it is to define a clear set of rationales for properly ascertaining the amount of a partial discharge to grant a borrower.

Based upon all of this feedback, the Department is convinced that articulating a clear and consistent standard for applying a partial discharge is not feasible. Instead, the Department will award a full discharge for approved claims, while adding language that an approved claim must be tied to an act or omission that caused detriment to the borrower that warrants relief in the form that BD provides. Such an approach also means that a separate calculation of the educational value of a program is not necessary.

The Department finds support for this conclusion in the nature of the remedy provided by a defense to repayment, including the legal principles it implicates and the practical realities of administering the remedial scheme. Although the student loan context is unique, a defense to repayment resembles rescissionary remedies available in contract law (avoidance and restitution or reliance costs),[110]

restitution and unjust enrichment (rescission and restitution),[111] and rules governing unsecured consumer lending (obligor's defense to enforcement and recoupment).[112] Although we do not think it is appropriate or necessary to adopt specific rules from these areas of law, they provide helpful points of reference for considering the nature of the remedy that BD provides.

This type of remedy differs from damages. Generally speaking, a damages remedy seeks to measure and compensate an injured party for the harm they suffered; rescissionary remedies, on the other hand, emerge from principles of restitution and restore a party to the status quo ante. In the context of a fraudulent transaction, a damages remedy would seek to measure loss based on either the injured party's out-of-pocket costs or on the benefit of the bargain that the injured party lost as a result of the wrongdoer's fraud.[113] In contrast, relief like the rescissionary remedies mentioned above would seek to unwind the transaction altogether and restore the injured party to a pre-transaction status. The latter category of remedies may be appropriate where damages are unavailable or difficult to reliably estimate or where wrongful or intentional conduct undermines a key reason for entering the transaction in the first place.

Although BD combines interests that do not neatly fit distinctions in conventional legal doctrine, we think it more closely resembles the latter category of remedies described above, which informs our determination to omit the option of partial discharge. Partial discharge more closely resembles conventional damages remedies, which honor compensatory interests that exist in the BD context but present far more practical difficulties. A damages-like remedy in the BD context would suggest that recovery should reflect the difference between the actual value of the educational program and the price a borrower paid. It might also suggest

---

[110] The contract remedies of avoidance and restitution or reliance costs permit a party to avoid contractual obligations and recover amounts paid as part of performing or expended in reliance. *See* Restatement (Second) of Contracts § 376 (1981) ("A party who has avoided a contract on the ground of . . . misrepresentation, duress, undue influence or abuse of a fiduciary relation is entitled to restitution

for any benefit that he has conferred on the other party by way of part performance or reliance.").

[111] *See* Restatement (Third) of Restitution § 13(1) ("rescission and restitution" when a transaction is "induced by fraud or material misrepresentation"); *id.* § 54 (permitting a party to "reverse the challenged transaction instead of enforcing it," and to recover any benefits the party relinquished).

[112] *See* U.C.C. § 3–305(a), *and* 16 CFR part 433 (together providing consumer-obligor defenses to repayment and claims in recoupment arising out of underlying transaction).

[113] This might be calculated by the difference in value between the product received and the price paid. Another possible measure is the difference between the value actually received and the value the bargain would have produced if the false representations had been true. *See* Dobbs & Roberts, Law of Remedies §§ 9.1(1), 12.1.

calculating the difference between the education's actual value and the expected marginal increase in a borrower's future earnings. We do not think there is a feasible way of reliably estimating the lost value that would factor into determinations of partial discharge.

This approach will address the concerns of both commenters that pushed for limiting partial discharge and those that were concerned about approved claims being tied to minor matters. For the former group, the elimination of a partial discharge ensures that any borrowers whose claim is approved will receive a full discharge. But for the latter group, the language ensuring that an approved claim must warrant this relief adds a requirement that the circumstances justify the remedy BD provides. This concept is captured in new § 685.401(e), which states that in determining whether an act or omission merits relief, ''the Secretary will consider the totality of the circumstances, including the nature and degree of the acts or omissions and of the detriment caused to borrowers.'' Removing the concept of partial discharge also eliminates the need for changes to the rebuttable presumption of a full discharge requested by commenters.

In applying § 685.401(e)'s totality-of-the-circumstances approach, the Department expects to draw on principles and reasoning underlying the application of rescissionary remedies that BD resembles, where factual circumstances call for it. We chose not to expressly adopt the precise standards from any of those areas, because none account for the unique combination of interests at work in the Federal student loan program or for the wide range of varying circumstances that arise in the context of adjudicating BD claims.[114] Because of the student loan context's unique characteristics, the Department anticipates circumstances that may warrant BD relief even if an equivalent

remedy would not be available under conventional tests from contract law, restitution and unjust enrichment, or defenses to the enforcement of obligations of an unsecured loan.

The Department considered whether the regulations themselves should include a more specific enumeration of circumstances that will warrant relief, but ultimately determined that the most appropriate approach was to further develop the standard through adjudication of particular cases. To that end, in appropriate cases dealing with circumstances not specifically addressed in the regulations, the Department will make its explanations of remedy-related determinations public to guide affected parties and provide an opportunity for public scrutiny. As a general matter, however, the determination described in subsection (e) is informed by documented cases of fraud and misrepresentation that the Department has addressed in the past.[115] In those cases, the schools' acts and omissions related to borrowers' careers and employability, which are among the core reasons for seeking higher education. In addition, the detriment that borrowers suffered often reflected receiving far less value than the tuition and fees their loans paid for. In those cases, the schools' conduct and resulting harm also often left borrowers unable to meet their loan obligations within a reasonable time. These, however, are only certain attributes of past cases; that is, we consider the circumstances related to those schools to fall within the heartland of what warrants discharges, and we anticipate the range of circumstances warranting discharges will extend beyond these past examples.

The Department also adopts a rebuttable presumption that, for claims that otherwise satisfy the standard, the detriment caused in the case of closed schools will be sufficient to warrant relief. This is based on the Department's experience that when a school closes and is shown to have been responsible for the misconduct encompassed by ''actionable acts or omissions,'' the borrowers shown to have been injured by that conduct are very likely to fall within the circumstances that warrant relief. This also acknowledges that when schools close, it is often challenging for borrowers or for the Department to obtain additional evidence that may be necessary to fully establish the nature and degree of detriment. In such situations, the Department does not want to make borrowers worse off because their

institution has closed. This does not mean that every otherwise proven claim from a borrower who attended a closed school will necessarily be determined to warrant BD relief. Rather, in such cases are determined not to warrant relief, the Department will cite to the specific reasons and evidence for that conclusion.

The Department disagrees with the allegations by the commenters that its prior consideration of partial discharges had been shielding a specific type of institution. The Department has crafted a set of rules based upon what we have seen as misrepresentations, omissions, and other acts over time and there are no sector-specific limitations to those standards.

*Changes:* We revised the definition of borrower defense to repayment under § 685.401(a) to indicate that the Department must find that the act or omission caused detriment to the borrower warranting relief in the form of a full discharge of the outstanding balance, reimbursement of all amounts paid to the Secretary, deletion of the relevant credit history, and, in the case of a borrower in default, restoration of the ability to access title IV financial assistance. We have also added § 685.401(e), which states that in determining whether a detriment caused by an institution's act or omission warrants relief under this section, the Secretary will consider the totality of the circumstances, including the nature and degree of the acts or omissions and of the detriment caused to borrowers. For borrowers who attended a closed school shown to have committed actionable acts or omissions that caused the borrower detriment, there will be a rebuttable presumption that the circumstances warrant relief.

*Comments:* Commenters argued for a greater institutional role in calculating the amount of the discharge. They argued for a separate opportunity to provide a response on the discharge amount. Commenters also argued for the Department to conduct individual fact finding on harm.

*Discussion:* The Department disagrees with commenters. As noted elsewhere in this rule, the adjudication of borrower defense claims is a matter between the borrower and the Department. Institutions are given a considerable opportunity to submit evidence during that stage and will have a more extensive role during any efforts at recoupment. However, given that the Department is awarding a full discharge for any approved claim, that means an institution's response to the claim itself will also present it with an opportunity to submit evidence regarding the degree

---

[114] Among many other differences, a student loan differs from a mortgage, car loan, or other secured transaction, because there is no property to repossess or partially satisfy the debt. Likewise, in contrast to other types of loans, in the student loan context a misrepresentation that induces student debt is often inextricably intertwined with (and can often be one cause of) the borrower's inability to repay the loan; for some students, boosting earning capacity is the very reason they took out the loan in the first place, and it may be dispositive for whether they can ultimately pay the loan off. Furthermore, a student loan cannot be discharged in bankruptcy in the same way as other loans. These and other differences between student loans and other transactions inform our conclusion that drawing on principles surrounding rescissionary remedies in other areas of law is best suited for the context of specific cases.

[115] *See, e.g.,* examples cited in *supra* note 24.

of harm caused by the alleged acts or omissions and detriment. As for the discussion about individualized fact finding related to harm, the Department directs commenters to this discussion in the *Federal Standard* section, which explains, among other things, assessing individualized harm for each claim on a case-by-case basis is not an approach that is realistic or administratively feasible.

*Changes:* None.

**Borrower Defense to Repayment— Recovery From Institutions (§ 685.409)**

*Comments:* Many commenters urged the Department to hold institutions accountable for acts or omissions that give rise to a successful defense to repayment. Other commenters encouraged the Department to limit the exceptions to recoupment, and even if the cost of collection exceeds the amounts received or if the claims were approved outside the limitations period, the Department ought to recover as much funds as possible in the interest of making the taxpayer whole.

Other commenters expressed reservations about the Department's ability to recoup from the institution. These commenters stated that the Department did not have a legal obligation to detail the instances in which it would not seek to recoup because doing so would undermine its overall prosecutorial discretion. The commenters suggested eliminating § 685.409(b) or revising § 685.409(b)(1) to note the Department's discretion will be consistent with typical practice. Other commenters stated that the Department lacked the statutory authority to impose borrower defense liabilities against affiliated persons of closed schools.

Other commenters suggested that by requiring the Department seek recoupment from schools and school owners in all but a few narrow circumstances, the regulations will inadvertently constrain how much relief the Department is willing to provide borrowers. These commenters suggested that the Department would be reluctant to grant relief when doing so might result in an institutional liability that would push a school to close. Additionally, commenters theorized that if the Department is required to pursue recoupment, and believes schools will contest recoupment, then granting BD claims will create substantial additional administrative, legal, and resource demands on the Department. Commenters believed that this would decrease the likelihood that the Department would grant meritorious claims or pursue group processes.

*Discussion:* We take our responsibility to oversee and protect the taxpayer investment seriously and believe institutions should be held to their financial obligations when their actions result in discharge-related liabilities. Recoupment is a critical tool for ensuring that the institution that committed acts or omissions that lead to approved claims help offset that cost. And it is one of several ways to deter future unwanted behavior. In support of the commenters' request to hold institutions accountable, we proposed § 685.409, which is the framework under which we would seek recovery from institutions of the amounts that the Secretary discharges from BD claims and proposed to use existing procedures for pursuing liabilities under part 668, subpart H proceedings. We discuss recovery proceedings and the subpart H context elsewhere in this document. We proposed limited circumstances under which the Department would not recoup from institutions, namely: the costs of collecting would exceed the amounts received; the claims were approved outside the limitations period; a preexisting settlement agreement precludes additional financial recovery; and the Secretary already collected on the claim in a separate proceeding. In response to commenters who suggested limiting when the Secretary may choose not to collect, we decline. Settlement agreements or recoveries in other Secretarial collection actions may preclude the Secretary's ability to collect and we are merely codifying those limited circumstances on recovery here.

We disagree with commenters who stated that we lack the statutory authority to institute action to collect the amount of approved BD claims from persons affiliated with closed schools. As we discussed in the NPRM, Sec. 454(a)(3) of the HEA provides that an institution must accept responsibility and financial liability stemming from its failure to perform the functions set forth in its PPA—the signed document required for participating in the Federal financial aid programs through which the institution and other relevant parties agree to abide by the rules and requirements governing the programs.[116] This commitment includes persons affiliated with the institution who do not just inherit and profit from the assets of the institution but also assume its liabilities—which, in this case, would be the liabilities associated with the approved BD claims. In the case of a closed school, we described the persons affiliated with the

institution as those individuals described in § 668.174(b). The Department proposed this recoupment framework to protect taxpayers as much as possible from losses caused by the actions of schools and affiliated persons.

Because the BD framework is a bifurcated process, the recovery provisions under § 685.409 would have no bearing on the separate process of adjudicating the claim. We dismiss any unfounded conjecture that the recoupment process itself would decrease the likelihood of granting meritorious claims.

*Changes:* None.

*Comments:* Some commenters argued the Department failed to consider that institutions may force borrowers to repay them for the cost of loan discharges. Others argued that the Department did not consider that an institution may withhold the transcripts of borrowers whose BD claims are approved, making it harder for the borrower to obtain work.

*Discussion:* We see no basis for an institution requiring a borrower to repay the cost of a loan discharged due to an approved BD claim. As noted in this final rule, the decision whether to discharge a loan is between the borrower and the Department. The act of recouping on that discharge is between the Department and the institution. We see no reason why an institution would have an enforceable right to shift liability to the borrower.

With regard to transcript withholding, we note that such policies would have separate implications under State and Federal consumer protection laws. Likewise, transcript-withholding practices have also drawn increased scrutiny from the Department independent of this rule and from the CFPB.[117]

*Changes:* None.

*Recoupment Procedures*

*Comments:* Some institutions argued that the recoupment process should occur under subpart G and objected to the Department's proposal to remove § 668.87. Commenters stated that striking § 668.87 represents an extraordinary oversight and the Department should provide institutions a meaningful opportunity to comment on any recovery process. Commenters also argued that the Department had not used § 668.87 to seek recoupment of an approved borrower defense claim and thus could not have a reason for moving

---

[116] 87 FR at 41911.

[117] *See, e.g.,* CFPB, *Student Loan Serv. Special Ed.,* 27 Supervisory Highlights, Fall 2020, at 8–9, *https://files.consumerfinance.gov/f/documents/ cfpb_student-loan-servicing-supervisory-highlights-special-edition_report_2022-09.pdf.*

away from it. Commenters also argued that reaching faster decisions on claims was not a sufficient reason for shifting to a new recoupment process.

A few commenters stated the Department does not include any regulatory text in the proposed rule that guarantees, specifies, or even suggests that recovery proceedings will occur under subpart H. A few commenters asked if the shift to part 668, subpart H would mean that the same time limits that apply to program reviews would be applied, such as 30 to 90 days to respond a review and 45 days to appeal any final decision.

*Discussion:* We disagree that recoupment proceedings should be processed under subpart G, and we reiterate that the recoupment process under subpart H is the proper venue. The recovery of amounts discharged concerns monetary liabilities due to the Department, which is chiefly administered through subpart H; subpart G pertains to fine, limitation, suspension, or termination proceedings.

When the Department initially issued final rules on recovery proceedings under § 668.87, subpart G appeared a more appropriate fit because those recovery proceedings also included combined consideration of certain fact-finding steps like the actual claims' merits and relief for members of the group. In doing so, however, it made BD recovery an outlier among the other procedures in subpart G—that is, a fine, limitation, suspension, or termination proceeding involves punitive measures, whereas subpart H appeals are more appropriate in cases involving the recovery or reimbursement of federal funds owed.[118] In light of the other updates to the BD process, we consider subpart H the appropriate venue for recovery.

First, the updated structure and sequence of the process for adjudicating BD claims includes new features to make it a more robust fact-finding process, which also provides for considerable input from schools. But as we explain more in the "*General Opposition to Regulations*" section, BD claims reflect a defense that borrowers assert against repaying the Department and that is principally a Department-borrower matter. It would not make sense to treat a BD claim's merits and school liability as coextensive or to

make BD claims' adjudications a series of adversarial steps between the borrower and school—nor would such a sequence be administratively feasible for the volume of BD claims that the Department now faces. As part of the updated structure's acknowledgement of those realities, the decision of whether to approve the claim is handled through the process outlined in § 685.406, which avoids the previous structure's combined merits-relief-recovery step that was a reason for including recovery proceedings in subpart G.

Second and relatedly, in light of that updated structure, there is little reason for recovery to remain an outlier among the punitive steps provided for in subpart G. As noted, BD recovery more closely matches the other means of recovering federal funds provided for in subpart H. As we explain in the "*Federal Standard*" section of this document, relief in the form of a defense to repayment, though unique, resembles features of remedies like rescission, avoidance, restitution, and certain forms of out-of-pocket or reliance costs, not punitive remedies like special, consequential, or exemplary damages—which underscores that recovery proceedings were an outlier in subpart G. In light of the buttressed fact-finding procedures now included in BD-claim adjudication under the updated structure, it makes more sense to avoid leaving recoupment as an outlier in subpart G and focus it on what it is, which is recovering liabilities from the institution rather than a punitive step like the other subpart G proceedings.

Contrary to at least one comment's suggestion, the 2016 BD regulations do not acknowledge that the Department *should* bear the burden of proof in any recovery action against an institution. Rather, the 2016 BD regulations acknowledged that the proponent of a BD claim bears the burdens of production and persuasion in relation to the claim's merits. The 2016 regulations combined determinations of claims' merits into a single step along with determinations of relief and recovery, and it only envisioned the Department as the proponent of granting group claims. In that context, it made more sense for the Department to bear all relevant evidentiary and persuasive burdens as part of that step. The updated regulations still assign the burden of persuasion on a claim's merits to its chief proponent, but the new regulation's update acknowledges that proponent will often be third-party requestors or simply individual borrowers. Having avoided combining merits, relief, and recovery determinations into a single step, the

2016 regulations' description of the relevant burdens is not applicable.

We believe that, in addition to schools' opportunities to submit evidence and arguments during the adjudication stage, using the familiar process in subpart H will provide institutions with a meaningful opportunity to contest any liabilities sought in recoupment.[119] While it is true that the subpart G process has also been in use for some time, it is used far less frequently than subpart H. For instance, since October 1, 2017, the Department received about 175 subpart H appeals compared to just under 75 actions initiated under subpart G.[120]

In response to the commenters who stated the Department does not include any regulatory text in the proposed rule that guarantees, specifies, or even suggests that BD recovery proceedings would occur under subpart H, we agree that the regulations should better reflect the recovery proceedings. Therefore, we are adding regulatory text that makes clear the Secretary will recoup these amounts discharged under a subpart H proceeding. We are including a new § 668.125 to part 668, subpart H to add specific provisions related to the proceedings for recouping the costs of approved borrower defense claims from institutions. Under these provisions, institutions will have 45 days to request a review of the determination that they are liable for the amounts discharged, with that period running from the day the institution receives a written notice from the Department. This timeline mirrors the process for other part 668, subpart H proceedings and addresses the questions from commenters about how timelines for borrower defense would compare to program reviews.

The added language also specifies that the written notice's request will fulfill the role of a final program review or final audit determination as described in §§ 668.115 to 668.124. This ensures that the correct document will be used for all the proceedings under this part. The Department also adds language in § 668.125(e) to specify that the Department has the burden to prove that the loans it is seeking to recoup on were discharged for the purposes of borrower defense and that the institution has the burden to prove that the decision to discharge the loans was incorrect or inconsistent with law and thus that the institution should not be liable. Also within paragraph (e), the Department

---

[118] *See, e.g., In re The Hair Cal. Beauty Acad.,* Dep't of Educ. OHA Docket No. 2018–13–SP (July 2, 2019), at 13 (explaining the "distinctions between appeals within the Department under Subpart H (which address recovery of federal funds) and under Subpart G (which address fines, penalties, terminations and other civil punishments)").

[119] 87 FR at 41912.

[120] These figures are based on a Department of Education analysis of subpart G actions initiated or subpart H appeals submitted to the Administrative Actions and Appeals Service Group within Federal Student Aid since October 1, 2017.

specifies the types of evidence that may be submitted in the hearing, which is limited to (1) materials submitted to the Department during the process of adjudicating the claims, which includes information from borrowers, the institution, or other third parties; (2) any materials the Department relied on to adjudicate claims and that the Department provided to the institution; and (3) any other relevant documentary evidence submitted by the institution related to the bases cited by the Department's decision to approve the borrower defense claims and pursue recoupment.

*Changes:* We have added § 685.409(d) to provide that in requiring an institution to repay funds to the Secretary in connection with the program review issued concerning the institution's act or omission that gave rise to a successful claim under this subpart, the Secretary follows the procedures described in part 668, subpart H. We have added new § 668.125 within part 668, subpart H that specifies certain procedural elements specific to a borrower defense recoupment proceeding as described above.

*Comments:* Commenters suggested the Department provide greater detail on the proposed change to the recoupment process, including specifically placing the burden on educational institutions, demonstrating that the proposed framework is permissible under the HEA, and explaining why the Department believes it is better to allocate the burden in recoupment proceedings to the educational institution rather than to the Department. These commenters suggest that, although the proposed rule provided some of the Department's reasoning, the final rule could be more comprehensive and more explicit. Commenters stated that since the HEA supports the proposed recoupment process and burden allocation, the final rule should cite the relevant regulatory authority and case law that supports the Department's interpretation of the HEA, in addition to elaborating on the reasons behind the change.

*Discussion:* We appreciate the feedback from the commenters. In this rule, we are separating the process for adjudicating a BD claim from the process for recouping the government's loss from the responsible institution. Under this rule, if the Department initiates an action to recoup from the institution, it will follow the procedures provided in 34 CFR part 668, subpart H, which apply to other actions in which the Department attempts to recoup funds from a participating institution.

Under those rules, following an audit or compliance determination by the Department, the institution has the burden of demonstrating that its receipt or expenditure of funds was appropriate and in compliance with applicable conditions. That approach is appropriate here since the institution is the party which is most likely to have relevant records relating to the basis of the BD claim and because the institution had an opportunity to present relevant evidence and arguments at the time the Department was adjudicating the claim. To switch the burden of production would create a disincentive to institutions to submit their evidence during the earlier process thus limiting the record before the Department when it is adjudicating claims.

*Changes:* We have added new § 668.125 within part 668, subpart H that specifies certain procedural elements specific to a borrower defense recoupment proceeding as described in the response to the prior comments.

*Comments:* A few commenters objected to using part 668, subpart H, saying that it provided more limited rights than what is available under part 668, subpart G. Commenters pointed to the ability to have live witness testimony and, discovery in particular, as elements not available under part 668, subpart H. Commenters also noted that only certain types of evidence can be brought under part 668, subpart H, which would not be the most relevant for defending allegations. They also argued that without showing student harm the Department could not recoup the compensatory damages contemplated under part 668, subpart H. Commenters also asked whether the timeline for this proceeding would match the same timeline used for other part 668, subpart H proceedings.

*Discussion:* The processes of part 668, subpart G are designed to address the issues presented in those cases—the possible termination, limitation or suspension of the institution's title IV program participation or the imposition of a penalty on the institution. In contrast, the processes provided under part 668, subpart H are designed to resolve issues relating to whether the institution owes a financial liability to the Department. In the BD context, the issue is the latter (financial liability) not the former. The Department has successfully used the processes in subpart H to resolve financial liability issues for more than 30 years, including in cases where the Department is pursuing liabilities from an institution based on approved closed school and other discharges. The commenters did not provide any examples of situations

in which the processes provided in subpart H would not be sufficient to address the issues presented. We also note that many commenters' have a misunderstanding of the subpart G process. There is no right to discovery in subpart G and there is no automatic right for the parties to present oral testimony or oral argument. Instead, the hearing officer sets the procedures to be used based on the issues presented as outlined in § 668.89(a) and (b). In BD cases, the institution will have had the opportunity to rebut the evidence and arguments supporting the claims during the adjudication process and will have seen how the Department addressed its arguments during that process. If the Department decides to pursue collection of the liability from the institution, the subpart H process provides an opportunity for the institution to present its arguments that it should not be held liable for the value of the claims granted. This process also affords institutions the ability to appeal the decision of the hearing official to the Secretary.

As noted above, the Department has added language in the new § 668.125 to address certain issues raised by commenters. This specifies the types of evidence considered during the proceedings and confirms the time provided for an institution to request a hearing after receiving written notice.

*Changes:* We added new § 668.125 that lays out the procedures for a proceeding under part 668, subpart H related to recoupment efforts on approved borrower defense claims. Those additions are described above.

*Comments:* A few commenters suggested that holding executives and owners personally liable, as authorized under the HEA, would produce two intended results: reducing the burden on students and taxpayers for decisions made by these individuals that resulted in harm to students and creating a deterrent effect on the owners, executives, and board members of these institutions. These commenters urged the Department to adopt specific processes to facilitate the recoupment of funds from the owners and executives of institutions subject to borrower's defense claims, regardless of whether the school has closed.

*Discussion:* We decline to incorporate specific additional processes to seek recoupment of funds from owners of institutions subject to BD claims. We believe that the financial responsibility regulations in part 668, subpart L, along with the regulations in § 685.409 provide us with adequate authority to recover from owners in circumstances permitted by the HEA.

*Changes:* None.

*Comments:* Many commenters noted that there was no regulatory text to accompany the NPRM preamble's mention that we would not seek to recoup on approved claims stemming from an act or omission that would not have been approved under the standard in effect at the time the loan was first disbursed.

*Discussion:* The Department is adding regulatory text to clarify the policy laid out in the NPRM. Though the standard in this regulation will apply to all claims pending on or received on or after July 1, 2023, in § 685.409(b) the Department has added language noting that it will not seek to recoup on an approved claim under this regulation unless it would have been approved under the 1994 regulation standard for loans first disbursed prior to July 1, 2017; the 2016 regulation standard for loans first disbursed on or after July 1, 2017, and before July 1, 2020; and the 2019 regulation standard for loans first disbursed on or after July 1, 2020, and before July 1, 2023.

*Changes:* Because the standards in this rule will apply to claims pending on or received on or after July 1, 2023, we revised § 685.409(b) to clarify that the Secretary shall not collect from the school any liability to the Secretary for any amounts discharged or reimbursed to borrowers under the discharge process described in § 685.406 unless: for loans first disbursed before July 1, 2017, the claim would have been approved under the standard in § 685.206(c)(1); for loans first disbursed between on or after July 1, 2017, and before July 1, 2020, the claim would have been approved under the standard in §§ 685.222(b) through (d); and, for loans first disbursed between on or after July 1, 2020, and before July 1, 2023, the claim would have been approved under the standard in § 685.206(e)(2).

*Comments:* A few commenters suggested that the Department conduct a second adjudication under the 1994, 2016, or 2019 regulation, as applicable, before attempting to recoup any approved claims that would have originally been covered by one of those regulations. The commenters noted that the borrower would not have to participate under that process.

*Discussion:* The Department disagrees with these commenters. Approving a BD claim will not automatically trigger a recoupment process. Instead, as specified in § 685.409, the Department will need to initiate a part 668, subpart H proceeding. As part of that process, the Department would need to demonstrate how the approved claim it seeks to recoup would have met the

standards for approval under the relevant regulation. This will provide the institution the information it needs to contest whether that claim would in fact have been approved under the relevant regulation. We will also provide the institution with an opportunity to respond in the relevant proceeding before making a final determination.

*Changes:* None.

*Comments:* Some commenters suggested that the Department not bifurcate the processes of approval of BD claims and recoupment. They argued for keeping the two processes together—in particular due to, what they described as, the significant harm to an institution just from approving a claim. They also noted that any approval puts an institution one step closer to recoupment. Another commenter pointed out that the Department did not give examples of how a borrower must cooperate in any recoupment proceeding.

*Discussion:* The Department declines the commenter's suggestion to combine the approval of BD claims and recoupment. As we discuss elsewhere in this preamble, the adjudication of borrower defense claims is a matter between the borrower and the Department, and recoupment is a matter between the institution and the Department. These are two separate proceedings with different parties and, as such, require different processes. Similarly, the Department disagrees with the commenter's claim that the mere act of approving a BD claim imposes exposure on the institution so extensive that approval and recoupment cannot be disconnected. These concerns are addressed in more detail by the Department's responses in the ''*General Opposition to Regulations*'' section related to comments on institutional reputational and other forms of harm. We also note that the argument about all approvals putting an institution one step closer to recoupment overlooks the actual provisions and structure of this rule. In this rule, the Department outlines several situations in which an institution will not face a recoupment proceeding, including claims outside the limitations period for recoupment or those that would not have been approved under the BD standard in place at the time of the loan's disbursement. The Department also retains the discretion whether to pursue recoupment from the institution in other circumstances.

We specify in § 685.410 that to obtain a discharge, a borrower must reasonably cooperate with the Secretary in any proceeding under these regulations.

Because recoupment is a matter between the institution and the Department, the borrower would be a non-party at the recoupment stage because, by then, the borrower's BD claim would have been adjudicated. The sworn statement under penalty of perjury and any other materials submitted by the borrower when they applied are likely to be the most important items from the borrower in a recoupment proceeding. The cases where additional cooperation might be necessary would vary depending on the specifics of the recoupment effort and the facts involved. Accordingly, the Department expects that borrowers will provide any necessary additional assistance as relevant and requested when conducting a recoupment proceeding.

*Changes:* None.

*Time Limit for Recovery From the Institution*

*Comments:* Many commenters recommended that either a 5- or 6-year time limit for recovery from the institution would be optimal to both benefit borrowers and maintain fairness for institutions. A few proposed a 3-year limitation period to align with the record retention requirement for student aid records.

A few commenters suggested limiting the tolling period and suggested revised language. The commenters stated tolling should come to an end and allow the institution to maintain its business without the fear of receiving BD claims at some indeterminate date in the future. Similarly, some commenters expressed concerns about the lack of any limit on the recoupment period for claims approved due to a judgment. Other commenters proposed that the limitations period should be temporarily suspended upon notification by the Department and that any pause should cease upon the issuing of a final decision on the claim or the issuing of a judgment. One commenter requested that the Department make the regulatory text more definitive as to when events suspend the limitations period. Finally, commenters also suggested that the Department issue a decision within 1 year of the final decision notice about whether it would seek to recoup.

*Discussion:* The Department sought feedback in the NPRM on whether to use a 5-year or 6-year limitations period for BD recoupment proceedings.[121] After careful consideration, the Department is convinced that a 6-year limitations period for recoupment is appropriate. In part, we believe that,

---

[121] 87 FR at 41913.

because some States have 6-year limitations periods for consumer protection claims and that a borrower could assert a State law standard during reconsideration as a defense to repayment, a 6-year time frame would give the Secretary the ability to recoup the costs of approved BD claims. The limitations period would be tolled if the Department notifies the institution of the BD claim.

We disagree with commenters who suggest a 3-year limitations period. The Department believes this time frame is too short, as it minimizes the financial remedies for the Department.

We also disagree with the proposal to limit the recoupment period for judgments. Obtaining a judgment often takes years after a complaint is filed. The Department is concerned that the limitations period for recoupment could expire while a case is working its way through the litigation process. Using a clock on judgments could also encourage institution to intentionally extend case schedules rather than expeditiously moving a case closer toward resolution. Given that the litigation process produces and preserves evidence, and that a judgment follows a robust factfinding process, the lack of a limitations period for judgments is appropriate.

In response to the commenter who requested that the Department alter the regulatory text on tolling the limitations period, we disagree that the text is vague as the commenter described. The relevant text in those provisions reflects existing regulatory language,[122] and the word "may" is used to avoid presupposing that the school's acts or omissions impacted the borrower or that the borrower's claim should be granted. We enumerated the instances when certain notifications toll the limitations period: when the Department official notifies the school; receipt of a class action complaint; and upon a civil investigative demand or other demand for information from a competent authority. We believe the regulatory text in § 685.409(c) is clear. We are, however, making slight modifications to the regulatory text on the school's receipt of a class action complaint to state the limitations period is tolled when a class is certified in a case against the institution asserting relief that may form the basis of a BD claim.

We are partially accepting the proposal by commenters to not keep the limitations period permanently suspended even after a final decision is issued. In particular, if there is a final agency decision to deny an application,

it would be reasonable to cease the tolling of any limitations period, since that would keep a denied claim potentially available for recoupment until the loan is paid off. Therefore, we are updating § 685.409 to cease the suspension of any limitations period upon issuing a final agency decision to deny a claim. We, however, decline the other suggestions from the commenter to cease the suspension of the limitations period upon any approval, or to announce the Department's intentions regarding recoupment within 1 year of a final decision. Based on past experience, the Department is highly likely to receive additional individual applications after the approval of claims. As such, the universe of approved claims under which the Department may seek to recoup could grow over time. It would be more efficient for both the Department and the institution to conduct a single recoupment effort for similarly situated claims. As such, preserving flexibility for a delay between approval and any initiated recoupment is appropriate.

*Changes:* We revised § 685.409(c)(2)(ii) to state that the limitations period does not apply if a class that may include the borrower is certified in a case against the institution asserting relief that may form the basis of a BD claim. We also added new § 685.409(c)(4) to note that the suspension of the limitations period in this section will cease upon the issuing of a final decision to deny a claim under § 685.406(f)(2).

*Comments:* A few commenters argued that tolling the limitations period for a class action complaint is too broad. These commenters also stated that written notice of a State investigation is too low a bar to toll. These commenters suggested that tolling of the limitations period be limited to final, non-default adverse judgments regarding a class action complaint asserting relief for a class, or written notice of a final adverse action, or non-appealable finding of a civil investigative demand from a Federal or State agency.

*Discussion:* We agree with the commenters in part. Simply filing a class action complaint is too low a bar for tolling the limitations period, as a judge may then decline to certify a class. Instead, requiring a class to be certified in a case against the institution establishes a more meaningful bar for tolling the limitations period. This balances the need for the Department to pause the limitations period so that cases can run their course and potentially lead to an approvable BD claim without holding an open-ended

limitations period over an institution for every complaint filed.

We disagree, however, with the suggestion to unlink the limitations tolling from the filing of a written State investigation request. As we state in the NPRM, such notice would make the institution aware of the issue and the possibility of related action, essentially alleviating the concerns that a limitations period is meant to address. Receiving such formal notice would require the institution to maintain relevant records and thus addresses any concerns about institutions no longer retaining any relevant records.[123] Moreover, we are concerned that if we did not toll the limitations period upon receipt of the investigation request, the institution may have an incentive to intentionally delay providing responsive documents to avoid the prospect of recoupment.

We also disagree that tolling should only be keyed to final adverse outcomes or findings. As a general matter, a limitations period serves interests in finality, providing notice to defendants, and avoiding adjudications based on stale or disappeared evidence. We do not believe that waiting until final adverse outcomes or findings is needed to account for those interests. Instead, we believe that the events the regulations identify for tolling purposes reflect reasonable points in time that acknowledge the sequence in which Department is likely to learn of relevant bases for relief but that still address interests in finality and avoiding unlimited periods of liability.

*Changes:* None.

*Comment:* One commenter argued that since a portion of many borrowers' loans are for costs not attributed to the institution, such as room and board, the Department should not try to recoup on the full amount of all discharges.

*Discussion:* The Department disagrees. When a student borrows, they are taking out money for the cost of attending that institution and the cost of attendance (COA) is calculated by the institution. It is important to note that institutions have the discretion to determine a reasonable COA based on information they have about their students' circumstances. It would not be appropriate to limit recoupment to some lesser amount. Moreover, given that money is fungible, there is no feasible way to distinguish what funds went to living expenses versus other purposes.

*Changes:* None.

---

[122] *See, e.g.,* 34 CFR 685.222(e)(b)(iii)(B)–(C).

[123] 87 FR at 41913.

**Pre-Dispute Arbitration and Class Action Waivers (§§ 668.41, 685.300, 685.304)**

*General Support for Pre-Dispute Arbitration and Class Action Waiver Regulations*

*Comments:* Many commenters supported the Department's proposed rules to prohibit mandatory pre-dispute arbitration and class action waivers and agreements. These commenters acknowledged that the regulation is within the Department's authority under Sec. 454(a)(6) of the HEA, which authorizes the Department to include in the PPA such "provisions as the Secretary determines are necessary to protect the interests of the United States and to promote the purposes of" the Direct Loan program. One commenter specifically noted that students should not have to forfeit their rights in pursuit of higher education and that had these students been aware of potential wrongdoing earlier, fraudulent activity could have been curtailed.

*Discussion:* We appreciate the many commenters who wrote in support of these regulations prohibiting institutions from requiring pre-dispute arbitration agreements or class action waivers from borrowers who obtained or benefitted from a Direct Loan. The Department's experience in reviewing and resolving BD claims demonstrates that many borrowers have been misled into attending predatory institutions, all the while incurring student loan debt. We believe it is in the public interest to ensure that these borrowers' rights under the Direct Loan Program, such as their ability to file a BD claim or pursue other appropriate legal relief, are not abrogated by an institution that has chosen to participate in the Direct Loan Program.

*Changes:* None.

*Comments:* Several commenters urged the Department to take appropriate enforcement action against any institution that intends to circumvent the notice provisions in these regulations.

*Discussion:* We agree with the importance of these requirements. The Department intends to vigorously assess institutions' compliance with these regulations and enforce them to protect borrowers' rights.

*Changes:* None.

*General Opposition for Pre-Dispute Arbitration and Class Action Waiver Regulations*

*Comments:* A few commenters representing institutions opposed the Department's prohibition of mandatory pre-dispute arbitration agreements,

arguing that such prohibition adds complexity, cost, and uncertainty to the resolution of student complaints. These commenters further asserted that arbitration allows for faster and more cost-effective resolution of disputes when compared to litigation via the judicial system. They further argued that defendants and claimants have the same legal rights in arbitration as in court.

Another commenter stated that the Department did not sufficiently explain its analysis for the proposed regulatory changes pertaining to arbitration agreements. This commenter further asserted that we failed to engage with the justifications for the current regulation in a meaningful manner and, therefore, the Department did not provide the public a sufficient basis to justify the rule change.

*Discussion:* We disagree with commenters who characterize pre-dispute arbitration agreements as more beneficial to students and borrowers. As discussed in the NPRM, the Department believes that the history of the Federal student loan programs demonstrates that mandatory pre-dispute arbitration agreements and class action waivers impede borrowers' ability to file BD claims and receive appropriate relief and discharges.[124] As noted in the NPRM, Corinthian Colleges included mandatory arbitration and class action waivers in students' enrollment agreements; these students effectively could not receive BD relief due to the restrictive covenants in their enrollment agreements. Including such provisions in the students' enrollment agreements further insulates institutions from financial liability and severely limits the opportunities for borrowers to pursue recovery while bringing their claims about the institutions' misdeeds to the attention of appropriate regulators and the public.

In response to the commenter who stated that we did not sufficiently explain our analysis for the changes pertaining to pre-dispute arbitration agreements, we note that we explained in the NPRM our reasons for prohibiting pre-dispute arbitration agreements in students' enrollment agreements and the basis for the policy changes from the 2019 rule.[125] We reviewed both the 2016 NPRM and the 2019 final rule and remain concerned about current and prospective students' ability to assess the potential burdens and risks they assume when they choose to attend an institution that includes mandatory arbitration and class action waivers in

its enrollment agreement. The NPRM also highlighted those areas where the 2019 regulations failed to protect borrowers and taxpayers.[126] We also note that the 2019 regulations relied on evidence of the efficacy of arbitration that is inconsistent with the actual experience in the student loan programs administered by the Department.

*Changes:* None.

*Comments:* Multiple commenters requested that the Department maintain the current regulations with regard to pre-dispute arbitration agreements and class action waivers. One commenter posited that the Department's rationale for regulating pre-dispute arbitration agreements was vague enough to allow for arbitration bans tied to any source of Federal funding. One commenter also alleged that the Department did not consider the benefits of arbitration when developing these regulations. Another commenter claimed that the Department has not explained how these regulations better balance the costs and benefits of arbitration.

*Discussion:* The Department has the authority to regulate the use of pre-dispute arbitration agreements under Sec. 454(a)(6) of the HEA, which authorizes the Department to include in the PPA such "provisions as the Secretary determines are necessary to protect the interests of the United States and to promote the purposes of" the Direct Loan program. Such purposes include providing financing for students to pursue postsecondary education and obtaining repayment for the taxpayers. To obtain repayment, the loans must be enforceable obligations. To ensure that loans are enforceable, borrowers must have a full opportunity to raise legal issues regarding the institution's conduct and services and access to timely and pertinent information that may inform their enrollment decisions.

The Department's actions are tied specifically to promoting the interests of the Direct Loan program. Institutions choose to participate in the Direct Loan program and are subject to many restrictions and requirements relating to that participation. If an institution voluntarily signs a PPA to participate in the Direct Loan program and benefit from public funds, then it must agree to abide by the conditions the Department determines are necessary to safeguard borrowers, taxpayers, and the integrity of the program.

In response to the commenters who stated that the Department failed to consider the benefits of arbitration and the costs and benefits associated with arbitration, we considered the effect of

---

[124] 87 FR at 41914.

[125] 87 FR at 41914–41918.

[126] 87 FR at 41915.

pre-dispute arbitration agreements on the achievement of the goals of the Direct Loan program. For a borrower to fully obtain the benefits of the Direct Loan program, a Federal public benefit, all of the benefits must be available to the borrower without obstruction or delay including a borrower defense discharge. As we explained in the NPRM, we concluded that these pre-dispute arbitration agreements frustrate the purposes of the Direct Loan program.[127]

We recognize that arbitration may provide some potential efficiencies for institutions and consumers and the regulations do not discourage institutions from offering or promoting arbitration to complainants once a grievance is reported. The regulations instead only forbid institutions from imposing arbitration upon Direct Loan borrowers as a mandatory barrier to seeking relief through other means. The regulations also do not bar institutions from immediately addressing a grievance as fully as it can, whether or not the student chooses to raise the complaint to outside authorities.

*Changes:* None.

*Pre-Dispute Arbitration and Class Action Waiver Notices*

*Comments:* A few commenters suggested that we clarify that institutions must use the notice language included in the final regulations verbatim and without conditions. These commenters cited a recent court decision in compelling students to pursue arbitration *Britt* v. *Florida Career College* as the basis for the commenters' suggestion.

Several other commenters asked the Department to clarify the timing of notices sent to borrowers to ensure that they be made aware as quickly as practicable that their rights to pursue claims in court have been restored, both individually and as part of a class.

*Discussion:* The regulations at § 685.300(e)(3) clearly state the specific language that institutions must use in notices (and amendments to notices) provided to borrowers whose class action rights are restored under these regulations, as well as when institutions must deliver such notices or amendments. Similar provisions apply for the regulations at § 685.300(f)(3) for pre-dispute arbitration agreements.

*Changes:* None.

*Comment:* One commenter requested clarification regarding an instance where an institution that otherwise satisfied the requirements to notify students that the institution complies

[127] 87 FR at 41914.

with § 685.300(e)(3), moves to dismiss, defer, or stay a class action lawsuit, without reference to the agreement.

*Discussion:* The Department believes that the regulation clearly refers to the institution's use of pre-dispute arbitration agreements in certain types of cases. We do not believe that further clarification is needed.

*Changes:* None.

*Internal Dispute Process*

*Comments:* Several commenters expressed concerns with provisions that would restrict institutions from requiring students to pursue complaints related to a BD claim through an internal dispute process before presenting it to an accrediting agency or government agency. These commenters assert that requiring students to attempt to resolve disputes internally before filing a claim would lower the number of pending BD claims and provide borrowers with a faster resolution when disputes arise. In addition, commenters claim that reliance upon an internal dispute process would be consistent with the processes established under the Federal Arbitration Act (FAA) for resolving disputes without protracted legal challenges.

*Discussion:* We recognize that some internal dispute resolution processes provide some potential merits and efficiencies, and the regulations do not discourage the use or promotion of internal grievance procedures. Instead, the regulations only forbid institutions from imposing a mandatory barrier upon borrowers before seeking relief through other means. The regulations also do not bar institutions from immediately addressing a grievance as fully as they may wish, regardless of whether the student chooses to raise the complaint with outside authorities.

However, if a borrower believes that a grievance is significant enough to warrant the attention of a government agency or accrediting agency, we believe that the benefit of bringing that complaint to their attention outweighs the benefits of compelling the student to delay. The regulations do not impose any duty on such an authority or accrediting agency to take any particular action, and they may choose to defer or delay consideration of the complaint until completion of the institutional process. However, at a minimum, the regulations would help those authorities better monitor institutional performance by making timely notice of substantial complaints more likely.

We disagree with the commenters who invoke the FAA to support mandatory reliance upon an internal dispute process. The FAA specifically

refers to the practice of arbitration and does not extend to an entity's internal dispute process. Moreover, for reasons detailed elsewhere in this Notice in response to other comments concerning mandatory arbitration, the Department considers the regulation of class action waivers and pre-dispute arbitration agreements to be justified because they affect the interests of the Direct Loan program.

*Changes:* None.

*Comments:* A few commenters noted that requiring students to exhaust internal dispute processes before presenting BD claims to an accrediting agency or relevant government agency diminishes the opportunity to ensure students are afforded full relief and to identify and address systemic issues. Commenters suggested that if institutions maintain that students benefit from internal dispute processes then institutions can offer this as an option.

*Discussion:* We appreciate the comments in support of prohibiting institutions from requiring Direct Loan borrowers to navigate an internal dispute process prior to presenting a complaint to an accrediting agency or government agency. We agree that allowing institutions to mandate the use of an internal dispute process diminishes the opportunity to ensure students are afforded full relief and to identify and address systemic violations. We agree with the commenters who correctly noted that the regulations do not discourage the use or promotion of internal grievance procedures, and instead only prohibit participating institutions from imposing such a process upon borrowers as a mandatory barrier before borrowers can seek relief through other means.

*Changes:* None.

*Submission of Arbitral and Judicial Records; Centralized Database*

*Comments:* A few commenters suggested the Department eliminate the requirements that institutions submit arbitral and judicial records in connection with BD claims. These commenters stated the requirements to submit these records are extremely broad and likely would place a significant burden on institutions without regard to the materiality of the claims or the likelihood of success.

*Discussion:* We decline to eliminate the submission requirements. As we stated in the NPRM, use of these mandatory arbitration agreements is often shielded from public view and the lack of transparency is an issue that impedes our ability to oversee institutions and to "protect the interests

of the United States'' by hampering our ability to identify patterns of abuse and wrongdoings to take appropriate corrective action.[128] In other words, the Department requires these records to conduct oversight over institutions.

We also disagree that these requirements to submit records are overly broad. Section 685.300(g)(1) states that a school must submit arbitral records in connection with any BD claim filed in arbitration by or against the school, and § 685.300(h)(1) states that a school must submit judicial records in connection with any BD claim filed in a lawsuit by the school against the student or by any party, including a government agency, against the school. The required submission of records is thus appropriately connected with any BD claims.

*Changes:* None.

*Comments:* One commenter requested further information regarding requirements for the submission of arbitral and judicial records in accordance with § 685.300(g) and (h). This commenter requested additional details on the publicly accessible centralized database where the Secretary would publish arbitral and judicial records. The commenter further requested clarification on the policy basis for the Department's regulations, who the Department believes will access these records and why publicly available documents (such as judicial records) will need to be submitted when they are freely available elsewhere. Finally, the commenter asked whether the Department has considered the potential for individuals to ''troll'' the database for clients.

A separate group of commenters suggested that the Department clarify what it means by ''in connection with any borrower defense claim filed in arbitration,'' (§ 685.300(g)) or filed ''in a lawsuit'' (§ 685.300(h)). They asked whether the Department is asserting that covered records must be submitted after a BD claim is filed or whether we would require an institution to submit records that could give rise to a BD claim.

*Discussion:* To implement the 2016 regulations on the prohibition of pre-dispute arbitration agreements and class action waivers, the Department published an electronic announcement [129] about the changes made under those regulations. We envision a similar approach to implementation of these regulations and

will provide guidance to institutions on how to submit arbitral or judicial records in accordance with the regulations. Because the requirements of these regulations will include an information collection in accordance with the Paperwork Reduction Act, the Department will seek public comment about the data we will collect, as well as information about the centralized database. This includes where the Secretary will publish the centralized database containing the appropriate arbitral and judicial records.

With respect to the commenter's requests for clarification on the policy basis for the Department's regulations, the Department reiterates its policy position and the Department's rationale in the NPRM, specifically the discussion set forth at 87 FR 41913 through 41918. Notably, and we emphasize again, the institutions' use of mandatory arbitration agreements impedes the Department's oversight authority as arbitral records are often shielded from public view. We disagree with the commenters' assertion that publicly available documents are freely available elsewhere. In the case of judicial records that may be public, some records may be difficult for the general public to access because of user registration, fees, and other hindrances. The Department's publication of these arbitral and judicial records in a centralized database supports open government initiatives to help ensure consistency, increase transparency, and establish self-service opportunities for stakeholders, especially for borrowers or prospective students.

In response to the commenter's request to clarify whether the Department has considered the potential for individuals to ''troll'' the database for clients, we considered the matter and addressed confidentiality concerns in the NPRM.[130]

Finally, with respect to the commenters who suggested that the Department clarify what it means by ''in connection with any borrower defense claim,'' we believe the regulatory text at § 685.300(i)(1) provides the parameters of a BD claim, which is a claim based on an act or omission that is or could be asserted as a borrower defense as defined in the regulations. Thus, we would require institutions to submit records in connection with an act or omission that is or could give rise to a BD claim.

*Changes:* None.

*Comments:* Multiple commenters requested that the Department rescind the proposal and maintain the current

regulations, with regard to pre-dispute arbitration agreements and class action waivers. Commenters asserted that the 2019 Rule cited that the ''primary motivation'' for allowing the use pre-dispute arbitration agreements and class action waivers was to provide students ''an opportunity to obtain relief in the quickest, most efficient, most cost-effective, and most accessible manner possible.'' Commenters further stated that when weighed against the costs of a trial, the Department chose when issuing the existing regulations ''to emphasize speedy relief and accessibility'' in resolving grievances. A commenter alleged that the Department did not explain why the additional time and cost of a class action lawsuit is preferable to the speed of arbitration. Commenters also argued that the disclosures currently required under § 668.41(h) protect student borrowers by requiring detailed consumer disclosures about the use of pre-dispute arbitration agreements and class action waivers, consistent with Congress' intent with respect to the utilization of arbitration for dispute resolution.

*Discussion:* In the NPRM we described the actual effect that class action waivers had in the postsecondary education field on students and Federal taxpayers.[131] Nothing in the comments opposing the regulation provides evidence that these effects are exaggerated or mischaracterized, that the substantial problems enabled by the use of class action waivers has been reduced or eliminated by more modest measures, that the disadvantages and burdens the regulation would place on schools outweigh the real costs and harm that use of class action waivers has already caused, or that there is any reason to expect that this pattern will change so that such waivers will not enable these same problems in the future.

Reliance upon internal dispute resolution processes and arbitration impedes effective program oversight by the Department as well as accrediting agencies and other oversight bodies, because institutional and arbitral records are often shielded from public view. Prospective students may not be able to make informed enrollment and borrowing decisions without knowledge of or access to arbitral records that may otherwise reveal systemic problems at an institution, whereas public knowledge of a class action suit allows prospective students to make more informed decisions.

It is possible that restricting the use of class action waivers may in some cases

---

[128] 87 FR at 41916.

[129] *https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2019-03-15/ope-announcements-subject-guidance-concerning-some-provisions-2016-borrower-defense-repayment-regulations.*

[130] 87 FR at 41917.

[131] 87 FR at 41916.

increase legal expenses and could divert funds from educational services or lead to tuition increases. We also concur that arbitration or an internal resolution process may in some cases be faster or less costly. However, the 2019 regulations failed to adequately balance the costs and benefits of arbitration, focusing too heavily upon the premise that arbitration provides speedier results, while failing to consider the protection of the interests of the United States, whose funds are at stake for BD claims asserted on Direct Loans. Moreover, the benefits associated with the availability of a class action suit as a borrower remedy are not limited merely to the amount of monetary relief or the speed with which a grievance is resolved. The potential for a class action lawsuit also offers value as a preventative measure, and we expect that the potential for exposure to class actions will motivate institutions to provide competitive value and treat their student borrowers fairly in order to reduce the likelihood of such suits occurring.

In response to comments that the disclosures currently required under § 668.41(h) protect students, the Department does not believe that there is evidence that such protections are adequate to safeguard borrowers against harm. Since the issuance of the 2019 regulations, the Department has heard from borrowers, student advocacy groups, State attorneys general, and the public about problems arising from mandatory class action waivers and the opaqueness of institutional and arbitral records. In a review of court filings, the Department observed that institutions frequently relied on pre-dispute arbitration clauses to discourage students from filing appropriate claims in court and to force them into arbitration. The records of these arbitration proceedings are not publicly accessible.[132] State attorneys general [133] have also written the Secretary to request a BD discharge on behalf of the borrowers in their states and the Department found that the students' enrollment agreements purported to bar such borrowers from bringing a BD claim to the Department, even though they had a legal right to do so. Finally,

the Department was also apprised of reports and studies that suggest that, in other consumer-related fields, forcing individual borrowers into arbitration with businesses that have experience with arbitration and which were involved in structuring the arbitration process tilted in the favor of the industry irrespective of the amount of disclosures that were made.[134]

In sum, the Department's position is that class action waivers contribute to an environment in which bad actors can mask abuses, delay or evade accountability, and harm borrowers by restricting access to the full array of relief available to them under the law.

*Changes:* None.

*Legal Authority*

*Comments:* A few commenters opposed the Department's pre-arbitration and class action waiver regulations and argued that the restriction on mandatory pre-dispute arbitration agreements and class action waivers violates decades of public policy favoring arbitration and that courts have ruled that prohibitions against arbitration violate the FAA.

*Discussion:* As we explained in the 2016 NPRM, the Department lacks authority, to displace or diminish the effect of the FAA and does not invalidate any arbitration agreement, whether already in existence or obtained in the future. This is true for these regulations as well; we are not displacing or diminishing the effect of the FAA, and these regulations do not affect any arbitration agreement in existence or obtained in the future.

As we explained in the NPRM, this position has prevailed in Federal district court.[135] Specifically, the court in *California Association of Private Postsecondary Schools* v. *Devos* noted that "if a school wants to participate in a Federal program and to benefit from the many billions of dollars that the United States distributes in Direct Loans every year, it must agree to abide by the conditions that the Secretary reasonably determines are necessary to protect the public and the integrity of the program." [136] In that case, the court concluded that the Department's 2016

regulations were consistent with the Secretary's authority under the HEA and did not conflict with the FAA. We further noted that regulations issued by the U.S. Department of Health and Human Services (HHS) in 2019, which barred health care facilities participating in the Federal Medicare and Medicaid programs from requiring residents to agree to binding arbitration as a condition for admission, were similarly upheld based on the agency's authority to condition participation in those Federal programs.[137]

*Changes:* None.

*Comments:* A few commenters contended that the Department lacks the authority to regulate on arbitration agreements or class action waivers. In these commenters' view, absent an explicit statutory authority to regulate on arbitration agreements and class action waivers, the Department cannot prohibit an institution from including in the institution's enrollment agreements an arbitration agreement or class action waiver in the filing of a BD claim.

*Discussion:* The Department respectfully disagrees with these commenters. Under Sec. 454(a)(6) of the HEA, the Secretary shall include in the institution's PPA "provisions as the Secretary determines are necessary to protect the interest of the United States and to promote the purposes of" the Direct Loan program. Moreover, Sec. 410 of the GEPA provides the Secretary with authority to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operations of, and governing the applicable programs administered by, the Department.[138] Under Sec. 414 of the Department of Education Organization Act, the Secretary is authorized to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department.[139] Collectively, the above statutory authorities granted to the Secretary gives the Department broad discretion to regulate on arbitration agreements and class action waivers as they relate to a BD claim.

*Changes:* None.

*Definitions*

*Comments:* A few commenters requested that the Department modify its definition of "borrower defense claim" in § 685.300(i) to be a claim

[132] *Britt* v. *IEC Corp.,* No. 20–CV–60814, 2021 WL 4147714 (S.D. Fla. Sept. 13, 2021); *Hadden* v. *Univ. Acct. Servs.,* No. 18–CV–81385, 2020 WL 7864091 (S.D. Fla. Dec. 31, 2020); *Cheatham* v. *Virginia Coll., LLC,* No. 19–CV–04481, 2020 WL 5535684 (N.D. Ga. Sept. 15, 2020); *Mosley* v. *Educ. Corp. of Am.,* No. 20–CV–105, 2020 WL 3470174 (N.D. Ala. June 25, 2020); *Caplin* v. *Everglades Coll. Inc.,* No. 20–CV–21886, 2020 WL 10224161 (S.D. Fla. Nov. 2, 2020).

[133] *See https://coag.gov/app/uploads/2022/06/CEHE-BD-application-6.30.22.pdf.*

[134] Mark Egan, Gregor Matvos, & Amit Seru, *Arbitration with Uninformed Consumers,* Harvard Business School Finance Working Paper No. 19–046, at 1 (May 11, 2021), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3260442* (in study of consumer arbitration in the securities industry, explaining that the "the pool of arbitrators skews pro-industry due to competition").

[135] FR at 41915 (citing *Cal. Ass'n of Priv. Postsecondary Sch.* v. *DeVos,* 436 F. Supp. 3d 333, 344 (D.D.C. 2019), *vacated as moot,* No. 20–5080, (D.C. Cir. Oct. 14, 2020)).

[136] *Id.*

[137] *Northport Health Servs. of Ark.* v. *U.S. Dep't of Health & Human Servs.,* 14 F.4th 856, 866–69 (8th Cir. 2021).

[138] 20 U.S.C. 1221e–3.

[139] 20 U.S.C. 3474.

based on an act or omission that is or could be asserted as a borrower defense. These commenters note that for purposes of the pre-dispute arbitration and class action waiver provisions, clarity around a borrower defense claim is needed given the Eleventh Circuit ruling in *Young* v. *Grand Canyon University, Inc.*[140]

*Discussion:* The proposed rule's definition of a BD claim included as an element an actionable act or omission, which refers to the enumerated categories or conduct that may serve as a basis for a borrower defense. Because the definition is inclusive of such an act or omission, we were concerned that adding a reference to a claim based on that act or omission would risk being superfluous. Nevertheless, considering the Eleventh Circuit ruling in *Young*,[141] which focused on a BD claim and the regulatory language we constructed, the Department will incorporate the language proposed by the commenters.

*Changes:* We revised § 685.300(i) to define a borrower defense claim as a claim based on an act or omission that is or could be asserted as a borrower defense as defined in the BD regulations.

*Comments:* One commenter expressed concern about institutions that contract with online program managers (OPMs). The commenter indicated that OPMs develop, deliver, and recruit for online degree programs that are marketed and promoted using the brand name of their institutional clients. OPMs are compensated by a percentage of revenue raised from the academic programs they manage, which set up incentives like those found among predatory institutions. The commenter urged the Department to consider OPMs covered under the pre-dispute arbitration and class action waiver regulations.

*Discussion:* As we stated in the NPRM, the Department's authority with respect to the terms and conditions of the institution's PPA with the Secretary only pertains to the making of a Direct Loan or the provision of educational services for which the Direct Loan was intended.[142] OPMs may be covered under these regulations only to the extent they are providing services that are part of the borrower's educational

program for which the Direct Loan was intended.

*Changes:* None.

**Interest Capitalization (§§ 685.202, 685.208, 685.209)**

*General Support for Interest Capitalization Regulations*

*Comments:* Many commenters expressed their support for our proposal to end interest capitalization on Direct Loans where it is not required by HEA.

One commenter noted that the proposed rule will have the effect of slowing growth on the balance of loans and create a fairer repayment system. This commenter also stated that interest capitalization imposes financial burdens on borrowers who are already experiencing financial instability.

Commenters pointed out that ending interest capitalization would assist many borrowers who have struggled with high loan balances and repayment of their loans since their overall amount of interest paid would be significantly lower.

*Discussion:* The proposed regulations eliminated most of the current regulatory provisions that require capitalization for Direct Loans under circumstances when it is not required by statute. As proposed, accrued interest would no longer be capitalized when: a borrower enters repayment; upon the expiration of a period of forbearance; annually after periods of negative amortization under the alternative repayment plan or the income-contingent repayment (ICR) plan; when a borrower defaults on a loan; when a borrower who is repaying under the Pay As You Earn (PAYE) income-driven repayment plan fails to recertify their income or chooses to leave the plan; and when a borrower who is repaying under the Revised Pay As You Earn (REPAYE) plan, fails to recertify their income or leaves the plan. As noted later in this preamble, the Department missed two instances of interest capitalization that are not statutorily required in the NPRM but will be included in this final rule, which is why we describe the proposal as covering "most" instances of capitalization. We believe the final rule will now cover all instances where capitalization is not required by statute.

Although the Department will not capitalize interest, it will still accrue while a borrower is in these situations. The borrower will have to pay that interest before a payment is applied to the principal balance.

The Department cannot change interest capitalization requirements in the HEA. This includes when a

borrower exits a period of deferment on an unsubsidized loan and when a borrower who is repaying loans under the income-based repayment (IBR) plan is determined to no longer have a partial financial hardship, including if they fail to annually recertify income.

*Changes:* None.

*Comments:* Many commenters asked the Department to make the elimination of interest capitalization retroactive.

*Discussion:* The Department thanks these commenters for their support for the amendments to these regulations. The Department does not have the authority to make these changes retroactive.

*Changes:* None.

*Comments:* One commenter requested the Department eliminate interest capitalization for all Federal student loans and require student loan servicers to reduce the principal balances by the amount of capitalized interest charged over the original amount borrowed.

*Discussion:* In this regulation, the Department eliminates all instances of interest capitalization on Direct Loans that we can address through regulation.

*Changes:* None.

*Comments:* A few commenters recommended the Department end the practice of capitalizing interest for borrowers while they are still in school.

*Discussion:* The Department does not capitalize interest while the borrower is in school. Instead, capitalization occurs when a borrower who is in school moves into repayment. In this regulation, the Department ended capitalization when a borrower first enters repayment on a loan. Borrowers who enter repayment and then return to school on at least a half-time basis are placed on an in-school deferment. Capitalization does occur when the in-school deferment ends, but that is a statutory requirement that we cannot change.

*Changes:* None.

*Comments:* A few commenters suggested that we remove all instances of capitalization where we have the legal authority to do so. They noted two instances where we could do so yet were not reflected in the NPRM—when a borrower is repaying loans under the alternative repayment plan and when a borrower no longer has a partial financial hardship under the PAYE repayment plan.

*Discussion:* We agree with the commenters who suggested these two additional areas where we have the authority to eliminate interest capitalization. The Department intended to remove all instances of interest capitalization that were not required by statute in our proposed regulations.

---

[140] 980 F.3d 814, 821 (11th Cir. 2020).

[141] In *Young,* the Eleventh Circuit stated that our regulation was "poorly written" but ultimately confirmed that the regulatory language prohibited GCU from compelling the plaintiff from arbitrating the borrower defense claim. *Id.* at 815, 821. To minimize confusion, we will incorporate the commenters' proposed by commenters.

[142] 87 FR at 41917.

During the development of the regulations through the negotiated rulemaking process, however, these two instances were missed. We believe these changes are consistent with the Department's overall goals and in the best interest of borrowers. We thank the commenters for their suggestions, which we accepted.

*Changes:* The Department is amending the regulations to remove interest capitalization at § 685.208(l)(5) when a borrower is repaying under the alternative repayment plan and at § 685.209(a)(2)(iv)(A)(1) when a borrower no longer has a partial financial hardship under the PAYE repayment plan.

*Comments:* One commenter expressed concerns for borrowers who were not aware of how interest capitalization would apply to their loans and were not always given proper information or counseling on it. They urged the Department to eliminate all instances of interest capitalization on Federal student loans. Another commenter requested that the Department eliminate interest capitalization in all instances.

*Discussion:* Every borrower is required to complete entrance counseling to ensure they understand the terms and conditions of their loan. Borrowers learn through entrance counseling how interest works, their repayment options, and how to avoid delinquency and default. Information regarding interest and repayment is also included in the master promissory note which the borrower signs. However, the Department agrees that the counseling may not prevent all borrower confusion around interest capitalization. Removing instances of interest capitalization where not required by statute will thus be one less thing for borrowers to have to understand when going through counseling.

As discussed earlier, the Department cannot eliminate interest capitalization where it is required by the HEA.

The Department is eliminating interest capitalization in all circumstances where we have the discretion to do so. These changes only apply to Direct Loans. We do not have a legal basis to make the suggested changes in the FFEL program regulations. The terms of FFEL program loans are set by the promissory note signed by the borrower and the lender, and the lender has a right to receive the return on the loan that was set under the law at the time the loan was made. In this case, the regulations and the promissory note give the lender the right to capitalize interest in most cases. The assumption is that the lender took that into account when deciding that it

was financially worthwhile to make the loan.

The interest rates on all Federal student loans, including those in the FFEL Program, are set by Congress and cannot be changed by the Department.

*Changes:* None.

*Comments:* A few commenters stated that borrowing Federal student loans with interest capitalization makes education costlier for graduate students who face capitalizing events because they are enrolled in income-driven repayment (IDR) plans that require annual recertification of income.

*Discussion:* We have addressed this concern by eliminating interest capitalization on Direct Loans when a borrower who is repaying under the PAYE plan fails to recertify income and when a borrower who is repaying under the REPAYE plan leaves the plan.

*Changes:* None.

*Comments:* Some commenters requested that the Department no longer capitalize interest when borrowers consolidate their Federal student loans into a Federal Direct Consolidation Loan.

*Discussion:* The Department does not believe such a change would be appropriate. Taking out a consolidation loan does not result in capitalization; rather, it is a new loan with a new principal balance made up of the principal and interest that the borrower owed on each of the underlying loans. That is different from the capitalization events covered in this final rule, in which outstanding interest is added to the principal balance of the existing loan.

*Changes:* None.

*General Opposition to Changes in Interest Capitalization*

*Comments:* One commenter writing in opposition to the changes to interest capitalization produced a hypothetical example that showed the dollar savings to the borrower from eliminating capitalization would be small per $100 borrowed. The commenter also argued that the size of the savings versus the cost of the proposal both financially, for servicers to implement it, and borrowers to understand it, may not pass a cost and benefit analysis. They suggested the changes to interest capitalization be limited only to new borrowers going forward.

*Discussion:* We disagree with the commenter. The example used is for a one-time, short-term capitalization event and does not account for the long-term effects of capitalized interest or the possibility of multiple capitalization events. Those items are reflected in the estimated cost of the policy in the

Regulatory Impact Analysis. Moreover, there would not be any costs to the borrower from understanding this policy because it would be implemented automatically to provide them a benefit. If anything, it would reduce costs for borrowers related to comprehending student loan repayment since the Department has found that borrowers are often confused as to why their balances have grown. Additionally, we compensate servicers for their time spent updating policies and procedures. We also anticipate reducing this burden will reduce the number of phone calls servicers must field from borrowers who are unhappy with their loan balance growing. Finally, this benefit should be available to all borrowers in repayment going forward. There is nothing in the record that would justify only providing this type of benefit to new borrowers.

*Changes:* None.

**Total and Permanent Disability Discharges (§§ 674.61, 682.402, and 685.213)**

*Comments:* Many commenters overwhelmingly supported the proposed revisions to the TPD discharge regulations. In particular, the commenters supported expanding the list of healthcare professionals who may certify that a borrower is totally and permanently disabled; removing the 3-year income monitoring period; and expanding the circumstances that may support a TPD discharge based on SSA disability determinations.

A few commenters suggested that TPD discharges should be extended to other groups of disabled borrowers, such as cancer patients; partially disabled veterans; primary caretakers and spouses of permanently disabled persons; borrowers with permanent disabilities who still work; people who have been disabled for over 10 years; and people suffering from post-traumatic stress disorder. Commenters argued that if there is factual evidence that a student loan borrower is unable to engage in any substantial gainful activity by means of the Social Security earnings record data demonstrating a period of substantial earnings impairment for a continuous period of not less than 60 months, then the borrower should qualify for a TPD discharge either automatically or upon their own certification of their disability status in accordance with the TPD discharge application process.

*Discussion:* The Department does not believe that we should specify medical conditions that may qualify a borrower for a TPD discharge, but instead should describe general criteria for meeting the TPD discharge requirements. Many

borrowers with the conditions cited above may already qualify for a TPD discharge under the current regulations either through a physician's certification, an SSA disability determination, or a Department of Veterans Affairs (VA) disability determination. However, we note that TPD discharges as outlined in the HEA are intended for borrowers who are totally and permanently disabled, not for the spouse or caretaker of a disabled individual. Regarding Social Security earnings, a continuous period of low earnings does not necessarily indicate that a borrower is disabled and would not in itself be sufficient grounds for granting a TPD discharge. We believe that a TPD discharge in such a situation would be inappropriate, unless the borrower qualified through one of the three means available for receiving a TPD discharge: an SSA disability determination, a VA disability determination, or a certification from an authorized healthcare professional.

*Changes:* None.

*Comments:* One commenter raised concerns about the potential ramifications stemming from large numbers of borrowers experiencing "Long COVID" (Post-COVID–19 conditions and Post-Acute Sequelae of SARS–CoV–2). The commenter expressed the view that many borrowers with Long COVID will likely have difficulty obtaining TPD discharges because Long COVID is quite new and is little understood by the medical community. Testing capacities or treatment avenues for Long COVID remain limited, and some medical professionals may not believe that the condition exists at all. In addition, in the view of the commenter, patients experiencing Long COVID may find it difficult to receive SSDI benefits or SSI based on disability at all, much less be classified in either the SSA's Medical Improvement Not Expected (MINE) or Medical Improvement Possible (MIP) categories. The commenter believes that it is more likely that patients with Long COVID would be placed in SSA's Medical Improvement Expected (MIE) category, which requires a medical review by the SSA after 1 year. The commenter urged the Department to revise the regulations in the Final Rule to consider Long COVID and other disabling chronic illnesses. The commenter recommended, as an intermediate approach, establishing a Long COVID forbearance that would both pause loan payments and set the interest rate at 0 percent during the forbearance period. The forbearance would apply to borrowers with Long COVID, but for whom a TPD discharge

determination cannot currently be made. The commenter expressed the view that this would provide time to add to our body of knowledge about Long COVID while offering some relief to borrowers. At a minimum, the commenter requested that the Department actively monitor developments with respect to our understanding of Long COVID's impact on individuals and assess whether TPD discharges are adequately serving borrowers afflicted with Long COVID.

*Discussion:* While much is not known about Long COVID at this point, a borrower suffering from disabilities severe enough to prevent the borrower from working would exhibit symptoms that a qualified physician or other healthcare professional would be able to diagnose. The definition of a total and permanent disability includes a medical condition that "can be expected to last" or "has lasted" for a continuous period of not less than 60 months. While physicians and other healthcare professionals may be reluctant to certify that a Long COVID medical condition can be expected to last for up to 60 months, in the near future, they will be able to certify whether the condition has lasted for up to 60 months.

The commenter recommended establishing a new forbearance type specifically geared toward borrowers suffering from Long COVID. Even if this were feasible, we believe that the existing forbearance and deferment provisions render such a regulatory action superfluous. Currently, a borrower who is experiencing severe medical problems and who does not qualify for any of the existing deferments—such as an unemployment deferment or an economic hardship deferment—may apply for a forbearance. The Department grants forbearances for borrowers with medical conditions that do not rise to the level of a total and permanent disability. Interest accrues during forbearance periods. While the Department may pause interest accrual during a national emergency, the Department does not have the authority to set interest rates on title IV loans. Interest rates on title IV loans are established by Congress.

*Changes:* None.

*Comments:* Loans discharged due to TPD are not currently reported as a zero balance on the borrower's credit report for up to 3 years after the discharge due to the post-discharge monitoring period. A few commenters suggested that the change in the monitoring period after a TPD discharge also necessitates a change in credit bureau reporting practices for title IV loan holders. Commenters also suggested that title IV

loan holders report these loans as having a zero balance immediately after a TPD discharge is granted.

*Discussion:* While the final regulations eliminate post-discharge income-monitoring, they do not remove the requirement that a loan discharged due to TPD may be reinstated if the borrower takes out another title IV loan or TEACH Grant during the 3-year post discharge monitoring period. Therefore, the consumer credit reporting practices of title IV loan holders for loans that have qualified for a TPD discharge need to stay unchanged.

*Changes:* None.

*Comments:* Several commenters stated that under the current proposed regulatory language, the Secretary would be required to provide automatic relief only if they obtained data from SSA or the VA, but there is no obligation to obtain such data. The commenters believe the rule should be strengthened to place an affirmative obligation on the Secretary to obtain data from the VA and SSA. In addition, the Department should work with SSA and the VA (through joint rulemaking or other means) to ensure that each agency is bound by the process set forth in this regulation. Several commenters encouraged the Department to automate the TPD discharge process as much as possible wherever the Department can do so for qualifying borrowers to access a TPD discharge without an application.

*Discussion:* The Secretary obtains TPD discharge data from the VA and the SSA through formal agreements with those agencies. The Department cannot, through its regulations, bind another agency to share with the Department the information necessary to grant a TPD discharge. We agree with commenters that automating the TPD process, as we have done with our agreements with SSA and VA, is desirable. However, we also believe that it is important to maintain a borrower application process for borrowers who may not qualify for a TPD discharge based on any current or future automated TPD discharge process.

*Changes:* None.

*Comments:* The Department received a few comments objecting to the proposal to remove the 3-year income-monitoring period. One commenter argued that it would lead to inappropriate TPD discharges that are costly to the taxpayer. The commenter referenced Sec. 437(a)(1) of the HEA, which directs the Department to develop safeguards that prevent fraud and abuse in the discharge of liabilities due to total and permanent disability to ensure that TPD discharges are granted only to individuals who truly meet the

statutory definition of total and permanently disabled.

A few other commenters pointed to the same section of the HEA to argue that Congress intended for the Department to have a monitoring period. One of these commenters pointed out that Sec. 437(a)(1)(A) and (B) of the HEA describe the circumstances under which reinstatement of a discharged loan is appropriate. They also noted that Sec. 437(a)(3) requires the Secretary to "establish and implement" procedures for an income monitoring process, apply it "to each borrower of a loan that is discharged due to total and permanent disability", and use return information "to determine the borrower's continued eligibility for the loan discharge." Finally, that same commenter also pointed to the Fostering Undergraduate Talent by Unlocking Resources for Education (FUTURE) Act, which amends the Internal Revenue Code of 1986 to provide for the release of IRS tax return data for the purpose of monitoring and reinstating title IV loans that were discharged due to a total and permanent disability.

One commenter also pointed to the extensive inaccuracies (and potentially fraudulent occurrences of TPD discharges) as described in OIG Final Audit Report 06–80001 (June 1999) that were identified prior to implementation of the monitoring period. The commenter recommended that, rather than returning to what the commenter characterized as the 1990's discharge process that allowed potential fraud and abuses, the Department should instead use the tools Congress has provided to minimize paperwork burden on individuals with a disability while also minimizing taxpayer burden from the cost of TPD discharges.

*Discussion:* Section 437 of the HEA states that the Secretary "may promulgate regulations to reinstate the obligation and resume collection on, loans discharged" due to TPD. That section does not require nor make mention of a post-discharge monitoring period, much less a 3-year monitoring period. The statutory language in no way obligates the Secretary to promulgate such regulations. The HEA does state that "the Secretary may promulgate regulations to reinstate the obligation of, and resume collection on, loans discharged under this subsection." Under these final regulations, loans discharged due to TPD will be reinstated under certain conditions. The Secretary will require the reinstatement of a borrower's discharged loans if the borrower obtains a new title IV loan or TEACH Grant

within 1 year of receiving the TPD discharge. The commenter inaccurately states that limiting the post-discharge monitoring period in this way is a return to the TPD discharge process that was in place prior to 1999.

Moreover, as noted in the NPRM, the Department has found that the income monitoring requirement is significantly more likely to result in the reinstatement of a loan for a low-income borrower than it is to identify someone whose income suggests they are able to engage in gainful employment. As noted in the NPRM, since 2013, loans for more than half of the 1 million borrowers who received a TPD discharge were reinstated because the borrower did not respond to requests for income documentation. However, an analysis conducted by the Department with Internal Revenue Service (IRS) data suggests that 92 percent of borrowers who received a TPD discharge did not exceed the earnings threshold, and that these results are similar for borrowers whose discharge is based on an SSA disability determination or physician's certification process. Similarly, an older review by GAO [143] found that the overwhelming majority of reinstatements were occurring because borrowers were not responding to requests for furnishing income information and that very few borrowers were earning above the income threshold.[144] Moreover, while Congress did give the Department authority for automatically receiving income data for borrowers who received a TPD discharge, that change unfortunately only will provide the data at a household level. This is a challenge because the TPD requirements are based upon an individual's earnings. That means the Department would be unable to ascertain the proper earnings level for married individuals through any automatic data match. Therefore, the Department is concerned that the income-monitoring requirement is something not required by Congress that generates far more false positives than real ones and cannot be addressed through automatic sharing of income information. Accordingly, the Department maintains its position of eliminating the income-monitoring period.

As to the OIG audit, since 1999 the Department has made many reforms to the TPD discharge process, including centralizing the TPD discharge application review process within the Department, rather than relying on guaranty agencies in the FFEL program

and school lenders in the Perkins Loan program to make TPD discharge decisions. The Department has implemented reforms allowing TPD discharges to be granted based on SSA or VA disability determinations, rather than relying solely on certifications by physicians. Finally, the Department has entered into agreements with SSA and VA to allow for automatic discharges to be granted based on information provided to us directly from these agencies. All of these reforms provide for more consistent TPD discharge review and significantly reduce the likelihood of TPD discharges being granted in error.

*Changes:* None.

*Comments:* One commenter expressed dismay over disability fraud, calling it widespread. The commenter referenced a particular case involving TPD discharges, and cited a June 15, 2022, press release from the Department of Justice, stating that the U.S. Attorney's Office of the Southern District of New York had charged a nurse practitioner with allegedly orchestrating TPD discharges in excess of $10 million on behalf of more than 100 borrowers that the nurse practitioner led to believe were eligible for various forms of student-loan relief.

The commenter expressed the view that the while this alleged fraudster was caught, the revised rule would enable many more fraudsters to operate by enabling lower-level professionals to certify a total and permanent disability.

*Discussion:* While the Department cannot comment on an ongoing investigation, we note that the press release from the DOJ states that the charges were brought due to "the outstanding investigative work of the Federal Bureau of Investigation and the U.S. Department of Education, Office of Inspector General." The commenter has highlighted the work that the Department of Education does, through its Office of Inspector General, of investigating cases of apparent fraud with regard to the student financial aid programs. We expect OIG to continue its outstanding work in this regard. We do not see the final regulations as impeding that work in any way. In fact, by enhancing BD discharges, false certification discharges, and closed school discharges, the overall impact of these final regulations will be to reduce fraud in the student loan programs.

*Changes:* None.

*Comment:* One commenter asserted that using an income-monitoring period does not have to be a cumbersome process for the disabled borrower. The commenter notes that the Department has asserted that requiring reinstatement

[143] 87 FR at 41939.
[144] https://www.gao.gov/assets/gao-17-45.pdf.

of loans for borrowers who have received TPD discharges if the borrower does not submit annual income information results in significant numbers of reinstatements simply because the borrower did not respond to a paperwork request and not because the borrower had earnings above the threshold for reinstatement.

The commenter asserted that the Department's position is untenable because borrowers are only required to submit annual income information because the Department has failed to carry out the authorization that was extended by Congress through the FUTURE Act. The Department could easily remedy borrower burden by implementing the automated data match as authorized. In doing so, we could alleviate borrower burden while protecting taxpayer dollars.

*Discussion:* The Department notes that under the COVID–19 HEROES waivers, borrowers who have received TPD discharges have not been required to provide annual income information. The Department believes that a more permanent solution is needed to relieve borrowers of this administrative burden by eliminating the regulatory requirement for annual income information. Moreover, we note that the authorization allowed by the FUTURE Act would still not fully absolve borrowers of the burden associated with income monitoring. That is because the current TPD income monitoring process looks at the income of the individual borrower, but IRS data are not able to provide individual income information from a married filing jointly tax return. We would thus not have enough information to determine if a married borrower filing jointly who received a TPD discharge had earnings that exceeded the threshold.

*Changes:* None.

*Comments:* A few commenters objected to allowing non-physician practitioners to make TPD determinations. They believed that current law prohibits non-physician healthcare professionals from making such determinations and point to State scope of practice laws which may have certain limitations on nurse practitioners (NPs), physician assistants (PAs), and psychologists diagnosing, prescribing, treating, and certifying an injury and determining the extent of a disability.

Another commenter believed that a licensed psychologist may be unable to reasonably certify the inability of a person to function productively in society. In the view of the commenter, entrusting TPD determinations to an individual psychologist invites fraud and incorrect TPD determinations. The commenter felt that the risks of error and fraud were not sufficiently weighed against the minor additional accessibility that would be available under the proposed rule, which, in the view of the commenter, rendered the proposed rule arbitrary and capricious.

*Discussion:* We believe that expanding the list of healthcare providers who may certify a TPD discharge application is imperative in enabling eligible borrowers to more easily obtain TPD discharges for which they qualify. Many states allow NPs to practice independently, meaning that they can run their own healthcare practice without the need for a collaborating physician in those states. PAs also have an extensive level of knowledge and training in general medicine and, while they often practice alongside physicians, PAs can also practice independently. When treating a patient, there are no requirements that a physician must be on the premises or that each patient must be seen by a physician in addition to the PA. The PA can take complete charge of patient appointments. A shortage of physicians, especially in poor and rural areas, results in NPs and PAs serving as primary healthcare providers for many individuals. Allowing NPs and PAs to certify TPD applications will be an enormous benefit for borrowers who seek care from these types of providers—particularly for those without access to doctors. Regarding NPs and PAs being unable to certify TPD discharge applications due to State scope of practice laws, the TPD regulations do not require NPs or PAs to certify TPD discharge applications; they simply allow it. Such individuals should know of the limitations of their own state licensure. However, we see no reason to limit the authority of all NPs and PAs merely because some States have such limitations.

Psychologists licensed at the independent practice level by a State are generally required to have Ph.D.s. They identify psychological, emotional, and behavioral issues and diagnose disorders. They provided evidence-based clinical services, including psychotherapy, evaluation and assessment, consultation, and training. Psychologists who provide health care services are primarily independent practitioners. The Department believes psychologists licensed at the independent practice level are well-qualified to diagnose patients, and to make TPD determinations.

*Changes:* None.

*Comment:* A commenter believed that § 674.61(d)(1) ("Discharge without an application") does not appear to require sufficient evidence of a total and permanent disability. The provision states merely that it is enough to receive VA data showing that the borrower is "unemployable due to a service-connected disability." The commenter believed that being "unemployable" is a temporary and non-severe designation rather than a determination of total and permanent unemployability or disability. The VA also uses a specific definition of "individual unemployability" (IU) that distinguishes "substantially gainful employment" from "marginal employment." The commenter recommended that the Department should establish its own definition of a qualifying disability and make its own determinations, on an individual basis, on the basis of that definition.

*Discussion:* The commenter's proposal would defeat the purpose of using VA disability determinations to grant TPD discharges. The language in proposed § 674.61(d)(1) is identical to the language in current § 674.61(d)(1). Current § 674.61(d)(1) states that "The Secretary may discharge a loan under this section without an application or any additional documentation from the borrower if the Secretary obtains data from the Department of Veterans Affairs (VA) showing that the borrower is unemployable due to a service-connected disability." The language in these final regulations is consistent with the language in the NPRM, and with the language in the current regulations.

The reference to a veteran being unemployable due to service-connected disability derives from the current definition in § 674.51(a)(2) which defines "total and permanent disability as the condition of an individual who has been "determined by the Secretary of Veterans Affairs to be unemployable due to a service-connected disability." This definition, in turn, derives from the statutory language which states that a borrower is considered totally and permanently disabled if the borrower "has been determined by the Secretary of Veterans Affairs to be unemployable due to a service-connected condition" (HEA, Sec. 437(a)(2)).

*Changes:* None.

*Comments:* One commenter noted that the proposed rule would remove § 682.402(c)(7). That paragraph outlines a borrower's responsibilities after receiving a total and permanent disability discharge. These responsibilities include notification of income and notification of the Secretary if the borrower is no longer disabled. The commenter believed that this paragraph should be retained and

similar language provided regarding all of the loan programs that permit TPD discharges. The commenter noted that the VA stipulates that "veterans may have to complete an employment questionnaire once a year for VA to continue to pay [disability] benefits. In the commenter's view, this creates an inconsistency between agencies regarding a verification of a veteran's level of disability and continuing eligibility for disability benefits.

*Discussion:* We have removed paragraph 682.402(c)(7) because most of the requirements in paragraph (c)(7) relate to income verification, which are no longer a requirement under the final regulations. In addition, because these final regulations expand the circumstances in which a borrower can qualify for a TPD discharge based on an SSA disability determination, a change in SSA disability status is less concerning, because we are allowing more SSA disability statuses to qualify a borrower for a TPD discharge based on an SSA disability determination.

With regard to the VA requiring veterans who are receiving disability benefits to submit an employment questionnaire annually, we note that VA disability benefits are structured differently than TPD discharges. VA disability benefits are ongoing. When the Department grants a TPD discharge, it is one-time event. We do not see a need to replicate VA's process for determining if a borrower continues to qualify for VA disability benefits.

*Changes:* None.

*Comment:* A commenter noted an apparent inconsistency between § 674.61(b)(3)(ii) and (b)(3)(vi). The former states that the Secretary determines whether the application "conclusively prove[s]" the disability, but the latter states only that the Secretary determines whether the application "support[s] the conclusion" that the disability qualifies. The commenter believed that "Conclusively proves" is the right standard because a conclusion should be necessary. Mere support toward a conclusion does not determine the result. Also, the same inconsistent language of "support[s] the conclusion" exists at § 682.402(c)(3)(v) and should be changed to "conclusively prove."

*Discussion:* We thank the commenter for pointing out the inconsistency in language in sections 674.61(b)(3) and 682.402(c)(3). However, we note that the "conclusively prove" language is the inconsistent language. The other two references to the TPD application in these sections use the phrase "supports the conclusion."

*Changes:* We have replaced "conclusively prove" with "supports the conclusion" in §§ 674.61(b)(3)(ii) and 682.402(c)(3)(v) so the language is consistent throughout these sections. We have also replaced the erroneous "conclusively proves" language in 685.213(b)(4)(ii) of the Direct Loan regulations with "supports the conclusion."

*Comments:* None.

*Discussion:* In consultation with SSA, the Department adjusted some language to better conform with how SSA describes those same items. This includes clarifying that the borrower must qualify for SSDI benefits or SSI based on disability. It also means referring to disability reviews as being continued rather than renewed and clarifying that they are scheduled for a certain period instead of being definitively within a certain period. The Department also adopted the formal term of "established onset date" instead of "disability onset date" to better match the appropriate terminology used by SSA. We also noted that the borrower has to qualify for SSDI or SSI benefits on a compassionate allowance because the NPRM language incorrectly referred to it as a program and did not have the clear link to the SSDI or SSI benefits. None of these changes alter the underlying policies as proposed in the NPRM.

*Changes:* We have adjusted the language in §§ 674.61, 682.402, and 685.213 to reflect the edits described above as well as other technical changes.

*Comments:* None.

*Discussion:* In the NPRM, the Department proposed that a borrower would be eligible for a TPD discharge if they qualify for SSDI benefits or for SSI based on disability, the borrower's next continuing disability review has been scheduled at 3 years, and the individual's entitlement to SSDI benefits or eligibility for SSI based on disability has been continued at least once. This meant that a borrower who has a determination of Medical Improvement Possible (MIP) that is continued as an MIP would be eligible for a discharge. However, upon additional review, the Department has determined that the requirement that the borrower be continued as an MIP is not necessary. Instead, in this final rule the Department has adjusted the requirements to allow a borrower who qualifies for SSDI or SSI benefits based on disability to be eligible for a discharge if the borrower's continuing disability review is scheduled at 3 years. The Department reached this conclusion after reviewing research reports from

SSA that we had not seen when drafting the NPRM. In a September 2020 report filed to Congress about its fiscal year 2016 continuing disability reviews, SSA noted that more than 97 percent of adult beneficiaries who were initially assigned the MIP determination are found to still be disabled even after second and later reviews.[145] This includes mailer deferrals, which are medical continuing disability reviews. The fact that all but a very small number of individuals initially assigned the MIP determination have their disability continued upon review suggests that requiring a borrower who receives such a designation to wait for a discharge under the proposal in the NPRM is not outweighed by the possibility of identifying the potentially small number of borrowers who may not have their disability status continued. Accordingly, this change to grant a discharge upon the initial MIP determination best meets the Department's goals of making the TPD process simpler for borrowers to navigate and capture additional circumstances that meet the requirements of the HEA.

*Changes:* We have adjusted § 674.61(b)(2)(iv)(C)(2), § 682.402(c)(2)(iv)(C)(2), and § 685.213(b)(2)(iii)(B) to note that a borrower is eligible for a discharge upon a determination that they qualify for SSDI benefits or for SSI based on disability and the borrower's next continuing disability review has been scheduled at 3 years.

**Closed School Discharge (§§ 674.33(g), 682.402(d), and 685.214)**

*General Support for Closed School Discharge Regulations*

*Comments:* Many commenters expressed general support for the proposed closed school discharge regulations, including providing automatic discharges after 1 year of closure, noting that these changes will broaden eligibility which will increase the number of borrowers who receive forgiveness, remove administrative burden and complexity for borrowers who have been harmed by a school closure, and simplify the eligibility process while reducing the number of students who are eligible for a discharge yet do not receive one.

*Discussion:* The Department thanks commenters for their support and agrees with them on the benefits of these changes to closed school discharges.

*Changes:* None.

*General Opposition to Closed School Regulations*

*Comments:* Several commenters expressed a variety of concerns with the proposed closed school discharge regulations. In the view of these commenters, the proposed regulations:

• Do not consider or acknowledge past orderly closures that have been implemented in consultation with and approval from accreditors and state educational agencies.

• Risk being overinclusive due to inaccurate student status data.

• Create incentives for students to reject teach-out options and delay their education.

• May result in unnecessary discharges for borrowers who have every intention of returning to their program of study through an approved teach-out after 1 year.

• May encourage borrowers to take a discharge and then transfer credits.

These commenters recommended:

• Returning to a 3-year period before granting an automatic closed school discharge because many students choose to voluntarily take a break between attending the closed school and the teach-out institution.

• Only allowing those students who were unable to complete their programs because their schools closed to seek closed school discharges.

• Disqualifying a borrower for a discharge if they accept teach-out at another institution or transfers credits.

*Discussion:* The Department respectfully disagrees with the proposals from these commenters. We believe that the final rules, with the modifications from the NPRM identified later in this section, provide reasonable protections for students who attend closing schools without adding unnecessary burdens to schools. Below we each address each of the components of the comment summary.

With regard to past orderly closures, we disagree that the final rule does not consider this issue. In fact, the conditions that lead to a discharge in this rule better align with what occurs during orderly closures. An orderly closure generally involves an institution doing a combination of teaching out its own students and establishing a teach-out agreement that gives borrowers a clear path to finishing their studies. A borrower who follows either of those paths and finishes would not receive a closed school discharge. Unfortunately, the far more common occurrence is that borrowers face abrupt closures. Under this rule, a poorly managed closure that lacks a teach-out agreement will be more likely to result in discharges for borrowers.

The Department disagrees with the commenters who argued that concerns about the Department's student completion information undercut the rationale for these regulatory changes. The Department is responsible for ensuring that it correctly awards discharges to borrowers who are eligible under the regulations. That is an operational matter and not regulatory. The Department also reminds commenters that it is the institution's responsibility to ensure it is entering accurate data about borrower completion status. The Department issues reminders to schools about this responsibility. In 2012, the Department clarified a series of institutional reporting requirements, including requirements to report student enrollment data even when the student has received Pell Grants but never a FFEL or DL program loan, and even when the student has received Perkins Loans but never a FFEL or DL program loan. While enrollment reporting issues were identified many years ago, those do not affect the regulatory changes, which focus on more recent information.

We also disagree with the argument that this final rule will create incentives for borrowers to take a discharge then simply transfer credits. First, the requirement in the HEA is that the borrower is eligible for a discharge if they are unable to complete the program because the college closed. The intent is for the student to complete their program at the college they were enrolled in. In this final rule, the Department is also treating programs completed as part of a teach-out or as a continuation at another location of the institution as equivalent to the completion of the program because both approaches are the situations where the program is most likely to be similar to the one the borrower was enrolled in. By contrast, it is incredibly common for borrowers who transfer credits through other means to lose significant numbers of credits. An earlier study of credit transfer by GAO found that very few students transferred credits from private, for-profit colleges and that even when a student moved from one private for-profit college to another, they still lost 83 percent of their credits on average.[146] For students transferring from a private nonprofit college, the average student lost half or more of their credits.[147] The share of credits lost was a little bit better when transferring from public colleges, but those institutions also do not commonly close. Borrowers

are thus highly likely to lose at least some credits when transferring colleges. The Department does not see how a borrower who is not able to transfer all their credits to another program and is thus forced to potentially pay to retake a course or pay for additional credits can be viewed as completing the same program.

The Department similarly rejects the suggestions for disqualifying borrowers for discharges if they simply accept a teach-out or transfer. Those borrowers are eligible for discharges under current rules because they did not complete the program. Having the act of transferring or taking a teach-out disqualify a borrower for a closed school discharge would thus be contrary to the statute.

*Changes:* None.

*Discharge Without Application*

*Comments:* Many commenters were generally supportive of the proposed automatic closed school discharge provision after 1 year. Other commenters opposed automatic discharge after 1 year and proposed the Department maintain automatic discharge after 3 years or eliminate the automatic discharge provision entirely. Some of those commenters also argued that the Department did not correctly present statistics in a report from GAO about the extent to which borrowers who received an automatic discharge had defaulted or faced struggles on their loans. Several commenters believed that the proposed regulations were not sufficient to immediately support student loan borrowers that are harmed by the closure of their institutions. These commenters noted that the HEA requires the Secretary of Education to discharge the loans of students who are unable to complete their program due to school closure and proposed granting automatic closed school discharge relief to all students immediately upon a school's closure, regardless of whether the student transfers to another program. One commenter proposed that, as an alternative, the Department should grant automatic closed school discharges to all affected borrowers within 90 days after a school closure. Multiple commenters noted that, while they support automatic discharge provision after 1 year for students that do not complete a teach-out agreement, the Department should further clarify that students who do not accept a teach-out agreement are eligible 1 year post closure.

*Discussion:* We appreciate the support from commenters for the automatic discharge provision and disagree with those who propose lengthening it to 3 years or eliminating it entirely. As noted

---

[146] https://www.gao.gov/assets/gao-17-574.pdf.
[147] https://www.gao.gov/assets/gao-17-574.pdf.

by GAO, significant numbers of borrowers do not re-enroll when their college closes. In a September 2021 report, GAO found that 43 percent of borrowers whose colleges closed from 2010 through 2020 did not enroll in another institution or complete their program. As GAO noted, this showed that ''closures are often the end of the road for a student's education.''[148]

The data obtained from GAO persuaded the Department that waiting 3 years from closure for issuing automatic discharges is too long. GAO's data found that 52 percent of the borrowers who received an automatic discharge had defaulted, while another 21 percent had been more than 90 days late at some point. Moreover, the majority of those who did default, did so within 18 months of closure. GAO also found that among the borrowers who did transfer, almost half had not finished their program within six years of switching schools. GAO also found that the borrowers who transferred but did not finish had a particularly low closed school discharge application rate.[149]

The high default rates of borrowers who do not re-enroll, especially the significant share defaulting within 18 months of closure, and the low application rates of borrowers who did not complete after enrolling elsewhere convince the Department that there are far too many borrowers missing out of closed school discharges that should be captured by an automatic process. As articulated in the NPRM, setting automatic discharges 1 year after the closure date for borrowers who do not re-enroll affords an opportunity to catch borrowers before they could default.

We agree that the final regulations should provide a more precise timeline for granting automatic closed school discharges. However, we feel that granting such discharges immediately, or 90 days after closure, is too soon. Borrowers need more time to decide on their options, and a borrower who intends to enroll in a teach-out or continue their program at another branch or location of the school may not do so within such a short time frame. As discussed above, we think the 1-year period properly balances giving students time to figure out whether to continue their program at another branch or location of their school or through a teach-out while still helping borrowers before they could default. We have clarified that the closed school

[148] https://www.gao.gov/assets/gao-21-105373.pdf.
[149] https://www.gao.gov/assets/gao-21-105373.pdf.

discharge will be provided 1 year after closure for a borrower who does not continue the program at another branch or location of their school or through a teach-out. Prior language had said ''within 1 year,'' which was too vague.

We also agree that the proposed regulations could better clarify that the automatic closed school discharge applies to borrowers who accept a continuation of their program at another branch or location of their institution or a teach-out if they do not ultimately finish that continuation or teach-out. Therefore, in the final regulations, we specify that the automatic closed school discharge will be approved 1 year after the date of last attendance in the continuation of the program or the teach-out for a borrower who accepts either of those paths but does not complete the program.

*Changes:* We have revised the regulations in §§ 674.33(g), 682.402(d), and 685.214 to specify that an automatic closed school discharge occurs 1 year after the school closure date for borrowers who do not take a teach-out or a continuation of the program. For borrowers who accept a teach-out or a continuation of the program at another branch or location of the school but do not complete the program, their discharge would be done 1 year after their final date of enrollment in the teach-out or at the other branch or location of the school.

*Comments:* Multiple commenters proposed that the Department implement an automatic 1-year grace period between the school closure date and the date borrowers are entitled to the automatic discharge. These commenters noted that allowing for a 1-year grace period is a less burdensome and more just approach as opposed to requiring borrowers enter repayment for six months and then having the Department refund the borrowers six months later.

*Discussion:* The Department does not have the legal authority to extend the grace period on repayment. Grace periods are established by statute.

*Changes:* None.

*Teach-Out Plans and Agreements*

*Comments:* Several commenters stated that if the Department does not accept proposed suggestions to provide students with an immediate and automatic discharge after a closure, the Department should consider ways to better address teach-outs. These commenters noted that while teach-out agreements are subject to more stringent requirements than teach-out plans, they still only provide a reasonable opportunity for program completion and

do not guarantee that students will be able to transfer all or even a majority of their credits, or access comparably priced programs. These commenters recommended that the Department strike the provisions denying a discharge to students who complete a teach-out plan or agreement. As an alternative, the commenters recommend that the Department strike the provision referring to teach-out plans and limit the exclusion of students who complete teach-out agreements to students who actually complete a comparable program in a reasonable amount of time. Additionally, the commenters noted that the Department could limit the exclusion to students who are able to transfer most or all their previously earned credits.

A few commenters recommended that the Department reconsider provisions allowing borrowers to receive a discharge where they did not complete a teach-out because this would sanction institutions that made a good faith effort to provide an alternative for students in the event of a closure. Other commenters argued that still providing discharges for borrowers who moved to another school through a transfer agreement could discourage the creation of such options.

Several other commenters stated the Department must create a strong incentive for schools to provide students with an opportunity to complete their program through an approved teach-out.

Some commenters recommended that the Department clarify the treatment of what happens if a borrower accepts a teach-out agreement but is unable to complete it due to circumstances in which a borrower was subject to an academic, disciplinary, or other ''fault'' dismissal.

*Discussion:* Under § 600.2 a teach-out agreement is defined as ''A written agreement between institutions that provides for the equitable treatment of students and a reasonable opportunity for students to complete their program of study'' in the case of closure. Approved teach-out agreements that provide equitable treatment should not include cases where all or the majority of credits are not accepted, where charges are significantly higher, or the institution conducting the teach-out does not meet necessary licensure and accreditation requirements. The Department believes that the proposal provides necessary protections for students harmed by a closure, and more closely aligns with statutory language. The statute states that a borrower is eligible for a discharge if the student ''is unable to complete the program in

which such student is enrolled due to the closure of the institution.'' The Department believes that if a student continues the program at another branch or location of the school or through an approved teach-out agreement then it is reasonable to treat these as students finishing the program they were enrolled in at the school that closed. These pathways incentivize students to complete their program while providing protections in case they ultimately do not finish. The Department believes the inclusion of teach-out agreements or continuing the program at another branch or location in consideration of a closed school discharge incentivizes institutions to engage in an orderly closure, which would reduce an institution's potential liability. In the event a student accepts a teach-out agreement or a continuation of the program at another branch or location and finds that the institution is not the right fit or the student is unable to complete the program, the student remains eligible for an automatic discharge 1 year after their last date of attendance because the student was unable to complete their program due to the closure. Additionally, the Department believes that a student being unable to complete a teach-out because of academic, disciplinary, or other fault dismissal, will be an exception and maintains its current proposal.

The Department reminds commenters that the providing of discharges for a borrower who accepts but does not finish a teach-out agreement is not a change from current practice. Under current regulations, a borrower who transfers but then does not finish the program is still eligible for a discharge. However, previously, they were not eligible for an automatic discharge. But as the GAO report mentioned earlier notes, very few of the borrowers who do engage in such a transfer still apply for a discharge. Accordingly, the Department believes keeping the automatic discharge option for those borrowers is appropriate.

The Department disagrees with suggestions to make students ineligible for a discharge if they accept a transfer agreement. The language in the HEA is tied to the borrower's completion of the program. A teach-out or a continuation of the program at another branch or location of the school is designed to be analogous to the program the borrower was in. A transfer agreement does not provide the same protections that a teach-out does, such as requirements around the equitable treatment of students.

*Changes:* None.

*180-Day Lookback Window*

*Comments:* Multiple commenters expressed support for changes that extend the period that a borrower who withdraws from a closed school is eligible to receive a discharge from 120 days to 180 days. One commenter noted that the extension provides needed additional time and builds in consistency across loan types. Several commenters opposed extending the lookback window to 180 days. The reasons for opposing the extension include that doing so provides too much uncertainty, a 180-day window should only occur when a borrower can demonstrate harm, and that 180 days is too long and allows discharges with no causal connection to why they did not finish. Some of these commenters suggested a 120-day lookback window would be more appropriate. While several commenters supported the change, these commenters suggested that the Department should lengthen the lookback window to 1 year and to make extending it further mandatory where extenuating circumstances are present. The commenters noted that a 1-year lookback window helps better protect students and is less burdensome to administer because the reality of school closures is that they typically occur after a sustained period of systemic failures in the administration of the institution.

*Discussion:* The Department appreciates the support for the 180-day lookback window and believes that it strikes the proper balance between capturing students who may have seen that a school was heading toward closure, without providing so long a period that a departure may be entirely unconnected to a closure. The Department notes that all loans disbursed on or after July 1, 2020, already have access to a 180-day lookback window so this is not a change for new loans going forward. While many institutions announce their ultimate closure with no warning, there are almost always warning signs along the way that an institution may be struggling or facing potential adverse actions that could either put its title IV aid at risk or result in it losing accreditation—two conditions that may affect an institution's decision to close. A 120-day lookback window would not provide enough protection for borrowers in case there is a decline in quality over the final academic year of an institution's operation. A 180-day lookback window is half a calendar year and will encompass a final term for an institution that operates on a semester basis. This allows that if a borrower was concerned about a school's situation in

the final term in which it is in operation and decided to leave, their departure could be captured for a closed school discharge. The Department also reminds commenters that the Secretary retains the flexibility to extend the lookback window under exceptional circumstances in the more limited cases where going back further than 180 days may be warranted because of other significant events indicating a trajectory toward closure and in consideration of a precipitating events impact on student enrollment.

*Changes:* None.

*Exceptional Circumstances*

*Comments:* Several commenters expressed support for the exceptional circumstances provisions in the NPRM. One commenter recommended the inclusion of additional exceptional circumstances in the final regulations. The commenter recommended adding to the list of exceptional circumstances evidence of material reductions in instructional expenses or student services by the institution which the commenter believed could be indicative of an institution's disinvestment in its students and programs and be predictive of a future closure. The commenter also recommended adding an institution's placement on heightened cash monitoring under § 668.162(d)(1) (known as HCM1) if that status was not resolved prior to closure. The commenter noted that while an institution could be placed on HCM1 for a variety of reasons, some of those reasons are extremely serious, such as "severe" findings in a program review or by the institution's auditor. The commenter believed that including HCM1 on the list of "exceptional circumstances," would provide the Department with an impetus to consider the reasons why an institution was placed on HCM1 and would still provide the Department flexibility to choose not to extend the look-back window if the reasons for HCM1 do not rise to a sufficient level of concern. In addition, the commenter recommended that the Department also consider including placement on the reimbursement payment methodology, as defined in § 668.162(c), as one of the factors on the list of "exceptional circumstances" since that is a significantly more serious financial responsibility status than HCM2. The commenter also believed that the Department should consider cases in which a majority of the students attending an institution might be affected by a program discontinuation. The commenter noted that there may be circumstances in which a significant

share of programs might not have closed at an institution, but that a small number of programs which include the majority of students at that institution might be discontinued, which should rise to the level of an "exceptional circumstance." Therefore, the commenter encouraged the Department to add the situation of when a majority of the students attending the institution might be affected by a program discontinuation as an exceptional circumstance. Finally, the commenter recommended that the Department consider instances where an institution makes misrepresentations regarding its financial health to students, shareholders, or any government agency.

A few commenters recommended that the Department ensure the lookback window includes whenever a closing school announced its intentions to go out of business because schools can avoid liability by announcing that they will close more than 180 days in advance. One commenter pointed out that schools may publicly announce that they are going out of business up to a year before school closure and that such an announcement should be included as an exceptional circumstance.

Multiple commenters proposed making the extension of the lookback window automatic at the sign of the first occurrence of any exceptional circumstance. These commenters cited evidence that the Department has not always extended the window even though it has had the ability to do so.

Finally, several commenters opposed the additional list of exceptional circumstances and proposed the Department omit the proposal while others proposed that the Secretary should be required to include a rationale to demonstrate how a triggering event harmed the withdrawn student before approving a discharge based on exceptional circumstance. One commenter suggested that the Department should not include or expand the Secretary's exceptional circumstance authority, specifically identifying instances where schools are placed on probation by their accreditor because schools are often placed on probation and these statuses do not show sufficient legitimate risk of closure.

*Discussion:* The "exceptional circumstances" provisions are intended to allow the Secretary the flexibility to extend the lookback window as the Secretary deems necessary. The Department does not believe that every example of an exceptional circumstance included on the list would apply to every school closure or be related to the

eventual closure in every instance. Therefore, we do not believe that exceptional circumstances should be automatic or that the regulations need to include more specificity as to the conditions under which the Secretary may extend the lookback window. Similarly, the examples provided under exceptional circumstances are just that—illustrative examples. The list is not intended to be an exhaustive list of circumstances or a list that will apply in every instance of a closed school discharge, and the Department sees no value in adding additional items to the list or providing additional clarity on when the Secretary will rely on an exception to extend the window. We note that the Secretary may take the recommended additional "exceptional circumstances," as well as other circumstances not enumerated here, into consideration in determining that it is necessary to extend the 180-day lookback window. In addition, in cases that involve misrepresentation to students, it may be more appropriate for the borrower to pursue relief under the BD regulations. Finally, we note that in deciding to extend the 180-day lookback window, the Secretary will consider an event's impact on students in deciding to execute an extension.

We disagree with the commenters that proposed further limitations on the exceptional circumstances authority. The circumstances behind institutional closures will vary, and it is important to preserve flexibility for the Secretary to acknowledge situations that are exceptional.

*Changes:* None.

*Closure Date*

*Comments:* A few commenters expressed concern with the proposed regulations under §§ 674.33(g)(1)(ii)(A), 682.402(d)(1)(ii)(A), and 685.214(a)(2)(i) that would specify that, for purposes of a closed school discharge, a school's closure date is the earlier of the date that the school ceases to provide educational instruction in most programs, as determined by the Secretary, or a date chosen by the Secretary that reflects when the school had ceased to provide educational instruction for most of its students. These commenters believed that under the proposed regulations a school that was still providing educational instruction and still had enrolled students could be considered a closed school for discharge purposes, without consideration of whether students could complete. A few commenters proposed that the Department withdraw the proposed definition of closure date or offer additional clarity. Other

commenters recommended that the Department provide a clear and singular definition of "closure date."

Other commenters recommended that the Department clarify the meaning of "most programs" and "most of its students" in § 685.214(a)(2)(i) and clarify whether the Department will employ any thresholds for these determinations. Still other commenters recommended that the Department clarify the preamble language in the NPRM stating that the provisions will not apply to small institutions that remain open but that close "a program or two." These commenters stated that the preamble language is too imprecise. A few commenters recommended that the Secretary consult with accreditors and the State to make determinations of closure on a case-by-case basis. Others requested that the Department clarify the language and include it as regulatory text in the final regulation. Some commenters also asked that the Department not treat an institution that is conducting an internal teach-out as an instance of trying to adjust the closure date to avoid the lookback period.

*Discussion:* We agree that the proposed language could lead to confusion. The language was only intended to establish a closure date for a school that has ceased overall operations. A school that has remained open would not be considered a closed school. The Department has clarified the language to state that, if a school has closed, its closure date for purposes of determining the beginning date of the 180-day lookback window, would be the earlier of: the date, determined by the Secretary, that the school ceased to provide educational instruction in programs in which most students at the school were enrolled, or a date determined by the Secretary that reflects when the school ceased to provide educational instruction for all of its students. This language is important to protect against a situation where an institution could intentionally keep a single, small program open long enough to avoid the 180-day lookback window, otherwise denying closed school discharges to borrowers.

Regarding the terms "most programs" and "most of its students," these terms are referring to dates "determined by the Secretary" or "chosen by the Secretary." Since these dates are established by the Secretary at the Secretary's discretion, there is no need to provide a specific definition of the word "most" for the purpose of these regulations. However, the revisions to §§ 674.33(g)(1)(ii)(A), 682.402(d)(1)(ii)(A), and 685.214(a)(2)(i) further clarify that changes to the closure date need to be tied to an

institution that did cease operations should address many of the commenters' concerns.

Regarding the internal teach-out, these often are only offered to a small subset of students and finish after the closure date. The borrowers who finish through an internal teach-out would not be eligible for a closed school discharge since they completed their program at the institution.

*Changes:* We revised §§ 674.33(g)(1)(ii)(A), 682.402(d)(1)(ii)(A), and 685.214(a)(2)(i) as described above.

*Terms in Need of Further Clarification*

*Comments:* A few commenters believed that the proposed regulations contained several undefined or weakly defined terms for key aspects of the closed school discharge regulations. Commenters recommended that the Department more effectively address and define "closed school" as it applies to approved additional locations of an institution that has not closed.

Commenters recommended that the Department clarify what the Department considers a "significant share of its academic programs" in § 685.214(h)(9). Commenters requested that the Department specify whether a significant share means 50 percent or more of an institution's programs were discontinued, or whether a higher threshold must be met before the Department would consider it an exceptional circumstance for purposes of extending the 180-day lookback period.

*Discussion:* Regarding the treatment of additional locations, the regulations define "school" as a school's main campus or any location or branch of the main campus, regardless of whether the school or its location or branch is considered title IV eligible. The only difference between this definition and the definition in the current closed school discharge regulations is the addition of the term "title IV" before the term "eligible" which adds clarity to the definition. The Department has intentionally defined school in this manner in the closed school discharge regulations because the Department's longstanding policy is that when an additional location closes, that additional location is treated as a closed school for the purposes of a closed school discharge, regardless of whether the main campus stays open. The eligibility for the closed school discharge only applies to that location, though. In other words, a closure of an additional location does not make students who attended other locations eligible for a closed school discharge.

The one exception to this is when the main campus closes, in which case the closure is treated as the closure of the entire institution.

The term a "significant share of its academic programs" is used in connection with exceptional circumstances that may justify an extension of the 180-day lookback window, as determined by the Secretary. Since the determination to extend the lookback window is at the Secretary's discretion, the Secretary would determine whether a school has discontinued a significant share of its academic programs.

*Changes:* None.

*Comments:* A few commenters opposed the Department's proposal to define a borrower's program as multiple levels or classification of instructional program (CIP) codes if the school granted a credential in one program while the student was enrolled in a different program. Other commenters supported the proposal, emphasizing concerns that some bad actors have historically awarded retroactive degrees to prevent the amount of closed school discharge a borrower might be entitled to, and further limiting potential liabilities to the institution.

*Discussion:* Under the definition in the final rule, the Secretary may define a borrower's program as multiple levels or CIP codes if:

• The enrollment occurred at the same institution in closely proximate periods;

• The school granted a credential in a program while the student was enrolled in a different program; or

• The programs must be taken in a set order or were presented as necessary for borrowers to complete to succeed in the relevant field of employment.

Just because a school offers stackable credentials does not mean the Department would automatically apply this provision. Rather, it gives the Secretary flexibility to guard against closing schools that may award credentials inappropriately, to prevent students from qualifying for closed school discharges.

*Changes:* None.

*Comparable Programs*

*Comments:* Many commenters supported removing the "comparable program" exclusion because it provides needed additional time for students that may withdraw prior to closure and provides greater consistency across loan types. Some of these commenters noted that the comparable program exclusion has prevented borrowers who were harmed by their school from obtaining needed relief.

Other commenters opposed the elimination of comparable program from consideration. Some of these commenters stated that eliminating consideration of transfer would incentivize borrowers to take a closed school discharge and then transfer the credits they have earned, resulting in a windfall for the borrower. These commenters stated that the Department should incentivize students to transfer and complete regardless of whether there is a formal teach-out agreement, and that the Department should encourage teach-outs rather than discharges.

One commenter noted that, under the Department's determination of closure, a student who lives in close proximity to a campus that takes courses online and is able to successfully complete the program in which they are enrolled would still be eligible for a discharge and states that this is irreconcilable with the HEA since the student would be able to complete their program.

*Discussion:* The Department is concerned that the current treatment of borrowers who transfer or accept a teach-out is overly confusing and that borrowers do not understand that if they do not complete a comparable program, they are still eligible for a discharge. As a result, borrowers who should be eligible because they transfer and do not complete often never apply for a closed school discharge.

The final rule places a greater emphasis on completion in determining who is ineligible for a closed school discharge. Students that continue, but do not complete, their program maintain eligibility for automatic discharge. This addresses the aforementioned concerns about low application rates for students that transfer and do not finish.

In reviewing the amendatory text for closed school discharges, and in light of the concerns raised about how borrowers who enroll in an online program at the same institution could be affected, the Department is further clarifying the way discharge eligibility would work. In continuing with the policy in the NPRM, a borrower who accepts and completes a teach-out approved by the accrediting agency and, if applicable, the school's State authorizing agency, would not be eligible for a discharge because such an arrangement is designed to give the borrower an opportunity to finish their program. In keeping with existing practice, a borrower who accepts the teach-out but does not finish would maintain access to the discharge, but this rule would give them an automatic discharge 1 year after their last date of enrollment in the teach-out.

In the final rule, the Department has amended the language that previously related to a teach-out performed by the closing institution to instead say a continuation of the program at another branch or location of the school. This means that if a borrower transfers to another branch or location of the same school and finishes the program, they too would lose access to the discharge on the grounds that they did finish their program. Similar to the teach-out, a borrower would receive an automatic discharge 1 year after their last date of attendance if they accept but do not finish the program continuation at another branch or location of the school. This acknowledges that even though the borrower continued their program, they may have decided the continuation did not work for them, such as they did not like moving from a ground-based to online option or the other location was too far away.

The Department declines to put other transfer arrangements, or a transfer done by the student on their own, that leads to them completing on the same footing as a teach-out or continuation of the program at another branch or location of the school. Such options do not have the same protections for the borrower in terms of program similarity. They also open up issues, such as determining what share of credits have to transfer to have that completion elsewhere count as the same program. The Department is concerned about denying the possibility of an automatic discharge to a borrower who transfers with minimal to no help from their original school and essentially starts over. The teach-out and continuation paths identified by the Department best align with the concept in the HEA about giving closed school discharges to borrowers who are unable to complete their programs by defining the instances in which what the borrowers finish are most likely to be the same program.

*Changes:* We have revised §§ 674.33(g), 682.402(d), and 685.214(c) to clarify that a borrower who continues the program at another branch or location of the school would receive a discharge 1 year after their last date of attendance at the branch or location if they do not complete the program. We have removed the references to a teach-out provided by the school.

*Operational Considerations*

*Comments:* Commenters recommended that the Department clarify how the Department proposes to operationalize automatic closed school discharges, especially given the proposed language regarding the

assessment of closed school discharge liabilities against open institutions.

Commenters also recommended that the Department clarify how it would control for third-party reimbursement in the context of automatic closed school discharges.

Commenters suggested that the Department administer the closed school survey the Department used in the past to determine whether a closed facility truly is a closed school for purposes of the final regulations.

Commenters requested that the Department outline the number of automatic closed school discharges we have issued and the process to notify the Department of the expiration of a borrower's 1 year period prior to eligibility.

One commenter noted the Department will have to improve its data collection process from institutions and accreditors to implement the closed school discharge process.

*Discussion:* We thank the commenters for their recommendations. However, we do not believe that it is necessary to modify the regulations as requested. The operational process for automatic closed school discharge is under development and will be in place by the effective date of these regulations. At present, the Department does not plan to administer the closed school survey.

With respect to the potential assessment of liabilities for closed school discharges against open schools, there is no change to existing Department policy. The Department has clarified the definition of closure date to capture that this would only apply when a school has in fact closed. Longstanding Department policy is that if a school closes a branch campus or additional location, the borrowers at that campus or location do become eligible for closed school discharges, and if the school maintains other locations the ones that are still operating can face the liabilities associated with those discharges.

*Changes:* None.

*Comments:* Commenters asked about an internal document that the Department uses to determine whether we consider a school to be closed. The Department stated in the NPRM that the document would appear in Volume 2 of the Federal Student Aid (FSA) Handbook. Commenters requested that it be released before the release of that volume of the Handbook, since Volume 2 has historically not been released until the February after the start of the award year. In the commenters view, this means that institutions will not be aware of the Department's closed school

criteria until six months after the regulations are effective.

*Discussion:* The Department believes it is important to first publish the document in the FSA Handbook so that all the relevant resources are available. We note that, under our traditional schedule, Volume 2 of the Handbook will be published before the effective date of the closed school discharge regulations. We also note that an older version of the chart was published during the negotiated rulemaking sessions.[150]

*Changes:* None.

*Institutional Liabilities*

*Comments:* A few commenters expressed the concern that the proposed changes fail to provide any procedural protections for institutions or their affiliates or principals to allow them to present evidence to defend against an application or recoupment. Commenters argued that the proposed changes to pursue liabilities against affiliated persons violate PPA rules.

*Discussion:* The Department has been evaluating closed school discharge applications for many years and does not believe that an adversarial process is needed for borrowers to qualify for closed school discharges. However, for the Department to hold a school liable for a closed school discharge, the Department would have to initiate an administrative process against the institution under 34 CFR part 668 to establish the liability. Additionally, the Department disagrees that pursuing liabilities against affiliated persons where applicable is in violation of existing rules. It is a statutory requirement in the HEA, which in Sec. 438 states the Secretary ''shall subsequently pursue any claim available to such borrower [who received a closed school discharge] against the institution and its affiliates and principals or settle the loan obligation pursuant to the financial responsibility authority under subpart 3 of part H.''

*Changes:* None.

*Efforts To Assist Borrowers*

*Comments:* Commenters recommended that the Department remove the revocation and denial provisions relating to reinstatement of a borrower's discharged loans for failure to cooperate in subsequent actions against their schools. The NPRM included proposed technical changes to § 685.214(e), which requires that a borrower cooperate with the Secretary

---

[150] https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/schoolclosureofbrancampuses.pdf.

in any judicial or administrative proceeding against the borrower's school. If the borrower fails to provide requested testimony, documents, or a sworn statement, the Secretary revokes the discharge or denies the borrower's application for relief. Commenters believed that borrowers who have suffered from a school closure, and in many cases suffer economic instability and other hardships, may have justifiable reasons for not responding to a mail or email communication from the Department that may follow weeks, months or even years after the borrower receives a discharge.

*Discussion:* The requirements that a borrower who has received a closed school discharge must cooperate with enforcement actions taken by the Department are a longstanding feature of the existing closed school discharge regulations. As the commenter notes, we are only making minor technical changes to these provisions. The Department believes that these provisions are an important tool for recouping closed school discharge liabilities from schools.

*Changes:* None.

*Comments:* Multiple commenters suggested additional measures to assist borrowers affected by closing schools, through the disclosure of information such as:

• Mandating that the institution provide borrowers with notices informing them of their rights shortly after announcing that the institution will close.

• Requiring institutions to explicitly share their accreditation probation status.

• Displaying warnings relating to possible school closures prominently on a school's website.

• Delivering warnings of possible school closures electronically to admitted and enrolled students.

• Setting up lines of communication with borrowers to inform them about the status of their application and other options for continuing their education.

• Requiring that an institution inform the Department it will close concurrently with its public announcement of closure.

*Discussion:* We appreciate the recommendations for additional steps the Department may take to assist borrowers in closed school situations by providing additional information. Many of these recommendations relate to activities that we believe are better addressed through guidance to closing schools and direct communication with borrowers, rather than as regulatory requirements. Similarly, we believe that recommendations regarding the

operational activities of the Department are better addressed through the Department's procedural rules, rather than through regulations. The Department notes that institutions are already required to share a probation status issued by their accrediting agency.

*Changes:* None.

*Comments:* Commenters recommended that the Department extend the November 1, 2013, automatic discharge date backwards to open the door to automatic relief for more borrowers and include information about what the process for discharge may look like for individuals who are entitled to a discharge prior to 2013.

*Discussion:* In the NPRM, there is no cut-off date for eligibility for an automatic closed school discharge. The process for closed school discharges before November 1, 2013, and on or after November 1, 2013, will not be substantially different.

*Changes:* None.

*Comments:* One commenter recommended reimbursing a borrower who has received a closed school discharge for loan payments that the borrower has already made, not just discharging the remaining balance on the loan.

*Discussion:* The closed school discharge regulations already provide for refunds or payments made by the borrower on the loan which is subject to a closed school discharge. Section 685.214(b) of the Direct Loan regulations specifies that a closed school discharge relieves a borrower of any past or present obligation to repay a loan and qualifies a borrower for reimbursement of payments made voluntarily or through enforced collections.

*Changes:* None.

*Comments:* Commenters stated that they believe that the Department does not possess the authority to promulgate a regulatory discharge structure based upon the statutory language. In the view of the commenters, the statute provides clear direction: borrowers are entitled to a closed school loan discharge when they are unable to complete their program due to the closure of the school. Automatic discharges, look-back periods, and other features of the closed school discharge regulations are not provided for in the statute. Commenters also expressed the concern that the Department's stated intent to increase the number of closed school discharges does not find support in the statute.

*Discussion:* As noted above, Sec. 410 of GEPA provides the Secretary with authority to make, promulgate, issue, rescind, and amend rules and

regulations governing the manner of operations of, and governing the applicable programs administered by, the Department. Further, under Sec. 414 of the Department of Education Organization Act, the Secretary is authorized to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Department. These general provisions, together with the provisions in the HEA, authorize the Department to promulgate regulations that govern closed school discharge standards, process, and institutional liability. To streamline and strengthen the closed school discharge process, we believe it is critical that the Department proceed now in accordance with its statutory authority, as delegated by Congress, to finalize these regulations that protect student loan borrowers while also protecting the Federal and taxpayer interests.

*Changes:* None.

**False Certification Discharges (§§ 682.402(e), 685.215(c) and 685.215(d))**

*Comments:* Many commenters supported the proposed regulations that would streamline the false certification discharge process. In particular, commenters supported establishing standards that apply to all claims regardless of when the loan was first disbursed; removing the provision that any borrower who attests to a high school diploma or equivalent does not qualify for a false certification discharge; expanding the types of documentation the Department considers when a borrower applies for a false certification discharge; and enabling groups of borrowers who experienced the same behavior from their institutions to apply together.

*Discussion:* We thank the commenters for their support.

*Changes:* None.

*Comments:* Several commenters asked the Department to provide that institutions are not liable for discharged amounts if the borrower submits to the school a written attestation that the borrower has a high school diploma or equivalent. Commenters also expressed concerns that granting false certification discharges due to a disqualifying condition may preclude students from receiving student loans since the need to scrutinize and evaluate disqualifying conditions would place a burden on institutions to rely on background checks to avoid liability. Additionally, several commenters suggested that a student must be required to attest they do not have a disqualifying condition or institutions can only be liable if a

student reported the condition but the institution still certified the loan. A few commenters recommended specifying the implementation time frame for these regulations and whether the Department would place retroactive requirements on the institution for prior periods. Numerous commenters requested clarification on the change from disbursement date to origination date.

*Discussion:* These final regulations are intended to ensure that a borrower can receive a false certification discharge if the borrower was coerced or deceived by their school and had reported not having a valid high school diploma or equivalent. A written attestation indicating that the borrower had a high school diploma or its equivalent would not necessarily relieve a school of liability for a false certification discharge. However, for the Department to hold a school liable for the discharge, the Department would have to go through an administrative process under part 668, subpart H to establish the liability.

The Department notes that the disqualifying condition criteria for a false certification discharge are well established in the existing regulations. These eligibility criteria are under current § 685.215(a)(1)(ii). The Department is making no changes to the regulatory text in this section. Schools should already comply with this regulation.

The requirements specified in these final regulations will apply to false certification discharge applications received on or after the effective date of these regulations. The effective date for these regulations is discussed under **DATES** above.

Relying on the disbursement date instead of the origination date allows institutions time to remedy an already completed false certification that a student was eligible for a loan. Utilizing the origination date will ensure that institutions may be held accountable for their misconduct even if it is subsequently corrected prior to disbursement.

*Changes:* None.

*Comments:* A few commenters recommended that only State attorneys general be allowed to submit applications for group false certification discharges, consistent with the accompanying BD regulations. These commenters further stated that since the Department has decided not to allow legal services representatives to submit group BD applications, the same should apply for false certification discharge. Other commenters suggested the Department should require some procedure to ensure accountability from

State attorneys general and legal aid organizations. Alternatively, one commenter recommended that state authorizing agencies be added to the list of entities eligible to request group claims. Several commenters asked the Department to clarify how the Department will process group claims, including appropriate due process protections for institutions subject to such claims.

*Discussion:* The Department has existing authority to grant group false certification discharges and has done so in the past. Group discharges are particularly useful for borrowers who attended the same school and who attest to similar violations for which there is common evidence that would allow for a discharge for a group of borrowers. Unlike BD discharges, which have been well-publicized in the media in recent years, many borrowers do not know of their right to apply for a false certification discharge. An opportunity for a group discharge is particularly important for these borrowers. In addition, the regulatory language providing for a group discharge will make it less difficult for a borrower advocate to compel action on the part of the Department, because it will specifically require the Department to act on a group discharge application from a State attorney general or a nonprofit legal services representative. The Department also notes it updated the BD regulations to allow nonprofit legal assistance organizations to also submit requests for group consideration. Regarding accountability for State attorneys general or nonprofit legal services, the Department notes that we have no regulatory authority over such entities. However, group claims submitted to the Department will be reviewed and either approved or denied based on the merits of the claim, as with claims submitted by individual borrowers. The due process rights of all parties will be respected. As noted earlier, any attempt to assess liabilities against an entity through a group claim will be subject to the process in part 668, subpart H. Finally, the Department recognizes the specialized expertise of State attorneys general and nonprofit legal services representatives in help borrowers understand their rights to apply for false certification discharges. The Department encourages other entities with knowledge of facts that would support potential group claims to work directly with State attorneys general or nonprofit legal services representatives.

*Changes:* None.

**Public Service Loan Forgiveness (PSLF) (§ 685.219)**

*Comments:* Many commenters expressed support for the proposed PSLF regulations, including the revised definitions, expansion of eligibility, payment counting flexibility, automation, and reconsideration. Commenters recommended the Department continue to streamline PSLF requirements where possible. A few commenters submitted technical corrections and recommendations. Several commenters further stated that the Department should prioritize the swift implementation of the regulations. Other commenters stated that eligibility for PSLF should not be expanded because of the cost to taxpayers.

*Discussion:* We thank the many commenters who wrote in to support our efforts to improve the PSLF program. Generally, we do not address technical or other minor changes or recommendations that are out of the scope of this regulatory action or that would require statutory changes. Cost impacts will be discussed in the Regulatory Impact Analysis section.

Section 482(c) of the HEA states that any regulatory changes initiated by the Secretary that have not been published in final form by November 1 prior to the start of the award year shall not become effective until the beginning of the second award year after such November 1 date. Consistent with the Department's objective to improve the implementation of PSLF, the Secretary intends to exercise his authority under section 482(c) to designate the simplified definition for full-time employment in PSLF as a provision that an entity subject to the provision may, in the entity's discretion, choose to implement prior to the effective date of July 1, 2023. The Secretary may specify in the designation when, and under what conditions, an entity may implement the provision prior to the effective date. The Secretary will publish any designation under this subparagraph in the **Federal Register**.

The Secretary does not intend to exercise his authority to designate any other regulations in this document for early implementation. The final regulations included in this document are effective July 1, 2023.

*Changes:* None.

*Qualifying Employer and Definitions*

*Comments:* Several commenters suggested that we expand eligibility for PSLF to include labor union employees; veteran service organizations; medical interns, residents, and fellows; marriage and family therapists, clinical social

workers, and professional counselors; attorneys providing public services and critical public defense services; Peace Corps and AmeriCorps volunteers; Fulbright English Teaching Assistants; translators and interpreters; and those working in national laboratories and nonprofit organizations, whether religious or not, if they file an annual tax-exempt IRS Form 990. One commenter recommended that the Department deem periods of service as a caregiver under the VA's Program of Comprehensive Assistance for Caregivers to be eligible service for PSLF purposes.

One commenter requested that PSLF eligibility expand to include an option for servicemembers to transfer PSLF eligibility to their married spouse.

Another commenter encouraged the Department to include the Federal Job Corps program as a qualifying employer because its mission and services meet the definition of public service. Job Corps members are engaged by the U.S. Department of Labor to manage the operation of Job Corps campuses and deliver services.

Additional commenters suggested that the Department add Certified B Corporations and Public Benefit Corporations to the list of qualifying employers.

Another commenter encouraged the Department to include specific guidance that Federal Reserve Banks are qualifying employers.

*Discussion:* The Department is responding to the comments about eligibility for certain occupations solely in the context of eligibility if a borrower provides these services at a private nonprofit organization. Many commenters asked the Department to consider these occupations for borrowers who work at private for-profit organizations as well. The Department will publish a separate final rule addressing the questions of eligibility for borrowers employed by private for-profit entities. This includes the discussion of early childhood education and all other occupations, including the ones mentioned in this comment summary. This final rule does not speak to the issue of any changes to the eligibility of private for-profit employers to serve as qualifying employers for the purposes of PSLF. It does address a related yet different question, which is whether a private nonprofit or government employer should be able to treat a contractor as if they are an employee or employed by that qualifying employer. That is a different issue, as it is only focused on who is considered an employee of a nonprofit or government employer, rather than the overall question of which employers qualify.

From the initial years of the PSLF program, the Department's regulations have established eligibility for PSLF based on whether the borrower works for a qualifying employer, not their specific job. As a result, anyone doing the jobs mentioned by the commenters while employed at a qualifying employer was eligible for PSLF. Borrowers are not permitted to transfer their PSLF eligibility to their spouse for any reason, which includes active-duty military employment. Under the Sec. 455(m) of the HEA, a borrower must work for a qualifying employer to be considered for PSLF. Eligible not-for-profit organizations include an organization that is tax-exempt under section 501(c)(3) of the Internal Revenue Code, and a not-for-profit organization that is not tax-exempt under section 501(c)(3) of the Internal Revenue Code, but that provides a qualifying service. However, the Department's regulations have consistently provided that a labor union is not a qualified employer for PSLF purposes. Labor unions are not 501(c)(3) organizations, nor do most of their full-time equivalent employees provide a qualifying service.

Job Corps is a program offered to young adults that is intended to improve the quality of their lives through vocational and academic training aimed at gainful employment and career pathways. Individuals participating in Job Corps programs are not employees of the program. To the extent any Job Corps participants work for a private for-profit employer, that issue will be addressed in the future final rule.

We have modified some definitions and added other definitions to provide additional clarity to the types of services that employers must provide to be considered a qualifying employer.

We will address Certified B corporations and public benefit corporations that are private for-profit employers in the future final rule.

We appreciate the comment requesting clarification on the inclusion of Federal Reserve Banks as qualifying employers for the purposes of PSLF. Employees who work at the Board of Governors of the Federal Reserve Board are considered government employees and qualify for PSLF. We will address employees of the Federal Reserve Banks in the future final rule regarding the eligibility of for-profit employers.

The proposed definition of "public health" includes those engaged in the following occupations (as those terms are defined by the Bureau of Labor Statistics): physicians, nurse practitioners, nurses in a clinical setting, health care practitioners, health care support, counselors, social workers, and other community and social service specialists. Therefore, borrowers working in these areas are eligible for PSLF if they work for an eligible employer. Borrowers working for a private for-profit employer will be addressed in the future final rule.

Attorneys providing public interest legal services and critical public defense services are eligible for PSLF if they are employed by an organization that is funded in whole or in part by a Federal, State, local, or Tribal government. As noted above, any further discussion of eligibility for private for-profit employers will be discussed in a future final rule.

Peace Corps and AmeriCorps volunteers have always been and continue to be qualified for the purposes of PSLF.

*Changes:* None.

*Comments:* One commenter suggested that the Department is required to determine PSLF eligibility based on *either* a qualifying employer *or* a qualifying job, as those employers and jobs are defined in the statute.

*Discussion:* After the addition of PSLF to the HEA in 2007, the Department engaged in negotiated rulemaking to develop proposed regulations to implement the program. During that process, the Department reviewed the text and legislative history of the PSLF provision and determined that it was consistent with Congressional intent to focus on the services provided by the qualifying employer rather than on the services provided by the individual employee. To do otherwise would be to have two different standards for different borrowers depending on their type of employer. The negotiating committee agreed with this approach and reached consensus on the proposed rules. The Department has consistently retained that approach since that time. Despite making other changes to PSLF, Congress has not made any statutory changes to require the Department to determine a borrower's eligibility based on the individual employee's activities rather than on the services offered by the employer. Accordingly, the Department does not agree with the comment.

*Changes:* None.

*Comments:* Several commenters expressed concern that the proposed definition of the term "non-governmental public service" requires services to be provided directly by the employees. Commenters believe that the inclusion of a "direct service" component is not only undefined in the

**65972** **Federal Register**/Vol. 87, No. 210/Tuesday, November 1, 2022/Rules and Regulations

regulations but is counter to Congressional intent. A few commenters expressed concern that the definition of public service could exclude veteran service organizations and suggested revising the definition to ensure that any definition of "non-governmental public service" include providing services to veterans or their families.

A few commenters suggested that the proposed definitions of "non-governmental public service" and "school library services" should be updated to clarify that employment by a school library or in other school-based services includes employment at public charter schools. Several commenters further argued that the proposed definition of "public service for the elderly" may not encompass all public services that could be provided to elderly individuals and urged the Department to either lower the age for assistance to the elderly or remove a precise age.

*Discussion:* We believe it is important to define non-governmental public service as services provided by employees of a nonprofit organization where the organization devotes a majority of its full-time equivalent employees to work in at least one of the areas designated in the HEA: emergency management, civilian service to military personnel and military families, public safety, law enforcement, public interest law services, early childhood education, public service for individuals with disabilities and/or the elderly, public health, public education, public library services, school library, or other school-based services. We agree with commenters that the word "directly" does not provide any additional clarity to the definition and will remove it.

Charter schools that are either government entities or tax-exempt under § 501(c)(3) of the IRC are considered qualifying employers for the purposes of PSLF. A nonprofit charter school that does not fit into either of those classifications would be evaluated based on the services it provides. We will address comments related to the eligibility of a private for-profit charter school in a future final rule considering any changes to whether a private for-profit employer can serve as a qualifying employer for PSLF purposes.

In addition, we have clarified the definition of "civilian service to the military" to mean providing services to or on behalf of members, veterans, or the families or survivors of members or veterans of the U.S. Armed Forces.

We believe that age 62, which is the youngest age for individuals to obtain Social Security retirement benefits, is an appropriate age to use for the purposes

of identifying public services to the elderly.

*Changes:* The Department has removed the word "directly" from the definition of "non-governmental public service." We reworded the definition of public health in § 685.219 (b).

*Comments:* A few commenters suggested replacing the term "teacher" in the definitions section of the regulations with the term "educator" to include school psychologists, school counselors, and specialized instructional support personnel who are employed full time by a local education agency under a contract that mirrors a teacher's contract.

*Discussion:* We believe that the proposed definition of "public education service," which includes the provision of educational enrichment and support to students in a public school or a school-like setting, including teaching, adequately addresses commenters concerns.

*Changes:* None.

*Comments:* A few commenters stated that the definition of "Government employee" should specify that service as a member of the U.S. Congress is not qualifying public service employment for the purposes of this section. Other commenters requested we remove, "as a member of the U.S. Congress is a governmental employee" because this provision does not fit the new definition of "non-governmental public service."

*Discussion:* We thank the commenters for this suggestion. The Department does not plan to remove these words or define the term "Government employee" in these regulations. Under Sec. 455(m)(3)(B) of the HEA, service in Congress does not qualify for PSLF.

*Changes:* None.

*Tax Exempt Organizations*

*Comments:* Several commenters stated that 501(c)(1) and 501(c)(6) tax-exempt organizations whose purposes and governing documents are consistent with 501(c)(3) tax-exempt organizations should be included as qualifying employers. Other commenters suggested adding a facility defined by sections 1819(a) or 1919(a) of the Social Security Act to the definition of a qualifying employer.

*Discussion:* We thank these commenters for the suggestions to include 501(c)(1) and 501(c)(6) tax-exempt organizations, whose purposes and governing documents are consistent with 501(c)(3) tax-exempt organizations to the Department's definition of qualifying employer. We do not, however, believe there is sufficient basis to automatically qualify any type of 501(c) organization beyond the 501(c)(3)

category that Congress specifically included in the statute. We also do not agree that any facility listed under the Social Security Act, such as a skilled nursing facility, should automatically be included as a qualifying employer for the purposes of PSLF.

*Changes:* None.

*Comments:* A few commenters stated that religious conduct would receive an unconstitutional financial benefit if religious organizations are considered qualifying employers. These commenters further stated that religious services were rightly previously excluded from PSLF and should continue to be excluded.

*Discussion:* The Department believes that the current rules do not provide improper aid to religious organizations and are consistent with the Constitution. The current regulations place religious individuals and entities on equal footing with their secular counterparts by allowing such individuals and entities to qualify for the same benefits available to others.

*Changes:* None.

*Comments:* A few commenters expressed concerns regarding the revised PSLF definitions and argued that the proposed definition of "non-governmental public service" is contrary to the text and purposes of the HEA. They contended that the requirement that a majority of the employer's full-time equivalent employees be engaged in providing one of the specified services would unlawfully eliminate eligibility for individuals who currently qualify for PSLF.

A few commenters further stated that the proposed definition of "public education service," which would require public education services to be provided to students in a public school or a school-like setting, deviates from established Department practice in administering and determining PSLF eligibility. These commenters suggested that the Department implement a holistic evaluation of employers to determine PSLF eligibility based on whether the organization and its employees provide a meaningful public service.

One commenter proposed to expand PLSF eligibility to include all those who work to advance the public interest.

Several commenters suggested that the proposed definitions fail to consider the substantial reliance interests of individuals such as the interests of employees who have reasonably relied upon the Department's past and current certification of eligible employment to select jobs that qualify for PSLF; the interests of public service organizations

that have relied upon the Department's current interpretation to recruit and retain employees by presenting the organization as a qualifying PSLF employer; and the interests of organizations that currently qualify for PSLF and may continue to do so if the proposed rule goes into effect, but which could subsequently fail to meet the requirements for PSLF due to employee hiring, departures, layoffs, or changes to the organization's structure.

In addition, several commenters stated the Department needs to take further action to clarify employment requirements for nonprofit organizations by explicitly removing any mention of the primary purpose condition, as required by *American Bar Association* v. *U.S. Department of Education.*[151]

*Discussion:* We thank these commenters for expressing concerns about the Department's definition of non-governmental public service. However, we believe requiring an employer to have a majority of their full-time equivalent employees be engaged in providing one of the specified services is consistent with the HEA and will not eliminate eligibility for individuals who currently qualify for PSLF. We also do not believe there is sufficient basis to automatically qualify any type of non-governmental organization beyond the 501(c)(3) category that Congress specifically included in the statute.

The Department reviews other nonprofit employers as it receives employment certifications from their employees. The new regulations will help the Department determine whether the employer provides one of the services specified in the HEA. This will improve the Department's ability to provide guidance to employers and employees alike. We note that there is no requirement that the borrower work for the same qualifying organization for the full 10-year period.

The primary purpose test was at one time used by the Department to determine whether a nonprofit organization which was not a 501(c)(3) organization provided a specific public service so that its employees could qualify for PSLF. The Department has not used this test for several years, nor did we include such a test in the current or proposed regulations; therefore, we cannot remove it.

The Department defines a non-governmental qualified employer as an employer that has devoted a majority of its full-time equivalent employees to working in at least one of the following areas: emergency management, civilian

service to military personnel military service, public safety, law enforcement, public interest law services, early childhood education, public service for individuals with disabilities and/or the elderly, public health, public education, public library services, school library, or other school-based services. We believe that the definition of public education service, which requires public education services to be provided to students in a public school or in a school-like setting, is consistent with the Department's current practice in administering and determining PSLF eligibility.

*Changes:* None.

*Full-Time Employment*

*Comments:* Many commenters supported the proposed definition of "full-time" employment that required borrowers to demonstrate they worked at least 30 hours a week across one or more jobs, but also requested we apply a retroactive determination for full-time employment based on the definitions and consideration for part-time employment.

*Discussion:* We thank the many commenters who supported our proposed change to the definition of "full-time." We believe the revisions will provide clarity to borrowers seeking PSLF. Applications submitted after the implementation date that include periods of employment that predate the effective date of these regulations will be reviewed under this new definition. Section 455(m) of the HEA requires that borrowers be employed full-time to qualify for PSLF. The Department cannot include part-time employment for the purposes of PSLF unless part-time employment at multiple qualifying jobs adds up to 30 hours per week.

*Changes:* None.

*Comments:* Many commenters supported the proposed credit hour conversion to determine full-time employment for adjunct faculty.

*Discussion:* We appreciate the support of these commenters.

*Changes:* None.

*Comments:* A few commenters suggested that to make the calculation of eligibility more equitable for adjunct faculty working at more than one institution with different term lengths, the regulations should be revised to base the determination of the minimum number of hours that need to be attained for PSLF credit using the 3.35 multiplier for each credit or contact hour taught by the faculty member. A few commenters thought the Department should increase the conversion rate.

*Discussion:* During the negotiated rulemaking process, the Department

adopted the 3.35 conversion factor suggested by negotiators. Additionally, we explained that this could apply to contact hours as well. For example, if a borrower was teaching six hours a week and had two office hours a week, this borrower would multiply eight by 3.35 which equals 21 total hours worked per week. This conversion factor is the minimum rate employers should use based upon a semester-hour schedule. Employers would continue to have flexibility to adjust this conversion factor upward or to account for trimesters, quarters, or other types of academic calendars if they think a different figure better captures the number of hours an adjunct professor is working. We also clearly defined "non-tenure track faculty" to eliminate ambiguity. We also defined "full-time" to include working in qualifying employment in one or more jobs for the equivalent of 30 hours per week as determined by the Secretary which qualifies the borrower for PSLF if the borrower is working:

(1) through a contractual employment period of at least eight months over a 12-month period, as in the case of primary and secondary school teachers and professors and instructors in higher education; or,

(2) in the case of non-tenure track faculty employment, by either—

(a) teaching at least nine credit hours per semester, six credit hours per trimester, or 18 credit hours per calendar year; or,

(b) multiplying each credit hour taught per week by 3.35 hours; or

(c) counting student-contact hours as attested by the borrower and substantiated by the employer on a form approved by the Secretary.

(3) When determining whether a borrower works full-time, the Secretary includes vacation or leave time provided by the employer or leave taken for a condition that is a qualifying reason under the Family and Medical Leave Act of 1993 (29 U.S.C. 2612(a)(1))). We also adjusted the definition of full-time to note that the treatment of teachers on an employment contract being considered to work for 12 months would also apply to instructors in postsecondary education. The original language was a nonexhaustive list, and this change adds clarity.

*Changes:* We modified § 685.219(b)(i)(B) to include professors and instructors in higher education.

*Comments:* One commenter suggested the Department allow employers who pay their employees based on caseload (rather than an hourly rate) to certify the employee is working full-time by

---

[151] 370 F. Supp. 3d 1 (D.D.C. 2019).

reporting an average of 30 or more hours on the employer certification form.

*Discussion:* We thank the commenter for this suggestion. We believe the definitions of ''full-time'' and ''qualifying employer'' provide adequate information for the employers to certify whether their employee is working full-time. Under the regulations, an employee must work the equivalent of 30 hours per week to be considered full-time. The employer is able to determine when an employee has met that threshold.

*Changes:* None.

*Comments:* One commenter suggested the Department require self-attestation for the purposes of determining full-time employment. Another commenter expressed concern that some employees who work in public service may not receive a W–2 form and may not be able to prove work in qualifying employment.

*Discussion:* The Department appreciates the points raised by these commenters. A borrower who does not receive a W–2 would not be eligible for PSLF except, as provided in these final regulations, for a borrower who works as a contracted worker for a qualifying employer in a position or providing services which, under applicable state law, cannot be filled or provided by a direct employee of the qualifying employer. We believe that the employer certification, along with other information on the PSLF application, will provide sufficient information to allow the Department to determine a borrower's employment full-time status for the purposes of PSLF.

*Changes:* None.

*Consolidation*

*Comments:* Many commenters supported the Department's proposal to allow borrowers to keep credit toward PSLF when they consolidate their loans. However, several commenters noted that the NPRM was unclear on the process of determining the treatment of consolidation loans for PSLF purposes. Some commenters argued that the Department should allow all loans in a consolidation to receive credit toward PSLF equal to the maximum amount of qualifying payments the borrowers have already made. Other commenters objected to such an approach, noting that it would allow a borrower to consolidate a loan and potentially receive credit for years' worth of payments toward PSLF when in actuality there were few, if any, payments toward PSLF on one or more of the underlying loans. Other commenters suggested the Department

allow prior payments made on FFEL Program loans to count toward PSLF.

*Discussion:* The Department agrees with commenters that the treatment of qualifying payments for PSLF after loan consolidation was unclear. The Department's goal in allowing borrowers to keep any credit they had made toward PSLF is to ensure they keep the progress they made, not to award additional credit toward forgiveness they have not earned. To that end, the Department will award borrowers qualifying payments equal to a weighted average of the loan balances being consolidated. In other words, if a borrower has 60 qualifying payments on a $20,000 loan and consolidates that loan with another $40,000 in loans with no qualifying payments, then the consolidation loan would be assigned 20 qualifying payments ($20,000 divided by $60,000 times 60). The Department believes this approach is better for the borrower than keeping the qualifying payment clock unchanged but only applying it to part of the consolidation loan. To benefit from PSLF a borrower has to spend some time on an IDR plan, since if they stayed on the standard 10-year plan, they would pay the loan off at the same time as receiving forgiveness. Since IDR payments are based on the borrower's income and are only affected by the balance amount on certain IDR plans, if a borrower's payment amount exceeded what they would owe on the standard 10-year plan, partial cancellation may not significantly change their monthly payment amount and the borrower would still have to make as many as 120 additional payments to get the remaining balance forgiven. The Department is unable to accept the changes recommended by the commenters with respect to payments on FFEL loans, because those are prohibited by statute.

*Changes:* We have amended § 685.219(c)(3) to note that a borrower will receive a weighted average of the payments the borrower made on the Direct Loan prior to consolidating.

*Deferment, Forbearance, and Default*

*Comments:* Many commenters supported counting certain periods of deferment and forbearance toward PSLF. These commenters further urged the Department to count all such periods toward PSLF to reduce unnecessary complexity, address administrative failures by student loan servicers, and fulfill the program's goal of alleviating the burden of Federal student loans for borrowers in public service. These commenters also suggested that borrowers should not

lose progress toward forgiveness when a servicer pauses a borrower's payments to process paperwork. Additionally, the commenters opined that these borrowers should not be penalized for following bad advice from a servicer or when servicer misconduct occurred. They noted that recent Federal investigations concluded that student loan servicers have steered borrowers into forbearance, made errors during loan transfers, and failed to advise borrowers on IDR plans.

A few commenters further urged the Department to expand the hold harmless provision to count payments for periods of default from previously defaulted borrowers. One commenter suggested we count periods of time spent rehabilitating defaulted loans as time toward forgiveness. Other commenters suggested these individuals should be allowed to make a payment that is equal to or lesser than the amount of the lowest IDR plan at the time, rather than an amount equal to or greater than the amount they would have paid at the time on a qualifying repayment plan. Other commenters advised that the Department strengthen oversight of loan servicers to avoid future forgiveness denials and ballooning debt.

Several commenters shared their experiences with servicers incorrectly putting the borrower into forbearance and detailed other improper servicer actions. Several commenters recommended counting $0 IDR payments during bankruptcy toward PSLF qualifying payments.

One commenter argued that the Department does not have the authority to allow periods of time spent in forbearance or deferment to count as qualifying payments for PSLF.

*Discussion:* The Department recognizes that there have been past issues with servicing Federal student loans. We have taken steps to address the impact of these servicing errors through the limited PSLF waiver that allows borrowers to receive credit for past periods of repayment that would otherwise not qualify for PSLF.[152] We will also award credit toward PSLF for borrowers who spent 12 or more consecutive months or a cumulative total of 36 or more months of forbearance for those periods of time if borrowers certify qualifying employment, this includes time in the past that servicers have paused payments while processing borrowers'

[152] *https://studentaid.gov/announcements-events/pslf-limited-waiver.*

paperwork for extended periods.[153] The Department has created the Fresh Start initiative which provides defaulted borrowers who do not qualify for PSLF a path to get out of default and regain potential eligibility for PSLF.

In the proposed regulations, the Department also expanded the types of forbearances and deferments that qualify for PSLF through these new regulations. Qualifying borrowers are statutorily entitled to deferments and certain forbearances. We have to determine whether the statute requires borrowers to give up these rights to apply for PSLF. After further review of the legislative history and language of the PSLF provisions, we do not see anything which suggests Congress intended to require borrowers to give up their rights to these benefits to qualify for PSLF. As discussed in the NPRM, the Department carefully reviewed the different types of deferments and forbearances and proposed awarding credit for ones where a borrower would likely be either engaged in qualifying employment and thus face a confusing tradeoff of pausing payments or receiving credit toward forgiveness or have a high likelihood of a $0 payment on an IDR plan and thus there would not be a meaningful difference were they to have been enrolled on an eligible IDR plan. Awarding credit for deferments and forbearances beyond the ones identified by the Department would not be appropriate because they could be in situations where the borrower would be required to make a payment greater than $0 on IDR or there's no indication that the individual would otherwise be engaging in qualifying employment. In some cases, such as the unemployment deferment, it would not be possible for a borrower to engage in qualifying employment for PSLF since a borrower cannot receive that deferment if they have full-time job.

The regulations also provide a reconsideration process, which will enable borrowers to request a review of the PSLF status of their employer or the number of qualifying payments.

With respect to time while payments are administratively paused as servicers recalculate payments on an IDR plan or transfer them to the PSLF servicer, the Department agrees with commenters to allow those periods to count toward PSLF, provided the borrower still engages in qualifying service. These forbearances will be captured under § 685.205(b)(9), which is already in the regulations as a type of forbearance that would count toward PSLF. The

Department had been concerned about this being a path for borrowers to gain significant credit simply by applying repeatedly. However, the Department is working on changes related to the Fostering Undergraduate Talent by Unlocking Resources for Education (FUTURE) Act, which will allow borrowers who provide the necessary approval to the Department to automatically recalculate payments every year using data filed to the IRS. Those borrowers are unlikely to see a delay in having their payment account updated. Similarly, under planned improvements to the student loan servicing the Department is planning to eliminate transfers to specialty servicers for programs like PSLF, further reducing the incidence of months paused for administrative reasons.

For all other deferments and forbearances, we have created a hold harmless provision that will allow borrowers who have been encouraged and placed in forbearances for long periods of time to make payments equal to or greater than what they would have paid in order to count that time spent in forbearances as time toward forgiveness. This process is less burdensome than trying to substantiate which periods of deferment or forbearance may be a result of steering or bad advice versus which ones are not. The hold harmless option would allow borrowers to pay what they otherwise would have paid during the time they spent in a forbearance or a deferment and have that time count toward PSLF rather than an amount equal to or greater than the amount they would have paid at the time on a qualifying plan. The Department announced a payment account adjustment in April 2022 that included adjustments to borrowers' accounts for certain deferments prior to 2013 and extended periods of any type of forbearance. Those adjustments will pick up significant periods that might otherwise have been subject to the hold harmless provision. The Department's regulations cannot waive statutory requirements, and the statute is clear that we cannot count time in default toward PSLF and that includes time spent in loan rehabilitation. Borrowers must make 120 qualifying payments to receive credit toward PSLF. Borrowers on IDR plans with a $0 payment remain eligible for PSLF.

*Changes:* None.

*Comments:* A few commenters suggested adding a separate Peace Corps deferment instead of having this deferment be included in the AmeriCorps forbearance. Commenters also proposed retroactively counting all

service of Peace Corps and returned Peace Corps volunteers regardless of loan status or payments.

*Discussion:* A borrower may apply for an Economic Hardship deferment based on Peace Corps service which is separate from the AmeriCorps forbearance. Borrowers who are Peace Corps volunteers would likely have a $0 payment under an IDR plan which is a qualifying repayment plan for PSLF; however, they may choose to apply for an Economic Hardship deferment instead and receive credit toward PSLF forgiveness. Typically, AmeriCorps volunteers are working and receiving payment during their service time. Therefore, these borrowers are eligible for a forbearance which counts toward time to forgiveness under these regulations. The Department evaluates each PSLF application to determine if a borrower should receive credit for the months for which they provided information on the form. While we do not retroactively count payments by Peace Corps or returned Peace Corps, PSLF applicants will have a full review and assessment of any period of employment covered by any future application.

*Changes:* None.

*Single Standard, Waiver Expansion, COVID, IDR, and FFEL*

*Comments:* Several commenters expressed concerns regarding the expiration of temporary waivers and the need for a single Federal standard regarding PSLF. These commenters further stated that borrowers will have difficulty navigating multiple standards and the confusion will cause borrowers who are entitled to PSLF benefits not to receive them. Commenters encouraged the Department to retroactively ensure prior qualifying employment and subsequent payments would count toward PSLF qualifying payments.

Several commenters urged the Department to include in the PSLF regulations provisions in the Limited PSLF Waiver that allow borrowers with FFEL loans to have payments on those loans count toward PSLF. These commenters stated FFEL loan borrowers only have a year to take the steps to consolidate into the Direct Loan program and get credit for past payments under the Limited PSLF Waiver and asked the Department to extend the deadline on the limited PSLF waiver. Other commenters noted that to qualify for PSLF, the borrower must make required payments on a Direct Loan; payments on FFEL or Perkins loans do not count toward forgiveness. Several commenters asked that we lower the number of required payments

---

[153] *https://studentaid.gov/announcements-events/idr-account-adjustment.*

from 120 months to 60 months and one commenter requested we forgive loans based on a percentage rate of 20 percent each year.

A few commenters stated that while borrowers were automatically placed into forbearance with 0 percent interest rates through August 31, 2022, and the time in forbearance is considered counting as payments toward the minimum requirements for forgiveness, the borrower must have maintained full-time employment at a qualifying employer. These commenters contended that this was an unrealistic obligation during the worst public health crisis in 100 years and that many nonprofits had to lay off workers due to the pandemic at no fault of the worker.

Other commenters suggested that any payment under IDR should count toward PSLF if the borrower qualifies for PSLF. These commenters recommended the Department clearly state in regulations that any month that would count toward IDR forgiveness would be counted as qualifying time toward forgiveness for PSLF. Several commenters urged the Department to ensure PSLF regulations align with future proposed IDR regulations.

*Discussion:* The Department understands the importance of aligning PSLF and IDR regulations and will strive to do so where appropriate. We have adopted some of the benefits provided under the temporary waiver into these regulations, such as allowing payments made on a Direct Loan prior to consolidation to still be counted toward forgiveness after consolidation. There are other places where we have taken a different approach. For instance, the limited PSLF waiver treats any month in repayment as a qualifying payment. The Department cannot change in regulation the statutory requirements that dictate which repayment plans are eligible for PSLF, but we have made changes that will help borrowers count payments they make toward PSLF by allowing partial, late, and lump sum payments to count. Other elements, such as the hold harmless provision, which provides borrowers a recourse of action when servicers either provided misinformation or steered borrowers into extended forbearance, go further than what the limited PSLF waiver provides. Section 455(m) of the HEA requires that borrowers be employed full-time at qualifying employers and make 120 payments to qualify for PSLF. These rules cannot waive statutory provisions or retroactively grant qualifying payments to borrowers prior to the inception of the program. Instead, the purpose of these regulations is to

define and clarify the requirements for PSLF. The benefits provided under the waivers and the expiration date for the waivers are separate and apart from these rules. Under the Higher Education Relief Opportunities for Students Act of 2003 (HEROES Act) (Pub. L. 108–76, 20 U.S.C. 1098bb(b)) authority, the Secretary announced waivers and modifications of statutory and regulatory provisions designed to assist "affected individuals." Under 20 U.S.C. 1098ee(2), the term "affected individual" means an individual who—

• Is serving on active duty during a war or other military operation or national emergency;

• Is performing qualifying National Guard duty during a war or other military operation or national emergency;

• Resides or is employed in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency; or

• Suffered direct economic hardship as a direct result of a war or other military operation or national emergency, as determined by the Secretary.

Based on this authority and due to the national pandemic, the Secretary has provided a number of waivers to the requirements for the PSLF program and also paused payments, with those months counting toward forgiveness if the borrower has qualifying employment.

Establishing a single standard that includes all benefits of the waivers and merges the new regulations is not feasible because elements of the waiver, such as counting any month in repayment as a qualifying payment regardless of whether a borrower made a payment or their repayment plan or granting credit for payments made on a commercial FFEL loan, can only be provided on a time-limited basis. The Department believes that these rules streamline processes, clearly define new terms, and revise existing terms.

*Changes:* None.

### PSLF Reconsideration and Application Changes

*Comments:* Several commenters approved of the proposed reconsideration process and recommended that the Department lengthen the time period in which a borrower can request reconsideration beyond the proposed 90 days. These commenters stated that to file a robust reconsideration request, many borrowers will need to access loan and PSLF records from servicers, as well as information from employers of years

past. These commenters further claimed that the proposed reconsideration window would be costly and inefficient for the Department, as pushing borrowers to file hasty requests would be likely to lead to unwarranted denials and repeat reconsideration requests.

Other commenters suggested the Department not allow the same servicers to be tasked with reconsideration of any determinations or denials made by that servicer.

*Discussion:* We appreciate the commenters' support of the opportunity for reconsideration. We believe, however, that many borrowers possess the needed records for reconsideration at the time they submit their initial application or would be able to obtain them and request reconsideration within 90 days. The reconsideration request allows for a review of accuracy because the borrower believes the Department made a mistake or did not have all information necessary to make the correct determination at the time of the initial review. We believe that through the reconsideration process, one of the benefits could be global fixes if the Department identified mass errors in applications that were previously denied.

The regulations do not address how the Department uses its contractors to perform certain roles in the program.

We appreciate the commenters' concern about the costs associated with the regulatory action. We provide detailed information about the costs in the Regulatory Impact Analysis section.

*Changes:* None.

### PSLF Qualifying Payments

*Comments:* Many commenters suggested that the number of qualifying payments for PSLF should be reduced. Other commenters suggested that the number of qualifying payments should be dependent on the type of institution the borrower attended. A few commenters suggested borrowers should be eligible for PSLF after a specific number of years, rather than after making a specific number of qualifying payments. A few commenters stated the amount or percent of relief should be tied to the number of qualifying payment years. Other commenters stated that all student loans should be forgiven when the borrower meets a specific age threshold. These commenters expressed concerns regarding the duration of student loans and that low-paying public service occupations make it difficult to make other needed payments toward necessities.

One commenter noted that the proposed regulations allow a borrower

to request loan forgiveness after making the 120 monthly qualifying payments but expressed concern about the Department allowing for lump-sum monthly payments. The commenter suggested that § 685.219(e)(1) should be revised to clarify that the borrower may request loan forgiveness only after making the 120 monthly qualifying payments and while performing 120 months of qualifying service.

*Discussion:* The HEA requires that a borrower make 120 months of qualifying payments to receive forgiveness under PSLF. The changes to the number of qualifying payments and time to forgiveness suggested by the commenters would require a statutory change and cannot be accomplished through regulation.

The Department appreciates the comment about the updating the regulations to include the borrower may request loan forgiveness after making both the 120 months of qualifying payments and qualifying service. The Department will amend the regulatory text.

*Changes:* The Department will amend § 685.219(e)(1) to specify that a borrower may request loan forgiveness after making the 120 months of both qualifying payments and qualifying service.

*Eligibility for Physicians Working in Texas and California Hospitals*

*Comments:* Several groups of commenters responded to the Department's directed question related to PSLF eligibility for physicians in States where they are ineligible to work for qualified employers due to State laws, such as those in California and Texas. These commenters stated that qualified California and Texas physicians who work at nonprofit hospitals but are not directly employed by them should have equal access to PSLF like their colleagues in areas that are not impacted by State law.

Other commenters questioned how the Department would be able to establish that physicians in those States were not employees of hospitals exclusively due to State law as opposed to other circumstances when physicians are employed at nonprofit hospitals but are paid by physician groups or work as independent contractors. Other commenters noted that if State law prohibits a public service organization from directly employing a licensed physician, eligibility for loan forgiveness can be demonstrated by a written certification signed by an authorized official of the public service organization. Other commenters noted similar issues such as hospitals not

hiring psychiatric pharmacists in States such as Hawaii. One commenter also argued for the inclusion of certified midwives that work for a physician group that provides services to nonprofit hospitals in California.

A few commenters also noted that since physicians are not eligible for PSLF under these arrangements in other states, physicians in Texas and California should not be eligible. Other commenters disagreed with the Department's proposed expansion of the definition altogether.

*Discussion:* These final rules do not speak to one issue raised by commenters in response to the NPRM—whether and in what circumstances private for-profit employers, including early childhood organizations, should be treated as qualifying employers for the purposes of PSLF. That issue and the responses to comments related to it, will be addressed in a future final rule.

We thank the commenters for their suggestions to expand eligibility for PSLF to certain and distinct contract employees who provide an eligible service for PSLF but are prohibited from being a full-time employee of an otherwise qualifying employer due to State law. The Department is aware of this situation existing for physicians at some nonprofit hospitals in Texas and California, where rules that have been in place for decades prevent their direct employment by the hospital. Other borrowers may be in a similar situation.

Based on the information provided by the commenters, the Department has determined that this situation is distinct from other types of contractual employment. A hospital must have doctors to provide the needed care to carry out its mission, but in this situation the only option is to bring on contractors to fill gaps or expand capacity because the hospital is legally prohibited from pursuing any other staffing model. In these cases, the employer is limited to hiring someone only as a contractor. Congress intended to support certain organizations and their employees by providing PSLF but limited the benefit to employees. These State laws mean that certain borrowers in these States are barred from PSLF solely because of the State law. For the reasons expressed by the commenters, the Department has decided to address this unequal treatment by allowing borrowers in the narrow and specific situation of a borrower who works as a contractor for a qualifying employer in a position or providing services which, under applicable state law, cannot be filled or provided by an employee of the qualifying employer to qualify for PSLF. We believe that this relates to a

relatively limited universe of borrowers. This change does not expand the range of qualifying employers, but rather who can be captured under a qualifying employer. Accordingly, in situations such as the one raised by a commenter who works as a certified midwife, eligibility would be based on whether the specific adjustment allowed in this rule also applies to them.

As discussed above, the Department will publish a separate final rule addressing the comments raised concerning allowing private for-profit employers to serve as qualifying employers for PSLF. This rule does not speak to that issue.

*Changes:* The Department has amended the definition of the term "employee or employed" to include an individual who works as a contracted employee for a qualifying employer in a position or providing services which, under applicable State law, cannot be filled or provided by a direct employee of the qualifying employer.

*Eligibility for Other Contractors*

*Comments:* A few commenters suggested expanding the definition of employee or employed to mean any individual who is hired and paid by a public service organization, including contractors.

The Department received a range of comments arguing for expanding PSLF to other types of contractual employment relationships beyond the specific case of physicians at certain nonprofit hospitals in Texas or California. These ranged from suggestions for expansions to specific occupations to calls for the inclusion of all borrowers who work as contracted workers at any qualifying organization. Other commenters added that the Department should focus on the service provided and not the employers' status and further stated that private-practice medical practitioners that get reimbursed from Tricare or TriWest (or other qualifying providers) for providing public healthcare for Active-Duty Military and Veterans should get credit. Several commenters urged the Department to include contracted nurses and nurse practitioners as eligible employees for PSLF. Another commenter suggested that we provide clarification that qualifying employers may certify the public service work of contracted employees retroactively.

Many commenters supported extending PSLF eligibility to certain self-employed independent contractors who are working on a full-time basis with a qualifying employer, who are not employed directly by the qualifying employer, and who may receive tax

forms with stated profession other than W–2s, including 1099 forms.

*Discussion:* As discussed above, the Department will publish a future final rule addressing comments related to expanding eligibility of private for-profit organizations to serve as qualifying employers for PSLF. This rule does not speak to that issue. Instead, this response addresses the question of whether there should be other situations when a government or private nonprofit organization can certify the employment of a contractor.

The Department has decided to allow borrowers in the narrow and specific situation of working as contracted workers for a qualifying employer in a position or providing services which, under applicable State law, cannot be filled or provided by a direct employee of the qualifying employer to qualify for PSLF. An employee who works under this condition may receive a Form 1099 which would be acceptable instead of a W–2. As the Department explained in its rationale for this limited exception earlier in this document, the reasons that justify allowing this targeted exception do not apply to the use of contractors more generally.

*Changes:* None.

*Comments:* Other commenters noted that while there might be some pushback to include contractors and that contractors tend to earn higher salaries, the borrower must be enrolled in the PAYE or IBR plan, which requires financial hardship to be eligible.

*Discussion:* The Department thanks the commenters for their feedback. Unless a borrower works as a contractor for a qualifying employer in a position or providing services which, under applicable State law, cannot be filled or provided by a direct employee of the qualifying employer, employer, the borrower would not be considered working for a qualifying employer for the purposes of PSLF.

*Changes:* None

*Certification and Other Forms*

*Comments:* Several commenters mentioned that qualifying organizations are likely willing to sign PSLF forms on behalf of contractors since they are likely already completing PSLF forms as qualifying employers and often track the number of hours worked for the independent contractors they hire. One commenter argued that they do not believe that a company's willingness to sign a verification form for an employee has practical utility and recommends that the Department use the same approach here as for all other employers. Another commenter requested the Department include

contracted public defenders, certified by their local governments, as a qualifying employer and permit employer certification for contracted public defenders. This approach would allow an employee to substantiate their periods of qualifying employment using other avenues of documentation, such as W–2s, if the employer is unwilling to certify employment (or if the employer has closed). The commenter reminded the Department that the Privacy Act of 1974 provides that the Department shall "collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs."

*Discussion:* The Department appreciates the suggestions from the commenters. We are cognizant of the rights of individuals under the Privacy Act of 1974 and take every precaution to protect those rights. We further believe that the PSLF and Temporarily Expanded PSLF certification and application is an appropriate means of collecting information and certifying that a borrower is working full-time at a qualifying employer. Additionally, we determine PSLF eligibility based on the services provided by the employer and not by the individual's specific job or job description. As stated earlier, the Department has permitted the use of Form 1099s in the limited condition described above. The Department will also review borrower's alternate documentation if an employer refuses to certify the certification and application form.

*Changes:* None.

*Early Childhood Educators Who Work for For-Profit Entities*

The Department thanks commenters for responding to the questions we asked in the NPRM and for providing comments related to Early Childhood Educators who work for for-profit entities. We received many comments related to the eligibility of Early Childhood Educators who work for for-profit entities as well as suggestions to include employees of for-profit entities in many other occupations as well as removing any limitation on the eligibility of for-profit employers so as they provide a qualifying service.

The Department is separating this issue for a future final rule because we received significant and detailed comments in response to our questions around the possible treatment of for-profit companies that provide early childhood education as qualifying employers for PSLF. These comments included a number of proposals that

address operational, legal, and policy considerations, which the Department needs additional time to consider. That rule will be published after November 1, 2022. These Final Rules do not address this issue.

**Executive Orders 12866 and 13563**

**Regulatory Impact Analysis**

Under Executive Order 12866, the Office of Information and Regulatory Affairs (OIRA) in the Office of Management and Budget (OMB) must determine whether a regulatory action is "significant" and, therefore, subject to the requirements of the Executive Order and subject to review by OMB. Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action likely to result in a rule that may—

(1) Have an annual effect on the economy of $100 million or more, or adversely affect a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or Tribal governments or communities in a material way (also referred to as an "economically significant" rule);

(2) Create serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles stated in the Executive Order.

The Department estimates the quantified annualized economic and net budget impacts to be $71.8 billion in increased transfers among borrowers, institutions, and the Federal Government, including annualized transfers of $7.4 billion at 3 percent discounting and $7.8 billion at 7 percent discounting, and annual quantified costs of $6.3 million related to paperwork burden. Therefore, based on our estimates, OIRA has determined that this final action is "economically significant" and subject to OMB review under section 6(a)(3) of Executive Order 12866. Notwithstanding this determination, based on our assessment of the potential costs and benefits (quantitative and qualitative), we have determined that the benefits of this final regulatory action justify the costs.

We have also reviewed these regulations under Executive Order 13563, which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in

Executive Order 12866. To the extent permitted by law, Executive Order 13563 requires that an agency—

(1) Propose or adopt regulations only on a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2) Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives and taking into account—among other things and to the extent practicable—the costs of cumulative regulations;

(3) In choosing among alternative regulatory approaches, select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4) To the extent feasible, specify performance objectives, rather than the behavior or manner of compliance a regulated entity must adopt; and

(5) Identify and assess available alternatives to direct regulation, including economic incentives such as user fees or marketable permits to encourage the desired behavior, or provide information that enables the public to make choices.

Executive Order 13563 also requires an agency "to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible. The Office of Information and Regulatory Affairs of OMB has emphasized that these techniques may include "identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes."

We are issuing these final regulations as these policies are better than the alternatives considering the facts. The focus of this regulatory package is to improve title IV HEA program administration. In choosing among regulatory approaches, we selected those approaches that maximize net benefits. Based on the analysis that follows, the Department believes that these regulations are consistent with the principles in Executive Order 13563.

We have also determined that this regulatory action will not unduly interfere with State, local, and Tribal governments in the exercise of their governmental functions.

As required by OMB Circular A–4, we compare the final regulations to the current regulations. In this regulatory impact analysis, we discuss the need for regulatory action, potential costs and benefits, net budget impacts, and the regulatory alternatives we considered.

*1. Major Rule Designation*

Pursuant to Subtitle E of the Small Business Regulatory Enforcement Fairness Act of 1996, also known as the Congressional Review Act (5 U.S.C. 801 *et seq.*), the Office of Information and Regulatory Affairs designated this rule as a "major rule," as defined by 5 U.S.C. 804(2).

*2. Need for Regulatory Action*

The Department has identified a significant need for regulatory action to address regulatory burdens, alleviate administrative burden, and ensure Federal student loan borrowers are more easily able to access the loan discharges to which they are entitled under the HEA. Accordingly, these final regulations will alleviate some of the burden on students, institutions, and the Department, as discussed further in the Costs and Benefits section of this RIA.

In recent years, outstanding Federal student loan debt has increased considerably and, for too many borrowers, that burden has been costly. More than 1 million borrowers defaulted on a Federal student loan each year in the periods prior to the nationwide pause of student loan interest and repayment first implemented by the Department and then extended by Congress in the Coronavirus Aid, Relief, and Economic Security (CARES) Act. Millions of others fell behind on their payments and risked default. For those who have defaulted, consequences can be significant, with many borrowers having their tax refunds or other expected financial resources garnished or offset, their credit histories marred, and their financial futures put on hold.

We continually examine our regulations to improve the Federal student loan programs and it was the primary goal of this negotiated rulemaking. This NPRM specifically addresses regulatory changes to discharges that will help borrowers to reduce or eliminate debt for which they should not be responsible to pay based upon discharge programs authorized by the HEA. The American Rescue Plan Act of 2021 modified the Federal tax treatment of student loan discharges through December 31, 2025, by excluding such discharges from gross income for Federal income tax purposes.

The Department seeks to reduce the burden for students and borrowers to access the benefits to which they are entitled through several provisions in these final regulations. This includes streamlining the BD regulations and

establishing a process for group consideration of claims from borrowers with common claims or affected by the same institutional act or omission; restricting the use of mandatory arbitration and class action waiver requirements imposed by institutions participating in the Direct Loan program; reducing the burden caused by interest capitalization; ensuring totally and permanently disabled borrowers have the ability to access and maintain a discharge more easily; allowing borrowers to automatically access a closed school loan discharge; easing the process of accessing false certification discharges; and clarifying the rules borrowers must comply with in the PSLF program. Throughout these final regulations, we accommodate and, where possible, require, that these benefits are provided automatically, so that borrowers are not required to submit unnecessary paperwork to benefit from provisions included in the HEA.

These efforts to reduce burden for students and institutions will also indirectly reduce the burden on the Department by, for example, limiting the need for adjudication of individual claims for BD in some cases, simplifying the criteria that need to be checked to determine if payments count toward PSLF, and limiting the need for the Department to process paperwork by providing discharges on a more automatic basis for borrowers whose schools close or when a borrower has a total and permanent disability.

These final regulations will affect each of the three major Federal student loan programs. This includes the Direct Loan program, which is the sole source of Federal student loans issued by the Department today, as well as loans from the FFEL Program, which stopped issuing new loans in 2010 and the Perkins Loan Program, which stopped issuing new loans in 2017. Changes to TPD and closed school discharges will affect all three programs. Changes to false certification will affect FFEL and Direct Loans. Changes to interest capitalization, BD, arbitration, and PSLF will only affect Direct Loans.

*Borrower Defense:* Borrowers whose colleges take advantage of them, such as by misrepresenting job placement rates or other important information about the program, are eligible for a BD discharge on their loans. However, the process—which was rarely used prior to 2015—has resulted in many borrowers filing claims that remain pending due to burdensome review processes and differing standards and processes depending on when the borrower took out their loan. These final BD

regulations make these policies more consistent, regardless of when the borrower took out the loan, and create a more timely and effective process for reviewing borrowers' claims. The Department also seeks to implement measures that will reduce the burden on institutions of participating in BD proceedings with the changes to group claims and recoupment. Allowing group claims ensures that institutions with large numbers of outstanding claims will likely only have to respond once to a request for information regarding the allegations that could lead to an approved BD claim. While the standards in this rule will apply to borrower defense claims pending on or received on or after July 1, 2023, the Department will only seek recoupment for discharges tied to conduct that would be approved under the applicable regulation based on the loan disbursement date. Additionally, separating the approval of BD claims from recoupment of loan discharge costs from the institution also limits the burden on educational institutions, when we seek to establish liabilities from a discharge paid. The use of pre-existing processes for recoupment proceedings also means institutions will not need to learn and participate in an entirely new liability and appeals process.

*Pre-Dispute Arbitration:* Often, schools that have taken advantage of borrowers have required borrowers to participate in private arbitration proceedings. These pre-dispute arbitration agreements require borrowers to agree to the terms before a conflict ever arises and often dictate whether the borrower can appeal the decision. Though pre-dispute agreements are not inherently predatory in practice, they can be applied in predatory ways toward borrowers such as undermining borrowers' rights to avail themselves of certain loan discharges, depriving borrowers of the protections in the HEA. We have seen arbitration applied across different industries including consumer protection and employment, and in the realm of education, pre-dispute arbitration agreements are often linked to propriety education enrollment agreements.[154] Additionally, while the Department is aware of arguments that arbitration lowers the costs of dispute resolution for borrowers relative to litigation, a study of consumer finance

cases analyzed by the Consumer Financial Protection Bureau found that most resulted in no determination on the merits of the allegation by the arbitrator, and those that did (and where counsel was retained) resulted in attorney's fees awarded at a similar rate to both consumers and companies.[155]

The Department observed several issues and problems around pre-dispute arbitration and class action waivers. First, institutions may use arbitration clauses in enrollment agreements to effectively discourage borrowers from pursuing complaints. This enables an institution to avoid financial risk associated with its wrongdoing and shift the risk to the taxpayers and Federal government through subsequent BD discharges. Additionally, borrowers cannot have their day in court because some enrollment agreements prevent their ability to participate in lawsuits, including class action litigation. This further insulates institutions from the potential financial risk of their wrongdoing and the lack of transparency surrounding institutions' arbitration requirements and limits on class actions.

*Interest Capitalization:* Virtually all struggling borrowers likely saw their balances increase due to interest capitalization. Interest capitalization may have occurred due to time in forbearances or deferments. Furthermore, because the interest on an unsubsidized loan accrues while the borrower is enrolled in school, a capitalization event following the in-school grace period affects any borrower who has one of these types of loans. Eliminating interest capitalization stops compounding the costs and makes loans more affordable for borrowers. While eliminating interest capitalization does not remove borrowers' debt burden, it will help to increase affordability for students whose balances might continue to grow. That is particularly true for the low-income or struggling borrowers who tend to use deferments and forbearances more heavily, and thus see more capitalizing events throughout their repayment periods.

*Total and Permanent Disability Discharge:* Another area in which the current regulations create gaps for borrowers is related to total and permanent disability discharges. For borrowers who are unable to engage in gainful employment due to a disability, their student loan debt become exceedingly burdensome, leaving many

in dire financial circumstances, despite being eligible for discharges of their Federal student loans under the HEA. Some eligible borrowers are not fully aware of existing relief pathways, but for those who are aware of TPD discharges, they face a complex and onerous procedure to ensure borrowers continue to meet the statutory test of not being able to engage in gainful employment to acquire and maintain discharges.

The Department has identified several aspects of the TPD discharge process that will be improved through regulation. First, the Department currently administers a 3-year post-discharge income monitoring period, for which the documentation requirements are burdensome for affected borrowers. Since 2013, loans for more than half of the 1 million borrowers who received a TPD discharge were reinstated because the borrower did not respond to requests for income documentation, although an analysis conducted by the Department with Internal Revenue Service (IRS) data suggests that 92 percent of these borrowers did not exceed the earnings threshold, and that these results are similar for borrowers whose discharge is based on an SSA disability determination or physician's certification process. Second, borrowers who currently qualify for TPD discharges based on SSA disability determinations must be in SSA's Medical Improvement Not Expected (MINE) category to qualify, although there are other circumstances that may support a discharge based on an SSA disability determination under the terms of the HEA. For borrowers applying for a TPD discharge based on a disability determination by the SSA, acceptable documentation for the TPD discharge is limited to the notice of award that the borrower receives from the SSA and for borrowers applying for a TPD discharge based on a physician's certification, only a Doctor of Medicine or a Doctor of Osteopathy may certify the TPD discharge form. This final regulation aims to mitigate and to streamline total and permanent disability discharge process.

*Closed School Discharge:* Borrowers have also faced the negative financial impacts of institutions closing, often without adequate warning, interrupting borrowers' ability to continue and complete their desired educational programs. Many of these borrowers were left with debt but no degree, sometimes facing new barriers to education such as finding an easily accessible new institution and potentially losing many credits that are nontransferable. Historically, borrowers who do not

---

[154] Habash, T. and Shireman, R., (April 28, 2016). *How College Enrollment Contracts Limit Students' Rights, The Century Foundation.* Retrieved from *https://tcf.org/content/report/howcollege-enrollment-contracts-limit-students-rights/.*

[155] Consumer Financial Protection Bureau. (2015.) "Arbitration Study: Report to Congress." *https://files.consumerfinance.gov/f/201503_cfpb_arbitration-study-report-to-congress-2015.pdf.*

finish their programs are far more likely to risk default than those who graduate, so closures can negatively affect borrowers' ability to make their payments, creating a need for improved processes for closed school discharges.

Several aspects of the closed school discharge process have limited the ability of borrowers to receive closed school discharges. Final regulations published in the **Federal Register** on November 1, 2016, provided for automatic closed school discharges to borrowers who were eligible for a closed school discharge but did not apply for one, and who did not enroll elsewhere within 3 years of the institution's closure. Final regulations published on September 23, 2019, eliminated this provision. These final regulations will reinstate a form of the 2016 provision.

Closed school discharges for borrowers who withdrew from a school prior to the school closing are also not consistent across years in the discharge window available to borrowers. Additionally, the Secretary may extend the closed school discharge window under "exceptional circumstances." The nonexhaustive list of exceptional circumstances provided in the regulations does not include many events that may occur on the path to closure and could reasonably be associated as a cause of that closure. In addition, the September 23, 2019, regulations removed some of the exceptional circumstances that were included in the prior regulations, such as "a finding by a State or Federal government agency that the school violated State or Federal law," and that remain highly relevant factors in some college closures. This final regulation aims to remedy these issues.

*False Certification Discharge*: The Department also identified opportunities to improve false certification discharges. These are discharges available to borrowers under the HEA if the institution that certifies

the borrower's eligibility for the loan does so under false pretenses, such as when the borrower did not have a high school diploma or equivalent and did not meet alternative criteria; when the borrower had a status that disqualified them from meeting legal requirements for employment in the occupation for which they are training; or if the institution signed the borrower's name without authorization.

One challenge the Department identified with false certification discharges is that there are different standards and processes for false certification discharges depending on when the loan was disbursed, which can create confusion for borrowers. These final regulations streamline the false certification discharge process for student loan borrowers, establish standards that apply to all claims regardless of when the loan was first disbursed, and provide for a group discharge process. These final rules will also reduce the burden on borrowers to prove eligibility for false certification discharges if they did not have a high school diploma, if the institution falsely signed the borrower's name for the loan, or if the borrower had a disqualifying condition (those that would prevent the borrower from obtaining employment due to applicable State requirements related to criminal record, age, physical or mental condition, or other factors) at the time they took out the loan.

*Public Service Loan Forgiveness*: The HEA provides forgiveness of remaining balances for borrowers who make 120 qualifying payments on their loan while working in qualifying employment in public service. However, the Department is concerned that too many borrowers have found it difficult to navigate the program's requirements due to unclear or complex definitions and overly stringent requirements regarding the payments made on the loan. For instance, the current

regulations leave the definition of what constitutes full-time employment up to interpretation by each employer. This creates inconsistency, such as when one employer considers 40 hours a week as full-time employment and another employer may consider 35 hours as full-time employment, so a borrower employed 35 hours a week may be denied or granted qualifying employment depending on their employer, despite working in the same type of work. There are also situations where professors and contingent faculty have difficulty obtaining employer certification of their qualifying employment because their employers are unsure of what conversion factor to use in converting course load into hours worked per week.

The Department will improve the PSLF application process and automate the discharge process in instances where the Secretary has enough information to determine eligibility for forgiveness. This will significantly reduce burden on the borrower and the Department's burden, to review and approve applications. The current PSLF application process is difficult for many borrowers, who often struggle both with meeting the complex terms of the program and with the process of applying to demonstrate their eligibility.

*3. Summary of Comments and Changes From the NPRM*

The Department made several significant changes to borrower defense from the NPRM as well as some changes to interest capitalization, closed school discharges, and total and permanent disability discharges. The Department did not make any non-technical changes to arbitration and class action waivers or false certification discharges. Table 1 below provides a summary of the key changes from the NPRM to the final rule.

**BILLING CODE 4000–01–P**

**Table 1—Summary of Key Changes in the Final Regulations**

| Provision | Regulation Section | Description of change from NPRM |
|---|---|---|
| Borrower defense to repayment | | |
| Definitions | § 685.401 | Adjusting the definition of borrower defense to repayment to note that the act or omission caused detriment to the borrower that warrants relief in the form of a full discharge of amounts remaining on the loan associated with the claim, a refund of all payments made to the Secretary, restoring eligibility to federal financial aid for a borrower in default, and updating or deleting credit reports. In determining whether a detriment caused by an institution's act or omission warrants relief under this section, the Secretary will consider the totality of the circumstances, including the nature and degree of |

| | | |
|---|---|---|
| | | the acts or omissions and of the detriment caused to borrowers. Redefining the State law standard to only apply to reconsideration requests on loans issued prior to July 1, 2017. Creating a definition of third-party requestor and legal assistance organization and clarifying the definition of final Secretarial action. |
| Group process | § 685.402 | Granting a legal assistance organization the ability to also request consideration of a group claim, with accompanying definitions in § 685.401. Granting institutions an opportunity to respond to group claim requests prior to the Secretary issuing a decision on whether to form the group. Lengthening the time to decide on forming a group to 2 |

| | | |
|---|---|---|
| | | years instead of 1 but shortening the time to decide a claim after forming a group to 1 year. |
| Individual process | § 685.403 | Clarifying the definition of a materially complete application to ask borrowers to provide more detail on the nature of the school's act or omission and how it affected them and adding requirement that mirrors current practice of requiring applications to be submitted under penalty of perjury. |
| Group process based on prior Secretarial final actions | § 685.404 | Removing possible types of actions to reflect the updated definition in § 685.401 that defines final Secretarial actions as an exhaustive list of actions under part 668, subpart G, denying the institution's application for |

| | | |
|---|---|---|
| | | recertification or revoking the institution's provisional program participation agreement. |
| Adjudication of borrower defense applications | § 685.406 | Clarifying that the Secretary is the one making the final decision on an adjudication outcome following recommendation from the Department official. Add that the timeline for deciding an individual claim is the later of July 1, 2026 or 3 years after an application is materially complete. |
| Reconsideration | § 685.407 | Allowing third-party requestors to seek reconsideration of denied claims and updating the limitations on State law reconsideration requests to loans issued prior to July 1, 2017. |
| Discharge | § 685.408 | Removing discussion of partial discharges to match the updated |

|  |  | definition in § 685.401 that provides a full discharge for all approved claims. |
|---|---|---|
| Recovery | § 685.409 | Clarifying that the Department will not seek to recoup on approved discharges for claims associated with loans issued prior to July 1, 2023, unless they would have been approved under the standards of the regulation in effect at the time of the loan's disbursement. |
| Interest capitalization |  |  |
| Partial Financial Hardship | § 685.209(a)(2)(iv)(A)(1) | Removing the section that provides that accrued interest is capitalized when a borrower no longer has a partial financial hardship under the PAYE repayment plan. |
| Alternative Payment Plan | § 685.208(1)(5) | Removing the section that provides that any unpaid accrued interest is capitalized when a borrower is repaying under the alternative |

| | | repayment plan. |
|---|---|---|
| Total and permanent disability discharge | | |
| Types of SSA disability determinations that can result in a discharge | § 674.61(b)(2)(iv)(C)(2), § 682.402(c)(2)(iv)(C)(2), and § 685.213(b)(2)(iii)(B) | Removing the requirement that a borrower who qualifies for SSDI benefits or SSI based on disability and the borrower's next continuing disability review has been scheduled at 3 years must have that disability status renewed at least once to qualify for a TPD discharge |
| Clarification of eligibility under SSA determinations | § 674.61, § 682.402, and § 685.213 | Adjusting wording to better reflect SSA terminology about its disability determinations. These changes do not change the underlying policies. |
| Closed school discharge | | |
| School Closure Date | §§ 674.33(g)(1)(ii)(A), 682.402(d)(1)(ii)(A), and 685.214(a)(2)(i) | Clarifying that the Secretary's ability to determine an earlier closure date is based on the date that the school ceased to provide |

| | | |
|---|---|---|
| | | educational instruction in programs in which most students at the school were enrolled or the date when the school ceased to provide educational instruction for all of its students. |
| Eligibility for a discharge | §§ 674.33(g), 682.402(d), and 685.214(c) | Clarifying that a borrower who continues the program at another branch or location of the school would receive a discharge 1 year after their last date of attendance at the branch or location if they do not complete the program. Removing the references to a teach-out provided by the school. |
| Public Service Loan Forgiveness | | |
| Definition of employee or employed | § 685.219(b) | Will add a new definition to employee or employed to include a borrower who works as a contractor for a qualifying employer in a position or providing |

| | | services which, under applicable state law, cannot be filled or provided by a direct employee of the qualifying employer. |
|---|---|---|

BILLING CODE 4000–01–C

*Comments:* Commenters argued that the model created by the Department to estimate the net budget impact of the changes to borrower defense understated the costs because it did not properly account for the growth in loan volume associated with borrower defense claims received by the Department. The commenter argued that the new standards would generate an increase in the number of claims filed compared to the past and that was not captured in the regulatory impact analysis.

*Discussion:* We disagree with the commenters. The estimates in the NPRM and this final rule reflect the anticipated changes in costs from this regulation, not the overall cost of borrower defense discharges. Claims that would have been approved under prior regulations thus do not and should not show up in the cost estimates in this rule because the regulatory changes here are not changing the outcome on those claims. As such, any increases in borrower defense applications that would have been approved regardless of this regulation do not show up in the cost estimates in this regulatory impact analysis.

The budgetary effects in the regulatory impact analysis reflect reasonable assumptions made by the Department. In general, the Department has seen a significant decline in the filing of borrower defense claims associated with more recent enrollment. Of the approximately 376,000 cases opened since July 1, 2020, only 11,300 are from borrowers whose self-reported first enrollment date was on or after July 1, 2020.[156] Similarly, of the more than 150,000 individual claims the Department has approved so far, 80 percent are covered by the 1994 regulations. While the Department will continue to review claims and may approve additional ones associated with

more recent conduct, this bears out the assumptions that the loan volume associated with borrower defense will be significantly higher for past cohorts than in more recent years. The Department also notes that there is a difference between the total volume associated with a submitted borrower defense claim and the estimate about the amount of volume that results in approved claims. The Department's estimates are focused on the share of volume associated with conduct associated with approved claims. We believe that the estimate that shows the share of volume associated with conduct that could lead to an approved borrower defense claim declining over time is correct. Many of the institutions that produced the largest amount of borrower defense claims closed years ago. Many others with a significant number of claims have seen enrollment declines. Additionally, the number of lawsuits and investigations related to institutions from actors such as State attorneys general has also declined over time. As such, we do not see indications of a likely increase in conduct that leads to an approved borrower defense claim.

*Changes:* None.

*Comments:* Commenters argued that the Department should withdraw the regulation because of the significant cost of the regulations.

*Discussion:* We disagree with the commenters. We have concluded that the benefits from this rule exceed its costs. The specific types of benefits are discussed in greater detail in the costs and benefits section of this regulatory impact analysis.

*Changes:* None.

*Comments:* Commenters argued that instead of citing approval estimates from the regulatory impact analysis for the 2016 and 2019 regulations the Department should have conducted its own analysis of the approval rate under the 2016 regulation to justify its conclusions as to the Department's preferences for recreating elements of the 2016 regulation.

*Discussion:* There is not a straightforward way to calculate an approval rate for claims associated with the 2016 regulation. To date, the Department has approved nearly 123,000 individual claims covered by the 1994 regulation, just over 17,000 claims associated with the 2016 regulation, and just over 13,000 claims associated with both. However, there is not an appropriate denominator to use to calculate an approval rate. In 2020, the Department issued denial notices to tens of thousands of borrowers, including many covered by the 2016 regulation. However, those denial notices were challenged in court and the Department stipulated in October 2020 that we would not issue any further denials until the *Sweet* v. *DeVos* lawsuit was resolved on the merits. A settlement agreement on that case that received preliminary approval in July 2022 would rescind those denial notices. Other claims may not have received an individual approval notice but have since been included in a group discharge of claims. Still other claims have not received a decision of either approval or denial. The result is that any reported approval rate would risk excluding elements that could meaningfully affect the number.

*Changes:* None.

*Comments:* Commenters argued that the Department's budget estimates underestimated the harm to institutions by underestimating the amount of funds it expects to recoup. Commenters pointed to higher recoupment estimates in the 2016 and 2019 regulations and procedural changes in the NPRM for institutions to challenge liabilities as arguments that the recovery rate should be higher.

*Discussion:* The Department disagrees with the commenters. The estimates in this rule reflect what the Department expects to recoup from institutions resulting from the changes in this regulation. The estimates are not reflective of borrower defense discharges overall.

---

[156] Department of Education analysis of borrower defense claims based upon the date the claim was filed and the first enrollment date reported by the borrower.

To date, the Department has yet to complete a recoupment effort for approved borrower defense claims. The Department has received some funds from institutions as part of bankruptcy negotiations that offset the expense of some of the transfers from the Federal Government to students when it discharges a loan due to an approved borrower defense claim. But the overwhelming majority of approved borrower defense claims have come against institutions that are no longer in business and have no further resources to potentially reimburse the Department for costs. The Department initiated a recovery proceeding in August 2022 for the only set of claims approved to date against an institution that is still operating. However, that process is not complete. The large share of approved claims associated with closed schools argues in favor of a gap between volume associated with approved claims and amounts recouped.

The structure of the Federal standard will also affect recoupment. As noted in the preamble, the Department will not seek to recoup on the cost of discharges associated with loans disbursed prior to July 1, 2023, unless those claims would have been approved under the standard in the regulation in effect at the time those loans were disbursed. This concept is also now reflected in regulatory text. By applying a single standard to all claims, some claims may be approved that would not have been approved under the standard in effect at that time. Finally, we remind commenters that the budgetary effects from discharges and savings from recoupment in the regulatory impact analysis reflect the effect of this rule, not borrower defense discharges overall.

*Changes:* None.

*Comments:* Commenters argued that the Department's analysis of the budgetary impact of the borrower defense rules was inaccurate because it did not incorporate the effects of the proposed settlement in the *Sweet* v. *Cardona* litigation.

*Discussion:* In July 2022, the proposed settlement in *Sweet* v. *Cardona* received preliminary approval. However, the settlement is not final. It would thus be inappropriate to factor this settlement into the baseline for estimating the cost of borrower defense discharges. We discuss the effect of the potential settlement on the net budget impact of the BD provisions in the Net Budget Impact section. Overall, if the settlement is approved, the effect would be to reduce some of the transfers to borrowers in the form of approved BD claims due to this regulation because those borrowers would instead receive

settlement relief that discharges their loan. Those discharges from settlement relief are not BD discharges. Claims that are granted settlement relief but would not have been approved under this regulation do not affect the net budget impact of this regulation, since they would not have resulted in a transfer to the borrower in the form of a loan discharge nor the possibility of a transfer from the institution to the Department through a recoupment effort.

*Changes:* None.

*Comments:* Commenters argued that the Department did not sufficiently explain why it anticipates that 75 percent of group claims would be approved versus 12 percent of individual claims.

*Discussion:* The underlying budget estimates for this rule are derived using the same model and data that the Department uses for its annual estimates of the student loan programs, with specific assumptions related to BD added in. That model uses a statistically significant sample of administrative data from the National Student Loan Data System to estimate costs both based upon the cohort of when loans are disbursed as well as by different risk groups, such as whether a borrower is a first- or second-year student, the sector of school they attend, and other factors. The model is subject to an annual external audit and changes to overall assumptions must be approved by the OMB. This ensures that we are using the same data and the same consistent procedures we employ to produce other cost estimates, such as those in the President's annual budget request to Congress.

In establishing the parameters to estimate the effects of the borrower defense rule the Department drew on its experience with administering the different borrower defense regulations to estimate approval rates. We also considered these rates in comparison to the regulatory impact analysis in the 2016 regulation, since that regulation bears more similarities to this final rule than the 2019 regulation does. To date, all approved individual BD claims have been approved by reaching conclusions about an institution's conduct from common evidence the Department has across a range of borrowers and applying those findings to approve individual claims. Many of those findings that were initially used to grant individual approvals were also later used to grant a group discharge of claims. For instance, the Department approved individual claims at Corinthian Colleges, ITT Technical Institute, Marinello Schools of Beauty,

and Westwood College before later discharging loans for groups of borrowers who attended those institutions. In constructing its estimates for the NPRM, the Department anticipated that in the future it is more likely to approve those claims first as a group rather than doing individual approvals followed by a discharge of a group of claims.

The higher estimated approval rate for the group claims also reflects the requirements for submitting an application to consider a group. A materially complete application requires evidence beyond sworn borrower statements, which means that if the Department forms a group, it will be beginning that consideration process with a greater evidence basis than it is likely to possess for most individual claims. By contrast, an individual claim only requires a sworn borrower statement for submission. Commenters should also recall that the Department can decide whether to form a group. It is unlikely the Department would form a group where the evidence indicating a likelihood of approval is low. The process for individual claims is different since borrowers decide to initiate those and it is thus reasonable to expect a wider range of quality.

Establishing an approval rate for claims based upon past experience is further complicated by ongoing litigation. The Department issued denials of tens of thousands of claims, but those were then challenged in court. The Department has since committed to not issue further denials until there is a decision on the merits in the litigation. We, therefore, did not factor those claims into estimates of how many claims would be approved or denied. Similarly, for the group claims the Department has only issued approvals so does not have a corresponding number of denied group applications. Instead, as noted above, we estimated that group claims would have a very high likelihood of approval, since a group would be unlikely to be formed if the chance of success was low. Were the Department to base its estimates solely upon the past approvals it has done, then the relevant approval rates would have been 100 percent for group claims. The historical group claim figure does not include any claims that might be denied and, thus, likely overstates the approval rate going forward. For individual claims, the historical approval rate is 47 percent. That figure is also overstated. The denominator is the total number of claims filed by borrowers at two institutions, DeVry University and the Court Reporting Institute, whose enrollment overlapped

with the period in which we approved findings that made allegations that match our approved findings. The Department is only including those two institutions because all other approvals to date either started as or eventually became group discharges, and we are only including the more limited time period because that is what we have adjudicated to date. The numerator is the number of those borrowers whose applications include allegations that are supported by the Department's findings. A more comprehensive individual approval rate would use a denominator that includes all claims filed, not just those from borrowers who enrolled in the same period as the approved findings. It would also include claims from institutions where we do not have findings. Any approval rate that accounted for all those factors would be a small fraction of that 47 percent approval rate.

In determining how to adjust the group and individual figures downward, we also looked at past estimates from the 2016 regulation. That regulation did not split apart estimates for individual versus group claims. Accordingly, we think the overall estimate, which ranged from 50 to 65 percent of volume associated with group claims seemed overall lower than what we might anticipate when making calculations solely for group claims. Accordingly, we took an estimate that adjusts downward from what the Department has approved to date and upward from the 2016 regulation to a range of 60 to 75 percent, depending on risk group. As for individual claims, the Department considered that the total number of institutions covered by individual claims would be greater than those for group claims, since the Department has at least one individual claim against almost every institution of higher education. However, that significant breadth of claims is less likely to produce approvals since to date no individual claim has been approved without the presence of common findings. The Department also looked at the estimates for claim approvals in the 2019 final rule, which are more analogous to individual claims because that regulation did not allow for group claims. That rule estimated that between 5.25 percent and 7.5 percent of volume associated with applications would be approved. The Department adjusted those estimates upward since this final rule does not include several elements of the 2019 rule that would have led to denials, such as a statute of limitations or the need to show that an act or omission by the school was made with

knowledge that it was false, misleading, or deceptive, or that it was made with a reckless disregard for the truth. Accordingly, we think a range of between 8 and 12 percent of volume associated with individual claims reflects the lower likelihood of approval, while also noting that changes in this rule will produce higher approval estimates than the 2019 regulation. As with other prior regulations, the Department estimates the likelihood of a claim being successful at a higher rate at proprietary institutions based upon the fact that to date all approved claims have been associated with that sector. Finally, we note that the Department has yet to approve any borrower defense claims associated with a public or private nonprofit institution. Basing those estimates on adjustments to estimates from previous regulations ensures a greater consistency in estimation given that there is no other data from which to draw upon.

*Changes:* None.

*Comments:* One commenter argued that the Department should have conducted an analysis of the impact of the rule on third-party marketers.

*Discussion:* The Department disagrees. We have provided an analysis showing the anticipated effects of the rule on institutions. Considering cost impact on third-party marketers would result in double-counting because the actions of third-party servicers are attributed to the institution. We have accounted for the effects on third-party servicers as a cost for institutions; counting again would be duplicative.

*Changes:* None.

*Comments:* A few commenters argued that the Department failed to abide by the Data Quality Act. They argued that the regulatory impact analysis lacked supporting documentation or analysis for its proposals to use presumptions and several other elements of the regulation related to borrower defense and arbitration. Similarly, a commenter argued that the Department did not undertake impact studies and financial analyses of the rules to understand the effect on institutions and the students they enroll.

*Discussion:* The Department disagrees with the commenters. All of the budget estimates produced in the regulatory impact analysis are done using the Department's model for estimating the budgetary effects of the student loan programs, which is audited annually and draws data directly from administrative systems maintained by Federal Student Aid. The Department looked at data on actual borrower defense claims received to model the

anticipated effects of that rule, including looking at the type of college associated with claims, when borrowers enrolled, and the levels of debt. The Department does not think there is a better available data source for looking at this issue than our own administrative data and the official model used to estimate costs. Commenters did not identify any instances where they thought a data source used lacked objectivity. The Department believes drawing on the administrative data it has that presents a comprehensive view of borrower defense claims filed to date. Moreover, the Department believes that the model it uses to produce formal cost estimates of the Federal student loan programs ensures consistency between regulatory and other cost estimation work. As noted above, the model is annually audited and subject to approval from the OMB. It is also used across both regulations and estimations for the Department's financial statements, and the annual President's budget request.

The Department also disagrees with the commenter who raised concerns about the lack of impact studies. The regulatory impact analysis provides estimates of the financial effect of the rule in terms of the cost of approved claims to the Department, the deterrent effect of the policy, and the amount of funds we anticipate recouping.

*Changes:* None.

*Comments:* Commenters also stated that the Department did not conduct an impact analysis related to the prohibition on pre-dispute arbitration agreements and class action waivers.

*Discussion:* With respect to the commenters who stated that we did not sufficiently explain our analysis supporting the prohibition on pre-dispute arbitration agreements and class action waivers, we disagree and point to the Regulatory Impact Analysis from the NPRM. We also disagree with the assertion that we failed to engage the current regulation's justifications in a meaningful manner and provide the basis for our proposals, both of which we specifically addressed.[157]

*Changes:* None.

*Comments:* One commenter argued that the Department did not properly balance the benefits of removing paperwork burdens associated with the TPD income-monitoring period with the potential cost to taxpayers.

*Discussion:* We agree that protecting federal funds from fraud and error is a necessary and important function of the Department. We note that, under the Paperwork Reduction Act, the

---

[157] 87 FR at 41913–41918.

Department is obligated to reduce paperwork burden where possible. As we noted in the preamble to the NPRM, we have not found the income monitoring requirement to be a useful measure of a borrower's continuing eligibility for a TPD discharge. The commenter alleges that the Department does not address the paperwork burden benefits of this change. In fact, we stated in the preamble to the NPRM:

These proposed rules would eliminate the Post-Discharge Monitoring form (TPD–PDM) from the collection and will create a decrease in overall burden from the 1845–0065 collection. The forms update would be completed and made available for comment through a full public clearance package before being made available for use by the effective date of the regulations. The burden changes would be assessed to OMB Control Number 1845–0065, Direct Loan, FFEL, Perkins and TEACH Grant Total and Permanent Disability Discharge Application and Related Forms [NPRM, p. 41970]

The NPRM went on to state that "burden will be cleared at a later date through a separate information collection for the form" [NPRM, p. 41973]. Far from being arbitrary and capricious, this is our standard practice for evaluating paperwork burden that is primarily a result of requiring individuals to complete a Federal form.

*Changes:* None.

*Comment:* One commenter asked that the Department expand on the effects of removing the limitation on providing automatic discharges for schools that closed prior to November 1, 2013, and show the costs of that change in the regulatory impact analysis.

*Discussion:* The commenter's request reflects an assumption that the Department is able to retroactively award discharges for schools that closed prior to the effective date of the regulations. The Department, however, is unable to retroactively implement the regulation. It would thus be inappropriate to show additional effects associated with those older closures.

*Changes:* None.

### 4. Discussion of Costs and Benefits

The final regulations are broadly intended to provide benefits to borrowers by improving the administration of specific aspects of Federal student loan programs, including through clearer guidelines and processes for obtaining the benefits and protections that the HEA provides them. These changes are particularly important for borrowers who have difficulty keeping up with their payments, who often end up in forbearance, delinquency, or default, and as a result, see their balances grow

through interest accrual and capitalization. Some borrowers may struggle to manage their student loan debt because they were misled due to acts or omissions by the school they attended. This caused them detriment rather than delivering the education promised, which could justify relief in the form of a discharge of the remaining balance of the loan, a refund of payments made to the Secretary, and other changes as applicable to credit reporting and removing a borrower from default. Or they may have a loan that was certified under false pretenses and never should have been made. Others may have debts from an education that they could not complete because a school closed, putting them at significant risk of default. In other cases, a borrower may face major repayment challenges because they have a total and permanent disability that prohibits them from engaging in gainful employment for prolonged periods of time. There are also borrowers who may not be struggling, but who are engaging in service to the United States and need promised relief so they can continue in their public service positions. The rule will help borrowers to thrive economically by avoiding repayment difficulties and default, as well as other contributors to financial instability.

The Department also believes that these final regulations will provide critical support to underserved borrowers, thereby enhancing equity. For instance, Black borrowers are disproportionately likely to face repayment difficulties and growing balances. Within recent cohorts, Black college graduates faced a likelihood of default that was five times larger than that of white borrowers.[158] Black borrowers enter repayment after earning a bachelor's degree with higher debt than borrowers in other racial groups, and also continue to see their balances increase rather than fall.[159]

Family income, college completion status, and the type of college a student borrowed to attend are additional factors that relate to repayment difficulties. One study finds that students who borrowed to attend 2-year for-profit colleges were 26 percent more likely to default than those who

borrowed at 4-year public colleges, and that family income is a strong predictor of default risk.[160]

Using data from the College Scorecard, a different analysis finds that across all institution types, undergraduate non-completers have substantially higher default rates compared to those who completed a degree or credential.[161] Borrowers in these groups also spend more time with their loans in forbearance and are more likely to see their balances increase after entering repayment.[162]

The remainder of this subsection of the RIA summarizes the conclusions and information on which the Department relied, such as technical studies, assumptions, data, and methodologies, to develop this regulation.

#### 4.1 Borrower Defense

These final regulations improve the process for adjudicating BD claims and for recouping from institutions the cost of discharges associated with approved claims where possible. The Department anticipates that these final regulations will have many benefits for borrowers, as well as some reduction of burden for institutions of higher education. In total, the Department believes the expected increase in BD discharges and the expected increase in recoupment, as compared with the 2019 regulations, would deter behavior that could form the basis for a BD claim and ensure more borrowers are able to access a loan discharge, as provided for in the HEA.

The final regulation will establish a uniform Federal standard for initial adjudication of BD claims, regardless of when a loan was disbursed, which will streamline administration of the BD regulations and increase protections for students. However, institutions will not be subject to recoupment actions for applications that are granted based upon this regulation that would not have been approved under the applicable standard that would have been in effect at the time the loan was disbursed. A uniform standard also will significantly reduce the time necessary to determine eligibility and relief for BD claims, ensuring that borrowers would receive faster determinations. The use of a uniform Federal standard for initial

---

[158] Scott-Clayton, J. (2018). The looming student loan default crisis is worse than we thought. Brookings Institution Evidence Speaks Report, vol. 2 #34. Retrieved from *https://www.brookings.edu/research/the-looming-student-loan-default-crisis-is-worse-than-we-thought/*.

[159] Scott-Clayton, J. (2016). Black-white disparity in student loan debt more than triples after graduation. Brookings Institution Evidence Speaks Report, vol. 2 #3. Retrieved from *https://www.brookings.edu/wp-content/uploads/2016/10/es_20161020_scott-clayton_evidence_speaks.pdf*.

[160] Hillman, N.W. (2014). College on credit: A multilevel analysis of student loan default. *The Review of Higher Education,* 37(2), 169–195.

[161] Itzkowitz, M. (2018, August 8). Want More Students To Pay Down Their Loans? Help Them Graduate. Third Way report. Retrieved from: *http://thirdway.imgix.net/pdfs/want-more-students-to-pay-down-their-loans-help-them-graduate.pdf*.

[162] Department analysis of the 2004/2009 Beginning Postsecondary Students Study, estimated via PowerStats (table references: ivbztb and qobjsb).

adjudication will also ensure all borrowers receive a consistent review, unlike current rules that outline different requirements depending on when a loan was disbursed.

The Federal standard will provide a clearer path for approval of BD claims where the Department's review of the evidence shows that the institution's act or omission caused detriment to the borrower that warrants relief in the form of a full discharge of remaining loan balances, a refund of all payments made to the Secretary, and other benefits. This balances assistance for harmed borrowers while limiting the approval of immaterial claims. We also add aggressive and deceptive recruitment as grounds for a BD approval. The Department is adding this category based upon its experience in administering the BD regulation and because the Department is concerned about instances in which aggressive and deceptive recruitment tactics have caused detriment to borrowers by preventing them from making an informed choice. We also will restore the categories of breach of contract and judgment as grounds for a BD claim, which were included in the 2016 regulation but removed in the 2019 regulation. We have also expanded the category of judgment to include final Department actions against an institution that could give rise to a BD claim. This is limited to actions under part 668, subpart G, denying the institution's application for recertification, or revoking the institution's provisional program participation agreement under § 668.13, based on the institution's acts or omissions that could give rise to a borrower defense claim related to a substantial misrepresentation, substantial omission of fact, or aggressive and deceptive recruitment. To clearly delineate that omission of fact is a form of misrepresentation, we have listed it separately.

These final regulations also provide clearer protections for borrowers while their cases are under consideration by Department officials, by placing a borrower's loan in forbearance or stopping collections activity while the case is being adjudicated. Interest accumulation will cease immediately in the case of a group claim or after 180 days for an individual claim. Individual claims will be adjudicated within 3 years from the receipt of a materially complete application, with adjustments to address claims pending on the effective date of this regulation. Group claims will be adjudicated within 1 year from the formation of a group, which will occur within 2 years of receipt of

a complete application. Previously, there was no timeline for adjudicating BD claims. As a result, many borrowers who filed claims have been waiting for years to have their claims adjudicated. Of nearly 81,000 claims submitted in 2017, for instance, more than 14,000 (nearly one in five) remain pending. Nearly one in five claims submitted in 2018 and over one in four claims submitted in 2019 also remain pending.[163] Certainty about how long it will take to decide a claim will help borrowers better judge whether they think they have a claim they want to submit since they will have an understanding that it could take several years to receive a decision. It will also let them plan for whether they want to turn down a forbearance and continue to pay their loans or not.

The Department's failure to render a decision by the end of the timeline will render the loans unenforceable. Loans in such a circumstance will not be considered subject to a BD claim so an institution will not face a recoupment action for the cost of those loans. This will also provide a benefit to borrowers, who would see their loan discharged if we are unable to render a decision on their claim within the deadlines.

The Department has included a group process for BD claims. This process was eliminated in the 2019 regulations. Through a group claim the Department may consider evidence in its own possession as well as requests from third parties to render a single decision on similarly situated borrowers who all attended the same institution, regardless of whether they all applied for BD relief. This will ensure a more efficient process. The inclusion of third-party requestors to initiate a group claim will provide a formal path for the Department to receive additional evidence that will help it make sound decisions on claims. The Department estimates that as much as 75 percent of BD volume associated with private for-profit colleges could be associated with group claims, with the rates in public and private nonprofit sectors a minority of volume. While the staff time required to investigate the evidence behind a group claim could be longer than what is needed for an individual claim, applying the same adjudication result to a group of borrowers will result in an overall reduction in staff time. Approving group claims will also result in the filing of fewer individual claims, as the approved group claims will result in discharges for borrowers who have

not yet applied, eliminating the need for such borrowers to submit applications. On net, these actions will save time for both borrowers and the Department, thereby generating real social benefits.

All approved claims will receive a full discharge of remaining loan balances associated with the claim, as well as a refund of amounts previously paid to the Secretary. This eliminates a previously proposed complex process for the potential calculation of partial discharges. It also simplifies the adjudication standards by noting that an approved claim must involve circumstances that warrant this form of relief. All borrowers with approved claims to date have been approved for a full discharge.

If a claim is not approved, a reconsideration process will allow a borrower to submit new evidence that was not available in the initial application. This process will afford borrowers an opportunity to be considered under a State law standard if a decision under the Federal standard does not result in an approved claim and the loans were first disbursed prior to July 1, 2017.

By increasing relief to borrowers with claims that merit approval, improving the BD standard, restoring a group process, and providing a reconsideration process, these final regulations will result in additional transfers from the Department to borrowers, or from institutions to borrowers when the Department successfully recovers from the institutions. All borrowers will fall under a single, more expansive rule and those whose claims are approved will be able to receive relief more quickly and efficiently, which generates real benefits to society.

This process will also afford institutions an appropriate opportunity to respond. The Department's allowance for group processes in the final regulations means that institutions will have an opportunity to respond before a group is formed as well as during the adjudication process if the Department does decide to form a group. That means an institution needs to respond only twice regarding a group claim, instead of sending responses to hundreds if not thousands of individual claims. While institutions will be expected to provide a response within 90 days when contacted, the separation of approval and recovery processes means that institutions will not be expected to engage in extended challenges to claims for which the Department decides not to pursue recoupment.

In the past, the Department has seen institutions attempt to increase

---

[163] Department analysis of data retrieved from the CEMS Borrower Defense System in June 2022. Values were rounded to the nearest 10.

enrollment by resorting to conduct that later leads to BD approvals. For instance, the Department has found that some institutions guarantee borrowers that they would get a well-paying job. They also aggressively marketed inflated job placement rates to encourage students to enroll in their institution. Holding institutions accountable for this type of misrepresentation, as well as adding in aggressive recruitment as a type of conduct that can lead to approved BD claims, will benefit institutions that do not engage in these tactics. This is because approved BD claims may deter institutions from providing students with inaccurate information and from using aggressive recruitment tactics, helping institutions with better conduct and outcomes more successfully compete for enrollment.

The final rules provide for a process to recover the discharged amount from institutions after the adjudication of BD cases. Recovery from institutions is important to offset costs to the Federal government and taxpayers from approved BD claims. It also holds institutions accountable for past behavior and will help to deter future practices that could form the basis for additional BD claims.

As noted earlier, the Department will apply the BD standards in this rule to all claims pending on or received on or after July 1, 2023, but recoupment would only occur if the claims would have been approved under the standards for the relevant BD regulation in effect at the time the loans were disbursed. The Department believes there will still be a deterrent effect even in situations where a claim is approved but recoupment doesn't occur. If an institution is still engaging in similar behavior that led to the approved BD claim on a loan disbursed earlier, they will have a strong incentive to cease that behavior to reduce the risk of future recoupment efforts. Similarly, institutions that are not currently engaging in a behavior that could lead to an approved BD claim would be dissuaded from adopting practices that have been shown to lead to approved claims.

*Costs of the Regulatory Changes:*

As detailed in the Net Budget Impact section, the changes to BD are expected to reduce transfers from affected borrowers to the Federal government as their obligation to repay loans is discharged. We estimate this transfer to have an annualized net impact of $903 million and $819 million at 7 percent and 3 percent discount rates, respectively. This will be partially reimbursed by affected institutions with the annualized recoveries estimated at

$36.9 and $37.1 million at 7 percent and 3 percent discount rates. The Department anticipates that all costs are transfers, other than minimal costs related to implementation. If the Department recoups the forgiven dollars from institutions, they are transfers from institutions to borrowers. Otherwise, they are transfers from the Federal budget to borrowers. Details about these estimates are in the Net Budget Impacts section of this document.

In the Federal standard for defense to repayment claims, a claim could be brought on any of the following grounds: substantial misrepresentation, substantial omission of fact, breach of contract, aggressive and deceptive recruitment, and a State or Federal judgment or final Department action against an institution that could give rise to a BD claim. The first two grounds incorporate and expand part 668, subpart F, which currently defines three categories of misrepresentation, relating to the nature of education programs, the nature of financial charges, and the employability of graduates. Aggressive recruitment is added as a new ground for a BD application and is outlined in part 668, subpart R. The Federal standard will be applied to all borrowers regardless of when their loans were disbursed. BD applications that are currently awaiting adjudication upon the effective date of the regulations will be adjudicated based on the final regulations. Since these regulations expanded on the categories in which borrowers may be eligible for a BD claim, these pending cases could be approved where they otherwise may not be under existing regulations. In addition, the Department expects an increase in the number of BD applications when the regulations go into effect due to the expanded categories of institutional misconduct. However, as explained in the discussion of benefits of the BD rule, the Department also expects a deterrent effect from the regulations as institutions adjust their behavior, even in circumstances where an institution is not subject to recoupment.

The regulations expand group BD claims by including a process initiated by third-party requestors and a process based on prior Secretarial final actions, as well as the general authority for the Secretary to form a group. With these changes, the Department expects that individuals who have a valid BD claim they could assert, but who were previously unaware of their eligibility or unfamiliar with the process, could become members of a group claim. The Department will award a full discharge to all borrowers with approved claims

by adjusting the Federal standard to note that an approved claim requires the Department to conclude that the institution's act or omission caused detriment to the borrower or borrowers that warrants this form of relief.

The reconsideration process could increase costs in the form of burden for the Department, although these costs are likely to be small. There are two possible outcomes for a BD application: denial or approval. The Department expects some borrowers whose BD applications are denied to seek reconsideration, which will increase administrative costs and time compared to previous regulations that do not have reconsideration processes. Historically, just under 7 percent of the borrowers who received a denial notice had filed a request for reconsideration.[164] In addition, third-party requestors may also seek reconsideration. The change made by the Department from the NPRM to the final rule to limit reconsideration under State law to loans issued prior to July 1, 2017, will also reduce the costs of reconsideration, as there are more limited instances where the Department would have conducted another review under a different standard.

While these final regulations will result in higher short-term costs for the Federal government in the form of transfers to borrowers, the Department expects that some of these payments will be recovered from institutions over time. While the Department will likely be unable to recover from institutions that are no longer operating when BD claims are adjudicated, the final regulations will increase the likelihood that the Department could recover from relevant institutions before they are closed because (1) group claims against an institution will increase the expected benefit of recovering from the institution since they will result in large discharge amounts if approved; (2) the Department is expected to respond to group claims within 1 year of deciding to form the group, which will increase the possibility that the institution is still in operation; and (3) the streamlined claims process will allow the Department to act more quickly on BD applications. As a result, the costs in the form of transfers to borrowers that will result from the final BD regulations could be smaller for the Federal government in the long term as it receives transfers from institutions.

*Benefits of the Regulatory Changes:*

---

[164] Department analysis of data retrieved from the CEMS Borrower Defense System in October 2022 combined with historical information on cases previously determined ineligible for relief.

The final regulations will result in administrative cost savings for the Department, efficiencies for institutions in responding to claims, and benefits to borrowers. In addition, borrowers may benefit from a deterrent effect of these final regulations.

The Department anticipates that establishing a process for recoupment from institutions and providing for a faster adjudication process will assist it in recovering more funds from institutions on claims associated with future loan disbursements because those schools will be less likely to have closed by the time liabilities are assessed than is the case under current regulations.

The Department also believes that a stronger and more expansive BD process will result in changes in institutional behavior that benefit borrowers. For instance, past title IV policy changes to increase accountability, such as the cohort default rate measure and the 90/10 rule, encouraged institutions to change their practices to respond and conform to new regulations. Accordingly, we expect that, over time, institutions will engage less frequently in acts or omissions that could give rise to a BD claim, which, in turn, will generate benefits to borrowers. Discouraging the type of acts or omissions that would lead to approved borrower defense claims will increase the likelihood that borrowers are presented with more accurate and transparent information about the cost of their programs, ability to transfer credits, employment outcomes, and other key things that are necessary for making an informed decision. Institutions will also want to avoid being overly aggressive in pursuing students, furthering the ability of prospective borrowers to understand the decision they are making. A greater focus on transparency and lessening aggressive sales tactics will in turn put greater pressure on institutions to make sure they are delivering better value for students, since making false promises could lead to the possibility of discharges and then recoupment. Overall, when students are able to make better decisions, they will be more likely to consider and enroll in programs and institutions that generate either lower debt or a greater earnings gain.[165]

Borrowers who will be most affected by the final regulations tend to be relatively disadvantaged, which influences the nature and scale of benefits we describe below. To date, BD applicants have disproportionately attended schools in the proprietary sector, and proprietary schools disproportionately serve students of color, women, low-income students, veterans, and single parents.[166] Of more than 554,000 BD claims received from 2015 through June 2022, more than 420,000—about three out of four BD applicants—attended proprietary institutions. Meanwhile, just 5 percent of applicants attended public institutions.[167] These numbers understate the share of borrowers who attended private for-profit institutions because the data reflect the institution's sector at the time a borrower applied, not when they attended. That means a borrower who attended a college when it was a proprietary institution but applied after it became a nonprofit is considered an applicant from a nonprofit institution.

Borrowers who received Pell Grants while enrolled and borrowers who struggle to repay their loans and default will benefit from these final regulations. Among the more than 144,000 approved individual claims, 88 percent were from borrowers who had also received a Pell Grant at some point.[168] This is slightly higher than overall share of BD applicants who received a Pell Grant, which was 82 percent. At least 22 percent of applicants are currently in default on their loans, consisting of approximately 95,000 borrowers.[169] This number does not include borrowers previously in default who have had their claims approved and discharged, but it does include some borrowers whose claims have been approved and are in the process of being discharged. As a result, it potentially understates the degree to which BD applicants have been in default.

The single Federal standard for initial adjudication, uniform BD regulations, and a more streamlined process (such as awarding a full discharge for approved claims) will reduce the staff time per borrower needed to adjudicate BD

applications. These savings will largely come from being able to apply consistent rules across all borrowers while still ensuring that each case receives a thorough and rigorous review to determine whether their claims should be approved or denied.

The group process will significantly reduce the staff time required to investigate and adjudicate BD cases on a per-borrower basis. The final regulations include several means by which the Department can pursue a group process. Specifically, a group process can be initiated by the Department based on either common evidence from cases being adjudicated or prior Secretarial final action, or a State or legal assistance organization may request that a group process be initiated.

When the Department initiates a group process, it will be considering the possibility of approval for tens of borrowers all at once, if not hundreds or thousands. While the scope of this work will require significantly more time than reviewing any one individual claim, it is far more efficient than review on a per-borrower basis. In addition, the evidence available during group claims is expected to be more extensive than what the Department may possess for an individual claim. The process for group claims tied to prior final actions by the Secretary will be particularly efficient because the Department will draw upon prior work done by the agency, minimizing the amount of duplication in investigation that needs to occur. This will result in a significant saving of Department staff time and ensure faster adjudication for borrowers, as well as a straightforward process for subsequent recoupment. This process is more efficient than how the Department has addressed BD claims to date. For those claims, it has first worked to reach common findings, a process similar to what would be done to determine a group claim. But after reaching those common findings for approval, the Department then conducts reviews of individual claims to determine if the allegations provided by the borrower match the common findings. This results in a second step of claim review that has disqualified some borrowers who may have experienced the misconduct that led to approvals, but whose claims did not necessarily articulate those experiences. Such a secondary review will not be necessary in the group process, though the Department will continue to review borrower eligibility to ensure findings are applied appropriately only to affected borrowers. The time saved

---

[165] Michael Hurwitz & Jonathan Smith, 2018. "Student Responsiveness To Earnings Data In The College Scorecard," Economic Inquiry, Western Economic Association International, vol. 56(2), pages 1220–1243, April. Dynarski, Susan, CJ Libassi, Katherine Michelmore, and Stephanie Owen. 2021. "Closing the Gap: The Effect of Reducing Complexity and Uncertainty in College Pricing on the Choices of Low-Income Students." American Economic Review, 111 (6): 1721–56.

[166] Cellini, S.R. (2022). For-Profit Colleges in the United States: Insights from two decades of research. *The Routledge Handbook of the Economics of Education*, 512–523.

[167] Department analysis of data retrieved from the CEMS Borrower Defense System in June 2022. School Type is determined using the "School Type" field on each case in the system. Each value is rounded to the nearest 10.

[168] Analysis of data from the National Student Loan Data System, early October 2022.

[169] Analysis of administrative data of BD applications received, early October 2022.

using a group process benefits borrowers, as well as the Department.

The use of group processes can also provide some efficiencies for institutions in the process of responding to claims. Institutions have to respond to individual claims separately, which could require them to respond to hundreds if not thousands of separate claims from similarly situated borrowers. By contrast, a group approach will require institutions to offer only a single response prior to the formation of the group and a second during adjudication if the Department decides to form a group.

The regulations will also result in significant benefits to borrowers who qualify for a BD approval. Those who have their claims approved will receive a significant benefit as they will no longer have to repay the loans associated with their claim. This results in a transfer from the Department to the borrower. It is the Department's experience that many borrowers who have borrower defense claims approved are those who have had difficulty repaying their loans since the institution did not fulfill its obligations to its students. We anticipate that result will remain true under these regulations. Moreover, the borrower will receive refunds of amounts previously paid to the Secretary, an additional benefit. For all applicants, the regulations will help to reduce the burden of applying where the Department is able to identify eligible borrowers for loan relief but where the borrowers might not know they are eligible or how to access relief. These borrowers who are eligible for BD discharges, but may not know how to access relief, are unlikely to have benefited from the education they received and may be distressed borrowers who are delinquent, in default, or have previously defaulted on their student loans. These loan repayment struggles create further barriers for borrowers' personal financial circumstances, and also add to the Department's administrative burden when there are borrowers in the system who are eligible for a discharge but instead are in default. The regulations will allow more eligible borrowers to access relief through group claims, which will bring benefit to both borrowers and the Department. Although the borrowers could have received relief by applying individually, we see substantial benefit to them

receiving this relief sooner through the group process.

The Department believes that the expansion of eligibility for BD claims and the reintroduction of a rigorous group process will result in positive change in institutional behaviors due to the deterrent effect. Past Federal sanctions of institutions resulted in a considerable enrollment shift away from sanctioned institutions and similar types of institutions that did not face sanctions. Though these sanctions were not sector specific, they had greater effects on proprietary institutions and resulted in a shift of enrollment toward public institutions. This shift resulted in reductions in both student borrowing and on defaults on federal student loans.[170] Research also finds that public sector enrollment generates higher earnings relative to proprietary school enrollment. Attending a public certificate program is associated with $2,144 higher annual earnings or $28,600 to $49,600 in lifetime earnings per diverted student in present value terms at 7 percent and 3 percent discount rates, respectively, relative to attending a proprietary certificate program.[171] When institutions were sanctioned in the past under other accountability rules, students who would have attended a sanctioned institution instead switched sectors and experienced improved outcomes. Thus, we can expect gains to students in the form of reduced debt, lower chances of default, and increased earnings. Moreover, as noted earlier, the Department believes that the deterrence effect will occur even if the institution does not face a recoupment action related to approved claims. Improved behavior on the part of institutions should benefit students even if they remain enrolled at the same institution. Even if they do not face financial consequences for an approved claim, an institution would want to stop engaging in such behavior in the future to avoid

the possibility of recoupment actions tied to future loans.

A deterrence effect will also benefit institutions that do not engage in conduct that leads to approved BD claims. The Department has seen in the past that some institutions with poor outcomes have used fraudulent or misleading materials in marketing and recruitment to attract new students. This may place institutions that remain truthful about their outcomes at a competitive disadvantage in attracting and enrolling students. Curbing the conduct that leads to approved BD claims thus helps institutions that never engaged in those behaviors in the first place. It is possible that in some limited circumstances tied to the worst behavior, the approval of BD claims could result in the exit of an institution from the Federal financial aid programs. An institution that engages in problematic practices for years could face significant liabilities from approved BD claims that they cannot afford. As with deterring institutions from engaging in misleading or other questionable practices, having the institutions with the worst behaviors exit the Federal aid programs will provide benefits to all other institutions that are operating in a more truthful and ethical manner.

### 4.2  False Certification Discharge

False certification discharges provide relief to borrowers whose institutions falsely certified their eligibility for a Federal student loan. The Department's 2019 regulations stated that borrowers who took out loans after July 1, 2020, are ineligible for a false certification discharge if they attested to having a high school diploma or equivalent. For loans disbursed after July 1, 2020, the regulations are unclear regarding the ability of a borrower to seek a false certification discharge for a disqualifying status. After these regulatory changes, we observed a sharp decline in the number of borrowers and total amounts of false certifications discharged in 2021. The number of borrowers who were granted false certification discharge was 400 in 2020 but was only 100 in 2021, and the total amount of false certification discharges was $4.8 million in 2020 but only $0.8 million in 2021, suggesting that borrowers were facing increased barriers to accessing false certification discharges to which they were entitled.

---

[170] Cellini, S.R., Darolia, R. and Turner, L.J. (2020). "Where Do Students Go When For-Profit Colleges Lose Federal Aid?" *American Economic Journal: Economic Policy,* 12 (2): 46–83.

[171] Department analysis based on results in Cellini, Stephanie Riegg and Nicholas Turner. 2019. "Gainfully Employed? Assessing the Employment and Earnings of For-Profit College Students Using Administrative Data." *Journal of Human Resources.* 54(2): 342–370. Calculation assumes earnings impact is a constant $2,144 each year, which is conservative since the estimated earnings impact appears to grow with time since program exit, and that students spend 40 years in the labor market after starting at age 25.

**Federal Register** / Vol. 87, No. 210 / Tuesday, November 1, 2022 / Rules and Regulations        **65997**

Table 2—False Certification Discharges,
by Calendar Year

| Calendar Year | Borrowers | Amount ($ M) | Average per borrower ($ K) |
|---|---|---|---|
| 2019 | 300 | 3.8 | 12.7 |
| 2020 | 400 | 4.8 | 12.0 |
| 2021 | 100 | 0.8 | 8.0 |
| Total | 800 | 9.4 | 11.8 |

The effects for borrowers could be significant. In 2020, prior to the new regulations, the discharge approval rate was about 7.3 percent, and the average amount discharged per application was $9,310.

Table 3—Number of False Certification Approvals and Discharge Amounts, by Reason

| Application Status | Discharge Type | 7/1/19 to 6/30/20 | 7/1/20 to 6/30/21 | 2020 calendar year estimated | 2020 subtotal |
|---|---|---|---|---|---|
| Applications Approved | FC – ATB | 520 | 145 | 330 | |
| | FC – DQS | 30 | 10 | 30 | 470 |
| | FC – UNS | 200 | 30 | 120 | |
| Applications Denied | FC – ATB | 3500 | 1510 | 2510 | |
| | FC – DQS | 1500 | 770 | 1130 | 6000 |
| | FC – UNS | 3530 | 1190 | 2360 | |
| Loans Discharged | FC – ATB | 1170 | 250 | 710 | |
| | FC – DQS | 50 | 40 | 50 | 980 |
| | FC – UNS | 400 | 40 | 220 | |
| Amount Discharged | FC – ATB | $5,764,280 | $1,274,520 | $3,519,400 | |
| | FC – DQS | $219,130 | $305,600 | $262,370 | $4,404,220 |
| | FC – UNS | $1,161,290 | $83,610 | $622,450 | |
| Average amount discharged per application | | | | | $9,310 |
| Average amount discharged per loan | | | | | $4,510 |
| Average approval rate | | | | | 7.3% |

Data source: Federal Student Aid (FSA)

Note: 2020 calendar year is estimated with the average of 2020 and 2021 fiscal years. ATB stands for the ability to benefit, DQS for disqualifying status, and UNS for unauthorized signature. All figures are rounded to the nearest 10.

To address the decline in borrower access to necessary discharges on their loans, and to ensure the regulations governing these discharges are streamlined and understandable to eligible borrowers, the Department will apply one set of regulatory standards to cover all false certification discharge claims.

The uniform standard will improve borrower access to false certification discharges by clarifying that eligibility for the discharge begins at the time the loan was originated, not at the time the loan was disbursed. Current regulations for Direct Loan and FFEL Program loans also contain separate requirements for loans first disbursed before July 1, 2020, and loans first disbursed on or after July 1, 2020, which confuse borrowers and create equity issues for borrowers who may struggle to navigate this complexity. This uniform standard will ensure that more borrowers have access to the expanded eligibility and that they are not forced to navigate a complex and overlapping set of regulatory frameworks. As with the BD standard, we believe that this uniform standard will streamline the administration of the regulations and better protect students while reducing confusion among borrowers, institutions, servicers, and the Department.

The Department will rescind the requirement that any borrower who falsely attests that they have a high school diploma or its equivalent does not qualify for a false certification discharge. This will ensure that borrowers can seek a discharge if they were coerced or deceived by their institution of higher education and as a result reported having a valid high school diploma or its equivalent when

they in fact did not, further expanding access to false certification discharges.

These final regulations specify that the Secretary may grant a false certification discharge, including without an application, if the institution falsified Satisfactory Academic Progress (SAP) for the loans. We will grant group discharges based on the falsification of SAP and the Department would establish the dates and borrowers affected. The discharge will only cover loans for those borrowers for the period covered by the falsification of SAP and does not discharge all the borrower's other loans or all loans at the institution. The Department is aware of problematic practices by institutions that have falsified SAP, which is a basic eligibility requirement for continued access to title IV, HEA aid, and believes that this addition will ensure that borrowers whose institutions falsely confirmed their eligibility through these practices have access to loan relief, and that institutions may be held accountable for their actions.

These final regulations will remove the requirement that borrowers submit signature specimens when applying for discharge due to unauthorized loan, unauthorized payment, or identity theft, and replace the need that a borrower provides a judicial determination of identity theft with the ability to submit alternative evidence. This will expand access to false certification discharges by reducing the burden of document preparation on borrowers and simplifying the application process.

These final regulations will also establish a group process for awarding discharges to similarly situated borrowers. In part, this addition was in response to negotiators who noted that the Department has rarely utilized its authority to grant group false certification discharges. As a result, borrowers will receive more equitable and consistent treatment because they will be able to access relief on their loans regardless of whether they applied, based on evidence the Department collects or has in its possession. A State attorney general or nonprofit legal services representative will be able to submit an application for a group false certification discharge to the Department. This will ensure a more efficient process than is typically available, whereby third-party requestors and other stakeholders will be able to contribute directly to the fact-finding process required before adjudicating the application. The group process, and associated improvements, will also help to significantly reduce staff time required to investigate and adjudicate individuals' applications

when common facts and circumstances are present.

*Costs of the Regulatory Changes*:
Increased accessibility of discharges may encourage more borrowers to file claims or may result in additional discharges as a result of borrowers' access to a group process. The Department expects an increase in the Federal government's expenditure and an increase in the time in processing the claims in the short term, but a minimal long-term cost. The Department anticipates the costs associated from these changes will be transfer costs. The short-term increase in expenditures will come from the following regulations.

The Department will rescind the provision that any borrower who attests to having obtained a high school diploma or equivalent does not qualify for a false certification discharge on that basis. The Department is aware of numerous instances in which borrowers were forced or misled by their institution into attesting to holding a high school diploma, or into obtaining a diploma on false pretenses. In cases where such evidence is available, the Department believes the institution should be held accountable for its misconduct, and the borrower should be able to access a discharge of their eligible loans. This could lead to more borrowers applying and being granted loan discharges in the future.

These final regulations will remove the requirement that borrowers submit signature specimens and replaces the provision of a judicial determination of identity theft with alternative evidence. Similarly, the Department anticipates that removing this barrier will allow more eligible borrowers to apply without having their applications rejected, and may, therefore, increase the costs of approved false certification discharges.

*Benefits of the Regulatory Changes*:
The process, which will be more streamlined, will ease the administrative burden on the Department for the review of claims and for appeals of denials that are escalated for further review. Most importantly, the process contemplates the benefits to the borrowers themselves who are entitled to discharges when their institution wrongfully saddles them with debt they are not eligible for and wastes their aid eligibility.

The Department also expects that there will be some behavioral impact as institutions respond to changes in the regulations and reduce their use of such predatory practices, since the Department could assess liabilities against the institution for the discharges. In addition, this deterrent of

strengthening and streamlining these regulations is expected to offer some benefit to taxpayers. Therefore, the long-term transfer costs may be reduced.

Taken together, the final regulations will result in a more streamlined process, rescind limitations on borrower eligibility from current regulations, and remove and replace requirements, which are expected collectively to improve borrowers' accessibility to false certification discharge. The Department expects that these final rules will ensure more borrowers have access to relief. While this will increase costs to taxpayers through additional false certification discharges, the Department also anticipates that some of these costs will be recouped from the institutions responsible, and that these final rules will be more efficient.

### 4.3 Public Service Loan Forgiveness

These final regulations clarify the regulations to help borrowers better understand and access the program, particularly by simplifying the rules regarding what constitutes a qualifying payment, and to streamline the Department's processing of the applications it receives for forgiveness. Overall, we anticipate that these final regulations will increase the amount of loan forgiveness through PSLF.

These final regulations further clarify the definition of full-time employment that meets the terms of the program to address inconsistencies in how different employers may consider full-time employment and in how non-tenure track faculty are treated. Most of these changes are modest but will bring benefits to borrowers in the form of more consistent treatment. This may also provide additional clarity to employers, ensuring they can better understand the program and inform borrowers of their eligibility. These final regulations revise the definition of what it means for a borrower to be an employee or employed to include the narrow circumstance of someone who works as a contractor for a qualifying employer in a position or providing service which, under applicable State law, cannot be filled or provided by a direct employee of the qualifying employer. This revised definition will ensure physicians in California and Texas, and anyone else affected by a similar set of restrictions, will be eligible for PSLF benefits as this group were not intended to be excluded by the PSLF regulations.

Where possible, the Department will seek to automate the process of identifying public servants and accounting for their time worked to ensure they automatically receive

progress toward PSLF. The changes in the regulatory text that allow for a discharge when the Secretary has sufficient information will allow for this circumstance without needing to specify a specific match or source of data. This also recognizes that the Department cannot bind another agency with a matching agreement in its regulations. However, as noted in previous public announcements the Department is working to implement data matches with other Federal agencies that will enable it to account for Federal employees and service members and is exploring the feasibility of matches at the State level that may also provide the information needed to determinate PSLF eligibility. The benefit of these data matches for borrowers is increased access for those who would otherwise not have applied, but who may be eligible for relief on their loans. We anticipate an increase in the total amount of loans forgiven due to greater use of automation made possible by changes in these regulations. For instance, we are already aware of approximately 110,000 Federal employees who have completed some employer certifications and will thus benefit from the automatic match and another 17,000 service members in a similar situation. We anticipate there could be at least tens of thousands of more borrowers we might identify as eligible for credit toward PSLF from these matches. Additional matches in the future could help hundreds of thousands of borrowers. We also expect that borrowers identified for forgiveness through these data matches will have information that is validated by government agencies, ensuring greater program integrity among a larger share of applicants who receive forgiveness. However, because we have not yet conducted these matches, we cannot currently determine how many of the borrowers identified by these matches will have already applied for PSLF, and thus have an easier path to receiving forgiveness, or if these will be borrowers who had not previously applied for the program.

Automation will also have considerable benefits, both for the Department and for borrowers, in terms of reducing the administrative burden. While there are initial costs associated with developing the automation, the future cost savings far outweigh the development costs. As noted above, 127,000 borrowers who were civilian Federal employees or service members had employer certifications completed for some employment prior to any data match, and many others could opt to

certify employment in the future. Automating the consideration of those borrowers' employment and/or PSLF applications will save time for borrowers and reduce the investment of staff resources required to analyze PSLF applications.

These final regulations create more flexible requirements around loan payments to ensure more eligible borrowers have access to PSLF, partially addressing the low success rate of PSLF applications. Currently, the regulations governing qualifying payments are extremely rigid. Payments must be made on-time, within 15 days of the due date, or they do not count as qualifying payments. Payments also must be made in full, so payments off by only a few cents or payments that are made in more than one installment are disqualified. Additionally, some public servants have opted for deferments or forbearances available to borrowers who are working in public service jobs—such as for AmeriCorps and Peace Corps—without realizing those months will not qualify for PSLF. Simpler payment rules and counting some deferments and forbearances will significantly reduce confusion and improve take up of the program. In addition, borrowers will benefit by being able to make qualifying payments, through the final rule's hold harmless provision, for prior deferment or forbearance periods where there was previously no qualifying payment possible. This change grants borrowers the ability to make up payments that did not previously qualify as well as not reset the clock toward consolidation.

These changes will increase costs to the government in the form of greater transfers to borrowers eligible for PSLF, as take-up of the benefit increases due to automation and as more borrowers become eligible for PSLF outside of the narrow constraints of the existing rules but consistent with the statutory purpose of the PSLF program. Borrowers who work in Federal agencies where data matching agreements are arranged will benefit as a higher fraction of eligible borrowers receive forgiveness and the burden in applying for benefits is reduced. All other things equal, among borrowers for whom receiving forgiveness becomes more likely, borrowers with higher debt levels, including some graduate borrowers, will experience greater amounts of loan forgiveness.

These final regulations formalize a reconsideration process and establish a clear timeline by which borrowers must submit a reconsideration request. These refinements will streamline the application process and provide a clearer timeline to apply for PSLF or

request a reconsideration. The Department anticipates that this reconsideration process will increase administrative burden for the agency and for borrowers, but that it will allow for a fairer and more equitable process to access PSLF where borrowers believe the Department has erred in its determination.

*Costs of the Regulatory Changes*:
As detailed in the Net Budget Impact section, the changes to PSLF are expected to reduce transfers from affected borrowers to the Federal government as their loans are forgiven. We estimate this transfer to have an annualized net budget impact of $2.1 billion and $2.0 billion at 7 percent and 3 percent discount rate, respectively. The Department anticipates most of the budgetary impact will be transfers as borrowers more easily access PSLF benefits. In particular, we expect that the expansion of eligibility, the inclusion of additional payments as qualifying payments, and increases in take-up facilitated by automating the benefit where it is possible to identify eligible borrowers through a data match will increase transfers from the government to eligible borrowers. The revised definitions of qualifying services are not anticipated to impact a significant number of borrowers but will provide greater clarity about eligibility. This budget estimate is explained in greater detail in the net budget impact section of this regulatory impact analysis.

*Benefits of the Regulatory Changes:*
The Department anticipates several benefits based on these regulatory changes to PSLF. The Department seeks to reduce the burden of accessing PSLF benefits for borrowers who are employed by a nonprofit organization that provides non-governmental public services and streamline the process to obtain these benefits. The Department received over 917,000 employment certification forms in 2019, certifying that borrowers are working toward forgiveness, and 825,000 employment certification forms in 2020. The Department also received 96,000 forgiveness applications in 2019 and 135,000 forgiveness applications in 2020 from borrowers who may believe they completed the requirements of the program to qualify for forgiveness. Starting in late 2020, the combined form replaced the separate process of borrowers submitting employment certification forms and forgiveness applications. The Department received 130,000 combined forms in 2020 and 776,000 combined forms in 2021. However, after the announcement of the Limited PSLF Waiver in October 2021

that temporarily waived some program requirements through the end of October 2022, the Department has seen significant growth in applications compared to earlier periods. Due to the implementation of an automated process for some eligible borrowers as we described in the NPRM, we are anticipating decreases in the number of applications received because an application will not need to be submitted if the Department has the necessary information to assess whether the borrower met the PSLF requirements during the automated process. Under this process, a borrower will be notified if the borrower meets the requirements for loan forgiveness. After the borrower is notified, the Department will suspend collection and the remaining balance of principal and accrued interest will be forgiven.

By streamlining the PSLF process, the Department anticipates a reduction in the administrative burden and time savings for application processing. There will also be a burden reduction on qualifying employers as the employers will have a simpler time verifying what they are attesting to, such as the hours worked by the borrower.

We anticipate these regulations will impact tens of thousands of borrowers who will now qualify for PSLF under the clarified definitions of qualifying employment but previously did not qualify for PSLF. This is particularly due to the changes to the definition of employee or employed to capture a narrow and specific type of contractual relationship. The updated list of deferments and forbearances are anticipated to benefit a significant number of borrowers engaged in public service work who would otherwise not be able to consider those months toward forgiveness. Over the long run the Department hopes that hundreds of thousands of borrowers who would ordinarily have to apply for PSLF will receive student loan forgiveness without submitting an application. This includes military service members and Federal employee borrowers who will automatically receive credit toward PSLF using Federal data matches and the Department hopes that over time it will include some State-level matches as well.

## 4.4  Interest Capitalization

Interest capitalization occurs when any unpaid interest is added to a borrower's principal balance, further increasing the amount on which interest is charged. This raises the overall cost of repaying the loan. Prior to this rule, capitalization occurred when a borrower first entered repayment, after periods of

forbearance, after periods of deferment for non-subsidized loans, and when borrowers switched out of various income-driven repayment plans. In this regulation, the Department ends capitalization in all circumstances that are not required by statute. This will result in ending capitalization that occurs when a borrower first enters repayment, after periods of forbearance, and upon leaving all IDR plans except for IBR.

The Department is concerned that interest capitalization can adversely affect student loan borrowers by significantly increasing what they owe on their loans, which may extend the time it takes to repay them. While there are circumstances where interest capitalization is required by statute, such as when borrowers exit a deferment period and when they leave Income-Based Repayment, the Department believes that it is important to eliminate capitalization events where it has the authority to do so. Despite counseling, some borrower misunderstanding of interest accrual and capitalization and resulting confusion about the accuracy of one's loan balance contributed to the most frequent type of borrower complaint received by the Department.[172] Qualitative evidence from focus groups with struggling borrowers also has shown that borrowers find capitalized interest to be complex and burdensome, noting that many borrowers do not realize which decisions result in capitalization and feel overwhelmed and frustrated by growing balances on loans.[173] A recent study suggests that among borrowers entering an IDR plan after becoming delinquent on their payments, most fail to recertify and, as a result, have their interest capitalize.[174]

Data from the 2003–04 Beginning Postsecondary Students Study (BPS), which tracked students from entry in 2003–04 through 2009 with an additional administrative match through 2015, sheds greater light on the distributional consequences of interest

capitalization and the forbearance events that are a source of capitalization. The statistics that follow all concern students who first entered college in 2003–04 and borrowed a Federal student loan at some point within 12 years of entry (as of 2015). Among those students, 43 percent had a larger amount of principal balance outstanding in 2015 compared to what they originally borrowed.

Among borrowers who did not consolidate their loans (e.g., the group for whom the growth in balance can be attributed to interest capitalization), 27 percent had a higher principal balance as seen in Table 4. Borrowers who are Black or African American, received a Pell Grant, and borrowers from low-income families are overrepresented in this group. Specifically, 52 percent of Black or African American borrowers had a higher principal balance compared to 22 percent of White borrowers. There are also differences based upon income, with 33 percent of Pell Grant recipients (versus 14 percent of non-recipients), and 34 percent of borrowers from families with income at or below the Federal poverty line at college entry (versus 22 percent of borrowers with income at least 2.5 times the Federal poverty line) having principal balances that exceed their original amount borrowed. Gaps also exist by attainment. Among borrowers who did not consolidate their loans, those who did not complete any degree or credential were 60 percent more likely to see their principal balance grow than bachelor's degree recipients.[175]

While the BPS data cannot break down the exact sources of interest capitalization, this analysis indicates that borrowers in the groups most likely to experience capitalization also are more likely to experience periods in forbearance, which is one cause of interest capitalization. Nearly 80 percent of Black or African American student loan borrowers in the BPS sample had a forbearance at some point within 12 years of first enrollment as seen in Table 4 below. Among American Indian or Alaska Native or Hispanic or Latino borrowers, the rates of forbearance usage were 64 percent and 59 percent respectively. By contrast, about half of white students used a forbearance.[176]

The results are similar by Pell Grant receipt and family income at college entry. Nearly two-thirds of Pell Grant

---

[172] Report by the FSA Ombudsman, in Federal Student Aid. (2019). *Annual Report FY 2019. https://www2.ed.gov/about/reports/annual/2019report/fsa-report.pdf.*

[173] Delisle, J. & Holt, A. (2015, March). *Why student loans are different: Findings from six focus groups of student loan borrowers.* New America Foundation. Retrieved from: *https://files.eric.ed.gov/fulltext/ED558774.pdf;* Pew Charitable Trusts (2020, May). Borrowers Discuss the Challenges of Student Loan Repayment. *https://www.pewtrusts.org/-/media/assets/2020/05/studentloan_focusgroup_report.pdf.*

[174] Herbst, D. (forthcoming). "The Impact of Income-Driven Repayment on Student Borrower Outcomes." *American Economic Journal: Applied Economics.* Retrieved from: *https://djh1202.github.io/website/IDR.pdf.*

[175] Department analysis of the 2004/2009 Beginning Postsecondary Students Study, estimated via PowerStats (table reference: qobjsb).

[176] Ibid.

recipients who also borrowed had a forbearance at some point compared to just 40 percent of non-Pell students. Among borrowers from families with income at or below the Federal poverty line in 2003–04, 64 percent had a forbearance at some point compared with 46 percent of borrowers from families with income at least 2.5 times the Federal poverty line at college entry. Finally, 62 percent of borrowers who did not complete a degree or credential had a forbearance, compared with 46 percent of those who earned a bachelor's degree.

Data from the same study also show that the groups of borrowers that are more likely to have had a forbearance also had more total forbearances within 12 years of entering college. On average, Black or African American borrowers who had at least one forbearance had nearly six forbearances compared to four for white borrowers as seen in Table 4. Similarly, borrowers who received a Pell Grant and had a forbearance had an average of nearly five forbearances, compared to just over three for non-Pell students.[177] This means borrowers in these groups were subject to more capitalizing events than their peers.

**BILLING CODE 4000–01–P**

---

[177] Ibid.

**Table 4—Principal Balance Growth and Forbearance Usage Among 2003–04 College Entrants Who Borrowed**

| Borrower type | Share of borrowers whose principal balance exceeds original amount borrowed within 12 years of entry (among those who did not consolidate) | Share of borrowers who had a forbearance at any time within 12 years of entry | Average number of forbearances among borrowers who ever had a forbearance within 12 years of entry |
|---|---|---|---|
| Race/Ethnicity | | | |
| All | 27% | 56% | 4.5 |
| Black or African American | 52% | 79% | 5.7 |
| White | 22% | 50% | 4.0 |
| Hispanic or Latino | 25% | 59% | 4.5 |
| American Indian or Alaska Native | *** | 64% | 3.1 |
| Asian or Native Hawaiian/ other Pacific Islander | 13% | 39% | 3.0 |
| Pell Grant Receipt | | | |
| Received a Pell Grant | 33% | 64% | 4.8 |
| Never received a Pell Grant | 14% | 41% | 3.4 |
| Family Income | | | |
| Family income at or below 100% FPL in 2003-04 | 34% | 64% | 5.0 |
| Family income 101 – 250% FPL in 2003-04 | 31% | 63% | 4.7 |
| Family income above 250% FPL in 2003-04 | 22% | 48% | 3.9 |
| Attainment Status | | | |
| No degree or credential as of 2009 | 31% | 62% | 4.8 |
| Earned undergraduate certificate or associate degree as of 2009 | 30% | 61% | 4.6 |
| Earned bachelor's degree as of 2009 | 19% | 46% | 3.8 |

*** Reporting standards not met
Source: Beginning Postsecondary Students Study, estimated via PowerStats.

App.435

Capitalizing events present a significant burden to borrowers as they see their balances quickly rise with interest capitalization that is compounded over time. The events described in the table below are circumstances in which the final regulations eliminate interest capitalization.

| Table 5 Capitalization Events Being Eliminated |
| --- |
| Borrower who is repaying under the PAYE plan fails to recertify income, or chooses to leave the plan |
| Borrower who is repaying under the REPAYE plan leaves the plan |
| Negative amortization under the alternative repayment plan or the ICR plan |
| Exiting forbearance |
| Entering repayment for the first time |
| Default |
| Repaying under the alternative repayment plan |
| No longer has a partial financial hardship under the PAYE repayment plan |

BILLING CODE 4000-01-C

*Costs of the Regulatory Changes:*

As detailed in the Net Budget Impact section, the changes to interest rate capitalization are expected to reduce transfers from affected borrowers to the Federal government as their obligation to repay loans is lessened by the removal of capitalizing events. We estimate this transfer to have an annualized net budget impact of $1.29 billion and $1.26 billion at 7 percent and 3 percent discount rate, respectively. The main effects associated with the regulations represent a transfer from the Federal government to the eligible borrower, primarily forgone revenue from payments on the higher balance and resulting increase in interest due to elimination the capitalizing events listed above. These final regulations will also create some administrative costs for the Department, which will have to compensate servicers for the cost of changes to their systems to remove capitalizing events. More details on budgetary effects are provided in the Net Budget Impact Section.

*Benefits of the Regulatory Changes:*

The Department anticipates that some borrowers may see the lack of capitalizing events for borrowers exiting certain IDR plans as enabling them to switch out of IDR and instead enroll in a Standard or other repayment plan. For some borrowers, this could mean that they pay less on either a monthly basis or over the life of the loan (*e.g.,* if they exit an IDR plan and enter an Extended or Graduated repayment plan with lower monthly payments).

The lack of capitalizing events can also have broader societal benefits by reducing debt burdens for groups that may be most affected by interest capitalization—borrowers from low-income families, Black borrowers, and borrowers who do not complete a college credential.[178]

4.5   Total and Permanent Disability Discharges

The Department is committed to simplifying the Total and Permanent Disability (TPD) discharge process for eligible borrowers. In addition to allowing for automatic discharges when a borrower is identified through a data match with the Social Security Administration (SSA), which was announced in summer 2021, the Department is also finalizing these regulations for TPD to ensure it provides relief to eligible borrowers uniformly across its loan programs, including Perkins, FFEL, and Direct Loans.

These final regulations expand the circumstances in which borrowers can qualify for TPD discharges based on a finding of disability by SSA. Currently regulations only allow borrowers to qualify for a discharge if SSA has designated the borrower's case as Medical Improvement Not Expected (MINE). In this status, an individual's disability status is reviewed at 5 to 7 years, which fits the requirement in the HEA that a borrower have a disability that is expected to result in death or that has persisted or is expected to persist

for at least 60 consecutive months while the borrower does not engage in gainful employment. These final regulations add the following additional circumstances, when supported by appropriate data or documentation from SSA: (1) the borrower qualifies for Social Security Disability Insurance (SSDI) benefits or Supplemental Security Income (SSI) based on a Compassionate Allowance (applied where the applicant has an impairment that significantly affects their ability to function and meets SSA's definition of disability based on minimal, but sufficient, objective evidence; (2) SSA has designated the borrower's case as Medical Improvement Possible (MIP), (3) the borrower had a qualifying circumstance and has since begun to receive SSA retirement benefits; and (4) the borrower has an established onset date for SSDI or SSI that is at least 5 years prior to the TPD application or has been receiving SSDI benefits or SSI based on disability for at least 5 years prior to the TPD application. More borrowers will be eligible for TPD discharges based on a finding of disability by SSA with the addition of these categories.

These final regulations also eliminate the post-discharge income monitoring period. Currently, borrowers must supply their income information annually through a 3-year post-discharge monitoring period to ensure that they continue to meet the criteria for the program. If borrowers do not respond to these requests, their loans

---

[178] Department analysis of the 2004/2009 Beginning Postsecondary Students Study, estimated via PowerStats (table reference: ivbztb and qobjsb).

are reinstated, regardless of whether the borrowers' earnings are above set thresholds. The Department is concerned that high numbers of borrowers have their loans reinstated not because they fail to meet the criteria but simply because they fail to submit the required paperwork. The Government Accountability Office's (GAO) 2016 report on Social Security offsets reported that more than 61,000 loans discharged through TPD, totaling more than $1.1 billion, were reinstated in fiscal year 2015 alone; and that 98 percent of those were reinstated because the borrower did not provide the requisite information for the monitoring period.[179] Meanwhile, an analysis conducted by the Department using Internal Revenue Service (IRS) data suggests that 92 percent of these borrowers did not exceed the earnings criteria required to retain their eligibility.

These final regulations streamline the process for applying for a TPD discharge where automation is not feasible. These final regulations amend the TPD regulations to expand allowable documentation that can be submitted as evidence of a qualifying disability status, including the current practice of accepting a Benefit Planning Query Handbook. We note that while this change will clarify an option that already exists for borrowers, the Department's hope is that the added categories of disability determinations will reduce the need for borrowers to rely upon a Benefit Planning Query Handbook in particular, which comes with a fee and may not always have all the necessary information within it. The final rule also expands the list of medical professionals eligible to certify an individual's total and permanent disability to include nurse practitioners, physician assistants, and certified psychologists licensed at independent practice level by a State.

*Costs of the Regulatory Changes:*

As detailed in the Net Budget Impact section, the changes to total and permanent disability are expected to reduce transfers from affected borrowers to the Federal government as their obligation to repay loans is discharged. We estimate this transfer to have an annualized net budget impact of $1.5 billion and $1.4 billion at 7 percent and 3 percent discount rate, respectively.

As a result of expanding the SSA categories that qualify for TPD discharges, the Department estimates increased costs to the taxpayer in the form of transfers to the additional borrowers who will be eligible for, and receive, TPD discharges.

Because more borrowers will be able to retain their discharges and not see their loans reinstated, the Department also anticipates that this change will increase costs to taxpayers in the form of transfers in direct benefits to those borrowers.

These final regulations expand allowable documentation and the list of certifying medical professionals are expected to modestly increase the amounts discharged through TPD through transfers to affected borrowers, as more borrowers overcome these barriers and apply for discharges.

*Benefits of the Regulatory Changes:*

The Department believes that many more borrowers will be eligible for TPD discharges with the addition of SSA categories. The Department intends to update the data match with SSA, which if successful, could mean that borrowers who previously had to apply for a discharge through the physician's certification process would be identified through the match with SSA. Borrowers who fall into the MIP category currently may be applying under the physician's certification process, but the Department intends to try and capture some of these borrowers if we can successfully update the data match with SSA.

Eliminating the post-discharge income monitoring period will also ensure consistency between borrowers with an SSA determination of disability status and those with a determination by the Department of Veterans Affairs (VA). Total and permanent disability discharges based on determinations by the VA are not subject to a post-discharge income monitoring period (though some veterans may apply for or receive a TPD discharge based on an SSA determination instead). The Department believes this change will reduce the burden that borrowers with a total and permanent disability face in retaining their discharge, as the time and effort involved in providing income information during the monitoring process will be eliminated.

The Department also believes that expanding allowable documentation and the list of certifying medical professionals will increase transfers to borrowers through discharges by lowering administrative burdens that borrowers face, including in reducing the costs that borrowers face in obtaining the necessary documentation of their disability.

### 4.6 Closed School Discharges

These final regulations improve access to closed school loan discharges for borrowers who are unable to complete their programs due to the closure of their institution. While there are many closures that occur in an orderly fashion with advance notice, the majority of students affected by closures in the last several years were mid-program and unable to complete their program at the college where they started.

Through these final regulations, the Department aims to expand eligibility for closed school discharges. In 2016, the Department issued regulations that provided automatic closed school discharges to borrowers who were eligible for a closed school discharge but did not apply for one and who did not enroll elsewhere within 3 years of the institution's closure.[180] A 2021 GAO report on college closures found that 43 percent of those eligible for a CSD had not re-enrolled 3 years later. GAO's data also found that 52 percent of the borrowers who received an automatic discharge had defaulted, while another 21 percent had been more than 90 days late at some point. Given this, these final regulations implement the automatic process for borrowers. These final regulations provide such automatic discharges 1 year after closure, which will significantly benefit affected borrowers.

Borrowers who left a school shortly before it closed can also receive a closed school discharge. However, the discharge windows have not been consistent across years for these borrowers. Loans made prior to July 1, 2020, were generally subject to a 120-day window, while borrowers with loans made after that date were subject to a 180-day window. These final regulations standardize the window, making it 180 days for all borrowers.

The Secretary can also extend this 180-day window under exceptional circumstances. However, the current non-exhaustive list does not include many events that may reasonably be associated with a closure, such as the accreditor issuing a show cause order. Additionally, the 2019 regulations removed items that were included in prior regulations, such as "a finding by a State or Federal government agency that the school violated State or Federal law." [181] These regulations expand this

---

[179] Government Accountability Office. (2016). "Social Security Offsets: Improvements to Program Design Could Better Assist Older Student Loan Borrowers with Obtaining Permitted Relief." (GAO Publication No. GAO–17–45.) Washington, DC: U.S. Government Printing Office. Retrieved from *https://www.gao.gov/products/gao-17-45.*

[180] 81 FR at 75926.

[181] 84 FR at 49788.

list to include this and several other items.

Finally, these final regulations provide clearer rules for when a borrower who transfers to another program could still receive an automatic closed school discharge. The past version of automatic closed school discharges required borrowers to apply for the discharge if they enrolled in another institution within 3 years of their original school's closure date. This is regardless of whether the new school they enrolled in accepted any credits or if the borrower finished. While a borrower who transferred but did not finish the program could apply for a closed school discharge, data from GAO show that very few of these borrowers did so. Excluding these individuals from the automatic closed school discharge in effect made the borrower's choice to continue their education

needlessly high stakes. These final regulations address these concerns by stating that a borrower maintains access to an automatic discharge as long as they do not complete the program through a continuation of the program at another branch or location of their school or through an approved teach-out. Borrowers who accept but do not complete a continuation of the program or a teach-out agreement would receive a discharge 1 year after their last date of attendance at the other branch or location or in the teach-out.

*Costs of the Regulatory Changes:*
As detailed in the Net Budget Impact section, the changes to closed school discharge are expected to reduce transfers from affected borrowers to the Federal government as their obligation to repay loans is discharged. We estimate this transfer to have an annualized net budget impact of $758 million and $693 million at 7 percent

and 3 percent discount rate, respectively. The Department will work to recover from institutions the amounts that the Secretary discharges and to leverage the processes already in place at § 668, part H. Based on historical closed school discharge data, the average discharge amount at the institutional level was $2.4 million based on discharge amounts from 573 closed institutions. Based on the same data, the majority of closed school discharge loan amounts (88.5 percent), were from closed proprietary schools. Table 6 illustrates the historical average closed school discharge amounts by institution type from 1991 through early April 2022, which is a good estimate of the discharge costs per loan by institution type for future closed school loan discharges.

**Table 6—Closed School Discharge Amounts by Institution Group**

| Institution Group | Average Discharge Amount | Sum of Closed School Discharges | % of Total Closed School Discharges |
|---|---|---|---|
| Private 2 to 3 Years | $2,876 | $5,771,862 | 0.41 |
| Private 4 Years or More | $5,030 | $106,347,003 | 7.60 |
| Private Less Than 2 Years | $2,610 | $1,461,896 | 0.10 |
| Proprietary 2 to 3 Years | $3,265 | $387,352,052 | 27.68 |
| Proprietary 4 Years or More | $5,074 | $823,679,386 | 58.85 |
| Proprietary Less Than 2 Years | $3,002 | $74,336,389 | 5.31 |
| Public 4 Years or More | $3,258 | $570,211 | 0.04 |
| Public Less Than 2 Years | $3,692 | $116,264 | 0.01 |

The Department will also incur costs associated with the closed school discharges. These costs will represent a transfer of benefits between the Federal government and the borrower. The Department will have to discharge the affected loans prior to trying to recover the funds from the institutions in order to provide a timely discharge for the borrower. Ultimately, the size of the transfer from the Department to borrowers would be the difference in funds between the discharge amount and the recovery amount from the institution. The Department will also incur administrative costs associated with the process of recovering funds

from closed institutions, especially in cases where the institutions may be facing litigation, such as due to bankruptcy or legal violations. This represents net new costs to the Department.

*Benefits of the Regulatory Changes:*
Automatic loan discharges will significantly benefit affected borrowers who are eligible for a discharge. In particular, after entering repayment, affected borrowers may receive a discharge early enough to avoid default on their loans. The Department will also face a reduced administrative burden due to the reduced staff time required to review applications for borrowers who

meet the eligibility criteria for a closed school discharge.

Lower-income students are also significantly more likely to benefit from closed school discharges. Of the more than 294,000 closed school discharges provided either through an application or automatically, 77 percent went to borrowers who also received a Pell Grant.[182] A closed school discharge will be particularly important for a Pell Grant recipient because it will also afford an opportunity to reset their Pell

---

[182] Analysis of data from the National Student Loan Data System, early October 2022. Data reflect all discharges coded as closed school discharges in the system.

Grant lifetime eligibility. This is critical given that these borrowers are likely to lose credits if they attempt to transfer to another program.

Regarding standardizing the closed school discharge window, the Department believes this will modestly increase eligibility for the discharge for some borrowers, though application rates for closed school discharge tend to be relatively low and are not likely to increase significantly. The Department is also expanding the non-exhaustive list of exceptional circumstances required for the Secretary to use their authority to extend the 180-day window. In certain cases, this will increase eligibility for closed school discharges, potentially by several years. However, this authority will be employed on a case-by-case basis and thus the overall impact is expected to be modest. In addition, automatic closed school discharge occurs 1 year after the school closure date for borrowers who do not take a teach-out or a continuation of the program at a branch or location of the school.

The Department believes that by removing the "comparable program" requirement and instead providing discharges for all borrowers unless they accept and complete an approved teach-out or finish a continuation of the program at another branch or location of the school will encourage borrowers to continue their education because they will still be able to keep their discharge if the teach-out or continuation option does not work for them. It also means a borrower who continues seeking higher education but loses all or most progress toward their degree will not have to worry about whether they will receive relief because they will receive an automatic discharge.

This approach will also encourage institutions to manage closures more carefully. In particular, institutions will have a stronger incentive to make sure borrowers have access to high-quality and affordable teach-out or continuation options; otherwise, the institution that is closing will face larger liabilities associated with closed school discharges. With higher-quality and affordable teach-outs or continuation options students will benefit from additional education. A large number of studies estimating the causal effect of college education on earnings suggest that each additional year of college generates annual earnings gains in the range of 7–15 percent.[183] Moreover,

education generates social benefits in the form of productivity spillovers, reduced crime, and increased civic participation.[184]

### 4.7 Pre-Dispute Arbitration

These final regulations limit pre-dispute arbitration and class action waivers in institutions' enrollment agreements to ensure borrowers have access to fair processes and to provide insight and evidence to the Department that may be needed to adjudicate BD claims. Mandatory pre-dispute arbitration and class action waivers may allow institutions to minimize financial risk associated with wrongdoing and instead may shift the risk of wrongdoing to taxpayers and the Federal government through subsequent BD discharges. While the Department included a similar provision in its 2016 BD regulations, the prohibition was rescinded by the 2019 regulations.

Borrowers also may not understand the implications of agreeing to a mandatory pre-dispute arbitration requirement or a class action waiver and what that means for future attempts to seek relief. In a study on arbitration clauses, legal researchers surveyed a random sample of consumers and concluded respondents generally lacked an understanding about the terms of the arbitration agreement and what that meant for their ability to seek relief in court. These researchers expressed concern about whether the consent consumers provide when they enter into a contract that contains an arbitration clause is knowing consent, and therefore valid.[185]

By prohibiting Direct Loan-participating institutions from using certain restrictive contractual provisions regarding dispute resolution and requiring notification and disclosure regarding their use of arbitration, schools will be prevented from keeping complaint information hidden from borrowers facing potential BD issues faced by their borrowers. Keeping complaint and arbitration information hidden from public view hinders the

Department's ability to investigate patterns of student complaints.

In addition, borrowers' ability to pursue individual and class-action litigation will make it difficult for schools to hide potentially deceptive practices from current or prospective students and will allow students who have been harmed by an institution to sue for damages and recoup their financial losses. Providing a litigation option could also mitigate the potential conflict of interest between the arbitrators and the institutions that hire them, leading to fairer outcomes for students. Taxpayer dollars will be better protected by ensuring that grievances from enrollees in problematic schools could be publicly aired through the court system.

The Department notes that the impact of these changes will be largely limited to the private for-profit sector. In a 2016 study by an independent think tank, researchers looked at enrollment contracts of more than 270 institutions across the country. None of the public colleges surveyed and only one private nonprofit college required its students to agree to arbitration as a condition of enrollment. Among private for-profit colleges, the researchers found significant differences depending on whether the institution participated in the Federal student financial aid programs. A majority (93 of the 158) private for-profit colleges that participate in the Federal aid programs used a forced arbitration clause compared to just one of the 49 that do not participate in the aid programs.[186]

*Costs of the Regulatory Changes:*
The costs associated with these final regulations would be affected by whether institutions are less likely to engage in behavior that could lead to an approved BD claim as a result of not using mandatory pre-dispute arbitration clauses or class action waivers. If institutions that engage in conduct that could lead to an approved BD claim do not change their behavior, then there could be a number of costs related to more grievances ending up in court. This will include the cost to students of seeking judicial intervention, though such costs may be offset if their claims in court are successful. Costs can also increase for institutions, as they tend to incur higher legal fees during litigation. Institutions will not only face higher administrative costs, but institutions are also likely to face higher number of settlements and the costs associated

[183] Oreopoulos, Philip and Uros Petronijevic (2013). "Who Benefits from College? A Review of Research on the Returns to Higher Education," The Future of Children, Vol. 23, No. 1, pp. 41–65.

[184] Oreopoulos, P., & Salvanes, K.G. (2011). Priceless: The nonpecuniary benefits of schooling. *Journal of Economic perspectives,* 25(1), 159–84. Moretti, E. (2004). Human capital externalities in cities. In *Handbook of regional and urban economics* (Vol. 4, pp. 2243–2291). Elsevier. Moretti, E. (2004). Estimating the social return to higher education: evidence from longitudinal and repeated cross-sectional data. *Journal of econometrics,* 121(1–2), 175–212.

[185] Sovern, J., Greenberg, E.E., Kirgis, P.F. and Liu, Y., 'Whimsy Little Contracts' with Unexpected Consequences: An Empirical Analysis of Consumer Understanding of Arbitration Agreements (February 19, 2015). 75 Maryland Law Review 1 (2015), St. John's Legal Studies Research Paper No. 14–0009, *http://dx.doi.org/10.2139/ssrn.2516432.*

[186] Habash, T., and Shireman, R., "How College Enrollment Contracts Limit Students' Rights." *The Century Foundation* (Apr. 28, 2018), *https://tcf.org/content/report/how-college-enrollment-contracts-limit-students-rights/.*

with them, as it is expected that the students will be able to reach more favorable decisions in court than during arbitration. These costs will, however, decrease if institutions currently engaging in conduct that could lead to an approved BD claim cease such conduct as a result of this change. These external factors do not represent any additional costs for the Department.

In addition to costs in the form of transfers to borrowers and administrative burden for the Department, there may be an increase in the time it takes to resolve disputes through non-arbitration means, as litigation proceedings rely on more detailed discovery and presentation of evidence than arbitration. Finally, bringing additional cases to court that have generally been resolved through arbitration may create a burden on the courts, leading to longer litigation time and increased costs for students and institutions.

*Benefits of the Regulatory Changes:*

Borrowers will see benefits due to the limitation on arbitration clauses and class-action waivers. Research indicates that the rate at which consumers receive favorable decisions in arbitration is quite low and the amounts they secure when they do are very small. Only 9 percent of disputes that go to arbitration end with relief for the consumer.[187] When a 2015 CFPB report looked at cases from one of the major arbitration companies it found that consumers won just over $172,000 in damages and $189,000 in debt forbearance across more than 1,800 disputes in six different financial markets. By contrast, the CFPB's analysis of individual cases brought in Federal court for all but one of these markets found that consumers were awarded just under $1 million in cases where the judge issued a decision. It is difficult to directly compare the success rate for an individual in arbitration compared to those who take their claims to court because the overwhelming majority of cases end in settlements in which the results are not easily ascertainable. The same CFPB study referenced above found that about 50 percent of the more than 1,200 individual cases filed in Federal court that were analyzed resulted in settlement. But the analysis could not determine what share of those

settlements were favorable to borrowers.[188]

Given that pre-arbitration agreements are prevalent in for-profit institutions' enrollment agreements, these benefits will have a greater impact on Black students, who are more likely to attend for-profit institutions compared to other educational institutions.[189] The prohibition will also support these students in filing BD claims where warranted.

5. Net Budget Impacts

These final regulations are estimated to have a net Federal budget impact in costs over the affected loan cohorts of $71.8 billion, consisting of a modification of $19.4 billion for loan cohorts through 2022 and estimated costs of $52.4 billion for loan cohorts 2023 to 2032. A cohort reflects all loans originated in a given fiscal year. Consistent with the requirements of the Credit Reform Act of 1990, budget cost estimates for the student loan programs reflect the estimated net present value of all future non-administrative Federal costs associated with a cohort of loans. Changes to the cost estimates for the final regulations involve an updated baseline that includes modifications for the limited PSLF waiver, the IDR account adjustment, the payment pause extension to December 2022, and the August 2022 announcement that the Department will discharge up to $20,000 in Federal student loans for borrowers who make under $125,000 as an individual or $250,000 as a family. Any additional changes are described in the relevant section for the various provisions.

The provisions most responsible for the costs of the final regulations are interest capitalization, PSLF, and TPD discharges. The specific costs for each provision are described in the following subsections covering the relevant topics.

5.1 Borrower Defense

As noted in this preamble, the regulatory provisions related to BD have undergone revisions starting in 2016 and then again in 2019 and the patterns of claim submission and processing have not reached a steady level to serve as a clear basis for estimating future

claims. Additional claims are expected from existing loan cohorts, and the level and timing of claims from older cohorts is not likely to be indicative of claims for future cohorts, because BD was not an active area of loan discharges during the early years in repayment of those older cohorts. In addition, the institutions that to date have been among the largest sources of BD claims have been closed for many years. Therefore, we are using a revised version of the approach used to estimate the costs of BD for the 2016 and subsequent regulations to generate estimates for the BD provisions.

The Department's estimates were informed by looking at data from the borrower defense group within FSA about the number of claims received, the loan volumes associated with pending and approved claims, the type of school attended by the borrowers with submitted claims, and the years borrowers reported that they attended. We used this to establish assumptions about the source of BD claims and general cohorts associated with them. We then used data pulled from the National Student Loan Data System (NSLDS) that are used in the scoring baseline and applied the assumptions described in this net budget impact analysis to generate the budget impact estimate.

As a reminder, these estimated costs reflect costs resulting from this regulation relative to baseline, not the overall cost of BD discharges. The estimated cost of the BD changes is a modification to cohorts through 2022 of $4.2 billion and a cost of $3.0 billion for cohorts 2023–2032. Where possible, we adjusted the assumptions made about school conduct, borrowers' chances of making a successful claim, and recovery rates to reflect information from pending claims.

More than three-quarters of BD claims are from borrowers who attended proprietary institutions, which does not include some borrowers who attended proprietary institutions that are now categorized as private nonprofit institutions. Just 5 percent of BD claims are from borrowers who attended public institutions. These amounts include institutions that have a significant number of claims and, therefore, may be more likely to have a group claim process applied to them. This is reflected in the school conduct assumption in Table 7.

While there are many factors and details that would determine the cost of the final regulations, ultimately a BD claim entered into the student loan model (SLM) by risk group, loan type, and cohort will result in a reduced

[187] Shierholz, H. "Correcting the Record: Consumers Fare Better under Class Actions than Arbitration." *Economic Policy Institute*, 1 Aug. 2017, *https://www.epi.org/publication/correcting-the-record-consumers-fare-better-under-class-actions-than-arbitration/*.

[188] *Arbitration Study: Report to Congress, pursuant to Dodd-Frank Wall Street Reform and Consumer Protection Act § 1028(a).* Consumer Financial Protection Bureau. (2015, March). Retrieved from *https://files.consumerfinance.gov/f/201503_cfpb_arbitration-study-report-to-congress-2015.pdf*.

[189] Urban Institute. (2020, June). Racial and Ethnic Representation in Postsecondary Education. Tomás Monarrez, Kelia Washington. *https://www.urban.org/research/publication/racial-and-ethnic-representation-postsecondary-education*.

stream of cash flows compared to what the Department would have expected from a particular cohort, risk group, and loan type. The net present value of the difference in those cashflow streams generates the expected cost of the final regulations.

In order to generate an expected level of claims for processing in the SLM, the Department used President's Budget 2023 (PB2023) loan volume estimates to identify the maximum potential exposure to BD claims for each cohort, loan type, and sector. For the final regulations, we updated this baseline to include modifications for the limited PSLF waiver announced in October 2021, adjustments to fix the count of qualifying payments on IDR announced in April 2022, the extension of the payment pause to December 2022, and the announcement of a one-time action to forgive up to $20,000 for Federal student loan borrowers. Including these additional items, particularly the debt cancellation costs, significantly reduces the net budget impact by lowering the scheduled principal and interest payments expected in the baseline. Other changes are described in the description of the budget estimates for each area. The Department expects that many borrowers who already have loans but have not yet filed a BD claim would have all or a significant portion of their loan balances eliminated by the broad-based forgiveness. For instance, the Department has noted that tens of millions of borrowers will be eligible for loan forgiveness, with significant numbers of those borrowers having all or at least half their balances eliminated. However, the broad-based forgiveness will not affect future loan volume because it is only eligible for currently outstanding debts. Other factors that would affect costs are the rate of consolidation from the FFEL program, the percentage of claims that go through a group process, the potential deterrent effect of claims on school practices, investigative activities of State authorities, increased borrower awareness of BD, and borrower eligibility for other discharges, especially closed school discharges.

As costs are estimated against a specific baseline, it is important to note that the President's Budget for 2023 assumed a higher level of BD claims based more on the 2016 assumptions [190] than the 2019 regulation assumptions.[191] The Department assumed a higher level of BD claims because claims processing and other announcements suggested that the

number of successful claims would be increasing. Some of the costs that could have been attributed to the final regulations are already in the baseline as a result of this modeling change. To provide some information about this factor, the Department ran the President's Budget Fiscal Year 2023 (PB23) baseline with no allowance for approved BD claims and also with the 2019 regulatory assumptions applied. Running a scenario in the NPRM with no allowance for approved BD claims and no inclusion of later policy announcements like broad-based debt relief had a net budget impact of −$8.6 billion. Using the reduced adjustment associated with the 2019 regulations resulted in a net budget impact of −$8.0 billion in savings compared to the baseline that incorporates the additional policy announcements described above. The loan volumes and assumptions relied on to generate net borrower defense claims are described below and presented in Table 7. The Department only applied assumptions to non-consolidated Direct Loan volume to avoid applying a discharge to both a borrower's non-consolidated and consolidated loan volume. The effect of the regulations on consolidated loans thus reflects assumptions about FFEL volumes that are consolidated in Direct Loans. The FFEL claims generated were applied to the Death, Disability, and Bankruptcy (DDB) rates for Direct Loan consolidations. The PB23 volumes are summarized in Table 7 by loan type and institutional control. A more detailed version of the loan volumes will be available on the Department's Negotiated Rulemaking website.[192]

The model to estimate BD claims under the final regulations relies upon the following factors:

Conduct Percent, which represents the share of loan volume estimated to be affected by institutional behavior resulting in a defense to repayment application. This percentage varies both by risk group (e.g., 2-year proprietary, graduate borrowers, and 4-year nonprofit or public institutions). It also varies by cohort year, which reflects that the Department has observed decreases in enrollment, including from closures, at institutions with significant numbers of BD applications as well as estimated deterrent effects of the rule. The conduct percent thus ranges from a high of 18 percent of loan volume at proprietary colleges in the 2011 to 2016 cohorts to a low of 1 percent at public and private nonprofit institutions in the pre-2000 cohorts. These figures reflect

the trends we have seen in the source of filed claims, whereby more than three-quarters of claims are associated with proprietary institutions and only 5 percent are from public institutions. The graduate risk group is the most complicated because it includes graduate borrowers from all sectors and because of how it is constructed it cannot be decomposed into individual types of institutions. The spike in conduct percentages in the 2011–2016 period also reflects that the Department has received significantly more claims from borrowers who attended during this period, which is also when many of the proprietary institutions that generated the largest number of claims were at their enrollment peaks. Several of those institutions, such as ITT Technical Institute and Corinthian Colleges, closed by the end of that period. Many others saw significant enrollment decreases or closed other chains or brands. As a result, we have significantly fewer claims associated with loans issued after 2017.

Group Process percent, which is the share of affected loan volume we expect to be subject to a group claim.

Claim Balance Adjustment Factor, which captures the potential change in borrowers' balances from origination to the time of their discharge and was added because this regulation addresses claims from older cohorts, not just future loan cohorts, so this factor could be more significant.

Borrower Percent, which is the percent of loan volume associated with approved defense to repayment applications; and

Recovery Percent, which estimates the percent of gross claims for which funds are recovered from institutions, with both of these varying by inclusion in a group process or not.

To generate gross claims volume (gc), loan volumes (lv) by risk group were multiplied by the Conduct Percent (cp), Group Process percent (gpp), the Claim Balance Adjustment factor (cbf), and the Borrower Percent for groups and individual claims (bp_g or bp_i). To generate net claims volume (nc) processed in the Student Loan Model, gross claims were then multiplied by the Recovery Percent. That is, $gc = gc\_g + gc\_i$ when $gc\_g = (lv * cp * cbf * gc^* bp\_g)$ and $gc\_i = (lv * cp * cbf * (1 - gc)^* bp\_i)$ and $nc = nc\_g + nc\_i$ where $nc\_g = gc\_g - (gc\_g * rp\_g)$ and $nc\_i = gc\_i - (gc\_i * rp\_i)$. To put this another way, we first calculated separate estimates of gross claims volume for group and individual claims. We calculated the estimate for each of those amounts by taking the amount of loan volume in each risk group and

[190] 81 FR at 76057.
[191] 84 FR at 49894.

[192] https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/index.html.

multiplying it by the share of loan volume in that group expected to be associated with a BD claim (the conduct percent), adjustments for how balances might have changed from origination to discharge (the claim balance factor), and the estimate approval rate for claims. As a hypothetical example, if a risk group had $1 million in loan volume, no increase in balances between origination and discharge (a claim balance factor of 100%), 10 percent of balances associated with a BD claim and 50 percent of that amount was expected to

be approved, the gross claims amount would be $50,000 ($1 million * 100% * 10% * 50%). We then multiplied the gross claims amount by estimates of the share that we would recover (the net recovery rate) to estimate the net claims cost.

Additional discussion of these factors follows their presentation in Table 7, with the comparable values for the 2016 and 2019 BD regulations presented in Table 8. To allow for the 2016 and 2019 assumptions to be compared, we collapsed the 2-year and 4-year

distinction because the rates applied by institutional control were the same. The assumed levels of school conduct that would result in a potential BD claim remain fairly consistent across the regulations and anticipate some deterrent effect of the regulations. The assumed approval rate is a key driver in changing the net budget impact of the different borrower defense proposals.

BILLING CODE 4000–01–P

**Table 7—Assumptions for Primary BD Scenario** [193]

---

[193] The table above is a summary. The complete table is available at *www.regulations.gov* using the Docket ID number ED–2021–OPE–0077 and at *www2.ed.gov/policy/highered/reg/hearulemaking/2021/index.html.*

Summary of PB2023 Loan Volumes Used for Borrower Defense ($bns)

| Cohort | 2 Year Public/ Private Nonprofit | 4 Year Public / Private Nonprofit | Proprietary | Graduate | Consolidation | Grand Total |
|---|---|---|---|---|---|---|
| 1994 | $ 1.4 | $ 18.8 | $ 2.6 | $ 10.0 | $ – | $ 32.7 |
| 1995 | $ 2.2 | $ 24.8 | $ 4.1 | $ 13.2 | $ 0.7 | $ 45.1 |
| 1996 | $ 2.2 | $ 25.7 | $ 4.1 | $ 14.2 | $ 2.1 | $ 48.3 |
| 1997 | $ 2.4 | $ 28.2 | $ 4.4 | $ 15.7 | $ 2.9 | $ 53.6 |
| 1998 | $ 2.4 | $ 29.1 | $ 4.8 | $ 16.3 | $ 4.9 | $ 57.5 |
| 1999 | $ 2.3 | $ 28.9 | $ 5.5 | $ 17.0 | $ 16.1 | $ 69.8 |
| 2000 | $ 2.4 | $ 31.6 | $ 6.4 | $ 18.8 | $ 10.9 | $ 70.1 |
| 2001 | $ 2.7 | $ 33.3 | $ 7.6 | $ 20.1 | $ 15.7 | $ 79.3 |
| 2002 | $ 3.4 | $ 36.7 | $ 9.2 | $ 23.4 | $ 17.9 | $ 90.6 |
| 2003 | $ 4.3 | $ 41.8 | $ 11.1 | $ 27.4 | $ 13.4 | $ 98.1 |
| 2004 | $ 5.2 | $ 46.9 | $ 13.7 | $ 31.3 | $ 15.5 | $ 112.6 |
| 2005 | $ 5.8 | $ 50.6 | $ 15.6 | $ 34.2 | $ 31.7 | $ 137.9 |
| 2006 | $ 6.2 | $ 51.4 | $ 17.1 | $ 39.0 | $ 39.2 | $ 152.9 |
| 2007 | $ 7.0 | $ 53.7 | $ 18.9 | $ 45.7 | $ 7.1 | $ 132.3 |
| 2008 | $ 8.4 | $ 59.3 | $ 25.0 | $ 50.1 | $ 11.8 | $ 154.6 |
| 2009 | $ 11.5 | $ 69.1 | $ 34.4 | $ 56.4 | $ 25.3 | $ 196.8 |
| 2010 | $ 9.4 | $ 49.6 | $ 26.3 | $ 38.8 | $ 34.8 | $ 158.8 |
| 2011 | $ 8.2 | $ 48.2 | $ 17.8 | $ 36.5 | $ 48.4 | $ 159.1 |
| 2012 | $ 8.3 | $ 45.7 | $ 15.2 | $ 35.1 | $ 46.2 | $ 150.6 |
| 2013 | $ 7.7 | $ 45.0 | $ 13.6 | $ 34.4 | $ 53.8 | $ 154.6 |
| 2014 | $ 6.6 | $ 44.5 | $ 12.2 | $ 35.1 | $ 69.5 | $ 168.0 |
| 2015 | $ 5.6 | $ 43.3 | $ 10.7 | $ 34.8 | $ 92.7 | $ 187.2 |
| 2016 | $ 5.2 | $ 43.8 | $ 9.4 | $ 35.8 | $ 91.2 | $ 185.5 |
| 2017 | $ 4.6 | $ 42.8 | $ 8.2 | $ 36.6 | $ 97.5 | $ 189.8 |
| 2018 | $ 4.3 | $ 41.4 | $ 7.7 | $ 37.0 | $ 83.3 | $ 173.7 |
| 2019 | $ 4.0 | $ 40.7 | $ 7.5 | $ 37.7 | $ 79.8 | $ 169.8 |
| 2020 | $ 3.5 | $ 34.8 | $ 7.4 | $ 38.0 | $ 60.8 | $ 144.4 |
| 2021 | $ 3.0 | $ 33.9 | $ 7.6 | $ 38.5 | $ 43.3 | $ 126.4 |
| 2022 | $ 3.6 | $ 38.7 | $ 6.7 | $ 31.3 | $ 55.1 | $ 135.5 |
| 2023 | $ 3.6 | $ 39.1 | $ 6.5 | $ 31.3 | $ 59.2 | $ 139.7 |
| 2024 | $ 3.6 | $ 39.5 | $ 6.5 | $ 31.3 | $ 77.3 | $ 158.3 |
| 2025 | $ 3.6 | $ 39.9 | $ 6.5 | $ 31.5 | $ 79.7 | $ 161.3 |
| 2026 | $ 3.6 | $ 40.5 | $ 6.6 | $ 31.4 | $ 81.1 | $ 163.3 |
| 2027 | $ 3.7 | $ 40.9 | $ 6.6 | $ 31.6 | $ 82.0 | $ 164.8 |
| 2028 | $ 3.7 | $ 41.3 | $ 6.7 | $ 31.8 | $ 82.7 | $ 166.2 |
| 2029 | $ 3.7 | $ 41.7 | $ 6.7 | $ 31.8 | $ 83.2 | $ 167.1 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2030 | $ | 3.7 | $ | 42.2 | $ | 6.8 | $ | 32.1 | $ | 83.8 | $ | 168.5 |
| 2031 | $ | 3.8 | $ | 42.7 | $ | 6.8 | $ | 32.4 | $ | 84.3 | $ | 170.0 |
| 2032 | $ | 3.8 | $ | 43.2 | $ | 6.9 | $ | 32.7 | $ | 84.6 | $ | 171.2 |

### Conduct Percent (Percentage of loan volume related to BD claims)

| Cohort Range | 2-yr proprietary | 2-yr NFPT/Public | 4-yr Proprietary | 4-yr NPFT/Public | GRAD |
|---|---|---|---|---|---|
| pre-2000 | 5.0% | 1.0% | 5.0% | 1.0% | 1.6% |
| 2000-2005 | 8.0% | 1.5% | 8.0% | 1.5% | 3.2% |
| 2006-2010 | 12.0% | 1.7% | 12.0% | 1.7% | 4.1% |
| 2011-2016 | 16.0% | 2.0% | 16.0% | 2.0% | 4.1% |
| 2017-2022 | 14.0% | 1.5% | 14.0% | 1.5% | 3.4% |
| 2023-2028 | 9.0% | 1.3% | 9.0% | 1.3% | 2.6% |
| 2028+ | 7.0% | 1.1% | 7.0% | 1.1% | 2.1% |

### Percentage of BD volume from group claims

| Cohort Range | 2-yr proprietary | 2-yr NFPT/Public | 4-yr Proprietary | 4-yr NPFT/Public | GRAD |
|---|---|---|---|---|---|
| pre-2000 | 15.0% | 5.0% | 15.0% | 5.0% | 7.0% |
| 2000-2005 | 35.0% | 12.0% | 35.0% | 12.0% | 16.6% |
| 2006-2010 | 68.0% | 14.0% | 68.0% | 14.0% | 24.8% |
| 2011-2016 | 80.0% | 18.0% | 80.0% | 18.0% | 30.4% |
| 2017-2022 | 70.0% | 12.0% | 70.0% | 12.0% | 23.6% |
| 2023-2028 | 55.0% | 8.0% | 55.0% | 8.0% | 17.4% |
| 2028+ | 45.0% | 6.0% | 45.0% | 6.0% | 13.8% |

### Percentage of BD volume from individual claims

| **Cohort Range** | 2-yr proprietary | 2-yr NFPT/Public | 4-yr Proprietary | 4-yr NPFT/Public | GRAD |
|---|---|---|---|---|---|
| pre-2000 | 85.0% | 95.0% | 85.0% | 95.0% | 93.0% |
| 2000-2005 | 65.0% | 88.0% | 65.0% | 88.0% | 83.4% |
| 2006-2010 | 32.0% | 86.0% | 32.0% | 86.0% | 75.2% |
| 2011-2016 | 20.0% | 82.0% | 20.0% | 82.0% | 69.6% |
| 2017-2022 | 30.0% | 88.0% | 30.0% | 88.0% | 76.4% |
| 2023-2028 | 45.0% | 92.0% | 45.0% | 92.0% | 82.6% |
| 2028+ | 55.0% | 94.0% | 55.0% | 94.0% | 86.2% |

**66012    Federal Register** / Vol. 87, No. 210 / Tuesday, November 1, 2022 / Rules and Regulations

### Percentage of volume approved in group claims

| Cohort Range | 2-yr proprietary | 2-yr NFPT/Public | 4-yr Proprietary | 4-yr NFPT/Public | GRAD |
|---|---|---|---|---|---|
| pre-2000 | 21.3% | 12.8% | 21.3% | 12.8% | 17.0% |
| 2000-2005 | 55.3% | 42.5% | 55.3% | 42.5% | 51.0% |
| 2006-2010 | 59.5% | 42.5% | 59.5% | 42.5% | 51.0% |
| 2011-2016 | 63.8% | 42.5% | 63.8% | 42.5% | 51.0% |
| 2017-2022 | 63.8% | 42.5% | 63.8% | 42.5% | 51.0% |
| 2023-2028 | 63.8% | 51.0% | 63.8% | 51.0% | 55.3% |
| 2028+ | 63.8% | 51.0% | 63.8% | 51.0% | 55.3% |

### Percentage of volume approved in individual claims

| Cohort Range | 2-yr proprietary | 2-yr NFPT/Public | 4-yr Proprietary | 4-yr NFPT/Public | GRAD |
|---|---|---|---|---|---|
| pre-2000 | 4.3% | 1.7% | 4.3% | 1.7% | 3.4% |
| 2000-2005 | 6.8% | 1.7% | 6.8% | 1.7% | 5.1% |
| 2006-2010 | 10.2% | 4.3% | 10.2% | 4.3% | 6.8% |
| 2011-2016 | 10.2% | 4.3% | 10.2% | 4.3% | 8.5% |
| 2017-2022 | 10.2% | 6.8% | 10.2% | 6.8% | 8.5% |
| 2023-2028 | 10.2% | 6.8% | 10.2% | 6.8% | 8.5% |
| 2028+ | 10.2% | 6.8% | 10.2% | 6.8% | 8.5% |

### Recovery percentage on approved claims

| Group Claims | 2-yr proprietary | 2-yr NFPT/Public | 4-yr Proprietary | 4-yr NFPT/Public | GRAD |
|---|---|---|---|---|---|
| pre-2000 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 2000-2005 | 0.3% | 0.2% | 0.3% | 0.2% | 0.2% |
| 2006-2010 | 2.5% | 2.0% | 2.5% | 2.0% | 2.0% |
| 2011-2016 | 2.5% | 2.0% | 2.5% | 2.0% | 2.0% |
| 2017-2022 | 7.0% | 5.6% | 7.0% | 5.6% | 5.6% |
| 2023-2028 | 15.0% | 12.0% | 15.0% | 12.0% | 12.0% |
| 2028+ | 15.0% | 12.0% | 15.0% | 12.0% | 12.0% |

**Table 8—Assumptions for Primary BD Scenarios in 2016 and 2019 Regulations**

| Cohort | 2016 Regulation | | | 2019 Regulation | | |
|---|---|---|---|---|---|---|
| | Public | Private | Proprietary | Public | Private | Proprietary |
| Conduct Percent | | | | | | |
| 2017 | 3.0% | 3.0% | 20.0% | N/A | N/A | N/A |
| 2018 | 2.4% | 2.4% | 16.0% | N/A | N/A | N/A |
| 2019 | 2.0% | 2.0% | 13.6% | N/A | N/A | N/A |
| 2020 | 1.7% | 1.7% | 11.6% | 1.6% | 1.6% | 11.0% |
| 2021 | 1.5% | 1.5% | 9.8% | 1.4% | 1.4% | 9.3% |
| 2022 | 1.4% | 1.4% | 8.8% | 1.3% | 1.3% | 8.4% |
| 2023 | 1.3% | 1.3% | 8.4% | 1.2% | 1.2% | 8.9% |
| 2024 | 1.2% | 1.2% | 8.0% | 1.1% | 1.1% | 7.6% |
| 2025 | 1.2% | 1.2% | 7.8% | 1.1% | 1.1% | 7.4% |
| 2026 | 1.2% | 1.2% | 7.7% | 1.1% | 1.1% | 7.3% |
| 2027 | N/A | N/A | N/A | 1.1% | 1.1% | 7.3% |
| 2028 | N/A | N/A | N/A | 1.1% | 1.1% | 7.3% |
| 2029 | N/A | N/A | N/A | 1.1% | 1.1% | 7.3% |
| Allowable Applications Percent | | | | | | |
| All Cohorts | N/A | N/A | N/A | 70.0% | 70.0% | 70.0% |
| Borrower Percent | | | | | | |
| 2017 | 35.0% | 35.0% | 45.0% | N/A | N/A | N/A |
| 2018 | 36.8% | 36.8% | 47.3% | N/A | N/A | N/A |
| 2019 | 38.6% | 38.6% | 49.6% | N/A | N/A | N/A |
| 2020 | 42.4% | 42.4% | 54.6% | 3.3% | 3.3% | 4.95% |
| 2021 | 46.7% | 46.7% | 60.0% | 3.8% | 3.8% | 5.48% |
| 2022 | 50.0% | 50.0% | 63.0% | 4.1% | 4.1% | 5.93% |
| 2023 | 50.0% | 50.0% | 65.0% | 4.5% | 4.5% | 6.30% |
| 2024 | 50.0% | 50.0% | 65.0% | 4.8% | 4.8% | 6.75% |
| 2025 | 50.0% | 50.0% | 65.0% | 5.3% | 5.3% | 6.98% |
| 2026 | 50.0% | 50.0% | 65.0% | 5.3% | 5.3% | 7.50% |
| 2027 | N/A | N/A | N/A | 5.3% | 5.3% | 7.50% |
| 2028 | N/A | N/A | N/A | 5.3% | 5.3% | 7.50% |
| 2029 | N/A | N/A | N/A | 5.3% | 5.3% | 7.50% |
| Recovery Percent | | | | | | |
| 2017 | 75.0% | 23.8% | 23.8% | N/A | N/A | N/A |
| 2018 | 75.0% | 23.8% | 23.8% | N/A | N/A | N/A |
| 2019 | 75.0% | 26.2% | 26.2% | N/A | N/A | N/A |
| 2020 | 75.0% | 28.8% | 28.8% | 75.0% | 16.0% | 16.0% |
| 2021 | 75.0% | 31.7% | 31.7% | 75.0% | 20.0% | 20.0% |
| 2022 | 75.0% | 33.3% | 33.3% | 75.0% | 20.0% | 20.0% |
| 2023 | 75.0% | 34.9% | 34.9% | 75.0% | 20.0% | 20.0% |
| 2024 | 75.0% | 36.7% | 36.7% | 75.0% | 20.0% | 20.0% |
| 2025 | 75.0% | 37.4% | 37.4% | 75.0% | 20.0% | 20.0% |
| 2026 | 75.0% | 37.4% | 37.4% | 75.0% | 20.0% | 20.0% |
| 2027 | N/A | N/A | N/A | 75.0% | 20.0% | 20.0% |
| 2028 | N/A | N/A | N/A | 75.0% | 20.0% | 20.0% |
| 2029 | N/A | N/A | N/A | 75.0% | 20.0% | 20.0% |

BILLING CODE 4000–01–C

*Conduct Percent:*

As with previous estimates, the conduct percent reflects the fact that more than 75 percent of borrower defense claims have come from borrowers who attended proprietary institutions. This factor also captures the potential deterrent effect of the final regulations. As claims are processed and examples of conduct that results in claims become better known, we believe institutions will strive to avoid similar behavior. We also expect that the improvement or closing of some institutions that have significant findings against them, which should reduce the level of potential claims in future loan cohorts. The Department is already observing this phenomenon with existing BD claims. After peaking in 2010 at 2 million, enrollment in proprietary institutions has declined by nearly 50 percent, in part due to new regulation of the sector.[194] The Department has also received significantly fewer BD claims associated with enrollment during this period of decline. Similarly, we received significant numbers of BD claims associated with enrollment that occurred just after the Great Recession in the 2011 to 2016 cohorts. This also reflects the high point of postsecondary undergraduate enrollment nationally, particularly among proprietary institutions. The conduct percent table thus reflects the correlation between enrollment levels and volume associated with BD claims. The volumes start out very low in the pre-2000s period when the number of borrowers was significantly lower, and most borrowers will have already paid off those loans and thus cannot file a BD claim. We then adjust the conduct percent upward with enrollment growth such that there are increases in each five-year period up to 2011–2016, with that period serving as the high point. The Department projected that the increases would be greatest in the 2005–2010 and 2011–2016 periods, which also corresponds with the biggest gains in enrollment, aided in part by fully online programs being eligible for title IV, as well as the peak of various lawsuits and investigations that allege conduct that if verified to be true would have a reasonable likelihood of leading to an approved borrower defense claim. The conduct percent then follows a slightly more gradual slope downward over time before reaching a final level that is elevated above our estimates for pre-2000 but lower than the other periods. We think that ultimate level reflects that the number of borrowers is still expected to remain well above the pre-2000s level for the extended future, and that as the Department continues to review claims there will be a continued deterrence effect to avoid conduct that could lead to an approved claim.

*Group Process Percent:*

The share of claims suitable for a group process is expected to vary by institutional control and loan cohort. The further back a cohort of loans were originated, the less likely there is to be evidence of conduct that would support a group claims process, so the group process percent for the pre-2000 loan cohort group is lower than for more recent years. Of current pending claims, approximately 90 percent of those expected to be subject to a group claims process have come from cohorts 2006 to 2016 and we would expect that period to generate the highest share of group claims. We expect conduct that will generate a group claim to decrease following the 2016 regulation and subsequent attention to BD, with more of an effect in future years when more claims have been processed through the system.

*Claim Balance Factor:*

The assumptions generating our BD claims are applied to volume estimates at origination, but BD claims are likely to happen several years into repayment when payments that have been made would be subject to refund or balances will have grown through accrued interest or fees. To account for this, the Department looked at BD claims in 2021 and determined the maximum potential claim between the claim amount, the current outstanding balance, and the balance when the loan entered repayment plus accumulated interest through 2021. This maximum balance was compared to the origination amount to generate an adjustment factor that was averaged across loan type. The factors applied to Stafford, PLUS, and Unsubsidized loans are 1.32, 1.68, and 1.54, respectively. These factors are based on balance comparisons for existing loans and include capitalization events that will be eliminated under this rule as well as potential interest accrual beyond the 180-day window for loan subject to a BD claim established in these regulations. Other changes, such as the revisions to IDR anticipated in a separate regulatory package, could also affect these adjustment factors. We are not reducing the adjustment factors for those potential effects to provide a conservative estimate of BD claims— that is, an estimate that offers a larger net budget impact than if all those other items were included. The interaction with other regulatory or legislative actions could affect future re-estimates of the net budget impact of the BD provisions. For instance, changes to IDR that increase borrower benefits would result in a decrease in the cost of the BD provisions because a loan discharge would result in less foregone revenue than previously anticipated. Similarly, there could be interactions between institutions that may have BD claims sustained against them and those that fail the 90/10 rule, which requires institutions to derive a certain share of their revenue from non-Federal sources.[195] If those institutions fail the 90/10 requirement and lose access to title IV funding, then the cost of the BD provisions could fall since those institutions would not be able to make additional loans that could result in an approved BD claim.

*Borrower Percent—Group and Individual:*

This assumption captures the share of claims expected to lead to a discharge. Factors such as the Federal standard, reconsideration process, the number of claims against individual institutions, enrollment periods associated with the claims, and type of allegations seen to date affect these figures. For instance, the Department adjusted the borrower percent upward for individual claims compared to the 2019 regulation because this rule removes the requirement that we conclude that the act or omission was made with knowledge of its false, misleading, or deceptive nature, or with reckless disregard for the truth. Removing this requirement will result in more claims being approved. Similarly, the Department increased the borrower percent for group claims relative to the overall figure in the 2016 regulation to reflect both the inclusion of third-party requestors and the addition of more categories that could result in an approved BD claim. Overall, the borrower percent for group claims is significantly higher than the one for individual claims. This reflects that, to date, all but two of the institutions for which the Department has approved BD findings have eventually been converted into group discharges. The individual approval rate also includes the significant number of claims that are associated with an institution for which the Department has only received a couple of claims, suggesting that any approval is more likely to be a result of individual circumstances than a more

---

[194] US Department of Education, 2021. *Digest of Education Statistics, 2021.* Table 303.10.

[195] *https://www.federalregister.gov/documents/2022/07/28/2022-15890/institutional-eligibility-student-assistance-general-provisions-and-federal-pell-grant-program.*

common set of actions. For that reason, overall chance of approval is thus expected to be lower.

*Recovery Percent—Group and Individual:*

The recovery percent would vary by cohort and institutional control. To date the Department has only begun one recovery action related to approved BD claims, and it has yet to conclude. Historically, the Department has not had a high success rate in recovering other discharge liabilities, such as closed school discharges. The recovery rates for closed school discharges are particularly low because once an institution has closed, it is difficult to collect funds from it. Some BD claims will result in a similar situation if the institution has closed. In other cases, the likelihood of recovery may be higher because the institution is still in business, but the Department will have to successfully sustain the liability through any applicable appeal proceedings. Another factor that affects potential recoveries is the timing, as the limitations period and application of a standard to all claims pending or submitted after the effective date of the regulations may limit the Department's ability to recover claims related to activities many years ago. We expect claims for future cohorts to happen earlier in the repayment period of the loans and therefore to have a somewhat increased chance of recovery. Moreover, recovery efforts could only occur on claims that would have been approved under the standard in effect at the time the loan was disbursed and thus would not be attributed to this regulation.

The process to generate an estimated level of borrower defense claims under these final regulations remains the same as described in the NPRM, but the surrounding environment against which the potential claims are compared has evolved with recent policy announcements. Since the publication of the NPRM on July 13, 2022, several developments have been announced that further underscore the uncertainty associated with the cost estimate of the borrower defense provisions. Assuming borrowers with potential borrower defense claims qualify for loan forgiveness and the timing works so the forgiveness precedes processing of any borrower defense claim, the balances involved in the borrower defense claim will decrease. The extent to which they

decline would vary based upon whether the borrower also has loans that are not associated with the borrower defense claim. However, the Department's estimates of future borrower defense claims and forgiveness are not linked to specific borrowers such that we could predict the extent of this potential reduction in future borrower defense claims at the borrower level. We considered information from evaluating the effect of loan forgiveness that found that approximately 46 percent of borrowers would receive full forgiveness, and, for those who receive partial forgiveness, the median reduction in their balance would be 43 percent. Applying overall income eligibility of 95 percent and a take-up rate of 82 percent, we reduced the borrower defense claims by 80 percent for undergraduate risk groups and 35 percent for the graduate risk group. Within claims processed to date, the average claim size varies by institution. For instance, in July 2021 the Department announced BD approvals of $500 million for approximately 18,000 borrowers who attended ITT Technical Institute, for an average of approximately $28,000 a borrower.[196] Also in 2021, we announced the approval of $53 million in discharges for 1,600 borrowers who attended Westwood College, with an average amount of $33,000.[197] When the Department approved a group discharge for 28,000 borrowers who attended Marinello Schools of Beauty, that resulted in discharging $238 million, or approximately $8,500 per borrower.[198]

If approved, the settlement proposed in the *Sweet* v. *Cardona* case would also have a significant effect on the net budget impact of this rule attributed to past cohorts. The settlement agreement that received preliminary approval in July 2022 would result in the upfront discharge for an estimated 200,000 borrowers who attended certain institutions and a streamlined review of applications for tens of thousands of

other applicants. All discharges from those two processes would be considered settlement relief, not an approved BD claim. They would, however, reduce the number of claims to be approved after the effective date of this regulation, which would in turn reduce the cost of this regulation. The settlement would not result in changes in the approval rate for claims associated with borrowers who applied after the settlement agreement was reached on June 22, 2022.

To model this scenario, the Department halved the conduct percentage for cohorts prior to 2022. This represents the rough split of the number of claims covered by the settlement and the number outside the class. This reduction in the conduct percentage results in reduced loan volume associated with BD claims, without changing the approval rate for future claims.

To address uncertainty in our assumptions more generally, we also developed some alternate scenarios to capture a range of net budget impacts from the BD regulations. The low budget impact scenario reduces the group percentage and increases recoveries to the 37 percent maximum assumed in the 2016 regulations. We chose this level for approvals because the 2016 regulation also formally included a group process. We predict fewer discharges due to the inclusion of other categories under which a claim could be approved, the addition of third-party requestors, and procedures that more clearly separate approving group claims from recoupment efforts. We also thought using the higher recovery estimate for that regulation would be appropriate because the 2016 regulation is more similar to this rule than the 2019 rule, which does not allow for group claims.

The high budget impact scenario assumes a smaller deterrent effect and keeps the highest conduct percent for an additional cohort range and shifts the 2017–2022 and 2023–28 percentages to the next cohort range. It also increases the highest group percentage and maintains that level for future cohorts; and eliminates all recoveries. The revised assumptions for these scenarios are detailed in Table 9 with the results presented in Table 10.

[196] https://www.ed.gov/news/press-releases/department-education-announces-approval-new-categories-borrower-defense-claims-totaling-500-million-loan-relief-18000-borrowers.

[197] https://www.ed.gov/news/press-releases/department-education-approves-borrower-defense-claims-related-three-additional-institutions.

[198] https://www.ed.gov/news/press-releases/education-department-approves-238-million-group-discharge-28000-marinello-schools-beauty-borrowers-based-borrower-defense-findings.

**Table 9—Revised Assumptions for Alternate Scenarios**

**Conduct Percent (Percentage of loan volume related to BD claims)**

| Cohort Range | Low Scenario | | | High Scenario | | |
|---|---|---|---|---|---|---|
| | Proprietary | NPFT/Public | GRAD | Proprietary | NPFT/Public | GRAD |
| pre-2000 | 5.0% | 1.0% | 1.6% | 5.0% | 1.0% | 1.6% |
| 2000-2005 | 8.0% | 1.5% | 3.2% | 8.0% | 1.5% | 3.2% |
| 2006-2010 | 12.0% | 1.7% | 4.1% | 12.0% | 1.7% | 4.1% |
| 2011-2016 | 16.0% | 2.0% | 4.1% | 16.0% | 2.0% | 4.1% |
| 2017-2022 | 14.0% | 1.5% | 3.4% | 16.0% | 2.0% | 4.1% |
| 2023-2028 | 9.0% | 1.3% | 2.6% | 14.0% | 1.5% | 3.4% |
| 2028+ | 7.0% | 1.1% | 2.1% | 9.0% | 1.3% | 2.6% |

**Percentage of BD volume from group claims**

| Cohort Range | Low Scenario | | | High Scenario | | |
|---|---|---|---|---|---|---|
| | Proprietary | NPFT/Public | GRAD | Proprietary | NPFT/Public | GRAD |
| pre-2000 | 5% | 3% | 4% | 15% | 5% | 8% |
| 2000-2005 | 30% | 6% | 8% | 35% | 12% | 15% |
| 2006-2010 | 50% | 7% | 11% | 70% | 14% | 24% |
| 2011-2016 | 60% | 7% | 14% | 80% | 18% | 30% |
| 2017-2022 | 50% | 5% | 10% | 80% | 18% | 30% |
| 2023-2028 | 40% | 3% | 7% | 80% | 18% | 30% |
| 2028+ | 30% | 2% | 5% | 80% | 18% | 30% |

**Percentage of BD volume from individual claims**

| Cohort Range | Low Scenario | | | High Scenario | | |
|---|---|---|---|---|---|---|
| | Proprietary | NPFT/Public | GRAD | Proprietary | NPFT/Public | GRAD |
| pre-2000 | 95% | 98% | 96% | 85% | 95% | 92% |
| 2000-2005 | 70% | 94% | 93% | 65% | 88% | 85% |
| 2006-2010 | 50% | 93% | 90% | 30% | 86% | 76% |
| 2011-2016 | 40% | 93% | 86% | 20% | 86% | 70% |
| 2017-2022 | 50% | 95% | 90% | 20% | 86% | 70% |
| 2023-2028 | 60% | 97% | 93% | 20% | 86% | 70% |
| 2028+ | 70% | 98% | 95% | 20% | 86% | 70% |

**Recovery percentage on approved claims**

| Cohort Range | Low Scenario | | | High Scenario | | |
|---|---|---|---|---|---|---|
| | Proprietary | NPFT/Public | GRAD | Proprietary | NPFT/Public | GRAD |
| pre-2000 | 1.00% | 1.00% | 1.00% | 0% | 0% | 0% |
| 2000-2005 | 6.00% | 6.00% | 6.00% | 0% | 0% | 0% |
| 2006-2010 | 10.00% | 10.00% | 10.00% | 0% | 0% | 0% |
| 2011-2016 | 23.80% | 23.80% | 23.80% | 0% | 0% | 0% |
| 2017-2022 | 37.40% | 37.40% | 37.40% | 0% | 0% | 0% |
| 2023-2028 | 37.40% | 37.40% | 37.40% | 0% | 0% | 0% |
| 2028+ | 37.40% | 37.40% | 37.40% | 0% | 0% | 0% |

**Table 10—Budget Estimates for BD Scenarios Runs**

| $(mns) | Low Budget Impact | Sweet Budget Impact | Primary Budget Impact | High Budget Impact |
|---|---|---|---|---|
| Modification | $2,426 | $2,755 | $4,217 | $4,794 |
| Outlays for Cohorts 2023-2032 | $1,696 | $2,995 | $2,995 | $6,603 |
| Total | $4,112 | $5,750 | $7,212 | $11,397 |

## 5.2  Closed School Discharge

These final regulations are expected to increase closed school discharges by creating a uniform 180-day enrollment window, increasing the use of administrative data to provide discharges without an application, limiting the circumstances where a borrower cannot receive an automatic discharge, and some other process changes. To estimate the effect of these changes, the Department generated a data file summarizing borrower loan amounts for different enrollment windows prior to closure as well as any existing discharges associated with those loans. This was used to generate a ratio of potential additional claims compared to current discharges to be applied to the closed school component of the discharge assumption. The adjustment factor varied by loan model risk group from 1.11 to 7.46 and was applied to all cohorts for claims from 2023 on. To capture the effect of loan forgiveness on closed school discharges for past cohorts that have not been processed yet, we applied a reduction in the increase associated with the regulations of 70 percent for undergraduate risk groups, 45 percent for the graduate risk group, and 60 percent for the consolidation risk group. This is based on information that approximately 77 percent of borrowers with a closed school discharge were Pell Grant recipients with potential eligibility for up to $20,000 in forgiveness. We also assume that around 95 percent of closed school borrowers would meet the income eligibility requirements, which is slightly higher than what is assumed for the overall forgiveness eligibility. We also applied an 82 percent overall take-up rate for forgiveness to generate an estimated average forgiveness eligibility of approximately $13,710 (($.77*20,000) + (.22*10,000) *.95 * .82)). We also looked at the distribution of closed school discharges in Budget Service's November 2021 sample of NSLDS data

by risk group. This amount is above the overall mean closed school discharge of $11,409 and close to the mean for all sectors except graduate students, whose mean discharge is $35,738. We did not eliminate all the effect of future closed school discharges for past cohorts. Borrowers who would be eligible for a closed school discharge but do not apply may be less likely to apply for loan forgiveness. Alternatively, depending on the timing of any application needed, they may be processed for a closed school discharge in advance of any forgiveness being applied. Therefore, we used the factors described above to reduce the estimated increase in transfers associated with the closed school discharge, but we expect the attribution of discharges and forgiveness to become clearer as more data become available in the next year or two, which future re-estimates of the loan program will take into account.

Together, the changes related to the closed school provisions cost $3.42 billion for past cohorts and $3.04 billion for cohorts 2023–2032.

## 5.3  Total and Permanent Disability

The main driver of the Department's estimated costs for the total and permanent disability provisions of the final regulation is the inclusion of additional circumstances in which borrowers can qualify for discharge based on a finding of disability by SSA. These changes are expected to result in additional transfers to borrowers. We did not adjust the net budget impact for the change in the final rule to grant a discharge after the initial determination that the borrower qualifies for SSDI benefits or SSI based on disability and the borrower's next continuing disability review has been scheduled at 3 years. We do not expect this to adjust the net budget impact, because almost all of those borrowers are expected to have that disability determination continue and thus they would have been eligible even without this provision. The Department's existing

data match with SSA does not provide the data needed to estimate the increased discharge from this change. We estimate from SSA data that the added categories have 300,000 additional borrowers compared to approximately 323,000 borrowers included in the categories already eligible through the match from September 2021.[199] However, this is not necessarily through the physician's certification process, rather than receiving the discharge automatically through a data match. The Department intends to update the data match with SSA and hopes that if successful more borrowers will be captured under that match in the future. Thus, some of these borrowers will not be a new discharge but rather could simply be moving between categories. To estimate this effect, the Department used an adjustment factor in the TPD match with SSA in the Death, Disability, and Bankruptcy DDB assumption from 1.5 to 2.25, resulting in the $4.3 billion modification to past cohorts and $9.3 billion for cohorts 2023–2032. The initial adjustment factor was based on data related borrowers in the SSA match prior to September 2020 when it was an opt-in process that indicated total discharges were around 40 percent of total loan disbursements and around 70 percent of outstanding balances across all risk groups and cohorts. As is the case with the other discharge provision in this regulation, future TPD claims of past borrowers will be affected by the loan forgiveness announced in August. An analysis of discharges in Budget Service's November 2021 sample of NSLDS data indicates that TPD has a

---

[199] Department of Education analysis based on estimates of United States sample SSA data as of 2019 of those with a status of MINE or MIP and data provided by the Department in August 19, 2021, press release, "Over 323,000 Federal Student Loan Borrowers to Receive $5.8 Billion in Automatic Total and Permanent Disability Discharges," retrieved from *https://www.ed.gov/news/press-releases/over-323000-federal-student-loan-borrowers-receive-58-billion-automatic-total-and-permanent-disability-discharges.*

higher average discharge than closed school ($26,161, compared to $11,409) so the potential forgiveness is a lower percentage of disability claim. We estimated an average eligibility for forgiveness of $11,055 based on the following assumptions: (1) 62 percent Pell recipients; (2) 75 percent take-up; and (3) 91 percent income eligibility [((.62*20,000) + (.38*10,000) * .75 *.91) = $11,057]. This is a little over 40 percent of the average TPD discharge in our sample data, so we reduced the increase applied to our TPD adjustment by 40 percent. While there is still an increase in transfers to borrowers for the TPD provisions, the effect on older cohorts is reduced because of the forgiveness. The other provisions to expand the types of medical professionals who can support an application and otherwise make the process of obtaining a discharge easier could also increase transfers to borrowers through total and permanent disability discharges. The Department does not have information to estimate this increase but assumes most of the future discharges will be through the automatic matches, provided that it can successfully update the data match with SSA, so the effect of these changes will be lower than the recent opt-out match provisions. We did not explicitly assign a certain percentage of the increased adjustment factor to these administrative changes but would not expect it to be more than 0.10 percent of the total effect with the additional eligibility categories being more significant. By itself, that increase in TPD discharges will increase costs by $3.8 billion. We do not estimate a significant cost impact from the elimination of the 3-year monitoring period for reinstatement of payment obligations because our baseline is conservative in assuming that many of those income monitoring issues eventually get resolved. To estimate the effect of this provision, we did run a version of the DDB assumption that excluded any reinstatements from the disability claims from the PB23 baseline for the NPRM published July 13, 2022, but the resulting effect was not significant enough to change the overall discharge rate at the four decimal level used in the student loan model.

### 5.4   Public Service Loan Forgiveness

These final PSLF regulations have an estimated cost of $4.0 billion as a modification to cohorts through 2022 and $15.6 billion for cohorts 2023–2032. These figures include an update from the NPRM to include the cost of the limited PSLF waiver announced in October 2021, adjustments to the

counting of progress toward income-driven repayment announced in April 2022, and the announcement of a one-time action to discharge up to $20,000 of student loan debt in August 2022. Incorporating those items has reduced the cost of the regulation compared to the NPRM. PSLF is estimated as part of our IDR modeling, which is done on at the borrower- and loan-type level so the effects of loan forgiveness can be taken more directly into account. There is no special adjustment for forgiveness in PSLF as there was for borrower defense, closed school, or total and permanent disability. Instead, the reduction in the borrower's balance affects the scheduled payments of principal and interest against which the effect of PSLF is evaluated.

The change to include certain periods of deferment or forbearance to count toward PSLF and to count payments made on underlying loans prior to consolidation will reduce the time period for some existing PSLF recipients to achieve forgiveness. The Department used information linking consolidations to underlying loans to determine the months paid prior to consolidation and used that to reduce the time to PSLF forgiveness for affected borrowers. A similar process was followed for the deferments and forbearances that count toward PSLF. Estimated deferments and forbearances are tracked for PSLF borrowers in the budget model, and for the final change, time associated with qualifying deferments and forbearances were included toward the 10 years of monthly payments required for forgiveness.

One change in these final PSLF regulations concerns the treatment of individuals who work as a contractor for a qualifying employer in a position or providing services that, under applicable State law, cannot be filled or provided by a direct employee of the qualifying employer. The most cited example of borrowers in this situation are doctors at non-profit hospitals in California and Texas. The Department's PSLF estimates have never been State or occupation specific. Therefore, the Department estimated the effect of this provision by instead increasing the percentage of borrowers with graduate loans who would receive PSLF by 3 percentage points. The Association of American Medical Colleges has reported that 73 percent of medical school graduates had educational debt and the median educational debt of indebted graduates was $200,000.[200] Together,

these changes with respect to consolidations led to the $19.7 billion estimated increase in transfers for the PSLF changes.

Allowing installments and late payments to count toward PSLF will result in borrowers being more likely to reach 120 qualifying payments at the same time they have 120 months of qualifying employment. This is in contrast to the situation prior to the limited PSLF waiver where the large numbers of payments not being counted meant that borrowers often needed far more than 120 months of qualifying employment to reach the same number of qualifying payments. Reconsideration should also help those who had issues with their initial applications. These factors are not specifically modeled in this estimate, as the Department does not have data at this time regarding these factors. Moreover, the Department believes that the limited PSLF waiver has addressed many of the situations where a borrower would have sought reconsideration related to whether past payments qualify. These factors are not explicitly accounted for in the Department's baseline, which assumes those who we project have qualifying employment would make payments in such a way that they qualify. The effects of the limited PSLF waiver, which fixed many of these issues for borrowers who had previously applied for PSLF, are included. The administrative and definitional factors are captured to some degree by a ramp up to the maximum percentage of borrowers assumed to receive PSLF forgiveness in our modeling, with levels that reflect the low percent of PSLF forgiveness in the initial years of borrowers potentially being eligible. This ramp up can be seen in Table 11 and varies by cohort range and education level. To better reflect the trends in the program of increasing qualifying payments as borrowers learn about the forms, etc., the model specifies the percent achieving 120 months of qualifying for four time groups: group 0 is prior to 2010; group 1 is from 2010 to 2014; group 2 is from 2015 to 2020; and group 3 is after 2020. The percentages are assumptions based upon the trends in approved applications given forgiveness and trends in reasons for denial that pre-dated the PSLF waiver. As always, we will reflect updated information in future budget re-estimates.

To provide a sense of the effect of these changes, the Department considered an alternate scenario that increased the PSLF percent to the

---

[200] Youngclaus J, Fresne JA. Physician Education Debt and the Cost to Attend Medical School: 2020 Update. Washington, DC: AAMC; 2020. Available at

*https://store.aamc.org/downloadable/download/sample/sample_id/368/.*

highest level we consider reasonable given the level of employment in government or nonprofit sectors, based on U.S. Census bureau data on employment sector by educational attainment.[201] As seen in Table 11, this varies by education level with graduate students at 38 percent in the alternate scenario compared to 33 percent in the primary scenario and approximately 32 percent and 20 percent for 4-year and 2-year college groups, respectively. In the alternate scenario, we increased the maximum PSLF percent and shifted the ramp-up so each cohort range took the

percentages from the cohort range to the level of the following cohort in the baseline, resulting in the PSLF percentages shown in Table 11 under Alternate Scenario. For example, the percentage for graduate borrowers went from 3.4 percent to 16.2 percent for cohorts before 2011. The PSLF percent is the percentage of borrowers assumed to receive PSLF in our modeling and ramps up across years. An increase in the PSLF percent results in additional forgiveness. We are showing increases in the PSLF percent because nothing in the regulations will lead to reduced

PSLF forgiveness compared to our baseline level. The alternate scenario is on top of the other changes in the regulation to award credit toward PSLF for certain deferments and forbearances and allow borrowers to keep progress toward PSLF from payments made on a Federally managed loan prior to consolidation.

**Table 11—Alternate Assumptions for Percentage of Borrowers Receiving PSLF by Cohort Range Under Different Scenarios**

| Percentage of Borrowers Assigned PSLF | | | |
|---|---|---|---|
| **PB23 Baseline Scenario** | | | |
| Cohort Range | 2-year | 4-year | Graduate |
| 2010 or earlier | 0.20% | 0.36% | 0.44% |
| 2011–2015 | 6.28% | 10.83% | 13.18% |
| 2016–2020 | 10.46% | 18.05% | 21.96% |
| 2021 and later | 14.65% | 28.88% | 30.74% |

| Primary Regulation Scenario | | | |
|---|---|---|---|
| | 2-year | 4-year | Graduate |
| 2010 or earlier | 0.20% | 0.36% | 3.44% |
| 2011–2015 | 6.28% | 10.83% | 16.18% |
| 2016–2020 | 10.46% | 18.05% | 24.96% |
| 2021 and later | 14.65% | 28.88% | 33.74% |

| Alternate Scenario | | | |
|---|---|---|---|
| | 2-year | 4-year | Graduate |
| 2010 or earlier | 6.28% | 10.83% | 16.18% |
| 2011–2015 | 10.46% | 18.05% | 24.96% |
| 2016–2020 | 14.65% | 28.88% | 33.74% |
| 2021 and later | 20.00% | 32.00% | 38.00% |

A few commenters requested additional information about the basis for the PSLF estimate. The percentages in Table 11 are the key factors in generating PSLF estimates. PSLF is estimated as part of the Department's IDR modeling that generates annual payments, deferment, and forbearance status, and expected annual principal and interest payments for borrowers assumed to be in IDR plans. Events that are expected to change the expected

stream of payments such as defaults, discharges, PSLF, or prepayments are probabilistically assigned according to percentages based on historical trends or, in the case of PSLF, expected qualification by educational level. The rates vary by cohort range and student loan model risk group. In IDR, risk group is based on the borrower's highest academic level and events, such as default or discharge, are assigned probabilistically by borrower. As more

borrowers submit employment certifications and start to receive PSLF, the Department will continue to revise and update its PSLF estimates.

The net budget impact of the reduced transfers from borrowers to the government from increased forgiveness in this alternate scenario is shown in Table 12.

---

[201] Data from the American Community Survey from the U.S. Census Bureau on employment by sector (employer ownership) and educational attainment among workers aged 25 to 64.

**Table 12—Net Budget Impacts of PSLF in Primary and Alternate Assumptions**

| $(mns) | PSLF Primary | PSLF Alternate |
|---|---|---|
| Modification | 3,989 | 31,456 |
| Outlays for Cohorts 2023–2032 | 15,696 | 26,203 |
| Total | 19,685 | 57,659 |

The modification cost for early cohorts is significantly affected by the increase in the alternate scenario because the baseline PSLF levels for the 2010 cohort and earlier are lower than the outyear cohorts as seen in Table 12. Recall that the primary estimate reflects the level of forgiveness seen in the program to date. The changes in the baseline to incorporate the PSLF waiver and the broad-based debt relief reduced the net budget impact of the PSLF provisions in these final regulations relative to the NPRM. Table 12 shows the net budget impact of this rule as well as in an alternate scenario.

5.5  Interest Capitalization

These final regulations remove all interest capitalization on Direct Loans that is not required by the HEA and is estimated to have a net budget impact of $24.8 billion from reduced transfers from borrowers, consisting of a modification to cohorts through 2022 of $3.4 billion and increased outlays of $21.4 billion for cohorts 2023–2032. The estimated impact of $24.8 billion is for loans in all types of repayment plans, but the estimation process differs for non-IDR and IDR loans as noted below. The revised score for these final regulations is for the calculation as done in the revised SLM. The baseline for the final estimate also incorporates the scores for the PSLF Waiver, IDR account adjustment, and extension of the COVID–19 payment pause until December 2022, and broad-based debt relief.

Interest capitalization is calculated in the Student Loan Model in accordance with specific conditions, so to estimate this cost for non-IDR loans, we must turn off that capitalization as applicable. We expect the removal of capitalization upon entering repayment to be the primary driver of the net budget impact for these provisions, since it affects all borrowers from the effective date of the regulations. We do not anticipate that removing capitalization on the alternative plan will have noticeable budgetary effect because, so few borrowers use that plan. For the NPRM,

we calculated an adjustment factor by loan type, cohort, non-IDR repayment plan, years since loan origination, and SLM risk group to represent the effect of removing capitalization upon entering repayment to generate the net budget impact for non-IDR loans. The adjustment factors varied significantly with later cohorts having increased adjustment since more of the cohort will enter repayment following the effective date of the final regulations. After the publication of the NPRM, we continued to revise the SLM to eliminate capitalization upon entering repayment. The model code was revised to accrue interest but not add it to the principal balance.

For the interest capitalization that affects IDR borrowers, we adjusted the calculations in our IDR sub-model that capitalized interest. One limitation to note is that our current IDR modeling does not estimate borrowers leaving IDR plans so there is no capitalization for that in the baseline and no impact of that provision (leaving PAYE and REPAYE) in this estimate. However, we did create a capitalization event based on the estimated probability that a borrower will leave PAYE or REPAYE in 2023 or later. This estimate does not change the borrowers' plan or subsequent payments and just captures the effect of capitalization at that point. The final regulations will result in reduced repayments from borrowers by removing capitalization for leaving PAYE or REPAYE. When this provision was analyzed for the NPRM we estimated a net budget impact of $108.3 million, consisting of a modification to past cohorts of $29.8 million and $79.5 million for cohorts 2023–2032. While interest capitalization is a fairly straightforward calculation, there are several sources of uncertainty for these estimates. As mentioned, the SLM was revised to account for the elimination of capitalization upon entering repayment. However, not all of the potential effects for the full level or timing of capitalization events that are being eliminated are included for non-IDR borrowers. Additionally, while entering

repayment and the timing patterns for that are supported by significant history, other capitalization events affected by the final regulations may be more subject to behavioral changes. Predicting effects of eliminating capitalization related to forbearances or defaults does depend on having the level, timing, repayment plan, and risk group mix of those underlying events estimated accurately. If the pattern of those events changes from historical trends as borrowers return to payment following the Covid payment pause, the costs associated with eliminating capitalization for those events will vary from what we have estimated here.

5.6  Pre-Dispute Arbitration Clauses

The Department does not estimate a significant budget impact on title IV programs from the prohibition on pre-dispute arbitration agreements and the related disclosures. It is possible that borrowers not having to go through arbitration could result in some additional BD claims, but we expect those costs have been captured in the BD score. Disclosure of certain judicial and arbitral records may cause some borrowers to enroll at other institutions than they would have attended, but we expect that borrowers will receive similar amounts of aid overall, so we do not estimate a significant impact on the title IV portfolio from these changes.

5.7  False Certification

The final regulations change the false certification discharge rules to establish common false certification discharge procedures and eligibility requirements, regardless of when a loan was originated, and to clarify that the Department will rely on the borrower's status at the time the loan was originated, rather than when the loan was certified, for determining false certification discharge. The revisions to the identity theft provisions will make it easier for affected borrowers to provide evidence for a discharge.

All of the provisions related to false certification should increase transfers to borrowers through additional false certification discharges. Under existing

regulations, false certification discharges represent a very low share of discharges granted to borrowers. Over the past 5 years, approximately 6,000 borrowers have received a total of $58 million in false certification discharges, compared to approximately 788,000 borrowers and $29.9 billion in disability discharges, 461,000 borrowers and $11.4 billion in death discharges, and 180,000 borrowers and $2.5 billion in closed school discharges. The Department does not expect an increase in false certification claims to result in a significant budget impact. The Department will continue to evaluate the changes to the false certification discharge.

*6. Accounting Statement*

As required by OMB Circular A–4, we have prepared an accounting statement showing the classification of the expenditures associated with the provisions of these regulations. This table provides our best estimate of the changes in annual monetized transfers as a result of these final regulations. Expenditures are classified as transfers from the Federal Government to affected student loan borrowers.

**Table 13—Accounting Statement: Classification of Estimated Expenditures (in millions)**

| Category | Benefits |
|---|---|
| Reduced likelihood of default and other adverse outcomes by awarding discharges to borrowers otherwise eligible for relief, particularly under borrower defense, closed school discharges, or total and permanent disability discharges. | not quantified |
| Time savings for Department staff and borrowers due to streamlined processes, including BD group claims, automated identification of public servants in PSLF, and automatic closed school discharges. | not quantified |
| Decreased instances of conduct that could lead to an approvable borrower defense claim, resulting in improved information for student decision-making and enrollment gains for institutions that do not engage in conduct subject to BD claims. | not quantified |

| | |
|---|---|
| Improved student outcomes such as gains in earnings or educational attainment for students who switch to higher-performing institutions in response to BD or have access to higher-quality continuation options under closed school discharge. | not quantified |
| Increased ability to repay loans by not capitalizing outstanding interest. | not quantified |

| Category | | Costs | |
|---|---|---|---|
| | | 7% | 3% |
| Costs of compliance with paperwork requirements. | | $6.27 | $6.29 |

| Category | | Transfers | |
|---|---|---|---|
| | | 7% | 3% |
| BD claims from the Federal government to affected borrowers. | Primary | 903.1 | 819.1 |
| Reimbursements of BD claims from affected institutions to the Federal government. | Primary | 36.9 | 37.1 |
| Closed school discharges from the Federal government to affected students | | 758 | 693 |
| Total and Permanent Disability discharges from the Federal government to affected students. | | 1,503 | 1,422 |

| | | |
|---|---|---|
| Increased PSLF amounts to eligible borrowers from administrative changes, better definitions of qualifying employment, allowing lump sum and installment payments, and counting payments prior to consolidation, and counting certain periods of deferment and forbearance. | 2,088 | 2,019 |
| Elimination of non-statutory interest capitalization. | $2,544 | $2,508 |

## 7. Alternatives Considered

In response to comments received and the Department's further internal consideration of these final regulations, the Department reviewed and considered various changes to the proposed regulations detailed in the NPRM. The changes made in response to comments are described in the Analysis of Comments and Changes section of this preamble. We summarize below the major proposals that we considered but which we ultimately declined to implement in these regulations. The rationales for why these proposals were not accepted are explained in the places in the preamble where they are summarized and discussed. The Department did not receive significant alternative proposals related to interest capitalization, so it is not discussed here.

### 7.1 Borrower Defense

We considered some proposals to remove elements of the Federal standard related to breach of contract, aggressive and deceptive recruitment, or judgments, which would have resulted in fewer claims being approved by narrowing the acts or omissions that could give rise to an approved claim. We also considered adding requirements that the Department conclude that an institution acted with intent or that the claim had a material effect. These changes would also result in approving fewer claims by creating requirements that would be harder for an individual borrower to meet. We also considered the removal of group claims or requirements for individual showing of harm, which would have further limited the number of approved claims, in particular by not providing a path to

discharges for borrowers who did not submit applications. We declined to accept any of these proposals and instead made other changes to the Federal standard to require that the Department conclude an institution's act or omission caused detriment that warrants the relief granted by a borrower defense discharge. This includes specifying that in making such a determination the Secretary will consider the totality of the circumstances, including the nature and degree of the acts or omissions and of the detriment caused to borrowers. We also considered but rejected proposals to add additional steps for institutions to ask for reconsideration of approved claims or conduct recoupment actions under part 668, subpart G but felt that the final rules provide sufficient opportunities for institutional due process and that part 668, subpart H is the more appropriate mechanism for recoupment. It is unclear if these changes would have resulted in different ultimate decisions, but they would have significantly extended the process of reviewing claims. We considered additional examples or processes for calculating the amount of a partial discharge but ultimately concluded only allowing for a full discharge would create a simpler and more effective standard. The range of suggestions for partial discharge could have either resulted in fewer claims being approved for a full discharge or more claims that would have received a partial discharge getting a full approval. We considered requests to allow for the simultaneous assertion of claims under State law, but kept it limited to reconsideration. Commenters asserted that this change would result in faster

second reviews of claims that are not approved under the Federal standard. Finally, we considered but did not accept proposals to stop interest accumulation on individual claims immediately because we want to encourage borrowers to submit strong claims. This would have increased the size of transfers to borrowers and represented a greater cost to the Department.

### 7.2 False Certification

The Department created a new form for a common law forgery loan discharge for borrowers whose signature was forged by someone other than a school employee. This applied only to Department-held Federal student loans, but the Department is encouraging other loan holders to create a process like this one. Until we launched this form, the Department evaluated all forgery claims using the discharge forms that only apply where the school falsified a signature or if there was a judicially proven crime of identity theft. This new form for a common law forgery loan discharge provides borrowers an alternative option. But it would not benefit many borrowers who do not fit into the false certification categories since the number of applications under the FFEL Program is very small and would continue to shrink.

The Department considered relying on the disbursement date as an alternative to relying on the origination date. Doing so would allow an institution to originate loans for students who have not yet met Title IV eligibility requirements and not disburse the funds until the student has met the requirements. This would potentially have decreased the number

of false certification discharges, which would then decrease the size of transfers to borrowers and the cost to the Department. However, under the HEA, if a school is not granted a certain period of time to remedy a false certification and, the loan is certified before, not after, the loan is originated. An institution should not originate a loan for a borrower who is not eligible for the loan. Relying on the origination date will also help ensure that no inadvertent disbursements are made to ineligible students.

The Department considered whether to expand eligibility for false certification discharges to cover circumstances such as barriers to employment. However, we are concerned that de facto barriers to employment (*e.g.,* jobs that likely would not hire someone with a criminal background, despite there being no specific related requirement for State licensure in that field) rather than explicit prohibitions (*e.g.,* jobs that cannot legally be held by someone with a criminal background) would create a substantial burden on institutions to be aware of such barriers and may not reliably identify borrowers eligible for such discharge. This alternative could have increased the transfers to borrowers by approving more false certification discharges, but as noted it would have been challenging for this to occur in practice given the complexity of determining what constitutes a barrier to employment.

### 7.3   Public Service Loan Forgiveness

The Department considered but ultimately declined to allow any additional deferments and forbearances to receive credit toward PSLF. Such a change would have increased transfers to borrowers by making them eligible for loan forgiveness sooner. We also considered allowing all contractors for a qualifying employer to qualify for PSLF but chose not to do so. This would have resulted in significantly larger transfers

to borrowers by dramatically increasing the number of borrowers who would be eligible for PSLF.

### 7.4   Total and Permanent Disability Discharges

The Department did not accept proposals to keep the 3-year income monitoring period or to not expand the categories of medical professionals that could sign forms during the physician's certification process. Both changes would have decreased transfers to borrowers by either reinstating more loans that had been discharged or resulting in potentially fewer applications through the physician's certification process.[202]

### 7.5   Closed School Discharges

The Department considered but ultimately did not adopt requests to limit discharges to borrowers who left a school within 120 days of a closure instead of 180 days, granting a 12-month deferment for a borrower after their school closes, restricting eligibility for borrowers who enrolled in a comparable program or attempted to enroll in a teach-out but did not complete the program. These changes would have had differing effects. A shorter lookback window or greater restrictions on eligibility would result in decreased transfers to borrowers because fewer discharges would be granted. A longer deferment, meanwhile, would increase transfers by providing approximately six months of no-interest accumulation for a borrower beyond the grace period after leaving school.

### 7.6   Pre-Dispute Arbitration

The Department considered but did not accept proposals to delete this provision or not mandate the associated transparency. The Department did not assign a significant estimated budget impact from the changes to pre-dispute

[202] *https://www.ssa.gov/legislation/FY%202016%20CDR%20Report.pdf.*

arbitration so its elimination would not have a budgetary effect either.

### 8. Regulatory Flexibility Act

Section 605 of the Regulatory Flexibility Act allows an agency to certify a rule if the rulemaking does not have a significant economic impact on a substantial number of small entities.[203]

The Small Business Administration (SBA) defines "small institution" using data on revenue, market dominance, tax filing status, governing body, and population. The majority of entities to which the Office of Postsecondary Education's (OPE) regulations apply are postsecondary institutions, however, which do not report such data to the Department. As a result, for this final rule, the Department will continue defining "small entities" by reference to enrollment,[204] to allow meaningful comparison of regulatory impact across all types of higher education institutions.[205]

---

[203] 5 U.S.C. 603.

[204] Two-year postsecondary educational institutions with enrollment of less than 500 FTE and four-year postsecondary educational institutions with enrollment of less than 1,000 FTE.

[205] In previous regulations, the Department categorized small businesses based on tax status. Those regulations defined "non-profit organizations" as "small organizations" if they were independently owned and operated and not dominant in their field of operation, or as "small entities" if they were institutions controlled by governmental entities with populations below 50,000. Those definitions resulted in the categorization of all private nonprofit organization as small and no public institutions as small. Under the previous definition, proprietary institutions were considered small if they are independently owned and operated and not dominant in their field of operation with total annual revenue below $7,000,000. Using FY2017 IPEDs finance data for proprietary institutions, 50 percent of 4-year and 90 percent of 2-year or less proprietary institutions would be considered small. By contrast, an enrollment-based definition captures a similar share of proprietary institutions, allowing consistent comparison to other types of institutions.

**Table 14—Small Institutions Under Enrollment-Based Definition**

| Level | Type | Small | Total | Percent |
|---|---|---|---|---|
| 2-year | Public | 328 | 1182 | 27.75 |
| 2-year | Private, Nonprofit | 182 | 199 | 91.46 |
| 2-year | Proprietary | 1777 | 1952 | 91.03 |
| 4-year | Public | 56 | 747 | 7.50 |
| 4-year | Private, Nonprofit | 789 | 1602 | 49.25 |
| 4-year | Proprietary | 249 | 331 | 75.23 |
| Total | | 3381 | 6013 | 56.23 |

Source: 2018-19 data reported to the Department.

Table 15 summarizes the number of institutions affected by these final regulations.

**Table 15—Estimated Count of Small Institutions Affected by the Final Regulations**

| | Small institutions affected | As percent of small institutions |
|---|---|---|
| Borrower Defense | 50 | 1.47 |
| False Certification | 0 | 0 |
| PSLF | 0 | 0 |
| Eliminate Interest Capitalization | 0 | 0 |
| TPD Discharge | 0 | 0 |
| Closed School Discharge | 0 | 0 |
| Pre-dispute Arbitration | 1,285 | 38.0 |

The Department certifies that Final Rule will not have a significant economic impact on a substantial number of small entities. The final regulations for False Certification, PSLF, TPD Discharge, and Closed School Discharge will not have an impact on small institutions.

These types of discharges are between the borrower and the lender, which often is the Department. The Department anticipates this will impact 310 small lenders that will be required to expand their current reporting and will take approximately 50 hours to update their systems. A few small institutions could be impacted by the final regulations where there is a large group BD claim. Based on recent experience of the Department adjudicating BD cases, small institutions are not expected to be impacted by the final regulations in BD because the Department is unlikely to attempt to recoup from isolated BD cases from small institutions. The changes to eliminate interest capitalization will not have an impact on small institutions as this is also an action between the borrower and lender.

The Department anticipates approximately 38 percent of small institutions will be impacted by these pre-dispute arbitration final regulations. We derived the percentage that will be impacted from a report by the Century

Foundation that sampled schools using arbitration clauses in their enrollment contracts.[206] Of the sampled schools, 62 percent of proprietary institutions and 2.9 percent of private nonprofit institutions used arbitration clauses. The study found public schools did not utilize arbitration clauses. We applied those proportions to the number of small proprietary institutions (both 2 year and 4 year) and private nonprofit (both 2 year and 4 year) and arrived at 1,285 or 38.01 percent of total small business institutions. We do not anticipate there is a significant cost impact to amend future contracts.

**Table 16—Estimated Annual Cost Range for Small Institutions and Entities Affected by the Final Regulations**

| Compliance Area | Small institutions or entities affected | Cost range per institution or entity | | Estimated overall cost range | |
|---|---|---|---|---|---|
| BD employment rate background check | 50 | 500 | 750 | 25,000 | 37,500 |
| Pre-dispute arbitration update future agreements | 1285 | 125 | 160 | 160,625 | 205,600 |
| Lenders | 310 | 2,231 | 2,343 | 691,622 | 726,330 |

While these final regulations will have an impact on some small institutions and entities, there will not be a significant cost and compliance impact. For example, we examined potential costs to lenders who are generally identified in the North American Industry Classification System (NAICS) under code 52 (finance and insurance) and specifically Credit Unions (522130) and Savings Institutions and Other Depository Credit Intermediation (522180).[207] We are unable to specifically identify the number of lenders that constitute small entities. However, of the universe of over 12,000 lenders with remaining volume in the FFEL portfolio, more than two-thirds have 10 or fewer borrowers with outstanding balances. As no new FFEL Program loans have been made since 2010, this is not the primary business line for these entities. Therefore, we believe that changes to the loan portfolio would have minimal impact on most lenders, including small entities.

*9. Paperwork Reduction Act of 1995*

As part of its continuing effort to reduce paperwork and respondent burden, the Department provides the general public and Federal agencies with an opportunity to comment on proposed and continuing collections of information in accordance with the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3506(c)(2)(A)). This helps ensure that the public understands the Department's collection instructions, respondents can provide the requested data in the desired format, reporting burden (time and financial resources) is minimized, collection instruments are clearly understood, and the Department can properly assess the impact of collection requirements on respondents.

Sections 668.41, 668.74, 674.33, 674.61, 682.402, 682.414, 685.213, 685.214, 685.215, 685.219, 685.300, 685.304, 685.402, 685.403, and 685.407, of this final rule contain information collection requirements. Under the PRA, the Department has or will at the required time submit a copy of these sections and an Information Collections Request to OMB for its review.

A Federal agency may not conduct or sponsor a collection of information unless OMB approves the collection under the PRA and the corresponding information collection instrument displays a currently valid OMB control number. Notwithstanding any other provision of law, no person is required to comply with, or is subject to penalty for failure to comply with, a collection of information if the collection instrument does not display a currently valid OMB control number.

*Section 668.41—Reporting and disclosure of information.*

Requirements: These final regulations remove the requirements in current Section 668.41(h). Burden Calculation: With the removal of the regulatory language in Section 668.41(h), the Department will remove the associated burden of 4,720 hours under OMB Control Number 1845–0004.

---

[206] *How College Enrollment Contracts Limit Students' Rights.* (2016, April 28). The Century Foundation. *https://tcf.org/content/report/how-college-enrollment-contracts-limit-students-rights/.*

[207] North American Industry Classification System (NAICS) is the standard used by Federal statistical agencies in classifying businesses to collect, analyze, and publish statistical data related to the U.S. business economy.

Student Assistance General Provisions—Student Right to Know (SRK)—OMB CONTROL NUMBER: 1845–0004

| Affected Entity | Respondent | Responses | Burden Hours | Cost $44.41 per institution from the 2019 Final Rule |
|---|---|---|---|---|
| For-Profit | -944 | -944 | -4,720 | -$209,615 |

*Section 668.74—Employability of graduates.*

Requirements: In the course of adjudicating BD claims, the Department has persistently seen misrepresentations about the employability of graduates. In these regulations, the Department is explicitly including, as a form of job placement rate misrepresentation, placement rates that are inflated through manipulation of data inputs. Section 668.74(g)(2) contains a provision that allows the Department to verify that an institution correctly calculated its job placement rate by requiring an institution to furnish to the Secretary, upon request, documentation and other data that was used to calculate the institution's employment rate calculations.

Burden Calculation: The Department believes that such a request will impose only a modest burden on the part of any institution to provide the existing background data upon which the employment rates that are presented were calculated. We believe that such required reporting will be made by 2 Private Not-for-profit, 2 For-Profit and 2 Public institutions annually. We anticipate that 6 institutions will receive such a request and that it will take 8 hours to copy and prepare for submission to the Department such evidence of their calculated employment rates for a total of 48 burden hours (6 institutions × 1 response × 8 hours = 48 burden hours).

**Student Assistance General Provisions—OMB Control Number 1845–0022**

| Affected Entity | Respondent | Responses per respondent | Burden Hours = 8 hours per response | Cost $46.59 per hour for institutions |
|---|---|---|---|---|
| Private Not-for-Profit | 2 | 1 | 16 | $745 |
| For-Profit | 2 | 1 | 16 | $745 |
| Public | 2 | 1 | 16 | $745 |
| Total | 6 | | 48 | $2,235 |

*Sections 674.33(g), 682.402(d), and 685.214—Closed School Discharge.*

Requirements: These final regulations amend the Perkins, FFEL, and Direct Loan regulations to simplify the closed school discharge process. Sections 674.33(g)(4), 682.402(d)(3) and 685.214(d)(1) provide that the borrower must submit a completed closed school discharge application to the Secretary and that the factual assertions in the application must be true and made by the borrower under penalty of perjury.

Additionally, the number of days that a borrower had withdrawn from a closed school to qualify for a closed school discharge will be extended from 120 days to 180 days.

Burden Calculation: These changes will require an update to the current closed school discharge application form. We do not believe that the language update will significantly change the amount of time currently assessed for the borrower to complete the form from those which has already been approved. The form update will be completed and made available for comment through a full public clearance package before being made available for use by the effective date of the regulations. The burden changes will be assessed to OMB Control Number 1845–0058, Loan Discharge Applications (DL/FFEL/Perkins).

*Sections 674.61, 682.402(d), and 685.213—Total and Permanent Disability (TPD) Discharge.*

Requirements: Under these final rule changes to Sections 674.61(b)(2)(iv), 682.402(c)(2)(iv), and 685.213(b)(2), a TPD discharge application will be allowed to be certified by a nurse practitioner, a physician's assistant licensed by a State, or a certified psychologist, licensed at the independent practice level by a State in addition to a physician who is a Doctor of Medicine or Osteopathy legally authorized to practice in a State. The type of SSA documentation that may qualify a borrower for a TPD discharge will be expanded to include an SSA Benefit Planning Query or other SSA documentation deemed acceptable by the Secretary. The regulations also amend the Perkins, Direct Loan, and FFEL Program regulations to improve the process for granting TPD discharges by eliminating the income monitoring period. Sections 674.61(b)(6)(i), 682.402(c)(6), and 685.213(b)(7)(i) will eliminate the existing reinstatement requirements, except for the provision which provides that a borrower's loan is reinstated if the borrower receives a new TEACH Grant or a new Direct Loan within 3 years of the date the TPD discharge was granted.

Burden Calculation: These final regulatory changes will require an update to the current total and permanent disability discharge application form. We do not believe that the language update will significantly change the amount of time currently assessed for the borrower to complete the Discharge Application (TPD–APP) application form from those which has already been approved. These final rules will eliminate the Post-Discharge Monitoring form (TPD–PDM) from the collection and will create a decrease in overall burden from the 1845–0065 collection. The forms update will be completed and made available for comment through a full public clearance package before being made available for use by the effective date of the regulations. The burden changes will be assessed to OMB Control Number 1845–0065, Direct Loan, FFEL, Perkins and TEACH Grant Total and Permanent Disability Discharge Application and Related Forms.

*682.402(e), 685.215(c) and 685.215(d)—False Certification Discharge.*

Requirements: These final regulations streamline the FFEL and Direct Loan false certification regulations to provide one set of regulatory standards that will cover all false certification discharge claims. Sections 682.402(e) and

685.215(c)(5) state that a borrower qualifies for a false certification discharge if the school certified the borrower's eligibility for a FFEL or Direct Loan as a result of the crime of identity theft. Additionally, Section 685.215(c)(10) will provide for a new application to allow a State Attorney General or nonprofit legal services representative to submit a request to the Secretary for a group discharge under section (c).

Burden Calculation: These changes will require an update to the current false certification discharge application forms. We do not believe that the language update will significantly change the amount of time currently assessed for the borrower to complete the forms from those which has already been approved. The forms update will be completed and made available for comment through a full public clearance package before being made available for use by the effective date of the regulations. New forms to capture the requirements of the identity theft section and the group discharge request will be created and made available for comment through a full public clearance package before being made available for use by the effective date of the regulations. The burden changes will be assessed to OMB Control Number 1845–0058, Loan Discharge Applications (DL/FFEL/Perkins).

Requirements: Under Section 682.402(e)(6)(i), if a holder of a borrower's FFEL loan determines that a borrower may be eligible for a false certification discharge, the holder provides the borrower with the appropriate application and explanation of the process for obtaining a discharge. The borrower burden to complete the form is captured under the form collection 1845–0058. Under Section 682.402(e)(6)(iii), if a FFEL borrower submits an application for discharge that a FFEL program loan holder determines is incomplete, the loan holder will notify the borrower of that determination and allow the borrower 30 days to amend the application and provide supplemental information.

Burden Calculation: The Department believes that such a request will require burden on the part of any FFEL lender. Of the 310 FFEL lenders, it is anticipated that 31 lenders will make such determinations of borrower discharge eligibility and that it will take 20 minutes to send an estimated 100 borrowers the correct form for completion, for a total of 33 burden hours (100 borrowers applications × 20

minutes per application (.33 hours) = 33 burden hours).

It is anticipated that 15 lenders will make a determination of 25 borrower's incomplete applications and that it will take 15 minutes to send borrowers the notice to amend their application, for a total of 6 burden hours (25 borrowers receiving lender notices × 15 minutes (.25 hours) = 6 burden hours).

It is anticipated that of the 25 borrowers who receive notice of an incomplete application, 20 will resubmit an amended application or provide additional documentation and it will take 30 minutes to make such amendments, for a total of 10 burden hours (20 borrowers amending initial filings × 30 minutes (.50 hours) = 10 hours under OMB Control Number 1845–0020.

Requirements: Section 682.402(e)(6)(vii) will require a guaranty agency to issue a decision that explains the reasons for any adverse determination on a false certification discharge application, describes the evidence on which the decision was made, and provides the borrower, upon request, copies of the evidence. The guaranty agency will consider any response or additional information from the borrower and notify the borrower as to whether the determination is changed.

Burden Calculation: The Department believes that such a request will require burden on the part of any guaranty agency. It is anticipated that each of the 18 guaranty agencies will make such adverse determinations on 75 borrower discharge applications and that it will take 30 minutes to send borrowers the decision, for a total of 38 burden hours (75 borrowers receiving adverse determination notifications × 30 minutes (.50 hours) = 38 burden hours) under OMB Control Number 1845–0020.

Requirements: Section 682.402(e)(6)(ix) will provide the borrower with the option to request that the Secretary review the guaranty agency's decision.

Burden Calculation: The Department believes that such a request will require burden on the part of any borrower. Of the 75 borrowers whose applications were denied by the guaranty agency, it is anticipated that 30 borrowers will request Secretarial review of the guaranty agencies decision and that it will take 30 minutes to send such a borrower request, for a total of 15 burden hours (30 borrowers × 30 minutes (.50 hours) = 15 burden hours) under OMB Control Number 1845–0020.

Federal Family Education Loan
Program Regulations—OMB Control
Number 1845–0020

| Affected Entity | Respondent | Responses | Burden Hours | Cost $46.59 Institutional $22.00 Individual |
|---|---|---|---|---|
| Individual | 50 | 50 | 25 | $550 |
| Private Not-for-Profit | 14 | 55 | 23 | $1,071.57 |
| For-Profit | 24 | 99 | 31 | $1,444.29 |
| Public | 11 | 46 | 23 | $1,071.57 |
| TOTAL | 99 | 250 | 102 | $4,137.43 |

*Section 682.414 —Reports.*

Requirements: In Section 682.414(b)(4), these final regulations require FFEL Program lenders to report detailed information related to a borrower's deferments, forbearances, repayment plans, delinquency, and contact information on any FFEL loan to the Department by an established deadline.

Burden Calculation: The Department believes that such a request will require burden on the part of any FFEL lender. It is anticipated that 310 lenders will be required to expand their current reporting and that it will take 50 hours to update systems and to initially provide the additional data, for a total of 15,500 burden hours (310 institutions × 50 hours = 15,500 burden hours) under OMB Control Number 1845–0020.

**Federal Family Education Loan Program Regulations—OMB Control Number 1845–0020**

| Affected Entity | Respondent | Responses | Burden Hours | Cost $46.59 Institutional |
|---|---|---|---|---|
| Private Not-for-Profit | 64 | 64 | 3,200 | $149,088 |
| For-Profit | 246 | 246 | 12,300 | $573,057 |
| Totals | 310 | 310 | 15,500 | $722,145 |

*Section 685.219—Public Service Loan Forgiveness.*

Requirements: These final regulations provide new, modified, and restructured definitions in Section 685.219(b) that will expand the use of the form.

Burden Calculation: These changes will require an update to the current PSLF form. We do not believe that the language update will significantly change the amount of time currently assessed for the borrower to complete the form from those which has already been approved. The form will be completed and made available for comment through a full public clearance package before being made available for use by the effective date of the regulations. The burden changes will be assessed to OMB Control Number 1845–0110, Application and Employment Certification for PSLF.

Requirements: These final regulations create a reconsideration process under Section 685.219(g) for borrowers whose applications for PSLF were denied or who disagree with the Department's determination of the number of qualifying payments or months of qualifying employment that have been earned by the borrower, which formalizes the current non-regulatory process.

Burden Calculation: The Department is currently in the clearance process for an electronic Public Service Loan Forgiveness Reconsideration Request, OMB Control Number 1845–0164. Public comment on the web-based format is currently being accepted through the normal information clearance process under docket number ED–2022–SCC–0039.

*Section 685.300—Agreements between an eligible school and the Secretary for participation in the Direct Loan Program.*

Requirements: These final regulations reinstate prior regulations that barred institutions, as a condition of participating in the Direct Loan program, from requiring borrowers to accept pre-dispute arbitration agreements and class action waivers as they relate to BD claims. Specifically, in Section 685.300(e), institutions will be prohibited from relying on a pre-dispute arbitration agreement, or any other pre-dispute agreement with a student who obtained or benefitted from a Direct Loan, in any aspect of a class action related to a BD claim, until the presiding court rules that the case cannot proceed as a class action. In Section 685.300(f), the final regulations require that certain provisions relating to notices and the terms of the pre-dispute arbitration agreements be included in any agreement with a student who receives a Direct Loan to attend the school or for whom a Direct PLUS Loan was obtained.

Burden Calculation: There will be burden on any school that meets the conditions for supplying students with the changes to any agreements. Based on the Academic Year 2020–2021 Direct Loan information available, there were 1,026,437 Unsubsidized Direct Loan recipients at 1,587 for-profit institutions. Assuming 66 percent of these students will continue to be enrolled at the time these regulations become effective, about 677,448 students will be required to receive the agreements or notices required in Sections 685.300(e) or (f). We anticipate that it will take 1,587 for-profit institutions .17 hours (10 minutes) per

student to develop these agreements or notices, research who is required to receive them, and forward the information accordingly for 115,166 burden hours (677,448 students × .17 hours) under OMB Control Number 1845–0021.

Requirements: Under the final rules at Sections 685.300(g) and (h), institutions will be required to submit certain arbitral records and judicial records connected with any BD claim filed against the school to the Secretary by certain deadlines.

Burden Calculation: The Department believes that such a request will require burden on any school that meets the conditions for supplying the records to the Secretary. We continue to estimate that 5 percent of 1,587 for-profit institutions or an estimated 79 for-profit institutions will be required to submit documentation to the Secretary to comply with the final regulations. We anticipate that each of the 79 schools will have an average of four filings thus there will be an average of four

submissions for each filing. Because these are copies of documents required to be submitted to other parties, we anticipate 5 burden hours to produce the copies and submit to the Secretary, for an increase in burden of 6,320 hours (79 institutions × 4 filings × 4 submissions/filing × 5 hours) under OMB Control Number 1845–0021.

**William D. Ford Federal Direct Loan Program (DL) Regulations—OMB Control Number 1845–0021**

| Affected Entity | Respondent | Responses | Burden Hours | Cost $46.59 Institutional |
|---|---|---|---|---|
| For-Profit | 1,587 | 678,712 | 121,486 | $5,660,033 |
| Total | 1,587 | 678,712 | 121,486 | $5,660,033 |

*Section 685.304—Counseling borrowers.*

Requirements: These final regulations remove Sections 685.304(a)(6)(xiii) through (xv). The final regulations at Section 685.300 will state the

conditions under which disclosures will be required and provide deadlines for such disclosures.

Burden Calculation: With the removal of the regulatory language in Sections 685.304(a)(6)(xiii) through (xv), the

Department will remove the associated burden of 30,225 hours under OMB Control Number 1845–0021.

**William D. Ford Federal Direct Loan Program (DL) Regulations– OMB Control Number 1845–0021**

| Affected Entity | Respondent | Responses | Burden Hours | Cost $44.41 per institution; $16.30 per individual from 2019 Final Rule |
|---|---|---|---|---|
| Individual | -342,407 | -342,407 | -27,393 | -$446,506 |
| For-Profit | -944 | -944 | -2,832 | -$125,769 |
| Total | -343,351 | -343,351 | -30,225 | -$572,275 |

*Section 685.402—Group process for borrower defense.*

Requirements: In § 685.402(c), the Department may initiate a group process upon request from a third-party requestor, on the condition that the third-party requestor submit an application and provide other required information to the Department to adjudicate the claim.

In Section 685.402(c)(4) the Secretary will notify an institution of the third-party requestor's application requesting to form a BD group. The institution will have 90 days to respond to the Secretary regarding the third-party requestor's application. The Department believes that such a request will require burden on any school that wishes to respond to the Secretary.

If, under Section 865.402(c)(6), a third-party requestors' group request is denied, the third-party requestor will

have 90 days from the initial decision to request the Secretary reconsider the formation of a group. The Department believes that such a request will require burden on any third-party requestor that wishes to respond to the Secretary.

Burden Calculation: A new form to capture the requirements for the third-party requestors for § 685.402(c) will be created and made available for comment through a full public clearance package before being made available for use by the effective date of the regulations.

Further, the Department believes that with these new regulations there will be new burden on the institutions who are included in a proposed group claim. From 2015–2021 the Department received 11 group claims against institutions from 29 States Attorneys General regarding borrower defense claims. With the new regulations, the Department anticipates an increase

group claim filings by third-party requestors. We estimate that 25 such third-party requestor group claims annually. Of that figure, we anticipate that 5 of the group claims will not meet the materially complete requirements.

For the 20 group claims that initially meet the materially complete requirement for which Secretary provides notice to the institutions, we believe that the 20 notified institutions will utilize the 90-day timeframe to respond to the group claim.

We estimate that the 20 institutions will require an average of 378 hours per notice to review and respond to the proposed group claim for a total of 7,560 burden hours (20 institutions × 378 hours/notice = 7,560) under OMB Control Number 1845–0021.

We anticipate that 5 of the estimated 25 third-party requestors filings for consideration of group claims will not

be approved by the Secretary. Of the 5 denials, we anticipate that 4 of the third-party requestors will request reconsideration from the Secretary within the 90-day timeframe of the regulations. We estimate that the 4 third-party requestors will require an average of 378 hours per request for reconsideration for a total of 1,512 burden hours (4 third-party requestor × 378 hours/reconsideration request = 1,512) under OMB Control Number 1845–0021.

**William D. Ford Federal Direct Loan Program (DL) Regulations— OMB Control Number 1845–0021**

| Affected Entity | Respondent | Responses | Burden Hours | Cost $46.59 Institutional |
|---|---|---|---|---|
| Private Not-For-Profit | 4 | 4 | 1,512 | $70,444.08 |
| For-Profit | 18 | 18 | 6,804 | $316,998.36 |
| Public | 2 | 2 | 756 | $35,222.04 |
| Total | 24 | 24 | 9,072 | $422,664.48 |

*Section 685.405 –Institutional response.*

Requirements: In § 685.405, the Department will continue to provide for an institutional response process to BD claims. Under the final regulations in § 685.405(a), the Department official will notify the institution of the BD claim and its basis for any group or individual BD claim. Under the final regulations in § 685.405(b), the institution will have 90 days to respond. Under the final regulations in § 685.405(c), with its response, the institution will be required to execute an affidavit confirming that the information contained in the response is true and correct under penalty of perjury on a form approved by the Secretary.

Burden Calculation: A new form to capture the requirements of § 685.405(c) will be created and made available for comment through a full public clearance package before being made available for use by the effective date of the regulations.

*Section 685.407—Reconsideration.*

Requirements: § 685.407 sets forth the circumstances under which a borrower or a third-party requestor may seek reconsideration of a Department official's denial of their BD claim. § 685.407(a)(4) identifies the reconsideration process, which includes an application approved by the Secretary.

Burden Calculation: A new form to capture the requirements of § 685.407(a) will be created and made available for comment through a full public clearance package before being made available for use by the effective date of the regulations.

Consistent with the discussions above, the following chart describes the sections of the final regulations involving information collections, the information being collected and the collections that the Department will submit to OMB for approval and public comment under the PRA, and the estimated costs associated with the information collections. The monetized net cost of the increased burden for institutions, lenders, guaranty agencies and students, using wage data developed using Bureau of Labor Statistics (BLS) data. For individuals, we have used the median hourly wage for all occupations, $22.00 per hour according to BLS. *https://www.bls.gov/oes/current/oes_nat.htm#00-0000.* For institutions, lenders, and guaranty agencies we have used the median hourly wage for Education Administrators, Postsecondary, $46.59 per hour according to BLS. *https://www.bls.gov/oes/current/oes119033.htm.*

**BILLING CODE 4000–01–P**

COLLECTION OF INFORMATION

| Regulatory section | Information Collection | OMB Control Number and estimated burden | Estimated cost $46.59 Institutional $22.00 Individual unless otherwise noted. |
|---|---|---|---|
| § 668.41 | The Department removes the requirements in current Section 668.41(h). | 1845-0004; -4,720 hrs. | Cost from the 2019 Final Rule ($44.41 per institution) -$209,615. |
| § 668.74 | Section 668.74(g)(2) contains a provision that allows the Department to verify that an institution correctly calculated its job placement rate by requiring an institution furnish to the Secretary, upon request, documentation and other data that was used to calculate the institution's employment rate calculations. | 1845-0022 +48 hrs. | +$2,235 |
| §§ 674.33(g), 682.402(d), 685.214 | Sections 674.33(g)(4), 682.402(d)(3) and 685.214(d)(1) will provide that the borrower must submit a completed closed school discharge application to the Secretary and that the factual assertions in the application must be true and made by the borrower under penalty of perjury. | 1845-0058  Burden will be cleared at a later date through a separate information collection for the form. | Costs will be cleared through separate information collection for the form |
| §§ 674.61, 682.402(d), 685.213 | Finalized changes expand the type of medical professional who can certify the TPD application. The | 1845-0065  Burden will be cleared at a later date | Costs will be cleared through |

|  | final changes also include an expansion of the acceptable Social Security Administration documentation for filing a TPD application. The final regulations also eliminate the income monitoring period for all TPD applicants except those who receive a new TEACH Grant or new Direct Loan within 3 years of the TPD discharge. | through a separate information collection for the form. | separate information collection for the form |
|---|---|---|---|
| §§ 682.402(e), 685.215(c) and 685.215(d) | These final regulations streamline the FFEL and Direct Loan false certification regulations to provide one set of regulatory standards that will cover all false certification discharge claims. Sections 682.402(e) and 685.215(c)(5) adds qualification for a false certification discharge if the school certified the borrower's eligibility for a FFEL or Direct Loan as a result of the crime of identity theft. Additionally, 685.215(c)(10) provides for a new application to allow a State Attorney General or nonprofit legal services representative to submit a request to the Secretary for a group discharge. | 1845–0058<br><br>Burden will be cleared at a later date through a separate information collection for the form. | Costs will be cleared through separate information collection for the form |
| § 682.402(e)(6) | Under Section 682.402(e)(6)(i) if a holder of a borrower's FFEL loan determines that a | 1845–0020<br>+102 hrs. | +$4,137.43 |

borrower may be eligible for a false certification discharge the holder provides the borrower with the appropriate application and explanation of the process for obtaining a discharge. Under Section 682.402(e)(6)(iii) if a FFEL borrower submits an application for discharge that a FFEL program loan holder determines is incomplete, the loan holder will notify the borrower of that determination and allow the borrower 30 days to amend the application and provide supplemental information. Section 682.402(e)(6)(vii) will require a guaranty agency to issue a decision that explains the reasons for any adverse determination on a false certification discharge application, describes the evidence on which the decision was made, and provides the borrower, upon request, copies of the evidence. The guaranty agency will consider any response or additional information from the borrower and notify the borrower as to whether the determination is changed. Section 682.402(e)(6)(ix) will provide the borrower with the option to request

| | | | |
|---|---|---|---|
| | that the Secretary review the guaranty agency's decision. | | |
| § 682.414(b) | In Section 682.414(b)(4), the Department will require FFEL Program lenders to report detailed information related to a borrower's deferments, forbearances, repayment plans, delinquency, and contact information on any FFEL loan to the Department by an established deadline. | 1845-0020 +15,500 | +$722,145 |
| § 685.219 | These final regulations provide new, modified, and restructured definitions for the PSLF Program in Section 685.219(b) which will expand the use of the form. | 1845-0110<br><br>Burden will be cleared at a later date through a separate information collection for the form. | Costs will be cleared through separate information collection for the form |
| § 685.219(g) | These final regulations create a reconsideration process for borrowers whose PSLF applications were denied or who disagree with the Department's determination of the number of qualifying payments or months of qualifying employment that have been earned by the borrower which formalizes the current non-regulatory process. | 1845-0164<br><br>This process is currently in public review under docket number ED-2022-SCC-0039. | Costs will be cleared through separate information collection for the form |
| § 685.300 | These final regulations reinstate prior regulations that barred institutions, as a condition of participating in the Direct Loan program, from requiring | 1845-0021 +121,486 | +$5,660,033 |

| | | | |
|---|---|---|---|
| | borrowers to accept pre-dispute arbitration agreements and class action waivers. Also, institutions will be required to submit certain arbitral records and judicial records connected with any BD claim filed against the school to the Secretary by certain deadlines. | | |
| § 685.304 | These final regulations remove Section 685.304(a)(6)(xiii) through (xv).  The final regulations at Section 685.300 will state the conditions under which disclosures will be required and provide deadlines for such disclosures. | 1845-0021 -27,393 individual hrs.; -2,832 institutional hrs. = -30,225 hrs. | Costs from 2019 Final Rule ($44.41 per institution; $16.30 per individual)  -$446,506 individual costs; -$125,769 institutional costs = -$572,275 |
| § 685.402 | In Section 685.402(c)(1), the Department may initiate a group process upon request from a third-party requestor, on the condition that the third-party requestor submits an application and other required information to the Department to adjudicate the claim. In Section 685.402(c)(4) the Secretary will notify an institution of the third-party requestor's application requesting to form a BD group.  The institution will have 90 days to respond to the Secretary regarding the third- | 1845-NEW  Burden for 685.402(c)(1) will be cleared at a later date through a separate information collection for the form.  Burden for 685.402(c)(4) and 685.402(c)(6) is +9,072. | Costs will be cleared through separate information collection for the form |

| | | | |
|---|---|---|---|
| | party requestor's application. Under Section 865.402(c)(6), if a third-party requestors' group request is denied, the third-party requestor will have 90 days from the initial decision to request the Secretary reconsider the formation of a group. | | |
| § 685.405 | Under the final regulations in § 685.405(a), the Department official will notify the institution of the BD claim and its basis for any group or individual BD claim. Under the final regulations in § 685.405(b) the institution will have 90 days to respond. Under the final regulations in § 685.405(c), with its response, the institution will be required to execute an affidavit confirming that the information contained in the response is true and correct under penalty of perjury on a form approved by the Secretary. | 1845-NEW<br><br>Burden will be cleared at a later date through a separate information collection for the form. | Costs will be cleared through separate information collection for the form |
| § 685.407 | The final regulations in § 685.407 sets forth the circumstances under which a borrower or a third-party requestor may seek reconsideration of a Department official's denial of their BD claim. § 685.407(a)(4) identifies the reconsideration | 1845-NEW<br><br>Burden will be cleared at a later date through a separate information collection for the form. | Costs will be cleared through separate information collection for the form |

| | | | |
|---|---|---|---|
| | process, which includes an application approved by the Secretary. | | |

The total burden hours and change in burden hours associated with each OMB Control number affected by the final regulations follows:

| Control No. | Total burden hours | Change in burden hours |
|---|---|---|
| 1845-0004 | 24,016 | -4,720 |
| 1845-0020 | 8,265,122 | +15,602 |
| 1845-0021 | 851,009 | +100,333 |
| 1845-0022 | 2,288,248 | +48 |
| Total | 11,428,395 | +111,263 |

BILLING CODE 4000-01-C

If you want to comment on the final information collection requirements, please send your comments to the Office of Information and Regulatory Affairs in OMB, Attention: Desk Officer for the U.S. Department of Education. Send these comments by email to *OIRA_DOCKET@omb.eop.gov* or by fax to (202)395–6974. You may also send a copy of these comments to the Department contact named in the **ADDRESSES** section of the preamble.

We have prepared the Information Collection Request (ICR) for these collections. You may review the ICR which is available at *www.reginfo.gov.* Click on Information Collection Review. These collections are identified as collections 1845–0004, 1845–0020, 1845–0021, 1845–0022.

*Regulatory Flexibility Act Certification*

Pursuant to 5 U.S.C. 601(2), the Regulatory Flexibility Act applies only to rules for which an agency publishes a general notice of proposed rulemaking.

*Federalism*

Executive Order 13132 requires us to ensure meaningful and timely input by State and local elected officials in the development of regulatory policies that have federalism implications. ''Federalism implications'' means substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. The proposed regulations do not have federalism implications.

*Accessible Format:* On request to the program contact person listed under **FOR FURTHER INFORMATION CONTACT**, individuals with disabilities can obtain this document in an accessible format. The Department will provide the requestor with an accessible format that may include Rich Text Format (RTF) or text format (txt), a thumb drive, an MP3 file, braille, large print, audiotape, or compact disc, or other accessible format.

*Electronic Access to This Document:* The official version of this document is the document published in the **Federal Register**. You may access the official edition of the **Federal Register** and the Code of Federal Regulations at *www.govinfo.gov.* At this site you can view this document, as well as all other documents of this Department published in the **Federal Register**, in text or Portable Document Format (PDF). To use PDF you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at *www.federalregister.gov.* Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

**List of Subjects**

*34 CFR Part 600*

Colleges and universities, Foreign relations, Grant programs—education, Loan programs—education, Reporting and recordkeeping requirements, Selective Service System, Student aid, Vocational education.

*34 CFR Part 668*

Administrative practice and procedure, Aliens, Colleges and universities, Consumer protection, Grant programs—education, Loan programs—education, Reporting and recordkeeping requirements, Selective Service System, Student aid, Vocational education.

*34 CFR Part 674*

Loan programs—education, Reporting and recordkeeping requirements, Student aid.

*34 CFR Part 682*

Administrative practice and procedure, Colleges and universities, Loan programs—education, Reporting and recordkeeping requirements, Student aid, Vocational education.

*34 CFR Part 685*

Administrative practice and procedure, Colleges and universities,

Education, Loan programs—education, Reporting and recordkeeping requirements, Student aid, Vocational education.

**Miguel A. Cardona,**
*Secretary of Education.*

For the reasons discussed in the preamble, the Secretary amends parts 600, 668, 674, 682, and 685 of title 34 of the Code of Federal Regulations as follows:

## PART 600—INSTITUTIONAL ELIGIBILITY UNDER THE HIGHER EDUCATION ACT OF 1965, AS AMENDED

■ 1. The authority citation for part 600 continues to read as follows:

**Authority:** 20 U.S.C. 1001, 1002, 1003, 1088, 1091, 1094, 1099b, and 1099c, unless otherwise noted.

■ 2. Section 600.41 is amended by revising paragraphs (a) introductory text, (a)(1) introductory text, and (a)(1)(i) to read as follows:

### § 600.41 Termination and emergency action proceedings.

(a) If the Secretary believes that a previously designated eligible institution as a whole, or at one or more of its locations, does not satisfy the statutory or regulatory requirements that define that institution as an eligible institution, the Secretary may—

(1) Terminate the institution's eligibility designation in whole or as to a particular location—

(i) Under the procedural provisions applicable to terminations contained in 34 CFR 668.81, 668.83, 668.86, 668.88, 668.89, 668.90(a)(1) and (4) and (c) through (f), and 668.91; or

\*    \*    \*    \*    \*

## PART 668—STUDENT ASSISTANCE GENERAL PROVISIONS

■ 3. The authority citation for part 668 is revised to read as follows:

**Authority:** 20 U.S.C. 1001–1003, 1070g, 1085, 1088, 1091, 1092, 1094, 1099c, 1099c–1, and 1231a, unless otherwise noted.

Section 668.14 also issued under 20 U.S.C. 1085, 1088, 1091, 1092, 1094, 1099a–3, 1099c, and 1141.

Section 668.41 also issued under 20 U.S.C. 1092, 1094, 1099c.

Section 668.91 also issued under 20 U.S.C. 1082, 1094.

Section 668.171 also issued under 20 U.S.C. 1094 and 1099c and section 4 of Pub. L. 94–452, 92 Stat. 1101–1109.

Section 668.172 also issued under 20 U.S.C. 1094 and 1099c and section 4 of Pub. L. 94–452, 92 Stat. 1101–1109.

Section 668.175 also issued under 20 U.S.C. 1094 and 1099c.

■ 4. Section 668.41 is amended by revising paragraph (c)(2) introductory text and removing paragraph (h).

The revision reads as follows:

### § 668.41 Reporting and disclosure of information.

\*    \*    \*    \*    \*

(c) \* \* \*

(2) An institution that discloses information to enrolled students as required under paragraph (d), (e), or (g) of this section by posting the information on an internet website or an Intranet website must include in the notice described in paragraph (c)(1) of this section—

\*    \*    \*    \*    \*

■ 5. Subpart F is revised to read as follows:

### Subpart F—Misrepresentation

Sec.
668.71  Scope and special definitions.
668.72  Nature of educational program or institution.
668.73  Nature of financial charges or financial assistance.
668.74  Employability of graduates.
668.75  Omission of fact.
668.79  Severability.

## Subpart F—Misrepresentation

### § 668.71 Scope and special definitions.

(a) If the Secretary determines that an eligible institution has engaged in substantial misrepresentation, the Secretary may—

(1) Revoke the eligible institution's program participation agreement, if the institution is provisionally certified under § 668.13(c);

(2) Impose limitations on the institution's participation in the title IV, HEA programs, if the institution is provisionally certified under § 668.13(c);

(3) Deny participation applications made on behalf of the institution; or

(4) Initiate a proceeding against the eligible institution under subpart G of this part.

(b) This subpart establishes the types of activities that constitute substantial misrepresentation by an eligible institution. An eligible institution is deemed to have engaged in substantial misrepresentation when the institution itself, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, marketing, advertising, recruiting or admissions services, makes a substantial misrepresentation about the nature of its educational program, its financial charges, or the employability of its graduates. Substantial

misrepresentations are prohibited in all forms, including those made in any advertising, promotional materials, or in the marketing or sale of courses or programs of instruction offered by the institution.

(c) The following definitions apply to this subpart:

*Misrepresentation.* Any false, erroneous or misleading statement an eligible institution, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, or to provide marketing, advertising, recruiting or admissions services makes directly or indirectly to a student, prospective student or any member of the public, or to an accrediting agency, to a State agency, or to the Secretary. A misleading statement includes any statement that has the likelihood or tendency to mislead under the circumstances. A misleading statement may be included in the institution's marketing materials, website, or any other communication to students or prospective students. A statement is any communication made in writing, visually, orally, or through other means. Misrepresentation includes any statement that omits information in such a way as to make the statement false, erroneous, or misleading. Misrepresentation includes the dissemination of a student endorsement or testimonial that a student gives either under duress or because the institution required such an endorsement or testimonial to participate in a program. Misrepresentation also includes the omission of facts as defined under § 668.75.

*Prospective student.* Any individual who has contacted an eligible institution for the purpose of requesting information about enrolling at the institution or who has been contacted directly by the institution or indirectly through advertising about enrolling at the institution.

*Substantial misrepresentation.* Any misrepresentation, including omission of facts as defined under § 668.75, on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment.

### § 668.72 Nature of educational program or institution.

Misrepresentation concerning the nature of an eligible institution's educational program includes, but is not limited to, false, erroneous or misleading statements concerning—

(a) The particular type(s), specific source(s), nature and extent of its institutional, programmatic, or specialized accreditation;

(b)(1) The general or specific transferability of course credits earned at the institution to other institution(s); or

(2) Acceptance of credits earned through prior work or at another institution toward the educational program at the institution.

(c) Whether successful completion of a course of instruction qualifies a student—

(1) For acceptance into a labor union or similar organization; or

(2) To receive, to apply to take, or to take the examination required to receive a local, State, or Federal license, or a nongovernmental certification required as a precondition for employment, or to perform certain functions in the States in which the educational program is offered, or to meet additional conditions that the institution knows or reasonably should know are generally needed to secure employment in a recognized occupation for which the program is represented to prepare students;

(d) The requirements for successfully completing the course of study or program and the circumstances that would constitute grounds for terminating the student's enrollment;

(e) Whether its courses are recommended or have been the subject of unsolicited testimonials or endorsements by:

(1) Vocational counselors, high schools, colleges, educational organizations, employment agencies, members of a particular industry, students, former students, or others; or

(2) Governmental officials for governmental employment;

(f) Its size, location, facilities, equipment, or institutionally-provided equipment, software technology, books, or supplies;

(g) The availability, frequency, and appropriateness of its courses and programs in relation to the employment objectives that it states its programs are designed to meet;

(h) The number, availability, and qualifications, including the training and experience, of its faculty, instructors, and other personnel;

(i) The nature and availability of any tutorial or specialized instruction, guidance and counseling, or other supplementary assistance it will provide to its students before, during or after the completion of a course;

(j) The nature or extent of any prerequisites established for enrollment in a course;

(k) The subject matter, content of the course of study, or any other fact related to the degree, diploma, certificate of completion, or any similar document that the student is to be, or is, awarded upon completion of the course of study;

(l) Whether the academic, professional, or occupational degree that the institution will confer upon completion of the course of study has been authorized by the appropriate State educational agency;

(m) Institutional or program admissions selectivity if the institution or program actually employs an open enrollment policy;

(n) The classification of the institution (nonprofit, public or proprietary) for purposes of its participation in the title IV, HEA programs, if that is different from the classification determined by the Secretary;

(o) Specialized, programmatic, or institutional certifications, accreditation, or approvals that were not actually obtained, or that the institution fails to remove from marketing materials, websites, or other communications to students within a reasonable period of time after such certifications or approvals are revoked or withdrawn;

(p) Assistance that will be provided in securing required externships or the existence of contracts with specific externship sites;

(q) Assistance that will be provided to obtain a high school diploma or General Educational Development Certificate (GED);

(r) The pace of completing the program or the time it would take to complete the program contrary to the stated length of the educational program; or

(s) Any matters required to be disclosed to prospective students under §§ 668.42, 668.43, and 668.45.

### § 668.73  Nature of financial charges or financial assistance.

Misrepresentation concerning the nature of an eligible institution's financial charges, or the financial assistance provided includes, but is not limited to, false, erroneous, or misleading statements concerning—

(a) Offers of scholarships to pay all or part of a course charge;

(b) Whether a particular charge is the customary charge at the institution for a course;

(c) The cost of the program and the institution's refund policy if the student does not complete the program;

(d) The availability, amount, or nature of any financial assistance available to students from the institution or any other entity, including any government

agency, to pay the costs of attendance at the institution, including part-time employment, housing, and transportation assistance;

(e) A student's responsibility to repay any loans provided, regardless of whether the student is successful in completing the program and obtaining employment;

(f) The student's right to reject any particular type of financial aid or other assistance, or whether the student must apply for a particular type of financial aid, such as financing offered by the institution; or

(g) The amount, method, or timing of payment of tuition and fees that the student would be charged for the program.

### § 668.74  Employability of graduates.

Misrepresentation regarding the employability of an eligible institution's graduates includes, but is not limited to, false, erroneous, or misleading statements concerning—

(a) The institution's relationship with any organization, employment agency, or other agency providing authorized training leading directly to employment;

(b) The institution's intentions to maintain a placement service for graduates or to otherwise assist its graduates to obtain employment, including any requirements to receive such assistance;

(c) The institution's knowledge about the current or likely future conditions, compensation, or employment opportunities in the industry or occupation for which the students are being prepared;

(d) Whether employment is being offered by the institution exclusively for graduates of the institution, or that a talent hunt or contest is being conducted, including, but not limited to, through the use of phrases such as ''Men/women wanted to train for . . . ,'' ''Help Wanted,'' ''Employment,'' or ''Business Opportunities'';

(e) Government job market statistics in relation to the potential placement of its graduates;

(f) Actual licensure passage rates, if they are materially lower than those included in the institution's marketing materials, website, or other communications made to the student or prospective student; or

(g)(1) Actual employment rates, if they are materially lower than those included in the institution's marketing materials, website, or other communications made to the student or prospective student, including but not limited to:

(i) Rates that are calculated in a manner that is inconsistent with the

standards or methodology set forth by the institution's accreditor or a State agency that regulates the institution, or in its institutional policy.

(ii) Rates that the institution discloses to students are inflated by means such as:

(A) Counting individuals as employed who are not bona fide employees, such as individuals placed on a 1-day job fair, an internship, externship, or in employment subsidized by the institution;

(B) Counting individuals as employed who were employed in the field prior to graduation; or

(C) Excluding students from an employment rate calculation due to assessments of employability or difficulty with placement.

(2) Upon request, the institution must furnish to the Secretary documentation and other information used to calculate the institution's employment rate calculations.

§ 668.75   Omission of fact.

An omission of fact is a misrepresentation under § 668.71 if a reasonable person would have considered the omitted information in making a decision to enroll or continue attendance at the institution. An omission of fact includes, but is not limited to, the concealment, suppression, or absence of material information or statement concerning—

(a) The entity that is actually providing the educational instruction, or implementing the institution's recruitment, admissions, or enrollment process;

(b) The availability of enrollment openings in the student's desired program;

(c) The factors that would prevent an applicant from meeting the legal or other requirements to be employed in the field for which the training is provided, for reasons such as prior criminal record or preexisting medical conditions;

(d) The factors that would prevent an applicant from meeting the legal or other requirements to be employed, licensed, or certified in the field for which the training is provided because the academic, professional, or occupational degree or credential that the institution will confer upon completion of the course of study has not been authorized by the appropriate State educational or licensure agency, or requires specialized accreditation that the institution does not have; or,

(e) The nature of the institution's educational programs, the institution's financial charges, or the employability of the institution's graduates as defined in § 668.72–74.

§ 668.79   Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice will not be affected thereby.

■ 6. Section 668.81 is amended by revising paragraph (a)(5)(i) to read as follows:

§ 668.81   Scope and special definitions.

(a) * * *

(5) * * *

(i) Borrower defense to repayment claims that are brought by the Department against an institution under § 685.206, § 685.222 or part 685, subpart D, of this chapter; and

*       *       *       *       *

§ 668.87   [Removed and Reserved]

■ 7. Section 668.87 is removed and reserved.

■ 8. Section 668.89 is amended by revising paragraph (b)(3)(iii) to read as follows:

§ 668.89   Hearing.

*       *       *       *       *

(b) * * *

(3) * * *

(iii) For borrower defenses under §§ 685.206(c) and (e) and 685.222 of this chapter, the designated department official has the burden of persuasion in a borrower defense and recovery action; however, for a borrower defense claim based on a substantial misrepresentation under § 682.222(d) of this chapter, the designated department official has the burden of persuasion regarding the substantial misrepresentation, and the institution has the burden of persuasion in establishing any offsetting value of the education under § 685.222(i)(2)(i).

*       *       *       *       *

§ 668.91   [Amended]

■ 9. Section 668.91 is amended by:
■ a. Removing paragraph (a)(2)(ii);
■ b. Redesignating paragraph (a)(2)(i) as (a)(2); and
■ c. Removing paragraph (c)(2)(x).
■ 10. Section 668.100 is added to subpart G to read as follows:

§ 668.100   Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice will not be affected thereby.

■ 11. Section 668.125 is added to read as follows:

§ 668.125   Proceedings to recover liabilities owed relating to approved borrower defense claims.

(a) If the Department determines that the institution is liable for any amounts discharged or reimbursed to borrowers under the discharge process described in § 685.408, it will provide the institution with written notice of the determination and the amount and basis of the liability.

(b) An institution may request review of the determination that it is liable for the amounts discharged or reimbursed by filing a written request for review with the designated department official no later than 45 days from the date that the institution receives the written notice.

(c) Upon receipt of an institution's request for review, the designated official arranges for a hearing before a hearing official.

(d) Except as provided in this section, the proceedings will be conducted in accordance with §§ 668.115 to 668.124 of this subpart. For purposes of this section references in §§ 668.115 to 668.124 to a final audit determination or a final program review determination will be read to refer to the written notice provided under paragraph (a) of this section.

(e) In place of the provisions in § 668.116(d), the following requirements shall apply:

(1) The Department has the burden of production to demonstrate that loans made to students to attend the institution were discharged on the basis of a borrower defense to repayment claim.

(2) The institution has the burden of proof to demonstrate that the decision to discharge the loans was incorrect or inconsistent with law and that the institution is not liable for the loan amounts discharged or reimbursed.

(3) A party may submit as evidence to the hearing official only materials within one or more of the following categories:

(i) Materials submitted to the Department during the process of adjudicating claims by borrowers relating to alleged acts or omissions of the institution, including materials submitted by the borrowers, the institution or any third parties;

(ii) Any material on which the Department relied in adjudicating claims by borrowers relating to alleged acts or omissions of the institution and provided by the Department to the institution; and

(iii) The institution may submit any other relevant documentary evidence that relates to the bases cited by the Department in approving the borrower

defense claims and pursuing recoupment from the institution.

■ 12. Subpart R is added to read as follows:

**Subpart R—Aggressive and Deceptive Recruitment Tactics or Conduct**

Sec.
668.500  Scope and purpose.
668.501  Aggressive and deceptive recruitment tactics or conduct.
668.509  Severability.

**Subpart R—Aggressive and Deceptive Recruitment Tactics or Conduct**

**§ 668.500  Scope and purpose.**

(a) This subpart identifies the types of activities that constitute aggressive and deceptive recruitment tactics or conduct by an eligible institution. An eligible institution has engaged in aggressive and deceptive recruitment tactics or conduct when the institution itself, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, marketing, advertising, lead generation, recruiting or admissions services, engages in one or more of the prohibited practices in § 668.501. Aggressive and deceptive recruitment tactics or conduct are prohibited in all forms, including in the institution's advertising or promotional materials, or in the marketing or sale of courses or programs of instruction offered by the institution.

(b) If the Secretary determines that an eligible institution has engaged in aggressive and deceptive recruitment tactics or conduct, the Secretary may:

(1) Revoke the eligible institution's program participation agreement, if the institution is provisionally certified under § 668.13(c);

(2) Impose limitations on the institution's participation in the title IV, HEA programs, if the institution is provisionally certified under § 668.13(c);

(3) Deny participation applications made on behalf of the institution; or

(4) Initiate a proceeding against the eligible institution under subpart G of this part.

(c) The following definitions apply to this subpart:

*Prospective student:* Has the same meaning in 34 CFR 668.71.

**§ 668.501  Aggressive and deceptive recruitment tactics or conduct.**

(a) Aggressive and deceptive recruitment tactics or conduct include but are not limited to actions by the institution, any of its representatives, or any institution, organization, or person with whom the institution has an agreement to provide educational programs, marketing, recruitment, or lead generation that:

(1) Demand or pressure the student or prospective student to make enrollment or loan-related decisions immediately, including falsely claiming that the student or prospective student would lose their opportunity to attend;

(2) Take unreasonable advantage of a student's or prospective student's lack of knowledge about, or experience with, postsecondary institutions, postsecondary programs, or financial aid to pressure the student into enrollment or borrowing funds to attend the institution;

(3) Discourage the student or prospective student from consulting an adviser, a family member, or other resource or individual prior to making enrollment or loan-related decisions;

(4) Obtain the student's or prospective student's contact information through websites or other means that:

(i) Falsely offer assistance to individuals seeking Federal, state or local benefits;

(ii) Falsely advertise employment opportunities; or,

(iii) Present false rankings of the institution or its programs;

(5) Use threatening or abusive language or behavior toward the student or prospective student; or,

(6) Repeatedly engage in unsolicited contact for the purpose of enrolling or reenrolling after the student or prospective student has requested not to be contacted further.

(b) [Reserved]

**§ 668.509  Severability.**

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice will not be affected thereby.

**PART 674—FEDERAL PERKINS LOAN PROGRAM**

■ 13. The authority citation for part 674 continues to read as follows:

**Authority:** 20 U.S.C. 1070g, 1087aa–1087hh; Pub. L. 111–256, 124 Stat. 2643; unless otherwise noted.

■ 14. Section 674.30 is added to read as follows:

**§ 674.30  Severability.**

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice will not be affected thereby.

■ 15. Section 674.33 is amended by:

■ a. Revising paragraph (g)(1);
■ b. In paragraph (g)(2)(iv) removing the words "credit bureaus" and adding in their place the words "consumer reporting agencies";
■ c. Revising paragraphs (g)(3) and (4);
■ d. In paragraph (g)(6)(i) introductory text, removing the words "In order to" and adding in their place the word "To";
■ e. In paragraph (g)(8)(i), removing the number "120" and adding in its place the number "180";
■ f. Revising paragraphs (g)(8)(v) and (vii); and
■ g. Adding paragraph (g)(9).

The revisions and addition read as follows:

**§ 674.33  Repayment.**

*    *    *    *    *

(g) * * *

(1) *General.* (i) The holder of an NDSL or a Federal Perkins Loan discharges the borrower's (and any endorser's) obligation to repay the loan if the borrower did not complete the program of study for which the loan was made because the school at which the borrower was enrolled closed.

(ii) For the purposes of this section—

(A) If a school has closed, the school's closure date is the earlier of: the date, determined by the Secretary, that the school ceased to provide educational instruction in programs in which most students at the school were enrolled, or a determined by the Secretary that reflects when the school ceased to provide educational instruction for all of its students;

(B) "School" means a school's main campus or any location or branch of the main campus regardless of whether the school or its location or branch is considered title IV eligible;

(C) The "holder" means the Secretary or the school that holds the loan; and

(D) "Program" means the credential defined by the level and Classification of Instructional Program code in which a student is enrolled, except that the Secretary may define a borrower's program as multiple levels or Classification of Instructional Program codes if—

(*1*) The enrollment occurred at the same school in closely proximate periods;

(*2*) The school granted a credential in a program while the student was enrolled in a different program; or

(*3*) The programs must be taken in a set order or were presented as necessary for students to complete in order to succeed in the relevant field of employment.

*    *    *    *    *

(3) *Discharge without an application.*
(i) The Secretary will discharge the

borrower's obligation to repay an NDSL or Federal Perkins Loan without an application from the borrower if the—

(A) Borrower qualified for and received a discharge on a loan pursuant to § 682.402(d) (Federal Family Education Loan Program) or § 685.214 (Federal Direct Loan Program) of this chapter, and was unable to receive a discharge on an NDSL or Federal Perkins Loan because the Secretary lacked the statutory authority to discharge the loan; or

(B) Secretary determines that the borrower qualifies for a discharge based on information in the Secretary's possession. The Secretary discharges the loan without an application from the borrower 1 year after the institution's closure date if the borrower did not complete the program at another branch or location of the school or through a teach-out agreement with another school, approved by the school's accrediting agency and, if applicable, the school's State authorizing agency.

(ii) If the borrower accepts but does not complete a continuation of their program at a branch or another location of the institution or a teach-out agreement at another school approved by the school's accrediting agency and, if applicable, the school's State authorizing agency, then the Secretary discharges the loan 1 year after the borrower's last date of attendance at the institution or in the teach-out program.

(4) *Borrower qualification for discharge.* Except as provided in paragraph (g)(3) of this section, to qualify for discharge of an NDSL or Federal Perkins Loan, a borrower must submit to the holder of the loan a completed closed school discharge application on a form approved by the Secretary, and the factual assertions in the application must be true and must be made by the borrower under penalty of perjury. The application explains the procedures and eligibility criteria for obtaining a discharge and requires the borrower to—

(i) State that the borrower—

(A) Received the proceeds of a loan, in whole or in part, on or after January 1, 1986, to attend a school;

(B) Did not complete the program of study at that school because the school closed while the student was enrolled, or the student withdrew from the school not more than 180 days before the school closed. The Secretary may extend the 180-day period if the Secretary determines that exceptional circumstances such as those described in paragraph (g)(9) of this section justify an extension; and

(C) On or after July 1, 2023, did not complete the program at another branch

or location of the institution or through a teach-out agreement at another school, approved by the school's accrediting agency and, if applicable, the school's State authorizing agency.

(ii) State whether the borrower has made a claim with respect to the school's closing with any third party, such as the holder of a performance bond or a tuition recovery program, and, if so, the amount of any payment received by the borrower or credited to the borrower's loan obligation; and

(iii) State that the borrower—

(A) Agrees to provide to the holder of the loan upon request other documentation reasonably available to the borrower that demonstrates that the borrower meets the qualifications for discharge under this section; and

(B) Agrees to cooperate with the Secretary in enforcement actions in accordance with paragraph (g)(6) of this section and to transfer any right to recovery against a third party to the Secretary in accordance with paragraph (g)(7) of this section.

\*    \*    \*    \*    \*

(v) If the borrower fails to submit the completed application described in paragraph (g)(4) of this section within 90 days of the holder of the loan's mailing the discharge application, the holder of the loan resumes collection and grants forbearance of principal and interest for the period during which collection activity was suspended.

\*    \*    \*    \*    \*

(vii) If the holder of the loan determines that a borrower who requests a discharge meets the qualifications for a discharge, the holder of the loan notifies the borrower in writing of that determination and the reasons for the determination.

\*    \*    \*    \*    \*

(9) *Exceptional circumstances.* For purposes of this section, exceptional circumstances include, but are not limited to—

(i) The revocation or withdrawal by an accrediting agency of the school's institutional accreditation;

(ii) The school is or was placed on probation or issued a show-cause order, or placed on an equivalent accreditation status, by its accrediting agency for failing to meet one or more of the agency's standards;

(iii) The revocation or withdrawal by the State authorization or licensing authority to operate or to award academic credentials in the State;

(iv) The termination by the Department of the school's participation in a title IV, HEA program;

(v) A finding by a State or Federal government agency that the school

violated State or Federal law related to education or services to students;

(vi) A State or Federal court judgment that a School violated State or Federal law related to education or services to students;

(vii) The teach-out of the student's educational program exceeds the 180-day look back period for a closed school discharge;

(viii) The school responsible for the teach-out of the student's educational program fails to perform the material terms of the teach-out plan or agreement, such that the student does not have a reasonable opportunity to complete his or her program of study;

(ix) The school discontinued a significant share of its academic programs;

(x) The school permanently closed all or most of its in-person locations while maintaining online programs;

(xi) The Department placed the school on the heightened cash monitoring payment method as defined in § 668.162(d)(2).

■ 16. Section 674.61 is amended by:
■ a. Revising paragraphs (b)(2) through (6);
■ b. Removing paragraph (b)(7);
■ c. Redesignating paragraph (b)(8) as paragraph (b)(7);
■ d. Revising newly redesignated paragraph (b)(7); and
■ e. Revising paragraphs (d) and (e).
The revisions read as follows:

### § 674.61 Discharge for death or disability.

\*    \*    \*    \*    \*

(b) \*    \*    \*

(2) *Discharge application process for borrowers who have a total and permanent disability as defined in § 674.51(aa)(1).* (i) If the borrower notifies the institution that the borrower claims to be totally and permanently disabled as defined in § 674.51(aa)(1), the institution must direct the borrower to notify the Secretary of the borrower's intent to submit an application for total and permanent disability discharge and provide the borrower with the information needed for the borrower to notify the Secretary.

(ii) If the borrower notifies the Secretary of the borrower's intent to apply for a total and permanent disability discharge, the Secretary—

(A) Provides the borrower with information needed for the borrower to apply for a total and permanent disability discharge;

(B) Identifies all title IV loans owed by the borrower and notifies the lenders of the borrower's intent to apply for a total and permanent disability discharge;

(C) Directs the lenders to suspend efforts to collect from the borrower for a period not to exceed 120 days; and

(D) Informs the borrower that the suspension of collection activity described in paragraph (b)(2)(ii)(C) of this section will end after 120 days and the collection will resume on the loans if the borrower does not submit a total and permanent disability discharge application to the Secretary within that time.

(iii) If the borrower fails to submit an application for a total and permanent disability discharge to the Secretary within 120 days, collection resumes on the borrower's title IV loans.

(iv) The borrower must submit to the Secretary an application for total and permanent disability discharge on a form approved by the Secretary. The application must contain—

(A) A certification by a physician, who is a doctor of medicine or osteopathy legally authorized to practice in a State, that the borrower is totally and permanently disabled as defined in § 674.51(aa)(1);

(B) A certification by a nurse practitioner or physician assistant licensed by a State or a certified psychologist licensed at the independent practice level by a State, that the borrower is totally and permanently disabled as defined in § 674.51(aa)(1); or

(C) A Social Security Administration (SSA) Benefit Planning Query (BPQY) or an SSA notice of award or other documentation deemed acceptable by the Secretary indicating that—

(*1*) The borrower qualifies for Social Security Disability Insurance (SSDI) benefits or Supplemental Security Income (SSI) based on disability and the borrower's next continuing disability review has been scheduled between 5 and 7 years;

(*2*) The borrower qualifies for SSDI benefits or SSI based on disability and the borrower's next continuing disability review has been scheduled at 3 years;

(*3*) The borrower has an established onset date for SSDI or SSI or at least 5 years prior to the application for a disability discharge or has been receiving SSDI benefits or SSI based on disability for at least 5 years prior to the application for a disability discharge;

(*4*) The borrower qualifies for SSDI benefits or SSI based on a compassionate allowance; or

(*5*) For borrowers currently receiving SSA retirement benefits, documentation that, prior to the borrower qualifying for SSA retirement benefits, the borrower met the requirements in paragraph (b)(2)(iv)(C) of this section.

(v) The borrower must submit the application described in paragraph (b)(2)(iv) of this section to the Secretary within 90 days of the date the physician, nurse practitioner, physician assistant, or psychologist certifies the application, if applicable.

(vi) After the Secretary receives the application described in paragraph (b)(2)(iv) of this section, the Secretary notifies the holders of the borrower's title IV loans that the Secretary has received a total and permanent disability discharge application from the borrower.

(vii) If the application is incomplete, the Secretary notifies the borrower of the missing information and requests the missing information from the borrower, the borrower's representative, or the physician, nurse practitioner, physician assistant, or psychologist who provided the certification, as appropriate. The Secretary does not make a determination of eligibility until the application is complete.

(viii) The lender notification described in paragraph (b)(2)(vi) of this section directs the borrower's loan holders to suspend collection activity or maintain the suspension of collection activity on the borrower's title IV loans.

(ix) After the Secretary receives a disability discharge application, the Secretary sends a notice to the borrower that—

(A) States that the application will be reviewed by the Secretary;

(B) Informs the borrower that the borrower's lenders will suspend collection activity or maintain the suspension of collection activity on the borrower's title IV loans while the Secretary reviews the borrower's application for discharge; and

(C) Explains the process for the Secretary's review of total and permanent disability discharge applications.

(3) *Secretary's review of the total and permanent disability discharge application.* (i) If, after reviewing the borrower's completed application, the Secretary determines that the data described in paragraph (b)(2) of this section supports the conclusion that the borrower is totally and permanently disabled as defined in § 674.51(aa)(1), the borrower is considered totally and permanently disabled as of the date—

(A) The physician, nurse practitioner, physician assistant, or psychologist certified the borrower's application; or

(B) The Secretary received the SSA data described in paragraph (b)(2)(iv)(C) of this section.

(ii) If the Secretary determines that the borrower's application does not support the conclusion that the

borrower is totally and permanently disabled as defined in § 674.51(aa)(1), the Secretary may require the borrower to submit additional medical evidence. As part of the Secretary's review of the borrower's discharge application, the Secretary may require and arrange for an additional review of the borrower's condition by an independent physician or other medical professional identified by the Secretary at no expense to the borrower.

(iii) After determining that the borrower is totally and permanently disabled as defined in § 674.51(aa)(1), the Secretary notifies the borrower and the borrower's lenders that the application for a disability discharge has been approved. With this notification, the Secretary provides the date the physician, nurse practitioner, physician assistant, or psychologist certified the borrower's loan discharge application or the date the Secretary received the SSA data described in paragraph (b)(2)(iv)(C) of this section and directs each institution holding a Defense, NDSL, or Perkins Loan made to the borrower to assign the loan to the Secretary.

(iv) The institution must assign the loan to the Secretary within 45 days of the date of the notice described in paragraph (b)(3)(iii) of this section.

(v) After the loan is assigned, the Secretary discharges the borrower's obligation to make further payments on the loan and notifies the borrower and the institution that the loan has been discharged. The notification to the borrower explains the terms and conditions under which the borrower's obligation to repay the loan will be reinstated, as specified in paragraph (b)(6) of this section. Any payments received after the date the physician, nurse practitioner, physician assistant, or psychologist certified the borrower's loan discharge application or the date the Secretary received the SSA data described in paragraph (b)(2)(iv)(C) of this section are returned to the person who made the payments on the loan in accordance with paragraph (b)(7) of this section.

(vi) If the Secretary determines that the physician, nurse practitioner, physician assistant, or psychologist certification or the SSA data described in paragraph (b)(2)(iv)(C) of this section provided by the borrower does not support the conclusion that the borrower is totally and permanently disabled as defined in § 674.51(aa)(1), the Secretary notifies the borrower and the institution that the application for a disability discharge has been denied. The notification includes—

(A) The reason or reasons for the denial;

(B) A statement that the loan is due and payable to the institution under the terms of the promissory note and that the loan will return to the status that would have existed had the total and permanent disability discharge application not been received;

(C) A statement that the institution will notify the borrower of the date the borrower must resume making payments on the loan;

(D) An explanation that the borrower is not required to submit a new total and permanent disability discharge application if the borrower requests that the Secretary re-evaluate the application for discharge by providing, within 12 months of the date of the notification, additional information that supports the borrower's eligibility for discharge; and

(E) An explanation that if the borrower does not request re-evaluation of the borrower's prior discharge application within 12 months of the date of the notification, the borrower must submit a new total and permanent disability discharge application to the Secretary if the borrower wishes the Secretary to reevaluate the borrower's eligibility for a total and permanent disability discharge.

(vii) If the borrower requests reevaluation in accordance with paragraph (b)(3)(vi)(D) of this section or submits a new total and permanent disability discharge application in accordance with paragraph (b)(3)(vi)(E) of this section, the request must include new information regarding the borrower's disabling condition that was not provided to the Secretary in connection with the prior application at the time the Secretary reviewed the borrower's initial application for a total and permanent disability discharge.

(4) *Treatment of disbursements made during the period from the certification or the date the Secretary received the SSA data until the date of discharge.* If a borrower received a title IV loan or TEACH Grant before the date the physician, nurse practitioner, physician assistant, or psychologist certified the borrower's discharge application or before the date the Secretary received the SSA data described in paragraph (b)(2)(iv)(C) of this section and a disbursement of that loan or grant is made during the period from the date of the physician, nurse practitioner, physician assistant, or psychologist certification or the date the Secretary received the SSA data described in paragraph (b)(2)(iv)(C) of this section until the date the Secretary grants a discharge under this section, the processing of the borrower's loan discharge application will be suspended until the borrower ensures that the full amount of the disbursement has been returned to the loan holder or to the Secretary, as applicable.

(5) *Receipt of new title IV loans or TEACH Grants after the certification or after the date the Secretary received the SSA data.* If a borrower receives a disbursement of a new title IV loan or receives a new TEACH Grant made on or after the date the physician, nurse practitioner, physician assistant, or psychologist certified the borrower's discharge application or on or after the date the Secretary received the SSA data described in paragraph (b)(2)(iv)(C) of this section and before the date the Secretary grants a discharge under this section, the Secretary denies the borrower's discharge request and collection resumes on the borrower's loans.

(6) *Conditions for reinstatement of a loan after a total and permanent disability discharge.* (i) The Secretary reinstates the borrower's obligation to repay a loan that was discharged in accordance with paragraph (b)(3)(v) of this section if, within 3 years after the date the Secretary granted the discharge, the borrower receives a new TEACH Grant or a new loan under the Direct Loan programs, except for a Direct Consolidation Loan that includes loans that were not discharged.

(ii) If the borrower's obligation to repay a loan is reinstated, the Secretary—

(A) Notifies the borrower that the borrower's obligation to repay the loan has been reinstated;

(B) Returns the loan to the status that would have existed had the total and permanent disability discharge application not been received; and

(C) Does not require the borrower to pay interest on the loan for the period from the date the loan was discharged until the date the borrower's obligation to repay the loan was reinstated.

(iii) The Secretary's notification under paragraph (b)(6)(ii)(A) of this section will include—

(A) The reason or reasons for the reinstatement;

(B) An explanation that the first payment due date on the loan following reinstatement will be no earlier than 90 days after the date of the notification of reinstatement; and

(C) Information on how the borrower may contact the Secretary if the borrower has questions about the reinstatement or believes that the obligation to repay the loan was reinstated based on incorrect information.

(7) *Payments received after the certification of total and permanent disability.* (i) If the institution receives any payments from or on behalf of the borrower on or attributable to a loan that has been assigned to the Secretary based on the Secretary's determination of eligibility for a total and permanent disability discharge, the institution must return the payments to the sender.

(ii) At the same time that the institution returns the payments, it must notify the borrower that there is no obligation to make payments on the loan after it has been discharged due to a total and permanent disability unless the loan is reinstated in accordance with § 674.61(b)(6), or the Secretary directs the borrower otherwise.

(iii) When the Secretary discharges the loan, the Secretary returns to the sender any payments received on the loan after the date the borrower became totally and permanently disabled.

\*    \*    \*    \*    \*

(d) *Discharge without an application.* (1) The Secretary will discharge a loan under this section without an application or any additional documentation from the borrower if the Secretary—

(i) Obtains data from the Department of Veterans Affairs (VA) showing that the borrower is unemployable due to a service-connected disability; or

(ii) Obtains data from the Social Security Administration (SSA) described in paragraph (b)(2)(iv)(C) of this section.

(e) *Notifications and return of payments.* (1) After determining that a borrower qualifies for a total and permanent disability discharge under paragraph (d) of this section, the Secretary sends a notification to the borrower informing the borrower that the Secretary will discharge the borrower's title IV loans unless the borrower notifies the Secretary, by a date specified in the Secretary's notification, that the borrower does not wish to receive the loan discharge.

(2) Unless the borrower notifies the Secretary that the borrower does not wish to receive the discharge, the Secretary notifies the borrower's lenders that the borrower has been approved for a disability discharge.

(3) In the case of a discharge based on a disability determination by VA—

(i) The notification—

(A) Provides the effective date of the disability determination by VA; and

(B) Directs each institution holding a Defense, NDSL, or Perkins Loan made to the borrower to discharge the loan; and

(ii) The institution returns to the person who made the payments any payments received on or after the effective date of the determination by VA that the borrower is unemployable due to a service-connected disability.

(4) In the case of a discharge based on a disability determination by the SSA—

(i) The notification—

(A) Provides the date the Secretary received the SSA data described in paragraph (b)(2)(iv)(C) of this section; and

(B) Directs each institution holding a Defense, NDSL, or Perkins Loan made to the borrower to assign the loan to the Secretary within 45 days of the notice described in paragraph (e)(2) of this section; and

(ii) After the loan is assigned, the Secretary discharges the loan in accordance with paragraph (b)(3)(v) of this section.

(5) If the borrower notifies the Secretary that they do not wish to receive the discharge, the borrower will remain responsible for repayment of the borrower's loans in accordance with the terms and conditions of the promissory notes that the borrower signed.

\* \* \* \* \*

■ 17. Section 674.65 is added to read as follows:

### §674.65 Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice will not be affected thereby.

## PART 682—FEDERAL FAMILY EDUCATION LOAN (FFEL) PROGRAM

■ 18. The authority citation for part 682 continues to read as follows:

**Authority:** 20 U.S.C. 1071–1087–4, unless otherwise noted.

■ 19. Section 682.402 is amended by:
■ a. Revising paragraphs (c)(2)(iv) through (vii) and (c)(3) through (6);
■ b. Removing paragraph (c)(7);
■ c. Redesignating paragraphs (c)(8) through (11) as paragraphs (c)(7) through (10), respectively;
■ d. Revising newly redesignated paragraphs (c)(7), (9), and (10);
■ e. Revising paragraphs (d)(1) through (3);
■ f. In paragraph (d)(6)(ii)(B) introductory text, removing the number ''120'' and adding in its place the number ''180'';
■ g. In paragraph (d)(6)(ii)(B)(*2*), removing the number ''120'' and adding in its place the number ''180'';
■ h. In paragraph (d)(6)(ii)(H), removing the number ''60'' and adding in its place the number ''90'';
■ i. In paragraph (d)(7)(ii), removing the number ''60'' and adding in its place the number ''90'';
■ j. Revising paragraph (d)(8);

■ k. Adding paragraph (d)(9);
■ l. Revising paragraph (e)(1);
■ m. In paragraph (e)(2)(v) removing the citation ''(e)(1)(ii)'' and adding in its place the citation ''(e)(1)(iii)'';
■ n. Revising paragraph (e)(3);
■ o. Removing paragraph (e)(13);
■ p. Redesignating paragraphs (e)(6) through (12) as (e)(7) through (13), respectively;
■ q. Adding a new paragraph (e)(6);
■ r. Revising redesignated paragraphs (e)(7) through (13) and paragraphs (e)(14) and (15); and
■ s. Adding paragraph (e)(16).

The revisions and additions read as follows:

### §682.402 Death, disability, closed school, false certification, unpaid refunds, and bankruptcy payments.

\* \* \* \* \*

(c) \* \* \*

(2) \* \* \*

(iv) The borrower must submit to the Secretary an application for a total and permanent disability discharge on a form approved by the Secretary. The application must contain—

(A) A certification by a physician, who is a doctor of medicine or osteopathy legally authorized to practice in a State, that the borrower is totally and permanently disabled as described in paragraph (1) of the definition of that term in §682.200(b);

(B) A certification by a nurse practitioner or physician assistant licensed by a State, or a licensed or certified psychologist at the independent practice level, that the borrower is totally and permanently disabled as described in paragraph (1) of the definition of that term in §682.200(b); or

(C) An SSA Benefit Planning Query (BPQY) or an SSA notice of award or other documentation deemed acceptable by the Secretary, indicating that—

(*1*) The borrower qualifies for Social Security Disability Insurance (SSDI) benefits or Supplemental Security Income (SSI) based on disability and the borrower's next continuing disability has been scheduled between 5 and 7 years;

(*2*) The borrower qualifies for SSDI benefits or SSI based on disability and the borrower's next continuing disability review has been scheduled at 3 years;

(*3*) The borrower has an established onset date for SSDI or SSI of at least 5 years prior or has been receiving SSDI benefits or SSI based on disability for at least 5 years prior to the application for a disability discharge;

(*4*) The borrower qualifies for SSDI benefits or SSI based on a compassionate allowance; or

(*5*) For a borrower who is currently receiving SSA retirement benefits, documentation that, prior to the borrower qualifying for SSA retirement benefits, the borrower met any of the requirements in paragraph (c)(2)(iv)(C) of this section.

(v) The borrower must submit the application described in paragraph (c)(2)(iv) of this section to the Secretary within 90 days of the date the physician, nurse practitioner, physician assistant, or psychologist certifies the application, if applicable.

(vi) After the Secretary receives the application described in paragraph (c)(2)(iv) of this section, the Secretary notifies the holders of the borrower's title IV loans that the Secretary has received a total and permanent disability discharge application from the borrower. The holders of the loans must notify the applicable guaranty agency that the total and permanent disability discharge application has been received.

(vii) If the application is incomplete, the Secretary notifies the borrower of the missing information and requests the missing information from the borrower or the physician, nurse practitioner, physician assistant, or psychologist who provided the certification, as appropriate. The Secretary does not make a determination of eligibility until the application is complete.

\* \* \* \* \*

(3) *Secretary's review of total and permanent disability discharge application.* (i) If, after reviewing the borrower's completed application, the Secretary determines that the data described in paragraph (c)(2)(iv) of this section supports the conclusion that the borrower is totally and permanently disabled, as described in paragraph (1) of the definition of that term in §682.200(b), the borrower is considered totally and permanently disabled—

(A) As of the date the physician, nurse practitioner, physician assistant, or psychologist certified the borrower's application; or

(B) As of the date the Secretary received the SSA data described in paragraph (c)(2)(iv)(C) of this section.

(ii) If the Secretary determines that the borrower's application does not support the conclusion that the borrower is totally and permanently disabled as described in paragraph (1) of the definition of that term in §682.200(b) the Secretary may require the borrower to submit additional medical evidence. As part of the Secretary's review of the borrower's discharge application, the Secretary may require and arrange for an additional

review of the borrower's condition by an independent physician or other medical professional identified by the Secretary at no expense to the borrower.

(iii) After determining that the borrower is totally and permanently disabled as described in paragraph (1) of the definition of that term in § 682.200(b), the Secretary notifies the borrower and the borrower's lenders that the application for a disability discharge has been approved. With this notification, the Secretary provides the date the physician, nurse practitioner, physician assistant, or psychologist certified the borrower's loan discharge application or the date the Secretary received the SSA data described in paragraph (c)(2)(iv)(C) of this section and directs each lender to submit a disability claim to the guaranty agency so the loan can be assigned to the Secretary. The Secretary returns any payment received by the Secretary after the date the physician, nurse practitioner, physician assistant, or psychologist certified the borrower's loan discharge application or received the SSA data described in paragraph (c)(2)(iv)(C) of this section to the person who made the payment.

(iv) After the loan is assigned, the Secretary discharges the borrower's obligation to make further payments on the loan and notifies the borrower and the lender that the loan has been discharged. The notification to the borrower explains the terms and conditions under which the borrower's obligation to repay the loan will be reinstated, as specified in paragraph (c)(6)(i) of this section.

(v) If the Secretary determines that the physician, nurse practitioner, physician assistant, or psychologist certification or SSA data described in paragraph (c)(2)(iv)(C) of this section does not support the conclusion that the borrower is totally and permanently disabled as described in paragraph (1) of the definition of that term in § 682.200(b), the Secretary notifies the borrower and the lender that the application for a disability discharge has been denied. The notification includes—

(A) The reason or reasons for the denial;

(B) A statement that the loan is due and payable to the lender under the terms of the promissory note and that the loan will return to the status that would have existed had the total and permanent disability discharge application not been received;

(C) A statement that the lender will notify the borrower of the date the borrower must resume making payments on the loan;

(D) An explanation that the borrower is not required to submit a new total and permanent disability discharge application if the borrower requests that the Secretary re-evaluate the application for discharge by providing, within 12 months of the date of the notification, additional information that supports the borrower's eligibility for discharge; and

(E) An explanation that if the borrower does not request re-evaluation of the borrower's prior discharge application within 12 months of the date of the notification, the borrower must submit a new total and permanent disability discharge application to the Secretary if the borrower wishes the Secretary to re-evaluate the borrower's eligibility for a total and permanent disability discharge.

(vi) If the borrower requests re-evaluation in accordance with paragraph (c)(3)(v)(D) of this section or submits a new total and permanent disability discharge application in accordance with paragraph (c)(3)(v)(E) of this section, the request must include new information regarding the borrower's disabling condition that was not provided to the Secretary in connection with the prior application at the time the Secretary reviewed the borrower's initial application for a total and permanent disability discharge.

(4) *Treatment of disbursements made during the period from the date of the physician, nurse practitioner, physician assistant, or psychologist certification or the date the Secretary received the SSA data described in paragraph (c)(2)(iv)(C) of this section until the date of discharge.* If a borrower received a title IV loan or TEACH Grant before the date the physician, nurse practitioner, physician assistant, or psychologist certified the borrower's discharge application or before the date the Secretary received the SSA data described in paragraph (c)(2)(iv)(C) of this section and a disbursement of that loan or grant is made during the period from the date of the physician, nurse practitioner, physician assistant, or psychologist certification or the Secretary's receipt of the SSA data described in paragraph (c)(2)(iv)(C) of this section until the date the Secretary grants a discharge under this section, the processing of the borrower's loan discharge request will be suspended until the borrower ensures that the full amount of the disbursement has been returned to the loan holder or to the Secretary, as applicable.

(5) *Receipt of new title IV loans or TEACH Grants after the date of the physician, nurse practitioner, physician assistant, or psychologist certification or after the date the Secretary received the SSA data described in paragraph (c)(2)(iv)(C) of this section.* If a borrower receives a disbursement of a new title IV loan or receives a new TEACH Grant made on or after the date the physician, nurse practitioner, physician assistant, or psychologist certified the borrower's discharge application or the date the Secretary received the SSA data described in paragraph (c)(2)(iv)(C) of this section and before the date the Secretary grants a discharge under this section, the Secretary denies the borrower's discharge request and collection resumes on the borrower's loans.

(6) *Conditions for reinstatement of a loan after a total and permanent disability discharge.* (i) The Secretary reinstates the borrower's obligation to repay a loan that was discharged in accordance with (c)(3)(iii) of this section if, within 3 years after the date the Secretary granted the discharge, the borrower receives a new TEACH Grant or a new loan under the Direct Loan Program, except for a Direct Consolidation Loan that includes loans that were not discharged.

(ii) If the borrower's obligation to repay a loan is reinstated, the Secretary—

(A) Notifies the borrower that the borrower's obligation to repay the loan has been reinstated;

(B) Returns the loan to the status that would have existed if the total and permanent disability discharge application had not been received; and

(C) Does not require the borrower to pay interest on the loan for the period from the date the loan was discharged until the date the borrower's obligation to repay the loan was reinstated.

(iii) The Secretary's notification under paragraph (c)(6)(ii)(A) of this section will include—

(A) The reason or reasons for the reinstatement;

(B) An explanation that the first payment due date on the loan following reinstatement will be no earlier than 90 days after the date of the notification of reinstatement; and

(C) Information on how the borrower may contact the Secretary if the borrower has questions about the reinstatement or believes that the obligation to repay the loan was reinstated based on incorrect information.

(7) *Lender and guaranty agency actions.* (i) If the Secretary approves the borrower's total and permanent disability discharge application—

(A) The lender must submit a disability claim to the guaranty agency, in accordance with paragraph (g)(1) of this section;

(B) If the claim satisfies the requirements of paragraph (g)(1) of this section and § 682.406, the guaranty agency must pay the claim submitted by the lender;

(C) After receiving a claim payment from the guaranty agency, the lender must return to the sender any payments received by the lender after the date the physician, nurse practitioner, physician assistant, or psychologist certified the borrower's loan discharge application or after the date the Secretary received the SSA data described in paragraph (c)(2)(iv)(C) of this section as well as any payments received after claim payment from or on behalf of the borrower;

(D) The Secretary reimburses the guaranty agency for a disability claim paid to the lender after the agency pays the claim to the lender; and

(E) The guaranty agency must assign the loan to the Secretary within 45 days of the date the guaranty agency pays the disability claim and receives the reimbursement payment, or within 45 days of the date the guaranty agency receives the notice described in paragraph (c)(3)(iii) of this section if a guaranty agency is the lender.

(ii) If the Secretary does not approve the borrower's total and permanent disability discharge request, the lender must resume collection of the loan and is deemed to have exercised forbearance of payment of both principal and interest from the date collection activity was suspended. The lender may capitalize, in accordance with § 682.202(b), any interest accrued and not paid during that period, except if the lender is a guaranty agency it may not capitalize accrued interest.

* * * * *

(9) *Discharge without an application.* The Secretary will discharge a loan under this section without an application or any additional documentation from the borrower if the Secretary—

(i) Obtains data from the Department of Veterans Affairs (VA) showing that the borrower is unemployable due to a service-connected disability; or

(ii) Obtains data from the Social Security Administration (SSA) described in paragraph (c)(2)(iv)(C) of this section.

(10) *Notifications and return of payments.* (i) After determining that a borrower qualifies for a total and permanent disability discharge under paragraph (c)(9) of this section, the Secretary sends a notification to the borrower informing the borrower that the Secretary will discharge the borrower's title IV loans unless the borrower notifies the Secretary, by a

date specified in the Secretary's notification, that the borrower does not wish to receive the loan discharge.

(ii) Unless the borrower notifies the Secretary that the borrower does not wish to receive the discharge, the Secretary notifies the borrower's loan holders that the borrower has been approved for a disability discharge. With this notification the Secretary provides the effective date of the determination by VA or the date the Secretary received the SSA data described in paragraph (c)(2)(iv)(C) of this section and directs the holder of each FFEL Program loan made to the borrower to submit a disability claim to the guaranty agency in accordance with paragraph (g)(1) of this section.

(iii) If the claim meets the requirements of paragraph (g)(1) of this section and § 682.406, the guaranty agency pays the claim and must—

(A) Discharge the loan, in the case of a discharge based on data from VA; or

(B) Assign the loan to the Secretary, in the case of a discharge based on data from the SSA.

(iv) The Secretary reimburses the guaranty agency for a disability claim after the agency pays the claim to the lender.

(v) Upon receipt of the claim payment from the guaranty agency, the loan holder returns to the person who made the payments any payments received on or after—

(A) The effective date of the determination by VA that the borrower is unemployable due to a service-connected disability; or

(B) The date the Secretary received the SSA data described in paragraph (c)(2)(iv)(C) of this section.

(vi) For a loan that is assigned to the Secretary for discharge based on data from the SSA, the Secretary discharges the loan in accordance with paragraph (c)(3)(iv) of this section.

(vii) If the borrower notifies the Secretary that they do not wish to receive the discharge, the borrower will remain responsible for repayment of the borrower's loans in accordance with the terms and conditions of the promissory notes that the borrower signed.

* * * * *

(d) * * *

(1) *General.* (i) The Secretary reimburses the holder of a loan received by a borrower on or after January 1, 1986, and discharges the borrower's obligation with respect to the loan in accordance with the provisions of paragraph (d) of this section, if the borrower (or the student for whom a parent received a PLUS loan) could not complete the program of study for

which the loan was intended because the school at which the borrower (or student) was enrolled closed, or the borrower (or student) withdrew from the school not more than 180 days prior to the date the school closed. The Secretary may extend the 180-day period if the Secretary determines that exceptional circumstances, as described in paragraph (d)(9) of this section, justify an extension.

(ii) For purposes of the closed school discharge authorized by this section—

(A) If a school has closed, the school's closure date is the earlier of: the date, determined by the Secretary, that the school ceased to provide educational instruction in programs in which most students at the school were enrolled, or a date determined by the Secretary that reflects when the school ceased to provide educational instruction for all of its students;

(B) The term "borrower" includes all endorsers on a loan;

(C) A "school" means a school's main campus or any location or branch of the main campus, regardless of whether the school or its location or branch is considered title IV eligible, and

(D) "Program" means the credential defined by the level and Classification of Instructional Program code in which a student is enrolled, except that the Secretary may define a borrower's program as multiple levels or Classification of Instructional Program codes if—

(*1*) The enrollment occurred at the same school in closely proximate periods;

(*2*) The school granted a credential in a program while the student was enrolled in a different program; or

(*3*) The programs must be taken in a set order or were presented as necessary for borrowers to complete in order to succeed in the relevant field of employment

(2) *Relief available pursuant to discharge.* (i) Discharge under this paragraph (d) relieves the borrower of any existing or past obligation to repay the loan and any charges imposed or costs incurred by the holder with respect to the loan that the borrower is or was otherwise obligated to pay.

(ii) A discharge of a loan under this paragraph (d) qualifies the borrower for reimbursement of amounts paid voluntarily or through enforced collection on a loan obligation discharged under this paragraph (d).

(iii) A borrower who has defaulted on a loan discharged under this paragraph (d) is not regarded as in default on the loan after discharge, and is eligible to receive assistance under the title IV, HEA programs.

(iv) A discharge of a loan under this paragraph (d) must be reported by the loan holder to all consumer reporting agencies to which the holder previously reported the status of the loan, so as to delete all adverse credit history assigned to the loan.

(3) *Borrower qualification for discharge.* Except as provided in paragraph (d)(8) of this section, to qualify for a discharge of a loan under this paragraph (d), a borrower must submit a completed closed school discharge application on a form approved by the Secretary and the factual assertions in the application must be true and must be made under penalty of perjury. The application explains the procedures and eligibility criteria for obtaining a discharge and requires the borrower to state that the borrower (or the student on whose behalf a parent borrowed)—

(i) Received the proceeds of a loan, in whole or in part, on or after January 1, 1986, to attend a school;

(ii) Did not complete the program of study at that school because the school closed while the student was enrolled, or the student withdrew from the school not more than 180 calendar days before the school closed. The Secretary may extend the 180-day period if the Secretary determines that exceptional circumstances, as described in paragraph (d)(9) of this section, justify an extension;

(iii) On or after July 1, 2023, state that the borrower did not complete the program at another branch or location of the school or through a teach-out agreement at another school, approved by the school's accrediting agency and, if applicable, the school's State authorizing agency; and

(iv) State that the borrower (or student)—

(A) Agrees to provide to the Secretary or the Secretary's designee upon request other documentation reasonably available to the borrower that demonstrates that the borrower meets the qualifications for discharge under this section; and

(B) Agrees to cooperate with the Secretary or the Secretary's designee in enforcement actions in accordance with paragraph (d)(4) of this section and to transfer any right to recovery against a third party to the Secretary in accordance with paragraph (d)(5) of this section.

\*    \*    \*    \*    \*

(8) *Discharge without an application.* (i) A borrower's obligation to repay a FFEL Program loan will be discharged without an application from the borrower if the—

(A) Borrower received a discharge on a loan pursuant to § 674.33(g) of this chapter under the Federal Perkins Loan Program, or § 685.214 of this chapter under the William D. Ford Federal Direct Loan Program; or

(B) The Secretary or the guaranty agency, with the Secretary's permission, determines that the borrower qualifies for a discharge under sections (d)(3)(i), (ii) and (iii) based on information in the Secretary or guaranty agency's possession. The Secretary or guaranty agency discharges the loan without an application or any statement from the borrower 1 year after the institution's closure date if the borrower did not complete the program at another branch or location of the school or through a teach-out agreement at another school, approved by the school's accrediting agency and, if applicable, the school's State authorizing agency.

(ii) If the borrower accepts but does not complete a continuation of the program at another branch of location of the school or a teach-out agreement at another school, approved by the school's accrediting agency and, if applicable, the school's State authorizing agency, then the Secretary or guaranty agency discharges the loan 1 year after the borrower's last date of attendance in the teach-out program.

(9) *Exceptional circumstances.* For purposes of this section, exceptional circumstances include, but are not limited to—

(i) The revocation or withdrawal by an accrediting agency of the school's institutional accreditation;

(ii) The school is or was placed on probation or issued a show-cause order, or placed on an accreditation status that poses an equivalent or greater risk to its accreditation, by its accrediting agency for failing to meet one or more of the agency's standards;

(iii) The revocation or withdrawal by the State authorization or licensing authority to operate or to award academic credentials in the State;

(iv) The termination by the Department of the school's participation in a title IV, HEA program;

(v) A finding by a State or Federal government agency that the school violated State or Federal law related to education or services to students;

(vi) A State or Federal court judgment that a School violated State or Federal law related to education or services to students;

(vii) The teach-out of the student's educational program exceeds the 180-day look back period for a closed school discharge;

(viii) The school responsible for the teach-out of the student's educational

program fails to perform the material terms of the teach-out plan or agreement, such that the student does not have a reasonable opportunity to complete his or her program of study;

(ix) The school discontinued a significant share of its academic programs.

(x) The school permanently closed all or most of its ground-based or in-person locations while maintaining online programs.

(xi) The school was placed on the heightened cash monitoring payment method as defined in § 668.162(d)(2).

(e) \*    \*    \*

(1) *General.* (i) The Secretary reimburses the holder of a loan received by a borrower on or after January 1, 1986, and discharges a current or former borrower's obligation with respect to the loan in accordance with the provisions of this paragraph (e), if the borrower's (or the student for whom a parent received a PLUS loan) eligibility to receive the loan was falsely certified by an eligible school. On or after July 1, 2006, the Secretary reimburses the holder of a loan, and discharges a borrower's obligation with respect to the loan in accordance with the provisions of this paragraph (e), if the borrower's eligibility to receive the loan was falsely certified as a result of a crime of identity theft. For purposes of a false certification discharge, the term "borrower" includes all endorsers on a loan.

(ii) A student's or other individual's eligibility to borrow will be considered to have been falsely certified by the school if the school—

(A) Certified the eligibility for a FFEL Program loan of a student who—

(*1*) Reported not having a high school diploma or its equivalent; and

(*2*) Did not satisfy the alternative to graduation from high school requirements in 34 CFR 668.32(e) and section 484(d) of the Act that were in effect at the time the loan was certified, as applicable;

(B) Certified the eligibility of a student who is not a high school graduate based on—

(*1*) A high school graduation status falsified by the school; or

(*2*) A high school diploma falsified by the school or a third party to which the school referred the borrower;

(C) Certified the eligibility of the student who, because of a physical or mental condition, age, criminal record, or other reason accepted by the Secretary, would not meet State requirements for employment (in the student's State of residence when the loan was certified) in the occupation for

which the training program supported by the loan was intended;

(D) Signed the borrower's name without authorization by the borrower on the loan application or promissory note; or

(E) Certified the eligibility of an individual for a FFEL Program loan as a result of the crime of identity theft committed against the individual, as that crime is defined in paragraph (e)(14) of this section.

(iii) The Secretary discharges the obligation of a borrower with respect to a loan disbursement for which the school, without the borrower's authorization, endorsed the borrower's loan check or authorization for electronic funds transfer, unless the student for whom the loan was made received the proceeds of the loan either by actual delivery of the loan funds or by a credit in the amount of the contested disbursement applied to charges owed to the school for that portion of the educational program completed by the student. However, the Secretary does not reimburse the lender with respect to any amount disbursed by means of a check bearing an unauthorized endorsement unless the school also executed the application or promissory note for that loan for the named borrower without that individual's consent.

(iv) If a loan was made as a result of the crime of identity theft that was committed by an employee or agent of the lender, or if at the time the loan was made, an employee or agent of the lender knew of the identity theft of the individual named as the borrower—

(A) The Secretary does not pay reinsurance, and does not reimburse the holder, for any amount disbursed on the loan; and

(B) Any amounts received by a holder as interest benefits and special allowance payments with respect to the loan must be refunded to the Secretary, as provided in paragraphs (e)(8)(ii)(B)(4) and (e)(10)(ii)(D) of this section.

*    *    *    *    *

(3) *Borrower qualification for discharge.* Except as provided in paragraph (e)(15) of this section, to qualify for a discharge of a loan under this paragraph (e), the borrower must submit to the holder of the loan an application for discharge on a form approved by the Secretary. The application need not be notarized, but must be made by the borrower under penalty of perjury, and, in the application, the borrower must—

(i) State whether the student has made a claim with respect to the school's false certification with any third party, such

as the holder of a performance bond or a tuition recovery program, and if so, the amount of any payment received by the borrower (or student) or credited to the borrower's loan obligation;

(ii) In the case of a borrower requesting a discharge based on not having had a high school diploma and not having met the alternative to graduation from high school eligibility requirements in 34 CFR 668.32(e) and under section 484(d) of the Act applicable when the loan was certified, and the school or a third party to which the school referred the borrower falsified the student's high school diploma, the borrower must state in the application that the borrower (or the student for whom a parent received a PLUS loan)—

(A) Received, on or after January 1, 1986, the proceeds of any disbursement of a loan disbursed, in whole or in part, on or after January 1, 1986, to attend a school;

(B) Reported not having a valid high school diploma or its equivalent when the loan was certified; and

(C) Did not satisfy the alternative to graduation from high school statutory or regulatory eligibility requirements identified on the application form and applicable when the loan was certified.

(iii) In the case of a borrower requesting a discharge based on a condition that would disqualify the borrower from employment in the occupation that the training program for which the borrower received the loan was intended, the borrower must state in the application that the borrower (or student for whom a parent received a PLUS loan) did not meet State requirements for employment in the student's State of residence in the occupation that the training program for which the borrower received the loan was intended because of a physical or mental condition, age, criminal record, or other reason accepted by the Secretary.

(iv) In the case of a borrower requesting a discharge because the school signed the borrower's name on the loan application or promissory note without the borrower's authorization state that he or she did not sign the document in question or authorize the school to do so.

(v) In the case of a borrower requesting a discharge because the school, without authorization of the borrower, endorsed the borrower's name on the loan check or signed the authorization for electronic funds transfer or master check, the borrower must—

(A) State that he or she did not endorse the loan check or sign the

authorization for electronic funds transfer or master check, or authorize the school to do so; and

(B) State that the proceeds of the contested disbursement were not received either through actual delivery of the loan funds or by a credit in the amount of the contested disbursement applied to charges owed to the school for that portion of the educational program completed by the student.

(vi) In the case of an individual whose eligibility to borrow was falsely certified because he or she was a victim of the crime of identity theft and is requesting a discharge—

(A) Certify that the individual did not sign the promissory note, or that any other means of identification used to obtain the loan was used without the authorization of the individual claiming relief;

(B) Certify that the individual did not receive or benefit from the proceeds of the loan with knowledge that the loan had been made without the authorization of the individual; and

(C) Provide a statement of facts and supporting evidence that demonstrate, to the satisfaction of the Secretary, that the individual's eligibility for the loan in question was falsely certified as a result of identity theft committed against that individual. Supporting evidence may include—

(1) A judicial determination of identity theft relating to the individual;

(2) A Federal Trade Commission identity theft affidavit;

(3) A police report alleging identity theft relating to the individual;

(4) Documentation of a dispute of the validity of the loan due to identity theft filed with at least three major consumer reporting agencies; and

(5) Other evidence acceptable to the Secretary.

(vii) That the borrower agrees to provide upon request by the Secretary or the Secretary's designee, other documentation reasonably available to the borrower, that demonstrates, to the satisfaction of the Secretary or the Secretary's designee, that the student meets the qualifications in this paragraph (e); and

(viii) That the borrower agrees to cooperate with the Secretary or the Secretary's designee in enforcement actions in accordance with paragraph (e)(4) of this section, and to transfer any right to recovery against a third party in accordance with paragraph (e)(5) of this section.

*    *    *    *    *

(6) *Discharge procedures—general.* (i) If the holder of the borrower's loan determines that a borrower's FFEL

Program loan may be eligible for a discharge under this section, the holder provides the borrower the application described in paragraph (e)(3) of this section and an explanation of the qualifications and procedures for obtaining a discharge. The holder also promptly suspends any efforts to collect from the borrower on any affected loan. The holder may continue to receive borrower payments.

(ii) If the borrower fails to submit the application for discharge and supporting information described in paragraph (e)(3) of this section within 60 days of the holder providing the application, the holder resumes collection and grants forbearance of principal and interest for the period in which collection activity was suspended.

(iii) If the borrower submits an application for discharge that the holder determines is incomplete, the holder notifies the borrower of that determination and allows the borrower an additional 30-days to amend their application and provide supplemental information. If the borrower does not amend their application within 30 days of receiving the notification from the holder the borrower's application is closed as incomplete and the holder resumes collection of the loan and grants forbearance of principal and interest for the period in which collection activity was suspended.

(iv) If the borrower submits a complete application described in paragraph (e)(3) of this section, the holder files a claim with the guaranty agency no later than 60 days after the holder receives the borrower's complete application.

(v) The guaranty agency determines whether the available evidence supports the claim for discharge. Available evidence includes evidence provided by the borrower and any other relevant information from the guaranty agency's records or gathered by the guaranty agency from other sources, including the Secretary, other guaranty agencies, Federal agencies, State authorities, test publishers, independent test administrators, school records, and cognizant accrediting associations.

(vi) The guaranty agency issues a decision that explains the reasons for any adverse determination on the application, describes the evidence on which the decision was made, and provides the borrower, upon request, copies of the evidence. The guaranty agency considers any response from the borrower and any additional information from the borrower and notifies the borrower whether the determination is changed.

(vii) If the guaranty agency determines that the borrower meets the applicable requirements for a discharge under this paragraph (e), the guaranty agency notifies the borrower in writing of that determination.

(viii) If the guaranty agency determines that the borrower does not qualify for a discharge, the guaranty agency notifies the borrower in writing of that determination and the reasons for the determination.

(ix) If the guaranty agency determines that the borrower does not qualify for a discharge, the borrower may request that the Secretary review the guaranty agency's decision.

(x) A borrower is not precluded from re-applying for a discharge under this paragraph (e) if the discharge request is closed as incomplete, or if the guaranty agency or Secretary determines that the borrower does not qualify for a discharge if the borrower provides additional supporting evidence.

(7) *Guaranty agency responsibilities— general.* (i) A guaranty agency will notify the Secretary immediately whenever it becomes aware of reliable information indicating that a school may have falsely certified a student's eligibility or caused an unauthorized disbursement of loan proceeds, as described in paragraph (e)(3) of this section. The designated guaranty agency in the State in which the school is located will promptly investigate whether the school has falsely certified a student's eligibility and, within 30 days after receiving information indicating that the school may have done so, report the results of its preliminary investigation to the Secretary.

(ii) If the guaranty agency receives information it believes to be reliable indicating that a borrower whose loan is held by the agency may be eligible for a discharge under this paragraph (e), the agency will immediately suspend any efforts to collect from the borrower on any loan received for the program of study for which the loan was made (but may continue to receive borrower payments) and inform the borrower of the procedures for requesting a discharge.

(iii) If the borrower fails to submit the Secretary's approved application described in paragraph (e)(3) of this section within 60 days of being notified of that option, the guaranty agency will resume collection and will be deemed to have exercised forbearance of payment of principal and interest from the date it suspended collection activity.

(iv) If the borrower submits an application for discharge that the guaranty agency determines is

incomplete, the guaranty agency notifies the borrower of that determination and allows the borrower an additional 30-days to amend their application and provide supplemental information. If the borrower does not amend their application within 30 days of receiving the notification from the guaranty agency the borrower's application is closed as incomplete and the guaranty agency resumes collection of the loan and grants forbearance of principal and interest for the period in which collection activity was suspended.

(v) Upon receipt of a discharge claim filed by a lender or a complete application submitted by a borrower with respect to a loan held by the guaranty agency, the agency will have up to 90 days to determine whether the discharge should be granted. The agency will review the borrower's application in light of information available from the records of the agency and from other sources, including other guaranty agencies, State authorities, and cognizant accrediting associations.

(vi) A borrower's application for discharge may not be denied solely on the basis of failing to meet any time limits set by the lender, the Secretary or the guaranty agency.

(8) *Guaranty agency responsibilities with respect to a claim filed by a lender.* (i) The agency will evaluate the borrower's application and consider relevant information it possesses and information available from other sources, and follow the procedures described in this paragraph (e)(8).

(ii) If the agency determines that the borrower satisfies the requirements for discharge under this paragraph (e), it will, not later than 30 days after the agency makes that determination, pay the claim in accordance with paragraph (h) of this section and—

(A) Notify the borrower that his or her liability with respect to the amount of the loan has been discharged, and that the lender has been informed of the actions required under paragraph (e)(8)(ii)(C) of this section;

(B) Refund to the borrower all amounts paid by the borrower to the lender or the agency with respect to the discharged loan amount, including any late fees or collection charges imposed by the lender or agency related to the discharged loan amount; and

(C) Notify the lender that the borrower's liability with respect to the amount of the loan has been discharged, and that the lender must—

(*1*) Immediately terminate any collection efforts against the borrower with respect to the discharged loan amount and any charges imposed or costs incurred by the lender related to

the discharged loan amount that the borrower is, or was, otherwise obligated to pay; and

(*2*) Within 30 days, report to all credit reporting agencies to which the lender previously reported the status of the loan, so as to delete all adverse credit history assigned to the loan; and

(D) Within 30 days, demand payment in full from the perpetrator of the identity theft committed against the individual, and if payment is not received, pursue collection action thereafter against the perpetrator.

(iii) If the agency determines that the borrower does not qualify for a discharge, it will, within 30 days after making that determination—

(A) Notify the lender that the borrower's liability on the loan is not discharged and that, depending on the borrower's decision under paragraph (e)(8)(iii)(B) of this section, the loan will either be returned to the lender or paid as a default claim; and

(B) Notify the borrower that the borrower does not qualify for discharge and state the reasons for that conclusion. The agency will advise the borrower that he or she remains obligated to repay the loan and warn the borrower of the consequences of default, and explain that the borrower will be considered to be in default on the loan unless the borrower submits a written statement to the agency within 30 days stating that the borrower—

(*1*) Acknowledges the debt and, if payments are due, will begin or resume making those payments to the lender; or

(*2*) Requests the Secretary to review the agency's decision.

(iv) Within 30 days after receiving the borrower's written statement described in paragraph (e)(8)(iii)(B)(*1*) of this section, the agency will return the claim file to the lender and notify the lender to resume collection efforts if payments are due.

(v) Within 30 days after receiving the borrower's request for review by the Secretary, the agency will forward the claim file to the Secretary for his review and take the actions required under paragraph (e)(12) of this section.

(vi) The agency will pay a default claim to the lender within 30 days after the borrower fails to return either of the written statements described in paragraph (e)(8)(iii)(B) of this section.

(9) *Guaranty agency responsibilities with respect to a claim filed by a lender based only on the borrower's assertion that he or she did not sign the loan check or the authorization for the release of loan funds via electronic funds transfer or master check.* (i) The agency will evaluate the borrower's request and consider relevant

information it possesses and information available from other sources, and follow the procedures described in this paragraph (e)(9).

(ii) If the agency determines that a borrower who asserts that he or she did not endorse the loan check satisfies the requirements for discharge under paragraph (e)(3)(v) of this section, it will, within 30 days after making that determination—

(A) Notify the borrower that his or her liability with respect to the amount of the contested disbursement of the loan has been discharged, and that the lender has been informed of the actions required under paragraph (e)(9)(ii)(B) of this section;

(B) Notify the lender that the borrower's liability with respect to the amount of the contested disbursement of the loan has been discharged, and that the lender must—

(*1*) Immediately terminate any collection efforts against the borrower with respect to the discharged loan amount and any charges imposed or costs incurred by the lender related to the discharged loan amount that the borrower is, or was, otherwise obligated to pay;

(*2*) Within 30 days, report to all credit reporting agencies to which the lender previously reported the status of the loan, so as to delete all adverse credit history assigned to the loan;

(*3*) Refund to the borrower, within 30 days, all amounts paid by the borrower with respect to the loan disbursement that was discharged, including any charges imposed or costs incurred by the lender related to the discharged loan amount; and

(*4*) Refund to the Secretary, within 30 days, all interest benefits and special allowance payments received from the Secretary with respect to the loan disbursement that was discharged; and

(C) Transfer to the lender the borrower's written assignment of any rights the borrower may have against third parties with respect to a loan disbursement that was discharged because the borrower did not sign the loan check.

(iii) If the agency determines that a borrower who asserts that he or she did not sign the electronic funds transfer or master check authorization satisfies the requirements for discharge under paragraph (e)(3)(v) of this section, it will, within 30 days after making that determination, pay the claim in accordance with paragraph (h) of this section and—

(A) Notify the borrower that his or her liability with respect to the amount of the contested disbursement of the loan has been discharged, and that the lender

has been informed of the actions required under paragraph (e)(9)(iii)(C) of this section;

(B) Refund to the borrower all amounts paid by the borrower to the lender or the agency with respect to the discharged loan amount, including any late fees or collection charges imposed by the lender or agency related to the discharged loan amount; and

(C) Notify the lender that the borrower's liability with respect to the contested disbursement of the loan has been discharged, and that the lender must—

(*1*) Immediately terminate any collection efforts against the borrower with respect to the discharged loan amount and any charges imposed or costs incurred by the lender related to the discharged loan amount that the borrower is, or was, otherwise obligated to pay; and

(*2*) Within 30 days, report to all credit reporting agencies to which the lender previously reported the status of the loan, so as to delete all adverse credit history assigned to the loan.

(iv) If the agency determines that the borrower does not qualify for a discharge, it will, within 30 days after making that determination—

(A) Notify the lender that the borrower's liability on the loan is not discharged and that, depending on the borrower's decision under paragraph (e)(9)(iv)(B) of this section, the loan will either be returned to the lender or paid as a default claim; and

(B) Notify the borrower that the borrower does not qualify for discharge and state the reasons for that conclusion. The agency will advise the borrower that he or she remains obligated to repay the loan and warn the borrower of the consequences of default, and explain that the borrower will be considered to be in default on the loan unless the borrower submits a written statement to the agency within 30 days stating that the borrower—

(*1*) Acknowledges the debt and, if payments are due, will begin or resume making those payments to the lender; or

(*2*) Requests the Secretary to review the agency's decision.

(v) Within 30 days after receiving the borrower's written statement described in paragraph (e)(9)(iv)(B)(*1*) of this section, the agency will return the claim file to the lender and notify the lender to resume collection efforts if payments are due.

(vi) Within 30 days after receiving the borrower's request for review by the Secretary, the agency will forward the claim file to the Secretary for his review and take the actions required under paragraph (e)(12) of this section.

(vii) The agency will pay a default claim to the lender within 30 days after the borrower fails to return either of the written statements described in paragraph (e)(9)(iv)(B) of this section.

(10) *Guaranty agency responsibilities in the case of a loan held by the agency for which a discharge request is submitted by a borrower.* (i) The agency will evaluate the borrower's application and consider relevant information it possesses and information available from other sources, and follow the procedures described in this paragraph (e)(10).

(ii) If the agency determines that the borrower satisfies the requirements for discharge under paragraph (e)(3) of this section, it will immediately terminate any collection efforts against the borrower with respect to the discharged loan amount and any charges imposed or costs incurred by the agency related to the discharged loan amount that the borrower is, or was otherwise obligated to pay and, not later than 30 days after the agency makes the determination that the borrower satisfies the requirements for discharge—

(A) Notify the borrower that his or her liability with respect to the amount of the loan has been discharged;

(B) Report to all credit reporting agencies to which the agency previously reported the status of the loan, so as to delete all adverse credit history assigned to the loan;

(C) Refund to the borrower all amounts paid by the borrower to the lender or the agency with respect to the discharged loan amount, including any late fees or collection charges imposed by the lender or agency related to the discharged loan amount; and

(D) Within 30 days, demand payment in full from the perpetrator of the identity theft committed against the individual, and if payment is not received, pursue collection action thereafter against the perpetrator.

(iii) If the agency determines that the borrower does not qualify for a discharge, it will, within 30 days after making that determination, notify the borrower that the borrower's liability with respect to the amount of the loan is not discharged, state the reasons for that conclusion, and if the borrower is not then making payments in accordance with a repayment arrangement with the agency on the loan, advise the borrower of the consequences of continued failure to reach such an arrangement, and that collection action will resume on the loan unless within 30 days the borrower—

(A) Acknowledges the debt and, if payments are due, reaches a satisfactory arrangement to repay the loan or resumes making payments under such an arrangement to the agency; or

(B) Requests the Secretary to review the agency's decision.

(iv) Within 30 days after receiving the borrower's request for review by the Secretary, the agency will forward the borrower's discharge request and all relevant documentation to the Secretary for his review and take the actions required under paragraph (e)(12) of this section.

(v) The agency will resume collection action if within 30 days of giving notice of its determination the borrower fails to seek review by the Secretary or agree to repay the loan.

(11) *Guaranty agency responsibilities in the case of a loan held by the agency for which a discharge request is submitted by a borrower based only on the borrower's assertion that he or she did not sign the loan check or the authorization for the release of loan proceeds via electronic funds transfer or master check.* (i) The agency will evaluate the borrower's application and consider relevant information it possesses and information available from other sources, and follow the procedures described in this paragraph (e)(11).

(ii) If the agency determines that a borrower who asserts that he or she did not endorse the loan check satisfies the requirements for discharge under paragraph (e)(3)(v) of this section, it will refund to the Secretary the amount of reinsurance payment received with respect to the amount discharged on that loan less any repayments made by the lender under paragraph (e)(11)(ii)(D)(2) of this section, and within 30 days after making that determination—

(A) Notify the borrower that his or her liability with respect to the amount of the contested disbursement of the loan has been discharged;

(B) Report to all credit reporting agencies to which the agency previously reported the status of the loan, so as to delete all adverse credit history assigned to the loan;

(C) Refund to the borrower all amounts paid by the borrower to the lender or the agency with respect to the discharged loan amount, including any late fees or collection charges imposed by the lender or agency related to the discharged loan amount;

(D) Notify the lender to whom a claim payment was made that the lender must refund to the Secretary, within 30 days—

(1) All interest benefits and special allowance payments received from the Secretary with respect to the loan disbursement that was discharged; and

(2) The amount of the borrower's payments that were refunded to the borrower by the guaranty agency under paragraph (e)(11)(ii)(C) of this section that represent borrower payments previously paid to the lender with respect to the loan disbursement that was discharged;

(E) Notify the lender to whom a claim payment was made that the lender must, within 30 days, reimburse the agency for the amount of the loan that was discharged, minus the amount of borrower payments made to the lender that were refunded to the borrower by the guaranty agency under paragraph (e)(11)(ii)(C) of this section; and

(F) Transfer to the lender the borrower's written assignment of any rights the borrower may have against third parties with respect to the loan disbursement that was discharged.

(iii) In the case of a borrower who requests a discharge because he or she did not sign the electronic funds transfer or master check authorization, if the agency determines that the borrower meets the conditions for discharge, it will immediately terminate any collection efforts against the borrower with respect to the discharged loan amount and any charges imposed or costs incurred by the agency related to the discharged loan amount that the borrower is, or was, otherwise obligated to pay, and within 30 days after making that determination—

(A) Notify the borrower that his or her liability with respect to the amount of the contested disbursement of the loan has been discharged;

(B) Refund to the borrower all amounts paid by the borrower to the lender or the agency with respect to the discharged loan amount, including any late fees or collection charges imposed by the lender or agency related to the discharged loan amount; and

(C) Report to all credit reporting agencies to which the lender previously reported the status of the loan, so as to delete all adverse credit history assigned to the loan.

(iv) The agency will take the actions required under paragraphs (e)(10)(iii) through (v) of this section if the agency determines that the borrower does not qualify for a discharge.

(12) *Guaranty agency responsibilities if a borrower requests a review by the Secretary.* (i) Within 30 days after receiving the borrower's request for review under paragraph (e)(8)(iii)(B)(2), (e)(9)(iv)(B)(2), (e)(10)(iii)(B), or (e)(11)(iv) of this section, the agency will forward the borrower's discharge application and all relevant

documentation to the Secretary for review.

(ii) The Secretary notifies the agency and the borrower of a determination on review. If the Secretary determines that the borrower is not eligible for a discharge under this paragraph (e), within 30 days after being so informed, the agency will take the actions described in paragraphs (e)(9)(iv) through (vii) or (e)(10)(iii) through (v) of this section, as applicable.

(iii) If the Secretary determines that the borrower meets the requirements for a discharge under paragraph (e) of this section, the agency will, within 30 days after being so informed, take the actions required under paragraph (e)(8)(ii), (e)(9)(ii) or (iii), (e)(10)(ii), or (e)(11)(ii) or (iii) of this section, as applicable.

(13) *Lender responsibilities.* (i) If the lender is notified by a guaranty agency or the Secretary, or receives information it believes to be reliable from another source indicating that a current or former borrower may be eligible for a discharge under this paragraph (e), the lender will immediately suspend any efforts to collect from the borrower on any loan received for the program of study for which the loan was made (but may continue to receive borrower payments) and, within 30 days of receiving the information or notification, inform the borrower of the procedures for requesting a discharge.

(ii) If the borrower fails to submit the Secretary's approved application within 60 days of being notified of that option, the lender will resume collection and will be deemed to have exercised forbearance of payment of principal and interest from the date the lender suspended collection activity on the loan. The lender may capitalize, in accordance with § 682.202(b), any interest accrued and not paid during that period.

(iii) If the borrower submits an application for discharge that the lender determines is incomplete, the lender notifies the borrower of that determination and allows the borrower an additional 30-days to amend their application and provide supplemental information. If the borrower does not amend their application within 30 days of receiving the notification from the lender the borrower's application is closed as incomplete and the lender resumes collection of the loan and grants forbearance of principal and interest for the period in which collection activity was suspended.

(iv) The lender will file a claim with the guaranty agency in accordance with paragraph (g) of this section no later than 60 days after the lender receives the borrower's complete application

described in paragraph (e)(3) of this section. If a lender receives a payment made by or on behalf of the borrower on the loan after the lender files a claim on the loan with the guaranty agency, the lender will forward the payment to the guaranty agency within 30 days of its receipt. The lender will assist the guaranty agency and the borrower in determining whether the borrower is eligible for discharge of the loan.

(v) The lender will comply with all instructions received from the Secretary or a guaranty agency with respect to loan discharges under this paragraph (e).

(vi) The lender will review a claim that the borrower did not endorse and did not receive the proceeds of a loan check. The lender will take the actions required under paragraphs (e)(9)(ii)(A) and (B) of this section if it determines that the borrower did not endorse the loan check, unless the lender secures persuasive evidence that the proceeds of the loan were received by the borrower or the student for whom the loan was made, as provided in paragraph (e)(1)(iii) of this section. If the lender determines that the loan check was properly endorsed or the proceeds were received by the borrower or student, the lender may consider the borrower's objection to repayment as a statement of intention not to repay the loan and may file a claim with the guaranty agency for reimbursement on that ground but will not report the loan to consumer reporting agencies as in default until the guaranty agency, or, as applicable, the Secretary, reviews the claim for relief. By filing such a claim, the lender will be deemed to have agreed to the following—

(A) If the guarantor or the Secretary determines that the borrower endorsed the loan check or the proceeds of the loan were received by the borrower or the student, any failure to satisfy due diligence requirements by the lender prior to the filing of the claim that would have resulted in the loss of reinsurance on the loan in the event of default will be waived by the Secretary; and

(B) If the guarantor or the Secretary determines that the borrower did not endorse the loan check and that the proceeds of the loan were not received by the borrower or the student, the lender will comply with the requirements specified in paragraph (e)(9)(ii)(B) of this section.

(vii) Within 30 days after being notified by the guaranty agency that the borrower's request for a discharge has been denied, the lender will notify the borrower of the reasons for the denial and, if payments are due, resume

collection against the borrower. The lender will be deemed to have exercised forbearance of payment of principal and interest from the date the lender suspended collection activity, and may capitalize, in accordance with § 682.202(b), any interest accrued and not paid during that period.

(14) *Definition of identity theft.* (i) For purposes of this section, identity theft is defined as the unauthorized use of the identifying information of another individual that is punishable under 18 U.S.C. 1028, 1028A, 1029, or 1030, or substantially comparable State or local law.

(ii) Identifying information includes, but is not limited to—

(A) Name, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, and employer or taxpayer identification number;

(B) Unique biometric data, such as fingerprints, voiceprint, retina or iris image, or unique physical representation;

(C) Unique electronic identification number, address, or routing code; or

(D) Telecommunication identifying information or access device (as defined in 18 U.S.C. 1029(e)).

(15) *Discharge without an application.* A borrower's obligation to repay all or a portion of an FFEL Program loan may be discharged without an application from the borrower if the Secretary, or the guaranty agency with the Secretary's permission, determines based on information in the Secretary's or the guaranty agency's possession that the borrower qualifies for a discharge. Such information includes, but is not limited to, evidence that the school has falsified the Satisfactory Academic Progress of its students, as described in § 668.34 of this chapter.

(16) *Application for a group discharge from a State Attorney General or nonprofit legal services representative.* A State Attorney General or nonprofit legal services representative may submit to the Secretary an application for a group discharge under this section.

\*    \*    \*    \*    \*

■ 20. Section 682.414 is amended by revising paragraph (b)(4) to read as follows:

### § 682.414    Reports.

\*    \*    \*    \*    \*

(b) \* \* \*

(4) A report to the Secretary of the borrower's enrollment and loan status information, details related to the loans or borrower's deferments, forbearances,

repayment plans, delinquency and contact information, or any title IV loan-related data required by the Secretary, by the deadline date established by the Secretary.

\* \* \* \* \*

■ 21. Section 682.424 is added to subpart D to read as follows:

### § 682.424  Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice will not be affected thereby.

## PART 685—WILLIAM D. FORD FEDERAL DIRECT LOAN PROGRAM

■ 22. The authority citation for part 685 is revised to read as follows:

**Authority:** 20 U.S.C. 1070g, 1087a, *et seq.,* unless otherwise noted.

■ 23. Section 685.103 is amended by revising paragraph (d) to read as follows:

### § 685.103  Applicability of subparts.

\* \* \* \* \*

(d) Subpart D of this part contains provisions regarding borrower defense to repayment in the Direct Loan Program.

■ 24. Section 685.109 is added to subpart A to read as follows:

### § 685.109  Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice will not be affected thereby.

■ 25. Section 685.202 is amended by:
■ a. Removing paragraphs (b)(2), (4), and (5);
■ b. Redesignating paragraph (b)(3) as paragraph (b)(2) and revising it.

The revision reads as follows:

### § 685.202  Charges for which Direct Loan Program borrowers are responsible.

\* \* \* \* \*

(b) \* \* \*
(2) For a Direct Loan not eligible for interest subsidies during periods of deferment, the Secretary capitalizes the unpaid interest that has accrued on the loan upon the expiration of the deferment.

\* \* \* \* \*

■ 26. Section 685.205 is amended by revising paragraph (b)(6) to read as follows:

### § 685.205  Forbearance.

\* \* \* \* \*

(b) \* \* \*
(6) Periods necessary for the Secretary to determine the borrower's eligibility for discharge—
(i) Under § 685.206(c) through (e);
(ii) Under § 685.214;
(iii) Under § 685.215;
(iv) Under § 685.216;
(v) Under § 685.217;
(vi) Under § 685.222;
(vii) Under subpart D of this part; or
(viii) Due to the borrower's or endorser's (if applicable) bankruptcy;

\* \* \* \* \*

■ 27. Section 685.206 is amended by revising paragraph (e) to read as follows:

### § 685.206  Borrower Responsibilities and Defenses.

\* \* \* \* \*

(e) *Borrower defense to repayment for loans first disbursed on or after July 1, 2020, and before July 1, 2023.* This paragraph (e) applies to borrower defense to repayment for loans first disbursed on or after July 1, 2020, and before July 1, 2023.
(1) *Definitions.* For the purposes of this paragraph (e), the following definitions apply:
(i) A "Direct Loan" under this paragraph (e) means a Direct Subsidized Loan, a Direct Unsubsidized Loan, or a Direct PLUS Loan.
(ii) "Borrower" means:
(A) The borrower; and
(B) In the case of a Direct PLUS Loan, any endorsers, and for a Direct PLUS Loan made to a parent, the student on whose behalf the parent borrowed.
(iii) A "borrower defense to repayment" under this paragraph (e) includes—
(A) A defense to repayment of amounts owed to the Secretary on a Direct Loan, or a Direct Consolidation Loan that was used to repay a Direct Loan, FFEL Program Loan, Federal Perkins Loan, Health Professions Student Loan, Loan for Disadvantaged Students under subpart II of part A of title VII of the Public Health Service Act, Health Education Assistance Loan, or Nursing Loan made under part E of the Public Health Service Act; and
(B) Any accompanying request for reimbursement of payments previously made to the Secretary on the Direct Loan or on a loan repaid by the Direct Consolidation Loan.
(iv) The term "provision of educational services" under this paragraph (e) refers to the educational resources provided by the institution that are required by an accreditation agency or a State licensing or authorizing agency for the completion of the student's educational program.
(v) The terms "school" and "institution" under this paragraph (e)

may be used interchangeably and include an eligible institution, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, or to provide marketing, advertising, recruiting, or admissions services.
(2) *Federal standard for loans first disbursed on or after July 1, 2020, and before July 1, 2023.* For a Direct Loan or Direct Consolidation Loan first disbursed on or after July 1, 2020, and before July 1, 2023, a borrower may assert a defense to repayment under this paragraph (e), if the borrower establishes by a preponderance of the evidence that—
(i) The institution at which the borrower enrolled made a misrepresentation, as defined in § 685.206(e)(3), of material fact upon which the borrower reasonably relied in deciding to obtain a Direct Loan, or a loan repaid by a Direct Consolidation Loan, and that directly and clearly relates to:
(A) Enrollment or continuing enrollment at the institution or
(B) The provision of educational services for which the loan was made; and
(ii) The borrower was financially harmed by the misrepresentation.
(3) *Misrepresentation.* A "misrepresentation," for purposes of this paragraph (e), is a statement, act, or omission by an eligible school to a borrower that is false, misleading, or deceptive; that was made with knowledge of its false, misleading, or deceptive nature or with a reckless disregard for the truth; and that directly and clearly relates to enrollment or continuing enrollment at the institution or the provision of educational services for which the loan was made. Evidence that a misrepresentation defined in this paragraph (e) may have occurred includes, but is not limited to:
(i) Actual licensure passage rates materially different from those included in the institution's marketing materials, website, or other communications made to the student;
(ii) Actual employment rates materially different from those included in the institution's marketing materials, website, or other communications made to the student;
(iii) Actual institutional selectivity rates or rankings, student admission profiles, or institutional rankings that are materially different from those included in the institution's marketing materials, website, or other communications made to the student or

provided by the institution to national ranking organizations;

(iv) The inclusion in the institution's marketing materials, website, or other communication made to the student of specialized, programmatic, or institutional certifications, accreditation, or approvals not actually obtained, or the failure to remove within a reasonable period of time such certifications or approvals from marketing materials, website, or other communication when revoked or withdrawn;

(v) The inclusion in the institution's marketing materials, website, or other communication made to the student of representations regarding the widespread or general transferability of credits that are only transferrable to limited types of programs or institutions or the transferability of credits to a specific program or institution when no reciprocal agreement exists with another institution, or such agreement is materially different than what was represented;

(vi) A representation regarding the employability or specific earnings of graduates without an agreement between the institution and another entity for such employment data, or sufficient evidence of past employment or earnings to justify such a representation, or without citing appropriate national, State, or regional data for earnings in the same field as provided by an appropriate Federal agency that provides such data. (In the event that national data are used, institutions should include a written, plain language disclaimer that national averages may not accurately reflect the earnings of workers in particular parts of the country and may include earners at all stages of their career and not just entry level wages for recent graduates.);

(vii) A representation regarding the availability, amount, or nature of any financial assistance available to students from the institution or any other entity to pay the costs of attendance at the institution that is materially different in availability, amount, or nature from the actual financial assistance available to the borrower from the institution or any other entity to pay the costs of attendance at the institution after enrollment;

(viii) A representation regarding the amount, method, or timing of payment of tuition and fees that the student would be charged for the program that is materially different in amount, method, or timing of payment from the actual tuition and fees charged to the student;

(ix) A representation that the institution, its courses, or programs are endorsed by vocational counselors, high schools, colleges, educational organizations, employment agencies, members of a particular industry, students, former students, governmental officials, Federal or State agencies, the United States Armed Forces, or other individuals or entities when the institution has no permission or is not otherwise authorized to make or use such an endorsement;

(x) A representation regarding the educational resources provided by the institution that are required for the completion of the student's educational program that are materially different from the institution's actual circumstances at the time the representation is made, such as representations regarding the institution's size; location; facilities; training equipment; or the number, availability, or qualifications of its personnel; and

(xi) A representation regarding the nature or extent of prerequisites for enrollment in a course or program offered by the institution that are materially different from the institution's actual circumstances at the time the representation is made, or that the institution knows will be materially different during the student's anticipated enrollment at the institution.

(4) *Financial harm.* Under this paragraph (e), financial harm is the amount of monetary loss that a borrower incurs as a consequence of a misrepresentation, as defined in paragraph (e)(3) of this section. Financial harm does not include damages for nonmonetary loss, such as personal injury, inconvenience, aggravation, emotional distress, pain and suffering, punitive damages, or opportunity costs. The Department does not consider the act of taking out a Direct Loan or a loan repaid by a Direct Consolidation Loan, alone, as evidence of financial harm to the borrower. Financial harm is such monetary loss that is not predominantly due to intervening local, regional, or national economic or labor market conditions as demonstrated by evidence before the Secretary or provided to the Secretary by the borrower or the school. Financial harm cannot arise from the borrower's voluntary decision to pursue less than full-time work or not to work or result from a voluntary change in occupation. Evidence of financial harm may include, but is not limited to, the following circumstances:

(i) Periods of unemployment upon graduating from the school's programs that are unrelated to national or local economic recessions;

(ii) A significant difference between the amount or nature of the tuition and fees that the institution represented to the borrower that the institution would charge or was charging, and the actual amount or nature of the tuition and fees charged by the institution for which the Direct Loan was disbursed or for which a loan repaid by the Direct Consolidation Loan was disbursed;

(iii) The borrower's inability to secure employment in the field of study for which the institution expressly guaranteed employment; and

(iv) The borrower's inability to complete the program because the institution no longer offers a requirement necessary for completion of the program in which the borrower enrolled and the institution did not provide for an acceptable alternative requirement to enable completion of the program.

(5) *Exclusions.* The Secretary will not accept the following as a basis for a borrower defense to repayment under this paragraph (e)—

(i) A violation by the institution of a requirement of the Act or the Department's regulations for a borrower defense to repayment under paragraph (c) or (d) of this section or under §685.222, unless the violation would otherwise constitute the basis for a successful borrower defense to repayment under this paragraph (e); or

(ii) A claim that does not directly and clearly relate to enrollment or continuing enrollment at the institution or the provision of educational services for which the loan was made, including, but not limited to—

(A) Personal injury;
(B) Sexual harassment;
(C) A violation of civil rights;
(D) Slander or defamation;
(E) Property damage;
(F) The general quality of the student's education or the reasonableness of an educator's conduct in providing educational services;
(G) Informal communication from other students;
(H) Academic disputes and disciplinary matters; and
(I) Breach of contract unless the school's act or omission would otherwise constitute the basis for a successful defense to repayment under this paragraph (e).

(6) *Limitations period.* A borrower must assert a defense to repayment under this paragraph (e) within 3 years from the date the student is no longer enrolled at the institution. A borrower may only assert a defense to repayment under this paragraph (e) within the timeframes set forth in this paragraph

(e)(6) and paragraph (e)(7) of this section.

(7) *Extension of limitation periods and reopening of applications.* For loans first disbursed on or after July 1, 2020, and before July 1, 2023, the Secretary may extend the time period when a borrower may assert a defense to repayment under § 685.206(e)(6) or may reopen a borrower's defense to repayment application to consider evidence that was not previously considered only if there is:

(i) A final, non-default judgment on the merits by a State or Federal Court that has not been appealed or that is not subject to further appeal and that establishes the institution made a misrepresentation, as defined in paragraph (e)(3) of this section; or

(ii) A final decision by a duly appointed arbitrator or arbitration panel that establishes that the institution made a misrepresentation, as defined in paragraph (e)(3) of this section.

(8) *Application and forbearance.* To assert a defense to repayment under this paragraph (e), a borrower must submit an application under penalty of perjury on a form approved by the Secretary and sign a waiver permitting the institution to provide the Department with items from the borrower's education record relevant to the defense to repayment claim. The form will note that pursuant to § 685.205(b)(6)(i), if the borrower is not in default on the loan for which a borrower defense has been asserted, the Secretary will grant forbearance and notify the borrower of the option to decline forbearance. The application requires the borrower to—

(i) Certify that the borrower received the proceeds of a loan, in whole or in part, to attend the named institution;

(ii) Provide evidence that supports the borrower defense to repayment application;

(iii) State whether the borrower has made a claim with any other third party, such as the holder of a performance bond, a public fund, or a tuition recovery program, based on the same act or omission of the institution on which the borrower defense to repayment is based;

(iv) State the amount of any payment received by the borrower or credited to the borrower's loan obligation through the third party, in connection with a borrower defense to repayment described in paragraph (e)(2) of this section;

(v) State the financial harm, as defined in paragraph (e)(4) of this section, that the borrower alleges to have been caused and provide any information relevant to assessing whether the borrower incurred financial harm, including providing documentation that the borrower actively pursued employment in the field for which the borrower's education prepared the borrower if the borrower is a recent graduate (failure to provide such information results in a presumption that the borrower failed to actively pursue employment in the field); whether the borrower was terminated or removed for performance reasons from a position in the field for which the borrower's education prepared the borrower, or in a related field; and whether the borrower failed to meet other requirements of or qualifications for employment in such field for reasons unrelated to the school's misrepresentation underlying the borrower defense to repayment, such as the borrower's ability to pass a drug test, satisfy driving record requirements, and meet any health qualifications; and

(vi) State that the borrower understands that in the event that the borrower receives a 100 percent discharge of the balance of the loan for which the defense to repayment application has been submitted, the institution may, if allowed or not prohibited by other applicable law, refuse to verify or to provide an official transcript that verifies the borrower's completion of credits or a credential associated with the discharged loan.

(9) *Consideration of order of objections and of evidence in possession of the Secretary under this paragraph (e).* (i) If the borrower asserts both a borrower defense to repayment and any other objection to an action of the Secretary with regard to a Direct Loan or a loan repaid by a Direct Consolidation Loan under this paragraph (e), the order in which the Secretary will consider objections, including a borrower defense to repayment under this paragraph (e), will be determined as appropriate under the circumstances.

(ii) With respect to the borrower defense to repayment application submitted under this paragraph (e), the Secretary may consider evidence otherwise in the possession of the Secretary, including from the Department's internal records or other relevant evidence obtained by the Secretary, as practicable, provided that the Secretary permits the institution and the borrower to review and respond to this evidence and to submit additional evidence.

(10) *School response and borrower reply under this paragraph (e).* (i) Upon receipt of a borrower defense to repayment application under this paragraph (e), the Department will notify the school of the pending application and provide a copy of the borrower's request and any supporting documents, a copy of any evidence otherwise in the possession of the Secretary, and a waiver signed by the student permitting the institution to provide the Department with items from the student's education record relevant to the defense to repayment claim to the school, and invite the school to respond and to submit evidence, within the specified timeframe included in the notice, which will be no less than 60 days.

(ii) Upon receipt of the school's response, the Department will provide the borrower a copy of the school's submission as well as any evidence otherwise in possession of the Secretary, which was provided to the school, and will give the borrower an opportunity to submit a reply within a specified timeframe, which will be no less than 60 days. The borrower's reply must be limited to issues and evidence raised in the school's submission and any evidence otherwise in the possession of the Secretary.

(iii) The Department will provide the school a copy of the borrower's reply.

(iv) There will be no other submissions by the borrower or the school to the Secretary unless the Secretary requests further clarifying information.

(11) *Written decision under this paragraph (e).* (i) After considering the borrower's application and all applicable evidence under this paragraph (e), the Secretary issues a written decision—

(A) Notifying the borrower and the school of the decision on the borrower defense to repayment under this paragraph (e);

(B) Providing the reasons for the decision; and

(C) Informing the borrower and the school of the relief, if any, that the borrower will receive, consistent with paragraph (e)(12) of this section and specifying the relief determination.

(ii) If the Department receives a borrower defense to repayment application that is incomplete and is within the limitations period in paragraph (e)(6) or (7) of this section, the Department will not issue a written decision on the application and instead will notify the borrower in writing that the application is incomplete and will return the application to the borrower.

(12) *Borrower defense to repayment relief under this paragraph (e).* (i) If the Secretary grants the borrower's request for relief based on a borrower defense to repayment under this paragraph (e), the Secretary notifies the borrower and the

school that the borrower is relieved of the obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay or will be reimbursed for amounts paid toward the loan voluntarily or through enforced collection. The amount of relief that a borrower receives under this paragraph (e) may exceed the amount of financial harm, as defined in paragraph (e)(4) of this section, that the borrower alleges in the application pursuant to paragraph (e)(8)(v) of this section. The Secretary determines the amount of relief and awards relief limited to the monetary loss that a borrower incurred as a consequence of a misrepresentation, as defined in paragraph (e)(3) of this section. The amount of relief cannot exceed the amount of the loan and any associated costs and fees and will be reduced by the amount of refund, reimbursement, indemnification, restitution, compensatory damages, settlement, debt forgiveness, discharge, cancellation, compromise, or any other financial benefit received by, or on behalf of, the borrower that was related to the borrower defense to repayment under this paragraph (e). In awarding relief under this paragraph (e), the Secretary considers the borrower's application, as described in paragraph (e)(8) of this section, which includes information about any payments received by the borrower and the financial harm alleged by the borrower. In awarding relief under this paragraph (e), the Secretary also considers the school's response, the borrower's reply, and any evidence otherwise in the possession of the Secretary, which was previously provided to the borrower and the school, as described in paragraph (e)(10) of this section. The Secretary also updates reports to consumer reporting agencies to which the Secretary previously made adverse credit reports with regard to the borrower's Direct Loan or loans repaid by the borrower's Direct Consolidation Loan under this paragraph (e).

(ii) The Secretary affords the borrower such further relief as the Secretary determines is appropriate under the circumstances. Further relief may include determining that the borrower is not in default on the loan and is eligible to receive assistance under title IV of the Act.

(13) *Finality of borrower defense to repayment decisions under this paragraph (e).* The determination of a borrower's defense to repayment by the Department included in the written decision referenced in paragraph (e)(11) of this section is the final decision of the Department and is not subject to appeal within the Department.

(14) *Cooperation by the borrower under this paragraph (e).* The Secretary may revoke any relief granted to a borrower under this section who refuses to cooperate with the Secretary in any proceeding under this paragraph (e) or under part 668, subpart G. Such cooperation includes, but is not limited to—

(i) Providing testimony regarding any representation made by the borrower to support a successful borrower defense to repayment under this paragraph (e); and

(ii) Producing, within timeframes established by the Secretary, any documentation reasonably available to the borrower with respect to those representations and any sworn statement required by the Secretary with respect to those representations and documents.

(15) *Transfer to the Secretary of the borrower's right of recovery against third parties under this paragraph (e).* (i) Upon the grant of any relief under this paragraph (e), the borrower is deemed to have assigned to, and relinquished in favor of, the Secretary any right to a loan refund (up to the amount discharged) that the borrower may have by contract or applicable law with respect to the loan or the provision of educational services for which the loan was received, against the school, its principals, its affiliates and their successors, or its sureties, and any private fund, including the portion of a public fund that represents funds received from a private party. If the borrower asserts a claim to, and recovers from, a public fund, the Secretary may reinstate the borrower's obligation to repay on the loan an amount based on the amount recovered from the public fund, if the Secretary determines that the borrower's recovery from the public fund was based on the same borrower defense to repayment and for the same loan for which the discharge was granted under this section.

(ii) The provisions of this paragraph (e)(15) apply notwithstanding any provision of State law that would otherwise restrict transfer of those rights by the borrower, limit or prevent a transferee from exercising those rights, or establish procedures or a scheme of distribution that would prejudice the Secretary's ability to recover on those rights.

(iii) Nothing in this paragraph (e)(15) limits or forecloses the borrower's right to pursue legal and equitable relief arising under applicable law against a party described in this paragraph (e)(15) for recovery of any portion of a claim exceeding that assigned to the Secretary or any other claims arising from matters unrelated to the claim on which the loan is discharged.

(16) *Recovery from the school under this paragraph (e).* (i) The Secretary may initiate an appropriate proceeding to require the school whose misrepresentation resulted in the borrower's successful borrower defense to repayment under this paragraph (e) to pay to the Secretary the amount of the loan to which the defense applies in accordance with part 668, subpart G. This paragraph (e)(16) would also be applicable for provisionally certified institutions.

(ii) Under this paragraph (e), the Secretary will not initiate such a proceeding more than 5 years after the date of the final determination included in the written decision referenced in paragraph (e)(11) of this section. The Department will notify the school of the borrower defense to repayment application within 60 days of the date of the Department's receipt of the borrower's application.

■ 28. Section 685.208 is amended by removing paragraph (l)(5).

■ 29. Section 685.209 is amended by:

■ a. Removing paragraph (a)(2)(iv);

■ b. Redesignating paragraphs (a)(2)(v) and (vi) as paragraphs (a)(2)(iv) and (v), respectively;

■ c. In paragraph (b)(1)(vii), removing the parenthetical phrase ''(including amount capitalized)'';

■ d. Removing and reserving paragraph (b)(3)(iv);

■ e. Removing paragraph (c)(2)(iv);

■ f. Redesignating paragraphs (c)(2)(v) and (vi) as paragraphs (c)(2)(iv) and (v), respectively;

■ g. In paragraph (c)(4)(iii)(B), removing the words ''paragraphs (c)(2)(iv) and'', and adding in their place ''paragraph''.

*     *     *     *     *

■ 30. Section 685.212 is amended by adding paragraph (k)(4) to read as follows:

**§ 685.212   Discharge of a loan obligation.**

*     *     *     *     *

(k) * * *

(4) If a borrower's application for a discharge of a loan based on a borrower defense is approved under 34 CFR part 685, subpart D, the Secretary discharges the obligation of the borrower, in accordance with the procedures described in subpart D of this part.

■ 31. Section 685.213 is amended by:

■ a. Revising paragraphs (b)(2) through (7);

■ b. Removing paragraph (b)(8); and

■ c. Revising paragraphs (d) and (e).

The revisions read as follows:

**§ 685.213    Total and permanent disability discharge.**

\*    \*    \*    \*    \*

(b) \* \* \*

(2) *Disability certification or Social Security Administration (SSA) disability determination.* The application must contain—

(i) A certification by a physician, who is a doctor of medicine or osteopathy legally authorized to practice in a State, that the borrower is totally and permanently disabled as described in paragraph (1) of the definition of that term in § 685.102(b);

(ii) A certification by a nurse practitioner or physician assistant licensed by a State, or a certified psychologist at the independent practice level who are licensed to practice in the United States, that the borrower is totally and permanently disabled as described in paragraph (1) of the definition of that term in § 685.102(b); or

(iii) An SSA Benefit Planning Query (BPQY) or an SSA notice of award, or other documentation deemed acceptable by the Secretary, indicating that—

(A) The borrower qualifies for Social Security Disability Insurance (SSDI) benefits or Supplemental Security Income (SSI) based on disability, and the borrower's next continuing disability review has been scheduled between 5 and 7 years;

(B) The borrower qualifies for SSDI benefits or SSI based on disability and the borrower's next continuing disability review has been scheduled at 3 years;

(C) The borrower has an established onset date for SSDI benefits or SSI of at least 5 years prior to the application for a disability discharge or has been receiving SSDI benefits or SSI based on disability for at least 5 years prior to the application for a TPD discharge;

(D) The borrower qualifies for SSDI or SSI based on a compassionate allowance; or

(E) For borrowers currently receiving SSA retirement benefits, documentation that, prior to the borrower qualifying for SSA retirement benefits, the borrower met the requirements in paragraphs (b)(2)(iii)(A) through (D) of this section.

(3) *Deadline for application submission.* The borrower must submit the application described in paragraph (b)(1) of this section to the Secretary within 90 days of the date the physician, nurse practitioner, physician assistant, or psychologist certifies the application, if applicable. Upon receipt of the borrower's application, the Secretary—

(i) Identifies all title IV loans owed by the borrower, notifies the lenders that the Secretary has received a total and permanent disability discharge application from the borrower and directs the lenders to suspend collection activity or maintain the suspension of collection activity on the borrower's title IV loans;

(ii) If the application is incomplete, notifies the borrower of the missing information and requests the missing information from the borrower or the physician, nurse practitioner, physician assistant, or psychologist who certified the application, as appropriate, and does not make a determination of eligibility for discharge until the application is complete;

(iii) Notifies the borrower that no payments are due on the loan while the Secretary determines the borrower's eligibility for discharge; and

(iv) Explains the process for the Secretary's review of total and permanent disability discharge applications.

(4) *Determination of eligibility.* (i) If, after reviewing the borrower's completed application, the Secretary determines that the data described in paragraph (b)(2) of this section supports the conclusion that the borrower meets the criteria for a total and permanent disability discharge, as described in paragraph (1) of the definition of that term in § 685.102(b), the borrower is considered totally and permanently disabled—

(A) As of the date the physician, nurse practitioner, physician assistant, or psychologist certified the borrower's application; or

(B) As of the date the Secretary received the SSA data described in paragraph (b)(2)(iii) of this section.

(ii) If the Secretary determines that the borrower's application does not support the conclusion that the borrower is totally and permanently disabled as described in paragraph (1) of the definition of that term in § 685.102(b), the Secretary may require the borrower to submit additional medical evidence. As part of the Secretary's review of the borrower's discharge application, the Secretary may require and arrange for an additional review of the borrower's condition by an independent physician or other medical professional identified by the Secretary at no expense to the borrower.

(iii) After determining that the borrower is totally and permanently disabled, as described in paragraph (1) of the definition of that term in § 685.102(b), the Secretary discharges the borrower's obligation to make any further payments on the loan, notifies the borrower that the loan has been discharged, and returns to the person who made the payments on the loan any payments received after the date the physician, nurse practitioner, physician assistant, or psychologist certified the borrower's loan discharge application or the date the Secretary received the SSA data described in paragraph (b)(2)(iii) of this section. The notification to the borrower explains the terms and conditions under which the borrower's obligation to repay the loan will be reinstated, as specified in paragraph (b)(7)(i) of this section.

(iv) If the Secretary determines that the physician, nurse practitioner, physician assistant, or psychologist certification or the SSA data described in paragraph (b)(2)(iii) of this section provided by the borrower does not support the conclusion that the borrower is totally and permanently disabled, as described in paragraph (1) of the definition of that term in § 685.102(b), the Secretary notifies the borrower that the application for a disability discharge has been denied. The notification to the borrower includes—

(A) The reason or reasons for the denial;

(B) A statement that the loan is due and payable to the Secretary under the terms of the promissory note and that the loan will return to the status that would have existed if the total and permanent disability discharge application had not been received;

(C) The date that the borrower must resume making payments;

(D) An explanation that the borrower is not required to submit a new total and permanent disability discharge application if the borrower requests that the Secretary re-evaluate the borrower's application for discharge by providing, within 12 months of the date of the notification, additional information that supports the borrower's eligibility for discharge; and

(E) An explanation that if the borrower does not request re-evaluation of the borrower's prior discharge application within 12 months of the date of the notification, the borrower must submit a new total and permanent disability discharge application to the Secretary if the borrower wishes the Secretary to re-evaluate the borrower's eligibility for a total and permanent disability discharge.

(v) If the borrower requests re-evaluation in accordance with paragraph (b)(4)(iv)(D) of this section or submits a new total and permanent disability discharge application in accordance with paragraph (b)(4)(iv)(E) of this section, the request must include new information regarding the borrower's disabling condition that was

not provided to the Secretary in connection with the prior application at the time the Secretary reviewed the borrower's initial application for total and permanent disability discharge.

(5) *Treatment of disbursements made during the period from the date of the certification or the date the Secretary received the SSA data until the date of discharge.* If a borrower received a title IV loan or TEACH Grant before the date the physician, nurse practitioner, physician assistant, or psychologist certified the borrower's discharge application or before the date the Secretary received the SSA data described in paragraph (b)(2)(iii) of this section and a disbursement of that loan or grant is made during the period from the date of the physician, nurse practitioner, physician assistant, or psychologist certification or the receipt of the SSA data described in paragraph (b)(2)(iii) of this section until the date the Secretary grants a discharge under this section, the processing of the borrower's loan discharge request will be suspended until the borrower ensures that the full amount of the disbursement has been returned to the loan holder or to the Secretary, as applicable.

(6) *Receipt of new title IV loans or TEACH Grants certification, or after the date the Secretary received the SSA data.* If a borrower receives a disbursement of a new title IV loan or receives a new TEACH Grant made on or after the date the physician, nurse practitioner, physician assistant, or psychologist certified the borrower's discharge application or on or after the date the Secretary received the SSA data described in paragraph (b)(2)(iii) of this section and before the date the Secretary grants a discharge under this section, the Secretary denies the borrower's discharge request and resumes collection on the borrower's loan.

(7) *Conditions for reinstatement of a loan after a total and permanent disability discharge.* (i) The Secretary reinstates a borrower's obligation to repay a loan that was discharged in accordance with paragraph (b)(4)(iii) of this section if, within 3 years after the date the Secretary granted the discharge, the borrower receives a new TEACH Grant or a new loan under the Direct Loan Program, except for a Direct Consolidation Loan that includes loans that were not discharged.

(ii) If the borrower's obligation to repay the loan is reinstated, the Secretary—

(A) Notifies the borrower that the borrower's obligation to repay the loan has been reinstated;

(B) Returns the loan to the status that would have existed if the total and permanent disability discharge application had not been received; and

(C) Does not require the borrower to pay interest on the loan for the period from the date the loan was discharged until the date the borrower's obligation to repay the loan was reinstated.

(iii) The Secretary's notification under paragraph (b)(7)(ii)(A) of this section will include—

(A) The reason or reasons for the reinstatement;

(B) An explanation that the first payment due date on the loan following reinstatement will be no earlier than 90 days after the date of the notification of reinstatement; and

(C) Information on how the borrower may contact the Secretary if the borrower has questions about the reinstatement or believes that the obligation to repay the loan was reinstated based on incorrect information.

*    *    *    *    *

(d) *Discharge without an application.* (1) The Secretary will discharge a loan under this section without an application or any additional documentation from the borrower if the Secretary:

(i) Obtains data from the Department of Veterans Affairs showing that the borrower is unemployable due to a service-connected disability; or

(ii) Obtains data from the Social Security Administration (SSA) described in paragraph (b)(2)(iii) of this section

(2) [Reserved]

(e) *Notification to the borrower.* (1) After determining that a borrower qualifies for a total and permanent disability discharge under paragraph (d) of this section, the Secretary sends a notification to the borrower informing the borrower that the Secretary will discharge the borrower's title IV loans unless the borrower notifies the Secretary, by a date specified in the Secretary's notification, that the borrower does not wish to receive the loan discharge.

(2) Unless the borrower notifies the Secretary that the borrower does not wish to receive the discharge the Secretary discharges the loan:

(i) In accordance with paragraph (b)(4)(iii) of this section for a discharge based on data from the SSA; or

(ii) In accordance with paragraph (c)(2)(i) of this section for a discharge based on data from VA.

(3) If the borrower notifies the Secretary that they do not wish to receive the discharge, the borrower will

remain responsible for repayment of the borrower's loans in accordance with the terms and conditions of the promissory notes that the borrower signed.

■ 32. Section 685.214 is amended by:
■ a. In paragraph (a)(1), removing the citation "paragraph (c)" and adding, in its place, the citation "paragraph (d)".
■ b. Revising paragraph (a)(2);
■ c. Removing paragraph (g);
■ d. Redesignating paragraphs (c) through (f) as paragraphs (d) through (g), respectively;
■ e. Adding a new paragraph (c);
■ f. Revising redesignated paragraphs (d) through (g); and
■ f. Adding a new paragraph (h).

The revisions and additions read as follows:

### §685.214  Closed school discharge.

(a) *    *    *
(2) For purposes of this section—
(i) If a school has closed, the school's closure date is the earlier of: the date, determined by the Secretary, that the school ceased to provide educational instruction in programs in which most students at the school were enrolled, or a date determined by the Secretary that reflects when the school ceased to provide educational instruction for all of its students;

(ii) "School" means a school's main campus or any location or branch of the main campus, regardless of whether the school or its location or branch is considered title IV eligible;

(iii) "Program" means the credential defined by the level and Classification of Instructional Program code in which a student is enrolled, except that the Secretary may define a borrower's program as multiple levels or Classification of Instructional Program codes if:

(A) The enrollment occurred at the same institution in closely proximate periods;

(B) The school granted a credential in a program while the student was enrolled in a different program; or

(C) The programs must be taken in a set order or were presented as necessary for borrowers to complete in order to succeed in the relevant field of employment;

*    *    *    *    *

(c) *Discharge without an application.* (1) If the Secretary determines based on information in the Secretary's possession that the borrower qualifies for the discharge of a loan under this section, the Secretary discharges the loan without an application or any statement from the borrower 1 year after the institution's closure date if the borrower did not complete the program

at another branch or location of the school or through a teach-out agreement at another school, approved by the school's accrediting agency and, if applicable, the school's State authorizing agency.

(2) If a borrower accepts but does not complete a continuation of the program at another branch or location of the school or a teach-out agreement at another school, approved by the school's accrediting agency and, if applicable, the school's State authorizing agency, then the Secretary discharges the loan 1 year after the borrower's last date of attendance at the other branch or location or in the teach-out program.

(d) *Borrower qualification for discharge.* (1) Except as provided in paragraphs (c) and (h) of this section, to qualify for discharge of a loan under this section, a borrower must submit to the Secretary a completed application and the factual assertions in the application must be true and must be made by the borrower under penalty of perjury. The application explains the procedures and eligibility criteria for obtaining a discharge and requires the borrower to—

(i) State that the borrower (or the student on whose behalf a parent borrowed)—

(A) Received the proceeds of a loan, in whole or in part, on or after January 1, 1986, to attend a school;

(B) Did not complete the program of study at that school because the school closed while the student was enrolled, or the student withdrew from the school not more than 180 calendar days before the school closed. The Secretary may extend the 180-day period if the Secretary determines that exceptional circumstances, as described in paragraph (i) of this section, justify an extension; and

(C) On or after July 1, 2023, state that the borrower did not complete the program at another branch or location of the school or through a teach-out agreement at another school, approved by the school's accrediting agency and, if applicable, the school's State authorizing agency.

(ii) State whether the borrower (or student) has made a claim with respect to the school's closing with any third party, such as the holder of a performance bond or a tuition recovery program, and, if so, the amount of any payment received by the borrower (or student) or credited to the borrower's loan obligation; and

(iii) State that the borrower (or student)—

(A) Agrees to provide to the Secretary upon request other documentation

reasonably available to the borrower that demonstrates that the borrower meets the qualifications for discharge under this section; and

(B) Agrees to cooperate with the Secretary in enforcement actions in accordance with paragraph (d) of this section and to transfer any right to recovery against a third party to the Secretary in accordance with paragraph (e) of this section.

(2) [Reserved]

(e) *Cooperation by borrower in enforcement actions.* (1) To obtain a discharge under this section, a borrower must cooperate with the Secretary in any judicial or administrative proceeding brought by the Secretary to recover amounts discharged or to take other enforcement action with respect to the conduct on which the discharge was based. At the request of the Secretary and upon the Secretary's tendering to the borrower the fees and costs that are customarily provided in litigation to reimburse witnesses, the borrower must—

(i) Provide testimony regarding any representation made by the borrower to support a request for discharge;

(ii) Produce any documents reasonably available to the borrower with respect to those representations; and

(iii) If required by the Secretary, provide a sworn statement regarding those documents and representations.

(2) The Secretary denies the request for a discharge or revokes the discharge of a borrower who—

(i) Fails to provide the testimony, documents, or a sworn statement required under paragraph (d)(1) of this section; or

(ii) Provides testimony, documents, or a sworn statement that does not support the material representations made by the borrower to obtain the discharge.

(f) *Transfer to the Secretary of borrower's right of recovery against third parties.* (1) Upon discharge under this section, the borrower is deemed to have assigned to and relinquished in favor of the Secretary any right to a loan refund (up to the amount discharged) that the borrower (or student) may have by contract or applicable law with respect to the loan or the enrollment agreement for the program for which the loan was received, against the school, its principals, its affiliates and their successors, its sureties, and any private fund, including the portion of a public fund that represents funds received from a private party.

(2) The provisions of this section apply notwithstanding any provision of State law that would otherwise restrict transfer of those rights by the borrower

(or student), limit or prevent a transferee from exercising those rights, or establish procedures or a scheme of distribution that would prejudice the Secretary's ability to recover on those rights.

(3) Nothing in this section limits or forecloses the borrower's (or student's) right to pursue legal and equitable relief regarding disputes arising from matters unrelated to the discharged Direct Loan.

(g) *Discharge procedures.* (1) After confirming the date of a school's closure, the Secretary identifies any Direct Loan borrower (or student on whose behalf a parent borrowed) who appears to have been enrolled at the school on the school closure date or to have withdrawn not more than 180 days prior to the closure date.

(2) If the borrower's current address is known, the Secretary mails the borrower a discharge application and an explanation of the qualifications and procedures for obtaining a discharge. The Secretary also promptly suspends any efforts to collect from the borrower on any affected loan. The Secretary may continue to receive borrower payments.

(3) If the borrower's current address is unknown, the Secretary attempts to locate the borrower and determines the borrower's potential eligibility for a discharge under this section by consulting with representatives of the closed school, the school's licensing agency, the school's accrediting agency, and other appropriate parties. If the Secretary learns the new address of a borrower, the Secretary mails to the borrower a discharge application and explanation and suspends collection, as described in paragraph (g)(2) of this section.

(4) If a borrower fails to submit the application described in paragraph (d) of this section within 90 days of the Secretary's providing the discharge application, the Secretary resumes collection and grants forbearance of principal and interest for the period in which collection activity was suspended.

(5) Upon resuming collection on any affected loan, the Secretary provides the borrower another discharge application and an explanation of the requirements and procedures for obtaining a discharge.

(6) If the Secretary determines that a borrower who requests a discharge meets the qualifications for a discharge, the Secretary notifies the borrower in writing of that determination.

(7) If the Secretary determines that a borrower who requests a discharge does not meet the qualifications for a discharge, the Secretary notifies that borrower in writing of that

determination and the reasons for the determination.

(h) *Exceptional circumstances.* For purposes of this section, exceptional circumstances include, but are not limited to—

(1) The revocation or withdrawal by an accrediting agency of the school's institutional accreditation;

(2) The school is or was placed on probation or issued a show-cause order, or was placed on an equivalent accreditation status, by its accrediting agency for failing to meet one or more of the agency's standards;

(3) The revocation or withdrawal by the State authorization or licensing authority to operate or to award academic credentials in the State;

(4) The termination by the Department of the school's participation in a title IV, HEA program;

(5) A finding by a State or Federal government agency that the school violated State or Federal law related to education or services to students;

(6) A State or Federal court judgment that a School violated State or Federal law related to education or services to students;

(7) The teach-out of the student's educational program exceeds the 180-day look-back period for a closed school discharge;

(8) The school responsible for the teach-out of the student's educational program fails to perform the material terms of the teach-out plan or agreement, such that the student does not have a reasonable opportunity to complete his or her program of study;

(9) The school discontinued a significant share of its academic programs;

(10) The school permanently closed all or most of its in-person locations while maintaining online programs; and

(11) The school was placed on the heightened cash monitoring payment method as defined in § 668.162(d)(2) of this chapter.

■ 33. Section 685.215 is amended by:
■ a. Revising paragraph (a)(1);
■ b. Adding paragraph (a)(3);
■ c. Revising paragraphs (c) introductory text and (c)(1) through (5);
■ d. Redesignating paragraphs (c)(6) through (8) as paragraphs (c)(7) through (9), respectively;
■ e. Adding a new paragraph (c)(6);
■ f. Adding paragraph (c)(10);
■ g. Revising paragraph (d); and
■ h. Removing paragraphs (e) and (f).

The revisions and additions read as follows:

**§ 685.215  Discharge for false certification of student eligibility or unauthorized payment.**

(a) *Basis for discharge*—(1) *False certification.* The Secretary discharges a borrower's (and any endorser's) obligation to repay a Direct Loan in accordance with the provisions of this section if a school falsely certifies the eligibility of the borrower (or the student on whose behalf a parent borrowed) to receive the proceeds of a Direct Loan. The Secretary considers a student's eligibility to borrow to have been falsely certified by the school if the school—

(i) Certified the eligibility of a student who—

(A) Reported not having a high school diploma or its equivalent; and

(B) Did not satisfy the alternative to graduation from high school requirements under section 484(d) of the Act and 34 CFR 668.32(e) of this chapter that were in effect when the loan was originated;

(ii) Certified the eligibility of a student who is not a high school graduate based on—

(A) A high school graduation status falsified by the school; or

(B) A high school diploma falsified by the school or a third party to which the school referred the borrower;

(iii) Signed the borrower's name on the loan application or promissory note without the borrower's authorization;

(iv) Certified the eligibility of the student who, because of a physical or mental condition, age, criminal record, or other reason accepted by the Secretary, would not meet State requirements for employment (in the student's State of residence when the loan was originated) in the occupation for which the training program supported by the loan was intended; or

(v) Certified the eligibility of a student for a Direct Loan as a result of the crime of identity theft committed against the individual, as that crime is defined in paragraph (c)(6) of this section.

\*　　\*　　\*　　\*　　\*

(3) *Loan origination.* For purposes of this section, a loan is originated when the school submits the loan record to the Department's Common Origination and Disbursement (COD) System. Before originating a Direct Loan, a school must determine the student's or parent's eligibility for the loan. For each Direct Loan that a school disburses to a student or parent, the school must first submit a loan award record to the COD system and receive an accepted response.

\*　　\*　　\*　　\*　　\*

(c) *Borrower qualification for discharge.* To qualify for discharge under this paragraph, the borrower must submit to the Secretary an application for discharge on a form approved by the Secretary. The application need not be notarized but must be made by the borrower under penalty of perjury; and in the application, the borrower's responses must demonstrate to the satisfaction of the Secretary that the requirements in paragraphs (c)(1) through (7) of this section have been met. If the Secretary determines the application does not meet the requirements, the Secretary notifies the applicant and explains why the application does not meet the requirements.

(1) *High school diploma or equivalent.* In the case of a borrower requesting a discharge based on not having a high school diploma and not having met the alternative to graduation from high school eligibility requirements under section 484(d) of the Act and 34 CFR 668.32(e) of this chapter as applicable when the loan was originated, and the school or a third party to which the school referred the borrower falsified the student's high school diploma, the borrower must state in the application that the borrower (or the student on whose behalf a parent received a PLUS loan)—

(i) Reported not having a valid high school diploma or its equivalent when the loan was originated; and

(ii) Did not satisfy the alternative to graduation from high school statutory or regulatory eligibility requirements identified on the application form and applicable when the loan was originated.

(2) *Disqualifying condition.* In the case of a borrower requesting a discharge based on a condition that would disqualify the borrower from employment in the occupation that the training program for which the borrower received the loan was intended, the borrower must state in the application that the borrower (or student for whom a parent received a PLUS loan) did not meet State requirements for employment in the student's State of residence in the occupation that the training program for which the borrower received the loan was intended because of a physical or mental condition, age, criminal record, or other reason accepted by the Secretary.

(3) *Unauthorized loan.* In the case of a borrower requesting a discharge because the school signed the borrower's name on the loan application or promissory note without the borrower's authorization, the borrower must state that he or she did not sign the document in question or authorize the school to do so.

(4) *Unauthorized payment.* In the case of a borrower requesting a discharge because the school, without the borrower's authorization, endorsed the borrower's loan check or signed the borrower's authorization for electronic funds transfer, the borrower must—

(i) State that he or she did not endorse the loan check or sign the authorization for electronic funds transfer or authorize the school to do so; and

(ii) State that the proceeds of the contested disbursement were not delivered to the student or applied to charges owed by the student to the school.

(5) *Identity theft.* In the case of an individual whose eligibility to borrow was falsely certified because he or she was a victim of the crime of identity theft and is requesting a discharge, the individual must—

(i) Certify that the individual did not sign the promissory note, or that any other means of identification used to obtain the loan was used without the authorization of the individual claiming relief;

(ii) Certify that the individual did not receive or benefit from the proceeds of the loan with knowledge that the loan had been made without the authorization of the individual; and

(iii) Provide a statement of facts and supporting evidence that demonstrate, to the satisfaction of the Secretary, that eligibility for the loan in question was falsely certified as a result of identity theft committed against that individual. Supporting evidence may include—

(A) A judicial determination of identity theft relating to the individual;

(B) A Federal Trade Commission identity theft affidavit;

(C) A police report alleging identity theft relating to the individual;

(D) Documentation of a dispute of the validity of the loan due to identity theft filed with at least three major consumer reporting agencies; and

(E) Other evidence acceptable to the Secretary.

(6) *Definition of identity theft.* (i) For purposes of this section, identity theft is defined as the unauthorized use of the identifying information of another individual that is punishable under 18 U.S.C. 1028, 1028A, 1029, or 1030, or substantially comparable State or local law.

(ii) Identifying information includes, but is not limited to—

(A) Name, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, and employer or taxpayer identification number;

(B) Unique biometric data, such as fingerprints, voiceprint, retina or iris image, or unique physical representation;

(C) Unique electronic identification number, address, or routing code; or

(D) Telecommunication identifying information or access device (as defined in *18 U.S.C. 1029(e)*).

\*    \*    \*    \*    \*

(10) *Application for group discharge.* A State Attorney General or nonprofit legal services representative may submit to the Secretary an application for a group discharge under this section.

(d) *Discharge procedures.* (1) If the Secretary determines that a borrower's Direct Loan may be eligible for a discharge under this section, the Secretary provides the borrower an application and an explanation of the qualifications and procedures for obtaining a discharge. The Secretary also promptly suspends any efforts to collect from the borrower on any affected loan. The Secretary may continue to receive borrower payments.

(2) If the borrower fails to submit the application for discharge and supporting information described in paragraph (c) of this section within 60 days of the Secretary's providing the application, the Secretary resumes collection and grants forbearance of principal and interest for the period in which collection activity was suspended.

(3) If the borrower submits an application for discharge that the Secretary determines is incomplete, the Secretary notifies the borrower of that determination and allows the borrower an additional 30-days to amend their application and provide supplemental information. If the borrower does not amend their application within 30 days of receiving the notification from the Secretary, the borrower's application is closed as incomplete and the Secretary resumes collection of the loan and grants forbearance of principal and interest for the period in which collection activity was suspended.

(4) If the borrower submits a completed application described in paragraph (c) of this section, the Secretary determines whether the available evidence supports the claim for discharge. Available evidence includes evidence provided by the borrower and any other relevant information from the Secretary's records and gathered by the Secretary from other sources, including guaranty agencies, other Federal agencies, State authorities, test publishers, independent test administrators, school records, and cognizant accrediting associations. The

Secretary issues a decision that explains the reasons for any adverse determination on the application, describes the evidence on which the decision was made, and provides the borrower, upon request, copies of the evidence. The Secretary considers any response from the borrower and any additional information from the borrower and notifies the borrower whether the determination is changed.

(5) If the Secretary determines that the borrower meets the applicable requirements for a discharge under paragraph (c) of this section, the Secretary notifies the borrower in writing of that determination.

(6) If the Secretary determines that the borrower does not qualify for a discharge, the Secretary notifies the borrower in writing of that determination and the reasons for the determination.

(7) A borrower is not precluded from re-applying for a discharge under paragraph (c) of this section if the discharge request is closed as incomplete, or if the Secretary determines that the borrower does not qualify for a discharge if the borrower provides additional supporting evidence.

■ 34. Section 685.219 is revised to read as follows:

### § 685.219  Public Service Loan Forgiveness Program (PSLF).

(a) *Purpose.* The Public Service Loan Forgiveness Program is intended to encourage individuals to enter and continue in full-time public service employment by forgiving the remaining balance of their Direct loans after they satisfy the public service and loan payment requirements of this section.

(b) *Definitions.* The following definitions apply to this section:

*AmeriCorps service* means service in a position approved by the Corporation for National and Community Service under section 123 of the National and Community Service Act of 1990 (42 U.S.C. 12573).

*Civilian service to the military* means providing services to or on behalf of members, veterans, or the families or survivors of deceased members of the U.S. Armed Forces or the National Guard that is provided to a person because of the person's status in one of those groups.

*Early childhood education program* means an early childhood education program as defined in section 103(8) of the Act (20 U.S.C. 1003).

*Eligible Direct Loan* means a Direct Subsidized Loan, a Direct Unsubsidized Loan, a Direct PLUS Loan, or a Direct Consolidation Loan.

*Emergency management services* means services that help remediate, lessen, or eliminate the effects or potential effects of emergencies that threaten human life or health, or real property.

*Employee or employed* means an individual—

(i) To whom an organization issues an IRS Form W–2;

(ii) Who receives an IRS Form W–2 from an organization that has contracted with a qualifying employer to provide payroll or similar services for the qualifying employer, and which provides the Form W–2 under that contract;

(iii) who works as a contracted employee for a qualifying employer in a position or providing services which, under applicable state law, cannot be filled or provided by a direct employee of the qualifying employer.

*Full-time* means:

(i) Working in qualifying employment in one or more jobs—

(A) A minimum average of 30 hours per week during the period being certified,

(B) A minimum of 30 hours per week throughout a contractual or employment period of at least 8 months in a 12-month period, such as elementary and secondary school teachers and professors and instructors, in higher education, in which case the borrower is deemed to have worked full time; or

(C) The equivalent of 30 hours per week as determined by multiplying each credit or contact hour taught per week by at least 3.35 in non-tenure track employment at an institution of higher education.

(ii) Routine paid vacation or paid leave time provided by the employer, and leave taken under the Family and Medical Leave Act of 1993 (29 U.S.C. 2612(a)(1)) will be considered when determining if the borrower is working full-time.

*Law enforcement* means service that is publicly funded and whose principal activities pertain to crime prevention, control or reduction of crime, or the enforcement of criminal law.

*Military service* means "active duty" service or "full-time National Guard duty" as defined in section 101(d)(1) and (d)(5) of title 10 in the United States Code and does not include active duty for training or attendance at a service school.

*Non-governmental public service* means services provided by employees of a non-governmental qualified employer where the employer has devoted a majority of its full-time equivalent employees to working in at least one of the following areas (as defined in this section): emergency management, civilian service to military personnel military service, public safety, law enforcement, public interest law services, early childhood education, public service for individuals with disabilities or the elderly, public health, public education, public library services, school library, or other school-based services. Service as a member of the U.S. Congress is not qualifying public service employment for purposes of this section.

*Non-tenure track employment* means work performed by adjunct, contingent or part time faculty, teachers, or lecturers who are paid based on the credit hours they teach at institutions of higher education.

*Other school-based service* means the provision of services to schools or students in a school or a school-like setting that are not public education services, such as school health services and school nurse services, social work services in schools, and parent counseling and training.

*Peace Corps position* means a full-time assignment under the Peace Corps Act as provided for under 22 U.S.C. 2504.

*Public education service* means the provision of educational enrichment or support to students in a public school or a public school-like setting, including teaching.

*Public health* means those engaged in the following occupations (as those terms are defined by the Bureau of Labor Statistics): physicians, nurse practitioners, nurses in a clinical setting, health care practitioners, health care support, counselors, social workers, and other community and social service specialists.

*Public interest law* is legal services that are funded in whole or in part by a local, State, Federal, or Tribal government.

*Public library service* means the operation of public libraries or services that support their operation.

*Public safety service* means services that seek to prevent the need for emergency management services.

*Public service for individuals with disabilities* means services performed for or to assist individuals with disabilities (as defined in the Americans with Disabilities Act (42 U.S.C. 12102)) that is provided to a person because of the person's status as an individual with a disability.

*Public service for the elderly* means services that are provided to individuals who are aged 62 years or older and that are provided to a person because of the person's status as an individual of that age.

*Qualifying employer* means:

(i) A United States-based Federal, State, local, or Tribal government organization, agency, or entity, including the U.S. Armed Forces or the National Guard;

(ii) A public child or family service agency;

(iii) An organization under section 501(c)(3) of the Internal Revenue Code of 1986 that is exempt from taxation under section 501(a) of the Internal Revenue Code;

(iv) A Tribal college or university; or

(v) A nonprofit organization that—

(A) Provides a non-governmental public service as defined in this section, attested to by the employer on a form approved by the Secretary; and

(B) Is not a business organized for profit, a labor union, or a partisan political organization.

*Qualifying repayment plan* means:

(i) An income-contingent repayment plan under § 685.209 or an income-based repayment plan under § 685.221;

(ii) The 10-year standard repayment plan under § 685.208(b) or the consolidation loan standard repayment plan with a 10-year repayment term under § 685.208(c); or

(iii) Except for the alternative repayment plan, any other repayment plan if the monthly payment amount is not less than what would have been paid under the 10-year standard repayment plan under § 685.208(b).

*School library services* means the operations of school libraries or services that support their operation.

(c) *Borrower eligibility.* (1) A borrower may obtain loan forgiveness under this program if the borrower—

(i) Is not in default on the loan at the time forgiveness is requested;

(ii) Is employed full-time by a qualifying employer or serving in a full-time AmeriCorps or Peace Corps position—

(A) When the borrower satisfied the 120 monthly payments described under paragraph (c)(1)(iii) of this section; and

(B) At the time the borrower applies for forgiveness under paragraph (e) of this section; and

(iii) Satisfies the equivalent of 120 monthly payments after October 1, 2007, as described in paragraph (c)(2) of this section, on eligible Direct loans.

(2) A borrower will be considered to have made monthly payments under paragraph (c)(1)(iii) of this section by—

(i) Paying at least the full scheduled amount due for a monthly payment under the qualifying repayment plan;

(ii) Paying in multiple installments that equal the full scheduled amount due for a monthly payment under the qualifying repayment plan;

(iii) For a borrower on an income-contingent repayment plan under § 685.209 or an income-based repayment plan under § 685.221, paying a lump sum or monthly payment amount that is equal to or greater than the full scheduled amount in advance of the borrower's scheduled payment due date for a period of months not to exceed the period from the Secretary's receipt of the payment until the borrower's next annual repayment plan recertification date under the qualifying repayment plan in which the borrower is enrolled;

(iv) For a borrower on the 10-year standard repayment plan under § 685.208(b) or the consolidation loan standard repayment plan with a 10-year repayment term under § 685.208(c), paying a lump sum or monthly payment amount that is equal to or greater than the full scheduled amount in advance of the borrower's scheduled payment due date for a period of months not to exceed the period from the Secretary's receipt of the payment until the lesser of 12 months from that date or the date upon which the Secretary receives the borrower's next submission under subsection (e).

(v) Receiving one of the following deferments or forbearances for the month:

(A) Cancer treatment deferment under section 455(f)(3) of the Act;

(B) Economic hardship deferment under § 685.204(g);

(C) Military service deferment under § 685.204(h);

(D) Post-active-duty student deferment under § 685.204(i);

(E) AmeriCorps forbearance under § 685.205(a)(4);

(F) National Guard Duty forbearance under § 685.205(a)(7);

(G) U.S. Department of Defense Student Loan Repayment Program forbearance under § 685.205(a)(9);

(H) Administrative forbearance or mandatory administrative forbearance under § 685.205(b)(8) or (9); and

(vi) Being employed full-time with a qualifying employer, as defined in this section, at any point during the month for which the payment is credited.

(3) If a borrower consolidates one or more Direct Loans into a Direct Consolidation Loan, including a Direct PLUS Loan made to a parent borrower, the weighted average of the payments the borrower made on the Direct Loans prior to consolidating and that met the criteria in paragraphs (c)(2)(i) through (vi) of this section will count as qualifying payments on the Direct Consolidation Loan.

(d) *Forgiveness amount.* The Secretary forgives the principal and accrued interest that remains on all loans for which the borrower meets the requirements of paragraph (c) of this section as of the date the borrower satisfied the last required monthly payment obligation.

(e) *Application process.* (1) Notwithstanding paragraph (f) of this section, after making the 120 monthly qualifying payments on the eligible loans for which loan forgiveness is requested while working the 120 months of qualifying service, a borrower may request loan forgiveness by filing an application approved by the Secretary.

(2) If the Secretary has sufficient information to determine the borrower's qualifying employer and length of employment, the Secretary informs the borrower if the borrower is eligible for forgiveness.

(3) If the Secretary does not have sufficient information to make a determination of the borrower's eligibility for forgiveness, the borrower must provide additional information about the borrower's employment and employer on a form approved by the Secretary.

(4) If the borrower is unable to secure a certification of employment from a qualifying employer, the Secretary may determine the borrower's qualifying employment or payments based on other documentation provided by the borrower at the Secretary's request.

(5) The Secretary may request reasonable additional documentation pertaining to the borrower's employer or employment before providing a determination.

(6) The Secretary may substantiate an employer's attestation of information provided on the form in paragraph (e)(3) of this section based on a review of information about the employer.

(7) If the Secretary determines that the borrower meets the eligibility requirements for loan forgiveness under this section, the Secretary—

(i) Notifies the borrower of this determination; and

(ii) Forgives the outstanding balance of the eligible loans.

(8) If the Secretary determines that the borrower does not meet the eligibility requirements for loan forgiveness under this section, grants forbearance of payment on both principal and interest for the period in which collection activity was suspended. The Secretary notifies the borrower that the application has been denied, provides the basis for the denial, and informs the borrower that the Secretary will resume collection of the loan. The Secretary does not capitalize any interest accrued and not paid during this period.

(f) *Application not required.* The Secretary forgives a loan under this section without an application from the borrower if the Secretary has sufficient information in the Secretary's possession to determine the borrower has satisfied the requirements for forgiveness under this section.

(g) *Reconsideration process.* (1) Within 90 days of the date the Secretary sent the notice of denial of forgiveness under paragraph (e)(8) of this section to the borrower, the borrower may request that the Secretary reconsider whether the borrower's employer or any payment meets the requirements for credit toward forgiveness by requesting reconsideration on a form approved by the Secretary. Borrowers who were denied loan forgiveness under this section after October 1, 2017, and prior to [EFFECTIVE DATE OF FINAL RULE], have 180 days from the effective date of this Final Rule to request reconsideration.

(2) To evaluate a reconsideration request, the Secretary considers—

(i) Any relevant evidence that is obtained by the Secretary; and

(ii) Additional supporting documentation not previously provided by the borrower or employer.

(3) The Secretary notifies the borrower of the reconsideration decision and the reason for the Secretary's determination.

(4) If the Secretary determines that the borrower qualifies for forgiveness, the Secretary adjusts the borrower's number of qualifying payments or forgives the loan, as appropriate.

(5) After the Secretary makes a decision on the borrower's reconsideration request, the Secretary's decision is final, and the borrower will not receive additional reconsideration unless the borrower presents additional evidence.

(6) For any months in which a borrower postponed monthly payments under a deferment or forbearance and was employed full-time at a qualifying employer as defined in this section but was in a deferment or forbearance status besides those listed in paragraph (c)(2)(v) of this section, the borrower may obtain credit toward forgiveness for those months, as defined in paragraph (d) of this section, for any months in which the borrower—

(i) Makes an additional payment equal to or greater than the amount they would have paid at that time on a qualifying repayment plan or

(ii) Otherwise qualified for a $0 payment on an income-driven repayment plan under § 685.209 and income-based repayment plan under § 685.221.

■ 33. Section 685.300 is amended by:
■ a. Revising paragraphs (b)(7) and (10);
■ b. Redesignating paragraphs (b)(11) and (12) as paragraphs (b)(12) and (13), respectively;
■ c. Adding new paragraph (b)(11);
■ d. Revising newly redesignated paragraph (b)(13); and
■ e. Adding paragraphs (d) through (i).

The revisions and additions read as follows:

### § 685.300   Agreements between an eligible school and the Secretary for participation in the Direct Loan Program.

\*     \*     \*     \*     \*

(b) \* \* \*

(7) Provide assurances that the school will comply with loan information requirements established by the Secretary with respect to loans made under the Direct Loan Program;

\*     \*     \*     \*     \*

(10) Provide that the school will not charge any fees of any kind, however described, to student or parent borrowers for origination activities or for the provision of information necessary for a student or parent to receive a loan under part D of the Act or for any benefits associated with such a loan;

(11) Comply with the provisions of paragraphs (d) through (i) of this section regarding student claims and disputes;

\*     \*     \*     \*     \*

(13) Accept responsibility and financial liability stemming from losses incurred by the Secretary for repayment of amounts discharged by the Secretary pursuant to §§ 685.206, 685.214, 685.215, 685.216, 685.222, and subpart D of this part.

\*     \*     \*     \*     \*

(d) *Borrower defense claims in an internal dispute process.* The school will not compel any student to pursue a complaint based on allegations that would provide a basis for a borrower defense claim through an internal dispute process before the student presents the complaint to an accrediting agency or government agency authorized to hear the complaint.

(e) *Class action bans.* (1) The school will not seek to rely in any way on a pre-dispute arbitration agreement or on any other pre-dispute agreement with a student who has obtained or benefited from a Direct Loan, with respect to any aspect of a class action that is related to a borrower defense claim, unless and until the presiding court has ruled that the case may not proceed as a class action and, if that ruling may be subject to appellate review on an interlocutory basis, the time to seek such review has elapsed or the review has been resolved.

(2) Reliance on a pre-dispute arbitration agreement, or on any other pre-dispute agreement, with a student, with respect to any aspect of a class action includes, but is not limited to, any of the following:

(i) Seeking dismissal, deferral, or stay of any aspect of a class action;

(ii) Seeking to exclude a person or persons from a class in a class action;

(iii) Objecting to or seeking a protective order intended to avoid responding to discovery in a class action;

(iv) Filing a claim in arbitration against a student who has filed a claim on the same issue in a class action;

(v) Filing a claim in arbitration against a student who has filed a claim on the same issue in a class action after the trial court has denied a motion to certify the class but before an appellate court has ruled on an interlocutory appeal of that motion, if the time to seek such an appeal has not elapsed or the appeal has not been resolved; and

(vi) Filing a claim in arbitration against a student who has filed a claim on the same issue in a class action, after the trial court in that class action has granted a motion to dismiss the claim and noted that the consumer has leave to refile the claim on a class basis, if the time to refile the claim has not elapsed.

(3) *Required provisions and notices:* (i) After the effective date of this regulation, the school must include the following provision in any agreements with a student recipient of a Direct Loan for attendance at the school, or a student for whom the PLUS loan was obtained, that include pre-dispute arbitration or any other pre-dispute agreement addressing class actions: ''We agree that this agreement cannot be used to stop you from being part of a class action lawsuit in court. You may file a class action lawsuit in court, or you may be a member of a class action lawsuit even if you do not file it. This provision applies only to class action claims concerning our acts or omissions regarding the making of the Direct Loan or our provision of educational services for which the Direct Loan was obtained. We agree that the court has exclusive jurisdiction to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of educational services for which the loan was obtained.''

(ii) When a pre-dispute arbitration agreement or any other pre-dispute agreement addressing class actions has been entered into before the effective date of this regulation and does not contain the provision described in paragraph (e)(3)(i) of this section, the

school must either ensure the agreement is amended to contain that provision or provide the student to whom the agreement applies with written notice of that provision.

(iii) The school must ensure the agreement described in paragraph (e)(3)(ii) of this section is amended to contain the provision set forth in paragraph (e)(3)(i) or must provide the notice to students specified in that paragraph no later than the exit counseling required under § 685.304(b), or the date on which the school files its initial response to a demand for arbitration or service of a complaint from a student who has not already been sent a notice or amendment, whichever is earlier.

(A) *Agreement provision.* ''We agree that neither we, nor anyone else who later becomes a party to this agreement, will use it to stop you from being part of a class action lawsuit in court. You may file a class action lawsuit in court, or you may be a member of a class action lawsuit in court even if you do not file it. This provision applies only to class action claims concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. We agree that the court has exclusive jurisdiction to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of educational services for which the loan was obtained.''

(B) *Notice provision.* ''We agree not to use any pre-dispute agreement to stop you from being part of a class action lawsuit in court. You may file a class action lawsuit in court, or you may be a member of a class action lawsuit even if you do not file it. This provision applies only to class action claims concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. We agree that the court has exclusive jurisdiction to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of educational services for which the loan was obtained.''

(f) *Pre-dispute arbitration agreements.* (1)(i) The school will not enter into a pre-dispute agreement to arbitrate a borrower defense claim or rely in any way on a pre-dispute arbitration agreement with respect to any aspect of a borrower defense claim.

(ii) A student may enter into a voluntary post-dispute arbitration

agreement with a school to arbitrate a borrower defense claim.

(2) Reliance on a pre-dispute arbitration agreement with a student with respect to any aspect of a borrower defense claim includes, but is not limited to, any of the following:

(i) Seeking dismissal, deferral, or stay of any aspect of a judicial action filed by the student, including joinder with others in an action;

(ii) Objecting to or seeking a protective order intended to avoid responding to discovery in a judicial action filed by the student; and

(iii) Filing a claim in arbitration against a student who has filed a suit on the same claim.

(3) Required provisions and notices: (i) The school must include the following provision in any pre-dispute arbitration agreements with a student recipient of a Direct Loan for attendance at the school, or, with respect to a Parent PLUS Loan, a student for whom the PLUS loan was obtained, that include any agreement regarding arbitration and that are entered into after the effective date of this regulation: "We agree that neither we nor anyone else will use this agreement to stop you from bringing a lawsuit concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. You may file a lawsuit for such a claim, or you may be a member of a class action lawsuit for such a claim even if you do not file it. This provision does not apply to lawsuits concerning other claims. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Direct Loan or the provision of educational services for which the loan was obtained."

(ii) When a pre-dispute arbitration agreement has been entered into before the effective date of this regulation, that did not contain the provision specified in paragraph (f)(3)(i) of this section, the school must either ensure the agreement is amended to contain the provision specified in paragraph (f)(3)(iii)(A) of this section or provide the student to whom the agreement applies with the written notice specified in paragraph (f)(3)(iii)(B) of this section.

(iii) The school must ensure the agreement described in paragraph (f)(3)(ii) of this section is amended to contain the provision specified in paragraph (f)(3)(iii)(A) of this section or must provide the notice specified in paragraph (f)(3)(iii)(B) of this section to students no later than the exit counseling required under § 685.304(b),

or the date on which the school files its initial response to a demand for arbitration or service of a complaint from a student who has not already been sent a notice or amendment, whichever is earlier.

(A) *Agreement provision.* "We agree that neither we, nor anyone else who later becomes a party to this pre-dispute arbitration agreement, will use it to stop you from bringing a lawsuit concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. You may file a lawsuit for such a claim, or you may be a member of a class action lawsuit for such a claim even if you do not file it. This provision does not apply to other claims. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of educational services for which the loan was obtained."

(B) *Notice provision.* "We agree not to use any pre-dispute arbitration agreement to stop you from bringing a lawsuit concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. You may file a lawsuit regarding such a claim, or you may be a member of a class action lawsuit regarding such a claim even if you do not file it. This provision does not apply to any other claims. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Direct Loan or the provision of educational services for which the loan was obtained."

(g) *Submission of arbitral records.* (1) A school must submit a copy of the following records to the Secretary, in the form and manner specified by the Secretary, in connection with any borrower defense claim filed in arbitration by or against the school:

(i) The initial claim and any counterclaim;

(ii) The arbitration agreement filed with the arbitrator or arbitration administrator;

(iii) The judgment or award, if any, issued by the arbitrator or arbitration administrator;

(iv) If an arbitrator or arbitration administrator refuses to administer or dismisses a claim due to the school's failure to pay required filing or administrative fees, any communication the school receives from the arbitrator or arbitration administrator related to such a refusal; and

(v) Any communication the school receives from an arbitrator or an arbitration administrator related to a determination that a pre-dispute arbitration agreement regarding educational services provided by the school does not comply with the administrator's fairness principles, rules, or similar requirements, if such a determination occurs;

(2) A school must submit any record required pursuant to paragraph (g)(1) of this section within 60 days of filing by the school of any such record with the arbitrator or arbitration administrator and within 60 days of receipt by the school of any such record filed or sent by someone other than the school, such as the arbitrator, the arbitration administrator, or the student.

(3) The Secretary will publish the records submitted by schools in paragraph (g)(1) of this section in a centralized database accessible to the public.

(h) *Submission of judicial records.* (1) A school must submit a copy of the following records to the Secretary, in the form and manner specified by the Secretary, in connection with any borrower defense claim filed in a lawsuit by the school against the student or by any party, including a government agency, against the school:

(i) The complaint and any counterclaim;

(ii) Any dispositive motion filed by a party to the suit; and

(iii) The ruling on any dispositive motion and the judgment issued by the court;

(2) A school must submit any record required pursuant to paragraph (h)(1) of this section within 30 days of filing or receipt, as applicable, of the complaint, answer, or dispositive motion, and within 30 days of receipt of any ruling on a dispositive motion or a final judgment;

(3) The Secretary will publish the records submitted by schools in paragraph (h)(1) in a centralized database accessible to the public.

(i) *Definitions.* For the purposes of paragraphs (d) through (h) of this section, the term—

(1) *Borrower defense claim* means a claim based on an act or omission that is or could be asserted as a borrower defense as defined in:

(i) § 685.206(c)(1);

(ii) § 685.222(a)(5);

(iii) § 685.206(e)(1)(iii); or

(iv) § 685.401(a);

(2) *Class action* means a lawsuit in which one or more parties seek class treatment pursuant to Federal Rule of Civil Procedure 23 or any State process

analogous to Federal Rule of Civil Procedure 23;

(3) *Dispositive motion* means a motion asking for a court order that entirely disposes of one or more claims in favor of the party who files the motion without need for further court proceedings;

(4) *Pre-dispute arbitration agreement* means any agreement, regardless of its form or structure, between a school or a party acting on behalf of a school and a student that provides for arbitration of any future dispute between the parties.

### § 685.304  [Amended]

■ 35. Section 685.304 is amended:
■ a. In paragraph (a)(6)(xi), by adding "and" after "records;";
■ b. In paragraph (a)(6)(xii), by removing the semicolon after "loan" and adding a period in its place; and
■ c. Removing paragraphs (a)(6)(xiii) through (xv).

■ 36. Section 685.308 is amended by revising paragraph (a)(3) to read as follows:

### § 685.308  Remedial actions.

(a) * * *

(3) The school's actions that gave rise to a successful claim for which the Secretary discharged a loan, in whole or in part, pursuant to §§ 685.206, 685.214, 685.216, 685.222, or subpart D of this part.

* * * * *

■ 37. Subpart D is added to read as follows:

### Subpart D—Borrower Defense to Repayment

Sec.
685.400  Scope and purpose.
685.401  Borrower defense-general.
685.402  Group process for borrower defense.
685.403  Individual process for borrower defense.
685.404  Group process based on prior Secretarial final actions.
685.405  Institutional response.
685.406  Adjudication of borrower defense applications.
685.407  Reconsideration.
685.408  Discharge.
685.409  Recovery from institutions.
685.410  Cooperation by the borrower.
685.411  Transfer to the Secretary of the borrower's right of recovery against third parties.
685.499  Severability.

### Subpart D—Borrower Defense to Repayment

### § 685.400  Scope and purpose.

This subpart sets forth the provisions under which a borrower defense to repayment may be asserted and applies to borrower defense applications

pending with the Secretary on July 1, 2023, or received by the Secretary on or after July 1, 2023.

### § 685.401  Borrower defense-general.

(a) *Definitions.* For the purposes of this subpart, the following definitions apply:

*Borrower* means
(i) The borrower; and
(ii) In the case of a Direct PLUS Loan, any endorsers, and for a Direct PLUS Loan made to a parent, the student on whose behalf the parent borrowed.

*Borrower defense to repayment* means an act or omission of the school attended by the student that relates to the making of a Direct Loan for enrollment at the school or the provision of educational services for which the loan was provided and that caused the borrower detriment warranting relief in the form of:

(i) A defense to repayment of all amounts owed to the Secretary on a Direct Loan including a Direct Consolidation Loan that was used to repay a Direct Loan, a FFEL Program Loan, Federal Perkins Loan, Health Professions Student Loan, Loan for Disadvantaged Students under subpart II of part A of title VII of the Public Health Service Act, Health Education Assistance Loan, or Nursing Loan made under part E of the Public Health Service Act;

(ii) Reimbursement of all payments previously made to the Secretary on the Direct Loan or on a loan repaid by the Direct Consolidation Loan;

(iii) For borrowers in default, determining that the borrower is not in default on the loan and is eligible to receive assistance under title IV of the Act; and

(iv) Updating or deleting adverse reports the Secretary previously made to consumer reporting agencies regarding the borrower's Direct Loan.

*Covered loan* means a Direct Loan or other Federal student loan that is or could be consolidated into a Federal Direct Consolidation Loan.

*Department official* means an employee of the Department who administers the group process described in § 685.402, the individual process as described in § 685.403, and the institutional response process in § 685.405.

*Direct Loan* means a Direct Subsidized Loan, a Direct Unsubsidized Loan, a Direct PLUS Loan, or a Direct Consolidation Loan.

*Legal assistance organization* means a legal assistance organization that:
(i) employs attorneys who:
(A) Are full-time employees;
(B) Provide civil legal assistance on a full-time basis; and

(C) Are continually licensed to practice law; and,

(ii) Is a nonprofit organization that provides legal assistance with respect to civil matters to low-income individuals without a fee.

*Legal representation authority* means a written agreement entered into between a borrower and a legal assistance organization that authorizes the legal assistance organization to represent the borrower in connection with a claim for borrower defense or a court order appointing the legal assistance organization class counsel for a certified class that includes the borrower in an action asserting claims with elements substantially similar to the elements of a claim for borrower defense.

*School* and *institution* may be used interchangeably and include an eligible institution as defined in 34 CFR 600.2, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs or to provide marketing, advertising, recruiting, or admissions services.

*State requestor* means a State as defined in 34 CFR 600.2, a State attorney general, a State oversight entity, a State agency responsible for approving educational institutions in the State, or a regulatory agency with the authority from that State.

*Third-party requestor* means a *State requestor* or *legal assistance organization* as defined in § 685.401(a).

(b) *Federal standard for borrower defense applications received on or after July 1, 2023, and for applications pending with the Secretary on July 1, 2023.* A borrower with a balance due on a covered loan will be determined to have a defense to repayment of a Direct Loan under this subpart, if at any time the Department concludes by a preponderance of the evidence that the institution committed an actionable act or omission and, as a result, the borrower suffered detriment of a nature and degree warranting the relief provided by a borrower defense to repayment as defined in this section. An actionable act or omission means—

(1) The institution made a substantial misrepresentation as defined in 34 CFR part 668, subpart F, that misled the borrower in connection with the borrower's decision to attend, or to continue attending, the institution or the borrower's decision to take out a covered loan;

(2) The institution made a substantial omission of fact, as defined in 34 CFR part 668, subpart F, in connection with the borrower's decision to attend, or to

continue attending, the institution or the borrower's decision to take out a covered loan;

(3) The institution failed to perform its obligations under the terms of a contract with the student and such obligation was undertaken as consideration or in exchange for the borrower's decision to attend, or to continue attending, the institution, for the borrower's decision to take out a covered loan, or for funds disbursed in connection with a covered loan;

(4) The institution engaged in aggressive and deceptive recruitment conduct or tactics as defined in 34 CFR part 668, subpart R, in connection with the borrower's decision to attend, or to continue attending, the institution or the borrower's decision to take out a covered loan; or,

(5)(i) The borrower, whether as an individual or as a member of a class, or a governmental agency has obtained against the institution a favorable judgment based on State or Federal law in a court or administrative tribunal of competent jurisdiction based on the institution's act or omission relating to the making of covered loan, or the provision of educational services for which the loan was provided; or,

(ii) The Secretary sanctioned or otherwise took adverse action against the institution at which the borrower enrolled under 34 CFR part 668, subpart G, by denying the institution's application for recertification, or revoking the institution's provisional program participation agreement under 34 CFR 668.13, based on the institution's acts or omissions that could give rise to a borrower defense claim under paragraphs (b)(1) through (4) of this section.

(c) *Violation of State law.* For loans first disbursed prior to July 1, 2017, a borrower has a borrower defense to repayment under this subpart if the Secretary concludes by a preponderance of the evidence that the school attended by the student committed any act or omission that relates to the making of the loan for enrollment at the school or the provision of educational services for which the loan was provided that would give rise to a cause of action against the school under applicable State law without regard to any State statute of limitations, but only upon reconsideration described under § 685.407(a)(1)(ii) or (a)(2)(i).

(d) *Exclusions.* An institution's violation of an eligibility or compliance requirement in the Act or its implementing regulations is not a basis for a borrower defense under this subpart unless the violation would otherwise constitute a basis for a borrower defense under this subpart.

(e) *Circumstances warranting relief.* In determining whether a detriment caused by an institution's act or omission warrants relief under this section, the Secretary will consider the totality of the circumstances, including the nature and degree of the acts or omissions and of the detriment caused to borrowers. For borrowers who attended a closed school shown to have committed actionable acts or omissions that caused the borrower detriment, there will be a rebuttable presumption that the detriment suffered warrants relief under this section.

### § 685.402  Group process for borrower defense.

(a) *Group process, generally.* Upon consideration of factors including, but not limited to, the existence of common facts and claims by borrowers, the likelihood of actionable acts or omissions that were pervasive or widely disseminated, and the promotion of compliance by an institution or other title IV, HEA program participant, the Secretary may determine whether a group of borrowers from one institution or commonly owned institutions identified by the Secretary has a borrower defense under this subpart.

(b) *Group process initiated by the Secretary.* The Secretary may identify and form a group based upon information from sources that include but are not limited to—

(1) Actions by the Federal Government, State attorneys general, other State agencies or officials, or other law enforcement activity;

(2) Lawsuits related to educational programs filed against the institutions that are the subject of the claims or judgments rendered against the institutions; or,

(3) Individual borrower defense claims pursuant to § 685.403.

(c) *Group process initiated in response to a third-party requestor application.* The Secretary will consider a request to form a group from a third-party requestor that complies with the requirements of this section. To comply with the requirements of this section, the requestor—

(1) Submits an application to the Secretary, under penalty of perjury, and on a form approved by the Secretary that—

(i) Identifies the requested group, including at minimum:

(A) The name of the institution or commonly owned institutions;

(B) The campuses or programs which are the subject of the claim, if applicable;

(C) A description of the conduct that forms the basis for the group borrower defense claim under the Federal standard in § 685.401(b);

(D) An analysis of why the conduct should result in an approved group borrower defense claim under the Federal standard in § 685.401(b); and,

(E) The period during which the activity in (c)(1)(i)(C) of this section occurred;

(ii) Provides evidence beyond sworn borrower statements that supports each element of the claim made in this paragraph (c)(1), including but not limited to evidence demonstrating the actionable acts or omissions asserted were pervasive or widely disseminated;

(iii) Provides the names and other identifying information of borrowers in the group to the extent available; and

(iv) For requests submitted by a legal assistance organization, includes a certification that the requestor has entered into a legal representation authority with each borrower identified as a member of the group; and,

(2) Provides any other information or supporting documentation reasonably requested by the Secretary within 90 days of the Secretary's request.

(3) The Secretary may consolidate multiple group applications related to the same institution or commonly owned institutions.

(4) Once the Secretary determines that the third-party requestor's application is materially complete, the Secretary will provide notice to the institution of the third-party requestor's application. The institution will have 90 days to respond to the Secretary regarding the third-party requestor's application request to form a group under this paragraph (c).

(5) The Secretary will provide a response to any materially complete third-party requestor group request under this paragraph (c) within two years of receipt. That response will be sent to the third-party requestor and the institution and includes:

(i) Whether the Secretary will choose to form a group and a definition of the group formed; and

(ii) Any additional information needed from the third-party requestor to continue the third-party requestor requested group process.

(6)(i) If the Secretary denies in whole or in part a third-party requestor's request to form a group under the process described in this paragraph (c), for reasons other than that the Secretary already has formed a group that includes the members of the proposed group or has findings that cover the members of the proposed group, the third-party requestor submitting the group claim may request that the

Secretary reconsider the decision upon the identification of new evidence that was not previously available to the Secretary in forming the group.

(ii) The third-party requestor submitting the group claim under this paragraph (c) must request reconsideration of the group formation no later than 90 days from the date of the Secretary's initial decision regarding formation of the group.

(iii) The Secretary will provide a response to the third-party requestor that requested reconsideration of the group's formation and the institution after reaching a decision on the reconsideration request.

(d) *Process after group formation.* Upon formation of a group of borrowers under this section, the Secretary—

(1) Designates a Department official to present the group's claim in the institutional response process described in § 685.405;

(2) For borrowers who have an application pending with the Secretary prior to the formation of the group, notifies those borrowers that they are an identified member of the group formed under this section and follows § 685.403(d) or (e) as appropriate;

(3) For borrowers whose names were submitted by the third-party requestor and that can be identified by the Secretary, or that can otherwise be identified by the Secretary, if the borrower is not in default and does not have a separate application pending with the Secretary, follows the procedures under § 685.403(d) except that interest on the loan will stop accumulating immediately;

(4) For borrowers whose names were submitted by the third-party requestor and that can be identified by the Secretary, or that can otherwise be identified by the Secretary, if the borrower is in default and does not have a separate application pending with the Secretary, follows the procedures under § 685.403(e) except that the interest on the loan will stop accumulating immediately;

(5) For possible group members that the Secretary cannot identify, takes reasonable steps to identify and notify potential members of the group, and if the Secretary ultimately is able to identify any additional members, follows the process under paragraphs (d)(3) and (4) of this section to allow those additional members to opt-in the group formed; and,

(6) If the Secretary later identifies a borrower that should have received the benefits as described under paragraph (d)(3) or (4) of this section, either prior to the adjudication of the group or after an adjudication that results in the approval of a group borrower defense, retrospectively applies the benefits available to the borrower under those subparagraphs and no other consequences will apply.

### § 685.403 Individual process for borrower defense.

(a) *Individual process, generally.* (1) If § 685.402 does not apply to an individual borrower who has submitted a borrower defense application, the Secretary will initiate a process to determine whether the individual borrower has a borrower defense under this subpart.

(2) If § 685.402 applies to an individual borrower who is covered under a group borrower defense application being considered by the Secretary, that group borrower defense application will toll the timelines under § 685.406 on adjudicating the individual borrower application.

(3) Paragraph (a)(1) of this section will not apply to claims covered by a group claim under § 685.402, including claims submitted prior to the formation of such a group, until after the Secretary makes a decision on that group claim.

(b) *Individual process.* (1) The Secretary will consider a borrower defense claim from an individual borrower to be materially complete when the borrower—

(i) Submits an application to the Secretary, under penalty of perjury and on a form approved by the Secretary with the following information:

(A) A description of one or more acts or omissions by the institution;

(B) The school or school representative attributed with the act or omission;

(C) Approximately when the act or omission occurred;

(D) How the act or omission impacted their decision to attend, to continue attending, or to take out the loan for which they are asserting a defense to repayment; and,

(E) A description of the detriment they suffered as a result of the institution's act or omission;

(ii) Provides additional supporting evidence for the claims made under subparagraph (b)(1)(i) of this section, if any;

(2) The individual must provide any other information or supporting documentation reasonably requested by the Secretary.

(c) *Individual borrower status.* Upon receipt of a materially complete application under this section, the Secretary—

(1) Designates a Department official to present the individual's claim in the institutional response process described in § 685.405;

(2) Notifies the borrower that the Department will adjudicate the claim under § 685.406(c); and

(3) Places all the borrower's loans in forbearance in accordance with paragraph (d) of this section or stopped enforcement collections in accordance with paragraph (e) of this section, as applicable.

(d) *Forbearance.* The Secretary grants forbearance on all of the borrower's title IV loans that are not in default in accordance with § 685.205 and—

(1) Notifies the borrower of the option to decline forbearance and to continue making payments on the borrower's loans, and the availability of income-contingent repayment plans under § 685.209 and the income-based repayment plan under § 685.221; and,

(2) Does not charge interest on the borrower's loans beginning 180 days from the date the borrower was initially granted forbearance under this paragraph (d) if the Secretary has failed to make a determination on the borrower's claim by that date and continuing until the Department notifies the borrower of the decision.

(e) *Loan collection activities during adjudication of borrower defense claim.* The Secretary—

(1) Suspends collection activity on all defaulted title IV loans until the Secretary issues a decision on the borrower defense claim;

(2) Does not charge interest on the borrower's loans beginning 180 days from the date the Secretary initially suspended collection activity under subparagraph (e)(1) of this section if the Secretary has not made a determination on the borrower's claim by that date and continuing until the Department notifies the borrower of the decision;

(3) Notifies the borrower of the suspension of collection activity and explains that collection activity will resume no earlier than 90 days following final adjudication of the borrower defense claim if the Secretary determines that the borrower does not qualify for a full discharge; and

(4) Notifies the borrower of the option to begin or continue making payments under a rehabilitation agreement or other repayment agreement on the defaulted loan.

### § 685.404 Group process based on prior Secretarial final actions.

(a) For purposes of forming a Secretary-initiated group process in accordance with § 685.402(b), the Department official may consider final actions as described in § 685.401(b)(5)(ii).

(b) For groups based on prior Secretarial final actions in accordance

with this section, § 685.405 will not apply to the affected institutions.

### § 685.405    Institutional response.

(a) For purposes of adjudicating a borrower defense claim other than those based on prior Secretarial final actions in accordance with § 685.404, the Department official notifies the institution of the group claim under § 685.402 or individual claim under § 685.403 and requests a response from the school. Such notification also may include, but is not limited to, requests for documentation to substantiate the school's response.

(b)(1) The notification in paragraph (a) of this section tolls any limitation period by which the Secretary may recover from the institution under § 685.409.

(2) The Department official requests a response from the institution, which will have 90 days to respond from the date of the Department official's notification.

(c) With its response, the institution must submit an affidavit, on a form approved by the Secretary, certifying under penalty of perjury that the information submitted to the Department official is true and correct.

(d) If the institution does not respond to the Department official's information request within 90 days, the Department official will presume that the institution does not contest the borrower defense to repayment claim.

### § 685.406    Adjudication of borrower defense applications.

(a) *Adjudication.* The Department official adjudicates a borrower defense claim in accordance with this section.

(b) *Group process, adjudication.* (1) For a group formed under § 685.402, the Department official makes a recommendation to the Secretary regarding adjudication after considering any evidence related to the claim, including materials submitted as part of the group application, individual claims that are part of the group, evidence in the Secretary's possession, evidence provided by the institution during the institutional response process described in § 685.405, and any other relevant information.

(2) For a group of borrowers under § 685.402 for which the Department official determines that there may be a borrower defense under § 685.401(b), there is a rebuttable presumption that the act or omission giving rise to the borrower defense affected each member of the group in deciding to attend, or continue attending, the institution, and that such reliance was reasonable.

(c) *Individual process, adjudication.* For an individual process under § 685.403, the Department official adjudicates the borrower defense using the information available to the official and makes a recommendation to the Secretary regarding adjudication. The Department official considers any evidence related to the claim, including materials submitted as part of the individual application, evidence in the Secretary's possession, evidence provided by the institution during the institutional response process described in § 685.405, and any other relevant information.

(d) *Additional information needed from the school or individual.* If the Department official requests additional information from the school, the school must respond to the Department official's information request within 90 days. If the Department official requests additional information from the individual, the individual must respond to the Department official's information request within 90 days.

(e) *Secretary decision.* The Secretary makes a final decision after taking into account the Department official's recommendation and the record compiled under §§ 685.402, 685.403, 685.404, 685.405, and 685.407, as applicable.

(f) *Written decision.* The Secretary issues a written decision as follows:

(1) *Approval of a Borrower Defense Claim.* If the Secretary approves the borrower defense claim—

(i) The written decision states the Secretary's determination and the relief provided as defined in § 685.401 on the basis of that claim.

(ii) The Secretary places a borrower's Direct Loans associated with a group borrower defense claim into forbearance until the Secretary discharges the loan obligations under § 685.212(k). If any balance remains on the Direct Loans not associated with the borrower defense claim, those loans will return to their status prior to the claim process. The Secretary resumes collection activities on those Direct Loans not associated with the borrower defense claim no earlier than 90 days from the date the Department official issues a written decision. No interest will be charged on the loans during the forbearance period.

(2) *Denial of a Borrower Defense Claim*—(i) *Denial, group.* If the Secretary denies the borrower defense claim, the written decision states the reasons for the denial, the evidence upon which the decision was based, and the loans that are due and payable to the Secretary. The Secretary informs the borrowers that for the Direct Loans associated with the group borrower defense claim, those loans will return to their status prior to the group claim process. The Secretary resumes collection activities on the Direct Loans associated with the group borrower defense claim no earlier than 90 days from the date the Secretary issues a written decision. The Secretary also informs individual borrowers from the group claim initially adjudicated under § 685.406(b)(1) of their option to file a new borrower defense application under an individual process in accordance with § 685.403.

(ii) *Denial, individual.* If the Secretary denies the borrower defense claim, the written decision states the reasons for the denial and the evidence upon which the decision was based. The Secretary informs the borrowers that their loans will return to their status prior to the claim process. The Secretary resumes collection activities on the loans under which a forbearance or stopped collection was granted during adjudication of the claim in accordance with §§ 685.403(d) and (e), no earlier than 90 days from the date the Secretary issues a written decision. The Secretary also informs the borrower of the opportunity to request reconsideration of the claim pursuant to § 685.407.

(3) *Copies of written decisions.* The Secretary provides copies of the written decision in this subsection to:

(i) An individual whose claim was adjudicated under § 685.406(c), as applicable;

(ii) The members of the group whose claims were adjudicated under § 685.406(b)(1), as applicable;

(iii) The school; and,

(iv) The third-party requestor who requested the group claims process, as applicable.

(g) *Adjudication, timelines.* (1) The Secretary will issue a decision on a group or individual borrower defense claim under the following timelines:

(i) For a group claim under § 685.402(c), within 1 year of the date the Department official notified the third-party requestor under § 685.402(c)(5).

(ii) For an individual claim under § 685.403, within the later of July 1, 2026 or 3 years after the date the Department determines the borrower submitted a materially complete application.

(2) The timelines in paragraph (g)(1) of this section will not apply for additional adjudications carried out as part of the reconsideration process in § 685.407.

(3) An individual claim under § 685.403 that is included in a group claim under § 685.402 will be subject to the adjudication timeline for that group under paragraph (g)(1)(i) of this section, and any timelines associated with

individual adjudication in paragraph (g)(1)(ii) of this section will be tolled until the Secretary renders a decision on the claim under § 685.402.

(4) The Department official will provide an interim update to the individual borrower submitting a claim under § 685.403, the third-party requestor requesting a group process under § 685.402, and the institution contacted for the institutional response under § 685.405 no later than 1 year after the dates in paragraph (g)(1) of this section. Such notification will—

(i) Indicate the Department official's progress in adjudicating the claim or claims; and,

(ii) Provide an expected timeline for rendering a decision on the claim.

(5) If the Secretary does not issue a written decision under paragraph (e) of this section on loans covered by certain claims by the dates identified in paragraph (g)(1) of this section, the loans, or portion of the loans in the case of a Direct Consolidation Loan, will not be enforceable by the Department against the borrower and the school will not be liable for the loan amount.

### § 685.407   Reconsideration.

(a) The decision of the Secretary is final as to the merits of the borrower defense and any discharge that may be granted on the claim. Notwithstanding the foregoing—

(1) If the borrower defense is denied, an individual may request that the Secretary reconsider their individual borrower defense claim on the following grounds:

(i) Administrative or technical errors;

(ii) Consideration under an otherwise applicable State law standard under § 685.401(c) but only for loans first disbursed before July 1, 2017; or,

(iii) Identification of evidence that was not previously provided by the borrower and that was not identified in the final decision as a basis for the Department official's determination;

(2)(i) If the borrower defense is denied for a group claim adjudicated under § 685.406(b)(1), any of the third-party requestors that requested to form a group under § 685.402(c) may request that the Secretary reconsider the borrower defense for the reasons provided under (a)(1)(i) through (iii) of this section. A third-party requestor's reconsideration request made in accordance with subparagraph (a)(1)(ii) of this section must provide:

(A) The applicable State law standard;

(B) Why the third-party requestor requests use of such State law standard;

(C) Why application of the State law standard would result in a different outcome for the group than adjudication under the Federal standard; and

(D) Why the applicable State law standard would lead to a borrower defense.

(ii) An individual borrower from a group claim initially adjudicated under § 685.406(b)(1) may not file a reconsideration request under this section.

(3) The borrower or third-party requestor that requested to form a group under § 685.402(c) must request reconsideration under this section no later than 90 days from the date of the Department official's written decision, for any decisions issued on or after the effective date of these regulations.

(4)(i) The Secretary will consider a reconsideration request under paragraph (a)(1) or (a)(2)(i) of this section in which the individual or third-party requestor—

(A) Submits an application under penalty of perjury to the Secretary, on a form approved by the Secretary; and,

(B) Provides additional supporting evidence for the reconsideration claims made in this paragraph (a)(4)(i), if any; and

(ii) The borrower or third-party requestor submitting the reconsideration request must provide any other information or supporting documentation reasonably requested by the Secretary regarding the reconsideration request.

(b) The Secretary designates a different Department official than the one who conducted the initial adjudication.

(c) If accepted for reconsideration by the Secretary, the Department official follows the procedures in § 685.405 to notify the institution of the claim and the basis for the group's borrower defense under § 685.402 or individual's borrower defense under § 685.403 for purposes of adjudicating reconsideration of the borrower defense claim and to request a response from the school to the reconsideration request.

(d) If accepted for reconsideration by the Secretary, the Secretary follows the procedures in § 685.403(d) for granting forbearance and § 685.403(e) for defaulted loans, as applicable.

(e) The Department official adjudicates the borrower's reconsideration request under § 685.406, makes a recommendation to the Secretary, and the Secretary provides notice of the final decision upon reconsideration in accordance with § 685.406(f).

(f)(1) The Secretary may reopen at any time a borrower defense application that was denied. If a borrower defense application is reopened by the Secretary, the Secretary follows the procedures in § 685.403(d) for granting

forbearance and for § 685.403(e) for defaulted loans, as applicable.

(2) Upon reopening a borrower defense application under paragraph (f) of this section, the Department official adjudicates the claim under § 685.406, makes a recommendation to the Secretary, and the Secretary provides notice of the final decision on the reopened case in accordance with § 685.406(f).

### § 685.408   Discharge.

(a) The Secretary discharges the obligation of the borrower in accordance with the procedures described in subpart D of this part.

(b) Members of a group that received a written notice of an approved borrower defense claim in accordance with § 685.406(f)(1) may request to opt out of the discharge for the group.

### § 685.409   Recovery from institutions.

(a)(1) For loans first disbursed on or after July 1, 2023, the Secretary may collect from the school, or in the case of a closed school, a person affiliated with the school as described in § 668.174(b) of this chapter, any liability to the Secretary for any amounts discharged or reimbursed to borrowers for claims approved under § 685.406.

(2) Notwithstanding paragraph (a) of this section, the Secretary may choose not to collect from the school, or in the case of a closed school, a person affiliated with the school as described in § 668.174(b) of this chapter, any liability to the Secretary for any amounts discharged or reimbursed to borrowers under the discharge process described in § 685.408, under conditions such as:

(i) The cost of collecting would exceed the amounts received; or

(ii) The claims were approved outside of the limitations period in paragraph (c) of this section;

(b) The Secretary will not collect from the school any liability to the Secretary for any amounts discharged or reimbursed to borrowers for an approved claim under § 685.406 for loans first disbursed prior to July 1, 2023, unless:

(1) For loans first disbursed before July 1, 2017, the claim would have been approved under the standard in § 685.206(c)(1);

(2) For loans first disbursed on or after July 1, 2017, and before July 1, 2020, the claim would have been approved under the standard in §§ 685.222(b) through (d); or

(3) For loans first disbursed on or after July 1, 2020, and before July 1, 2023, the claim would have been approved under the standard in § 685.206(e)(2).

(c)(1) The Secretary will initiate a proceeding to collect from the school

the amount of discharge or reimbursement for the borrower resulting from a borrower defense under § 685.408 no later than 6 years after the borrower's last date of attendance at the institution;

(2) The limitations period described in paragraph (c)(1) of this section will not apply if at any time prior to the end of the limitations period—

(i) The Department official notifies the school of the borrower's claim in accordance with § 685.405(b);

(ii) A class that may include the borrower is certified in a case against the institution asserting relief that may form the basis of a claim in accordance with this subpart; or

(iii) The institution receives written notice, including a civil investigative demand or other written demand for information, from a Federal or State agency that has power to initiate an investigation into conduct of the school relating to specific programs, periods, or practices that may have affected the borrower, for underlying facts that may form the basis of a claim under this subpart.

(3) For a borrower defense under § 685.401(b)(5), the Secretary may initiate a proceeding to collect at any time.

(4) The tolling of the limitations period described in paragraph (c)(2) of this section will cease upon the issuance of a written decision denying an application under § 685.406(f)(2).

(d) In requiring an institution to repay funds to the Secretary based on successful borrower defense claims under this subpart, the Secretary follows the procedures described in 34 CFR part 668, subpart H.

### § 685.410  Cooperation by the borrower.

To obtain a discharge under this subpart, a borrower must reasonably cooperate with the Secretary in any proceeding under this subpart.

### § 685.411  Transfer to the Secretary of the borrower's right of recovery against third parties.

(a) Upon the granting of any discharge under this subpart, the borrower is deemed to have assigned to, and relinquished in favor of, the Secretary any right to a loan refund (up to the amount discharged) that the borrower may have by contract or applicable law with respect to the loan or the contract for educational services for which the loan was received, against the school, its principals, its affiliates, and their successors, its sureties, and any private fund.

(b) The provisions of this section apply notwithstanding any provision of State law that would otherwise restrict transfer of those rights by the borrower, limit or prevent a transferee from exercising those rights, or establish procedures or a scheme of distribution that would prejudice the Secretary's ability to recover on those rights.

(c) Nothing in this section limits or forecloses the borrower's right to pursue legal and equitable relief against a party described in this section for recovery of any portion of a claim exceeding that assigned to the Secretary or any other claims arising from matters unrelated to the claim on which the loan is discharged.

### § 685.499  Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice will not be affected thereby.

[FR Doc. 2022–23447 Filed 10–31–22; 8:45 am]

**BILLING CODE 4000–01–P**